**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - X
                            :
GLEN FALLS INSURANCE        :
COMPANY a/s/o HAROLD and    :
LAUREN HEINZ,               :
            Plaintiffs,     :CIVIL ACTION NO:303 CV 105
                            :(Dominic J. Squatrito,
VS                          : U.S.D.J.)
                            :
COMMAND FORCE SECURITY      : Hartford Courthouse
SYSTEMS, INC.,              :
            Defendant.      :
                            :
- - - - - - - - - - - - - - X

Deposition of THOMAS J. KLEM, taken pursuant to the Federal Rules of Civil Procedure, before Kimberly M. White, CSR, LSR, (Lic#SHR433) Licensed Shorthand Reporter and Notary Public within and for the State of Connecticut, held at the Morrison, Mahoney & Miller, LLP, One Constitution Plaza, Hartford, Connecticut, on March 16, 2004 at 10:14 a.m.

DEL VECCHIO REPORTING SERVICES
LICENSED SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT 06443
203-245-9583   FAX 203-245-2760   800-839-6867
HARTFORD                              STAMFORD

DEL VECCHIO REPORTING SERVICES, LLC
203 245-9583

**Page 2**

1  APPEARANCES:

2  ON BEHALF OF THE PLAINTIFFS:
   JOSEPH MASCARO, ESQ.
3  MORRISON, MAHONEY & MILLER, LLP
   One Constitution Plaza
4  Hartford, Connecticut  06103

7  ON BEHALF OF THE DEFENDANT:
8  MICHAEL P. MEZZACAPPA, ESQ.
   KAUFMAN, BORGEEST & RYAN, LLP
9  200 Summit Lake Drive, First Floor
   Valhalla, New York  10595

**Page 3**

1       T H O M A S  J. K L E M,
2  of 24 Robert Road, Stoughton, Massachusetts, having
3  first been duly sworn, was deposed and testified as
4  follows:
5              DIRECT EXAMINATION
6  BY MR. MEZZACAPPA:
7       Q    Good morning, Mr. Klem. My name is Michael
8  Mezzacappa. I represent the defendant in the
9  litigation -- I represent the defendant, Command
10 Force Security, in this litigation. I'm going to ask
11 you a series of questions this morning and
12 undoubtedly into this afternoon.
13           If at any point you don't understand my
14 questions, please just tell me. Also, all your
15 answers have to be verbal so that the court
16 stenographer can take them down.
17           Is that clear?
18      A    Yes, it is.
19      Q    Okay. And did you state your full name for
20 the record already?
21      A    (Indicating.)
22      Q    Okay. Please state your full name for the
23 record.
24      A    Thomas Klem, K-l-e-m.
25      Q    And what is your date of birth, sir?

**Page 4**

1       A    10/16/44.
2       Q    And where were you born?
3       A    Washington, D.C.
4       Q    Are you presently employed?
5       A    Yes.
6       Q    By whom?
7       A    I'm the president of my own company,
8  T. J. Klem & Associates, LLC.
9       Q    And where is that located?
10      A    Stoughton, Massachusetts.
11      Q    And how long have you been the president of
12 that company?
13      A    Ten years.
14      Q    What is your highest level of education to
15 date?
16      A    I have a master's of fire protection
17 engineering from Worcester Polytechnical Institute,
18 Worcester, Mass.
19      Q    And when did you receive that degree?
20      A    1994.
21      Q    And prior to that time, where did you get
22 your bachelor's degree?
23      A    University of Maryland.
24      Q    And in what year did you get that?
25      A    1971.

Page 5

1  Q   And in what specialty or major?
2  A   Fire protection and business.
3  Q   Was that a double major?
4  A   Yes.
5  Q   When you graduated from college at the
6  University of Maryland in 1971, where did you go to
7  work?
8  A   I was currently employed at the Prince
9  George's County, Maryland fire department.
10 Q   And in what capacity?
11 A   At the time, I was the executive assistant
12 to the fire chief; but I held various roles,
13 responsibilities, throughout the twelve-year career
14 that I had with PG County Fire Department.
15 Q   And when did your career there start?
16 A   1966.
17 Q   And in what capacity did it start?
18 A   As a firefighter.
19 Q   And for what -- how many years were you a
20 firefighter at Prince George's County Fire Department
21 before becoming anything else?
22 A   Probably three years, rough estimate.
23 Q   And what was your next job title with Prince
24 George's County Fire Department after being a
25 fireman?

Page 6

1  A   I was a fire officer, first rank, at that
2  time, and in the department was fire sergeant.
3  Q   And for how many years did you spend as a
4  fire sergeant?
5  A   Roughly four or five. Then there was a
6  lateral transfer at that level to fire investigator,
7  and let's see if I can -- fire inspector. There we
8  go. Couldn't come up with that.
9  Q   And could you estimate for me the number of
10 years you were a fire inspector at Prince George's?
11 A   Fire inspector spans the next rank, too.
12 Inspector's out of the fire marshal's office. I was
13 promoted to captain in approximately 1970, and I was
14 maintained and was assigned out of the fire marshal's
15 office to the engineering and inspection division.
16 So I -- it spans two different ranks, that time
17 period. And I would say it's probably a total of
18 roughly five years.
19 Q   Okay. And after -- what was the next rank
20 that you attained at the Prince George's County Fire
21 Department after the one you just described?
22 A   After fire captain, I was appointed
23 executive assistant to the fire chief.
24 Q   And when you left Prince George's, was that
25 the highest level you had attained, executive

Page 7

1  assistant?
2  A   Yes.
3  Q   And in what year did you leave the employ of
4  Prince George's County Fire Department?
5  A   In 1976.
6  Q   And where did you go to work after that?
7  A   I went to work at the United States Fire
8  Administration, a U.S. government agency at the time
9  under the Department of Commerce.
10 Q   And how many years did you work for that
11 agency?
12 A   From 1976 to 1982.
13 Q   And what was your job title when you first
14 were employed by them in 1976?
15 A   I was a -- the investigator for United
16 States Fire Administration.
17 Q   And what were your job responsibilities with
18 that title?
19 A   To investigate major fire occurrences
20 throughout the United States and to develop
21 investigative fire protocols for use, dissemination,
22 training and data collection throughout the country.
23 Q   And for what period of time did you hold
24 that job title at that agency?
25 A   There was no change in job title

