**Page 49**

Q  And where is your evidence locker today which contains this lamp and part of the bulb?

A  It's either in Hingham, Massachusetts or in Kingston. I have two lockers. Actually, I have four lockers at two locations, but I don't know which locker it's in or the location.

Q  Have photographs of this lamp ever been taken to your knowledge?

MR. MASCARO: By him or his agents or anyone?

BY MR. MEZZACAPPA:

Q  By anyone?

A  I think so. I think some of the photographs that are within the file show the lamp or portions of the lamp; I don't know how complete. I know portions of the lamp, I can recall in preparing for the deposition, I could see in some of the photos as well as where the lamp was plugged into, a factual piece of information and a photograph of same. So appliance cord of the lamp, in other words.

Q  From the time -- withdrawn.

When was the lamp secured or taken from the premises and put into the locker?

A  On the 24th.

Q  And who did that?

**Page 50**

A  Either Joe Folger or Kevin Murphy or in combination with one another.

Q  And was Fire Marshal Kohn made aware of the fact that the lamp was being taken from the premises?

A  I don't know.

Q  Was the lamp, the cord, the light bulb, any of the parts that were secured by Joe or Kevin ever tested by an electrical engineer?

A  No.

Q  Now, Mr. Heinz indicated to Kevin or Joe, and the information got back to you, that lights were off; is that correct?

A  Yes.

Q  Okay. Did Mr. Heinz ever relate to Mr. Folger or to Kevin, to your knowledge, that one of the -- one or more of the three-way positions on the three-way bulb was not working at the time of 7/23/01?

A  Yes.

Q  And when was that information relayed to them?

A  I -- I think while they were on the scene on the 24th.

Q  And did you have any discussions with Kevin or Joe about that?

**Page 51**

A  Absolutely.

Q  What were the sum and substance of your conversations with Kevin or Joe about that?

A  Well, we talked about, you know, ignition scenarios and plausibility of a lamp -- three-way lamp or a bulb actually in the state that it was alleged to have been and whether or not it was possible and/or plausible that some actions of the lamp being knocked over could result in the reuniting, so to speak, of the tungsten portion of the high-resistance coil within the bulb and whether or not -- if that scenario was indeed plausible -- whether or not it could have resulted in the ignition of readily available and easily ignitable combustibles, as we knew them, on the bed.

Could we take a real quick break just for five minutes?

MR. MEZZACAPPA: Sure. No problem.

(A recess was taken from 11:33 to 11:42 a.m.)

BY MR. MEZZACAPPA:

Q  Did you come to an opinion that the lamp was not lit in that bedroom that morning?

A  I think that was the general consensus of the investigators, certainly as they related to me.

Q  Okay. Did you form your own opinion from

**Page 52**

what Kevin -- did you form your own opinion from all the information you had that the lamp was not lit or lighted?

A  Well, I really don't know if I made that differentiation. I knew the testimony was from Mr. Heinz that that was the case, but I also know as an experienced investigator that some people at times can be mistaken. But that was the best information that we had. And subsequent, I've made the determination that it was really not relevant whether it was on or not, that it was a plausible scenario whether it was on or off, given the condition testified by Mr. Heinz regarding the light and the positions of the three-way switch or the three-way bulb; i.e., one of the wattages was burned out.

Q  Now, you came to your conclusions in this case, though, and authored your reports before Mr. Heinz was deposed, correct?

Mr. Heinz was deposed this year in 2004?

A  Yes.

Q  Is it fair to say that you came to your conclusions and had authored your reports and basically closed your file and had given Encompass an opinion before Mr. Heinz ever was deposed?

A  Well, I didn't close my file, but I

53

1 certainly gave Encompass my conclusions based on the
2 best information at the time of the writing of the
3 report, and that last one was in two thousand --
4 March, I believe, of 2003.
5    Q    Did you ever investigate a fire prior to
6 this that was caused by a lighted lamp?
7    A    Yes.
8    Q    And on the occasion -- on how many occasions
9 prior to this?
10    A    I'd say around 20 throughout my career, at
11 least. Maybe more than that, but I'm being
12 conservative.
13    Q    On those approximately 20 or more fires that
14 you investigated which were caused by a lighted lamp,
15 is the light bulb sufficient heat to ignite or start
16 a fire?
17    A    Well, you have to be -- you know, if the --
18 it depends on the wattage is what I'm getting around
19 to, and I can't recall -- certainly I don't think I
20 remember a one-watt light bulb being a subset of the
21 20 that I investigated. And if it was or if the
22 light bulb at the Heinz residence was at such a
23 wattage, I would have examined that a lot more
24 carefully. But in general, I think the literature is
25 relatively clear that based on the wattage of the

54

1 light and the nature of the combustible materials
2 that the bulb comes in contact with and any other
3 environmental conditions such as coverage -- in other
4 words, debris or materials covering the bulb -- and
5 the amount of energy that's released in that
6 geometry, you can get ignition -- certainly from 150,
7 175, down to about 60 watts, fairly well documented
8 in the literature. Other than that, I would not feel
9 comfortable without doing some probably demonstrative
10 testing and/or further literature search regarding
11 ignition phenomenon and light bulbs.
12    Q    This three-way light bulb that was in the
13 room of fire origin, in addition to the 150-watt
14 setting, what were the other two settings?
15    A    I don't know except for -- based on my
16 personal experience of buying light bulbs and what
17 wattages they are, and I probably made an assumption
18 it was similar wattage to the bulb in question.
19    Q    If the light bulb were unscrewed from the
20 lamp, would we be able to tell on the metal part, the
21 threaded metal part, what the three positions would
22 be?
23    A    I don't know. I would refer to a --
24 probably a person that's more knowledgeable about
25 that particular case.

