97

1  A    Wilton, Connecticut building department.

2  Q    And in what form did you ask the Wilton,

Connecticut building department for documents?

A    We verbalized the request to the building

5  inspector.

6  Q    Did you ever serve them with any subpoenas?

7  A    No.

8  Q    Do you know anyone that works for the

9  Connecticut building department?

10      MR. MASCARO:  I'm sorry.

11      MR. MEZZACAPPA:  The Wilton, Connecticut

12      building department.  Thank you.

13  A    I think the notes that you were handed this

14  morning refers to a certain individual.  I don't know

15  what his name is off the top of my head.

16      MR. MEZZACAPPA:  Let's have this marked

17      as the next exhibit.

18      (A document was marked Defendant's Exhibit 3 for

19      identification.)

20  BY MR. MEZZACAPPA:

21  Q    I'm going to show you what's been marked as

22  Defendant's Exhibit 3 for identification.  This is a

23  typewritten document that was handed to me for the

24  first time today.  I believe your attorney told me

25  that you or your office prepared it.

98

1      Could you first tell me what that document

2  is.

3  A    These are notes that were taken by

4  Mr. Murphy and then memorialized as typewritten notes

5  at my request, probably last week or something like

6  that.

7  Q    And what were they -- these typewritten

8  notes, what documents did Mr. Murphy use to

9  memorialize these into typewritten?

10  A    I'm not sure.

11  Q    Does Mr. Murphy or Mr. Folger, to your

12  knowledge, have documents relative to their

13  investigation of this file that they created which

14  have not been exchanged with me?

15  A    No.  These represent the notes, I believe,

16  to the best of my knowledge.

17  Q    In addition to these typewritten notes,

18  though, are there handwritten notes that Mr. Murphy

19  or Mr. Folger prepared, that they have, which have

20  not been turned over to us?

21  A    I don't know.

22  Q    Okay.

23      MR. MEZZACAPPA:  At this time, I'm going

24      to request production of any documents,

25      notes, memos, photographs that haven't been

99

1      produced to us which your employees,

2      Mr. Folger or Mr. Murphy or anyone else on

3      your behalf, including Alycia -- I don't

4      recall her last name -- would have prepared

5      regarding this case.

6  A    Okay.

7  BY MR. MEZZACAPPA:

8  Q    Do the notes in front of you, Exhibit 3,

9  indicate the name of the person that was contacted by

10  you at the Wilton, Connecticut building department?

11  A    It wasn't by me, but by either Mr. Murphy

12  or -- Mr. Murphy or Mr. Folger.  Bob Root.

13  Q    And what was Bob Root -- R-o-o-t; is that

14  correct?

15  A    That's what I have.

16  Q    -- what was he asked for, based on the notes

17  that are in front of you?

18  A    Certificate of occupancy and copies of smoke

19  detector sign-offs including -- included, hopefully.

20  Q    And is it your understanding that you never

21  received any response to that request?  When I say

22  "you," your company.

23  A    I don't believe that we did.  And if we did,

24  at the time I probably wasn't making copies of what

25  amendments were to the initial report.  So it's

100

1  possible that they sent them and I included in this

2  report but then I didn't retain a copy for my file.

3  That's possible.  And I don't know if we ever

4  received it, to be quite clear.

5      MR. MEZZACAPPA:  Okay.  To the extent

6      that any other documents which I've forgotten

7      to ask about or reference today, we would

8      also request production of those.

9      MR. MASCARO:  We reserve our rights.

10  BY MR. MEZZACAPPA:

11  Q    Sir, is it accurate that -- and we'll go

12  through it in detail later -- the second report you

13  issued is premised on the installation by Command

14  Force of a smoke detection system after renovations

15  were made to that home?

16  A    Not after, no.

17  Q    Okay.  You read Mr. Heinz's testimony,

18  correct?

19  A    Yes.

20  Q    And you read Mr. Matza's testimony, correct?

21  A    Yes.

22  Q    And you recall Mr. Heinz not being able to

23  give me a definitive date on when the alterations to

24  his home were made; is that correct?

25  A    I think there's debate in that area, yes.

101

1    Q    And you read Mr. Matza's testimony that
2  indicated that he did not observe the house at the
3  time that he visited it with the renovation above the
4  garage, with the windows with the Anderson window
5  stickers on it.  Do you remember that testimony?
6    A    I remember the testimony, but I also
7  remember that he didn't do a complete walk-through of
8  the building.
9    Q    Your testimony is that Mr. Matza testified
10  he didn't do a complete walk-through of the building?
11    A    Yes.
12    Q    Okay.  Do you know for sure, as you sit here
13  today, the date of installation by Command Force of
14  the alarm system?
15    A    Not specifically.  I was shown a contract.
16    Q    Okay.  And the contract is dated when, that
17  you were shown?
18    A    I'd have to refer to that contract.  I
19  don't --
20    Q    Please do.
21        MR. MEZZACAPPA:  Let the record reflect
22        that Mr. Mascaro handed the witness a
23        document.
24  BY MR. MEZZACAPPA:
25    Q    Is that the contract, sir, that you were

102

1  referring to?
2    A    Yes.
3    Q    What is the date of the contract?
4    A    February 4, 2000.
5    Q    And is that a contract from my client,
6  Command Force, with the Heinzes for the installation
7  of the burglar and smoke detection system?
8    A    Yes.
9    Q    And for the record, what is the exhibit tab
10  on that document and the date, please, for the court
11  reporter?
12    A    Heinz B; is that right?
13        MR. MASCARO:  For the record, it's marked
14        as Defendant's Exhibit B from the deposition
15        of Harold Heinz on January 29, 2004.
16  BY MR. MEZZACAPPA:
17    Q    Did you ever receive any documents from any
18  source that demonstrated when the renovations were
19  done to Mr. Heinz's home?
20    A    I saw a building permit application.
21    Q    And the building permit application, did
22  that state with definitive certainty when the work
23  was done on the home?
24    A    I think so, yes.  I would say so.
25    Q    And what is your recollection as to when the

103

1  work was completed on Mr. Heinz's home, based on the
2  building application?
3    A    In the latter months of 2000.
4    Q    When you say "the latter months of 2000," do
5  you mean November and December of 2000?
6    A    I mean after February.  That's the distinct
7  recollection that I have.  It was after February of
8  2000.
9    Q    Other than that building application, do you
10  have any source of knowledge of exactly when, after
11  February of 2000, the renovations to Mr. Heinz's home
12  were done?
13    A    I interpreted what I viewed as that -- the
14  renovations were ongoing from 1999 and were completed
15  in some -- in the fall of the year of 2000.
16    Q    But do you have any independent knowledge --
17  not what you interpreted from a document -- as to
18  when exactly the renovations were physically done to
19  Mr. Heinz's home?
20    A    Well, Mr. Heinz's deposition referred to
21  that.  And I'd have to get into the specifics of what
22  he said, but that would be the other data point that
23  I would refer to was his sworn testimony.
24    Q    You didn't have Mr. Heinz's deposition
25  before you when you authored your report, correct?

