1        <u>UNITED STATES DISTRICT COURT</u>

2        <u>DISTRICT OF CONNECTICUT</u>

3   CV NO:  303 CV 105                    :

4   GLENS FALLS INSURANCE COMPANY         :   VOLUME II

5   A/S/O HAROLD AND LAUREN HEINZ         :   HARTFORD

6   VS.                                   :   AT HARTFORD

7   COMMAND FORCE SECURITY SYSTEMS, INC.  :   THURSDAY

8                                         :   MAY 6, 2004

9   <u>CONTINUED DEPOSITION OF:  T.J. KLEM, MScFPE</u>

10  APPEARANCES:

11  LAW OFFICES OF MORRISON, MAHONEY & MILLER, LLP
         Attorneys for the Plaintiff
12       One Constitution Plaza
         Hartford, CT  06103
13       (860) 616-4441
    BY:  JOSEPH MASCARO, ESQ.
14
    LAW OFFICES OF KAUFMAN, BORGEEST & RYAN, LLP
15       Attorneys for the Defendant
         200 Summitt Lake Drive
16       Valhalla, NY  10595
         (914) 741-6100
17       mmezzacappa@kbrny.com
    BY:  MICHAEL P. MEZZACAPPA, ESQ.
18

19

20

21

22

23

24

25

Heather A. Pellerin, License # 00144
Registered Professional Reporter
Certified Realtime Reporter

1  Continued deposition of T.J. KLEM, a witness, taken on

2  behalf of the DEFENDANTS, COMMAND FORCE SECURITY SYSTEMS,

3  INC., in the herein before entitled action, pursuant to the

4  Federal Rules of Civil Procedure, before Heather A.

5  Pellerin, duly qualified Notary Public in and for the State

6  of Connecticut and Commonwealth of Massachusetts, held at

7  the LAW OFFICES OF MORRISON, MAHONEY & MILLER, LLP,

8  Attorneys for the Plaintiffs, One Constitution Plaza,

9  Hartford, CT  06103, (860) 616-4441, commencing at 12:15

10  p.m. on THURSDAY, MAY 6, 2004.

11                    **STIPULATIONS**

12      It is hereby stipulated and agreed by and among

13  counsel for the respective parties that all formalities

14  in connection with the taking place of this deposition,

15  including time, place, sufficiency of notice, and the

16  authority of the officer before whom it is being taken

17  may be and are hereby waived.

18      It is further stipulated and agreed that objections

19  other than as to form are reserved to the time of trial.

20      It is further stipulated that the proof of the

21  qualifications of the Notary Public before whom the

22  deposition is being taken is hereby waived.

23

24

25

| 1 | **INDEX** |
|---|---|
| 2 | T.J. KLEM |

| 3 | **CONT'D DIRECT**        **CROSS**        **REDIRECT**        **RECROSS** |
|---|---|
| 4 | 152* |
|   | *By Mr. Mezzacappa |
|   | **By Mr. Mascaro |
| 5 | **CONTINUED DEFENDANT'S EXHIBITS**                    **PAGE** |
| 6 | Exhibits 5-6, Diagrams                               177 |
| 7 | Exhibit 7, Single Sheet of Handwritten Notes        178 |
| 8 | Exhibits 8-18, Color Photographs                    191 |
| 9 | Exhibit 19, Color Photograph                        208 |
| 10 | Exhibit 20, Color Photograph (marked off record) |
| 11 | |
| 12 | **AMENDED TESTIMONY**                                **PAGE** |
| 13 | Regarding Command Detector Placement                179/180 |

