1    in this case regarding that from my client and from

2    Mr. Heinz, and we will take that testimony as a given for

3    the time being.

4            What I want to talk to you about is:  How many

5    smoke detectors were there in total, in your opinion, on

6    the date of the fire in that house from whatever source,

7    whether they were there previously, whether my client

8    installed them, or whatever.  How many existed?

9        A.   I'm going to refer to my notes.

10       Q.   Okay.

11       A.   Nine.

12       Q.   What did you refer to in order to come up with

13   that answer?

14       A.   The documents that you were given, the sketches.

15   There are no exhibit numbers.  We can either put these in

16   exhibit numbers --

17           MR. MASCARO:  He hasn't marked them yet.

18           MR. MEZZACAPPA:  Were these supplied to me?

19           MR. MASCARO:  I believe so.  These are part of

20       the original file?

21           THE WITNESS:  Yes, absolutely.

22           MR. MEZZACAPPA:  What are they part of?

23           THE WITNESS:  They're part of what was provided

24       to you.

25           MR. MASCARO:  They weren't segregated that way.

1    You want to make copies of them now, Mike, and mark

2    those?  Those could be his originals.  I can copy

3    these if necessary.

4        MR. MEZZACAPPA:  Let's see if I can find them

5    fairly quickly.  There's a couple spots they could be

6    in.

7        MR. MASCARO:  There may be some in there.

8        THE WITNESS:  That's one of them.  That's

9    another one.  That's another one.

10       MR. MASCARO:  That's that one there?

11       THE WITNESS:  No, I didn't refer to that one,

12   no.  That's a duplicate.  I don't mean to do that to

13   you.

14       MR. MEZZACAPPA:  It's actually your file.

15       THE WITNESS:  You have that.  I saw earlier

16   today you have that.

17       MR. MASCARO:  If you want to make copies of them

18   and mark them independently, why don't we do that?

19       MR. MEZZACAPPA:  Yeah.  Why don't I leave them

20   in the file and we can mark the copies.

21       THE WITNESS:  I used that one.  I used that one.

22   And I actually -- those are the two I used.

23       MR. MASCARO:  Okay.

24       (A break was taken)

25       MR. MEZZACAPPA:  Back on the record.  Can you

1          mark these two diagrams?

2              (Defendant's Exhibits 5-6, Diagrams, Marked for

3              Identification)

4      Q.    (By Mr. Mezzacappa) Sir, in order to come up

5  with that answer you indicated you looked at two documents.

6  I have now marked those documents as Defendant's Exhibits 5

7  and 6.  Are those the two documents you utilized to come up

8  with nine detectors?

9      A.    Yes, yes.

10     Q.    And what is Defendant's Exhibit 5?

11     A.    It's a sketch of the basement area and some

12  notations that have been made.

13     Q.    And who prepared that sketch?

14     A.    Kevin Murphy prepared the sketch.  I provided

15  the notations on my October visit to the site.

16     Q.    And looking at Defendant's Exhibit 6, what is

17  that?

18     A.    This is some sketches that Mr. Murphy made that

19  were the basis of his sketches.

20     Q.    Basis of Defendant's Exhibit 5?

21     A.    Yes.

22     Q.    Okay.  And are your notes anywhere on

23  Defendant's Exhibit 6?

24     A.    No.

25     Q.    So, by looking at Defendant's Exhibits 5 and 6

 1  then you prepared this yellow sheet of paper for us today,

 2  and you have listed nine detectors; is that correct?

 3      A.   Yes, that's right.

 4          MR. MEZZACAPPA:  Let's have this marked as well,

 5      if you don't mind, Counsel?

 6          MR. MASCARO:  No.

 7          MR. MEZZACAPPA:  That will be Defendant's

 8      Exhibit 7.

 9          (Defendant's Exhibit 7, Single Sheet of

10          Handwritten Notes, Marked for Identification)

11      Q.   (By Mr. Mezzacappa) I don't want to pretend to

12  be able to read your handwriting, not that it's that bad,

13  but if you can read into the record what you have put next

14  to the number nine, please do so.

