1    one, was that a system detector?

2        A.    Yes.

3        Q.    Okay.  And do you know if that system detector

4    is the one that sent the signal to the central station?

5        A.    I don't know.

6        Q.    Okay.  And looking back at the picture that's in

7    front of you, which I think is Defendant's Exhibit 15, the

8    one we were looking at with the replacement next to the one

9    that was thermally knocked down or disconnected from the

10   ceiling, I think it's 15, looking at that photograph, can

11   you tell where this is in the home?

12       A.    Yes.

13       Q.    Where is it?

14       A.    It's at the base of the stairs.

15       Q.    In the basement level of the home?

16       A.    Yes.

17       Q.    Okay.  And how far from the room of fire origin,

18   where the cat knocked over the lamp was this smoke detector

19   located?

20       A.    Eleven feet from the opening to the room, and

21   then another 12 feet perpendicular of the doorway to the

22   location of the origin of fire.

23       Q.    When you say "perpendicular to the room of fire

24   origin," what I want to know is the distance from the door

25   frame to the smoke detector in a straight line.  Can you

1   give me that?

2        A.    Eleven feet.

3        Q.    Okay.  Was this the closest system detector to

4   the room of fire origin?

5        A.    Yes.

6        Q.    Was this the closest detector out of the eight

7   that were in the home to the room of fire origin?

8        A.    Yes.

9        Q.    Let's finish with those pictures, and then I

10  will give you the other ones to look for the burned remains

11  of what was in photograph 18.  Please look at Defendant's

12  Exhibit 16 while we're still dealing with the pile in front

13  of you.

14       A.    Exhibit 16?

15       Q.    Uh-hmm.  They should be in order.  It should be

16  the next one after that.  There you go.  Tell me what

17  Defendant's Exhibit 16 shows.

18       A.    Defendant's Exhibit 16 is a photograph of the

19  downstairs or basement area shooting towards the room of

20  fire origin and inclusive of the stairs.

21       Q.    Now, looking carefully at this photograph, is

22  the piece of plywood covering -- is the piece of plywood

23  deep into the photo in the center in the room of fire

24  origin?

25       A.    No.

1     Q.    Okay.  Where is the room of fire origin in

2  relation to this picture?

3     A.    How do you want me to explain this to you?

4     Q.    In words, in looking at the picture.

5     A.    (Witness points).

6     Q.    Pointing might help, but in words you can

7  describe the doorways you see and which room was the room

8  of fire origin.

9     A.    The doorway at the end of the corridor looking

10  in the center of the photograph is to the laundry room,

11  okay, and then that door frame and the door frame -- so the

12  hinged part of the door to the laundry room and the throw

13  part of the door to the room of origin are perpendicular to

14  one another and in close approximation.

15     Q.    Okay.  So they're at a 90-degree angle to one

16  another, the laundry room door, and the door to the room of

17  fire origin?

18     A.    Yes.

19     Q.    So looking into this picture at the plywood --

20  before we get to the plywood, which is in the laundry room,

21  we would make a right before the laundry room and be in the

22  room of fire origin; is that correct?

23     A.    That's correct.

24     Q.    And from that doorway to the room of fire origin

25  out to the ceiling depicted at the top of this photograph

203

1   where the old smoke detector, system detector was located,

2   is 11 feet?

3        A.    Right.  Let's get the point of the measurement.

4        Q.    Okay.

5        A.    To the front of the doorway I didn't measure.

6   To the back of the doorway I did measure.

7        Q.    When you say "the back of the doorway," what do

8   you mean by that, the hinge side or the throw side?

9        A.    From the throw side.

10       Q.    So from the hinge side it would have been

11   11 feet minus the width of the doorway, correct?

12       A.    Correct.

13       Q.    So that the detector is actually -- what's the

14   width of doorway?  Withdraw the first question.  What is

15   the width of the doorway to the room of fire origin?

16       A.    29 inches.

17       Q.    So that's better than two feet, correct?

18       A.    Correct.

19       Q.    So the hinged side of the doorway to the room of

20   fire origin measuring back to the location of the system

21   detector on the ceiling in the hallway is slightly less

22   than nine feet, correct?

