1    A.    I do.

2    Q.    And the smoke detector could have been battery

3  operated and been fully in compliance with all codes that

4  applied at the time, correct?

5    A.    Might have been.  It's a possibility.  That's

6  one of several considerations.  It could have been battery

7  operated.

8    Q.    Okay.  I don't want to ask one of several

9  considerations.  I want to ask you, and I want an answer as

10  to if the smoke detector that you say should have been in

11  this room was battery operated on 7/23/01, in your opinion,

12  would that have met all codes at that time relevant to that

13  house?

14    A.    I'm saying it might not have.

15    Q.    Does your report here say that the smoke

16  detector that you feel, in your opinion needed to be in

17  that room of fire origin, needed to be centrally station

18  monitored on 7/23/01?  Does your report state that?

19    A.    No.

20    Q.    Does air outside contain oxygen?

21    A.    I hope so.

22    Q.    Does that feed a fire?  Is that known to feed a

23  fire?

24    A.    I wouldn't put it in those terms.

25    Q.    Is oxygen necessary for fire to occur?

1       A.    Some fires.

2       Q.    Okay.  Can you have a fire in a house like this

3   without oxygen or without air?

4       A.    Generally, no.  The majority of the times, by

5   far the majority of the times.

6       Q.    Neither one of your reports mentions that the

7   window in the room of fire origin was open at the time of

8   the fire; is that correct?

9       A.    I will have to check.

10      Q.    Okay.

11      A.    I believe it doesn't, but certainly the notes --

12      Q.    I'm not asking about the notes.  I'm asking

13  about Defendant's Exhibit C and D.  Do either one of those

14  reports indicate that the window in the room of fire origin

15  was open?

16      A.    I don't think so.  The reports do not.

17      Q.    The computer file -- fire modeling program known

18  as CFAST, C-F-A-S-T, did you utilize that here?

19      A.    Yes.  Well, let me say, this is part of the

20  discussion that we had about I did computer modeling as it

21  is reflected in the second report, but I did not provide

22  any quantitative determinations in my reports, and

23  especially my second report, about what the results of the

24  computer model were.

25      Q.    Is it true that under the CFAST program that you

1    ran there was a single room model with a door that opens to
2    the outside in that model?
3        A.    Did I model it that way, or can you model it
4    that way?
5        Q.    The run that you did --
6        A.    Yes.
7        Q.    -- based on the data you supplied, was done with
8    the single room model with a door that opened to the
9    outside; is that correct?
10       A.    No, not if you define "outside" to mean ambient
11   outside.  Outside is defined to be not within the room of
12   origin, so when it opens to the outside it can mean opening
13   to another compartment or opening to the outside of the
14   building.
15       Q.    The model CFAST that you used, did the room in
16   it open to the outside of the building or within a
17   building?
18       A.    Both.
19       Q.    And when you ran it did you get different
20   results based on that?
21       A.    I don't believe I ran both models.
22       Q.    Which one did you run, one that went to the
23   outside world, or one that opened to another interior
24   space?
25       A.    Into the interior space.

1      Q.   And what was the other interior space in that

2  model that you ran?

3      A.   The corridor.

4      Q.   Did you use any of the results from that model

5  in preparing your second report?

6      A.   I mean, I learned things from that, but I did

7  not, to the best of my knowledge, use any aspect of that

8  for my conclusions.

9      Q.   Did the computer model in this case determine

10 when the flashover took place from the time that the fire

11 first started?

12     A.   Yes, it did.  In the results that I gave you,

13 yes, it did.

14     Q.   Did you put into that model -- in other words,

15 your second report has a time frame based on flashover

16 which was taken from the computer model?

17     A.   No, that's not right.

18     Q.   Okay.  Does your second report have any figures

19 regarding the timing of flashover that were generated from

20 or obtained from the computer model?

21     A.   No, it does not.

22     Q.   All right.  Do you know when this fire started

23 precisely?

24     A.   In the broadest definitions of fire, no, I

25 don't.

1      Q.    Okay.  Do you know how long there was a smoke or

2  flame condition before the smoke detector picked it up?

