## 01/29/04 GLENS FALLS COMPANY vs COMMAND FORCE INC    WITNESS: HAROLD HEINZ

**Diamond Reporting**

**Page 1 to Page 116**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DIAMOND REPORTING*
*Suite 907*
*16 Court Street*
*Brooklyn, NY    11241*
*Phone:    (718) 624-7200*
*FAX:    (718) 855-1772*

## Page 1

(1)
(2) UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(3) -------------------------------------------X
GLENS FALLS INSURANCE COMPANY a/s/o HAROLD and
(4) LAUREN HEINZ,
(5) PLAINTIFF,
(6) -against-
(7) COMMAND FORCE SECURITY SYSTEMS, INC.,
(8) DEFENDANT.
-------------------------------------------X
(9)
(10) **DATE:**   January 29, 2004
(11) **TIME:**   10:00 a.m.
(12)
(13) EXAMINATION BEFORE TRIAL of the
(14) Plaintiff, HAROLD HEINZ, taken by the Defendant,
(15) pursuant to a Court Order, held at the offices of
(16) Pepe & Hazard, LLP. 30 Jeliff Lane, South Port,
(17) Connecticut, before a Notary Public of the State of
(18) New York.
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 2

(1)
(2) A P P E A R A N C E S :
(3)
(4) MORRISON, MAHONEY & MILLER, LLP.
Attorneys for Plaintiffs
(5) One Constitution Plaza
Hartford, Connecticut 06103
(6) BY: JOSEPH E. MASCARO, ESQ.
(7)
(8)
KAUFMAN, BORGEEST & RYAN, LLP.
(9) Attorneys for the Defendant
200 Summit Lake Drive
(10) Valhalla, New York 10595
BY: MICHAEL P. MEZZACAPPA, ESQ.
(11)
(12)
(13)
(14)
(15) * * *
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 3

(1)
(2)
(3) F E D E R A L S T I P U L A T I O N S
(4)
(5)
(6) IT IS HEREBY STIPULATED AND AGREED
(7) by and between the counsel for the respective
(8) parties hereto, that the filing, sealing, and
(9) certification of the within deposition shall
(10) be and the same are hereby waived;
(11)
(12) IT IS FURTHER STIPULATED AND AGREED
(13) that all objections, except as to the form
(14) of the question, shall be reserved to the times
(15) of the trial.
(16)
(17) IT IS FURTHER STIPULATED AND AGREED
(18) that the within deposition may be signed before
(19) any Notary Public with the same force and effect
(20) as if signed and sworn to before this court.
(21)
(22)
(23) * * * *
(24)
(25)

## Page 4

(1)
(2) HAROLD HEINZ, called as a witness, having been
(3) first duly sworn by a Notary Public of the State of
(4) New York, was examined and testified as follows:
(5) EXAMINATION BY
(6) **MR. MEZZACAPPA:**
(7)    *Q.   Please state your name for the record.*
(8)    **A.   Harold Heinz.**
(9)    *Q.   Where do you reside?*
(10)    **A.   34 Wildwood Drive, Wilton, Connecticut**
(11) **06897.**
(12)    *Q.   Good morning. My name is Michael*
(13) *Mezzacappa. I'm an attorney with the law office of*
(14) *Kaufman, Borgeest & Ryan. We were retained to*
(15) *represent Command Force Security Systems in a*
(16) *litigation brought by your insurer. I'm going to*
(17) *ask you a series of questions today. If at any*
(18) *point you don't understand them or want me to*
(19) *rephrase the question, ask me to do that. You have*
(20) *to answer all of the questions verbally so the*
(21) *court stenographer can take down everything you say*
(22) *and that I say. Is anything that I stated so far*
(23) *that unclear?*
(24)    **A.   Not at all.**
(25)    *Q.   What is your date of birth?*

## Page 5

(1)
(2)    **A.   12/12/48.**
(3)    *Q.   Where were you born?*
(4)    **A.   Hamburg, Germany.**
(5)    *Q.   When did you come to the United States?*
(6)    **A.   1958.**
(7)    *Q.   Are you currently a United States*

(8)  citizen?
(9)   A.   I am, I am.
(10)  Q.   The address you gave me is 34 Wildwood
(11) Drive. For what period of time have you resided
(12) there?
(13)  A.   For the last 4 years.
(14)  Q.   Do you recall –
(15)  A.   Off and on.
(16)  Q.   Do you recall when it was that you
(17) first moved into that house?
(18)  A.   It had to be in 2000, I believe. Let's
(19) say August of 1999.
(20)  Q.   August of 1999?
(21)  A.   Yes.
(22)  Q.   At that time that you moved in, who
(23) resided there with you permanently?
(24)  A.   My wife and my 2 daughters.
(25)  Q.   What is your wife's name?

### Page 6

(1)
(2)   A.   Lauren.
(3)   Q.   Your daughter's names?
(4)   A.   Amanda and Rebecca.
(5)   Q.   Do you have any other children?
(6)   A.   I have a son.
(7)   Q.   Your son's name?
(8)   A.   Corey.
(9)   Q.   How old is Corey?
(10)  A.   22.
(11)  Q.   Did he ever live in the house at 34
(12) Wildwood Drive with you on a permanent basis?
(13)  A.   No.
(14)  Q.   Did he ever live in the house on any
(15) kind of temporary basis?
(16)  A.   Well, it's his – it was his legal
(17) residence up until 1999, until he went to college.
(18)  Q.   Is he still in college today?
(19)  A.   No. He graduated, and he lives in
(20) Buffalo.
(21)  Q.   Are you presently employed?
(22)  A.   Self-employed.
(23)  Q.   What is your occupation?
(24)  A.   We operate a retail business in the
(25) Bronx.

