(22) Q. The wattage, was there a 3-way light
(23) bulb in that 3-way lamp on that day?
(24) A. Yes, there was.
(25) Q. Was the 3-way light bulb operational on

### Page 47

(1)
(2) that day or the last time that you used the lamp;
(3) in other words, did all 3 positions light when you
(4) last used the lamp?
(5) A. I do not think so.
(6) Q. How many of the 3 positions worked, if
(7) you recall, when you last used it?
(8) A. To the best of my knowledge, one was
(9) working.
(10) Q. For what period of time?
(11) A. Or maybe 2.
(12) Q. For what period of time did at least 1
(13) position on the 3-way bulb not operate prior to
(14) July 23 of 2001?
(15) A. Very, very, very short period of time.
(16) Q. Does your store in the Bronx sell 3-way
(17) bulbs?
(18) A. Yes.
(19) Q. Can you get the 3-way light bulbs from
(20) your store for that lamp?
(21) A. Quite possibly.
(22) Q. Do you know what the wattage of the
(23) 3-way positions that were there?
(24) A. I do.
(25) Q. What were they?

### Page 48

(1)
(2) A. 50, 100 and 150.
(3) Q. Did you ever learn what caused the
(4) fire?
(5) A. Not directly, no.
(6) Q. Did you ever inquire from any fire
(7) department, police official or anyone else what
(8) caused this fire?
(9) A. I asked, but I never really get any
(10) concrete answers from anyone. All I got was
(11) speculation.
(12) Q. Who did you ask?
(13) A. I spoke to the people that did the fire
(14) investigation for the insurance company. I spoke
(15) to, I spoke to the fire marshal, but I never got
(16) any definitive answers.
(17) Q. The fire marshal you spoke to, was that
(18) Mr. Kohn?
(19) A. Yes.
(20) Q. K-O-H-N?
(21) A. Yes.
(22) Q. What, if anything, did he indicate to
(23) you?
(24) A. He didn't indicate anything to me.
(25) Q. Did he tell you where in the house?

### Page 49

(1)
(2) A. He told me the investigation wasn't
(3) complete. After that -- I mean he gave to me, you

(4) know, his thoughts on it, but I never got anything
(5) definite.
(6) Q. What were his thoughts on that that he
(7) conveyed to you?
(8) A. He gave me this diatribe about the cat
(9) knocking over the lamp and starting the fire on the
(10) bed.
(11) Q. Did you have any reason to doubt that
(12) when you had learned it?
(13) A. Yes. The cat is very ill. The cat
(14) wouldn't be jumping on the night table knocking
(15) over the light especially when there is no room on
(16) the night table.
(17) Q. Had the cat ever jumped on furniture in
(18) that room before?
(19) A. Not on the end table or nightstands,
(20) no. On a bed, sofas, chairs, sure.
(21) Q. Did the cat parish in the fire?
(22) A. Yes, she did.
(23) Q. Did the fire, according to Fire Marshal
(24) Kohn, start in the room where the cat was located?
(25) A. That is -- all indications that is

### Page 50

(1)
(2) where the fire started, yes.
(3) Q. Have you ever viewed that room after
(4) the fire?
(5) A. Sure.
(6) Q. Did you have any doubt that the fire
(7) started in that room from your own observations?
(8) A. It looked like it started in that.
(9) That room was totally incinerated.
(10) Q. When Mr. Matza installed the fire alarm
(11) system or his company installed the fire alarm
(12) system, did you ever ask him for more smoke
(13) detectors than he installed?
(14) A. I believe not, no.
(15) Q. Did you ever take pictures of the smoke
(16) detectors installed by Mr. Matza?
(17) A. No.
(18) Q. Do you know how much you paid for the
(19) system installed by Mr. Matza's company?
(20) A. You have it right here.
(21) Q. Does that document Exhibit I refresh
(22) your recollection as to how much you paid?
(23) A. That is it, $2,100.
(24) Q. Did you agree on that price before the
(25) system was installed?

### Page 51

(1)
(2) A. I believe we did. He sent us the
(3) proposal. I think my wife must have the
(4) signature. My wife sent it back to him.
(5) Q. Do you recall that it was your wife who
(6) signed Exhibit I, the contract, rather than
(7) yourself?
(8) A. Yes.
(9) Q. And does that contract indicate that a
(10) burglar alarm system was also installed?
(11) A. It does.

(12) Q. And in addition to the burglar alarm
(13) system which you see outlined in that document, did
(14) you ever have ask Mr. Matza or anyone from his
(15) company to install more security or more detectors?
(16) A. No.
(17) Q. In addition to Fire Marshal Kohn, I
(18) believe you said that you asked the adjuster hired
(19) by the insurance company what caused the fire. Do
(20) you recall the name of that person?
(21) A. No. I don't think we ever exchanged
(22) names.
(23) Q. Do you remember ever dealing with a
(24) person named Richard Klein from Schleifer and
(25) Associates?

Page 52
(1)
(2) A. No.
(3) Q. Do you ever remember meeting with or
(4) discussing anything with Wendy Clark from the
(5) insurance company?
(6) A. No, I have no idea, no.
(7) Q. Did you ever hire a public adjuster to
(8) assist you in determining the amount of damages as
(9) a result of this fire?
(10) A. Yes, we did.
(11) Q. Who did you hire?
(12) A. It's a matter of record, you guys have
(13) that. I don't remember the name, Bridgeport.
(14) Q. Do you recall hiring Nutmeg Adjusters?
(15) A. Yes.
(16) Q. Was the person that you principally
(17) dealt with named Richard Alouette?
(18) A. Yes.
(19) Q. A Nutmeg adjuster?
(20) A. Yes.
(21) Q. Did you ever ask Mr. Alouette what had
(22) caused this fire?
(23) A. Truthfully, I don't really think so.
(24) Q. Did you ever learn from any other
(25) source other than Fire Marshal Kohn, when he was

Page 53
(1)
(2) giving his opinion, what caused this fire?
(3) A. No.
(4) Q. Did you ever speak to any neighbors or
(5) possible witnesses about this fire?
(6) A. No.
(7) Q. When the house was originally built in
(8) 1967 or 1968, do you know the square footage of it?
(9) A. Yes. I believe the square footage of
(10) it was 2,200 square feet.
(11) Q. Now, when you did the renovations in
(12) the year 2000, do you know when it was in the year
(13) 2000 that you increased the insurance on the house?
(14) A. No, I don't recollect that, no.
(15) Q. Did anyone from the insurance company
(16) ever come out to inspect your home before or after
(17) the installation of the alarm system by Command
(18) Force?
(19) A. To the best of my recollection, I don't