Page 8

1  throughout -- from 1976 through 1982. There was
2  increases in grade or pay grade, but the title stayed
3  the same.
4  Q   What about the responsibilities? Did they
5  also remain the same during those six years?
6  A   In general, yes. Yes.
7  Q   And after leaving there in 1982, what did
8  you do?
9  A   I went to the National Fire Protection
10 Association.
11 Q   Also known as NFPA?
12 A   Also known as.
13 Q   Okay. And what did you -- what did you do
14 for NFPA in 1982?
15 A   In 1982 I was the chief fire investigator.
16 Q   And what were your responsibilities in that
17 role?
18 A   To investigate for the agency, the
19 association, major fire occurrences throughout the
20 world and to develop investigative reports that
21 summarized the lessons learned from these major
22 incidents and to integrate the lessons learned back
23 into the NFPA code development process. In addition,
24 I had responsibility -- since I was concurrently
25 obtaining a master's degree in fire protection

Page 9

1 engineering -- to disseminate information in the
2 latest engineering technology to the engineering
3 staff that I had responsibility for.
4    Q    And for what period of time were you with NFPA?
5
6    A    1982 to 1994.
7    Q    And did your job title change during those
8 12 years?
9    A    No, not really. Insignificant. No. Pay
10 increase and that type of thing, but no change in
11 title.
12   Q    What about your responsibilities over those
13 12 years? Did they change in any way other than what
14 you've described already?
15   A    Just increases in number of employees that
16 report to me, you know, changed significantly, if
17 that is what you're driving at. But basically the
18 same responsibility throughout the tenure.
19   Q    I'm sorry?
20   A    I'm sorry. You didn't interrupt me. I just
21 thought of other things.
22   Q    Go ahead.
23   A    So responsibility, yeah. I guess I would
24 expand that to -- I had responsibility to testify to
25 Congress. I had responsibility to serve on various

Page 10

1 governmental -- federal government committees to
2 develop increased levels of protection, such as the
3 Department of Transportation. I was assigned as the
4 NFPA representative to work with DOT in developing
5 improved standards of flammability, human behavior
6 reaction, training of the staff -- "staff" meaning
7 the flight attendants and crew -- with regard to fire
8 safety issues: When to evacuate, when to land an
9 airplane, you know, when certain conditions of fire
10 are reported on aircraft. That general type of
11 thing. I think there was several other committees
12 like that that I also served on, but I'd have to
13 think about it.
14       But that was generally what I did. When
15 NFPA developed partnerships with the federal
16 government and so forth, I would be assigned to that
17 liaison role if that role was created as a result of
18 an investigation, and it would not be untypical to do
19 that.
20   Q    Can you estimate for me the number of times
21 in the last ten years you've testified at trial?
22   A    Forty-nine approximately -- oh, excuse me.
23 At trial? I take that back. Probably five, six
24 times. That number may be a little bit more that.
25 I'm being conservative.

Page 11

1    Q    When you were answering 49, were you
2 including the five or six times at trial as well as,
3 say, 45 other times at depositions similar to this?
4    A    Yeah, roughly. Roughly. Certainly the
5 balance is in depositions and hearings and that type
6 of thing, but -- and to a lesser extent, at trial.
7    Q    Are you including your testimony before
8 Congress when I said the last ten years in
9 testifying?
10   A    No, I am not.
11   Q    Okay. Did you testify before any
12 congressional committee in the last ten years?
13   A    No.
14   Q    How many times did you testify before a
15 congressional committee in your lifetime?
16   A    Twice.
17   Q    And what were those committees?
18   A    I don't remember the name of the committee.
19 One was after the One Meridian Plaza. I believe I'm
20 correct at that. I would do a more thorough search,
21 but my recollection is that one after the Meridian
22 Plaza and one for hotel fire safety in high-rise
23 buildings, so I think -- that's a grouping, so --
24 high-rise fire safety was the issue, and I think it
25 was prompted by One Meridian Plaza, if I'm recalling

Page 12

1 correctly. And one was with regard to the mobile
2 home fire safety standard that was being considered
3 by Congress. I believe that's the times.
4    Q    Have you ever testified, either at a
5 deposition or at trial, for this firm, Morrison,
6 Mahoney & Miller?
7    A    Yes, I have.
8    Q    On how many occasions?
9    A    Probably five or something like that.
10   Q    And do you have a recollection of whether
11 those five occasions were at trial or at deposition
12 or what is the combination of those?
13   A    I don't believe I've ever gone to trial with
14 Morrison, Mahoney & Miller representing the client.
15 That's what I recall.
16   Q    When was the last time you testified, as you
17 sit here today, for Morrison, Mahoney & Miller before
18 today?
19   A    Off the top of my head, I think it's
20 probably about two years ago. We can look at that if
21 you need to be more precise, but my recollection was
22 it was regarding a warehouse -- or excuse me -- a
23 factory fire in Rhode Island, and we represented the
24 owner of the building.
25   Q    And have you testified for Morrison,

**13**

1  Mahoney & Miller's Boston office as well as the
2  Hartford office?
3     A    I've never testified before today for their
4  Hartford office. So another way of saying that is
5  that it's always been for Boston.
6     Q    Thank you. Was there a particular attorney
7  at Morrison, Mahoney & Miller that you testified for
8  in Boston?
9     A    I -- I have a number of them. If you want
10 me to list them, I can give it a try.
11    Q    Please do.
12    A    Joe Desmond is one; Gene Harney (phonetic)
13 was another -- and I recall twice being deposed with
14 Gene, and Joe I think only -- only once; and Joe
15 Flanagan, who was the partner. And I'm not sure
16 all -- Gene and Joe report to him, but I've had
17 probably three cases with Joe Flanagan; and then
18 there's another associate that works with Joe that is
19 not coming to mind that I think was standing in for
20 Joe. The primary contact was Joe Flanagan, you know,
21 and at least three, perhaps four times with Flanagan.
22         MR. MEZZACAPPA: Off the record.
23         (An off-the-record discussion was had.)
24 BY MR. MEZZACAPPA:
25    Q    Sir, I'm going to show you what's been