55

1    Q    Was Mr. Heinz asked what the other positions
2 of the light bulb were other than 150 watts?
3         MR. MASCARO:  By whom?
4         MR. MEZZACAPPA:  By anyone at his
5         company.
6    A    I don't know. I don't know.
7 BY MR. MEZZACAPPA:
8    Q    Did you come to an opinion from speaking to
9 Mr. Murphy or Mr. Folger or from your own experience
10 that if the light was not lit or lighted, what was
11 the probability that when the lamp was knocked over
12 the filament could have relit or relighted?
13    A    We came to the conclusion that it was
14 possible and based -- we based that on interviewing
15 another person that we retained often on
16 investigations, an electrical engineer by the name of
17 Don Galler who is employed by MIT -- Massachusetts
18 Institute of Technology -- and a frequent associate
19 that's brought to the scene of investigations. He
20 did not come to this scene, but we discussed that
21 matter and it's reflected in our initial
22 investigative report. And then that, coupled with
23 when we began, you know, peeling the onion skin back
24 regarding that, relate our own experiences. And the
25 consensus of the investigators is that we have,

56

1 indeed, over our lifetime experience where filaments
2 have been partially connected and a shaking,
3 jiggling, movement of the home or foundation resulted
4 in a reillumination, so to speak, of a light bulb.
5 It was within each of our experiences. And if I'm
6 relaying Mr. Galler's statements to me correctly, he
7 said that he actually had also experienced it on a
8 forensic analysis.
9    Q    How do you spell Mr. Galler's name?
10    A    G-a-l-l-e-r.
11    Q    And did you personally call him on this
12 case?
13    A    Yes.
14    Q    What is his first name again? I'm sorry.
15    A    Don. Donald.
16    Q    And did you take any notes in your
17 conversation with Donald Galler regarding this case?
18    A    No, I didn't.
19    Q    When did you have the conversation with
20 Mr. Galler?
21    A    Within a month of the investigation. I'm
22 not sure where in that time frame it was, but it was
23 certainly before filing the report which was -- the
24 initial report, which was probably within a month.
25 And Mr. Galler's statement to us is reflected in that

57

1 initial report.
2  Q    Is he a professor -- what kind of a degree
3 does Mr. Galler have?
4  A    He has a master's degree in electrical
5 engineering.
6  Q    And he teaches or works at MIT?
7  A    He works at MIT.
8  Q    And do you have a telephone number for him?
9  A    I can look one up for you, if you like.
10 _____
11  Q    Yeah. We'll leave a blank in the
12 transcript. I'll ask you to give me the telephone
13 number and address for Mr. Galler.
14         MR. MASCARO: We'll do that later.
15         THE WITNESS: Okay. That's fine.
16         MR. MEZZACAPPA: Yeah. That's fine. You
17         can do it later. So long as counsel's
18         permitting me to do it before I see the
19         transcript back.
20         MR. MASCARO: Yeah. Subject to any
21         objections.
22 BY MR. MEZZACAPPA:
23  Q    Did you -- did Mr. Galler author anything to
24 you as a result of your conversation with him?
25  A    Did he offer anything?

58

1  Q    Author.
2  A    Author.
3  Q    Send you any written material?
4  A    No, he didn't.
5  Q    On how many occasions did you speak to
6 Mr. Galler about this scenario, this fire?
7  A    Probably just once. And then, you know,
8 offhand, you know, What's going on with that one, you
9 know, but the real substance was in one conversation.
10 You know, he may have, off the top of his head, you
11 know, say, Well, what's going on with that case and
12 something like that. I don't recall that
13 specifically, but I know it was one conversation that
14 I had with him.
15  Q    When Mr. Galler told you he experienced this
16 scenario before about light bulb or filament
17 relighting, was that with a lamp getting knocked
18 down?
19  A    I don't remember the specific circumstances.
20  Q    In your investigation of fires, did you ever
21 see a lamp knocked down and the filament reconnect as
22 a result of a lamp being knocked down?
23  A    No. Not that -- I mean, that's a level of
24 scenario determination that I might not have sought
25 out, so to speak, at the time of those

59

1 investigations. It may have occurred, but my
2 responsibility at that time was to determine cause
3 and not necessarily make a more rigorous
4 determination of whether or not there was a
5 reconnection. So it's possible that that occurred,
6 but I don't believe I would have obtained that level
7 of detail on the 20 or so cases that I've testified
8 to that I have investigated regarding lamps and
9 lights and light bulbs.
10  Q    Did you come to a conclusion from an
11 engineering standpoint that it was more likely than
12 not that the lamp was lit rather than that the light
13 bulb was unlit until the cat knocked it over, at
14 which point it then became relighted?
15  A    I -- I think that any of those are possible
16 and that it became, as I was assessing it, rather
17 insignificant or not relevant. I was satisfied that
18 we were dealing with a unique scenario and that
19 several subsets of that scenario were possible, one
20 involving that Mr. Heinz was mistaken and the light
21 was indeed lit; or equally plausible, less probable,
22 that the filament reconnected and started the
23 ignition scenario.
24  Q    Just so I'm clear, then: You came to a
25 conclusion that it was more likely or more plausible

60

1 that the lamp was left lit than the filament
2 reconnected when the cat knocked it over; is that
3 correct?
4         MR. MASCARO: I'm going to object to the
5         form. You can go ahead and answer it.
6  A    Okay. I was satisfied that we had a
7 scenario of ignition that dealt with the lamp coming
8 in contact with readily available, easily ignitable
9 materials to the exclusion of all other scenarios.
10 That I was very clear on.
11         And then exploring what possibilities were,
12 we came up with two: That either Mr. Heinz -- at
13 least two that I'll talk about -- Mr. Heinz was
14 mistaken and the light was indeed on and when the cat
15 knocked it over, then no reconnecting of the filament
16 was necessary; or two, that we did have, indeed, as
17 Mr. Heinz testified, that the filament -- or excuse
18 me -- that the lights were not on and that particular
19 lamp was not on, and coupled with his testimony that
20 all of the settings of the bulb were not accurate --
21 and by the way, we also talked to Mr. Heinz's son
22 about this, who seemed to corroborate it -- and that
23 that second subpart of the overall ignition scenario
24 was possible. And my assessment of the -- of the
25 probability of that is that it's possible; it can