104

1    A    Correct.
2    Q    And you didn't have Mr. Heinz's deposition
3  available to you when you authored either of your
4  reports, correct?
5    A    Correct.
6    Q    And you hadn't spoken to Mr. Heinz before
7  you authored your report, correct, either of your
8  reports -- issued reports?  I'm sorry.  I meant
9  issued.
10    A    No, we didn't talk to Mr. Heinz.
11    Q    Did you talk to Mr. Heinz before issuing the
12  reports and get definitive dates from him as to when
13  the construction on his house was done?
14    A    Yes.
15    Q    What definitive dates did you get from
16  Mr. Heinz as to when construction on his house was
17  done?
18    A    I'm sorry.  You said definitive.  I stand
19  corrected.  We got an approximation.
20    Q    Are the conclusions, in part, in your second
21  report based on the fact that the renovations were
22  done before Command Force installed its alarm in
23  Mr. Heinz's home?  I'm not talking about the postfire
24  renovations; I'm talking about the prefire
25  renovations to Mr. Heinz's home.

105

1    A    Well, the conclusions that I make in the
2  report, the analysis takes two prongs:  One within
3  the renovations and one independent of the
4  renovations.  And from an analysis standpoint, both
5  are relevant topics for discussion, but the
6  conclusions are the same.
7        Q    Do you have any personal knowledge or source
8  of information to disagree with Mr. Matza's testimony
9  that there was no ongoing construction when he walked
10  through the house nor were any renovations going on
11  when he walked through the house and before the alarm
12  was installed by his worker, Mr. Pasquarella?
13            MR. MASCARO:  I'm going to object to the
14        form.  You can go ahead and answer if you
15        can.
16    A    I have no personal knowledge except for the
17  references that I have made to certain building
18  permits and -- what would we call this? -- contract
19  for installation of the detectors dated 2/14 of '00.
20  BY MR. MEZZACAPPA:
21        Q    Did you see the contracts for installation
22  that we're showing you today before you issued your
23  second report?
24    A    No, I did not.
25        Q    Did you know when the renovations were

106

1  actually completed on the home before you issued your
2  second report?
3    A    No.  Not a specific date, but in general
4  reference that had relevance to my analysis.
5        Q    Did you ask Mr. Heinz before issuing either
6  of your reports how many smoke detectors were in the
7  house before he had Command Force put a hard-wired
8  system in the house?
9    A    I don't believe those questions were asked
10  of Mr. Heinz.
11        Q    Did you or your employees ask Mrs. Heinz any
12  of those questions?
13    A    No.
14        Q    Did you know before issuing either one of
15  your reports that the window in the room of fire
16  origin was open at the time the fire commenced?
17    A    I believe that's part of the record.
18        Q    And where do you believe that that is
19  contained?
20    A    I would say that it's either in the report
21  itself or -- or in Mr. Murphy's notes.
          If you look at Defendant's Exhibit No. 3
23  dated 3/16/04, "Small casement window open."
24        Q    Can I have that document?
25            (Witness handed attorney the document.)

107

1        This document was just prepared for purposes
2  of this deposition, correct?
3    A    Yes.
4        Q    This document did not exist at the time that
5  you prepared either one of your reports; is that
6  correct?
7    A    Well --
8            MR. MASCARO:  Object to the form.
9  BY MR. MEZZACAPPA:
10        Q    This actual document, in typewritten form,
11  did not exist at the time you issued either one of
12  the reports; is that correct?
13            MR. MASCARO:  He's just asking about in
14        this form.
15  BY MR. MEZZACAPPA:
16        Q    The document in that form we're looking at.
17    A    In that form.  That's correct.
18        Q    And does the information about the window
19  being open -- is that information contained in either
20  one of your reports that we've previously marked?
21    A    I can't recall specifically.  I could try to
22  thumb through and see if I can pick it up, if you
23  would like.
24        Q    Yeah.  I would like you to do that, and then
25  we'll take a lunch break.

108

1            (Witness reading the document.)
2    A    I'm ready.
3        Q    Okay.
4    A    No.
5        Q    Did you look through both reports before you
6  gave me the answer?
7    A    I feel sure it's not listed in the second
8  report.
9        Q    Okay.  So the information -- to be clear for
10  the record, because we stopped for a while:  The
11  information that's contained in this new document
12  that was created for this deposition, based on notes
13  that either Mr. Folger or Mr. Murphy prepared
14  regarding the small casement window being open, is
15  not contained in either of the reports that your
16  office issued, correct?
17    A    That's right.
18        Q    Before authoring either of the reports --
19  before issuing either of the reports, was an analysis
20  made of the oxygen level in the room from the open
21  window?
22    A    I don't believe so.
23        Q    Is it true that the progression of a fire is
24  determinative -- withdrawn.
25            Is it true that the progression of a fire or

109

1  whether a smoldering fire turns into a flaming fire
2  has to do with oxygen levels?
3      A    That's a variable.
4      Q    Were the wind conditions or weather reports
5  obtained from you before issuing either one of
6  reports that your office made?
7      A    I don't believe so.
8      Q    Do you know where the window that was open
9  was in relation to the exact spot of origin of this
10  fire in that room?
11      A    I don't know.
12      Q    Do you know on which side of the house the
13  open window was located?
14      A    The rear of the house.
15      Q    Do you know where in relation to the doorway
16  to the room the window was located?
17      A    Say that one more time, please.
18      Q    Do you know where in relation to the doorway
19  to the room the open window was located?
20      A    Exact opposite wall, far wall, outside wall.
21      Q    Isn't it true that an open window and an
22  open doorway would then create an opportunity for a
23  cross-breeze to blow smoke out of the room after the
24  fire had commenced?
25      A    It's possible.