| 14 | |
|---|---|
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Heather A. Pellerin, License # 00144
Registered Professional Reporter
Certified Realtime Reporter

```
 1   T.J. KLEM, called as a witness by the defendants, having

 2   first been duly sworn by the Notary, was examined and

 3   testified on his oath as follows:

 4

 5        CONT'D DIRECT EXAMINATION BY MR. MEZZACAPPA:

 6

 7        Q.   Good afternoon, Mr. Klem.

 8        A.   Good afternoon.

 9        Q.   We were last here on March 16th, 2004, and cut

10   short by the snowstorm, and we will resume your testimony

11   as an expert in the case of Glens Falls Insurance Company

12   versus Command Force Security Systems.  All of the same

13   rules apply.  I will not read you the rules all over again

14   unless you want me to.

15        A.   No.  I don't need to have them read.

16        Q.   In between last time at your deposition on

17   March 16th and today, did you review any documents,

18   photographs, or other materials in anticipation of today's

19   deposition?

20        A.   Yes.

21        Q.   And what did you review in between the two days?

22        A.   I prepared myself for the deposition, so I went

23   through the entire file and relevant matters that I thought

24   would be asked, or backup documentation that I thought

25   would be necessary to show, indicated site-specific years
```

1    of codes, for example, NFPA codes that I was using as

2    opposed to other years of codes that might be available as

3    engineering standards.

4         Q.   And when did you review these documents?

5         A.   Mostly within the last two days.  I think the

6    last two days is probably when all of the review occurred.

7         Q.   And the documents that you reviewed, have they

8    been exchanged to me, as far as you know?

9         A.   All the documents, except for the one that was

10   just handed to you this morning, I went on-line and got

11   some additional supplemental information that I thought was

12   supportive of positions and conclusions and utilization of

13   codes and standards and opinions that I formed.

14        Q.   So the information that you handed to me today

15   is labeled "Chapter 541, Building Fire and Demolition

16   Codes"; is that correct?

17        A.   Correct.

18        Q.   Is this the only new document that you believe I

19   didn't have when we were taking your deposition on

20   March 16th?

21        A.   Yes.

22        Q.   And when did you download this information?

23        A.   Within the last two days, probably yesterday,

24   and I actually forgot it, and I had my assistant fax it to

25   me.

1      Q.   And where did you download it from?

2      A.   The Connecticut State Building Code web site.

3  You see the www.CGA.state.CT.US web site at the bottom of

4  the page?

5      Q.   And was this referenced in any of -- in either

6  of the two reports that we have been speaking about last

7  time?

8      A.   Only in the sense that the utilization of the

9  codes, and more specifically the utilization of certain

10  sections of the code, and specifically I'm talking about

11  new versus existing homes, is supported by this and other

12  documents that you already had prior to this and

13  independent of this.

14      Q.   And this version of the Connecticut state code,

15  was that in effect at the time of the fire, 7/23/01?

16      A.   The wording was.  I think it refers to -- this

17  section is 29-292 and it says "formerly section 29-40," and

18  you will see the date is 5/6/04, so you have to go back in

19  that year's time to section 29-40 for the identical section

20  that you have in front of you.

21      Q.   Did you go back and look at 29-40?

22      A.   I did not, I did not.

23      Q.   So, as you sit here today, you do not know if

24  29-40 is identical to the language that's contained in

25  29-292; is that correct?

1    A.    I didn't check it word-for-word, but having
2  experience in having looked at codes it says "formerly the
3  section," so it would lead the user, which I am in many
4  instances and in many states, to make that conclusion, but
5  I did not go back and find that reference document and
6  check it word-for-word.
7    Q.    The house at 34 Wildwood we were speaking about,
8  and that you're here for, was not new construction on the
9  day of the fire, was it?
10    A.    That depends if you're talking in code terms or
11  are you talking in layman's terms.  In layman's terms, no,
12  it was not.
13    Q.    And we established on your deposition on
14  March 16th, 2004, that you did not know definitively when
15  renovations were done in the year 2000; is that correct?
16          MR. MASCARO:  Definitively meaning by
17      specifically the date it ended?
18          MR. MEZZACAPPA:  Right, just when renovations
19      definitively were done, not just when it ended.
20          THE WITNESS:  If I said that, you know, I
21      certainly have had my memory refreshed by the
22      deposition of Mr. Heinz it's fairly clear when
23      renovations began and ended, so I perhaps misspoke
24      then if I said that.  I clearly know the time
25      interval of the renovations.  I think what I said is

1    I have not seen building permits to independently

2    support what I knew of the renovations other than

3    what I had read in the depositions of persons in this

4    case, including Mr. Heinz.