15          MR. MASCARO:  And read it slowly.

16          THE WITNESS:  The numbers that I have have no

17      association to, Defendant's Exhibit 5 and Defendant's

18      Exhibit 6.

19      Q.   (By Mr. Mezzacappa) Okay.  Thank you.

20      A.   It's a listing.  No. 1 is "downstairs family."

21  No. 2 is, quote, "system detector above stairs."  No. 3 is

22  "electric/furnace room."  No. 4 is "system," quote,

23  unquote, "detector at top of stairs."  No. 5 is, quote,

24  "hard-wired detector at top of stair."  No. 6 "system,"

25  quote, unquote, "detector outside master bedroom."  No. 7

1    is "detector inside bedroom No. 1."  No. 8 --

2         Q.   Can you just read No. 7 again?

3         A.   "Detector inside bedroom No. 1."  No. 8 is

4    "detector inside bedroom No. 2."  No. 9 is "detector

5    inside," quote, "skylight in," quote, "great room."

6         Q.   From looking at these nine detectors, could you

7    tell which ones had been installed by Command, my client,

8    prior to the date of the fire?

9         A.   Yes.

10        Q.   Which ones were installed by Command Force?

11        A.   When I say "system detector."

12        Q.   So No. 2, No. 4, No. 6; is that correct?

13        A.   Yes.  Let me just double-check.  I'm going to

14   clarify this.  I'm going to put on No. 2 system detector

15   about stairs, basement, paren, basement level.

16        Q.   Okay.

17        A.   Just so it's clear.

18        Q.   And we will let the court reporter go back and

19   amend that in the first list, if you would.  So you are

20   confident, as you sit here today, that the three detectors

21   installed by my client are No. 2, 4, and No. 6, based on

22   your list?

23        A.   Actually, I think I will amend this.  I think in

24   listing the detectors that No. 4 and 6 are the same, so I

25   will note that by an arrow between No. 4 and 6 and write

1    "same."

2         MR. MASCARO:  Does that mean there's a total of

3    eight?

4         THE WITNESS:  That means there's a total of

5    eight, and the other detector is a third system

6    detector, and I didn't verify that by the designation

7    of "system" in any of the eight that I have listed.

8         Q.   (By Mr. Mezzacappa) So somewhere on this list is

9    another system detector, but you just can't tell which one

10   it is right now?

11        A.   That's right, that's right.

12        Q.   Is there any dispute that my client installed

13   three system detectors in this case, from your point of

14   view?  Let me rephrase the question?

15        A.   Okay.

16        Q.   Do you have any documentation, photographs, or

17   other evidence, to differ with the testimony of Mr. Matza

18   that there were three centrally monitored detectors placed

19   in Mr. Heinz's home by my client at some point?

20        A.   I have nothing to dispute that.

21        Q.   Okay.  So, in addition to those three, when you

22   did your inspection in October of the home, is it fair to

23   say there's another five, or are there another six

24   detectors?  That's what I need to know right now.

25        MR. MASCARO:  As of the date when he went in

1 there in October?

2  MR. MEZZACAPPA:  When he went in there in

3 October, and I'm excluding the ones put in after the

4 fire.  When you went in in October, what I'm trying

5 to get an answer to is:  Are there five more

6 detectors other than the three my client installed,

7 or are there six more detectors, other than the three

8 my client installed?

9  THE WITNESS:  Five.

10  Q. (By Mr. Mezzacappa) Okay.  So you believe

11 there's a total of eight in October when you go in and

12 inspect the house; is that correct?

13  A. Correct.

14  MR. MASCARO:  Not including the ones installed

15 after the fire?

16  MR. MEZZACAPPA:  Right.

17  Q. (By Mr. Mezzacappa) For all purposes of these

18 questions I'm excluding anything installed after the fire.