23       A.    Right.

24       Q.    And this picture, Defendant's Exhibit 16, am I

25   pointing to the ceiling in the hallway where the system

1    smoke detector was located?

2         A.    On the same plane, yeah, I'd say that's right.

3         Q.    For the record, in the photo I have pointed

4    slightly to the right of the new smoke detector, and

5    comparing it back to Defendant's Exhibit 15 for a second,

6    which shows a closeup of that ceiling, is it fair to say

7    that if we counted -- if we skipped one board then we would

8    get to the next board --

9         A.    Yup.

10         Q.    -- where the old detector was located?

11         A.    Yeah.  Or another way of saying it, see, the two

12    latching or attachment mechanisms there, and you see them

13    in that photograph.

14         Q.    So now let the record reflect the witness is

15    comparing Defendant's Exhibit 15 to 16 and is showing us

16    where the latching -- two latching mechanisms are located

17    on the ceiling which would have attached the old system

18    detector which was thermally damaged by the fire to the

19    ceiling in Defendant's Exhibit 16, correct?

20         A.    Correct.

21         Q.    Okay.  Thank you.

22         MR. MASCARO:  So Defendant's Exhibit 15 is a

23         closeup view of at least a portion of what is

24         depicted in Defendant's Exhibit 16?

25         THE WITNESS:  Yes.

```
1        Q.   (By Mr. Mezzacappa) Now, could you look at

2    Defendant's Exhibit 17?  Before we move on to Defendant's

3    Exhibit 17, I want to really be clear that, looking at

4    Defendant's Exhibit 16, there were no other smoke

5    detectors, in your opinion, on the day of the fire of

6    whatever type in between the one that was located on the

7    ceiling here as we described and the room of fire origin,

8    correct?

9        A.   Correct.

10       Q.   Okay.  Now, please take a look at Defendant's

11   Exhibit 17.  You can put those over here.  What is

12   Defendant's Exhibit 17 showing us?

13       A.   It's a smoke detector.

14       Q.   And where is that located?

15       A.   I would have to use the other photos.  I can't

16   put it together just from that photo.

17       Q.   Okay.  I will let you look at the other photos

18   to tell me that in a minute.  Look at Defendant's

19   Exhibit 18, please.  What does that depict?

20       A.   The first floor landing and entranceway to a

21   bedroom area.

22       Q.   Okay.  Now, if we -- and does that show evidence

23   of a smoke detector having been installed in the hallway

24   adjacent to that bedroom?

25       A.   Correct, it does.
```

1      Q.    Did you remove that detector in October?

2      A.    I did not.

3      Q.    Someone previously removed it?

4      A.    I have no idea.  I would presume so.

5      Q.    Was the plate that's depicted in this

6   photograph, in your opinion, there at the time of the fire?

7      A.    Yes.

8      Q.    Okay.  And do you base that on the soot damage

9   to it that was visible to you when you took the photo?

10     A.    Yes.

11     Q.    Now, if you walked down the stairs from this

12   photograph, Defendant's Exhibit 18, do you arrive in the

13   hallway, which is depicted in Defendant's Exhibit 16?

14     A.    Yes, you do.

15     Q.    Do you see where the staircase in Defendant's

16   Exhibit 16 comes down?

17     A.    Yeah, you can see part of the stair.  Right here

18   is one, what they call a landing, and from the same plane

19   of the landing from the -- or from first floor to what is

20   depicted in the photograph, and then there is a landing.  I

21   should say instead of "landing," the first reference, I

22   should say, or stairs that come to a landing, and then you

23   turn a hairpin turn, which is 180 degrees, and then go down

24   another set of steps to the basement level.  So these are

25   -- those two stairs are what they call scissor-type stairs,

1    so they're off -- they're not on the same vertical plane.

2        Q.    Okay.

3        A.    They're offset.

4        Q.    In this house, the scissor staircase has three

5    sets of stairs; is that correct?  One from the lowest level

6    up to the level that's depicted in Defendant's Exhibit 16,

7    and one from the level of 16 to 18, or am I incorrect?