3      A.    I know an approximate time.

4      Q.    I don't want an approximate time.

5      A.    Not a precise time, no, the answer is not a

6  precise time.

7      Q.    Okay.  Did you question Mr. Heinz or Mrs. Heinz

8  or anyone who was an occupant to the house on or before

9  7/23/01 about whether they cleaned in any manner this smoke

10  detector, the one that was installed by my client which was

11  about nine feet away from the room of fire origin?

12      A.    I don't think so.

13      Q.    Okay.  There's no sprinkler system required in a

14  home of this type at that time; is that correct?

15      A.    In Connecticut.

16      Q.    In Connecticut?

17      A.    Not that I know of.

18      Q.    Do you know for certain when this fire started

19  -- whenever it did start, whether it was smoldering or an

20  open flame at that moment?

21      A.    My opinion is it was smoldering initially.

22      Q.    Do you know whether it was smoldering or open

23  flame?  I'm not really asking for your opinion at this

24  moment, but do you know for sure whether it was smoldering

25  or whether it was an open flame?

1     A.    Positively, no, I don't.

2     Q.    The smoke detectors that NFPA 72 speaks about,

3   the 1996 version, does it say in NFPA they have to be

4   centrally monitored?

5     A.    Some of them do.

6     Q.    In a residential home such as this, does NFPA 72

7   say they have to be centrally monitored?

8     A.    No.

9     Q.    Did you ever print out -- withdrawn.  When your

10  computer crashed, what is it that you lost that was in

11  there relevant to this case?

12    A.    Electronic billing, reports, the models

13  themselves, the input and output data for the files to the

14  computer model, any correspondence that I had done on the

15  case, notes that I put into an electronic version,

16  everything.

17    Q.    Were you able to recreate any of that file from

18  asking for copies, say, from Encompass Insurance, Jake

19  Mollenkopf, Morrison, Mahoney & Miller, were you able to

20  get anything back that you had lost in the computer crash?

21    A.    As I recall, I got my first report back from

22  them.

23    Q.    And who did you get your first report back from?

24    A.    I don't recall.  I probably got it from

25  Morrison, Mahoney & Miller.  I would say it's more likely

1    than not I got it from them.

2        Q.    Do you have an opinion as to what the most

3    likely fire in that house would have been based on the

4    layout of the house?

5        A.    Well, there's several that I would say for

6    residential.  I would list several.

7        Q.    I don't want you to just do residential.  I want

8    you to do that house.  What were the most likely fire

9    scenarios in that house?  If I were to ask you that

10   question before this fire ever occurred, what would the

11   most likely fire scenarios in that house based on its

12   layout be?

13       A.    It can involve -- a kitchen fire is plausible.

14   Heating fires statistically are plausible in a residential

15   occupancy.  Bedroom fires are statistically high for fire

16   fatalities, electrical fires is -- are plausible.

17       Q.    In listing them that way, would you say that

18   kitchen fires are higher on the ranking scenario and

19   electrical fires being the lowest?  You gave me four

20   scenarios.  Did I fairly and accurately hear kitchen,

21   heating, bedroom, and electrical, in that order?

22       A.    Um, well, bedroom is not a cause, bedroom is a

23   location.  So, you know, cooking is high in terms of

24   incident occurrences just, you know, trying to double back

25   and then filling in.  The heating fire is statistically

1  high in terms of residential fire occurrences. Bedroom

2  fires are high in terms of location and frequency of fire

3  fatalities, and closely followed by living room, which was

4  not listed, and then the two that are locations can be

5  caused by any of the ones that I have listed except for

6  heating/likely heating and kitchen fire.

7           So, there's subsets of ignition in terms of the

8  location, and those subsets of ignition in bedrooms and

9  living rooms can be smoking materials, electrical

10  appliances, deliberately set fires, so that's probably the

11  majority of concern, incident occurrences and concerns from

12  a fire protection standpoint of where fatalities occur and

13  when they occur.

14      Q.   Isn't it true that the NFPA code that applied at

15  the time of this fire in the State of Connecticut says that

16  you protect areas of the home?