### Page 7

(1)
(2)   Q.   What is the name of that?
(3)   A.   Williamsbridge Discount.
(4)   Q.   What is the business of Williamsbridge
(5) Discount?
(6)   A.   A retail business.
(7)   Q.   What do they sell?
(8)   A.   General merchandise.
(9)   Q.   Such as what?
(10)  A.   Very similar to Woolworth, if you are
(11) familiar with that.
(12)  Q.   For what period of time have you been
(13) running that business?
(14)  A.   15 years.
(15)  Q.   Does anyone else in the family work

(16)  with you in that business?
(17)  A.   My wife Lauren.
(18)  Q.   Prior to residing at 34 Wildwood Drive,
(19) where did you live?
(20)  A.   We lived in Dix Hills in Long Island.
(21)  Q.   For what period of time did you reside
(22) in Dix Hills?
(23)  A.   15 years.
(24)  Q.   Have you ever been convicted of a
(25) crime?

### Page 8

(1)
(2)   A.   No.
(3)   Q.   Have you ever plead guilty to a crime?
(4)   A.   No.
(5)   Q.   Do you know who Anthony Pasquarella is?
(6)   A.   Yes.
(7)   Q.   Who is Anthony Pasquarella?
(8)   A.   He is associated with Command Force
(9) Security Alarm System Company.
(10)  Q.   When did you first meet Anthony
(11) Pasquarella?
(12)  A.   Probably in 1990.
(13)  Q.   What were the facts and circumstances
(14) of that meeting?
(15)  A.   He did the security installation of my
(16) retail business.
(17)  Q.   Is that the same business you were
(18) talking about before?
(19)  A.   It is.
(20)  Q.   The security system at that retail
(21) business which was installed in or about 1990, is
(22) it a burglar alarm system?
(23)  A.   Yes.
(24)  Q.   Is it a fire detection system?
(25)  A.   No. It's a burglar alarm system.

### Page 9

(1)
(2)   Q.   The burglar alarm system, could you
(3) describe it, in other words, motion detection, hard
(4) wires on the window, what kind of system is it?
(5)   A.   Exactly, it is a hard wired and some
(6) windows, some doors as well as motion detectors
(7) alarm system.
(8)   Q.   When that was first installed, was it
(9) installed by Anthony Pasquarella?
(10)  A.   Yes, it was.
(11)  Q.   How was it that you came to meet him
(12) the first time, did you call his company from the
(13) yellow page or something else?
(14)  A.   Actually, he was – Matthew, his
(15) partner, somehow knew my sister-in-law. That is
(16) how we met.
(17)  Q.   Who is your sister-in-law?
(18)  A.   Randy Wexler – Randy Brown, Wexler is
(19) his her maiden name.
(20)  Q.   When you say partner Matthew, do you
(21) mean Matthew Matza?
(22)  A.   Yes.
(23)  Q.   When is the first time you ever spoke

(24)  *to or with Matthew Matza?*
(25)  A.   Around 1990s.

Page 10

(1)
(2)  Q.   *Was that also for the purpose of*
(3)  *alarming your business in the Bronx?*
(4)  A.   Yes.
(5)  Q.   *When you met or did you meet Mr. Matza*
(6)  *at your business or did you just speak to him on*
(7)  *the phone at that time?*
(8)  A.   No. I believe we met at the business.
(9)  Probably I spoke to him first. He came and met me
(10)  at the business.
(11)  Q.   *When you had that system installed in*
(12)  *or about 1990 in your business, was that monitored*
(13)  *by a central station alarm?*
(14)  A.   It was. It still is, yes. Command
(15)  Force is still – we still do business today.
(16)  Q.   *Was that business in the Bronx the*
(17)  *first time that you ever did business with Command*
(18)  *Force?*
(19)  A.   Yes.
(20)  Q.   *Did there come a time after they*
(21)  *alarmed your business in the Bronx that you then*
(22)  *used them to alarm your house in Dix Hills?*
(23)  A.   Yes.
(24)  Q.   *And what kind of alarm did you have*
(25)  *Command Force install in your house in Dix Hills?*

Page 11

(1)
(2)  A.   It was hard wire, windows doors and
(3)  motions as well.
(4)  Q.   *Was that a burglar system only?*
(5)  A.   Yes.
(6)  Q.   *Did you ever have Command Force install*
(7)  *a fire detection system in your home in Dix Hills?*
(8)  A.   No.
(9)  Q.   *Other than using Command Force for your*
(10)  *business and your home in Dix Hills, were there any*
(11)  *other properties other than 34 Wildwood that you*
(12)  *used their services for?*
(13)  A.   No.
(14)  Q.   *Do you recall in what year you had the*
(15)  *burglar alarm system installed by Command Force at*
(16)  *the Dix Hills home?*
(17)  A.   It's hard to say. Probably – after
(18)  they did the renovation of the house, so I mean –
(19)  Dix Hills or?
(20)  Q.   *Dix Hills.*
(21)  A.   I don't know. I really have – maybe
(22)  1994, 1995, something like that.
(23)  MR. MASCARO:   You don't want to guess.
(24)  A.   It was quite a while ago.
(25)  Q.   *I don't want you to guess, but you can*

Page 12

(1)
(2)  *approximate to the best of your recollection. In*
(3)  *or about the middle '90s when you had the home in*
(4)  *Dix Hills alarmed by Command Force, did you have*
(5)  *them hook it up to a central station alarm?*

(6)  A.   No.
(7)  Q.   *Did it have audible alarms that would*
(8)  *sound at the house?*
(9)  A.   Yes, sirens, yes, inside and out.
(10)  Q.   *Was that alarm ever triggered other*
(11)  *than by accident while you lived in the home in Dix*
(12)  *Hills?*
(13)  A.   No.
(14)  Q.   *Did you move directly from the house in*
(15)  *Dix Hills out to 34 Wildwood in Wilton,*
(16)  *Connecticut?*
(17)  A.   Yes, we did.
(18)  Q.   *In what year was that; was that late*
(19)  *1999 or early 2000, if you recall?*
(20)  A.   My son graduated in – August of 1999.
(21)  Q.   *Now, in order to close on the house,*
(22)  *did you have to have insurance for the house?*
(23)  A.   Yes.
(24)  Q.   *Who was your insurance company for 34*
(25)  *Wildwood at the time that you closed on that house?*