(20) think so.
(21) Q. Did you ever indicate to the insurance
(22) company that you installed an alarm system?
(23) A. I believe that Command Force -- I think
(24) there was a letter that was required, stipulating
(25) that the things were in place. If I'm not

Page 54
(1)
(2) mistaken, Command Force issued some kind of
(3) certificate or something else. That is what the
(4) insurance company required.
(5) Q. Did you ever see that document?
(6) A. I don't recollect.
(7) Q. Do you have a copy of that document?
(8) A. I don't think so. I don't think so.
(9) MR. MEZZACAPPA: At this time, we're
(10) going to request production of any document
(11) prepared by Command Force that is in the
(12) possession of the insurer and represented by
(13) Mr. Mascaro certifying that the system had
(14) been installed.
(15) MR. MASCARO: We take no position at
(16) this time.
(17) MR. MEZZACAPPA: This would be
(18) something in your possession.
(19) MR. MASCARO: I understand. If we have
(20) something to that effect, we would have
(21) produced, but I will check my file to see if
(22) we have that.
(23) Q. Did the insurance company ever indicate
(24) to you, when they adjusted this loss after the
(25) fire, that the system that was installed by Command

Page 55
(1)
(2) Force was not acceptable to them?
(3) A. Did the insurance company, no, no. I
(4) had no conversation with the insurance company
(5) about that.
(6) Q. Did you ever speak to a man named
(7) Mr. Thomas Klem, K-L-E-M?
(8) A. He is an adjuster for the insurance
(9) company?
(10) Q. He is an expert fire engineer type.
(11) A. If he was at the house, I may have
(12) spoken to him. The name doesn't ring a bell to me.
(13) Q. Did you remain in the house after the
(14) day of the fire?
(15) A. No.
(16) Q. When was the next time you occupied any
(17) structure at 34 Wildwood after 7/23/01?
(18) A. 2002. I think we moved back in October
(19) 2002.
(20) Q. From the date of fire until October
(21) 2002, where did you reside?
(22) A. In Weston, Connecticut.
(23) Q. Was that in a private home?
(24) A. Yes, we rented a home.
(25) Q. What was the address of that home that

Page 56
(1)

Page 56

(2) you rented?
(3) A. I believe 30 Orchard Drive.
(4) Q. Who paid the rent for that home?
(5) A. The insurance company paid the rent for
(6) 12 months. 2 months I paid.
(7) Q. Why did you pay for 2 months?
(8) A. It was because the policy owner allowed
(9) for one year, and the house was not ready to be
(10) moved back into until October, which was well over
(11) the year past of the fire – actually more than 2
(12) months. I lived in the hotel for a while.
(13) Q. Did you live in the hotel before you
(14) moved into the rented home?
(15) A. No. After the fire, we stayed with
(16) friends. They let us stay at their house for 3
(17) weeks or so, for all of July, and then we just
(18) rented as of August or September, I think
(19) September, September 1, and then for the last 6
(20) weeks or so, before we moved back into the house,
(21) after the lease was up at the house, we rented –
(22) we lived at the Homestead in Norwalk.
(23) Those expenses weren't covered by the
(24) – that is these are expenses that weren't covered
(25) by the insurance company.

Page 57

(2) Q. Did you ever institute a separate suit
(3) against Command Force as a result of this fire?
(4) A. No.
(5) Q. The house that you rebuilt at 34
(6) Wildwood that exists today, does that have a smoke
(7) detection system in it?
(8) A. Yes, it does.
(9) Q. Who put that system in?
(10) A. It was put in by the builder.
(11) Q. Is that monitored by a central station
(12) alarm?
(13) A. Yes, it is.
(14) Q. Do you also have a burglar alarm today?
(15) A. Yes, all in one.
(16) Q. Do you have to do anything to arm that
(17) system when you leave the house?
(18) A. Yes, you have to arm the burglar alarm,
(19) yes.
(20) Q. Do you arm the burglar alarm system
(21) when you leave today?
(22) A. No.
(23) Q. Is that correct that the fire system
(24) operates whether or not you actually arm it,
(25) correct?

Page 58

(2) A. It works independently, yes.
(3) Q. Did you ever meet with anyone from TJ
(4) Klem and Associates including a man named Joe
(5) Folger or Kevin Murphy?
(6) A. These are fire adjusters, right?
(7) Q. Fire engineers.
(8) A. I probably met them, I mean I went
(9) through the rubble, seeing them.
(10) Q. Do you have any recollection of any
(11) conversation you had?
(12) A. Yes. They may have asked me some
(13) questions as to my thought as to what caused the
(14) fire.
(15) Q. What did you opine, what did you tell
(16) them in response to their questions?
(17) A. Basically what we've, you know, I just
(18) told them what the facts are, what I knew, that is
(19) all.
(20) Q. What did you tell them?
(21) A. Well, this all theory, I would assume
(22) this is all theory about the lamp starting the
(23) fire, being knocked down by the cat must have come
(24) from me, because how would the fire department know
(25) that at one stage, the lamp was burnt out unless I

Page 59

(2) told them that? So that every theory was deduced
(3) from that statement, I guess, you know.
(4) Q. Did the lamp have a switch that you
(5) would turn to different positions to activate the
(6) different positions with a 3-way bulb?
(7) A. A standard toggle switch. Everybody is
(8) familiar with those, 3 positions – 4 positions, 3
(9) positions on, one position off.
(10) Q. What position was that lamp on when you
(11) left the house on July 23?
(12) A. No way of knowing that the lamp was
(13) off. That is all I could tell you. Whether there
(14) was no light, that is all – what position the
(15) switch was in is anyone's guess.
(16) Q. Did you ever speak to Jake Mollenkopf
(17) from Encompass Insurance about this fire?
(18) A. Sure.
(19) Q. On how many occasions did you speak to
(20) Jake Mollenkopf?
(21) A. Probably several occasions.
(22) Q. What was the sum and substance of the
(23) conversations with Mr. Mollenkopf?
(24) A. That was for reimbursement for the
(25) fire, not really what caused the fire.

Page 60

(2) Q. What do you recall talking to him about
(3) specifically?
(4) A. Just about reimbursements, things that
(5) we were entitled to as far as rental and living
(6) expenses, so on so forth, prior to us hiring Nutmeg
(7) inspectors. After that, I didn't have any dealing
(8) with Jake.
(9) Q. After you hired Nutmeg, Richard
(10) Alouette, to you knowledge, dealt with Jake?
(11) A. Yes.
(12) Q. What was the square footage of the home
(13) in 2000 after you completed the renovations?
(14) A. I think somewhere around 3,300 square
(15) feet.
(16) Q. What specifically –
(17) A. That depends on how you count square

(18) footage.
(19)  Q.  What renovation did you do in the year
(20) 2000 in your home?
(21)  A.  We remodeled the old garage, turned it
(22) into 2 bedrooms and small computer area room, and
(23) increased the size of the main entrance hall as
(24) well as adding a 2-car garage and adding a family
(25) room 30 by 40 feet, and remodeling the kitchen.