**14**

1  provided by your attorney to me as part of your
2  resume and list -- well, let me rephrase that.
3         I'm going to show you what's been provided
4  by your attorney as the list of the cases that you've
5  testified, either at deposition or at trial, from
6  1995 until 2002. It's part of your resume and some
7  other lists that your attorney gave me. For purposes
8  of this deposition, I'm just going to mark the
9  three-page document -- make it four-page document --
10 that's part of what I described as the list. We'll
11 let her mark it first. I'm sorry.
12         MR. MEZZACAPPA: If you can mark that.
13    (A document was marked Defendant's Exhibit 1 for
14              identification.)
15 BY MR. MEZZACAPPA:
16    Q    Sir, please take a look at that list, the
17 four pages, and tell me, if you could, which of those
18 cases you've testified at deposition for Morrison,
19 Mahoney & Miller.
20    A    I also see that you asked -- I'm going to go
21 back and correct the record on your question -- I
22 wasn't in front of Congress, though. Okay. Never
23 mind.
24         This Number 27, *Duro Industries vs. Sherle
25 Wagner*, is definitely one. I believe Number 30 is,

**15**

1  *Thom Realty vs. Baker Fire*, but that may be for
2  another one. I'm not 100 percent sure on that *Thom,
3  really*. Number 30 may be for Robinson & Cole. I'm
4  not 100 percent sure.
5     Q    Okay.
6     A    That seems to be the -- of the 41, knowing
7  that there's eight others. I think that's where we
8  would find one case for Morrison, Mahoney & Miller
9  that I testified is -- well, I know there's more. So
10 they must be in -- let me just go over -- if it's
11 important to you -- again, just to make sure I've
12 been inclusive with everything on what you have in
13 front of you.
14    Q    While you're looking, I'll ask another
15 question to move it along.
16         Would there be an updated list that would
17 have more cases since 2002, up till the present time,
18 that would be more inclusive of the number of times
19 you testified for Morrison, Mahoney & Miller?
20    A    Yes. It may be able to give more -- yes,
21 there is. You know, the updated one has 49 or -- and
22 I was just deposed last week -- perhaps 50. That
23 last one was not for Morrison, Mahoney & Miller, but
24 it seems to me that there's more cases; and it
25 certainly could clarify the record as to the number

**16**

1  of times involved versus the number of times deposed,
2  which is kind of squishy with me right now without
3  that complete list.
4     Q    Looking over that list, can you tell me in
5  which states you've been deposed? And if it's a
6  large number of them, then we'll break it down by
7  region, maybe.
8     A    Okay. The first one is a Missouri case; and
9  then the second one is Alabama; California;
10 California; Massachusetts; Arizona.
11    Q    Are they all listed on this list? Before
12 you go through all 41 on this list, are they listed
13 in what state you've been deposed or testified?
14    A    Well, the state that I've been deposed is
15 different than the state I -- that the suit was filed
16 and so forth, as you well know.
17    Q    Okay.
18    A    I couldn't tell you where I was deposed on
19 half of these, likely, but I think it's a pretty
20 complete citing of the case and who was represented.
21    Q    Okay. Have you ever testified in federal
22 court in Connecticut before?
23    A    Let me just -- I've testified in a
24 deposition; and in a court case in Connecticut, yes,
25 I have. In a federal court of Connecticut?

17

1  Q   Yeah. We'll start with the federal court of
2  Connecticut, to your knowledge.
3  A   Well, there's a case that I testified and it
4  was not -- I don't believe it was federal, but I
5  don't think it's listed here and it was for a
6  Connecticut attorney.
7  Q   Do you believe it was Connecticut state
8  court that you testified in for the Connecticut
9  attorney?
10 A   I'd have to check for -- to be 100 percent
11 sure.
12 Q   Okay.
13 A   I think it was state court as opposed to
14 federal court but. . .
15 Q   Have you ever testified at a deposition in
16 the state of Connecticut before today?
17 A   Yes. In cases that were filed, I have
18 testified. There was an automatic sprinkler case for
19 Cynthia Jaworski, and it's not included here in the
20 41 that are listed.
21 Q   Is that because it was before the year that
22 this list was inclusive of, 1995 to 2002?
23 A   It had to be. I don't know that to be
24 100 percent sure, but I usually keep it fairly up to
25 date.

18

1  Q   Okay.
2  A   After I testify, I usually update it.
3  Q   Okay.
4      MR. MEZZACAPPA: We're just going to call
5      for production of the updated list.
6  A   Sure.
7  BY MR. MEZZACAPPA:
8  Q   And if you could indicate on the updated
9  list the number of cases or circle the numbers when
10 you give it to your attorney, Mr. Mascaro, that
11 you've testified for Morrison, Mahoney & Miller, that
12 would be appreciated.
13 A   Okay.
14     MR. MASCARO: No objection there.
15 BY MR. MEZZACAPPA:
16 Q   This case, as you know, was instituted as a
17 subrogation action by the Glen Falls Insurance
18 Company as subrogee -- subrogor of Mr. and Mrs. Heinz
19 against my client.
20     My question is: Have you testified or been
21 retained by that insurance company before this case?
22 A   Not that insurance company. There may be a
23 relationship of that insurance company to other
24 insurance companies that I have testified for, but in
25 the name of that company that you specified, no.