Page 61

1  happen. How many times out of 100 knocking over a
2  lamp in that scenario would result in the ignition, I
3  feel, you know, it's a low probability, but
4  nonetheless, I deal in the low probability area.
5  Fire is a low probability occurrence, and yet there
6  are millions of them that occur every year.
7  BY MR. MEZZACAPPA:
8  Q    Did you or your employees investigate the
9  possibility that when the lamp was knocked over onto
10 the bed by the cat that the plug was partially
11 removed from the outlet in the wall and allowed for
12 arcing or beading or an ignition source at that
13 location?
14 A    Yes. We evaluated that.
15 Q    And what did you come to your determination
16 as?
17 A    That was not the case.
18 Q    And how did you rule that out?
19 A    One, that the -- and you'll see photographs
20 of that -- that the receptacle is -- I'll call it
21 tight within the receptacle. I think I hear that the
22 male portion of the plug for the lamp was in the
23 receptacle and it was tight and that, further, the
24 physical evidence of the burn pattern indicated that
25 the position -- i.e., tight -- in the receptacle was

Page 62

1  in fact how it was arranged at the time of the fire.
2  Physical evidence corroborated that.
3       MR. MEZZACAPPA: Excuse me.
4       MR. MASCARO: Off the record for a
5       second.
6  (An off-the-record discussion was had.)
7  BY MR. MEZZACAPPA:
8  Q    Were you done with your answer? I
9  apologize.
10 A    I believe I was.
11 Q    Okay. You've mentioned an initial report.
12 Who authored the initial report from your office?
13 A    Mr. Folger.
14 Q    Did he sign that report?
15 A    No, he did not.
16 Q    Who -- and who authored the next report?
17 Authored. I'm sorry.
18      Who authored the next report issued by your
19 office?
20 A    I did.
21 Q    Was that the last report regarding this case
22 issued by your office?
23 A    Yes.
24 Q    Did you sign the report?
25 A    No, I did not.

Page 63

1  Q    What is the date of the first report
2  authored by Mr. Folger?
3  A    I don't -- we don't list the date that it
4  leaves our office, so to speak. We list the date of
5  the loss. I can say to you that it more likely than
6  not was within a month of the occurrence.
7  Q    Do you have anything at your office to
8  indicate when it was that the Folger report, the
9  first report, went out, was mailed or faxed or when
10 it left your office for the first time?
11 A    I may have something that could track that.
12 But I want to state for the record, I had a computer
13 crash in and around this time, so I'm hoping that the
14 document that I'm referring to is still present, and
15 I can't say that 100 percent.
16 Q    What document is it that you're referring to
17 that could track when the initial report from
18 Mr. Folger went out of your office?
19 A    Probably the date that I billed for my
20 services, our services.
21      MR. MEZZACAPPA: At this time I'm
22      requesting production of the date that the
23      first report went out, and if that's -- if
24      the only way to determine that is by the bill
25      for your services, then we would request that

Page 64

1       as well. And we'll follow up all the
2       requests in writing.
3  BY MR. MEZZACAPPA:
4  Q    And what was the date of the second report?
5  A    It was March of 2003.
6  Q    Did Mr. Mollenkoph ask you for a second
7  report?
8  A    No.
9  Q    Did anyone on behalf of Encompass Insurance
10 Company ask you for a second report?
11 A    Yes.
12 Q    Who?
13 A    I think Joe did.
14 Q    When you say "Joe," who do you mean?
15 A    Joe Mascaro.
16 Q    Your attorney?
17 A    Yes.
18      THE WITNESS: Right? Mascaro?
19      MR. MASCARO: Yeah.
20      THE WITNESS: Okay.
21 BY MR. MEZZACAPPA:
22 Q    And when, for the first time, were you asked
23 to issue a second report?
24 A    We probably began kicking it around three or
25 four months before then when we initially talked

65

1  about what else could be done in terms of more
2  in-depth evaluation of relevant factors regarding
3  this case.
4     Q    And do you know the exact date that the
5  second report was issued?
6     A    Again, I would refer to billing records, but
7  it's in and around the time frame that I've stated.
8         MR. MEZZACAPPA:  At this time we're going
9         to request production of the date that the
10        second report left your office, and if that
11        requires the billing documents to tell us
12        that, then we request those.
13 BY MR. MEZZACAPPA:
14    Q    The second report, was it prepared in draft?
15    A    No.  I mean, I no doubt had -- you know, I
16 didn't sit down and finish the report in one sitting.
17 I mean, I didn't submit any drafts.  I, certainly,
18 likely, went through word changes and that type of
19 thing, which would be normal in any production of a
20 report, but I never submitted a draft report outside
21 my office.
22    Q    And do you have copies of the drafts of that
23 second report maintained in your files in your
24 office?
25    A    No, I don't.

66

1     Q    Who was the first person that that second
2  report was sent to?
3     A    It was sent to Morrison, Mahoney & Miller.
4     Q    And who paid you for your services for the
5  issuance of the second report?
6     A    Encompass, CNA.
7     Q    Was Encompass or CNA copied on that second
8  report that was sent to Morrison, Mahoney & Miller?
9     A    No.
10    Q    And what was the bill for the preparation of
11 the second report?
12    A    Well, the report also included research and
13 was probably $4,000 or thereabouts.
14    Q    And have you been paid?
15    A    Yes.
16    Q    And who issued the check?
17    A    CNA or Encompass.
18    Q    Do you have a copy of the cancelled check?
19 Do you have a copy of the check before you cashed it
20 or deposited it?
21    A    No.
22    Q    Did you ever speak to anyone at Encompass or
23 CNA before issuing your second report?  And by that I
24 mean, after issuance of the first report by your
25 company, did you speak to anyone at Encompass or CNA