110

1          MR. MEZZACAPPA:  Okay.  This is a good
2          time for lunch.  Thanks.
3      (A recess was taken from 1:20 to 1:56 p.m.)
4  BY MR. MEZZACAPPA:
5      Q    Do you know, sir, precisely at what time the
6  fire started?
7      A    No.
8      Q    Do you know how much time lapsed between
9  the -- withdrawn.
10      Do you know if this was a smoldering fire or
11  an open-flame fire from when it commenced?
12      A    I believe from the time frame that the
13  physical evidence supports that it was prolonged,
14  smoldering.
15      Q    And what physical evidence would demonstrate
16  that it was a prolonged smoldering fire?
17      A    Well, the interval of time between Mr. Heinz
18  leaving at eight o'clock and the alarm time around
19  eleven o'clock suggests that it couldn't have been
20  prolonged smoldering.  The length of the smoldering
21  could well have been much less than the three-hour
   time interval, depending on when the cat knocked over
22  the lamp.  But in that initial phase, my belief is
23  that smoldering would occur prior to the open flame,
24  and the length of the smoldering process, regardless
25

111

1  of when the cat knocked it over, would be a
2  significant phase in the growth development and
3  spread of the fire.
4      Q    You don't know what time the cat knocked
5  over the lamp, correct?
6      A    Correct.
7      Q    And you don't know what the lamp landed on
8  exactly, do you?  By that I mean what combustible
9  materials it exactly landed on.
10      A    Well, we would term them as Class A
11  combustibles -- papers, woods, cellulose materials,
12  etc.
13      Q    When you say "cellulose materials," what do
14  you mean by that?
15      A    We're talking about plant derivatives --
16  cottons and papers; derivatives from living matter at
17  one time.  Common household combustibles.
18      Q    Do you know precisely for what period of
19  time the fire was smoldering before it went to open
20  flame?
21      A    No.
22      Q    Would the window open, feeding a smoldering
23  fire with oxygen, have helped it to go to open flame
24  more readily than if the window were closed?
25      A    Just the window being open or closed

112

1  wouldn't be enough information to make a
2  determination like that.
3      Q    Admittedly, though, it could be a factor,
4  the level of oxygen in the room as a result of an
5  open window going from smoldering to open-flame fire,
6  could it not?
7      A    I think of a room of this type it would not
8  be a factor, but I will note that technically, oxygen
9  levels are important considerations in smoldering
10  fire determinations.
11      Q    And why do you say a room of that nature, it
12  would not be a factor?
13      A    Because I'm talking about incipient
14  smoldering process.  A very large room in relative
15  terms to the amount of initial combustibles, an open
16  doorway and an oxygen supply through the open
17  doorway, in my view, would not have greatly affected
18  nor brought about an oxygen deficiency within the
19  room of fire origin independent of the door being
20  opened or closed.
21      Q    The window that was open, what's the size of
22  it?
23      A    Well, the overall size of it, I believe, is
24  a six-foot window.
25      Q    And how far open was it?

113

1    A    I don't know.

2    Q    Assuming it was a windy day, would that --
3    would the amount of oxygen entering the room depend
4    on how far the window was open?

5    A    Again, I -- I -- I don't think it would have
6    compensated for any oxygen deficiency in the
7    smoldering process given those circumstances.

8    Q    You're talking about an oxygen deficiency.
9    Just so I'm clear: I'm asking you if the window open
10   on a windy day would increase the level of oxygen in
11   the room and fan the fire or let a fire that's
12   smoldering go to an open flame sooner than if the
13   window had been closed.

14   A    There would be no change in the oxygen
15   concentration, window open or closed.

16   Q    Did you make a determination as to the
17   precise response time of the fire department to the
18   scene of the fire?

19   A    Yes.

20   Q    And what was the precise response time of
21   the fire department to the scene of the fire on
22   July 23, '01?

23   A    Slightly less than seven minutes from
24   notification.

25   Q    Did you ever interview Fire Marshal Kohn

114

1    about how long it took after arrival at the scene for
2    the fire department to then get water onto the fire?

3    A    I didn't ask him that question. I'm sure
4    Mr. Murphy and/or Mr. Folger did.

5    Q    And how -- how do you know they asked him
6    that?

7    A    Because they're trained investigators and
8    very competent at their job, and that would have been
9    questions that they would have asked.

10   Q    Does this typewritten memo which was
11   prepared for purposes of this deposition, Defendant's
12   Exhibit 3, indicate at all from their notes how soon
13   water was placed on the fire after the fire
14   department arrived there?

15   A    No, it does not.

16   Q    Does their first report -- does the first
17   report in this case, issued by Mr. Folger and
18   approved by you, indicate at what time precisely
19   water was placed on the active fire?

20   A    No.

21   Q    Was there a fire hydrant near this home?

22   A    I -- I don't recall that.

23   Q    Independent of reading the depositions in
24   this case, did you have any source of information
25   about how soon water was placed on this fire after

115

1    the fire department arrived?

2    A    It -- no, I don't.

3    Q    Out of the number of responding companies
4    which responded to this fire, do you know which
5    responding company was the first to put water on this
6    fire?

7    A    No. Mr. Murphy or Mr. Folger might, and
8    there is some commentary about attack lines and
9    second attack lines, as you can see on page 1 of the
10   report -- initial report.

11   Q    Does the initial report indicate which
12   company or at what time the fire companies placed
13   water on the active fire?

14   A    No.

15   Q    Did you ever become aware that Mr. -- from
16   any source other than from his deposition which --
17   prior to reading Mr. Heinz's deposition, were you
18   aware that the only reason he put a fire detection
19   system in his home was to save money on his insurance
20   premium?

21   A    I was not aware --

22        MR. MASCARO: Object to the form. You
23        can go ahead and answer it.

24   A    I was not aware of that, but I read that in
25   his deposition.

116

1    BY MR. MEZZACAPPA:

2    Q    I did not hear that. I am sorry. Did you
3    say, "I was not aware of that, but I read that in his
4    deposition"?

5    A    Yes.

6    Q    Okay. Thanks. I missed one word there.

7        Did you ever install a fire detection system
8    in a residential premises?

9    A    Yes.

10   Q    When?

11   A    My house.

12   Q    You installed your own alarm?

13   A    Yes.

14   Q    And when did you do that?

15   A    I've done it several times. I've done it
16   when I moved in 1998 into the current residence that
17   I'm in, and I installed detectors in 1982 in a home
18   that I lived in at that time; I installed detectors
19   in my home in Maryland in 1971 or '2, something like
20   that.