5        Q.   (By Mr. Mezzacappa) I think for the purpose of

6  the deposition I'm going to ask you yes or no questions the

7  rest of the day.  I think it will go much more quickly, and

8  my questions are seeking yes or no answers unless I specify

9  other than that.  Is that clear?

10       A.   Yes.

11       Q.   Okay.  Before you were deposed on March 16th,

12 2004, you read the deposition of Mr. Heinz, correct?

13       A.   Yes.

14       Q.   Okay.  And did you reread the deposition of

15 Mr. Heinz in between March 16th and today?

16       A.   Yes.

17       Q.   You did not speak to Mr. Heinz before you issued

18 either one of your reports, did you?

19       A.   Well, I didn't personally, that's correct.  My

20 company did, company representatives.

21       Q.   And when you issued your two reports, you did

22 not definitively know when renovations were done to

23 Mr. Heinz's home, correct?

24       A.   That's not correct.

25            MR. MASCARO:  I will object to the form.  You

1    can go ahead and answer if you can.

2         THE WITNESS:   No.

3    Q.    (By Mr. Mezzacappa) That's not correct?

4    A.    That's not correct.

5    Q.    Let's leave it at that's not correct, otherwise,

6    we will get really confused.  Before you were deposed on

7    March 16th, 2004, you had read the deposition of Matt

8    Matza; is that correct?

9    A.    That's correct.

10    Q.    And did you review the photographs which were

11    shown to Mr. Matza during his deposition?

12    A.    The exhibits were not part of that so I -- some

13    of the photos I'm sure I reviewed because specifically

14    they, if I'm remembering correctly, said something about

15    T.J. Klem and Associates photos so, obviously, I know

16    those, but the photos I have are photos that I have taken.

17    I have not been supplied photos from any other people that

18    have taken photos of that site.

19    Q.    Okay.  In your testimony on March 16th, 2004,

20    you testified that you believed the renovations were

21    completed in late 2000, and I asked you if by that you

22    meant November or December and you agreed.  Do you recall

23    that testimony?

24    A.    Basically, yes, yes.

25    Q.    Okay.  And do you have any documentary proof,

1    including photographs or documentary evidence, to

2    demonstrate that the renovations to the Heinz home were

3    completed before the end of the year in 2000?

4        A.    No, I don't have any.

5        Q.    And do you recall your testimony from my showing

6    you documents on March 16th, 2004, that my client installed

7    the alarm in or around February of 2000?

8        A.    I remember you saying that, yes.

9        Q.    Okay.  Do you remember that the documents that I

10   showed you -- that I showed you documents indicating that a

11   contract was entered into in February of 2000?

12       A.    I have seen that, yes.

13       Q.    Do you remember the testimony of Mr. Matza from

14   reading it that the alarm was installed shortly after the

15   contract was initially signed by Mrs. Heinz?

16       A.    That's his testimony, yes.

17       Q.    Do you have any documents, either photographs or

18   written documents, which would show that not to be true?

19       A.    No.

20       Q.    When the first report was issued by Mr. Folger

21   of your company, and I think -- withdraw the question.

22             We established on your last deposition of

23   March 16th, 2004, that there were two reports issued by

24   your company.  We had previously marked the first one as

25   Defendant's Exhibit C on January 7th, 2004?

```
 1        A.    Correct.
 2        Q.    We then previously had marked the second one as
 3   Exhibit D of January 7th, 2004, correct?
 4        A.    Yes.
 5        Q.    Am I accurate in saying that Mr. Folger authored
 6   the first report and that you, as per your testimony on
 7   March 16th, 2004, approved that report and may have made
 8   some changes to it?
 9        A.    Correct.
10        Q.    Okay.  And then that report -- withdrawn.  Who
11   originally was sent this report by your company?
12        A.    It's at the bottom left-hand -- right-hand
13   corner.
14        Q.    Indicated prepared for Jake Mollenkoph,
15   Encompass Insurance?
16        A.    That's correct.
17        Q.    And in what form would that report have been
18   sent?
19        A.    It would have had a folder, any fire department
20   records, supporting documentation, and I quite frankly
21   cannot recall whether that's the case in this, but I'm
22   saying generically reports usually, and specifically in
23   this report, they would have had photographs.  I just can't
24   recall whether or not it also had a fire department
25   dispatch record and initial determination along with it.  I
```

1    don't recall that.