19  A. All right.

20  Q. Did you ever make a determination in October of

21 2000, when you went to the house, or after that time, as to

22 who installed the other five detectors?

23  A. No.

24  Q. Okay.

25  A. I stand corrected.  I would like to correct that

1    record.

2        Q.    Okay.

3        A.    I relied on -- I'm relying on the testimony of

4    others, and specifically Mr. Heinz, who says in his

5    deposition that the other -- some of the other detectors

6    were installed in specifically the new bedroom areas by the

7    contractor responsible person by the name of Jim, who he

8    did not know the last name of, and he does not recall, is

9    my recollection of his testimony -- he installed the

10   battery operated detectors, and what we're calling the

11   electric room on Defendant's Exhibit 9, what I believe he

12   is calling the boiler room.

13       Q.    This contractor Jim, whose name we don't know,

14   did you ever speak to him?

15       A.    No.

16       Q.    Did you ever see any documents he generated?

17       A.    No.

18       Q.    Did you ever see any work orders or other

19   documents at all from his company?

20       A.    No.

21       Q.    Do you know when he did his work, specifically?

22       A.    Other than what sworn testimony I have read, no,

23   I don't.

24       Q.    Do you know when -- and I don't want you right

25   now answering about Mr. Heinz's testimony, because I had a

1    chance to cross-examine him.  I want you to answer from

2    your own personal knowledge and not from what you read from

3    Mr. Heinz's deposition.  Do you know when it is that this

4    contractor, Jim, installed some of these smoke detectors?

5        A.    I believe that was part -- yes, to answer your

6    question.

7        Q.    And when did he?  And I don't want you to refer

8    to Mr. Heinz's deposition.

9        A.    Right.

10        Q.    I just want you to refer to any other source you

11    have about when Jim installed the other smoke detectors.

12        A.    In a conversation that Mr. Murphy had with

13    Mr. Heinz, and as reported to me in part of Mr. Murphy's

14    investigative process, he designated a certain portion of

15    the home as new construction, and the information that he

16    provided me indicated that the new bedrooms were protected

17    with smoke detectors that were installed during the new

18    construction, what Mr. Murphy has titled "new

19    construction."

20        Q.    I'm asking you not what Mr. Murphy found out,

21    but when did Jim install these.  I need a month, a day, a

22    year.  When were they installed by Jim in that house?

23        A.    Approximately two years before the fire,

24    sometime in that two-year period.

25        Q.    But do you know what month and year they were

1   installed in that house?

2       A.   No.

3       Q.   Okay.  Is it possible then that they were

4   installed in that house after Mr. Matza installed his alarm

5   in the house or his -- I will rephrase the question.

6            Is it possible that Jim installed smoke

7   detectors in that home after Mr. Matza's company installed

8   smoke detectors in that home?

9       A.   It's possible.

10      Q.   Okay.  And this contractor, Jim, what work were

11  you told he did?

12      A.   The renovations.

13      Q.   Specifically, what renovations were done to the

14  home, according to what you were told?

15      A.   That a new wing was put on with two bedrooms, a

16  garage was added, and that's the major relevant points, and

17  parts of the building that were constructed, renovated.

18      Q.   Do you remember the testimony from Mr. Heinz

19  that he installed the alarm, or had Command Force install

20  the alarm because his insurance company wanted one

21  installed?  Do you recall that testimony?

22      A.   I remember his testimony to that, yes.

23      Q.   Do you have any documents or any evidence to

24  disagree with that testimony?

25      A.   No, I don't.

1    Q.    After the renovations were done by Jim, which

2  included the new wing with the two bedrooms, do you have

3  any documentary evidence or knowledge, as you sit here

4  today, whether Mr. Heinz's insurance company came back in

5  and reanalyzed the value of that house and increased the

6  insurance on it?