8        A.    I think you're incorrect.  I think there's two

9    stairs and a landing, so there is a top floor, a set of

10   stairs going to the landing that is in between or

11   approximately five feet down, and then you do a hairpin

12   turn and come down another set of stairs, five or six

13   stairs, something like that, and come to the basement

14   level.

15       Q.    Okay.  And where is the pool located?

16       A.    The pool, using which photo?

17       Q.    Any of the photos you can.  You can even just

18   describe it for me without using the photos.  Is the pool

19   on the level of the room where the fire origin is?

20       A.    It is, it is.

21       Q.    And so is it fair to say in this house there are

22   only two levels?

23       A.    It is fair to say.

24       Q.    Okay.  The one on the bottom is where the fire

25   started, and the one up above is depicted at the top of --

1  depicted in the photograph 18, correct?

2      A.   Correct.

3      Q.   Okay.  The smoke detector, do you know if the

4  smoke detector that -- withdrawn.  The plate for the smoke

5  detector located in Defendant's Exhibit 18, was that a

6  system detector, to your knowledge?

7      A.   Yes.

8      Q.   So, to recap, the three system detectors were

9  located at the top of the stairs on the first level, at the

10 bottom of the stairs in the hallway in Defendant's

11 Exhibit 16, and in that skylight we saw; is that correct?

12     A.   Yes.

13     Q.   Okay.  Now I will let you look at the other

14 photographs for two purposes, so that you can tell me where

15 the detector located in Defendant's Exhibit 17 is and that

16 -- so that you can find evidence of the thermally damaged

17 smoke detector that was once hanging on the ceiling in

18 Defendant's Exhibit 16.

19     A.   This is one.

20         MR. MEZZACAPPA:  So let's mark this as

21     Defendant's Exhibit 19.

22         (Plaintiff's Exhibit 19, Color Photograph,

23         Marked for Identification)

24     Q.   (By Mr. Mezzacappa) I'm showing you what's been

25 marked as Defendant's Exhibit 19 for identification.  You

1    have pulled this picture out of the remainder of the

2    pictures you took in October.  Does this show evidence of

3    the system detector that was once at the top of the ceiling

4    in Defendant's Exhibit 18?

5          A.    Yes, it does.

6          Q.    Is that sitting on the first step up from the

7    floor in this picture?

8          A.    Yes, it is.

9          Q.    And how did you make a determination that this

10   was the remnant of or the destroyed piece of a smoke

11   detector?

12         A.    I based it on seeing a lot of them like this,

13   and I believe that is a battery right there, so this is the

14   remains right here (indicating).

15         Q.    You're indicating -- the witness is showing us

16   the remains.  There is a blue disk in the remains, and

17   below that is a battery you can see visually laying on the

18   steps next to the rest of the debris.  Is that a fair

19   characterization?

20         A.    Yes, it is.

21         MR. MEZZACAPPA:  I'll make copies of these for

22         you, Joe, black and whites with front and backs so

23         you know what they are.

24         MR. MASCARO:  Exactly.

25         Q.    (By Mr. Mezzacappa) Were you able to figure out,

 1    looking at the other pictures, what -- where the smoke

 2    detector in Defendant's Exhibit 17 is located?

 3        A.    Yes.

 4        Q.    And where is that located?

 5        A.    It's at the basement level entryway to the

 6    family room.

 7        Q.    And is that a system detector or something else?

 8        A.    I think it's a single-station, battery-operated

 9    smoke detector.

10        Q.    Okay.

11            MR. MASCARO:  Did you say it was basement level

12        of the family room?

13            THE WITNESS:  Yes, yes.

14        Q.    (By Mr. Mezzacappa) It might help now for the

15    next series of questions if you have Defendant's Exhibit D

16    in front of you, which is your second report.

17        A.    Do I keep these?  Do I put this back?

18        Q.    No.  I will actually give copies to counsel.  I

19    will probably send you the original of this because he did

20    it, but, you know, this he can have?