17      A.   That's parts of it.

18      Q.   You say in your second report -- I have to find

19  it now to be fair to you. I want you to turn to the second

20  part of your report where it says, "As it is enforced in

21  the State of Connecticut," because that's a sentence I want

22  to ask you a question about.

23      A.   I'd better get to the right report.

24      Q.   It's page 4, first paragraph. Let me just look

25  at that. Thank you. Could you read the sentence that

1    contains that language I gave you, again, the extensive
2    renovations to the home, I will read it.  "The extensive
3    renovations to the home resulted in smoke detectors being
4    installed in bedrooms in the upper portions of the home,"
5    open paren, "reflecting the change in the national code,
6    and as it is enforced in CT," closed paren?
7        A.    Right.
8        Q.    What do you mean, "as it is enforced in CT"?
9    You mean the national code as it is enforced in CT?
10       A.    Yes.
11       Q.    And the national code you're referring to is
12   that the NFPA?
13       A.    Yes.
14       Q.    Who installed the smoke detectors in some of the
15   bedrooms in this house?
16       A.    Our infamous Jimmy, as I understand it.
17       Q.    And at the time Jimmy did that, having done the
18   renovations, did he have a responsibility to install
19   detectors in each and every bedroom based on his
20   renovations to the house, in your opinion?
21       A.    Yes.
22       Q.    And why is that?
23       A.    Because the state of Connecticut adopts the 1996
24   edition of NFPA 72 and has specific supplemental
25   information to treat such renovations as new construction,

1   and new construction in NFPA 96 requires the installation

2   of smoke detectors within each bedroom area outside the

3   bedroom areas and at each level of the occupancy.

4        Q.   Now, when Jim finished his work, did the State

5   of Connecticut building department, to your knowledge, come

6   in and inspect the house and inspect the renovations?

7        A.   Would you read that back.

8             MR. MASCARO:  That's two separate questions,

9        inspect the renovations or the whole house?

10            MR. MEZZACAPPA:  I meant the renovations, but

11       fair enough.  I don't want to -- my intention was not

12       to confuse you.

13            MR. MASCARO:  I understand.  I just want to make

14       sure it's clear.

15            MR. MEZZACAPPA:  My neurons are not firing as

16       they should, I suppose.  Withdraw the question.

17       Q.   (By Mr. Mezzacappa) Here's the next question.

18  To your knowledge, when Jim finished his renovations, did

19  anyone from the Connecticut Building Department come in and

20  inspect the work that he had done?

21       A.   I don't know.

22       Q.   Okay.  Did you ever see any documents from the

23  Connecticut Building Department indicating that they ever

24  inspected the extensive renovations?

25       A.   I have not seen the documents specifically.  I

1    have seen reference to them.

2        Q.    Having seen reference to them, do you know if

3    the Connecticut building department came in a certain year

4    and inspected extensive renovations?

5        A.    I don't know about the inspection, what they did

6    in terms of the performance.  I only know what I would have

7    assumed is a result of that.

8        Q.    Have you ever been asked to give an opinion

9    about whether you feel there is responsibility against Jim

10   other than by me today?

11       A.    No.

12       Q.    At the time my client installed the three system

13   detectors, assuming the extensive renovations were not done

14   with the new wing and the new bedrooms, is it your opinion

15   that my client had a responsibility to put smoke detectors

16   in each bedroom at that time according to the NFPA that

17   applied at that time?

18       A.    Yes.

19       Q.    What do you base that opinion on?

20       A.    The laws of Connecticut.

21       Q.    What laws of Connecticut do you refer to in

22   answering that question?

23       A.    The building code, its supplement, and its

24   reference to NFPA 72, 1996 version.

25       Q.    So without the extensive renovations, this was

1   an existing residential family dwelling, correct?

2       A.   Yes.

3       Q.   Okay.  What statutes specifically do you say

4   required my client, without those extensive renovations, to

5   install smoke detectors in each bedroom of that home?

6           MR. MASCARO:  Object to the form I think, but if

7       you understand it you can go ahead and answer it.