Page 13

(1)
(2)  A.   I really couldn't tell you that. I
(3)  mean I looked – I went through a broker.
(4)  Q.   *Who was the broker?*
(5)  A.   I don't know who – you asked me the
(6)  name of the broker?
(7)  Q.   *Yes.*
(8)  A.   It's they are in Plainview. I deal
(9)  with an agent. I don't know the name of the
(10)  company.
(11)  Q.   *Do you have any recollection of the*
(12)  *name of the agent, broker or the person that you*
(13)  *dealt with at that time to place insurance on the*
(14)  *home at 34 Wildwood?*
(15)  A.   Steven McClosky.
(16)  Q.   *M-C-C-L-O-S-K-Y?*
(17)  A.   Your guess is as good as mine.
(18)  Q.   *Leave a blank in the transcript. If*
(19)  *you are able to look at home or at some document,*
(20)  *you might have it and fill in the name of the*
(21)  *agency he was affiliated with.*
(22)  A.   Sure, we are still using the name.
(23)  ------------------------------------------X.
(24)  Q.   *Do you have a recollection of who your*
(25)  *property insurer was own your home in Dix Hills?*

Page 14

(1)
(2)  A.   It was through the same broker. It was
(3)  – the insurance was written through Steve, but
(4)  I'm sure that the insured changed over the years.
(5)  Q.   *Are you familiar with the name of Glens*
(6)  *Falls Insurance Company?*
(7)  A.   I heard of it.
(8)  Q.   *Do you have a recollection that they*
(9)  *ever insured your house at 34 Wildwood?*
(10)  A.   I wouldn't even guess to that. My
(11)  wife, my wife takes care of all of that. I used to
(12)  be in the insurance business years ago. Ever since
(13)  we got married, she takes care of all of the

(14) bills. She pays the bill. I don't get involved.
(15) The know the brokers change constantly. They
(16) change carriers. I couldn't be certain.
(17) Q.    What is your highest level of education
(18) to date?
(19) A.    I'm a college graduate.
(20) Q.    Where did you graduate from college.
(21) A.    CW Post College.
(22) Q.    On Long Island?
(23) A.    Yes.
(24) Q.    When did you graduate from there?
(25) A.    1971.

Page 15

(1)
(2) Q.    With what degree?
(3) A.    Bachelor of arts.
(4) Q.    What did you major in?
(5) A.    Political science.
(6) Q.    The house that you moved into at 34
(7) Wildwood in 1999, do you know when that structure
(8) was built?
(9) A.    I believe it was built in 1967 or 1968.
(10) Q.    When you moved into it or after you
(11) moved into it, did you do any renovations to it?
(12) A.    We remodeled the entire house. We
(13) doubled the size of the house.
(14) Q.    When was that done?
(15) A.    That was done starting in 2000.
(16) Q.    When in 2000 –
(17) A.    It probably started in 1999,
(18) construction in 1999. We finished sometime in
(19) 2000, late 2000.
(20) Q.    Who did that renovation or construction
(21) work for you?
(22) A.    I had a local construction company do
(23) that. The fellow's name is Jim something or other,
(24) I can't remember the last name.
(25) Q.    Do you have any documents at home that

Page 16

(1)
(2) would refresh your recollection to the last name?
(3) A.    Sure.
(4) Q.    Leave a blank in the transcript. Fill
(5) it in.
(6) A.    Sure.
(7) -----------------------------------------------X
(8) .
(9) Q.    What company was Jim affiliated with?
(10) A.    His own company, his last name was the
(11) name of the company.
(12) Q.    Do you know if he is still in business
(13) today?
(14) A.    Yes, he is.
(15) Q.    Have you ever used him or his
(16) construction company since late in 2000 to do any
(17) other work at 34 Wildwood?
(18) A.    No.
(19) Q.    And when you closed on the house at 34
(20) Wildwood in late 1999, did your insurer recommend
(21) that you put any type of alarm in the house at that

(22) time?
(23) A.    They wanted, I believe that they wanted
(24) a fire alarm and a security to issue the policy.
(25) Q.    Did they issue the policy before you

Page 17

(1)
(2) had that alarm installed?
(3) A.    I believe the policy was issued before
(4) that, yes, because we actually -- we bought the
(5) house 2 years before we moved into it, so.
(6) Q.    When did you buy the house?
(7) A.    We bought the house in 1996 or 1997.
(8) Q.    In between 1996 and 1997 – between the
(9) time you bought it and you moved in, did anyone
(10) occupy the home?
(11) A.    We rented the home for a few years.
(12) Q.    To whom did you rent it?
(13) A.    We rented to a couple.
(14) Q.    Do you recall their names?
(15) A.    I do, but I can't think of the name.
(16) Q.    If we leave a blank in the transcript
(17) you can fill that in?
(18) A.    Yes.
(19) -----------------------------------------------X
(20) .
(21) Q.    Before renting the house, did you have
(22) any kind of alarm system installed from the time
(23) you bought it until the time you moved in,
(24) yourself, did you have any kind of alarm installed?
(25) A.    No, there was no alarm.

Page 18

(1)
(2) Q.    When you moved into the house in 1999,
(3) did you switch insurance companies at that time for
(4) the property?
(5) A.    I believe not, I don't think so.
(6) Q.    When you said before that the insurance
(7) company wanted fire and security to issue the
(8) policy, in what year did that company want that
(9) done?
(10) A.    It had to have happened in 1999, 2000,
(11) when we remodeled the house and increased the
(12) insurance on the house.
(13) Q.    Did you have an architect draw any
(14) plans in order to remodel that house?
(15) A.    Yes, we did.
(16) Q.    What was the name of the architect?
(17) A.    Niddy Henrickson.
(18) Q.    Spell the first name.
(19) A.    N-I-D-D-Y; Henrickson.
(20) Q.    C-K-S-O-N?
(21) A.    Right.
(22) Q.    Had you ever employed Niddy Henrickson
(23) before the time you employed her to remodel the
(24) home at 34 Wildwood?
(25) A.    No.