Page 61

(1)
(2)  Q.  You believe that all these renovations
(3) took place during the year of 2000?
(4)  A.  Probably started at the end of probably
(5) -- started at the end of 1999, went through 2000
(6) into the early part of 2001. We had just finished
(7) before the fire started.
(8)  Q.  When Mr. Matza came and met you at the
(9) house, when was that?
(10)  A.  My recollection -- I really can't tell
(11) you that. I thought it was in the -- it was ion
(12) the summertime. That says February. I thought it
(13) was warm weather.
(14)  Q.  Looking at Exhibit I which is dated
(15) February 4th 2000, does that help you to refresh
(16) your recollection as to when Mr. Matza was at your
(17) home?
(18)  A.  I couldn't tell you, no. I can tell
(19) you he was there. He went over there. That was
(20) the end result of our conversation, what he came up
(21) with.
(22)  Q.  When after your wife signed that
(23) contract did Anthony Pasquarella install the alarm
(24) in your house?
(25)  A.  I would imagine shortly right

Page 62

(1)
(2) thereafter.
(3)  Q.  After Mr. Pasquarella installed the
(4) alarm, did you ever call him back and ask him to
(5) come back and modify or alter the alarm in any way?
(6)  MR. MASCARO:  Objection. Asked and
(7) answered. You can answer it.
(8)  A.  No, I never asked him. I did speak to
(9) him about the system. I had a phone conversation
(10) with him but not come back, no.
(11)  Q.  What is your best recollection of the
(12) phone conversations you had with Mr. Pasquarella
(13) after the alarm was stalled?
(14)  A.  I believe it was something about arming
(15) the system or security alarm. I had problems
(16) arming the system.
(17)  Q.  After you spoke to Mr. Pasquarella, did
(18) he explain to you how to alarm the system?
(19)  A.  Yes, he did.
(20)  Q.  Did his advice to you on the telephone
(21) then assist you in arming the system successfully?
(22)  A.  No, not really.
(23)  Q.  Were you ever issued any -- I'm sorry?
(24)  A.  I never really use the security
(25) system. You know what, Wilton instituted a

Page 63

(1)
(2) system. You have to register the alarm with the
(3) town. There is -- they issue a permit for the
(4) central station alarm. You pay a fee every year.
(5) I think now every 3 years that you pay the fee, and
(6) I think they give you X amount of false alarms
(7) before they issue a summons or something like that.
(8)  Q.  When did they institute that program?
(9)  A.  After we had the alarm installed, in
(10) 2001 or something like that.
(11)  Q.  Did they ever come to the home to do an
(12) inspection of the system, anyone from Wilton?
(13)  A.  Not that I know of, no.
(14)  Q.  Were you given any pamphlets or
(15) brochures or booklets from Command Force when they
(16) installed the system?
(17)  A.  Yes.
(18)  Q.  Did you ever refer to them or read them
(19) in order to assist yourself in arming the system?
(20)  A.  Yes.
(21)  Q.  In between the time that the Command
(22) Force company installed the smoke detection or fire
(23) detection system and the day of the fire 7/23/01,
(24) did you or any member of your family ever
(25) accidentally trigger the smoke or fire detection

Page 64

(1)
(2) system?
(3)  A.  Not to my knowledge.
(4)  Q.  The kitchen in this home as it existed
(5) on 7/23/2001, is it fair to say it was in the
(6) middle of the house?
(7)  A.  Yes.
(8)  Q.  Is it fair to say that there was living
(9) space on either side of the kitchen at that time?
(10)  A.  Yes.
(11)  Q.  I'm going to show to you, I'm going to
(12) have marked something I'll show it to you. It's
(13) the first action. Mark it Defendant's Exhibit A
(14) for identification?
(15)  (Whereupon, the aforementioned
(16) Certificate of Occupancy was marked as Defendant's
(17) Exhibit A for identification as of this date by the
(18) Reporter.)
(19)  Q.  I'm going to show you what has been
(20) marked as Heinz Exhibit A. Take a look at that
(21) document and tell me if you've seen it before
(22) today.
(23)  A.  No.
(24)  Q.  It's a Certificate of Occupancy, for
(25) the record, and it's dated May 18, 2000. Does this

Page 65

(1)
(2) refresh your recollection that in or about May 18
(3) of 2000 you were given permission by the Town of
(4) Wilton to built a new 2-car garage and a great room
(5) converting the existing garage into 2 bedrooms with
(6) a covered porch dimensions 13 by 4, converting a
(7) screen porch to a music room, converting 2 bedrooms

(8) into a master bedroom, does that refresh your
(9) recollection?
(10)     A.    Yes, but that is when it was finished.
(11) This is issued in August of 1999. And they issued
(12) the – looking for – they had to issue the permit,
(13) so I can move back.
(14)     Q.    The certificate of Occupancy?
(15)     A.    Yes, but the building permits were in
(16) 1999, is when they were, okay?
(17)     Q.    I'm not asking you about the –
(18)     A.    That is when they granted them.
(19)     Q.    They granted it back in August of
(20) 1999. According to this document, the building
(21) described in the buildings and zoning permit
(22) number, issued August 19, 1999, having satisfied
(23) the requirements of the building code and zoning
(24) regulations of the Town of Wilton, a certificate of
(25) Occupancy, says hereby issued to Harold and Lauren

Page 66

(1)
(2) Heinz, the Certificate of Use/Occupancy issued May
(3) 18 of 2000. Does that refresh your recollection?
(4)     MR. MASCARO:    As to?
(5)     Q.    As to whether it was issued to you, the
(6) Certificate of Use/Occupancy by the Town of
(7) Wilton.
(8)     A.    Okay.
(9)     Q.    Does that help you to refresh your
(10) recollection?
(11)     A.    I didn't see that document, but I mean
(12) that sounds about right. That would have been
(13) taken care of by the builder, that is his
(14) responsibilities.
(15)     Q.    Do you know when the contractor that
(16) you hired physically started doing work, converting
(17) the existing garage and building a new garage, do
(18) you know when that work was done?
(19)     A.    It started in, probably in the winter
(20) of 2000.
(21)     Q.    But you don't have a recollection as to
(22) the month or the day?
(23)     A.    No. Supposed to start much earlier.
(24) It kept on getting pushed back.
(25)     Q.    Did any of the fire department

Page 67

(1)
(2) officials, police officers or anyone else that was
(3) at the house when you arrived there on 7/23/2001
(4) tell you that any of the smoke detectors were
(5) sounding or audible when they arrived at the home?
(6)     A.    No.
(7)     Q.    Did you ever ask them if any were
(8) sounding or audible?
(9)     A.    No.
(10)     Q.    In my 2 questions, I should have told
(11) you not only the one installed by Command Force but
(12) also the battery operated one that existed before
(13) Command Force installed there, would your answers
(14) be the same?
(15)     A.    Yes, the same.