19

1  Q   Okay. Have you ever been retained or
2  testified for the Encompass, E-n-c-o-m-p-a-s-s,
3  Insurance Company?
4  A   I certainly have worked for Encompass -- and
5  to be complete, before they were known as Encompass,
6  they were referred to as CNA. And I had a
7  relation- -- a professional relationship with CNA and
8  Encompass and have done investigative work, fire
9  protection analysis. And I feel sure that I have
10 testified in some of those cases, but I couldn't tell
11 you which ones they are without referring --
12 Q   When you said -- I'm sorry. If you weren't
13 done --
14 A   -- without referring to a complete 49
15 listing of the cases that I have been deposed or
16 court testimony.
17 Q   Okay. When you say you've had a
18 relationship -- a professional relationship with CNA
19 and Encompass, what do you mean by that?
20 A   Well, we -- my firm offers fire
21 investigation, fire protection engineering services
22 to clients. Clients in the fire investigative area
23 are many times insurance companies. CNA is -- or
24 Encompass is one of the many fire -- or excuse me --
25 many insurance companies that I work for and

20

1  retain -- and am retained on, cases that stemmed
2  either from what I call active fire investigation,
3  meaning the occurrence has been in a day or two of
4  notification, or review cases many years after the
5  investigation and do an evaluation or provide expert
6  testimony regarding the documentation and analysis
7  that was done of the event.
8  Q   And can you estimate for me how many times
9  the Encompass Insurance Company either retained you
10 or your business over the years?
11 A   Well, I think of my overall business,
12 Encompass is below 10 percent. You know, that's just
13 based on my knowledge of my business and an overall
14 dependency, quote/unquote, that I would have with
15 Encompass. It's probably much less than 10, but I
16 think for discussion purposes it certainly doesn't
17 dominate my client base, nor does it dominate my
18 business year to year.
19 Q   What about the CNA Insurance Company?
20 A   I was using CNA/Encompass collectively, so I
21 couldn't differentiate the cases that I've done for
22 CNA versus Encompass. I'm being inclusive of both.
23 Q   Today how do you know that company, as CNA
24 or by Encompass or something else?
25 A   I actually -- you know, I think they refer

21

1  to one another as CNA and Encompass, so I would
2  recognize, you know, when someone called and an old
3  holdover would say, This is so and so from CNA. You
4  know, I think it's -- you know, I think of the same
5  thing. I don't know of their business relationship
6  or the name of the company or how it is officially
7  supposed to be listed or represented.
8         MR. MEZZACAPPA: Can you put all my
9      requests at the back of the transcript so
10     that I can turn them into a formal demand.
11        COURT REPORTER: Sure.
12        MR. MEZZACAPPA: I should have told you
13     that before.
14        Just at this time -- this is not
15     directed, sir, at you but rather at your
16     attorney -- I still need a delineation or an
17     explanation of the relationships between
18     Encompass, Glen Falls and CNA based on
19     Mr. Mollenkoph's testimony --
20        MR. MASCARO: Understood.
21        MR. MEZZACAPPA: -- and based on this
22     testimony so far.
23  BY MR. MEZZACAPPA:
24     Q   Mr. Klem, when did you form your company?
25     A   1994.

22

1      Q   And how many employees do you have today?
2      A   I have four part-time employees, not
3  including myself.
4      Q   Are there any full-time employees at the
5  company?
6      A   Myself.
7      Q   And has that pretty much stayed consistent
8  since 1994 until the present time?
9      A   I think generally, yes.
10     Q   What are the names of the other employees of
11 your company who were with you at the time of this
12 fire that we've been discussing, which was July 23,
13 2001?
14     A   I had Joe Folger, Kevin Murphy, Bill
15 Cross --
16     Q   With a C or a K?
17     A   C.
18        -- Barry Gannon, Frank Hogan, Brian Dolph,
19 D-o-l-p-h, Bill Pucci, P-u-c-c-i.
20     Q   Anyone else?
21     A   At the time -- I think at 2001, that was who
22 I retained on a part-time basis.
23     Q   Are these individuals still with you today
24 on a part-time basis?
25     A   Most of them. We can break it down. When I

23

1  say "most," I don't know the number I listed. I
2  don't know if it's half or not. I can go through and
3  tell you who is still -- maybe that's the best way to
4  pursue it.
5      Q   Yeah. Who's still with you today?
6      A   Joe Folger, Kevin Murphy, Bill Cross, Brian
7  Dolph. And I think the rest of them are no longer --
8  are no longer with us.
9      Q   So Barry Gannon, Frank Hogan and Bill Pucci
10 you no longer utilize?
11     A   That's correct.
12     Q   Okay. And what are the job titles of these
13 part-time employees, starting with Mr. Folger?
14     A   He's a certified fire investigator, so he's
15 basically an investigator.
16     Q   Does he have a college degree?
17     A   Yes.
18     Q   Does he have a degree greater than a
19 bachelor's?
20     A   I don't believe so, but I'm not 100 percent
21 positive of that.
22     Q   How long has he been a part-time employee of
23 yours as of July 23, 2001? So prior to that date,
24 what period of time did you employ him?
25     A   Mr. Folger started soon after I formed the

24

1  company. I don't have the information of the exact
2  date, but I would say from around 1994 or '95 to
3  2001.
4      Q   And how did you first meet him?
5      A   I met him -- he was the deputy fire chief of
6  the Plymouth Fire Department, so I began my
7  relationship with Mr. Folger on an investigation that
8  I was conducting and interfacing with the authority
9  having jurisdiction, which was Deputy Chief Folger,
10 Plymouth Fire Department. Plymouth, Massachusetts
11 Fire Department.
12     Q   And in addition to working for you on a
13 part-time basis from about 1994 until today, where
14 else does he work, to your knowledge?
15     A   He does not work for anyone else.
16     Q   And is that true since about 1994 when he
17 started his employment with you?
18     A   Yes. He retired and then began working for
19 me part-time.
20     Q   And how old is he today?
21     A   Probably Joe is between 55 and 60.
22     Q   And what about Kevin Murphy? For what
23 period of time have you employed him on a part-time
24 basis?
25     A   Kevin came on a little later. I would say

25

1  in 1995 -- late part of '95, maybe even into '96 --
2  to the present.
3      Q    And what is his age?
4      A    He's about 45.
5      Q    And what is his educational background?
6      A    He has an undergraduate degree, college
7  graduate. And I don't believe any postgraduate work,
8  but I could be wrong.
9      Q    And what was his major, if you know, in
10 college?
11     A    I don't know.
12     Q    Is he a certified fire investigator?
13     A    Yes, he is.
14     Q    How does one become a certified fire
15 investigator?
16     A    The certifications are from -- that we hold
17 are from the International Association of Arson
18 Investigators, and there are certain criteria --
19 number of years of service, number of times
20 testifying as an expert fire investigator. And it is
21 a test that's issued -- or not issued, but given by
22 the International Association of Arson Investigators,
23 an international organization that requires testing
24 through various -- based on various treatises,
25 including NFPA 921, NFPA handbook -- you know, I