67

1  regarding the contents of the second report before
2  you issued it?
3     A    I don't think so.
4     Q    Was Mr. Folger ever reprimanded, censured,
5  sanctioned or any other action taken by you as a
6  result of his issuance of the first report in this
7  case?
8     A    No.
9     Q    Did you ever review the first report issued
10 by Mr. Folger or authored by Mr. Folger before it
11 went out?
12    A    Yes.
13    Q    Did you ever make changes to Mr. Folger's
14 report before it went out?
15    A    High probability that I did.
16    Q    Do you remember what your changes were to
17 Mr. Folger's report before it went out?
18    A    No, I don't.
19    Q    Do you remember what percentage of
20 Mr. Folger's report you changed before it went out?
21    A    Five percent would be a very conservative
22 amount, meaning that it was more likely less than
23 that.
24    Q    At the time that you issued Mr. Folger's
25 report -- I'm sorry.  Withdrawn.

68

1         At the time that you reviewed Mr. Folger's
2  report and before it went out, did you agree with the
3  conclusions that Mr. Folger had found?
4     A    Yes.  And I just may add for clarity, when I
5  review reports, I place my signature block or
6  coauthor position on the front page of the report.
7  So I'm implying by that a review and an agreement
8  with the technical content of the report.
9     Q    And did you do that in this case?
10    A    I did.
11    Q    I'm going to show you what's been marked
12 previously at a deposition in this case as
13 Defendant's Exhibit C.  I believe this to be the
14 report from Mr. Folger, which is a cover sheet and
15 then eight numbered pages.
16        Could you please take a look at that.
17        (Witness complied.)
18    A    Okay.
19    Q    Is that the report that Mr. Folger issued in
20 this case?
21    A    I would have issued it, not Mr. Folger, and
22 it's not complete.
23    Q    When you say you issued it, what do you mean
24 by that?
25    A    It's electronically sent to me and I make

**Page 69**

1  the final sign-off, acceptance, before it's sent out,
2  and I would send it out myself.
3  Q    This is the report that Mr. Folger authored;
4  is that correct?
5  A    He principally authored, but we both signed
6  off on it. He wrote certainly the majority of the
7  report.
8  Q    Is there anywhere in your offices where a
9  copy of this is maintained which contains a signature
10 by either you or Mr. Folger?
11 A    No.
12 Q    When you say this report that I've handed to
13 you is incomplete, what do you mean by that?
14 A    There's no photos, and if there was any
15 available information such as initial fire department
16 reports and opinions and sketches and diagrams, they
17 would have been attached to this report. And I don't
18 see any of that.
19 Q    For the record, your attorneys did provide
20 us with your resume and fire marshal's reports and
21 photographs as well.
22      But for now I'm just sticking with the
23 contents of the report itself rather than any photos
24 or attachments to it.
25      Is that a complete copy of the contents of

**Page 70**

1  the report issued by your firm regarding this case,
2  absent the photos, absent any fire marshal's reports
3  or documents prepared by other entities?
4  A    I would refer to it, if we're all
5  comfortable, as the text.
6  Q    The text of the report. That's fine.
7       Is that a fair and accurate representation
8  of the text of the first report issued by your
9  office?
10 A    Yes.
11 Q    And are any drafts kept of this report in
12 any file in your office, either e-mail or
13 correspondence or electronically, to your knowledge?
14 A    No.
15 Q    And to whom was this report sent, to your
16 knowledge?
17 A    Morrison, Mahoney & Miller. I take that
18 back. I was referring to the second report.
19 Q    That's fine.
20 A    To Jake Mollenkoph.
21 Q    And he was the adjuster at the Encompass
22 Insurance Company who you were dealing with after
23 Mr. Bostrom turned over the case to him; is that
24 correct?
25 A    That's right.

**Page 71**

1  Q    And when you sent this report to
2  Mr. Mollenkoph, did you have any discussions with him
3  regarding its contents at the time you sent it or
4  thereafter?
5  A    Would you repeat your question, please.
6  Q    Sure. At the time that you sent this report
7  or at any time after you sent this report, did you
8  have any discussions regarding its contents with
9  Mr. Mollenkoph?
10 A    No discussions with Mr. Mollenkoph about the
11 report.
12 Q    Okay. Did you have any discussions yourself
13 or did your employees, to your knowledge, have any
14 discussions with any employees of Encompass Insurance
15 Company at the time or after you sent this report?
16 A    Nothing regard- -- we had conversations
17 afterwards is what -- the fine line I'm
18 differentiating, but it never was about the report,
19 to the best of my knowledge.
20 Q    Okay. Did the conversations that --
21 and let's break it down -- did you or your employees
22 have conversations after the report went out?
23 A    Yes.
24 Q    Okay. Was it you or was it your employees?
25 A    Me.

**Page 72**

1  Q    And who did you speak to?
2  A    Jake Mollenkoph.
3  Q    And on how many occasions after this report
4  was sent to him did you speak to him?
5  A    I believe just the one time.
6  Q    Okay. Was that on the telephone or in
7  person?
8  A    In person.
9  Q    And what was the sum and substance of that
10 conversation?
11 A    It was -- I guess the way to summarize it
12 was Jake, Mr. Mollenkoph, was perplexed at the
13 severity of the loss compared to what he felt were
14 early warning -- early notification of the fire
15 department built-in provisions contained within the
16 home.
17 Q    When you spoke to Mr. Mollenkoph on that
18 occasion, where was it that you were in person with
19 him?
20 A    I was at 34 Wildwood Drive in Wilton,
21 Connecticut.
22 Q    And when was that?
23 A    October of 2001.
24 Q    And how do you know it was October?
25 A    Before I came down, I checked my log of my

73

1  activities and I wanted to know about what time that
2  I came down here -- or there, to Wilton,
3  Connecticut -- and I refreshed my memory and it was
4  in October of 2001.
5  Q    And do you have your log of activities with
6  you today?
7  A    No, I don't.
8  Q    Was any portion of that log of activities
9  produced for us relevant to the activities on this
10 case?
11 A    No, it was not.
12 Q    Is the log of activities kept for this case
13 or is it generally a log of activities you keep on a
14 daily basis in your office?
15 A    It's a log that I keep in -- you know, like
16 today I will have an entry "Hartford," you know,
17 "Wilton," just to remind me when that happened.
18 There is never any content of substance in there
19 besides birthdays and that type of thing that I keep.
20 I don't use it for that function.  Only to try to
21 manage things and with questions like what you've
22 asked or asked of me.
23 Q    And where do you maintain the log of
24 activities?
25 A    On my desk.  In a notebook on my desk.