21   Q    Did you ever do it in anyone else's house
22   other than one that you lived in?

23   A    No. I take that back. I installed it in my
24   daughter's apartment. I installed detection --
25   detectors in my daughter's apartment in Boston.

117

1    Q    Could you look at page 1 of the initial
2  report issued by your company.
3    A    Okay.
     (Witness complied.)
5    Q    Do you see the sentence starting at the last
6  paragraph of the page that says, "The building
7  contained a fire detection alarm system (with smoke
8  detectors positioned about the home according to
9  national standards at the time of their
10 installation)" --
11   A    Yep.
12   Q    -- "that was operable at the time of the
13 incident and monitored by Command Force Security,
14 8103 252nd Street, Jamaica, New York 11426-1572,
15 (718)347-1572"?
16        Do you see that?
17   A    I do.
18   Q    Did you agree with that statement when you
19 reviewed this report for Mr. Folger?
20   A    Based on the level of assessment and
21 research, yes, I did. I should add for clarity: At
22 the time the report was written and submitted.
23   Q    Did you ever meet Jerry Green at the house
24 in October of 2001?
25   A    I don't believe Jerry Green was there at the

118

1  time. Might have been, but I don't remember.
2    Q    Turn to page 4 of the initial report,
3  please, and the bottom full paragraph on the page.
4  It indicates in the last sentence: "Further, this
5  initial assessment determined that during the growth,
6  development and spread of the fire, the room reached
7  flashover conditions and that the fire vented through
8  the six-foot picture window to the outside of the
9  structure."
10        Do you see that?
11   A    Yes, I do.
12   Q    Do you know when, after the fire started, it
13 reached flashover conditions? And I'm asking an
14 exact time. In other words, how many minutes,
15 seconds, hours lapsed from the commencement of the
16 fire until it reached flashover conditions --
17   A    No.
18   Q    -- in that room?
19        What do you mean by flashover?
20   A    A simultaneous ignition of all combustible
21 materials within a room driven to that point by a
22 temperature ceiling layer that assembles as a result
23 of the growth dynamics of the fire.
24   Q    And in lay terms, what would that -- what
25 would that mean?

119

1    A    That means you don't want to be there in
2  that room when it happens.
3    Q    In other words, the process of flashover, is
4  that when the flame actually consumes all the oxygen
5  in the room and ignites everything that might not be
6  burning at that point?
7    A    No. Oxygen -- certain levels of oxygen are
8  necessary and sufficient criteria for flashover. So
9  it's the sudden and dramatic change of the growth
10 development -- spread of the fire from being able to
11 survive within the interior of that room to not being
12 able to survive within the interior of the room
13 because of its rapid and dramatic change of phase, so
14 to speak. And that is also inclusive of
15 fully-equipped and fully-protected firefighters.
16 They cannot survive that.
17   Q    Did you make a determination as to whether
18 there was a television plugged in in that room?
19   A    Yes. My staff did.
20   Q    And what determination was made?
21   A    That it was not plugged in.
22   Q    Is that reflected in this report?
23   A    It's either reflected in -- let me see if I
24 can find out where that is referenced .
25        (Witness reading the document.)

120

1         Well, on page -- there may be another
2  reference, but on page 5: "The only receptacle that
3  was being used in the room of origin at the time of
4  the fire was the one lamp was plugged into."
5    Q    Okay. Did the lamp have a lampshade on it
6  at that time, do you know?
7    A    Yes, it did.
8    Q    Was a portion of the lampshade retained? Is
9  it in your evidence locker?
10   A    Yes.
11   Q    And what was the lampshade made out of, if
12 you know?
13   A    I can only tell you that there's wire
14 remains of the lampshade. I don't know what the
15 clothlike material that covered it was made of.
16   Q    Did you ever inquire of Mr. Heinz or did
17 your workers inquire of Mr. Heinz as to any cleaning
18 of the smoke detection system that was placed by
19 Command Force in the house?
20   A    I don't know.
21   Q    Is it true that if smoke detectors become
22 dirty or dusty or their pores are allowed to become
23 dirty or dusty that they're not going to work as
24 effectively as if they're clean?
25   A    It depends on how you define "effectively."

121

1   You know, I think that there could -- there could be
2   a response time-difference interval because of
3   cleaning.
4       Q    What kind of smoke detection system was
5   installed by Command Force in that home?
6       By that I mean:  Was it ionized or
7   photoelectric smoke detectors?
8       A    **Ionization.**
9       Q    Is there -- between ionization and
10  photoelectric, which one would trigger a smoldering
11  fire first, in your opinion?
12      A    **Photoelectric.**
13      Q    Is it, therefore, true that an ionization
14  would pick up an open-flame fire more quickly?
15      A    **Yes.  The research certainly indicates that.**
16      Q    Could you turn to the bottom of page 7 of
17  the report.  Do you see the last full sentence?  It
18  says, "Further in this regard in the response time of
19  the fire department of 9 minutes."
20      Do you see that sentence?
21      A    **I do.**
22      Q    Do you know how Mr. Folger or you or anyone
23  on behalf of your company determined the response
24  time of nine minutes?
25      A    **Well, first of all, it's a typo.  It should**

122

1   **be seven minutes.  And they determined it from**
2   **working with the fire department and the arrival time**
3   **-- which is elsewhere in the report -- of 11:15 from**
4   **the time of notification, and I believe at 11:08.  So**
5   **roughly seven minutes -- just under seven minutes is**
6   **what -- what was the determination.**
7       Q    Was this typo ever corrected in any report
8   sent to Encompass Insurance Company?
9       A    **I don't believe so.**
10      Q    Do you see the bottom of page 7, over to the
11  top of page 8, it says, "Additional time is also
12  spent by the arriving firefighters (and dependant on
13  the number of first-arriving firefighters) advancing
14  hose lines into the building"?
15      Do you see that?
16      A    **I do.**
17      Q    And do you see the next sentence?  It says,
18  "Flashover of the bedroom during this time is
19  expected, and when that" -- "and when this occurs,
20  extension of the fire to the next floor via the
21  exterior of building occurred."
22      Do you see that?
23      A    **I do.**
24      Q    Does this refresh your recollection as to
25  how long it took for the arriving firefighters to,