2        Q.    Okay.  And the second report, which was a

3    supplemental report, Defendant's Exhibit D, was prepared by

4    you, correct?

5        A.    Yes.

6        Q.    Did Mr. Folger help prepare this report?

7        A.    He might have answered questions if I had any on

8    what level was this or what room, for example, but nothing

9    of substance.

10        Q.    Okay.  And I started to question you, but I

11    didn't finish, and I learned that you were asked to provide

12    this supplemental report by Morrison, Mahoney & Miller, the

13    attorneys who are representing the plaintiff here, correct?

14        A.    I think that's the case, yes.

15        Q.    And who was it at Morrison, Mahoney & Miller,

16    that asked you to supplement the report?

17        A.    I believe it was Joe Mascaro, but it might have

18    been his predecessor, so I dealt with three people at

19    Morrison, Mahoney & Miller, and I don't remember which one

20    specifically, as I sit here today, which one asked for it.

21        Q.    It if it was not Mr. Mascaro, who was it that

22    you're referring to as the predecessor?  What is your

23    recollection of who his predecessor is?

24        A.    I would have to look at the file.

25            MR. MASCARO:  Answer as to what you can remember

1        as you sit here today.

2            THE WITNESS:  I can't recall.

3        Q.    (By Mr. Mezzacappa) And then you dealt with a

4    third person here at Morrison Mahoney & Miller?

5        A.    Yes.

6        Q.    Does that mean it could potentially be that

7    third person as well?

8        A.    No.  There's three separate people, two besides

9    Joe Mascaro.

10        Q.    All right.  What I'm just trying to get is not

11    who you dealt with in the firm, but who from here asked you

12    to supplement the report?

13        A.    I don't know.

14        Q.    Are there two possible people, Mr. Mascaro and

15    someone else, or three possible people, Mr. Mascaro and two

16    other possible people it could be?

17        A.    I think it could be three possible people, two

18    other than Joe Mascaro.

19        Q.    In addition to Mr. Mascaro, whose name we know?

20        A.    Yes.

21        Q.    Do you recall the names of the other people who

22    it could be that asked you to supplement the report?

23        A.    No, I don't.

24        Q.    Now, I believe you testified on March 16th,

25    2004, you were asked to supplement the report approximately

1  a year after you were last in the house; is that correct?

2      A.   Yes.

3      Q.   And at the time you were asked to supplement the

4  report the house had been knocked down after the fire and

5  was either in the process of being rebuilt or had been

6  rebuilt; is that correct?

7      A.   No, it's not correct.

8      Q.   It's not correct?

9      A.   No.

10     Q.   Okay.  So, at the time that you were asked to

11 supplement the report, what is your understanding of the

12 status of the house post fire?  What did it look like when

13 you were asked to supplement the report?

14     A.   Sorry to jump on you.

15     Q.   That's all right.

16     A.   It was months after the fire when I was there,

17 and the report came about a year after I was there, so the

18 house was in the same state of fire damage as was the case

19 just a month or two prior to the initial investigation by

20 Mr. Folger and Mr. Murphy of my company.

21     Q.   Maybe you misunderstood my question.  I wasn't

22 asking you when you went back there, because we established

23 at the last deposition that you were there in October of

24 the year of the fire, which was 2000?