7    A.    No knowledge.

8    Q.    Do you have any knowledge of whether the Glens

9  Falls Insurance Company or the Encompass Insurance

10  Company -- and I'm asking you because I still don't have a

11  footnote to this, I still don't have an answer to the

12  relationship between the two, so I'm asking you as one

13  question -- do you have any knowledge as to whether Glens

14  Falls or Encompass went back into the house after Jim did

15  his renovations and did an analysis of the worth of the

16  house for purposes of insurance?

17    A.    No idea.

18    Q.    Do you know if Glen's Falls or Encompass

19  Insurance requested that the homeowner, Mr. Heinz, add to

20  or supplement the smoke detection system that was installed

21  by Mr. Matza because of these new renovations which were

22  done by Jim?

23    A.    Other than the testimony of Mr. Heinz, no.

24    Q.    At the time of the fire in July of 2000, I

25  established with you on your deposition of March 16th,

1    2004, that under NFPA there was no requirement for

2    centrally monitored smoke detector, correct?

3         A.    No requirement, that's correct.

4         Q.    Okay.  At the time -- and also that, today, in

5    the State of Connecticut, where this house is in Wilton,

6    there is no requirement for centrally monitored smoke

7    alarms in a residential home, correct?

8         A.    I would just only amend that for accuracy to say

9    in a single-family dwelling, that's correct.

10        Q.    If it were -- your answer would be different if

11   it was a multiple dwelling; is that correct?

12        A.    A multifamily dwelling.

13        Q.    Okay.  And by "multifamily dwelling," how do you

14   define that?

15        A.    Three or more occupied residential areas, and I

16   would have to review that specifically.  That's usually a

17   threshold in fire protection.  I would certainly examine

18   the case in Connecticut if I were asked to.

19        Q.    Okay.  And when you went into the Heinz's home

20   in October of 2001, and based on everything you had been

21   told prior to that, had you ever been told this was a

22   multifamily dwelling?

23        A.    No.

24        Q.    And your analysis in this case did not review it

25   -- withdrawn.  Your analysis in this case did not treat

1    this house as a multifamily dwelling; is that correct?

2        A.    Correct.

3        Q.    Do you know, on the date of the fire, which

4    smoke detector in that house triggered a signal to the

5    central station?

6        A.    No.

7        Q.    Did you ever make a determination as to that at

8    any point before coming here today?

9        A.    No.

10       Q.    Is it fair to say that one of the three

11   detectors that my client installed, which was centrally

12   monitored, triggered the call to the Wilton -- to the

13   central station monitor?

14       A.    Yes.

15       Q.    Okay.  Is it fair to say that only the three

16   smoke detectors that my client installed were centrally

17   monitored as of the date of the fire?

18       A.    Yes.

19       Q.    Do you know, from your investigation, and by

20   that I'm going to encompass -- bad word.  Withdrawn.

21   Sorry.

22           MR. MASCARO:  Include?

23       Q.    (By Mr. Mezzacappa) Yeah, you know.  I use that

24   all the time, but I can't in this case.  Do you know, from

25   your company's examination of this premises, both

1   Mr. Folger and Mr. Murphy as well as your own, whether any

2   of the other detectors in the house that day, and by "any

3   other" I mean not the ones that my client installed,

4   whether they were sounding?  Whether they were operational

5   on that day of the fire?

6        A.   No.

7        Q.   Okay.  In other words, can you go up to a

8   detector after a fire, a battery operated smoke detector,

9   or a hard-wired smoke detector, which is not centrally

10  monitored, and determine if it has sounded, based on a

11  smoke or fire condition?

12       A.   By physical examination only, no.

13       Q.   Okay.  Is there such an examination that can be

14  done to determine if the other detectors in the home, the

15  other five detectors, were sounding at some point during

16  this subject fire?

17       A.   No, no, not from a physical evidence standpoint.

18       Q.   Is the only way to determine that to be there

19  and to hear them with your ears?

20       A.   Someone needs to be there and so testify.

21       Q.   Okay.  Is there anyone that you're aware of from

22  your investigation and your company's investigation of this

23  fire that has indicated whether the battery operated or

24  hard wired five smoke detectors, other than the ones my

25  client installed, were audible or ringing during this fire?