21            MR. MASCARO:  Yeah.  Let me see what's marked?

22            MR. MEZZACAPPA:  Where's the other thing?

23            MR. MASCARO:  You can take this back, actually.

24        We made copies.

25            MR. MEZZACAPPA:  We will keep these all

```
 1          together, and the rest of the photos go back here.
 2              THE WITNESS:  I like all these organized people.
 3          So Defendant's Exhibit D, I have that.
 4              MR. MASCARO:  Take out both of your reports.
 5              THE WITNESS:  Okay.
 6          Q.   (By Mr. Mezzacappa) Looking at Defendant's
 7     Exhibit D on page 1, you make reference to flashover?
 8          A.   Yes.
 9          Q.   And we established during your first deposition
10     what flashover -- it's just one word, just like it sounds,
11     for the stenographer.
12              Do you know exactly when flashover took place?
13     You know, time-wise on that date, can you give me the
14     minute of the day that flashover took place?
15          A.   An exact minute, no.
16          Q.   Do you know for certain how this fire was
17     initially ignited?
18          A.   Yes, I do.
19          Q.   And how was it initially ignited?
20          A.   It was ignited from the heat from an electrical
21     appliance, i.e., a lamp adjacent to the base of the bed
22     within the downstairs bedroom area occupied by Mr. Heinz's
23     son occasionally, approximately once a week, as testified,
24     and interviews indicate, and it came in contact with
25     readily available, easily ignitable materials from the heat
```

1  of the resistance illumination of the lightbulb within the

2  lamp.

3      Q.   Do you have any photos, of all the ones I showed

4  you today, which were the ones in October, that you took of

5  this lamp?

6      A.   No, not my photos, but if you're including the

7  collective pronoun my photos, Folger's photos on that date

8  would depict the lamp.

9      Q.   Was an analysis ever performed by your company

10 as to a potential products liability action against the

11 manufacturer of the lamp or the lightbulb?

12     A.   No testing was done on that lamp.

13     Q.   You forwarded counsel, and counsel provided us

14 with a CD ROM disc of materials you utilized in your fire

15 analysis here.  Do you recall that?

16     A.   Yes.

17     Q.   Okay.  And we started to speak at the last

18 deposition about the figures and the models that were used,

19 and you testified that you did not use any of the data

20 conclusions definitively in your written report here, data

21 conclusions from the fire modeling in your conclusions; is

22 that correct?

23     A.   Yes, that's right.  I got inferences of what the

24 modeling says, but it's not reflected in the report as a

25 specific collaboration of estimates to flashover or

 1  detector activation and so forth, that's correct.

 2      Q.   There was a document on your disc dated

 3  December, 2003.  When did you do the fire modeling in this

 4  case?

 5      A.   It was done in two intervals; one right before I

 6  wrote this report, and then, as I expressed in the last

 7  deposition, I had a computer crash and lost all that data,

 8  and so then probably two, three months ago I tried to

 9  replicate that information that I developed in that prior

10  time that had been erased from my hard drive because of the

11  crash to fairly and accurately depict what I had done so

12  that I could present it to you and to others that might

13  question what we did, since it was referred to in the

14  report analysis that I conducted fire modeling of the fire

15  incident, which I did.

16      Q.   When you say "this report," you're referring to

17  the second report, Defendant's Exhibit D, correct?

18      A.   Yes, I am.

19      Q.   Okay.  And when you tried to replicate this, did

20  you have any backup of the original fire modeling that you

21  did, any backup copies or computer copies?

22      A.   No, I didn't, but let me -- I didn't have any

23  backup copies of the input data.  I had backup copies of

24  the models that were run, either backup copies or I

25  rebooted the copies from NIST, the acronym, that I reloaded

1    on my computer after the crash.

2         Q.    When was the crash of your computer?

3         A.    Early 2002.

4         Q.    NIST is the bureau of standards, correct?

5         A.    Used to be.

6         Q.    And do they frequently update that publication,

7    their publications?

8         A.    I don't know what you mean by "frequently

9    update."

10        Q.    When you downloaded that model after the crash,

11   was that the same version that you had used the first time?