8           THE WITNESS:  Well, with that corollary of

9       clarification, there would not have been, in my

10      opinion, a need for your client to install smoke

11      detectors in each of the bedrooms.

12      Q.   (By Mr. Mezzacappa) What I want to do is go two

13  questions back and read your answer, but I thought it was

14  the same thing, but let's be clear why we're here.

15          MR. MASCARO:  I can clarify my objection.

16          MR. MEZZACAPPA:  Didn't I rephrase that question

17      then after that?

18          (Last page of testimony was reread)

19      Q.   (By Mr. Mezzacappa) Before you clarify your

20  objection, I will let you -- is everything still all right?

21  Did you understand my question when you gave your first

22  answer?

23      A.   No, I didn't.

24      Q.   Okay.  So do you want to change your answer to

25  two or three questions ago?

| | | |
|---|---|---|
| 1 | A. | Yes, I do. |
| 2 | Q. | I thought I was asking the same question. |
| 3 | A. | Yeah. |
| 4 | Q. | I didn't mean to be -- |
| 5 | A. | I didn't mean to answer incorrectly. |

6     Q.   I'm not saying you did.  I think I asked the
7 same question, but I got two different answers, so what I'd
8 like to do, if you want to hear them back again, fine, or
9 just the last question, and then we can wipe the other one
10 out.  I don't want it to stand as two different answers to
11 what I thought was the same question.

12         MR. MASCARO:  Just to put my confusion on the
13         record.  I thought one question specifically
14         referenced renovations not being completed, and the
15         second question referenced without renovations which,
16         to me, I interpreted as no renovations having been
17         done at all, so that's where my confusion came from.

18         MR. MEZZACAPPA:  My question was not splitting
19         the hair that much, and this can be on the record.
20         My question was -- let's do it now.  I will do a new
21         one, because there was some unclear information maybe
22         in my question.

23     Q.   (By Mr. Mezzacappa) What I'm seeking to ask you
24 is:  Assuming that at the time my client installed his
25 alarm system, or the alarm system that he put in, that

1    there were not extensive renovations to the house,

2    including a wing and two new bedrooms as we have discussed

3    today.  Did my client, in your opinion, have an obligation

4    to put smoke detectors in the bedrooms of that house at

5    that time under the codes that applied?

6        A.    Okay.  I need one point of clarification.  Was

7    there, in answering your question, an increase in -- were

8    additions ever made, they just weren't still under way?  In

9    other words, my confusion is that we know that, generally

10   speaking, the house was doubled in size, so are you saying

11   that doubling of the size never happened?  I need to make

12   that differentiation in answering the question.

13       Q.    I understand.  That's perfectly fine.  The

14   testimony from Mr. Heinz, which you have read, and I took,

15   indicated that at some point he did renovations to the

16   home?

17       A.    Correct.

18       Q.    The testimony from my client, Matt Matza, upon

19   showing him actual pictures with Anderson window stickers

20   and a room above the garage, said that that room was not

21   there when he had installed his alarm or went out to the

22   house or anything of that nature.  And the testimony from

23   Mr. Heinz was that he could not give me a definitive date

24   and month or year of when those renovations to add rooms to

25   the house had occurred.  That's all I have in this case.

1        So, what I'm asking you is:  when my client went

2   there, assuming that Jim had not added the new wing with

3   the new rooms, so that there were just the number of

4   bedrooms that existed before the house was doubled in size,

5   did my client, in your opinion, have an obligation to put

6   smoke detectors in the bedrooms, in all of the bedrooms, in

7   any of the bedrooms of that house, under the NFPA that

8   existed when my client installed the alarm?

9        A.    Well, again, it's not clear because the garage

10  addition is one aspect of the renovations, as I understand

11  it.  And two is the bedroom addition, so if -- those two

12  areas of the home, whether your client saw those and the

13  Anderson window stickers over the top of the garage or not

14  is driving my answer, or the confusion of how to answer,

15  but if you're including in the renovations the two bedrooms

16  on the ground level that, as I understand it, and from our

17  interview with Mr. Heinz, were added as part of the quote

18  renovations, then from a statutory standpoint the answer to

19  the question is no, and I pointed out in the report,

20  however, from an equivalency standpoint, the answer is yes,

21  they were required in the bedrooms.