Page 19

(1)
(2) Q.    Did she draft plans and get them
(3) approved by you before the construction company

(4) started the actual renovations?
(5)    A.  Yes.
(6)    Q.  Do you still have a copy of those
(7) plans?
(8)    A.  Possibly.
(9)    MR. MEZZACAPPA:  At this time, we are
(10) going to request the production of the plans,
(11) a copy of the plans.
(12)    MR. MASCARO:  We'll take no position on
(13) it at this time.
(14)    Q.  Were you living in the house while the
(15) house was being remodeled?
(16)    A.  Yes.
(17)    Q.  Do you have a recollection of what
(18) month the actual construction work commenced?
(19)    A.  I couldn't be sure, no.
(20)    Q.  Was it in 1999 or was it in 2000?
(21)    A.  It was probably in 2000, probably in
(22) winter of 2000.
(23)    Q.  Did Anthony Pasquarella ever come to
(24) the house at 34 Wildwood in the year 2000?
(25)    A.  I don't know, I couldn't tell you. The

**Page 20**

(1)
(2) only time Anthony was there was when he did the
(3) installation of the alarm at the end of the
(4) reconstruction.
(5)    Q.  When you say it was at the end of
(6) reconstruction, in what month was the alarm
(7) installed, to the best of your recollection?
(8)    A.  I would only be guessing. I have no
(9) clue.
(10)    Q.  If I told you that the alarm was
(11) installed in February of 2000, would that refresh
(12) your recollection?
(13)    A.  Not really, no.
(14)    Q.  Do you have any photographs of what the
(15) house looked like before the renovation that was
(16) undertaken in the year 2000?
(17)    A.  We should.
(18)    MR. MEZZACAPPA:  At this time, I would
(19) call for the production of copies of the
(20) photographs.
(21)    MR. MASCARO:  Again, we take no
(22) position at this time.
(23)    MR. MEZZACAPPA:  List all of the
(24) requests at the end of the transcript.
(25)    Q.  I'm going to show you what has been

**Page 21**

(1)
(2) previously marked Defendant's I for identification
(3) at a deposition on January 7th in this case of a
(4) different witness. Look at that document and tell
(5) me if you ever have seen it before today.
(6)    A.  Okay, I probably have, a bill for the
(7) security installation.
(8)    Q.  Is that the one for the installation at
(9) 34 Wildwood?
(10)    A.  Right.
(11)    Q.  Does that refresh your recollection

(12) looking at the date at the top of the document as
(13) to when the alarm was installed?
(14)    A.  Not really, no. That looks like the
(15) date that it was submitted to me for our approval.
(16) It -- I don't think that was the installation
(17) date. That is when he sent me the proposal.
(18)    Q.  Do you recall your wife signing that
(19) contract in February of 2000?
(20)    A.  No, I wouldn't know, no.
(21)    Q.  Do you recall your wife signing that
(22) contract around the middle of February of 2000?
(23)    A.  No.
(24)    Q.  From the time the alarm was installed
(25) by Command Force at 34 Wildwood, did you ever call

**Page 22**

(1)
(2) them back and ask them to update the alarm or put a
(3) bigger system in?
(4)    A.  No.
(5)    Q.  Is it after the fire in July of 2001
(6) did you have Command Force come back to the
(7) premises and install another alarm?
(8)    A.  Yes, I did.
(9)    Q.  What kind of alarm did you have them
(10) install after the fire?
(11)    A.  Just a security alarm.
(12)    Q.  Who came back to the house to install
(13) the security alarm?
(14)    A.  I really couldn't say. I was there. I
(15) believe it was -- I don't know.
(16)    Q.  At the time that the alarm was
(17) originally installed by Command Force, did you have
(18) any conversations with Anthony Pasquarella, Matthew
(19) Matza or Debbie Moeller about the system that you
(20) wanted in the house?
(21)    MR. MASCARO:  The pre-fire now?
(22)    MR. MEZZACAPPA:  Yes.
(23)    A.  After it was installed?
(24)    Q.  No. Before it was installed at 34
(25) Wildwood by Command Force, did you have any

**Page 23**

(1)
(2) conversations with Anthony Pasquarella, Debbie
(3) Moeller or Mat Matza about the type of system you
(4) wanted?
(5)    A.  Obviously we had to have a
(6) conversation. To come up with that, I spoke with
(7) someone. I spoke with Matthew, I think.
(8)    Q.  What is the best recollection you have
(9) of the sum and substance of that conversation?
(10)    A.  That is the result you see right there,
(11) that letter.
(12)    Q.  Which I gave to you, Exhibit I?
(13)    A.  Right, and that is I guess subsequently
(14) that is what was done. You have it there, that is
(15) it.
(16)    Q.  Did you tell Mr. Matza that either on
(17) the phone or in person that you want the alarm
(18) because your insurance company required you to have
(19) one?