(16)     Q.    Do you know where the lamp that was
(17) located in the fire bedroom is today?
(18)     A.    I assume it was totally destroyed by
(19) the fire.
(20)     Q.    Did anyone ever indicate to you that
(21) Mr. Klem was in possession of it?
(22)     A.    Not that I know of.
(23)     Q.    Did there come a time that you became
(24) aware that the Glens Falls Insurance Company was
(25) going to institute a suit against my client as a

Page 68

(1)
(2) result of this incident?
(3)     A.    What are you asking me?
(4)     Q.    In other words, did you ever learn
(5) about the existence of this lawsuit that we've been
(6) discussing today?
(7)     A.    Obviously, when I learned of it?
(8)     Q.    Yes.
(9)     A.    I guess 3, 4 months ago, perhaps.
(10)     Q.    How was it that you learned of the
(11) lawsuit for the first time?
(12)     A.    I was contacted by someone from the
(13) insurance company. Maybe it was more than – maybe
(14) of 6 months ago, I don't know.
(15)     Q.    Who contacted you?
(16)     A.    A law firm, I couldn't tell you the
(17) name.
(18)     Q.    To the best of your recollection?
(19)     A.    They asked questions.
(20)     Q.    I'm going to try to refresh your
(21) recollection. Was it Morrison, Mahoney & Miller
(22) where Mr. Mascaro works?
(23)     A.    I don't know. I mean the name, I have
(24) your letterhead, but I'm not sure if they were the
(25) first ones.

Page 69

(1)
(2)     Q.    Do you know who you spoke to at the law
(3) firm at that time?
(4)     A.    No.
(5)     Q.    Do you recall what was discussed at
(6) that time?
(7)     MR. MASCARO:    Just the nature in
(8) general, not what was specifically said back
(9) and forth.
(10)     MR. MEZZACAPPA:    I'm asking him for the
(11) sum and substance of his conversations. You
(12) actually represented him. He is not a
(13) plaintiff in this suit. I understand he was
(14) to cooperate with the insurance company. My
(15) position would be that that is not a
(16) privileged conversation.
(17)     MR. MASCARO:    My position will be that
(18) it is.
(19)     MR. MEZZACAPPA:    Based on what?
(20)     MR. MASCARO:    Because he is, the
(21) insurance company stands in his shoes. So, I
(22) would object to any questions that would ask
(23) him for conversations between him and any

Page 70

(1)
(2) MR. MEZZACAPPA: We'll mark that for a
(3) ruling. I'll move on. I won't ask him
(4) questions about your firm based on that
(5) direction, but I'll mark it.
(6) Q. Were you ever told by any other source
(7) other than an attorney at Morrison, Mahoney and
(8) Miller who your insurer was?
(9) A. Who my -- yes, I knew.
(10) Q. Who was your insurer?
(11) A. Encompass Insurance?
(12) Q. Was it Encompass Insurance, when I
(13) asked you before?
(14) A. They are the ones that issued the
(15) check, okay.
(16) Q. To your knowledge, on the date of the
(17) fire 7/23 --
(18) A. As a matter of fact, I think they had
(19) bought out. Encompass is the insurance company,
(20) so.
(21) Q. Did Glens Falls Insurance Company ever
(22) issue you any checks?
(23) A. You would have to -- I really don't
(24) know. I didn't look specifically to see who issued
(25) the checks. I couldn't tell you.

Page 71

(1)
(2) Q. You mentioned Encompass Insurance
(3) Company. Do you know if they issued some of the
(4) checks for this fire?
(5) A. Yes, I believe so. Jake, the insurance
(6) adjuster, he worked directly for Encompass, doesn't
(7) he?
(8) Q. Yes.
(9) A. He wrote the checks.
(10) Q. And who did you pay your insurance
(11) premiums to prior to the date of this fire?
(12) A. I don't have knowledge to that
(13) information. My wife pays all of the bills. I
(14) don't know who she issued the check to.
(15) Q. Does your wife maintain copies of
(16) canceled checks?
(17) A. I doubt that. She might. But I doubt
(18) if you are going to find them from then. They were
(19) burned up in the fire.
(20) Q. Did you maintain a filing cabinet in
(21) the house before the renovations? I am talking
(22) about before the fire now, did you have a file
(23) cabinet where you would keep canceled checks and
(24) important documents?
(25) A. Yes, we have.

Page 72

(1)
(2) Q. Where would the file cabinets be kept
(3) before the date of the fire?
(4) A. The bedroom where the fire was.
(5) Q. Was the cabinet and its contents
(6) consumed in the fire?
(7) A. Some of the things were. Some of them
(8) she has, but I couldn't tell you what.
(9) MR. MEZZACAPPA: I ask for production
(10) of copies of cancelled checks for the premium
(11) paid to an insurance company for one year
(12) prior to July 23, 2001, for the property
(13) insurance for this house.
(14) MR. MASCARO: If they have this, we'll
(15) produce it.
(16) Q. Did you ever make any complaints to
(17) Command Force prior to July 23, 2001, other than
(18) your conversations with Anthony Pasquarella about
(19) your difficulty arming the system?
(20) A. I, complaints no, I wouldn't say I had
(21) complaints, no.
(22) Q. When you arrived at the home on July
(23) 23, 2001, was the house still on fire?
(24) A. No.
(25) Q. In addition to the room where the cat

Page 73

(1)
(2) had been staying, was there any other portion of
(3) the house that was consumed by fire? I'm not
(4) talking about smoke damage right now.
(5) A. Yes, there were other rooms, yes.
(6) Q. What other rooms were consumed by fire
(7) from your own observations when you appeared there
(8) on July 23, 2001?
(9) A. The main entrance hall, the master
(10) bedroom, bathroom, the entire basement was consumed
(11) by fire right through to the roof. I would say 40
(12) percent of the house was actually burned, actually
(13) on fire.
(14) Q. Did other parts of the house have smoke
(15) damage?
(16) A. The entire house had smoke damage.
(17) Q. Do you know at what stage after the
(18) fire started the smoke damage took place, do you
(19) have any idea?
(20) A. No.
(21) Q. Did you ever speak to any fire marshal
(22) or investigator indicate to you when the smoke
(23) damage took place?
(24) A. No.
(25) Q. In addition to Fire Marshal Kohn, did

Page 74

(1)
(2) you speak to any other fire personnel from the
(3) Wilton Fire Department?
(4) A. I did.
(5) Q. What was the sum and substance of any
(6) conversations you had with anyone from the Wilton
(7) Fire Department?
(8) A. Nothing of any kind of value relating
(9) to the fire. Just a matter of them staying at the
(10) house overnight safeguarding the property. They
(11) camped out overnight so the house can be secured
(12) the next day.
(13) Q. Who secured the house the next day?