26

1  couldn't list all of the treatises, but it's a fairly
2  rigorous test for performing fire investigative work
3  and qualifying as an expert witness and being
4  experienced enough conducting investigations to meet
5  the minimum requirements of the International
6  Association of Arson Investigators.
7      Q    Are all these employees you listed for me
8  certified fire investigators?
9      A    No.
10     Q    Maybe it's easier to say who is not, out of
11 the employees you listed for me.
12     A    Bill Pucci and Brian Dolph are
13 graduate-degree fire protection engineers, master's
14 in fire protection engineers -- master's degree in
15 fire protection engineering. Sorry.
16     Q    But they're not certified fire
17 investigators, correct?
18     A    That's right.
19     Q    And was Kevin Murphy ever a fireman?
20     A    He still is.
21     Q    For which department?
22     A    He's a captain with the Plymouth,
23 Massachusetts fire department.
24     Q    Were you ever on the 921 committee? NFPA
25 921?

27

1      A    Not on the committee, I was not.
2      Q    Did you ever author or write any part of the
3  NFPA that exists currently?
4      A    Yes.
5      Q    When did you do that?
6      A    I developed an investigative protocol for
7  electrical investigations when I was with the United
8  States Fire Administration. That was adopted, nearly
9  in total, by NFPA and first listed as NFPA 907M. So
10 the investigative protocol was -- because it was
11 generated by the government -- was given to NFPA and
12 then they modified it. I can't tell you the extent
13 of which, only that if you read even 921 today, I can
14 see many of the things in principle that I developed
15 in that investigative protocol still pertinent and
16 standard. And then eventually NFPA 907M was folded
17 into NFPA 921.
18     Q    Are there any other parts of the NFPA which
19 you authored or contributed to?
20     A    Yes. The standard on telecommunications, I
21 authored. I was the chairman of a subcommittee that
22 authored three sections -- three chapters, I should
23 say -- of the telecommunications committee standard
24 recently developed.
25     Q    And when was that developed, what year?

28

1      A    First published in 19- -- or in 2000, I
2  believe, is the first year it was published. So it
3  was a brand-new committee.
4      Q    In what sections of NFPA today, if I opened
5  the book, would I find your contributions?
6      A    Only in the telecommunications committee.
7      Q    And is there a specific number or section
8  that I would look at to find that?
9      A    Well, the front of the -- if I understand
10 you right -- correctly, the front of the document
11 provides a listing of those people who are on the
12 committee. I don't believe it has a breakdown of who
13 was responsible for the various chapters in its
14 development. I can tell you that. My testimony is
15 that I was responsible as the subchairman who
16 developed three chapters on public sector response
17 and mitigation of hazards that are contained within
18 that standard.
19     Q    What percentage of your income do you derive
20 from testifying, either at a deposition or at trial?
21     A    Well, obviously it varies from year to year.
22 I think it's greater than 10 and less than 25 percent
23 would be my business sense and response to that.
24     Q    Talking now for the Heinz fire -- we'll call
25 it the Heinz fire today -- 34 Wildwood Drive in

29

1 Wilton, Connecticut, which occurred on July 23,
2 2001 -- in addition to yourself, who else from your
3 company had anything to do with the investigation of
4 that fire that's employed by you at that time?
5    A    Joe Folger and Kevin Murphy. And then as
6 the reporting process went on, I've had another fire
7 protection engineer, Alycia Wood, A-l-y-c-i-a Wood.
8 And I called her fire protection; she has not
9 graduated. She has been an intern for about a year
10 with me. She will graduate in May. She has an
11 undergraduate degree in chemical engineering and will
12 obtain a master's degree in fire protection
13 engineering in May of 2004. And she reviewed some
14 documents for me.
15    Q    When was it that she reviewed documents for
16 you?
17    A    Those documents were -- just to put it in
18 time perspective -- after the submission of reports
19 and in preparation for my deposition.
20    Q    And what documents, photographs, CD-ROMs or
21 any other form of communication or media did you
22 review in order to testify here today?
23    A    Oh, I reviewed reports. I reviewed
24 depositions of Command Force individual and
25 Mr. Heinz. I have reviewed the literature, both in

30

1 certain treatises that we can go into if you are
2 interested in that, being more elaborate or more
3 inclusive. I've done computer fire modeling. I've
4 done literature search on National Institute of
5 Standards and Technology, known as NIST, in
6 Gaithersburg on some of the latest studies on smoke
7 detector activation. And I -- I think that's fairly
8 inclusive. I may have left out something, but I
9 can't recall what that is.
10    Q    Okay. Just so I'm clear: In addition to
11 the deposition of my client, Matthew Matza from
12 Command Force, and in addition to the homeowner,
13 Mr. Heinz, you reviewed literature treatises,
14 computer file modeling, and you did some NIST,
15 N-I-S-T, searches; is that accurate?
16    A    I think it's fairly accurate, yes.
17    Q    Okay. The treatises you reviewed, could you
18 tell me what they are?
19    A    Portions of the Connecticut State Building
20 Code; portions of the 1993 NFPA 72; portions of the
21 1996 NFPA 17; portions of the NFPA 72, '99 edition --
22 let's see -- the NFPA handbook; NFPA life safety code
23 handbook; I probably researched the SFPE -- Society
24 of Fire Protection Engineers -- handbook on fire
25 protection engineering, probably the second edition;