74

1  Q    And in order to determine that you met with
2  Mr. Mollenkoph at 34 Wildwood Drive in October of
3  2001, was there a specific entry referencing this
4  case in there that made you be able to find that
5  information?
6  A    Yes.  "Wilton, Connecticut."  I mean, we've
7  done other cases in Wilton, but I knew that that was
8  only one of two times that we had been to Wilton,
9  Connecticut and I don't believe the other one was for
10 Encompass.
11      MR. MEZZACAPPA:  At this time I'm going
12      to request production of a redacted log of
13      activities showing us just the log of
14      activities relevant to this case.  So that
15      I'm clear on the record, you can redact every
16      other thing that doesn't interfere or refer
17      to this case, and we just want a log of
18      activities of your activities on this
19      particular case from the time you first got
20      the first call on it up until the present
21      time.
22           THE WITNESS:  Fair enough.
23           MR. MASCARO:  I understand that the
24      request will be made form- -- formally after
25      the deposition?

75

1           MR. MEZZACAPPA:  Yes.
2           MR. MASCARO:  We will reserve our rights
3      to all requests.
4           MR. MEZZACAPPA:  Okay.
5  BY MR. MEZZACAPPA:
6  Q    And when you met Mr. Mollenkoph in October
7  at the house at 34 Wildwood, was anyone present with
8  you?
9  A    I think there were representatives like of
10 Nutmeg Adjusters or -- you know, I don't remember.  I
11 mean, I was focused on Mr. Mollenkoph.  And, you
12 know, my recollection would be that that is the only
13 one I could say for sure was there; although it seems
14 quite unlikely there weren't other people there, but
15 I couldn't tell you who that was.
16 Q    Do you remember the name of the person that
17 was there from Nutmeg?
18 A    No.
19 Q    Does the name Richard Ouellette,
20 O-u-e-l-l-e-t-t-e, refresh your recollection as to
21 the name of the person?
22 A    Well, it refreshes that he works for Nutmeg,
23 but I couldn't tell you for sure that he was the one.
24 I mean, we've had contact with him in the past, so I
25 really don't know.

76

1  Q    Okay.  And when you spoke to Mr. Mollenkoph,
2  was anyone else present from his office at that time?
3  A    I don't believe so.
4  Q    And what was the sum and substance of the
5  conversation, other than what you already told me,
6  that you had with him at that scene?
7  A    I'm going to go back before I answer that
8  question and adjust the record.
9       There was a representative -- an attorney
10 that was also present from Morrison, Mahoney & Miller
11 by the name of -- I think it was Catherine or
12 Christine.
13      MR. MASCARO:  Catherine Stewart?
14      THE WITNESS:  Yes.
15 A    Catherine Stewart.  And I'm sorry.  I wanted
16 to make sure.
17 BY MR. MEZZACAPPA:
18 Q    That's okay.  And I appreciate it.
19 A    And I don't remember what your question is
20 now.
21 Q    That's fine.  We'll back up a little bit.
22      Before you had the meeting with
23 Mr. Mollenkoph and Ms. Stewart at the fire scene in
24 October, did you speak to Mr. Mollenkoph on the phone
25 to arrange the meeting?

Page 77

1  A  No.
2  Q  How was it that the meeting came to be in
3  October at the scene?
4  A  I had discussions with Catherine -- and
5  probably for a month earlier; five, ten minutes at a
6  time; maybe two or three times, you know -- about
7  what capabilities that T. J. Klem & Associates had
8  and what types of additional fire protection
9  engineering analysis could be done that might provide
10 additional insight into other conclusions that might
11 be able to be drawn regarding a forensic analysis of
12 this case.
13 Q  Did Mr. Mollenkoph or anyone suggest to you
14 that they wanted to pursue a third party to recover
15 some of the moneys they were going to have to pay as
16 an insurance company to Mr. Heinz here?
17 A  I don't think they ever said anything
18 overtly like that.
19 Q  Did they ever say words to that effect?  In
20 other words, did you get the message that after
21 authoring the first report they were unhappy and
22 wanted to spread their loss or recoup some of the
23 money they were going to have to pay the homeowner as
24 a result of this fire?
25 A  No.

Page 78

1  Q  Did Mr. Mollenkoph ever tell you that he had
2  any other engineering firms or fire investigators
3  look at your report, the first report?
4  A  I have no knowledge of that.
5  Q  Did Mr. Mollenkoph ever express any
6  dissatisfaction with your first report?
7  A  No.
8  Q  Did anyone ever express dissatisfaction with
9  your first report?
10 A  No.
11 Q  Let me have mark- -- well, I'm going to show
12 you what's previously been marked as the text -- I'll
13 leave it clipped to what it had.  There's some
14 statutes attached to it as well, some sections of the
15 NFPA and building code.
16     But I'm going to show you right now -- what
17 I want you to focus on is the seven numbered pages of
18 a previous exhibit marked as Defendant's Exhibit D
19 for identification on January 7th of this year in
20 this case.
21     And my question is:  Does that represent the
22 text of the second report that was issued by you?
23 A  Yes.
24 Q  The first line of that indicates "T. J.
25 Klem & Associates has been asked to supplement its