123

1   first, advance hose lines into the building; and
2   then, secondly, to get water on the fire?
3       A    **No, it doesn't.**
4       Q    Did you make a recommendation to the
5   insurance company or to the attorneys to bring a
6   third-party action against my client, Command Force
7   Security Systems?
8       A    **I have no such powers.**
9       Q    Whether or not you have powers, did you make
10  the recommendation that an action, a civil action
11  that we're sitting here for, be instituted against my
12  client?
13      A    **No.**
14      Q    Okay.  Did you ever interview any persons
15  from Command Force before issuing your two reports in
16  this case?
17      A    **No.**
18      Q    Did you ever make a determination through
19  any independent investigators about the design of the
20  system which was installed before you issued your two
21  reports?
22      A    **I made that assessment when I was on the**
23  **scene in October of '01.**
24      Q    Did you ever find out what the sum and
25  substance of the conversations between the customer,

124

1   Mr. Heinz, and Command Force, my client, were in
2   terms of what Mr. Heinz wanted placed in his home
3   regarding a smoke detection system?
4       A    **No.**
5       Q    At the time that Mr. Heinz requested that a
6   smoke detection system be placed in his home, was
7   there any mandatory code that required the
8   installation of a smoke detection system in a
9   residential home with -- which was existing and not
10  new construction?
11      A    **All right.  There's a couple of factors**
12  **there.  You're going to have to say that again.**
13      Q    Okay.  At the time that the alarm was
14  installed in Mr. Heinz's home, were there --
15      MR. MASCARO:  Don't take -- don't take
16      any notes.  Listen to the question.
17      THE WITNESS:  Okay.
18      MR. MEZZACAPPA:  And she can read it
19      back.
20      MR. MASCARO:  Yeah.
21      THE WITNESS:  Okay.
22  BY MR. MEZZACAPPA:
23      Q    At the time the smoke detection system was
24  installed in Mr. Heinz's home, was there any
25  requirement under any statute or code or local

125

1 ordinance that with existing residential structures,
2 they have a smoke detection system in them?
3              MR. MASCARO:  Do you need it read back?
             Do you need it read back?
5              THE WITNESS:  No.  I don't think so.
6     A    For existing homes, no.
7 BY MR. MEZZACAPPA:
8     Q    Before you mentioned construction that was
9 done on the home at some point in the later months of
10 2000, correct?
11    A    Yes.
12    Q    I just want to bring you back to that
13 reference point.
14         What percentage of a structure needs --
15 withdrawn.
16         What percentage of a residential home in the
17 year 2000 would have to be renovated or have to be
18 added onto to change the code requirements, as they
19 existed at that time, relevant to smoke detection?
20    A    The Connecticut state code doesn't use a
21 percentage.  They use a performance or achievement in
22 the '99 supplement.
23    Q    And did the '99 supplement for the
24 Connecticut state code apply in the year 2000 when
25 this alarm was installed?

126

1     A    Yes.
2     Q    And what achievement or -- what other word
3 did you use?  I'm sorry.
4              MR. MASCARO:  I think that was it.
5              MR. MEZZACAPPA:  No.  No.  He used two
6         words.
7              COURT REPORTER:  Performance.
8 BY MR. MEZZACAPPA:
9     Q    -- what performance or achievement does the
10 Connecticut state code require in order for an
11 existing structure to be -- to have a requirement for
12 a smoke detection system?
13             MR. MASCARO:  If you're going to refer to
14        the document, you should further identify
15        whether that's been produced or not.
16             THE WITNESS:  It's been produced.
17             MR. MASCARO:  Okay.  Then identify what
18        it is.
19             THE WITNESS:  Okay.
20             MR. MASCARO:  So counsel can look at it.
21             THE WITNESS:  Okay.
22    A    I'm referring to the information that was
23 sent to you, the Connecticut State Building Code
24 amendments, 1999 supplement.  Page 12 of the
25 supplement, Section 920.3.2.1, Alterations and

127

1     Additions:  "When alterations or additions require a
2     permit" -- "required a permit occur or when one or
3     more sleeping rooms are added or created in an
4     existing dwelling, the entire building shall be
5     provided with smoke detectors located as required for
6     new buildings.  Such smoke detection" -- "smoke
7     detectors within existing spaces may be
8     battery-operated and are not required to be
9     dual-powered or interconnected unless other
10    remodeling considerations require removal of wall and
11    ceiling coverings which would facilitate concealed
12    interconnected wiring."
13 BY MR. MEZZACAPPA:
14    Q    Under that code section, even if additional
15 rooms were added and sleeping quarters were required,
16 it still does not require a centrally-stationed -- a
17 centrally-monitored smoke detection station, does it?
18    A    Correct.
19    Q    Now, in this case, relevant to whether the
20 insurance -- withdrawn.
21         In this case, you don't know for sure when
22 Mr. Matza's company installed the alarm versus when
23 the renovations in the building were conducted; is
24 that true?
25    A    I don't know a specific date.  That's

128

1 correct.
2     Q    And you don't know if after Mr. Matza
3 installed his alarm -- Command Force installed their
4 alarm whether the contractor who did the renovations
5 on the existing structure added smoke detectors with
6 the renovations but before the fire, do you?
7     A    I only know what has been said in
8 Mr. Heinz's testimony.
9     Q    And just to clarify:  You didn't have
10 Mr. Heinz's testimony when you prepared your reports,
11 correct?
12    A    Correct.
13    Q    And you didn't interview Mr. Heinz and
14 obtain documents from Mr. Heinz in order to prepare
15 your reports, correct?
16    A    Correct.
17    Q    Looking at your second report, which you
18 issued, I believe you testified you issued this in or
19 around March of 2003?
20    A    Correct.
21    Q    What computer fire model did you use -- or
22 computer fire models did you use, as referenced by
23 you in the second-to-last line on page 1?
24    A    Well, I used various models, but none were
25 used in my final conclusions.  So with that said and

129

1  with that caveat, I used a computer model that's
2  called FAST and also used what they call Thomas's
3  Flashover Correlation and then used the subcomponent
4  of FAST to determine various fuel packages and
5  whether or not those fuel packages could bring the
6  room to flashover or if other phenomenon was
7  necessary in order to achieve through-flashover in
8  the building -- excuse me -- of the room of origin.
9      Q     And where did you obtain the model called
10 FAST?
11     A     It's a government-provided, free-of-charge
12 computer model.  So I either downloaded it from NIST,
13 National Institute of Standards and Technology, or
14 independently obtained a copy of it and downloaded it
15 into my computer.
16     Q     And what version did you use?
17     A     I think it was 3.2, if I remember correctly.
18     Q     What data did you input into that 3.2
19 version of FAST to get the information out of it?
20     A     Among the data was room dimensions; the
21 initial fuel package, being the bed; and the
22 compartment that divided the room up in terms of
23 ceiling layer migration and detector locations,
24 either theoretical or as installed the date of the
25 fire; room door being open; adjacent rooms, their