25     A.   Correct.

```
 1        Q.   But when you were asked to -- when you
 2   supplemented your report --
 3        A.   Yes.
 4        Q.   -- and it went out, that was a year later than
 5   when you were there in October of 2000, right?
 6        A.   By my recollection, it was months after that,
 7   and a year does not sound unreasonable to me.
 8        Q.   At the time you supplemented your report --
 9        A.   Yes.
10        Q.   -- possibly in the year 2001 or later, what was
11   the house -- what remained of the house of 34 Wildwood when
12   you supplemented your report?
13        A.   I have no idea.
14        Q.   Okay.  So as you were supplementing your report,
15   did you ever go back to the premises to get any more
16   information?
17        A.   No, I didn't.
18        Q.   The only time you were at the premises was in
19   October of 2001; is that correct?
20        A.   Correct.
21        Q.   When you were there was Mr. Mascaro with you?
22        A.   No.
23        Q.   Okay.  When you were there were any
24   representatives from Morrison, Mahoney & Miller present
25   with you?
```

```
1         A.    Yes.
2         Q.    Who was there present with you in October of
3    2000?
4         A.    I don't recall.
5         Q.    Do you have any notes that would refresh your
6    recollection as to that?
7         A.    I could look.
8              MR. MEZZACAPPA:  At this time we're going to
9         request production of any documents in whatever form
10        that would refresh his recollection as to who from
11        this law firm was there when he was there in October
12        of 2000.
13             MR. MASCARO:  You are asking for the documents
14        that reflect -- that would refresh his recollection,
15        if any, or just the information contained in the
16        documents?
17             MR. MEZZACAPPA:  The documents, if any, that
18        would refresh his recollection, since he has no
19        recollection as he sits here now.
20             MR. MASCARO:  Okay.
21             MR. MEZZACAPPA:  That's assuming documents
22        exist.
23             MR. MASCARO:  And just for the record, we don't
24        take the position one way or the other since I don't
25        know what this document may be, if it does exist,
```

1    whether there's any basis to object to the disclosure

2    of the full document.

3        MR. MEZZACAPPA:  Okay.

4        Q.   (By Mr. Mezzacappa) When you were asked to

5    supplement your report by someone at Morrison, Mahoney &

6    Miller, how was that done?  Was that a phone call, letter,

7    E-mail, or something else?

8        A.   It was a telephone call.

9        Q.   Do you remember the sum and substance of the

10   telephone call with the attorney from this firm?

11       A.   Yes.

12       Q.   Tell me what your recollection of that is,

13   please.

14       A.   They were asking, based on my additional review

15   of the fire incident and the additional review that

16   subsequently happened of applicable code standards,

17   regulations of the state of Connecticut and engineering

18   practices to opine as to whether or not the smoke detection

19   system that was installed within the premises was installed

20   properly, adequately, and whether or not, depending upon

21   the answer to that question, whether or not -- if it was

22   not installed properly, had it been installed as guided by

23   appropriate standards, whether or not it made a difference

24   in the outcome of the fire.

25       Q.   And what did you respond to this request?  How

1  did you respond?  What words did you use?

2      A.   I said I would put it in writing.  I perhaps

3  gave a thumbnail of, not detailed point-by-point

4  itemization of my findings, but I think, in general, I

5  probably told them my opinions.

6      Q.   Now, before they asked you to supplement your

7  report, was this before you went back to -- before you ever

8  went to the house in October of 2001?

9      A.   No.

10     Q.   Let me withdraw that.  That's an unclear

11  question.  Was the call from the attorney at Morrison,

12  Mahoney & Miller before you went to the house in October of

13  2001?

14     A.   The call that we're referring to was after I had

15  been called prior to that time to say to show up to the

16  site by a representative from Morrison, Mahoney & Miller

17     Q.   Okay.  And Mr. Folger and Mr. Murphy had

18  previously been to the house in July within days of the

19  fire and had issued the first report which you had signed

20  off on as well, correct?

21     A.   Correct.

22     Q.   Before this time?  And then there came a time

23  that someone from Morrison, Mahoney & Miller called you and

24  asked you to go to the house in October of 2001.  What was

25  the sum and substance of that phone call?