1         A.    We have no information on it.

2         Q.    Okay.  Did you review the fire documents

3    prepared by the Wilton Fire Department?

4         A.    Yes.

5         Q.    Including the marshal's report prepared by fire

6    Marshal Kohn?

7         A.    Yes.

8         Q.    K-O-H-N.  Was there any indication, to your

9    recollection, in those reports, that any firemen had

10   arrived at the scene and heard audible alarms going off?

11        A.    Well, my recollection is that they did say

12   something about that, but I don't have a distinct

13   recollection of it.  I'm more inclined to say it seems to

14   be the case, but I don't know for sure.

15        Q.    Okay.  Where in the NFPA, if anywhere --

16   withdrawn.  Does the NFPA that was applicable at the time

17   of this fire specifically state that the purpose of smoke

18   detectors is for the protection of property?

19        A.    I do believe that NFPA standards say that for

20   one and two-family dwellings it's not as specific.  It's

21   more implicit.

22        Q.    What I'm asking you is not whether it's

23   implicit, but if I pick up the NFPA, am I going to find a

24   sentence, a word, a phrase that says that the purpose of a

25   smoke detector is for the protection, of property, versus

1    the protection of lives, for example?

2        A.    For this occupancy?

3        Q.    Yes.

4        A.    No.

5        Q.    Okay.  Does the NFPA speak to the protection of

6    property for a different type of structure?

7        A.    Yes, it does.

8        Q.    What type of structure?

9        A.    It's -- it depends -- it's other structures, not

10   to the exclusion of single-family dwellings, when it talks

11   about levels of protection of fire protection that are

12   built into buildings for early warning, life safety, and

13   property protection with an arrangement that would include

14   audible alarms of occupants within and alarm notification

15   to the fire department or to a central station.

16       Q.    But alarm notification to a central station or

17   the fire department does not apply in a residential house

18   in the NFPA; is that correct?

19       A.    It is not a requirement.  If someone -- it's not

20   a requirement.  I will just end it there.

21       Q.    Okay.  At the time of this fire was there any

22   local Connecticut state code that required centrally

23   monitored smoke detectors in a residential home like the

24   one we're dealing with here?

25       A.    I'm not aware of any.

1    Q.   When you went to the house in October of 2001,

2  is it correct that you took a series of photographs

3  yourself?

4    A.   Yes.

5    Q.   And these were in addition to those taken by

6  Mr. Folger and Mr. Murphy?

7    A.   Yes.

8    Q.   Before I get into the photographs, what is your

9  understanding of how long -- withdrawn.  Sorry.  I don't

10  really want to mark all of these because that could --

11          MR. MASCARO:  Take forever.

12          MR. MEZZACAPPA:  Yeah.  Can we mark these

13      photographs?

14          (Defendant's Exhibits 8-18, Color Photographs.

15          Marked for Identification)

16    Q.   (By Mr. Mezzacappa) Sir, I'm showing you

17  Defendant's Exhibits 8-18, 10 photographs, maybe that's 11.

18  Don't make me do math.

19    A.   I always have trouble with that.

20    Q.   I think there's 11.  I'd like you to look at

21  these.  Can you establish for speed purposes or expediency

22  that you took all of these photographs in October?  That

23  would be the first thing that we should do.

24    A.   I did.

25    Q.   Are these photos a fair and accurate

1    representation of the way portions of the house looked to
2    you in October when you were there?
3        A.    Yes.
4        Q.    Okay.  Let's start with photo No. 8.
5        A.    Okay.
6        Q.    Can you tell me what that is, what that depicts?
7        A.    It's one of the utility, quote, unquote, type
8    rooms.  I think it's been referred to earlier today as a
9    boiler room, electric room, but it's a -- the ceiling has a
10   battery operated single-station smoke detector.
11       Q.    Did you form an opinion as to whether that
12   detector was there on the day of the fire?
13       A.    I made no such conclusion regarding that
14   detector.
15       Q.    Did you test that detector while you were there?
16       A.    No, I did not.
17       Q.    Turn to the next picture and tell us what that
18   depicts.
19       A.    That is a smoke detector, or a staining -- an
20   oval staining, circular staining is best, outside of the
21   bedroom area on the second floor of the home.
22       Q.    Let me just see that for one second.  Can you
23   tell us -- you see at the bottom of this photograph there
24   appears to be a battery operated smoke detector lying on
25   the floor leaning up against the molding of the doorway?