12        A.    I don't know.

13        Q.    And the data you put in the second time to back

14   up this report, Defendant's Exhibit D, was that identical

15   to the data you put in the first time?

16        A.    I believe it was.

17        Q.    You believe it was or it was?

18        A.    I have no reason to believe it was not.

19        Q.    Where did you get the figures to input into the

20   original fire computer model?

21        A.    You get that from the measurements of the room.

22   You get that from a list of objects and like-materials that

23   have defined heat release rates from NIST.  It's a

24   directory of materials and what the heat release ratings

25   are.

1    Q.   And you input the information into that data

2    model based on that, correct?

3    A.   Yes.

4    Q.   Did you keep copies of the data you input into

5    the first model which ended up crashing that you had on

6    your computer?

7    A.   Yes.

8    Q.   Where are those copies today?

9    A.   Those copies of the diagrams that we have

10   previously marked that have 3 feet, 5 feet, you know,

11   dimensions of the room, height of the room, and so forth.

12   Q.   I'm not asking you about the -- I'm asking you,

13   did you keep copies of the actual data that you typed into

14   the fire computer model?

15   A.   No, I don't have that.

16   Q.   So you cannot state with certainty now that when

17   you reran the model, after downloading from NIST what was

18   available on your new computer, that you exactly input the

19   same data and numbers into the second model, correct?

20   A.   I would have inputted the same numbers.  I mean,

21   I'm only working from one set of numbers.  I'm only

22   selecting one set of data, so I feel confident it's the

23   same data to a high degree of certainty.

24   Q.   But you don't have any documentary evidence to

25   show me that it is exactly the same data, correct?

1      A.   Just my sworn testimony.

2      Q.   But your sworn testimony is not documentary

3   evidence, correct?

4      A.   That's correct.

5      Q.   There's a three-page news release printed off

6   your computer dated 2/27/04.  That wasn't factored into the

7   computer models that were run on either occasion for

8   purposes of Defendant's Exhibit D; is that correct?

9      A.   I'm not familiar with the document you're

10   talking about.  I would have to see the document to know

11   what you're talking about.

12      Q.   Is there anything in your first report that

13   references the local fire department's response time and

14   their findings?

15      A.   I think there is, talking about alarm time,

16   response time and what more specific -- alarm time on

17   page 2, notified at 11/08 13 a.m., fire department left

18   15 a.m.  What was the second part of the question?

19      Q.   I'd have to have it read back, but does your

20   second report, Defendant's Exhibit D, reference the same

21   response time.

22      A.   I don't think there's a reference to the

23   response time.

24      Q.   The state code in Connecticut between 1999 and

25   the date of the fire, 7/23/01, was it amended, to your

1    knowledge?

2         A.   Yes.

3         Q.   And when was it amended?

4              MR. MASCARO:  Sorry, what code are we talking

5         about?

6              MR. MEZZACAPPA:  The State of Connecticut code.

7              MR. MASCARO:  Building code?  Fire code?

8              MR. MEZZACAPPA:  State building code.

9              THE WITNESS:  May 1st, 1999, Connecticut

10        supplement, April 7th, 2000, to 2000 is the way it

11        reads here, amended.

12        Q.   (By Mr. Mezzacappa) And what are you referring

13   to to answer the question?

14        A.   I'm referring to the history of the state

15   building code in Connecticut.

16        Q.   And is that part of the submissions that were in

17   your files?

18        A.   It is.

19        Q.   Under NFPA, how long does a central station

20   monitoring company have to -- withdrawn.  The code -- the

21   Connecticut code that was applicable on 7/23/01, what NFPA

22   year does it make reference to?

23        A.   1996 NFPA 72.

24        Q.   And under 1996 NFPA 72, is it correct there was

25   no requirement for a residential home of this type to have

1    a centrally monitored alarm?

2         A.    Yes.

3         Q.    And isn't it correct that under the 1996 NFPA

4    code the time within which a central monitor could call the

5    local fire department was two hours?

6         A.    No.

7         Q.    No?  What is the response time under the NFPA

8    section 72, 1996?