22        Q.    I don't know that you answered my question, so I

23  will move to strike that which was potentially not an

24  answer to my question.  I guess I have to break it down

25  further.

1          Do you have any sequence of photographs showing

2    when the house was renovated, date-stamped photographs

3    showing when the house was renovated?

4          A.    No photographs.

5          Q.    Okay.  What percentage, under the NFPA of a

6    home, needs to be renovated before the home is considered

7    new construction?

8          A.    The NFPA does not get into that aspect in the

9    NFPA 72.

10         Q.    Then where is it that you derive the requirement

11   -- withdrawn.  Is it fair to say that, today, under the

12   NFPA, if I build a new home anywhere in the United States I

13   have to have a hard -- a smoke detector in each room, each

14   bedroom?

15         A.    Yes, hard wired smoke detector in each.

16         Q.    Hard wired smoke detector in each bedroom?

17         A.    Correct.

18         Q.    Back on July 23rd, 2001, if I built a brand new

19   house anywhere in the United States, is it true that I had

20   to, under NFPA, have a hard wired smoke detector in each

21   bedroom of the house?

22         A.    Yes, and other areas, too, but that is the part

23   you're asking me about.

24         Q.    But right now we are talking about bedrooms.

25         A.    Right, right.

1    Q.    Today, under NFPA, anywhere in the United

2    States, on an existing residential single-home dwelling,

3    there is no requirement to have a smoke detector in any

4    bedroom; is that correct?

5    A.    No, it's not correct, technically correct.

6    Q.    Okay.  Is there a requirement under the NFPA in

7    an existing home in the United States today to have a smoke

8    detector in a bedroom?

9    A.    A separate standing document NFPA 72, no.

10    Q.    Did you ever install, other than in your own

11    home, a smoke detection system in any house?

12    A.    A single station or multistation?

13    Q.    Centrally monitored multistation --

14    A.    No, no.

15    Q.    Let me show you what's been marked as

16    Defendant's Exhibit 3 again.  I know we marked it at the

17    last deposition, but I don't recall if I used it with you,

18    so just take a look at that.  Is it fair to say that you

19    asked your employees, Mr. Folger and Mr. Murphy, to reduce

20    their notes to this typewritten form for purposes of this

21    deposition?

22    A.    No, not for purposes of this deposition.

23    Q.    When was it that you asked them to reduce their

24    notes to typewritten form?

25    A.    I don't know.  It was a long -- it was over a

1  year ago, I know that, especially when I recognized I

2  didn't have any backup documentation in the files.

3      Q.  Was it after Defendant's Exhibit D, your second

4  report, was authored?

5      A.  Oh, no, I don't believe so.  I think it was

6  before that.

7      Q.  May I have that?  Thank you.  To your knowledge,

8  did the State of Connecticut or the Wilton Fire Department

9  issue any violations to the homeowner in this case?

10     A.  The question was asked of Mr. Heinz, and he

11 responded no, so that's the source that I'm referring to,

12 and the answer is no.

13     Q.  That's fine.  I don't really want you to base

14 your knowledge on Mr. Heinz's testimony, but based on what

15 you know yourself.

16     A.  No.

17     Q.  Other than Mr. Heinz's testimony?

18     A.  No.

19     Q.  Okay.  Did ever consult with Mr. G-A-L-L-E-R,

20 Galler, on other cases before this one?

21     A.  Yes.

22     Q.  Have you consulted with him since this one?

23     A.  Yes.

24     Q.  Did you ever ask him to render a report

25 regarding the filament and bulb theory here?

1    A.    No.

2    Q.    Has he ever rendered one, to your knowledge?

3    A.    I don't know.

4    Q.    You see in the notes of Defendant's Exhibit 3,

5    it says "lamp theory was initiated by fire marshal Dave

6    Kohn."  Is that the first person, therefore, that initiated

7    that theory based on this fire?