(20)     A.   Yes, probably. I don't know. You mean
(21)  the alarm or the fire alarm, which one, the
(22)  security system or the fire alarm?
(23)     Q.   Let me go back.
(24)  Before, you told me that your insurance
(25)  company wanted a fire and security system to issue

(1)
(2)  the policy. Is that accurate?
(3)     A.   As far as – yes, as far as I can
(4)  remember, yes.
(5)     Q.   Was there a particular person at the
(6)  insurance company that expressed that to you?
(7)     A.   That was related through the broker.
(8)     Q.   What exactly did the broker tell you
(9)  about that?
(10)     A.   What we said previously, that the home
(11)  was valued over $500,000; they require a security
(12)  and fire alarm. I'm not so sure about the
(13)  security, but I know they said fire alarm, that is
(14)  what I remember.
(15)     Q.   Did the broker, other than your
(16)  conversations with the broker, did you ever speak
(17)  directly to the insurer about that requirement?
(18)     A.   No. I told – I was told it was
(19)  needed; that is what we did. That was the end of
(20)  the conversation, that was it.
(21)     Q.   Did the broker tell you any specifics
(22)  about what was needed to satisfy the insurer?
(23)     A.   No.
(24)     Q.   Did the broker tell you how much money
(25)  you had to spend on the system to satisfy the

(1)
(2)  insurer?
(3)     A.   No.
(4)     Q.   Did the broker tell you the number of
(5)  smoke detectors or how to install them on the house
(6)  to satisfy the insurer?
(7)     A.   No.
(8)     Q.   Did the broker tell you the placement
(9)  of the smoke detectors within the house?
(10)     A.   No.
(11)     Q.   Did the broker tell you any specifics
(12)  about the design of that system which the insurer
(13)  wanted?
(14)     A.   No.
(15)     Q.   Did there come a time when you ever
(16)  inquired of the insurer what kind of system they
(17)  desired to have in the house?
(18)     A.   No.
(19)     Q.   In addition to speaking to Mat Matza
(20)  about the installation of a fire detection system,
(21)  did you speak to Anthony Pasquarella or Debbie
(22)  Moeller about it, did you speak to them?
(23)     A.   I never spoke with Debbie. I don't
(24)  think – Debbie just took messages. She was a
(25)  secretary, right? I spoke with Anthony I guess

(1)

(2)  when he was there doing the installation. He
(3)  explained the system to me when he installed it
(4)  after he finished the installation.
(5)     Q.   Did you ever tell Anthony Pasquarella
(6)  you wanted the system because the insurance company
(7)  required it?
(8)     A.   I believe that is the reason why we had
(9)  it installed. I wouldn't have had it installed if
(10)  it hadn't been a requirement of the insurance
(11)  company. We live out in the woods. I can't even
(12)  see my house, I can't even find our house. How is
(13)  a thieve going to find it?
(14)     Q.   Did you ever leave a message with
(15)  Debbie Moeller speaking to her in person or on the
(16)  phone and tell her that the only reason you wanted
(17)  the system was because the insurance company
(18)  required it?
(19)     A.   I really don't remember that
(20)  conversation.
(21)     Q.   Did you ever indicate to Mr. Matza in
(22)  person or on the phone that you didn't want to
(23)  spend a lot of money on this system because it you
(24)  only wanted to satisfy the insurance company or
(25)  words to that effect?

(1)
(2)     A.   That is probably a correct statement.
(3)     MR. MASCARO:   Do you recall saying
(4)  that, is the question.
(5)     MR. MEZZACAPPA:   Note my objection.
(6)     A.   I think that conversation took place.
(7)     Q.   Where were you when you had that
(8)  conversation with Mat Matza?
(9)     A.   At the house.
(10)     Q.   Do you recall the exact words that you
(11)  used?
(12)     A.   Not exactly. Probably just that we
(13)  need to install a fire alarm as per the
(14)  requirements of the insurance company, that is it.
(15)     Q.   Other than your having spoken to the
(16)  broker, did you ever indicate to Mr. Matza what the
(17)  insurance company's requirements were?
(18)     A.   I wouldn't know what the requirements
(19)  were. I was just told it was required, that is it.
(20)     Q.   Did you tell Mr. Matza that it needed
(21)  to be a hard wired smoke detection system?
(22)     A.   I didn't, no, – I assume, I guess
(23)  somewhere along the line it had to be a central
(24)  station. That is all that I, all I recollect.
(25)     Q.   Did the broker tell you that this had

(1)
(2)  to be a central station – sorry, if you weren't
(3)  done with the answer, I don't meant to interrupt
(4)  you.
(5)     A.   I can't answer that question. These
(6)  conversations never took place to the specifics as
(7)  to what, you know – I mean a simple conversation,
(8)  you need a fire alarm system. That is it, end of
(9)  story.

(10)   Q.   You recall that to be central station,
(11)   correct?
(12)   A.   Yes.
(13)   Q.   What this system that was installed in
(14)   your house by Command Force a central station
(15)   monitored system?
(16)   A.   That it was.
(17)   Q.   Did you come to learn at some point
(18)   during or after the fire on July 23, 2001, that the
(19)   system worked?
(20)   MR. MASCARO:   Objection to the form.
(21)   You can answer.
(22)   A.   Ask the question again. I don't
(23)   understand.
(24)   Q.   The central station which monitored
(25)   your alarm that was installed at 34 Wildwood, did

Page 29

(1)
(2)   that central station attempt to get in touch with
(3)   you on the day of the fire?
(4)   A.   I believe not, no.
(5)   Q.   Do you ever recall being called at work
(6)   on the day of the fire to be alerted that there was
(7)   a fire at your home?
(8)   A.   Yes, I was called, yes.
(9)   Q.   Who called you?
(10)   A.   The police department.
(11)   Q.   Did you learn how the police department
(12)   learned of the fire?
(13)   A.   No.
(14)   Q.   Did you learn whether –
(15)   A.   Let's back up for a second, okay. I
(16)   think, I think that I remember that that day I
(17)   received 2 phone calls, one around 11:00 that the
(18)   fire – I think that must have been central station
(19)   command called – not Command Force, but their
(20)   monitoring system must have called saying that the
(21)   fire alarm was tripped, I think around 11:00 or
(22)   something like that, a Monday, and later on, at
(23)   1:00, the police department called, said there had
(24)   been a fire at my house. When they called
(25)   originally, I just didn't think much of it. I

Page 30

(1)
(2)   thought it was a false alarm. Malfunction.
(3)   Q.   When they called, were you at work?
(4)   A.   Yes.
(5)   Q.   The central station called you around
(6)   11:00 at work?
(7)   A.   Yes.
(8)   Q.   What was the sum and substance of the
(9)   conversation that they had with you at that time?
(10)   A.   Just that they got a fire alarm signal,
(11)   and that they notified – I am guessing, you know,
(12)   I don't know. I had these conversation with
(13)   central station so many times, you know, because
(14)   with the alarms, the burglar alarms going off at
(15)   the business; the conversation is always the same.
(16)   We notified the police or the fire, whoever it may
(17)   be. That is the conversation.