Page 74

(14) A. The house was boarded up the following
(15) day.
(16) Q. Who did that?
(17) A. I don't recollect the name of the
(18) company that did that. It was some adjusting
(19) company, someone out in Norwalk, I believe.
(20) Q. Where did the firemen obtain the water
(21) to fight this fire from?
(22) A. From the pond below the house.
(23) Q. Is that located outside the front door
(24) and down the hill?
(25) A. About 500 feet.

Page 75

(1)
(2) Q. Was that on your property?
(3) A. The next property, adjacent property.
(4) We're one property off the pond.
(5) Q. Did they obtain water from any other
(6) source to fight the fire?
(7) A. Not that I – I mean I don't know, not
(8) to my knowledge.
(9) Q. While you lived – in between the
(10) purchase of house in '96 and the date of the fire
(11) on July 23, 2001, did any fire department official
(12) ever come out to the house to inspect it or to do
(13) any studies of where they would obtain the water to
(14) fight a fire?
(15) A. No.
(16) Q. Did the firemen tell you – did you
(17) have any conversation with the firemen on July 23,
(18) 2001, or thereafter about how they located the
(19) pond?
(20) A. No.
(21) Q. In the summer months.
(22) A. But it's common knowledge for the fire
(23) department.
(24) Q. What do you base that on?
(25) A. They, that is what they use, the pond

Page 76

(1)
(2) to fill the tankers. They have a pump outside of
(3) the station. They use the pond as a water source
(4) for the fire pumpers. They have a pump-out station
(5) on Linden Tree Street, the next street.
(6) Q. On 7/23/01 when they were fighting the
(7) fire, did they use the pump-out station to fill the
(8) truck or did they put the lines directly into the
(9) pond to take the water?
(10) A. I believe they ran a fire line right
(11) through the pump station to the house.
(12) Q. Did they tell you how long that took
(13) them to accomplish?
(14) A. I heard 7 minutes.
(15) Q. Where did you hear that from?
(16) A. I guess hearsay. I really can't tell
(17) you where. Maybe the firemen, I don't know.
(18) Q. Was that 7 minutes after they arrived
(19) at your house?
(20) A. I wouldn't know.
(21) Q. Do you know how long it took the fire
(22) department to arrive at your house?
(23) A. I wouldn't know that, either.
(24) Q. Do you know how the Wilton Fire
(25) Department was originally called about the fire?

Page 77

(1)
(2) A. I am only guessing. I would imagine
(3) central station called them.
(4) Q. Did you ever speak to Gerry Green or
(5) Dave Bostrum from the Quincy, Massachusetts office
(6) of Encompass Insurance Company?
(7) A. Not to my recollection.
(8) Q. Were you ever given copies of the
(9) reports that TJ Klem and his associates authored as
(10) a result of this fire?
(11) A. No.
(12) Q. Did you ever speak to Mr. Klem after he
(13) came to his conclusion or anyone else on behalf of
(14) his company?
(15) A. I wouldn't know. I can't really answer
(16) that. I really don't know who he is.
(17) Q. The fire investigator for the insurance
(18) company.
(19) A. He was there several times, but they
(20) didn't make me privilege to any information or
(21) conclusion that they came to.
(22) Q. Did Mr. Klem or anyone from the
(23) insurance company – I'm not talking about your
(24) attorneys right now – indicate to you that they
(25) asked Mr. Klem to supplement his report about his

Page 78

(1)
(2) conclusions concerning this fire?
(3) A. Not to my knowledge.
(4) Q. Did anyone tell you not to use Command
(5) Force to re-alarm your new house?
(6) A. No.
(7) Q. Who is your insurance company today for
(8) the home at 34 Wildwood?
(9) A. The same company.
(10) Q. Encompass?
(11) A. Or Beacon One. Again, it's the same
(12) carrier.
(13) Q. Did anyone from Encompass Insurance or
(14) the current insurer, did anyone come to the house
(15) after it was rebuild in its present state and
(16) indicate what type of alarm you had to have at that
(17) house?
(18) A. No.
(19) Q. When you originally put the alarm in at
(20) 34 Wildwood by Command Force, did you get a
(21) reduction in your insurance premium as a result?
(22) A. I can't say that we did. I mean, I
(23) don't know why – I would assume so. I mean, I
(24) don't know. I assume the insurance is tied into
(25) that; that is how they rate the policy, according

Page 79

(1)
(2) to fire alarm, whatever you have, right, so you get
(3) percentages off from your premium because of that,

(4) right? That is standard.
(5) MR. MASCARO: He is asking specifically
(6) in this case if you got a discount, not in
(7) general practice.
(8) A. I don't know. The answer would be I
(9) really don't know. I was telling you what I was
(10) told. I don't know whether it actually happened.
(11) Q. Were you told that by the insurance
(12) company?
(13) A. I deal with a lot of insurance, because
(14) it relates to my business, so on. They ask you
(15) certain things, you get a lower rate. So, okay, a
(16) general question, I would assume they probably
(17) did. I mean that is just standard operating
(18) procedure.
(19) Q. What did you do before you were owned
(20) the store in the Bronx for a living?
(21) A. Before that, I was a salesman.
(22) Q. What kind of salesman?
(23) A. Pharmaceutical, health and beauty aids.
(24) Q. For what period of time did you do
(25) that?

Page 80

(1)
(2) A. About eight years.
(3) Q. Before that, what did you do?
(4) A. I was in business for myself.
(5) Q. What kind of business?
(6) A. Wholesale business.
(7) Q. What did you sell?
(8) A. Provisions, food.
(9) Q. Did you ever work in the insurance
(10) related industry?
(11) A. Yes, I did.
(12) Q. When did you work in the insurance
(13) related industry?
(14) A. After I graduated college.
(15) Q. Who did you work for?
(16) A. GEICO Insurance.
(17) Q. What did you do for GEICO?
(18) A. Claims adjuster.
(19) Q. For what period of time did you adjust
(20) claims?
(21) A. 7 years.
(22) Q. What kind of claims did you adjust?
(23) A. Automobile liability.
(24) Q. Did you ever do property damage
(25) adjusting with the auto?