31

1 NFPA 921. I think that's fairly accurate and
2 inclusive.
3    Q    The NFPA handbook on life safety -- the life
4 safety code handbook -- what edition was that, or
5 what year was that published and that you reviewed?
6    A    I don't know for sure. I know I have the
7 1994 edition. That's the oldest edition. And there
8 was one that was published after that that I have;
9 and I can't tell you exactly what it is, but it's
10 after 1994. It's based on the life safety code
11 post-1994. I just can't recall what year it is.
12    Q    If we leave a blank in the transcript, would
13 you be able to fill that in when you review your
14 transcript?
15    A    Absolutely.
16 _____
17    Q    When you're talking about the Connecticut
18 State Building Code, were you referring to BOCA,
19 B-O-C-A?
20    A    BOCA is part of the Connecticut State
21 Building Code, but it's the enacting legislation and
22 supplements as well that are included in my
23 statement.
24    Q    And what edition of the Connecticut State
25 Building Code did you review for purposes of your

32

1 testimony?
2    A    1999 and '99 supplement.
3    Q    *** And which NFPA, '93, '96 or '99, applied
4 at the time of this fire -- 72. I'm sorry. Which
5 NFPA 72 version would have applied at the time of
6 this fire? The '93, the '96, the '99 or something
7 else?
8    A    '96. I'd like to actually make reference
9 to my notes and file to make sure that that's
10 correct, if I could.
11         MR. MEZZACAPPA: Well, we will come back
12      to your notes and file later in the day. We
13      can put an asterisk next to it and say that's
14      based on your belief but you'd like to check
15      it, and that's fine.
16         THE WITNESS: Fair enough.
17         MR. MEZZACAPPA: And just put an asterisk
18      so I remember to ask him again about that
19      when he's looking at his notes.
20 BY MR. MEZZACAPPA:
21    Q    When were you first retained on this
22 particular fire which occurred on July 23, 2001?
23    A    Probably the day after the fire or the next
24 day. I know on the 25th Joe Folger and Kevin Murphy
25 were on the scene.

33

1 Q And who originally retained you on this
2 particular fire?
3 A A gentleman by the name of Dave Bostrom,
4 B-o-s-t-r-o-m, called me, and Jake Mollenkoph was a
5 principal interface after the notification. Did not
6 deal with Mr. Bostrom to any great degree after that
7 because of the magnitude of the loss, but was handed
8 off, so to speak, to Mr. Mollenkoph.
9 Q Now, prior to the time when Mr. Bostrom
10 called you -- withdrawn.
11     Is Mr. Bostrom, to your knowledge, at that
12 time an employee of the Encompass Insurance Company?
13 A Encompass or CNA. I don't know what the
14 name of the organization was at that time.
15 Q Okay.
16 A He currently still is with and now
17 communicates that he is with Encompass Insurance.
18 Q And when Mr. Bostrom had called you, did he
19 speak to you directly on the phone?
20 A Yes, he did.
21 Q And prior to that time, on how many times
22 had he -- Mr. Bostrom -- retained you at any time?
23     MR. MASCARO: Prior to this fire or?
24     MR. MEZZACAPPA: Prior to this fire.
25 BY MR. MEZZACAPPA:

34

1 Q My question is, if it was unclear: Prior to
2 this fire, on how many occasions had Mr. Bostrom
3 retained you or the company?
4 A Maybe -- I want to say -- it's probably
5 under ten, but I really don't know for sure.
6 Q And when he retained you for purposes of
7 this fire, did he tell you -- withdrawn.
8     What did he tell you?
9 A He wanted me to conduct origin and cause
10 investigation on the fire.
11 Q Did he give you any details on your first
12 conversation with you? In other words, what was the
13 sum and substance of the information he imparted to
14 you during that telephone call?
15 A He gave -- he told me it was a fairly big
16 loss, significant loss, a major home in Connecticut.
17 He told me of the name and address of the property.
18 He gave me contact information for Mr. Heinz and/or
19 his representative, and he told me that I would
20 probably be meeting, as I recall, Mr. Mollenkoph.
21 And I believe he mentioned Jerry Green at that same
22 time, who was another CNA, slash, Encompass employee.
23 Q Had Mr. Green -- Jerry Green -- ever
24 retained you prior to this time?
25 A Yes.

35

1 Q And on how many occasions?
2 A I want to say about the same number of
3 times. It's probably not more than ten, but
4 approximately ten.
5 Q And had Mr. Mollenkoph ever retained you
6 prior to this time?
7 A I believe he did once before that time. I
8 knew who he was. But not as frequent as Bostrom and
9 Green.
10 Q Since that time and up until today, has
11 Mr. Bostrom retained you?
12 A Probably three times since then.
13 Q And how about Mr. Green?
14 A Zero.
15 Q And how about Mr. Mollenkoph?
16 A Zero.
17 Q Since the date of this retention, July 23,
18 2001, did you testify in any cases for Mr. Bostrom,
19 Mr. Green or Jake Mollenkoph?
20 A I don't believe so, no.
21 Q On the occasions before July 23, '01 that
22 you did testify, were any of the -- was any of
23 testimony that you gave, either in a deposition or a
24 trial, for any of the cases that Mr. Bostrom,
25 Mr. Green or Mr. Mollenkoph retained you on?

36

1 A I'd have to check, but I guess my
2 inclination is to say no. There weren't any cases
3 like that that I recall.
4 Q If we leave a blank in the transcript, will
5 you be able to give a more definitive answer to that?
6 A I will try the best I can to answer that.
7 
8 Q Did you take notes when you first spoke to
9 Dave Bostrom on the telephone within days of this
10 fire?
11 A Yes.
12 Q And do you have those notes with you today?
13 A Yes, I do.
14 Q May I see them?
15 A They were provided to you. Would you like
16 to see mine?
17 Q You take yours out; I'll have mine. We'll
18 probably mark them and do it that way.
19     (Witness complied.)
20     MR. MEZZACAPPA: You want me to mark my
21     copy rather than his original?
22     MR. MASCARO: Why don't you.
23     MR. MEZZACAPPA: Okay.
24     MR. MASCARO: As long as we're clear that
25     it's the same document.