Page 79

1  fire investigative analysis of the 7/23/01 fire at
2  34 Wildwood Drive in Wilton, Connecticut."
3     Can you please tell me who asked you to
4  supplement your analysis.
5  A  Attorneys at Morrison, Mahoney & Miller.
6  Q  I don't want to know the sum and substance
7  of the conversations that your attorneys had with
8  you, but I do want to know in what form you were
9  asked to supplement it; in other words, did it come
10 in the form of a telephone call or a letter or some
11 other communication, an e-mail or anything like that?
12 A  No e-mails.  I'm quite sure of that.  But
13 certainly verbally.
14 Q  And when you were asked to supplement that
15 report, did you take notes based on that
16 conversation?
17 A  No.
18 Q  And do you recall in what month and what
19 year you were asked to supplement your report?
20 A  I would say late 2002 or beginning of 2003.
21 Q  And can you estimate for me how many months
22 after the issuance of the first report it was that
23 you were asked to supplement to the first report?
24 A  About a year.  Probably a little more than a
25 year.

Page 80

1  Q  At the time that you were asked to
2  supplement your report, is it fair to say that the
3  house at 34 Wildwood Drive in Wilton, Connecticut no
4  longer was in the condition that it was in on 7/24/01
5  when Mr. Folger had first seen it?
6  A  I have no idea.
7  Q  In order to supplement your report, did you
8  ever go back to the scene of the fire?
9  A  I was there in October and I did not return.
10 Q  You were there in October of 2001; is that
11 correct?
12 A  Correct.
13 Q  So in late 2002 or early 2003 you were asked
14 to supplement your report and you did not go back to
15 the fire scene in order to do that; is that correct?
16 A  That's correct.
17 Q  Did you have anyone from your company go
18 back to the fire scene in order to amend your report
19 or supplement your report?
20 A  No.
21 Q  Did you have available to you any
22 photographs other than the photographs -- withdrawn.
23     In order to supplement your report, were any
24 additional photographs made available to you other
25 than the ones you had previously taken or employees

81
1  of your company had taken when they investigated this
2  in July of 2001?
3     A    I generated photos on that date in October.
4  So none were given to me except for that which -- as
5  I recall -- I certainly generated photographs -- two
6  rolls, as I recall -- and I don't remember any other
7  photographs being provided to me besides what we
8  generated on the initial 7/25/01 initial
9  investigation and my visit in October of '01 and the
10 two rolls that I have referred to -- rolls of film.
11    Q    Now, on 7/21 -- 7/24/01, did Mr. Murphy or
12 Mr. Folger photograph the fire premises?
13    A    Yes.
14    Q    And are their photographs -- have their
15 photographs been attached to any of the reports in
16 this case?
17    A    Yes.
18    Q    And which report in this case were their
19 photographs attached to?
20    A    What we've been terming the first report or
21 Defendant's Exhibit C.
22    Q    And that's the first report, correct?
23    A    Correct.
24    Q    And then you took photos in October of 2001,
25 and did you attach those to your second report?

82
1     A    I don't believe so.
2     Q    Do you have those photos with you today?
3     A    I do.
4          MR. MEZZACAPPA:  Counsel, just for the
5     record, were those produced to us?
6          MR. MASCARO:  Off the record.
7     (An off-the-record discussion was had.)
8  BY MR. MEZZACAPPA:
9     Q    Sir, when you took photographs in October of
10 2001, were they on a digital camera or were they
11 using a digital camera?
12    A    They were not of a digital camera, but I
13 have the photos digitized in the developing process.
14    Q    When you say "digitized in the developing
15 process," is that so that they can be -- are they
16 placed on a disk so that they could be e-mailed?
17    A    Yes.
18    Q    And did you take the photographs yourself?
19    A    Yes.
20    Q    Approximately how many photographs did you
21 take?
22    A    Probably 72.
23    Q    And were those photographs date-stamped?
24 Did you have a camera that was able to date-stamp the
25 photographs?

83
1     A    I don't believe so.
2     Q    Do you have the photographs with you today?
3     A    Yes.
4     Q    May we see those.
5     (Witness handing attorney photographs.)
6          Before taking the photographs in October of
7  2001, had the lamp already been removed from the
8                  premises?
9     A    Yes.
10    Q    Had anything else been removed from the
11 premises to your knowledge?
12    A    No.
13    Q    How was the premises preserved between
14 July 24, '01 and October, when you took your
15 pictures?
16    A    I'm not sure.
17    Q    When you arrived in October of 2001, was
18 that the first time that you saw the fire scene
19 yourself?
20    A    Yes.
21    Q    How much was your company paid for the first
22 report that you issued?
23         MR. MASCARO:  Object to the form.  You
24    can go ahead and answer it.
25    A    Probably around -- I would say $1,000,

84
1  something like that.
2          MR. MEZZACAPPA:  Let the record reflect
3     the witness has handed me two envelopes
4     filled with photographs.  Just looking
5     through the photographs, let the record
6     reflect they are not date-stamped, and I do
7     not believe I've seen them before today.
8          So we will request production of a full
9     set of all the photographs taken by this
10    witness in October of 2001.
11 BY MR. MEZZACAPPA:
12    Q    Sir, other than the attorney Ms. Stewart and
13 Jake Mollenkoph and yourself, was anyone else at the
14 premises whose name you can recall at this time when
15 you took these photographs?
16    A    No names that I can recall, no.
17    Q    Do you know if the premises was altered in
18 any way between July of '01 and the date of this --
19 of these photographs being taken?
20    A    I could tell it was altered to some degree.
21    Q    To what degree was it altered?
22    A    Some smoke detectors had been installed
23 between the dates of the occurrence and the time that
24 I went out there.
25    Q    And how could you tell that some smoke

85

1 detectors had been installed?
2  A  No physical evidence of staining, sooting
3 that I would expect had the detectors been there
4 during the occurrence. They were clean and white.
5  Q  And do you know who installed those
6 detectors after the fire?
7  A  I read the testimony that Command Force --
8 Command Force did, representatives from Command
9 Force.
10  Q  And was it your understanding that they were
11 asked to do that by the homeowner, Mr. Heinz, to
12 protect what remained of the fire premises before a
13 decision was made on what to do with it?
14  A  As I recall Command Force testimony, I
15 don't -- it sounded to me like he -- the deposed
16 person from Command Force was -- did it voluntarily
17 or showed up at the scene. I wasn't clear on that;
18 in other words, how the request occurred and what
19 prompted the installation.
20  Q  Did you ever speak directly to Mr. Heinz
21 about this case?
22  A  I don't believe so.
23  Q  Did you ever speak to Mrs. Heinz about this
24 case?
25  A  No.