130

1  relationship to the room of origin and whether or not
2  room doors were open or closed; the area of those
3  adjoining rooms; interior finish of walls, floor and
4  ceiling.  I think that's a pretty good list.
5          You also have a printout of an example of
6  one of the input files and runs that I made but did
7  not base any of my conclusions solely upon that.
8      Q     Before you said that you ran a number of
9  various models, but none of the runs were used in
10 your final conclusions.  What do you mean by that?
11     A     Well, you sometimes test hypotheses and
12 various conditions to understand what various fuel
13 packages might do within a room of origin, and so you
14 run models to get insight into that particular fuel
15 package and whether or not that fuel package, in and
16 of itself, is enough to drive the room to flashover,
17 which is a key component in the analysis of this
18 case.
19          So that's what I mean by that.
20     Q     And how did you arrive at your conclusion of
21 when flashover occurred?
22     A     I worked back from the arrival of the fire
23 department is one way, one data point, that the fire
24 was extending, and there's reference in the report
25 that's the point where, you know, that flashover did

131

1  occur; and secondly, I ran Thomas's correlation for
2  the amount of energy that is required in order for a
3  room to go to flashover, assuming flaming ignition.
4      Q     But you don't know when the room went to
5  flashover, correct?
6      A     Only that it went to flashover.  How soon
7  before the arrival of the fire department is not
8  precisely known.
9      Q     And you don't know if it went to flashover
10 after they arrived but before they put water on it,
11 correct?
12     A     It was at flashover upon arrival, the room
13 of origin was.
14     Q     How do you know it was at flashover upon
15 arrival?
16     A     Because --
17     Q     What do you base that on?
18     A     Because of the fire significantly extending
19 from the six-foot window.  It's a classical point of
20 reference in understanding the growth dynamics and
21 spread of the fire within a compartment.
22     Q     And how do you know that the fire was
23 extending from the six-foot bedroom window when the
24 fire department arrived on the scene?
25     A     Their testimony.

132

1      Q     When you say "their testimony," were any of
2  them deposed similar to you under oath?
3      A     Not that I know of.
4      Q     Did you take any statements from them
5  yourself?
6      A     I didn't take any.  I think that the
7  statements were done by Mr. Folger and Mr. Murphy and
8  not in a more formal manner than of a discussion and
9  note-taking.
10     Q     And who did they speak with?  Did Folger and
11 Murphy speak to the actual fireman who arrived at the
12 scene first?
13     A     They may have, but they most likely talked
14 to the fire marshal who conducted the legitimate and
15 required investigation of the fire and assembled
16 similar information that was exchanged between the
17 investigators.
18     Q     The fire marshal was not one who fought the
19 fire, correct?
20     A     Correct.  I mean, as far as I know.  I don't
21 remember reading that anywhere.
22     Q     And he would have obtained his information
23 from the firemen who did fight the fire?
24     A     Absolutely.
25     Q     And then Folger and Murphy would have gotten

**133**

1 their information from the fire marshal, who got it
2 from the firemen?
3      A    I think that's probably the most likely
scenario, but I don't want to exclude the
5 possibilities that they talked to firefighters.  They
6 may have.  It wouldn't be unusual to do that, but I
7 don't know if they did for sure.
8      Q    Does either the report prepared by
9 Mr. Folger or the notes which are Exhibit 3 in front
10 of you indicate that either Murphy or Folger actually
11 spoke to actual firemen who arrived first on the
12 scene and observed the so-called flashover condition
13 which you claim existed when they arrived?
14      A    No.
15      Q    Did you plug into your analysis on the FAST
16 computer model the fact that there was an open window
17 in the room?
18      A    I don't believe I did.
19      Q    What were the dimensions of the room of fire
20 origin?
21      A    3.76 meters by 3.4 meters by 2.3 meters.
22      Q    I'm sorry.  Could you read them back again.
23      A    3.6 meters by 3.4 meters by 2.31 meters.
24      Q    I thought I heard 3.76.  Did I miss
25 something?

**134**

1      A    No.  That was the first one, 3.76.
2      Q    Okay.  3.76 --
3      A    -- 3.4 --
4      Q    -- 3.4 by 2.31 meters?
5      A    Right.
6      Q    Are you referring to a specific document to
7 give me that answer?
8      A    Yes.  I provided you with the input data
9 from CFAST, Version 3.1.7.  So I'll stand corrected
10 on the version.  It's 3.1.7.  And the data file is
11 called Wilton with a -- with an "e," Wiltone, "e,"
12 .dat; so period, d-a-t.
13      Q    Did you plug into the computer model the
14 space for the smoke to exit the room?
15      A    Yes.
16      Q    And what did you plug into the computer
17 model as the area or space for the smoke to exit the
18 room?
19      A    Initially the doorway and then the flashover
20 to the outside window.
21      Q    Is it accurate to state that the smoke
detection system picked up this fire before
23 flashover?
24      A    Don't know that to be factual.  It's
25 possible.

**135**

1      Q    What were the -- what's the actual data you
2 put into the CFAST model on the size of the doorway
3 for the smoke to exit the room?
4      A    1 meter by .7 meters -- excuse me --
5 .74 meters.
6           I take that back.  That's a vent number,
7 that "1" that I gave you, so that's -- so the width
8 is .74 meters.  We did a conservative where there
9 would be no sill.  Soffit height was 2.01.  So that
10 would uniquely determine the door opening.
11      Q    Did you account for the child safety gate
12 that was located in the doorway at the time when you
13 plugged the numbers into the computer?
14      A    No.
15      Q    Did you plug in the numbers yourself or did
16 someone do it on your behalf?
17      A    Both.
18      Q    Who -- who -- who helped you?
19      A    Well, no one helped me.
20      Q    Okay.  Which numbers did you plug in
21 versus -- who else are we talking about?  Let me do
22 it that way.
23      A    Alycia Wood, my assistant.  You know, you
24 set her off on her own and let her do the number
25 crunches and I do the same thing and we compare