1    A.   The sum and substance was, you know, we want to
2  review the report, in general, and the findings and
3  understand from, you know, observation of the actual site
4  and the relevant fire protection matters, so they wanted a
5  review of what the determinations were, and they wanted to
6  review what the determinations of what my company were at
7  that time.
8    Q.   And who made the first call to tell you that
9  they wanted a review of the determinations which were made
10  and that you should meet them at the house in October of
11  2001?
12    A.   That was a representative from Morrison, Mahoney
13  & Miller.
14    Q.   Do you know who that was?
15    A.   I don't.
16    Q.   Is there a possibility of who it could have been
17  that you have in mind?
18    A.   I know the description, it was a woman, but,
19  again, I don't recall what that woman's name is.
20    Q.   And she's an attorney here, or was at that time?
21    A.   She was at the time, yes.
22    Q.   Do you know if she's still employed by the
23  company?
24    A.   I don't believe she is, or has transferred.
25    Q.   Do you have any documents back at your office or

```
 1   anywhere that would refresh your recollection as to the
 2   identity of this woman lawyer?
 3        A.   I don't believe so.
 4             MR. MEZZACAPPA:  Assuming there are, we will
 5        request production of such documents or information
 6        that would refresh his recollection as to who this
 7        was.
 8             MR. MASCARO:  Same position as the last request.
 9        Q.   (By Mr. Mezzacappa) This woman attorney, was she
10   alone with you on the phone, or was there someone else on
11   the party line?
12        A.   There was no party line.
13        Q.   So it was just a call between the woman and
14   yourself?
15        A.   That's correct.
16        Q.   And did she initiate the call?
17        A.   Yes.
18        Q.   Did she express concern with the conclusions
19   that your first report, Exhibit C, contained at that time?
20        A.   No.
21        Q.   Did she at all express dissatisfaction with your
22   company's conclusions?
23        A.   No.
24        Q.   During that phone call did you defend your
25   company's conclusions from the first report which you had
```

1    previously signed off on that was prepared by Mr. Folger,
2    and I'm referring to Defendant's Exhibit C at this point.
3        A.    No.
4        Q.    And who set up the date for you to go in October
5    to the house?
6        A.    The attorney.
7        Q.    And did she specifically request that you come,
8    or that Mr. Folger and Mr. Murphy return to the scene, or
9    something else?
10       A.    I don't know if she was specific.  She asked me
11   -- I don't know if she intended to exclude others, but she
12   asked me to come.
13       Q.    And you made the decision during that phone call
14   that you would be the one to go?
15       A.    Yes.
16       Q.    Did you ask Mr. Folger or Mr. Murphy to
17   accompany you to that October meeting?
18       A.    No.
19       Q.    In addition to yourself and a representative
20   from Morrison, Mahoney & Miller -- withdrawn.
21            Does this -- does discussing this help you
22   refresh your recollection that when you went to the house
23   in October of 2001 this woman attorney was present there?
24       A.    Oh, she definitely was there, yeah.
25       Q.    In addition to her being there, was any other

1    lawyer or representative from Morrison, Mahoney & Miller at
2    the scene in October when you went for the first time?
3        A.    No.
4        Q.    In addition to you, the woman attorney, was
5    there -- and the woman attorney, was there anyone else
6    there in October of 2001?
7        A.    Jake Mollenkoph.
8        Q.    Now, before you went to the house in October of
9    2001, but after getting the call from the lawyer, did you
10   speak to Jake Mollenkoph, either on the telephone or in
11   person?
12       A.    No, not about this case.  You know, I dealt with
13   him on --
14       Q.    I understand.  I'm only asking about this case
15   right now.  Thank you.  When you arrived at the home in
16   2001, what is the first thing you did?
17       A.    I approached the building like I would an
18   investigation.  I looked around.  I saw in true size and
19   shape the building, the access, the arrangement, the
20   construction, all the things that I had understood on paper
21   and in words and through pictures and now got a feel for
22   the occupancy type, the damage to the building as -- fire
23   damage to the building as it became obvious on the
24   walk-around, and then I entered the building and began to
25   look around the building in areas that became obvious from

1   a typical single-family dwelling.  I began to observe what

2   I thought was a living room, dining room and so forth and

3   so on and ultimately was -- it led, that process led to the

4   basement area and to a bedroom area located on the basement

5   level where it appeared the fire started and to which

6   bedroom the report of Mr. Folger and myself, the initial

7   report as we call it, or Defendant's Exhibit C indicated

8   that the origin of fire occurred.