1     A.    Right, correct.

2     Q.    Was that removed from the plate on the ceiling?

3     A.    I assume so.

4     Q.    Okay.  Did you remove that while you were there

5  in October?

6     A.    I did not.

7     Q.    Okay.  Did you test the unit which is sitting at

8  the bottom of that doorway when you were there in October?

9     A.    I did not.

10     Q.    Do you know who removed that from its plate on

11  the ceiling?

12     A.    I do not.

13     Q.    Okay.  Did you attempt to match it up with the

14  plate on the ceiling to see if it was, in fact, the one

15  that fit that plate?

16     A.    I don't recall doing that.

17     Q.    Do you know who manufactured this product?

18     A.    I don't.

19     Q.    Do you know whether that product was operational

20  on the date of the fire?

21     A.    I do not.

22     Q.    Okay.  Turn now, please, to the next picture.

23  Can you tell us what that depicts?

24     A.    It's a closeup of the same detector outside of

25  the bedroom area.

1        Q.    That we were just discussing?

2        A.    Yes.

3        Q.    Okay.  You may turn to the next picture.  What

4    does that depict, photo No. 11?

5        A.    That is a replacement detector, from what I have

6    been calling the system detector, and if you want me to

7    make that same type of differentiation I did in the first

8    detector, the second detector we looked at I would call a

9    system detector, and so this is a replacement system

10   detector on the floor at the base of the stairs.

11       Q.    May I see the photo?  So this detector in

12   Defendant's Exhibit 11 was not, in your opinion, in the

13   house on the day of the fire, correct?

14       A.    Correct.

15       Q.    Turning back to the previous picture, which was

16   picture No. 10, Defendant's Exhibit 10, is that a system

17   detector that was installed by my client?

18       A.    I believe it was.

19       Q.    And is that a battery backup?  Did it have the

20   feature to be battery backed up?

21       A.    Yes.

22       Q.    Do you see the batteries in that detector?

23       A.    I do.

24       Q.    Now, how does that detector send a signal to the

25   box or the panel?

1        A.   It's a radio transmission.

2        Q.   So this is not a hard-wired detector where

3    there's wires through the ceiling to a panel, this sends a

4    signal to a panel, correct?

5        A.   Correct.

6        Q.   And then the panel sends a signal to a central

7    station alarm, correct?

8        A.   Correct.

9        Q.   Okay.  Thank you.  You may flip one more and

10   take a look at Defendant's Exhibit 12.  Tell us what that

11   shows.

12       A.   It's a little further away.  Defendant's

13   Exhibit 11 is a closeup.  This is more clearly showing the

14   boiler room to the lower central portion, the blue-type

15   bottle which we have been calling a boiler room, electrical

16   room, the one that had the battery operated smoke detector

17   depicted in Defendant's Exhibit 8.

18       Q.   Okay.

19       A.   And this is a smoke detector, replacement smoke

20   detector at the base of the stairs.

21       Q.   And so this detector also was not there at the

22   time of the fire, correct?  It was put in at some point

23   after the fire?

24       A.   Yes.

25       Q.   Okay.  And just for the record, the blue tank

1   looks like a hot water heater --

2       A.   I don't remember.

3       Q.   -- in the boiler room.  I'm just saying it for

4   the record because we hadn't described it, I don't think.