9         A.    Ninety seconds.

10        Q.    And that comes from the NFPA?

11        A.    Yes.

12        Q.    And what section of the NFPA are you referring

13   to?

14        A.    That would be 72, household fire warning

15   equipment, 2-4.9.2.

16        Q.    Now, the NFPA 72 does not require centrally

17   stationed monitored smoke detectors in a residential home,

18   correct?

19        A.    Correct.

20        Q.    Okay.  Is that the section you brought today

21   with you, that you just read from?

22        A.    Yes.

23        Q.    Okay.  Was that referenced in any of your

24   reports before today, either C or D from your company?

25        A.    No.  It's not specifically called out as we have

219

1   placed the cite on record today.

2        Q.   Okay.  And did you find this in response to my

3   originally -- original questioning of you on March 16th,

4   2004, and before today?

5        A.   Yes, I did.  I don't think it was part of my

6   record.  I'm positive it was not part of my record, but as

7   I was preparing I saw another applicable section and I

8   provided it as backup material.

9        Q.   And this 2-4.9.2 comes from the 1996 version of

10  NFPA, correct?

11       A.   Correct, NFPA 72 to be specific.

12       Q.   But NFPA 72, again, does not apply when it comes

13  to central station monitored -- does not require --

14  withdrawn.

15            NFPA 72 does not require centrally stationed

16  monitored smoke detectors in residential houses similar to

17  34 Wildwood Drive, correct?

18       A.   Correct.

19       Q.   Your second report, Defendant's Exhibit D,

20  references the 1999 NFPA, correct?

21       A.   It references two editions.

22       Q.   But it does reference the 1999 one, correct?

23       A.   Correct.

24       Q.   And that was not applicable on 7/23/01 in the

25  State of Connecticut at the place where this fire took

1  place; is that accurate?

2      A.    No.

3      Q.    It's not accurate?

4      A.    No.

5      Q.    Before I asked you on 7/23/01 which NFPA code

6  applied, and you said the 1996 section 72 did.

7      A.    Yes.

8      Q.    Is that accurate?

9      A.    Yes, it is.

10     Q.    That answer is still accurate?

11     A.    Yes.

12     Q.    Did the 1999 code apply for NFPA on 7/23/01?

13     A.    No, it didn't.

14     Q.    Okay.  Did you ever recommend to Encompass

15 Insurance or to Glens Falls Insurance that they institute a

16 lawsuit against Jim, the contractor, that did the

17 renovations to this home?

18     A.    No.

19     Q.    In your opinion, did the work that Jim did in

20 renovating this home bring this home up to the new code as

21 a new home or a new construction?

22     A.    I don't have enough information to make that

23 conclusion.

24     Q.    Has anyone, to your knowledge, made that

25 conclusion relevant to this case?

```
 1        A.   With regard to Jim, I don't know of anybody.
 2        Q.   And just to be clear, we don't -- you don't
 3   know, as you sit here today, when Jim's work was done,
 4   specifically a month, week, and year; is that correct?
 5        A.   I don't know that, and other things that are
 6   relevant, in my opinion.
 7        Q.   This second report, Defendant's Exhibit D,
 8   withdraw that because I'm not ready to finish it and it's
 9   just hanging there.
10             Do you see paragraph -- the first full paragraph
11   on page 4, second sentence says, "The 1996 edition and
12   prior editions of the national code did not require smoke
13   detectors within bedrooms, however, later editions of the
14   code do require detectors within bedrooms."  Do you still
15   agree with that?
16        A.   No.
17        Q.   You don't agree with this statement?
18        A.   No, I don't.
19        Q.   But you put this in your report, correct?
20        A.   Correct.
21        Q.   And you signed off on this report?
22        A.   I didn't sign it, but I authored it.
23        Q.   You approved it, authored it, and sent it to
24   Morrison, Mahoney & Miller?
25        A.   Yes.
```

1     Q.    And now you're disagreeing with what you wrote

2     in it?