8    A.    Probably.  I would say that's probably true.

9    Q.    Did Mr. Galler ever come down and inspect the

10   home?

11   A.    No.

12   Q.    Did Mr. Galler, was he ever shown the lamp that

13   you maintained in one of your lockers, evidence lockers?

14   A.    I don't think so.

15   Q.    When you spoke to Mr. Mollenkoph, and in your

16   words on page 72 of your deposition, "He was perplexed at

17   the severity of the loss compared to what he felt were

18   early warning."  Was he angry that he had to pay out on

19   this loss so much money?

20   A.    I don't know.

21   Q.    Did he ever express that to you at any time?

22   A.    No.

23   Q.    The hard wired smoke detectors that the NFPA

24   talks about with new construction today, or with existing

25   structures brought up to -- withdrawn.

1           Does the NFPA discuss existing structures

2    brought up to new codes based on renovations to them?

3           A.   Yes.

4           Q.   And with the hard wired smoke detectors that the

5    NFPA discusses, that is distinct, isn't it, from a

6    centrally monitored system?

7           A.   It could be.

8           Q.   Okay.  So a hard wired smoke detector which

9    could have battery backup or not -- withdrawn.

10          Can a hard wired smoke detector exist without

11   battery backup?

12          A.   Yes.

13          Q.   Okay.  Whether a hard wired smoke detector

14   exists with or without battery backup, it does not mean

15   that it's centrally monitored; is that correct?

16          A.   Correct.

17          Q.   Is Ms. Alicia Woods still employed by you today?

18          A.   Yes.

19          Q.   Did she maintain any copies or backups of what

20   was crashed on the computer system relevant to this case?

21          A.   No.

22          Q.   Is Mr. Murphy still employed by you today?

23          A.   Yes.

24          Q.   How about Mr. Folger?

25          A.   Yes.

1    Q.   Did you sit either one of them down based on

2  this case and show them your report and make comments to

3  them about their report?

4    A.   No.

5    Q.   Page 5 of your second report, you say in

6  paragraph -- in the last paragraph, "A smoke detector

7  adequately installed in the bedroom of fire origin,

8  regardless of the type, would have provided earlier

9  detection and faster response by the fire department."  Do

10  you see that sentence?

11    A.   I do.

12    Q.   I left out the parentheses in the middle, I'm

13  sorry, after "regardless of the type," it's open paren,

14  "i.e., ionization or photoelectric," closed paren.  You see

15  that sentence?

16    A.   I do.

17    Q.   That sentence assumes, does it not, that it's a

18  centrally monitored smoke detector?

19    A.   No.

20    Q.   It does not?

21    A.   No.

22    Q.   Okay.  So if it's in the -- a centrally

23  monitored smoke detector and it's battery operated, or even

24  hard wired, under the facts of this case, it would be

25  ringing and the cat would hear it but the fire department

1   wouldn't know it was going off; isn't that correct?

2       A.   That's right.

3       Q.   It's a given -- you would agree with me, would

4   you not, that no person was home at the time of this fire?

5       A.   Correct.

6       Q.   So then it is correct that that sentence that I

7   read to you and into the record is premised upon the smoke

8   detector being centrally monitored?

9       A.   No.

10      Q.   If the smoke detector were not centrally

11  monitored and only the cat was home, sir, how would the

12  fire department have had an earlier detection and faster

13  response in the facts of this case?

14      A.   The facts of this case -- the statement is a

15  generic statement, not related to the facts of this case

16  necessarily.

17      Q.   Okay.  But this is the report you did based on

18  34 Wilton -- 34, sorry, Wildwood Drive in Wilton,

19  Connecticut, correct?

20      A.   Correct.

21      Q.   This is not a generic report?

22      A.   It is in smoldering duration and detector type

23  discussion, so it is appropriate for that sentence to be

24  listed and appropriate then and appropriate now, in my

25  opinion.

1      Q.    But that sentence, sir, does not make any sense

2  compared to the facts of this case with only a cat at home,

3  does it?