(18)   Q.   I'm not asking about the conversations
(19)   you had with the central station based on your
(20)   business. All I'm asking you is on July 23, 2001,
(21)   when you were called by central station at 11:00,
(22)   I'm asking you what your best recollection of what
(23)   you were told on the phone was, by central
(24)   station.
(25)   A.   That they detected an alarm.

Page 31

(1)
(2)   Q.   After learning that, what, if anything,
(3)   did you do?
(4)   A.   I didn't do anything. I assumed it was
(5)   a false alarm.
(6)   Q.   Was that the first time central station
(7)   had ever contacted you and told you that they had
(8)   an alarm regarding a fire at that home?
(9)   A.   Yes. They didn't tell me they had a
(10)   fire. They told me that the alarm was tripped.
(11)   Q.   Was that the first time that central
(12)   station ever called you and told you that they had
(13)   an alarm regarding a fire at that home?
(14)   A.   Right.
(15)   Q.   Had there been other calls regarding
(16)   that home regarding a tripped burglar alarm prior
(17)   to 7/23./01 by the central station?
(18)   A.   I am not sure. There may have been,
(19)   quite possible. There would have been.
(20)   Q.   When you received a telephone call from
(21)   the police around 1:00, what was the sum and
(22)   substance of the conversation that you recall at
(23)   that time?
(24)   A.   That there had been a fire at the
(25)   house, and that the fire was under control at that

Page 32

(1)
(2)   time, and they wanted someone to come over.
(3)   Q.   What did you do upon receiving that
(4)   phone call?
(5)   A.   I went home.
(6)   Q.   Upon arriving home, did you observe any
(7)   fire department or police personnel there?
(8)   A.   They were still at the scene, yes.
(9)   Q.   You mentioned that this was a Monday,
(10)   correct?
(11)   A.   A Monday, yes.
(12)   Q.   What time did you leave the house that
(13)   morning?
(14)   A.   8:00.
(15)   Q.   Were you the last one to leave the
(16)   house?
(17)   A.   I guess so.
(18)   Q.   Were you alone when you left the house?
(19)   A.   I left with my wife and my daughter.
(20)   Q.   Which daughter did you leave with?
(21)   A.   Probably Rebecca.
(22)   Q.   Did Rebecca accompany you and your wife
(23)   to work that day?
(24)   A.   No. I took her to school.
(25)   Q.   Was she in some kind of a summer

<table>
<tr><td>

**Page 33**

(1)
(2) *program or day camp at that time?*
(3)    A.    Summertime. It wasn't school. She
(4) probably went to camp. There was no school.
(5)    Q.    *When you left the house with your*
(6) *daughter and your wife, did you activate the alarm*
(7) *in some manner?*
(8)    A.    Let's back up a second. Okay, when
(9) that particular day, the only people in my house
(10) was myself and my wife. Everybody was away. My
(11) son was on Long Island staying with his
(12) grandparents. My 2 daughters were in camp. So,
(13) only 2 people home were my wife and I, only 2
(14) people.
(15)    Q.    *When you left the house –*
(16)    A.    We left the house together.
(17)    Q.    *When you left the house together on*
(18) *July 23, 2001, did you activate the alarm in some*
(19) *manner?*
(20)    A.    No.
(21)    Q.    *Does that mean that the burglar alarm*
(22) *system was not activated on that day?*
(23)    A.    Yes.
(24)    Q.    *The fire alarm or fire detection*
(25) *system, is that automatically on whether or not you*

</td><td>

(8) *did the cat stay in the room previous to that*
(9) *date.*
(10)    A.    The cat never jumped over the gate.
(11)    Q.    *What was the purpose of putting the*
(12) *gate to keep the cat in that bedroom?*
(13)    A.    So she wouldn't soil the rest of the
(14) house. The cat was ill. So she wouldn't soil it.
(15)    Q.    *What health problems did that cat have?*
(16)    A.    Tumors, cancer.
(17)    Q.    *Did the cat have any other health*
(18) *problems at that time other than the tumors and the*
(19) *cancer and soiling the home?*
(20)    A.    Not that I'm aware of.
(21)    Q.    *When you left the house on that date,*
(22) *did you leave any windows open?*
(23)    A.    Yes, I believe that the window in the
(24) bedroom where the cat was, was slightly open.
(25)    Q.    *At that time, was the house equipped*

</td></tr>
</table>

<table>
<tr><td>

**Page 34**

(1)
(2) *activate it?*
(3)    A.    Yes.
(4)    Q.    *Did you have any pets at that time?*
(5)    A.    Yes.
(6)    Q.    *How many pets did you have at that*
(7) *time?*
(8)    A.    One pet.
(9)    Q.    *What kind of pet was that?*
(10)    A.    A cat.
(11)    Q.    *What was the cat's name?*
(12)    A.    Maui.
(13)    Q.    *Like Hawaii?*
(14)    A.    Yes. Maui.
(15)    Q.    *How old was the cat at that time?*
(16)    A.    7.
(17)    Q.    *Did the cat, at that time, when you*
(18) *left on that day, have a specific area of the house*
(19) *that it was going to stay in?*
(20)    A.    Yes, confined to the downstairs
(21) bedroom.
(22)    Q.    *How was it confined to the downstairs*
(23) *bedroom?*
(24)    A.    By a gate.
(25)    Q.    *What kind of gate?*