Page 81

(1)
(2) A. I started with property damage and
(3) ended up with personal injury.
(4) Q. The property damage claims you
(5) adjusted, were they all auto related?
(6) A. Accidents, deaths.
(7) Q. Were they ever homeowner's policies?
(8) A. No.
(9) Q. After the fire, did you rebuild the
(10) house at 34 Wildwood?
(11) A. Yes, we did. No, no, we didn't rebuild

(12) the house. We tore it down. We rebuilt a new
(13) house.
(14) Q. Was any part of the old house retained
(15) or used in building the new house?
(16) A. Yes.
(17) Q. What part?
(18) A. We used the old foundation, and we kept
(19) the pool room and the garage, also.
(20) Q. And the garage?
(21) A. Yes, but that was partially torn down
(22) as well.
(23) Q. Did you use the money that the
(24) insurance company gave you as a result of the fire
(25) to tear down the old house and build the new house?

Page 82

(1)
(2) A. Yes.
(3) Q. In addition to the money that the
(4) insurance gave to you, did you have to spend any
(5) additional monies to build the new house?
(6) A. Yes.
(7) Q. How much additional moneys did you
(8) spend to build the new house?
(9) A. $250,000.
(10) Q. Who built the new house for you?
(11) A. Design Builders.
(12) Q. Where are they located?
(13) A. Sandy Hook.
(14) Q. New Jersey?
(15) A. No. Connecticut.
(16) Q. What is the square footage of the
(17) current home you live in?
(18) A. 4,500 square feet.
(19) Q. Did you retain or utilize any of the
(20) windows, doors or any fixtures from the old house
(21) in building the new house?
(22) A. No.
(23) Q. Did any company salvage or sell to any
(24) market any structural members or items or windows
(25) or doors from the old house that was torn down?

Page 83

(1)
(2) A. No.
(3) Q. Did you ask for a proposal from Command
(4) Force for alarming your new house?
(5) A. Yes, I did.
(6) MR. MEZZACAPPA: Let's have this marked
(7) as Exhibit B for identification.
(8) (Whereupon, the aforementioned proposal
(9) was marked as Defendant's Exhibit B for
(10) identification as of this date by the
(11) Reporter.)
(12) Q. I'm going to show you what has been
(13) marked a Heinz Exhibit B, a similar copy to Exhibit
(14) I, which I showed to you previously. Is that the
(15) same document at this time signed by your wife on
(16) 2/14/2000? Do you recognize your wife's signature
(17) on that document?
(18) A. Yes.
(19) Q. Do you recognize her handwriting where

(20) it's dated 2/14/2000?
(21) A. Yes.
(22) Q. To your knowledge, were any other
(23) documents issued to you from Command Force after
(24) they installed the alarm?
(25) A. Not to my knowledge, no.

Page 84

(2) Q. Did you have a conversation with anyone
(3) before coming here today other than your lawyer?
(4) A. My wife.
(5) Q. Specifically about this incident? What
(6) did you discuss with your wife about this incident
(7) before coming here to testify about it?
(8) A. Nothing really, just that I had to come
(9) in reference to a lawsuit against Command Force,
(10) that is it.
(11) Q. Did you have any conversations with
(12) Matthew Matza, Anthony Pasquarella, Debbie Moeller
(13) or any other employee of Command Force after the
(14) date of the fire other than what you indicated
(15) already to have the house temporarily wired for
(16) protection, did you have any other conversations
(17) with them?
(18) A. In reference to the house?
(19) Q. Relevant to the house, and what had
(20) happened.
(21) A. No.
(22) Q. Did you ever make any complaints to
(23) Mr. Matza or any employee of Command Force after
(24) the date of the fire about what happened on the day
(25) of the fire?

Page 85

(2) A. No, not to my knowledge, no.
(3) Q. When Mr. Matza was with you at the
(4) house before the installation of the alarm, did you
(5) ever tell him how much you wanted to spend on this
(6) system?
(7) A. No.
(8) Q. Did you give him a ballpark figure on
(9) what you wanted to spend?
(10) A. No.
(11) Q. Did you indicate to him in any way how
(12) much too much would be?
(13) A. No.
(14) Q. Did you ever review any of the fire
(15) department documents that they prepared as a result
(16) of investigating the fire at your home?
(17) A. No.
(18) Q. Did you ever tell anyone from the fire
(19) department that clothing and belongings in the room
(20) why arranged to discourage the cat from climbing
(21) onto the bed?
(22) A. Okay, possibly, yes, maybe.
(23) Q. Had the cat ever climbed onto the bed
(24) before?
(25) A. She always climbed onto the bed. She

Page 86

(2) likes the bed, it's comfortable.
(3) Q. Did the firemen ever indicate to you
(4) that they used any of the water from the pool
(5) located in the house to fight the fire?
(6) A. No. I can tell you they didn't. The
(7) pool was full of water, I don't know.
(8) Q. Did you ever learn that, during the
(9) fire fighting efforts, one of the firemen fell into
(10) the pool?
(11) A. Yes, that made the local paper, yes.
(12) Q. What do you recollect, what local paper
(13) was that in?
(14) A. The Wilton Villager.
(15) Q. Did you keep a copy of that article?
(16) A. I may have, probably.
(17) MR. MEZZACAPPA: We'll request
(18) production of that.
(19) Q. Do you have a recollection of anything
(20) else being said in that article other than the
(21) fireman ended up in the pool?
(22) A. Basically, that is about it.
(23) Q. Did the article indicate what started
(24) the fire?
(25) A. No.

Page 87

(2) Q. Did the article indicate any difficulty
(3) with the fire department fighting the fire?
(4) A. No. It just indicated as to -- it just
(5) mentioned that they had back-up from various towns,
(6) because they had X amount of engines, that they
(7) needed to get from the surrounding towns, Darien,
(8) Weston and I believe Ridgefield, they had back-up
(9) to fight the fire and also from across the border
(10) from New York, I think, too.
(11) Q. Do you know how long it took the fire
(12) department to get this fire under control?
(13) A. I have no knowledge, no. All I know is
(14) that when they told me when they responded, got to
(15) the house, the fire was already shooting out the
(16) window, going through the roof.
(17) Q. Do you know who the first responding
(18) company was?
(19) A. No. Wilton -- don't know what.
(20) Q. Do you know what time they arrived at
(21) the fire?
(22) A. No, I don't.
(23) Q. Do you know if the fire department that
(24) responded first from Wilton was a volunteer one or
(25) a paid one?

Page 88

(2) A. We have a paid fire department
(3) supplemented by volunteers from my knowledge.
(4) Q. Do you know how quickly after arriving
(5) at the scene and observing these flames that they
(6) actually got the first water on the fire?
(7) A. I have no idea.
(8) Q. Did you ever take photos of the house
(9) in its burned condition?