37

1  MR. MEZZACAPPA: Well, that's -- my copy
2  gets a little washed out on the bottom, but
3  most of it is there.
   BY MR. MEZZACAPPA:
5  Q  Before we mark this, how many pages are
6  these notes?
7  A  Two that you asked about, the conversation
8  with Mr. Bostrom.
9  Q  This and this, like that (indicating)?
10 Okay.
11  MR. MEZZACAPPA: Let's just have this
12  marked.
13 A  Well, the way I have stapled it together are
14 original notes from Mr. Bostrom, and on the second
15 page is a briefing from Mr. Murphy.
16 BY MR. MEZZACAPPA:
17 Q  Okay.
18  MR. MEZZACAPPA: If we could have this
19  two-page document marked as Exhibit 2.
20  (A document was marked Defendant's Exhibit 2 for
21  identification.)
22 BY MR. MEZZACAPPA:
23 Q  Sir, I'm going to show you what's been
24 marked as Defendant's Exhibit 2 for identification.
25 For the purposes of the deposition, you can keep the

38

1  original in front of you and I'll keep the actual
2  marked copy, two pages.
3  Are these your notes -- is the first page of
4  this document your notes that you took when you spoke
5  to Mr. Bostrom?
6  A  Portions of them. Portions of the exhibit
7  are my notes for Mr. Bostrom.
8  Q  Okay. Which portion of the two-page exhibit
9  are your notes?
10 A  I would say a quarter of the way down,
11 adjacent to the date 7/24/01 and "Dave Bostrom,
12 Encompass," down to the bottom of -- although it's
13 not numbered -- page 1. The first page of that is
14 that initial conversation.
15 Q  Okay. And could you read for the record
16 your notes, please?
17 A  "7/24/01; Dave Bostrom, Encompass; new loss;
18 Wilton, Connecticut; 203-645-0774; after" -- "greater
19 than two o'clock," meaning after two o'clock. I made
20 a note: "203-284-8717, claim number 03447971,
21 7/23/01 DOL," and "near Warwick, 20 Bridgeport,
22 Harold and Lauren Heinz, 34 Wildwood Drive, Wilton,
23 Connecticut 06897." "C" means cell phone;
24 "203-253-0504; FM Dave Kohn, 203-834-6249; low-bed
25 storage; 8 a.m., left home; 11 a.m., alarm company";

39

1  and then "1.24 M."
2  Q  Do you know what "1.24 M" stands for?
3  A  No, I don't.
4  Q  Do you know what 11 a.m. stands for, "alarm
5  co."?
6  A  I think it was in the briefing of
7  Mr. Bostrom, he told me about what time of day the
8  alarm came in.
9  Q  You see where you put "low-bed storage"?
10 A  Yes.
11 Q  What does that indicate?
12 A  That the origin had been placed by the fire
13 marshal, the lower level on the bed, where storage of
14 materials were located.
15 Q  At the time you spoke to Mr. Bostrom, did he
16 fax over to you or give you any documents generated
17 by the Wilton Fire Department as a result of their
18 firefighting efforts or investigation?
19 A  No.
20 Q  Did you have more than one conversation with
21 Mr. Bostrom on that day?
22 A  I don't believe so.
23 Q  Did you agree to take the case at that time
24 based on what Mr. Bostrom told you?
25 A  Yes.

40

1  Q  Were there any other notes you made other
2  than on this one sheet as a result of your
3  conversations with Mr. Bostrom on that day?
4  A  I don't believe so.
5  Q  Did you speak to anyone else at the
6  Encompass Insurance Company that day?
7  A  No.
8  Q  Now, turning to page 2 of this document,
9  could you tell me what this reflects?
10 A  It reflects the next day who I'm talking to,
11 Kevin, and I -- Connecticut Fire, Encompass, just so
12 I know which case Kevin and I are talking about. And
13 then there's some notations that I made in that
14 conversation with Mr. Murphy.
15 Q  Before I have you read the notes, the
16 "Kevin" obviously is Kevin Murphy, your employee?
17 A  Yes.
18 Q  Okay. And between him and Mr. Folger --
19 withdrawn.
20  Did there come a time after getting the
21 telephone call from Dave Bostrom that you assigned
22 anyone in your office to do this investigation for
23 you?
24 A  Yes.
25 Q  And who did you assign?

41

1  A  Mr. Folger and Mr. Murphy.
2  Q  And between the two of them, who was going
3  to be the head of that team?
4  A  Mr. Folger.
5  Q  Did you give Mr. Folger any instructions
6  before you sent him to the fire premises?
7  A  I gave them the information on page 1 of
8  Exhibit 2.
9  Q  Did you give Mr. Folger anything else before
10 he was sent to the fire premises?
11 A  No.
12 Q  Did you give Mr. Murphy anything different
13 than you gave to Mr. Folger?
14 A  I gave nothing to Mr. Murphy.
15 Q  Okay. Could you read your notes in on this
16 second page of Exhibit 2, please.
17 A  "Harold H.; son's bedroom; cat in, confined;
18 8 a.m.; lights off; furniture, paren, son's; table
19 lamp; three-way lamp, 150 watt, fell over." And I
20 think we've gone over Connecticut, slash, Fire and
21 Encompass.
22 Q  Yes. Thank you.
23    These notes were based on what Kevin told
24 you on 7/24/01?
25 A  Yes.

42

1  Q  And do these notes refresh your recollection
2  as to the conversation you actually had with Kevin?
3  A  Yeah. I think from the outline that -- and
4  the -- that I've read into the record, I kind of know
5  what he was saying to me.
6  Q  Okay. Now I want you to testify based on
7  your knowledge that you had at that time, on 7/24. I
8  realize from investigating the fire and talking to
9  other people, you might have learned something else
10 or in addition, but I want you to try to put your
11 mind-set back to 7/24/01, remember the conversation
12 with Kevin and tell me to the best of your
13 recollection, from reviewing these notes, what it is
14 Kevin said to you.
15 A  Well, I think that Kevin -- in this "son's
16 bedroom; cat in, confined" is a combination of facts
17 and interface that he and Mr. Folger did with the
18 fire marshal, Mr. Kohn, and what his determinations
19 were -- "he" or "him" being Mr. Kohn. And after that
20 is factual information that was gained from
21 Mr. Heinz.
22    8 a.m. being the time that he left the
23 occupancy; during that conversation with Mr. Heinz,
24 he relayed to our investigators that the lights were
25 off and there was furniture in the son's room and