86

1     MR. MEZZACAPPA: Just let the record
2  reflect that there is a Kodak index system on
3  one of the bunches of photographs I'm looking
4  at that has a date of 10/10/01, and it shows
5  a development of 34 numbered pictures,
6  although it does start at 00 and it has a
7  photograph numbered zero. 00 apparently
8  didn't come out; the zero did, so there would
9  be 35 developed pictures in this particular
10 roll. And there's also with this roll a
11 CD-ROM.
12 BY MR. MEZZACAPPA:
13  Q  Is it accurate, sir, that the photographs
14 are also on that CD-ROM?
15  A  Yes.
16     MR. MEZZACAPPA: We will then ask that
17  not only that we be produced duplicate
18  originals from the negatives, but that they
19  be e-mail-attached to us so that I can
20  forward them on.
21     MR. MASCARO: Off the record for just one
22  second.
23     (An off-the-record discussion was had.)
24     MR. MEZZACAPPA: Just for the record,
25  these second set of photographs also contain

87

1  a Kodak index system dated 10/10/01, and it
2  also -- it shows from number A, which didn't
3  develop, to 00A, which didn't develop. The
4  first picture which did is 0A, and it runs
5  through 36A. All of the numbers have A's
6  next to them.
7 BY MR. MEZZACAPPA:
8  Q  When you went in the house for the first
9 time on -- in October, did the date 10/10/01 refresh
10 your recollection as to when you were there?
11  A  No. I think it was 10/8.
12  Q  Okay. And what do you base that
13 recollection on?
14  A  Well, the outside of the package has 10/09,
15 when I gave them to Cannon Camera for development,
16 and I would probably have done that the day after the
17 investigation.
18  Q  So you believe you were at the fire premises
19 on 10/08/01, correct?
20  A  Without referring to anything else, that is
21 my best determination.
22  Q  And for what period of time did you stay at
23 the premises on 10/08/01?
24  A  Probably two or three hours.
25  Q  In addition to taking the two rolls of

88

1 photographs which we have in front of us at this
2 time, what else did you do while you were there?
3  A  Well, I did a complete walk-through of the
4 house, noting things that were relevant to me.
5  Q  Did Mr. Folger or Mr. Murphy ever return to
6 the house after July of '01?
7  A  Not officially, and I don't know if
8 unofficially. They never told me if they did. I
9 doubt it.
10  Q  And on how many occasions were they at the
11 house when they did their initial investigation?
12  A  One day.
13  Q  Was that 7/24/01?
14  A  7/25/01.
15  Q  And when Mr. Folger and Mr. Murphy were
16 there on 7/25/01, was Mr. Mollenkoph with them, to
17 your knowledge?
18  A  Yes.
19  Q  When Mr. Murphy, Mr. Folger and
20 Mr. Mollenkoph were there on 7/25/01, to your
21 knowledge, were any representatives from the law firm
22 of Morrison, Mahoney & Miller there?
23  A  No.
24  Q  Morrison, Mahoney & Miller?
25  A  No.

89

1  Q    From your walk-through, did you determine
2  how many smoke detectors had been in the house, in
3  total, at the time of the fire?
4  A    I'm sure that was one thing I was looking
5  for.
6  Q    Did you make a determination that on the day
7  of the fire there were a certain number of smoke
8  detectors present, either from your walk-through or
9  from what Mr. Folger or Murphy had done or any of the
10 previous photographs, any source whatsoever?  What
11 I'm looking for -- and I really should withdraw this
12 question because it's going on, but I want to give
13 you some explanation about it.  I'll withdraw the
14 question and ask a new question.
15       From any source whatsoever, did you make a
16 determination as to the number of smoke detectors
17 that were present in the home on the date of the
18 fire, 7/23/01?
19 A    Yes.
20 Q    And how many smoke detectors were present in
21 the home in total at that time?
22 A    I would do better than give you a number,
23 listing them:  The downstairs family room was one
24 detector; two was in the -- what has been termed the
25 boiler room, downstairs; three was in the downstairs

90

1  stairway area; four would be at the top of the
2  stairs, in the area of the new bedroom construction;
3  and five would be in the skylight of the grand room
4  or family room on the first floor or the main entry
5  level.  And I'm sorry; there's more.  I apologize.
6  And then there's two additional detectors on the --
7  above -- or the grade level, first floor, in the
8  bedroom areas.  I think that's pretty inclusive of
9  all the detectors that I determined.
10 Q    Now, when you're giving me this count,
11 you're not giving me the newly installed ones which
12 were put in after the fire; is that correct?
13 A    I satisfied myself that the newly installed
14 ones were adjacent to where other detectors were
15 located, and the physical evidence showed that there
16 was indeed suggested -- a suggestion that a detector
17 was located there.  In other words, there were soot
18 stains or the lack of soot stains that corroborated
19 my assessment and final determination of where
20 detectors were located at the time of the fire.
21 Q    As listed in NFPA, what is the purpose of a
   smoke detector?
23 A    Actually, the literature is what I'll
24 respond to when you say "NFPA," inclusive of the
25 handbook, life safety code and the NFPA 72, the fire