**136**

1 notes.
2      Q    Did you and she arrive at the same
3 conclusion?
4      A    I don't know.  I know that we had a number
5 of iterations to make sure that we were modeling it
6 correctly.  So I doubt if on the first input of the
7 data and selected program -- subprogram algorithm of
8 CFAST, I doubt very much that we plugged in the same
9 numbers.  That's why it's analysis.
10      Q    And the numbers that you plugged in, are
11 those the ones you printed for us and gave us?
12      A    Finally.  Yes.  But -- yes.
13      Q    And the numbers that Alycia plugged in,
14 where would they be recorded?
15      A    There are -- in what has been provided.  In
16 other words, there was agreement in what we would use
17 and how we would use it; what we would test and how
18 we would test.  But again, it was not part of my
19 conclusion, so -- what we inputted or whether or not
20 there was agreement, but to test hypotheses.
21           MR. MEZZACAPPA:  Do you have those
22           pictures that we used before?
23           MR. MASCARO:  The ones we used before?
24           MR. MEZZACAPPA:  Yeah.  I'm going to need
25           to mark them at some point.  I don't want to

137

1    forget. Just maybe take them out again.
2         MR. MASCARO: I'll leave them right here.
3    BY MR. MEZZACAPPA:
4         Q    The figures you provided us, is that the
5    final run that you did after you and Alycia plugged
6    in various numbers to CFAST?
7         A    Again, we provided you with an example. And
8    we talked about many runs, all of which were not
9    saved on the computer because in our analysis
10   process, we're just marching through different things
11   trying to gain an understanding of the arrangements
12   and the corroboration of those determinations to the
13   published literature. So all the test runs were not
14   retained, and what I provided to you was one that was
15   retained and it's not inclusive of all the runs that
16   we made. Other runs definitely were made using
17   various sub- -- subsets of CFAST, and they weren't
18   provided because they weren't retained.
19        Q    What fire scenarios did you evaluate here in
20   terms of what materials were in the room? In other
21   words, there's a certain number of materials in this
22   room, and after the fire you don't know exactly what
23   they are, so you're kind of guesstimating on the
24   input into a computer model about what might have
25   existed in that room, correct?

138

1         MR. MASCARO: Object to the form. You
2    can go ahead and answer if you can.
3         A    The initial investigation did a
4    reconstruction. The initial investigation did an
5    examination that determined that there was clothing
6    on the bed, so we know it wasn't just a bare
7    mattress. The initial reconstruction positioned a
8    TV stand, or what we call a TV stand, adjacent to the
9    bed and a bureau from there, towards the front of the
10   building.
11        So the relevant fuel package arrangements
12   significant in the initial materials that would drive
13   the room, the flashover, were well documented.
14   BY MR. MEZZACAPPA:
15        Q    Using the fuel packages, what fire scenarios
16   did you evaluate to come up with the numbers that you
17   gave us?
18        A    I evaluated -- given all the input data --
19   the room dimensions, the size, the interior finish
20   and so forth -- we inputted the mattress alone as a
21   single object of ignition. We then made either -- we
22   then ran a program on how much would it take based on
23   that as a result for the next-adjacent fuel
24   package to become ignited and what criteria we should
25   use in order to bring on the ignition of that item

139

1    and what its heat release rate was; and then in turn,
2    how long would it take for the bureau to become
3    involved and what criteria you would use in terms of
4    the ignition of that tertiary material.
5         Q    And what conclusions did you come to?
6         A    Well, again, my conclusions are independent
7    of the testing or the hypothesis that I made, so
8    complete conclusions of my report are different than
9    the insight that I was gaining from testing the
10   hypothesis.
11        Q    And why is that?
12        A    Because my conclusions are not based solely
13   and independently of time elements, time parameters
14   determined in the computer modeling, but to gain --
15   computer modeling was to gain insight into the
16   ability to flash over rooms, to ignite adjacent
17   combustibles and how many combustibles were necessary
18   in order to drive the room to flashover, given the
19   input data.
20        Q    When was this house initially built?
21        A    I believe it was 1968.
22        Q    In your -- in your fire models, what
23   detective -- what detector activation algorithms did
24   you use and what kind of smoke detectors did you plug
25   in to get the data you got?

140

1         A    We plugged in a certain percent
2    obscurations -- and I'd have to refer to the
3    literature to give you the precise ones; it's not
4    reflected in any of the data that you were
5    provided -- but off the top of my head, it's a
6    5 percent per meter squared obscuration, which is
7    pretty much standard for that, and also model -- can
8    model the detector activation as if it were, you
9    know, a heat detector. And we probably did both in
10   the analysis.
11        Q    When you say "probably did both," do you
12   know you did both?
13        A    I'm usually pretty thorough, so I would say
14   I did both.
15        Q    Are your test results that you've given to
16   us reflective of doing both?
17        A    No, they're not.
18        Q    Did you plug in a response time index or
19   RTI?
20        A    No. There is no such thing as an RTI for
21   smoke detectors that's published.
22        Q    Once you visited the scene of the fire, were
23   you able to determine what kind of smoke detectors
24   were present in the home on the date of the fire that
25   my client had installed?

141

1    A    Ionization.

2    Q    And after learning that in October of 2001,

3  did you go back and rerun the computer model using

4  the ionization detector as the standard?

5    A    **Um, firstly, we didn't run the models until,**

6  **you know, like six or eight months later, and so I**

7  **already knew that information. And we were testing**

8  **using heat detectors, smoke detectors, photoelectric**

9  **and ionization, with the various percent obscuration**

10 **that's published in the literature. And for heat**

11 **detectors, ambient temperature assumptions of classic**

12 **heat detectors that would be installed. I believe**

13 **that we used 165 degrees F for the heat detector.**

14   Q    Now, this ionization smoke detector, is that

15 a heat detector?

16   A    **No.**

17   Q    Okay. So what would you have used for the

18 ionization smoke detector when you plugged it into

19 the model?

20   A    **I believe the difference between the two of**

21 **them is 5 percent obscuration versus 6 percent**

22 **obscuration, and both of which are per meter squared.**

23   Q    Did either Mr. Folger or Mr. Murphy draw a

24 diagram of the interior of the premises?

25   A    **Yes.**

142

1    Q    And where is that?

2  (Witness showing the document to the attorney.)

3        MR. MEZZACAPPA: Joe, he's showing me --

4  I think that's in the newer materials, right?

5        MR. MASCARO: Yes. I think it is.

6        MR. MEZZACAPPA: Let me find it.

7  BY MR. MEZZACAPPA:

8    Q    This here?

9    A    **Yes.**

10       MR. MEZZACAPPA: Okay. Let's have this

11 marked as --

12       THE WITNESS: Can we take a break,

13 please?