9        Q.   Okay.  And while you were at the house, did you

10  speak to Mr. Mollenkoph or the woman attorney from

11  Morrison, Mahoney & Miller about the fact that the first

12  report that your company had issued, Defendant's Exhibit C,

13  was not going to be a sufficient report in order to pursue

14  a third party similar to my client, Command Force Security?

15       A.   Never talked about that.

16       Q.   Did you -- did they -- did either Mr. Mollenkoph

17  or the woman attorney ever express to you that without you

18  issuing another report they wouldn't be able to pursue a

19  third party because it was their opinion that a third party

20  was responsible, or words to that effect?

21       A.   No.

22       Q.   Did they ask you to annihilate or withdraw your

23  first report?

24       A.   No.

25       Q.   When you wrote your second report, Defendant's

1  Exhibit D, does this report contain any sentence, language,
2  or words that say to ignore the first report?
3       A.   No.
4       Q.   Does this second report refer to the first
5  report except where it says on page 1, the last sentence of
6  the paragraph, first paragraph of the page, "the author" --
7  I'm sorry, withdrawn.
8            Does the second report in sum and substance or
9  in words or in sentences or in paragraphs, other than the
10 first paragraph where it indicates that you have been asked
11 to supplement the fire investigative analysis, refer to the
12 first report?
13           I guess a shorter way to say that, because you
14 look a little perplexed about my question, a shorter way to
15 say that would be:  Does the first report at all -- does
16 the second report, Defendant's Exhibit D, I'm sorry, at all
17 refer to the first report other than in its first
18 paragraph?
19      A.   I don't think so.
20      Q.   Now, when you were in the house on the second
21 occasion, I'm sorry, when you were in the house on your
22 first occasion, but your company's second occasion, this
23 was October of 2000, correct?
24      A.   Yes.
25      Q.   In between that time, and backing up until July

1    when Folger and Murphy had been there, do you know if

2    anyone else had been in the house in between those two

3    times?

4         A.    From my company?

5         Q.    From your company.  We will start with that.

6         A.    No one had been in the house, no.

7         Q.    Do you know if anyone had been in the house in

8    between July and October?

9         A.    I have no idea.

10        Q.    Okay.  So you don't know if anything was

11   removed, added, destroyed, or otherwise -- in any other way

12   tampered with in between July 25th, when Folger and Murphy

13   were done with their work, and October of 2000, when you

14   went in there; is that correct?

15        A.    No, it's not correct.

16        Q.    It's not correct?

17        A.    No.

18        Q.    Okay.  Do you know for certain, as you sit here

19   today, that nobody went into that house and tampered with

20   anything that might be important to your investigation in

21   between July and October?

22        A.    I know people were in the house.

23        Q.    Who was in the house that you know of?

24        A.    A person who put new smoke alarms in the

25   building.

1    Q.   Okay.  Other than the person who put new smoke

2    alarms in the building, do you know if anyone else was in

3    the house in between July 25th and October of 2000?

4    A.   No, I don't.

5    Q.   Okay.  And we established at your deposition on

6    March 16th that new smoke alarms were placed in close

7    proximity to the smoke alarms that were in the building,

8    and you knew they were new because they didn't have any

9    evidence of soot or having been in the fire premises; is

10   that correct?

11   A.   Well, if that's what I said.  I was not specific

12   enough, because they had only been placed at certain

13   levels, and when you say "existing detectors," there were

14   numerous detectors, so either we can break the question

15   down into that which I know existed and that which I know

16   were placed or some other variation of that.

17   Q.   Okay.  I understand what you're saying.  When

18   you went into the house in October, is it fair to say that

19   there were a number of smoke detectors in the house?

20   A.   Yes.

21   Q.   Okay.  And some of them had been placed there

22   after the fire; is that correct?

23   A.   That's correct.

24   Q.   Okay.  I don't want to talk today about the ones

25   that were placed there after the fire.  We have testimony