5   Please turn to the next photo.

6       A.   It's 13.

7       Q.   Defendant's Exhibit 13, and what is Defendant's

8   Exhibit 13 depicting in terms of the smoke detector?

9       A.    It depicts a system, quote, unquote, detector

10  that was installed in this -- excuse me, in the skylight

11  area in the great room on the ground floor, or above the

12  first floor of the basement.

13      Q.   Did you ever show Mr. Heinz or Ms. Heinz that

14  photo?

15      A.   No.  I'm positive I did not.

16      Q.   Okay.  Do you know if Mr. or Mrs. Heinz had any

17  input as to where the smoke detectors were placed when my

18  client installed them?

19      A.   Do I know if they had input?

20      Q.   Yes.

21      A.   I don't know.  I know of testimony.  I don't

22  know specifics or have specific independent documentation

23  besides testimony.

24      Q.   Okay.  And the -- this system smoke detector, do

25  you see the actual smoke detector on the third rung of the

1  ladder counting from the bottom up?  Let's do the top down.

2  The fourth rung of the ladder?

3      A.  Yes.

4      Q.  Well, I'm counting the part that's not really a

5  rung, the blue part being one, two, three, four.  Do you

6  see that there?

7      A.  Yes.

8      Q.  Did you take that smoke detector down from its

9  plate which held it in the skylight area for purposes of

10  that photograph?

11      A.  I did indeed.

12      Q.  Okay.  Did you test that smoke detector?

13      A.  No.

14      Q.  Did that have battery backup in it?

15      A.  Yes.

16      Q.  Okay.  And you don't know, sitting here today,

17  if this is the smoke detector that rang on the date of the

18  fire, correct, or that sent the signal on the date of the

19  fire, correct?

20      A.  That's correct.

21      Q.  Tell us what the next picture shows, please.

22      A.  It's within the garage, and it's the fire alarm

23  panel that receives the radio transmission and activates

24  the dial-up service to the central alarm system.

25      Q.  While you were in the house in October, did you

1  perform any tests on that panel?

2      A.   No.

3      Q.   Did you open the panel?

4      A.   I don't believe I did.  I don't recall

5  specifically.  It wouldn't be unusual if I did, but I don't

6  recall doing it.

7      Q.   Okay.  Were either Mr. or Mrs. Heinz there when

8  you were there in October of 2000?

9      A.   I never met them, Mr. or Mrs.

10     Q.   Please look at the next photo, which is

11 Defendant's Exhibit 15.  What does that depict?

12     A.   It's a closeup of a replacement smoke detector.

13     Q.   When you say "replacement," that's not one that

14 was in the house at the time of the fire, in your opinion?

15     A.   That's correct.

16     Q.   Okay.  And do you know in what room this is

17 located from just looking at that photo?

18     A.   It's downstairs, the base of the stairs.

19     Q.   All right.  And looking at that photograph, can

20 you see to the left -- holding the photograph so that the

21 replacement detector is more toward the right side,

22 horizontally, okay --

23     A.   Okay.

24     Q.   -- do you see evidence of a previous detector

25 being located two boards away on the ceiling?

1        A.    Yes.

2        Q.    Did you form an opinion as to whether there was

3    a detector located there on the date of the fire?

4        A.    I did.

5        Q.    Do you know how that detector was removed?

6        A.    Yes.

7        Q.    And how was it removed?

8        A.    Thermally.

9        Q.    By "thermally," it burned away?

10       A.    It separated from the ceiling thermally.

11       Q.    Does that mean the plastic plate holding it to

12   the ceiling in some manner melted and that it fell to the

13   ground?

14       A.    That's my belief, yes.

15       Q.    Did you locate the smoke detector in the debris

16   or on the floor when you were there in October?

17       A.    Remains, yes.

18       Q.    Okay.  Did you photograph the remains?

19       A.    Yes.

20       Q.    Okay.  Do any of the photographs that I have

21   given you or marked so far show the remains of that smoke

22   detector?

23       A.    No.

24       Q.    Before I show you the other photographs, which I

25   will ask you to look through and find the evidence of that