3     A.    I do.

4     Q.    You see the next sentence that says, "The

5     extensive renovations of the home resulted in smoke

6     detectors being installed in bedrooms in the upper portions

7     of the home," open paren, "reflecting the change in the

8     national code, and as it is enforced in CT," capitals,

9     Connecticut, it's just CT, closed paren, period.  Do you

10    see that?

11    A.    I do.

12    Q.    When you wrote this report, did you know when

13    the "extensive renovations," as you used those words, were

14    done?

15    A.    Yes.

16    Q.    When were the extensive renovations done?

17    A.    Between 1999 and 2001.

18    Q.    And based on your earlier testimony today and my

19    questions of you then it's very possible that the extensive

20    renovations were done when my client installed the alarm

21    with the three centrally monitored smoke detectors; isn't

22    that correct?

23    A.    I don't believe so.

24         MR. MEZZACAPPA:  Okay.  Can I have the last

25         question and answer read back.

1           (Last question was read).

2      Q.   (By Mr. Mezzacappa) Just so we're clear, the

3  best estimation you can give me on the extensive

4  renovations using your words are between the years 1999 and

5  the year 2001; is that correct?

6      A.   Correct.

7      Q.   And the fire happened on July 23rd, 2001.

8  There's really no dispute as to that, correct?

9      A.   Correct.

10     Q.   And my client, based on his testimony, and based

11 on the testimony of Mr. Heinz, and based on the contractor

12 in this case, did his work in the year 2000, correct?

13     A.   Correct.

14     Q.   Okay.  So if the renovations, the extensive

15 renovations were done in the year 2001, then this was done

16 after my client installed his alarm, correct?

17          MR. MASCARO:  I will object to the form.  You

18          can go ahead and answer it.

19          THE WITNESS:  I guess I'm confused by your

20          question.  Are you trying to break the estimate of my

21          time interval of the renovations down into segments

22          now, and one of the segments that you're asking about

23          is assuming that it's 2001, where the extensive

24          renovations were begun?  Is that your question?  I

25          guess I'm very confused.  I'm sorry.

1        Q.    (By Mr. Mezzacappa) That's okay.  You used the
2    term "extensive renovations" in the sentence on page 4 of
3    your report?
4        A.    Correct.
5        Q.    Without making reference to time?
6        A.    Okay.
7        Q.    We have established that, now, you're saying
8    these extensive renovations, based upon everything you have
9    done in this case, took place between 1999 and 2001?
10        A.    Correct.
11        Q.    Okay.  And we know the fire took place on
12    7/23/01?
13        A.    Correct.
14        Q.    You don't know, as you sit here, when in 2000,
15    1999, 2001, these extensive renovations were done, do you?
16        A.    Well, I do.  I guess that's the puzzling part.
17    The extensive renovations were begun in 1999, and they were
18    completed in the year 2001.
19        Q.    Okay.  For purposes of your answer, I don't want
20    you to base your answer on Mr. Heinz's testimony.  I want
21    you to base your answer as an expert on your own opinion
22    based on what you know for sure.  When were these extensive
23    renovations done?
24        A.    Okay.
25            MR. MASCARO:  I will object to the form of that,

1    and you can try and answer it if you understand it.

2    He testified where he got his information as to when

3    the renovations were done, and now you're asking him

4    to exclude at least part of that and answer the

5    question?

6    MR. MEZZACAPPA:  I will withdraw the question.

7    Q.    (By Mr. Mezzacappa) You don't have any documents

8    from Jim, the person who did the renovations, correct?

9    A.    Correct.

10    Q.    Okay.  You don't have an invoice?  You don't

11    have a bill?  You don't have a contract?  You have nothing.

12    You have seen nothing before you testified today from this

13    outside contractor named Jim who you were told did these

14    renovations, correct?

15    A.    Yes.

16    Q.    Okay.  Do you have any information that my

17    client, Command Force, did renovations, by that I mean

18    construction work, other than installing these alarms?

19    A.    No, other than installing the alarms.

20    Q.    Your report states that there should have been a

21    smoke detector in the room of fire origin, correct?

22    A.    Yes.

23    Q.    And you feel that that's correct?

24    A.    I do.

25    Q.    As you sit here today?