4      A.    Not unless it's centrally monitored, I would

5  agree with that.

6      Q.    You would agree with that?

7      A.    I would agree with that, yes.

8      Q.    Would you agree that had a smoke detector been

9  placed in the fire, in the room of fire origin and it was

10  battery operated, that the fire department would more than

11  likely not have been notified of the fire in the house?

12      A.    I agree.

13      Q.    Okay.  Would you agree that if the smoke

14  detector in the room of fire origin were hard wired but not

15  centrally monitored, that there's a great likelihood also

16  the fire department wouldn't have gotten notified of this

17  fire?

18      A.    I agree.

19      Q.    And would you agree that a battery operated or

20  hard wired smoke detector would have met, in your opinion,

21  the code requirements that applied at that time?

22      A.    In the bedroom, yes, it would have met that.

23  Had it been installed it would have met the requirements.

24      Q.    In reality then, the system that my client put

25  in that house, which was centrally monitored, alerted the

1   fire department but, in your opinion, if there were hard

2   wired or battery operated smoke detectors which were not

3   centrally monitored, placed in every bedroom of that house,

4   then the fire department never would have known of this

5   fire absent the central monitoring, correct?

6          A.   Given your design, that's correct.

7          Q.   Your whole report is premised on a delay in the

8   fire department being notified of this particular fire, is

9   it not?

10         A.   Yes.

11         Q.   Okay.  And yet there was no requirement on

12  July 23rd, 2001, for there to be a centrally monitored

13  smoke detection system in that home under the Connecticut

14  code or the NFPA 72?

15         A.   No requirement for central station monitoring.

16              MR. MEZZACAPPA:  I have nothing further.  Thank

17         you.

18              MR. MASCARO:  I don't have any questions.  I

19         think we got a regular transcript.

20              MR. MEZZACAPPA:  I want a copy of the

21         transcript.

22              (Deposition was concluded at 3:30 p.m.)

23

24

25

1                              CERTIFICATE

2        I, Heather A. Pellerin, License #00144, Notary Public

3    for the State of Connecticut and Commonwealth of

4    Massachusetts, do hereby certify that the deposition of

5    T.J. KLEM, was taken before me pursuant to the Federal

6    Rules of Civil Procedure, at the LAW OFFICES OF MORRISON,

7    MAHONEY & MILLER, LLP, Attorneys for the Plaintiff, One

8    Constitution Plaza, Hartford, CT  06103, (860) 616-4441,

9    commencing at 12:15 p.m. on THURSDAY, MAY 6, 2004.

10       I further certify that the witness was first sworn by

11   me to tell the truth, the whole truth, and nothing but the

12   truth, and was examined by counsel, and his testimony was

13   stenographically reported by me and subsequently

14   transcribed as herein before appears.

15       I further certify that I am not related to the

16   parties hereto or their counsel, and that I am not in

17   any way interested in the events of said cause.

18       Witness my hand this 10th day of May, 2004.

19

20               _Heather A. Pellerin_

21               Heather A. Pellerin, RPR, CRR, Notary

22

23   My Commission expires:        My Commission expires:

24   May 25, 2008 (In MA)          April 30, 2006 (In CT)

25

1     **CERTIFICATE OF DEPONENT**

2

3        I, T.J. KLEM, have read the foregoing transcript of

4     the testimony given at the deposition on THURSDAY, MAY 6,

5     2004, and it is true and accurate to the best of my

6     knowledge and/or with the changes as noted in the attached

7     errata sheet.

8

9                         _____
                          T.J. KLEM

10

11       Subscribed and sworn to before me this _____

12    day of _____, 2004.

13

14                         _____
                          Notary Public/Commissioner of Deeds

15

16    My Commission Expires:

17

18    NO:  CV.  303 CV 105
      GLENS FALLS INSURANCE COMPANY A/S/O HAROLD AND LAUREN HEINZ
19    vs.
      COMMAND FORCE SECURITY SYSTEMS, INC.
20    T.J. KLEM, (p.m.) MAY 6, 2004

21    HAP

22

23

24

25