</td><td>

**Page 36**

(1)
(2) *with any kind of a central air conditioning system?*
(3)    A.    No.
(4)    Q.    *Did that room where the cat was staying*
(5) *have a room type of window air conditioner?*
(6)    A.    No.
(7)    Q.    *Other than the window being partially*
(8) *opened in the room -- in the cat's bedroom, let's*
(9) *say, were there any other windows open in the*
(10) *premises when you left the house that day?*
(11)    A.    Not to my knowledge, no.
(12)    Q.    *Did you leave any lights on in the*
(13) *house when you left on 7/23/01?*
(14)    A.    No.
(15)    Q.    *Was there a lamp located in the bedroom*
(16) *where the cat was going to be staying?*
(17)    A.    Yes.
(18)    Q.    *What kind of a lamp was it?*
(19)    A.    It was a table top lamp, 3 feet high,
(20) 3-way lamp, pedestal lamp.
(21)    Q.    *For what period of time prior to*
(22) *7/23/01 did you own that lamp?*
(23)    A.    Many years.
(24)    Q.    *Was that lamp plugged into an outlet*
(25) *that was controlled by a switch on the wall?*

</td></tr>
</table>

<table>
<tr><td>

**Page 35**

(1)
(2)    A.    A child gate, child restraint safety
(3) gate.
(4)    Q.    *Had you ever left the house and left*
(5) *the cat in that room with the child gate before?*
(6)    A.    Yes.
(7)    Q.    *Did the cat ever jump over the gate or*

</td><td>

**Page 37**

(1)
(2)    A.    It was – I believe not.
(3)    Q.    *When was the last time that you were in*
(4) *that bedroom before you left the house that day?*
(5)    A.    That morning before the fire.
(6)    Q.    *What was the purpose of going into that*
(7) *bedroom on 7/23/01 before you left the house?*
(8)    A.    I wanted to feed the cat and clean out
(9) the cat litter. I do that every morning before I
(10) left.
(11)    Q.    *While you were in the room feeding the*
(12) *cat and cleaning out the litter, did you turn on*
(13) *the lamp?*
(14)    A.    No.
(15)    Q.    *Did that room have an overhead light*

</td></tr>
</table>

(16) controlled by a switch?
(17)   A.   Yes.
(18)   Q.   Did you turn that overhead light on
(19) while you were in the room that day?
(20)   A.   The room did not have an over – no
(21) overhead lights, no. The only light in the room
(22) was that lamp. That was it. Sorry, but it
(23) happened – it had sconce lights on the wall. The
(24) room this 2 sconce lights, the sconce lights.
(25)   Q.   The sconce lights, how would they be

### Page 38

(1)
(2) lit?
(3)   A.   By the switch.
(4)   Q.   Did you utilize that switch to turn the
(5) lights on when you fed that cat that morning?
(6)   A.   No.
(7)   Q.   Where in the house was that room
(8) located?
(9)   A.   In the basement.
(10)   Q.   What else was located in the basement
(11) of that house at that time?
(12)   A.   A recreation room, another bedroom and
(13) a laundry room and the boiler room and pool room.
(14)   Q.   When you say a pool room, was there a
(15) built-in pool in the home?
(16)   A.   Yes.
(17)   Q.   And as you face the front door of the
(18) house, this bedroom that we're talking about, is it
(19) located in the right or to the left or something
(20) else?
(21)   A.   To the left of the front door.
(22)   Q.   What kind of house existed on 7/23/01
(23) at 34 Wildwood; could you characterize as a ranch,
(24) 2-story or something else?
(25)   A.   A ranch.

### Page 39

(1)
(2)   Q.   This bedroom where the cat stayed, was
(3) it located down any number of steps from the front
(4) door when you would walk into the house?
(5)   A.   Yes, set of stairs.
(6)   Q.   How many stairs did you need to go down
(7) to get to that bedroom after walking in the front
(8) door?
(9)   A.   It was a curved stairs, so probably 12
(10) steps.
(11)   Q.   If you did not take those steps to go
(12) downstairs, can you describe the layout of the
(13) floor that you walk into from the front door; in
(14) other words, what was level with the ground, what
(15) rooms in the house were level with the ground
(16) outside?
(17)   A.   3 bedrooms, living room, kitchen, large
(18) family room, and then a 2-car garage.
(19)   Q.   Was there anything located above that
(20) floor at that time?
(21)   A.   No. It's a cathedral ceiling home.
(22)   Q.   Do you have a recollection of Mr. Matza
(23) visiting you at the home and walk through the home

(24) when you and he discussed the installation of the
(25) alarm system?

### Page 40

(1)
(2)   A.   Yes, I do.
(3)   Q.   At that time that he first visited your
(4) house, did you have any battery operated smoke
(5) detectors anywhere in the house installed?
(6)   A.   Yes.
(7)   Q.   How many battery operated smoke
(8) detectors at that time were already installed in
(9) the house?
(10)   A.   I really – at least 2, I know 2
(11) downstairs.
(12)   Q.   When you say downstairs, are you
(13) talking about where the pool is?
(14)   A.   No. I'm talking, one in the boiler
(15) room and one in the family room downstairs and
(16) probably had another one upstairs somewhere, and in
(17) the master bedroom, I'm not sure about that. But I
(18) do know about the one downstairs.
(19)   Q.   Who originally installed those, if you
(20) know?
(21)   A.   Probably the original owner of the
(22) home.
(23)   Q.   You don't mean the tenant that you
(24) leased the house for the 2 years?
(25)   A.   No.