(10) A. I did, yes.
(11) Q. Did you ever turn them over to your
(12) lawyers?
(13) A. I'm not sure.
(14) I'm not suing anybody.
(15) Q. Did you ever turn them over to
(16) Morrison, Mahoney & and Miller?
(17) A. No.
(18) MR. MEZZACAPPA: I'm going to call for
(19) the production of copies of the photos. We'll
(20) pay for, to reproduce them. We would ask that
(21) you either take them to a photo mat or have
(22) color lasers copied by counsel.
(23) MR. MASCARO: Send them to me. I'll do
(24) that.
(25) Q. Did you ever –

Page 89

(1)
(2) A. From the –
(3) MR. MEZZACAPPA: Off the record.
(4) (Off the record.)
(5) MR. MEZZACAPPA: Let's mark this as
(6) Exhibit C.
(7) (Whereupon, the aforementioned
(8) schematic was marked as Defendant's Exhibit C
(9) for identification as of this date by the
(10) Reporter.)
(11) Q. I'm going to show you what has been
(12) marked as Defendant's Exhibit C for identification
(13) for today. It's a schematic drawing prepared by
(14) someone at Schleifer and Associates, Inc. Looking
(15) at that diagram, is that a fair and accurate
(16) representation of the layout of the house as it
(17) existed on 7/23/01?
(18) A. Yes, okay, yes.
(19) Q. Can you show us or point to us where
(20) the room where the cat was located would have been?
(21) A. This is – okay, right here, this
(22) corner (indicating).
(23) Q. Indicating the left upper part of the
(24) drawing underneath what is labeled as one story
(25) timber frame dwelling; is that correct?

Page 90

(1)
(2) A. That is correct.
(3) Q. And what was the size of that bedroom
(4) where the cat was?
(5) A. 10 by 10.
(6) Q. Was that the smallest room in the
(7) house?
(8) A. Yes. There was another one identical
(9) to it next to it about the same size.
(10) Q. Next to it?
(11) A. Yes.
(12) Q. That was under that same part of the
(13) house that is depicted in that diagram called a one
(14) story timber frame dwelling?
(15) A. Yes. The fire started in the corner
(16) bedroom. There was another one next to it.
(17) Q. Did that room have a door that was able
(18) to be closed on it?
(19) A. Yes.
(20) MR. MASCARO: Which room?
(21) Q. The room of fire origin where the cat
(22) was, it had a door?
(23) A. Yes, but the door was not closed.
(24) Q. The door was not closed, but there was
(25) child safety gate in the door frame, correct?

Page 91

(1)
(2) A. Yes.
(3) Q. And where in relation to the door to
(4) that bedroom would the staircase that goes upstairs
(5) have been?
(6) A. With the door would have been closer to
(7) the staircase as possible. On the far – the door
(8) would be here in – the stairs are here. The door
(9) is here (indicating).
(10) Q. Indicating on the photo that the door
(11) would have been toward the bottom of the picture
(12) still in that top room that we see there. And that
(13) the staircase would have been where, sir?
(14) A. The staircase was right below the main
(15) entrance where it says wood deck. It would be,
(16) walk in as the front door, and you walk 6 feet, you
(17) just circle down.
(18) Q. Was it a scissor staircase?
(19) A. Zigzag, I guess you call it. You go 6
(20) steps, platform, go down another 6 steps.
(21) Q. Down where the platform is and down
(22) again?
(23) A. Yes.
(24) Q. Just so the record is clear, the wood
(25) deck he referred to is at the bottom of the picture

Page 92

(1)
(2) or the front of the house in the diagram. There is
(3) another 2 spots where it says wood deck toward the
(4) back or the top of it as you look at it. And it
(5) was at the bottom of that scissor staircase that
(6) the smoke detector installed by Command Force was
(7) located; is that correct?
(8) A. Right.
(9) Q. You approximated for me before that
(10) from its location from the doorway of the fire
(11) bedroom was about 10 feet?
(12) A. Yes, give or take, yes, probably
(13) closer, yes, about right.
(14) Q. When Mr. Matza went through the house
(15) with you the first time, did you discuss the
(16) placement of the smoke detectors with him that he
(17) was going to install?
(18) A. No.
(19) Q. Where in relation to that motion
(20) detector at the bottom of that stair would have
(21) been a battery operated smoke detector that was
(22) originally in the house on that level?
(23) A. You go down the stairs, on the front of
(24) the house, you get to the bottom, you have to make
(25) a right, and immediately to your right, there was a

Page 93

(2) door that goes into the boiler room, one in there,
(3) and there was one outside of the boiler room which
(4) was used to be the -- it was the family room of the
(5) original house downstairs. And one in the middle
(6) of the ceiling.
(7)  Q. The one in the middle of the ceiling is
(8) in the family room downstairs?
(9)  A. Middle of the room.
(10) Q. The one in the family room downstairs,
(11) what was the distance between it and the one
(12) Mr. Matza put in at the bottom of the staircase?
(13) A. 8, 10 feet, too.
(14) Q. Did you ever ask Mr. Matza to put a
(15) smoke detector in the room where the cat was
(16) staying on 7/23?
(17) A. No.
(18) Q. Do any of the photographs that you took
(19) after the fire show the placement of any of the
(20) smoke detectors that we've been discussing either
(21) the one that preexisted the installation by
(22) Mr. Matza or the one that Mr. Matza's employees
(23) company put in?
(24) A. I didn't take any specifically of the
(25) smoke detectors or the location, but they might

Page 94

(2) show up in the picture. I don't know. I mean the
(3) ones of the one downstairs and the one above
(4) outside the bedroom upstairs were totally melted,
(5) gone, destroyed. The third one in the area was
(6) fine.
(7)  Q. Indicating the third one in this
(8) picture, a room rectangle, it simply says one story
(9) next to the second story storage loft, that one was
(10) fine you say?
(11) A. Right, that was still operational.
(12) Q. The one that Mr. Matza put in the
(13) bottom of the stairs here and the one in the middle
(14) of the master bedroom --
(15) A. It was not in the master. In the hall
(16) outside of the master.
(17) Q. Those were both damaged from the fire?
(18) A. Yes.
(19) Q. Unusable?
(20) A. Right.
(21) Q. After the fire?
(22) A. Right.
(23) Q. Did you assist either Nutmeg Adjusters
(24) or the insurance company adjusters oncoming up with
(25) any figure for the fire loss?