43

1  there was a table lamp adjacent or within the room;
2  and the lamp was on the table, and it had a three-way
3  bulb in it and -- of the size and wattage of
4  150 watts -- that fell over. And that is a
5  combination of his visual observations and that which
6  was told to him by Fire Marshal Kohn.
7  Q  Before 7/23/2001, did you personally know
8  Fire Marshal Kohn?
9  A  No.
10 Q  Have you ever met Fire Marshal Kohn up until
11 today?
12 A  I may have had him in classes that I have
13 conducted, in presentations that I've made to
14 Connecticut and/or New York chapters, but I don't
15 recall -- and he might have been in those classes,
16 but I don't recall and couldn't point him out in a
17 room today.
18 Q  Now, from those notes, did you ask any
19 questions to Kevin Murphy? In other words,
20 Mr. Murphy told you some information; did you
21 question Mr. Murphy on 7/24/01?
22 A  I no doubt did.
23 Q  Okay. Do you remember what your questions
24 of him were?
25 A  I usually -- I don't remember the exact

44

1  words, but I can relate to you, if you want, what I
2  normally ask an investigationist.
3  Q  I don't really want the general information
4  of what you normally would ask unless you have a
5  specific recollection in this case of what you did
6  ask Mr. Murphy.
7  A  All I can testify to is that I ran him
8  through perhaps he might describe as the wringer of
9  what happened and when it happened and so forth. I
10 certainly feel confident that that is the case.
11 Q  And other than what you've told me so far
12 today that Mr. Murphy relayed to you, is there any
13 other information in your head that Mr. Murphy gave
14 to you after you ran him through the wringer of what
15 happened and when? In other words, did Mr. Murphy
16 tell you anything else other than what you have told
17 me so far?
18 A  Well, I recall that in the conversation --
19 and I believe it was on 7/24 -- in conversation with
20 Mr. Murphy, I got an idea of how extensive the fire
21 was and how the fire extended and an idea of the fire
22 department intervention. I learned that, I know,
23 very early on before they left, and they were only
24 there one day. So I feel confident that that's
25 accurate and truthful testimony.

## 45

1  Q    And did you speak to Fire Marshal Kohn on
2  the telephone?
3  A    I did not.
4  Q    Did Kevin tell you what Fire Marshal Kohn
5  related to him?
6  A    Yes. And some substance, you know, about
7  the cat and the son's room, the origin of the fire
8  area or the gain of the fire --
9  Q    Okay.
10 A    -- and his specific ignition scenario.
11 Q    Okay. Talking about the cat for a minute,
12 you have "cat in, confined." What do you mean by
13 that? What's your recollection of why you wrote
14 that?
15 A    Well, I asked -- I guess either I asked or
16 it was offered to me by Mr. Murphy during this
17 conversation that there was a cat in the room of
18 origin and that there was a child -- like a child's
19 gate. And I don't know how to exactly -- my children
20 are grown, so I don't know what the latest reference
21 is. A little gate to prevent people or children from
22 moving out of a bedroom, out of this specific room.
23 That was at the doorway.
24 Q    So it was your understanding that the
25 bedroom door was open and there was some kind of

## 46

1  child safety gate blocking a portion of the doorway
2  which would prevent the cat from walking out of the
3  room?
4  A    That's correct.
5  Q    Okay. Did you ever ask during that
6  conversation or any other conversations what would
7  have prevented the cat from jumping over the gate?
8  Did you ever have that conversation with anyone?
9  A    I don't think so.
10 Q    Did you ever learn the height of the gate
11 that was blocking -- partially blocking the open
12 doorway?
13 A    I don't think I know that information.
14 Q    Did you ever see a picture of this child
15 safety gate?
16 A    I don't believe so.
17 Q    Do you know if Mr. Folger or Mr. Murphy ever
18 took a picture of the child safety gate?
19 A    If it was still there, they would have. And
20 I don't recall, in reviewing the photographs, any --
21 that I would recognize as containing the gate.
22 Q    Do you know if the gate was porous or was
23 solid in material?
24 A    I do not.
25 Q    Concerning the lights off, what was your

## 47

1  understanding from speaking to Mr. Murphy on 7/24 of
2  the available lights in that bedroom?
3  A    I don't think we got generic in our
4  conversation. I learned more about the arrangement
5  of the lights after the 24th. But of concern at that
6  time was what was on in the room, meaning
7  electronic -- electronically. And I recall that
8  Mr. Murphy related to me that Mr. Heinz indicated to
9  him that there were no lights on in the bedroom when
10 he left at 8 a.m. on the 23rd of July, '01.
11 Q    Are you aware from reading Mr. Heinz's
12 testimony or were you aware before that time that
13 Mr. Heinz runs a store in the Bronx?
14 A    I didn't know until I read his deposition,
15 actually.
16 Q    Okay. And concerning what Mr. Heinz related
17 to Kevin Murphy, that there was a three-way lamp of
18 150 watts in the lamp, was that information that
19 Kevin got from Mr. Heinz to your knowledge, or did he
20 obtain it from any other source?
21 A    I don't know.
22 Q    Okay. Were there any pictures taken --
23 withdrawn.
24      Did this light bulb that was in the lamp in
25 the bedroom on the table -- did it survive the fire?

## 48

1  A    Portions of it did. I feel confident that
2  portions of it did.
3  Q    Okay. Were there photographs taken of that
4  light bulb?
5  A    I believe so, but to get to the chase, you
6  know, we retained the light and we would not have
7  separated the bulb from the lamp or light, and so
8  whatever was there at the time would have been
9  collected.
10 Q    Okay.
11 A    I mean, I feel sure that, you know, the bulb
12 is still there or portions of the bulb are still
13 there in the evidence locker, my evidence locker.
14 Q    So is it accurate to say that at some point
15 either you or members of your company removed the
16 lamp with the light bulb still screwed into it and
17 have that secured in your evidence locker today?
18 A    I know they have removed and tagged and
19 placed into evidence the lamp. I don't have any
20 independent recollection except for that which is
21 implicit, that the bulb is still in the lamp. And I
22 feel confident that if that is the case that none of
23 my trained and certified investigators would have
24 taken that bulb out of that lamp during the
25 collection process.