91

1  alarm code -- is that it's for life safety purposes
2  and to some degree property protection.
3  Q    Does the NFPA make any reference to property
4  protection?
5  A    I believe I cited in my second report that
6  there are various sections of the code that refer to
7  that.  And certainly from a fire protection
8  engineering standpoint, a user of the code
9  understands that initially life safety objectives are
10 achieved, but there's certain property implications
11 that are either cited or interpreted by engineering
12 judgment.  And depending on the complexity of the
13 fire detection system arrangement, certainly property
14 protection is strongly implied.
15       MR. MEZZACAPPA:  Move to strike that
16       which is unresponsive.
17 BY MR. MEZZACAPPA:
18 Q    What I'm asking you is:  Does the NFPA code
19 say that the purpose of a smoke detector is for
20 property protection?
21 A    That's a different question than the prior
22 one.  You just said NFPA.  Now, "code," I'm also
23 going to ask for which code you're talking about.
24 Q    Right now I'm just asking NFPA.  Does NFPA
25 state that the purpose of a smoke detector is for

92

1  property protection?
2  A    I believe that that's the case.
3  Q    As the NFPA existed at the time of this
4  fire, 7/23/01, isn't it true that it doesn't speak at
5  all to having a centrally-monitored fire detection or
6  smoke detection system?
7  A    It's not a complete enough question to
8  answer.
9  Q    Okay.  I'll rephrase the question.
10       Is there any requirement at the time,
11 7/23/01, for any smoke detector, as discussed by the
12 NFPA, to be hard-wired or centrally-monitored in an
13 existing structure?
14 A    Yes.
15 Q    When is that?
16 A    When there's certain revisions,
17 modifications, alterations to a single-family or
18 two-family dwelling, that the provisions of the
19 modifications install hard-wired detectors; and it is
20 acceptable in existing parts of the dwelling that a
21 battery-operated detector could suffice for
22 protection and early warning, life safety aspects of
23 those existing component areas.
24 Q    Just so I'm clear:  I'm asking you not
25 hard-wired but centrally-monitored.  By that I mean:

93

1  Does a smoke detection system, under the NFPA as it
2  existed on 7/23/01, require that a central station
3  monitoring company be hooked up to the smoke
4  detection system? Not whether or not it's hard-wired
5  or battery, but is there a requirement at that time,
6  7/23/01, under NFPA, that the system in place, the
7  smoke detection system, be centrally-monitored?
8      A   No. But that wasn't your first question.
9  Your first question was dual; you mentioned NFPA and
10 hard-wiring and central station.
11     Q   Okay. Then --
12     A   I appropriately responded.
13     Q   I -- I don't want to confuse you. I'm
14 trying to be clear. Sometimes my questions aren't,
15 and as I said in the beginning, if I'm unclear, let
16 me know.
17         So we're really clear on the record: On
18 7/23/01 was there any requirement under NFPA that
19 existed at that time that a smoke detection system be
20 centrally-monitored?
21     A   It's incomplete.
22     Q   Okay. I'm trying to keep the question
23 simple. I'll rephrase it. I don't want to ask an
24 inappropriate question.
25         In a residential structure, okay?

94

1      A   Okay.
2      Q   Let's start with that.
3          In a residential structure such as the home
4  that existed at 34 Wildwood Avenue on 7/23/01, under
5  the NFPA code that existed at that time or that
6  governed that date, was there any requirement that a
7  home smoke detection system be centrally-monitored?
8      A   No.
9      Q   Okay. Today, under the NFPA, with new
10 construction, is there any requirement that a
11 residential home smoke detection system be
12 centrally-monitored?
13     A   No.
14     Q   Do you know when my client, Command Force,
15 installed the smoke detection system at the Heinzes'
16 home?
17     A   If I recall, his testimony at Command Force
18 is that it's sometime in the year 2000. Specifically
19 the date I don't know offhand without referring to
20 either the deposition -- referring to the deposition.
21     Q   Before you read the deposition of Mr. Matza,
22 you had authored -- or issued; forget authored -- the
23 two reports from your company, correct?
24     A   Yes.
25     Q   Okay. And did you make a determination as

95

1  to when Mr. Matza or his company, my client, Command
2  Force, had installed the smoke detection alarm prior
3  to the date of the fire?
4      A   Only -- not a specific date, no.
5      Q   Okay.
6      A   But I feel sure that we asked and the
7  determination that we got from Mr. Heinz was that it
8  was installed recently.
9      Q   Did you get any more indication from
10 Mr. Heinz on when it had been installed?
11     A   No.
12     Q   Were you ever present at 34 Wildwood when
13 any employees of Command Force installed the alarm?
14     A   I don't believe so.
15     Q   Did you ever obtain any pictures of any of
16 the smoke detection -- detectors installed by Command
17 Force at the time they were installed, by Mr. Heinz
18 or any other source?
19     A   Prior to the fire?
20     Q   Yes.
21     A   No. I've never seen the photographs.
22     Q   Did you ever ask the homeowners for
23 photographs depicting what the interior of the house
24 looked like immediately at or after the alarm was
25 installed by Command Force?

96

1      A   I never asked for them.
2      Q   Do you know when exactly Mr. Heinz did any
3  renovations to the home prior to the date of the
4  fire?
5      A   Yes.
6      Q   When exactly did Mr. Heinz do renovations to
7  his home prior to the date of the fire?
8      A   I think the data will show that it was late
9  1999 to 2000, late in the month -- or late in the
10 year of 2000 that renovations to the ground-level
11 garage area, transforming it into two bedrooms and a
12 bathroom, occurred.
13     Q   Did you ever obtain any documents or
14 photographs to show exactly when the renovations were
15 done to do the conversion to the garage?
16     A   I never obtained them, no.
17     Q   Did anyone on behalf of your company obtain
18 any documents or photographs to show exactly when the
19 renovations were done?
20     A   We never received documents.
21     Q   Did you ever receive photographs?
22     A   No.
23     Q   Did you ask for documents?
24     A   Yes.
25     Q   From whom did you ask for documents?