14       MR. MEZZACAPPA: Yes. Sure.

15       -- Exhibit 4.

16 (A document was marked Defendant's Exhibit 4 for

17              identification.)

18    (A recess was taken from 3:03 to 3:10 p.m.)

19       MR. MEZZACAPPA: It is now ten after

20 three, and we've been working diligently

21 since ten o'clock this morning. We started

22 an hour early because the court stenographer

23 was here and I was here and the witness and

24 his attorney was here.

25       There is a snowstorm going on which we

143

1  didn't know about until last night. They

2  predicted it and now it is actually snowing

3  heavily. The witness has to travel back to

4  Boston and is concerned for his safety. I

5  have to travel back to New York and am also

6  concerned, so we've all agreed to adjourn

7  this deposition and continue it on another

8  agreeable date; hopefully in April, but we'll

9  work that out amongst ourselves.

10       And we'll call the Court, either the end

11 of this week or after my vacation, which is

12 next week, and elongate the discovery,

13 hopefully, with the Court's permission,

14 because we've been working diligently and

15 it's no fault of anyone's that we haven't

16 finished the discovery and the depositions in

17 this case.

18       With that said, we'll continue on another

19 date here in Mr. Mascaro's office. And we'll

20 start at 10 a.m., now that I know how to get

21 here fairly quickly.

22       If that's okay with everyone?

23       MR. MASCARO: I concur.

24    (The deposition concluded at 3:11 p.m.)

25

144

1              C E R T I F I C A T E

2

3    I hereby certify that I am a Notary Public, in

4  and for the State of Connecticut, duly commissioned

5  and qualified to administer oaths.

6    I further certify that the deponent named in the

7  foregoing deposition was by me duly sworn, and

8  thereupon testified as appears in the foregoing

9  deposition; that said deposition was taken by me

10 stenographically in the presence of counsel and

11 reduced to typewriting under my direction, and the

12 foregoing is a true and accurate transcript of the

13 testimony.

14    I further certify that I am neither of counsel

15 nor attorney to either of the parties to said suit,

16 nor am I an employee of either party to said suit,

17 nor of either counsel in said suit, nor am I

18 interested in the outcome of said cause.

19    Witness my hand and seal as Notary Public

20 this ____ day of _____, 2004.

21

22

                    _____

                    Kimberly M. White

23                  Notary Public

24 My commission expires: 8/31/2007.

25

145

INDEX OF EXAMINATION

PAGE

DIRECT EXAMINATION BY MR. MEZZACAPPA          -03-


INDEX OF EXHIBITS

DEFENDANT'S EXHIBIT                    PAGE

1- List of cases                      -014-

2- Handwritten notes                  -037-

3- Typewritten notes                  -097-

4- Diagram                            -142-

146

J U R A T

I have read the foregoing pages, and hereby acknowledge the same to be a true and correct record of the testimony.




_____

THOMAS J. KLEM


Subscribed and sworn to before me this _____ day of ____, 2004.




_____

Notary Public

My Commission Expires:

147

REQUESTS FOR PRODUCTION

REQUEST                                  PAGE

We're just going to call for production of the  -018- updated list.

Just at this time I still need a delineation   -021- or an explanation of the relationships between Encompass, Glen Falls and CNA based on Mr. Mollenkoph's testimony and based on this testimony so far.

At this time I'm requesting production of the   -063- date that the first report went out, and if that's -- if the only way to determine that is by the bill for your services, then we would request that as well.

At this time we're going to request production  -065- of the date that the second report left your office, and if that requires the billing documents to tell us that, then we request those.

At this time I'm going to request production   -074- of a redacted log of activities showing us just the log of activities relevant to this case. So that I'm clear on the record, you can redact every other thing that doesn't interfere or refer to this case, and we just want a log of activities of your activities on this particular case from the time you first got the first call on it up until the present time.

So we will request production of a full set    -084- of all the photographs taken by this witness in October of 2001.

We will then ask that not only that we be      -086- produced duplicate originals from the negatives, but that they be e-mail-attached to us so that I can forward them on.

At this time, I'm going to request production  -099- of any documents, notes, memos, photographs that haven't been produced to us which your employees, Mr. Folger or Mr. Murphy or anyone else on your behalf, including Alycia -- I don't recall her last name -- would have prepared regarding this case.

148

REQUESTS FOR PRODUCTION (CONTINUED)

REQUEST                                  PAGE

To the extent that any other documents which   -100- I've forgotten to ask about or reference today, we would also request production of those.

149

1      E R R A T A  S H E E T
2    NAME OF CASE:  Glenn Falls Insurance Company a/s/o
               Harold and Lauren Heinz

     DEPONENT:     Thomas J. Klem
4
     TAKEN ON:     March 16, 2004
5
6          C O R R E C T I O N S
7
8    PAGE  LINE    NOW READS           SHOULD READ
9         _____
10        _____
11        _____
12        _____
13        _____
14        _____
15        _____
16        _____
17        _____
18        _____
19        _____
20        _____
21        _____
22        _____
23        _____
24    _____    _____
25    Deponent Signature      Notary Public

---

150

     DEL VECCHIO REPORTING SERVICES, LLC
              117 RANDI DRIVE
        MADISON, CONNECTICUT  06443
              (203)245-9583
3
4    NAME OF CASE:  Glenn Falls Insurance Company a/s/o
               Harold and Lauren Heinz

5    DEPONENT:     Thomas J. Klem

6    TAKEN ON:    March 16, 2004

7    TAKEN BY:    Kimberly M. White, CSR, LSR

8    SENT TO:    Joseph Mascaro, Esq.
               Morrison, Mahoney & Miller
9
     INSTRUCTIONS FOR READING AND SIGNING OF DEPOSITION
10
     TO THE WITNESS:
11
12   1. Please read the enclosed copy of your
        deposition.
13   2. After reading the deposition, appear before a
        notary public and sign before him/her on the page
14      indicated and have the notary sign where
        indicated.
15
16   3. If there are any corrections to be made in the
        transcript, please do not make them on the
17      transcript.
        Please use the attached form for listing any and
18      all corrections and then have the notary sign
        along with your signature on the bottom of the
        sheet where indicated.
19
20   4. Do not make changes just to restate your
        testimony.

     5. Please return Jurat page and Errata Sheet ONLY
        to:
        DEL VECCHIO REPORTING SERVICES
        117 RANDI DRIVE
23      MADISON, CT  06443
                    Thank you.
24
25