### Page 41

(1)
(2)   Q.   When you purchased the home in 1996 and
(3) or 1997, up until the date of this fire, did you
(4) ever change the batteries in the battery operated
(5) smoke detectors?
(6)   A.   Yes.
(7)   Q.   With what frequency would you change
(8) the batteries in the smoke detectors?
(9)   A.   Usually once a year, if not sooner.
(10)   Q.   Were those battery operated smoke
(11) detectors working, to your knowledge, on July 23,
(12) 2001?
(13)   A.   Yes, they were working.
(14)   Q.   When you walked through the house with
(15) Mr. Matza, when you were discussing the
(16) installation of a hard wired smoke detection system
(17) and a burglar alarm system, did he and you talk
(18) about the placement of the smoke detectors that he
(19) was going to install at that time?
(20)   A.   I don't recollect that, no.
(21)   Q.   Do you recollect showing or telling
(22) Mr. Matza, when he came to your house, that you had
(23) battery smoke detectors throughout the house as you
(24) just discussed with me?
(25)   A.   I don't remember that conversation I

### Page 42

(1)
(2) had with him.
(3)   Q.   Do you remember showing Mr. Matza any
(4) of the battery operated smoke detectors?
(5)   A.   Possibly. I couldn't tell you.

(6)    Q.   Do you recall Mr. Matza seeing any of
(7) the battery operated smoke detectors?
(8)    A.   I couldn't answer that, either.
(9)    Q.   Did you ever indicate to Mr. Matza that
(10) you were going to take those down or remove those?
(11)    A.   Definitely not, no.
(12)    Q.   What is your best recollection of where
(13) the battery operated smoke detectors were located
(14) before Mr. Matza installed this alarm system?
(15)    A.   His installation had nothing to do with
(16) the alarms that were there. The one in the boiler,
(17) one in the family room downstairs, they were left
(18) where they were. He had nothing to do with that.
(19) That is all I really remember. There may have been
(20) one upstairs, but I don't recollect that. That may
(21) have gotten ripped out when – I definitely, we had
(22) 2 downstairs, definitely that I recall. They were
(23) there the day of the fire.
(24)    Q.   Now, the 2 that you had downstairs
(25) which were there on the day of the fire, is that

Page 43

(1)
(2) the same level as where the cat was staying?
(3)    A.   Right.
(4)    Q.   Do you have a recollection of the
(5) number of smoke detectors installed by Mr. Matza or
(6) his company in 2000?
(7)    A.   Well, I do now. You showed me the
(8) letter, there it is.
(9)    Q.   Does the letter that I showed you dated
(10) February 4, 2000, refresh your recollection as to
(11) the number of smoke detectors which were installed
(12) in the house?
(13)    A.   Right.
(14)    Q.   What does that letter indicate?
(15)    A.   That they – we had 3 installed - one
(16) downstairs, 2 upstairs.
(17)    Q.   Does reading that letter now refresh
(18) your recollection as to the location of the hard
(19) wired smoke detectors installed by Command Force?
(20)    A.   Yes, I know the location.
(21)    Q.   What were the locations of those?
(22)    A.   One was in the new family room upstairs
(23) that we built. One was in the hallway outside the
(24) master bedroom. And one was at the base of the
(25) stairs coming up from the basement.

Page 44

(1)
(2)    Q.   You said near the basement stairs?
(3)    A.   No, no. At the – located at the
(4) beginning of the basement stairs as you – as you
(5) are coming from the basement coming upstairs, right
(6) there, at the foot of the steps basement.
(7)    Q.   Is that in a hallway?
(8)    A.   Yes, hallway.
(9)    Q.   What distance would there be between
(10) that one and the room where the cat was staying?
(11)    A.   About 10 feet.
(12)    Q.   Do you have any personal knowledge as
(13) to which hard wired smoke detector activated the

(14) alarm on July 23, 2001?
(15)    A.   I don't believe that we had had a hard
(16) wire smoke detector in the house. I think they
(17) were all battery operated remote controls.
(18)    Q.   In order for the central station alarm
(19) to have called you at 11:00, do you know how they
(20) were alerted to the fire?
(21)    A.   Obviously by the fire alarm. I mean
(22) the system was not a hard wired system.
(23)    Q.   Do you know how the smoke detectors
(24) which were installed by Command Force would notify
(25) central station of a smoke condition?

Page 45

(1)
(2)    A.   Are you asking from my guess how it
(3) works?
(4)    Q.   No. Just, if you know, what was
(5) installed at your house by Command Force, do you
(6) have any knowledge as to how these smoke detectors
(7) operate?
(8)    A.   No, I have no knowledge. No. We had a
(9) control panel. We received video signals from the
(10) smoke detectors that were stationed throughout the
(11) house. There were 3 of them, not hard wired.
(12) Battery operated.
(13)    Q.   To your knowledge, from a battery
(14) operated smoke detector, they would send a radio
(15) signal to the panel, and the panel would then
(16) signal the central station alarm?
(17)    A.   Right. Yes.
(18)    Q.   Did you ever have to change those
(19) batteries on the smoke detectors installed by
(20) Command Force?
(21)    A.   As a matter of fact, yes, I changed the
(22) batteries on all of them.
(23)    Q.   What kind of batteries did they have?
(24)    A.   Double A batteries.
(25)    Q.   How many double A batteries would they

Page 46

(1)
(2) have?
(3)    A.   At least 4, I know that, probably 4, if
(4) not more.
(5)    Q.   Each one had 4?
(6)    A.   At least, yes.
(7)    Q.   Did those devices have anything to
(8) remind or check or replace the battery?
(9)    A.   If you forget, they would tell you on
(10) the panel, yes. They say your battery is low.
(11)    Q.   Where was that panel located?
(12)    A.   Tells on the keypads. There are 2 -
(13) one as you walk into the house by the garage, and
(14) we had another one actually located in the living
(15) room, which is right outside the front entrance
(16) hall about the middle of the house on the main
(17) floor.
(18)    Q.   The 3-way lamp that we discussed in the
(19) room where the cat was staying, what kind of a
(20) light bulb was in there on 7/23/01?
(21)    A.   You asked me the wattage?