Page 95

(2) A. For the damage to the house, no.
(3) Q. Did you assist anyone in coming up with
(4) any figures for the damage to the contents of the
(5) home, I don't mean the structure?
(6) A. I assisted in the way, in other words,
(7) we gave them blueprints of the house and access to
(8) the house. It is a deck house. We gave them the
(9) old plans. I believe they contacted the original
(10) designer of the house and got a replacement cost.
(11) We, you know, led them toward that information, but
(12) no numbers or anything like that, no.
(13) Q. When you say the house, original house
(14) was a deck house, what do you mean by that?
(15) A. A post and beam house. It was a -- it
(16) was a prefabricated house, kind of divisional
(17) design came up with in the 1960s. The house was
(18) not your standard stick construction, posted beam.
(19) Stick construction is 2 by 4 every 16 inches. Post
(20) and beam you don't have that. You have 10 feet of
(21) span before you have a main support beam. And in
(22) the house has huge rafters in it, like 10, 12
(23) inches in depth, therefore, leaving very ornamental
(24) ceilings. All of the ceilings were wood, very much
(25) like you see here by the window here. That is what

Page 96

(2) the house looked like inside. The house has beams
(3) like one running inside every 10 feet or so. That
(4) is how the house was constructed. That is what
(5) carries the weight of the floors and the ceilings.
(6)  Q. The walls would not have studded beams
(7) every 16 inches?
(8)  A. No, no.
(9)  Q. What were the walls --
(10) A. They did have that, but that is not
(11) what carries the weight of the house. It's not a
(12) normal house. Obviously you couldn't nail the
(13) outside structure to the house. That was -- the
(14) supporting structure of the house, you got, you can
(15) take it all out.
(16) Q. In other words, there were no weight
(17) bearing walls that partitioned the rooms?
(18) A. Right.
(19) Q. When you rebuilt the house, did you
(20) build it similarly or did you do a stick
(21) construction?
(22) A. No. Stick construction.
(23) Q. Did you provide any receipts for any of
(24) the items within the house to any of the adjusters
(25) including Mr. Alouette or the adjuster hired by the

Page 97

(2) insurance company?
(3)  A. Yes, we did.
(4)  Q. What receipts did you give to them?
(5)  A. I'm sure, basically my wife took care
(6) of that. We were providing them with all of the
(7) bills for the renovations and whatever materials
(8) that we put into the home.
(9)  Q. I'm going to show you what has been
(10) previously marked as Defendant's Exhibit HH for
(11) identification on 1/7/2004 when we were questioning
(12) Mr. Mollenkoph. Take a look at the first
(13) photograph. There are 2 photographs on that page
(14) labeled HH which depict a smoke detector. Is that
(15) one of the smoke detectors that was already in the

(16) house before my client Command Force installed the
(17) smoke detectors?
(18) A. Yes.
(19) Q. Was that a battery operated –
(20) A. Sorry, no, this is not, no. You know,
(21) it's hard to tell looking at the photograph here,
(22) okay, but I don't know what room this is in. I see
(23) it says Norelco hard wired, some –
(24) Q. Smoke detector, DET?
(25) A. So, then that would not be – no. This

Page 98

(1)
(2) would be in one of the bedrooms.
(3) MR. MASCARO: Answer the question based
(4) on your observation.
(5) Q. I don't want you to assume that the
(6) person who was in the margin of that is correct.
(7) Okay? We established with Mr. Mollenkoph that that
(8) is his handwriting in the margin.
(9) From living in the house, what I'm
(10) asking, do you recognize that smoke detector either
(11) as one that my client Command Force installed or
(12) one that preexisted the installation by Command
(13) Force?
(14) A. Preexisted, yes.
(15) Q. That preexisted and was your own before
(16) Command Force ever came to the house, correct?
(17) A. Yes.
(18) Q. Where was that smoke detector depicted
(19) in that photograph located?
(20) A. It would have to be the bedroom, new
(21) bedrooms.
(22) Q. And when you say the new bedrooms, was
(23) that after the renovations for which you retained
(24) the architect?
(25) A. Yes.

Page 99

(1)
(2) Q. Do you know who installed that smoke
(3) detector in the new bedroom?
(4) A. Done by the contractor that did the
(5) reconstruction of the house.
(6) Q. Taking a look at the remaining pictures
(7) from Exhibit HH, tell me if you see depicted in any
(8) of them any smoke detectors that you recognize in
(9) your home.
(10) A. No.
(11) Q. I know I asked you, I apologize, for
(12) foundation purposes, who is the builder that did
(13) the renovation work in the year 2000 into 2001 in
(14) your home?
(15) A. Jimmy. I can't remember the last name.
(16) Q. Did Jim, when he did his renovation
(17) work, install any smoke detectors?
(18) A. Well, the 2 that I just, that I just
(19) indicated to you.
(20) Q. In Exhibit HH?
(21) A. Right. According to that, that is
(22) according to the building code, they require in
(23) every bedroom.
(24) Q. Jim did that when he built or
(25) constructed?

Page 100

(1)
(2) A. I assume I guess his electrician did,
(3) he probably did, but his electrician.
(4) Q. Do you have any bills from –
(5) A. Not specifically.
(6) Q. Do you have any bills from Jim that
(7) itemized what he did in your house?
(8) A. No.
(9) Q. Do you have any bills from any
(10) subcontractors used by Jim, for example, electrical
(11) subcontractor that might have installed the smoke
(12) detector depicted in the Exhibit HH?
(13) A. No, I don't.
(14) Q. Do you know if you were separately
(15) charged by any electrical subcontractor for any
(16) work that they did?
(17) A. No.
(18) Q. Do you have any records at home that
(19) would refresh your recollection or indicate who the
(20) electrical subcontractor that installed the smoke
(21) detectors might have been?
(22) A. I have – I had no dealing with the –
(23) whoever the electrician was, I had no dealings
(24) with. I have no idea who it was.
(25) Q. Do you know from looking at Exhibit HH

Page 101

(1)
(2) when that smoke detector was installed in your
(3) home?
(4) A. Well, toward the end of the renovation
(5) when they finished the room.
(6) Q. Do you know when that was?
(7) A. It had to be sometime in 2000.
(8) Q. Before, you told us that the renovation
(9) went through the year 2001 and ended shortly before
(10) this fire which occurred in July. Could it be that
(11) the smoke detector depicted in Exhibit HH was
(12) installed in 2001?
(13) A. It's possible it could be. It's
(14) probable.
(15) Q. Looking at the third page of pictures
(16) labeled as Exhibit HH at the bottom picture appears
(17) to be a garage, correct?
(18) A. That is correct.
(19) Q. Is that garage with the one door that
(20) is open, one door is closed, is that a new garage?
(21) A. That is the part of the new addition,
(22) yes.
(23) Q. When was that garage completed?
(24) A. That was all part of the renovation
(25) we've been talking about. That was all the same

Page 102

(1)
(2) renovation. We added the bedroom, the family room
(3) and the garage and the second story garage, that
(4) was all done between the end of 1999 or the
(5) beginning of 2000 until – you have the records for