# 1/07/04 HEINZ vs. COMMAND FORCE SECURITY SYSTEMS

## Diamond Reporting

### Page 1 to Page 223

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DIAMOND REPORTING*
*Suite 907*
*16 Court Street*
*Brooklyn, NY    11241*
*Phone:   (718) 624-7200*
*FAX:    (718) 855-1772*

Page 1

(1)
(2) UNITED STATES DISTRICT COURT
(3) DISTRICT OF CONNECTICUT
(4) ------------------------------------------------X
(5) GLENS FALLS INSURANCE COMPANY a/s/o HAROLD and
(6) LAUREN HEINZ,
(7)
(8) PLAINTIFF,
(9)
(10) -against-
(11)
(12) COMMAND FORCE SECURITY SYSTEMS, INC.,
(13)
(14) DEFENDANT.
(15) ------------------------------------------------X
(16) DATE:   January 7, 2004
(17) TIME:   10:00 a.m.
(18)
(19)
(20) EXAMINATION BEFORE TRIAL of the
    Plaintiff GLENS FALLS INSURANCE COMPANY by a
(21) witness, JAKE MOLLENKOPF, taken by the
    Defendant, held at the office of Pepe &
(22) Hazard, LLP., 30 Jeliff Lane, South Port,
    Connecticut, before a Notary Public of the
(23) State of New York.
(24)
(25)

Page 2

(1)
(2) A P P E A R A N C E S:
(3) MORRISON, MAHONEY & MILLER, LLP.
    Attorneys for Plaintiffs
(4) One Constitution Plaza
    Hartford, Connecticut 06103
(5) BY: JOSEPH E. MASCARO, ESQ.
(6)
(7)
    KAUFMAN, BORGEEST & RYAN, LLP.
(8) Attorneys for the Defendant
    200 Summit Lake Drive
(9) Valhalla, New York 10595
    BY: MICHAEL P. MEZZACAPPA, ESQ.
(10)
(11)
(12)
(13)
        * * *
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)

Page 3

(1)
(2) F E D E R A L   S T I P U L A T I O N S
(3)
(4)
(5) IT IS HEREBY STIPULATED AND AGREED
(6) by and between the counsel for the respective
(7) parties hereto, that the filing, sealing, and
(8) certification of the within deposition shall
(9) be and the same are hereby waived;
(10)
(11) IT IS FURTHER STIPULATED AND AGREED
(12) that all objections, except as to the form
(13) of the question, shall be reserved to the
(14) times
(15) of the trial.
(16)
(17) IT IS FURTHER STIPULATED AND AGREED
(18) that the within deposition may be signed
(19) before
(20) any Notary Public with the same force and
(21) effect
(22) as if signed and sworn to before this court.
(23)
(24)
(25) * * * *

Page 4

(1)
(2) JAKE MOLLENKOPF, called as a witness,
(3) having been first duly sworn by a Notary
(4) Public of the State of New York, was examined
(5) and testified as follows:
(6) EXAMINATION BY
(7)     MR. MEZZACAPPA:
(8)     Q.    Please state your name for the record.
(9)     A.    Jake Mollenkopf.
(10)    Q.    Where do you reside?
(11)    A.    PO Box 319, Manasquan, New Jersey
(12) 08736.
(13)    MR. MASCARO:    He'll read and sign his
(14) own deposition.
(15)    Q.    Good morning. My name is Michael
(16) Mezzacappa. I'm the attorney with the law office
(17) of Kaufman, Borgeest & Ryan. We represent Command
(18) Force Security System, Inc. in a lawsuit Glens
(19) Falls Insurance Company against Command Force. I
(20) understand you are the representative from Glens
(21) Falls Insurance Company. I'm here to ask you a
(22) series of questions. If at any time you don't
(23) understand the question, ask me to rephrase it and
(24) I'll do that. You have to answer verbally. If you
(25) do, we will assume that you understood my question,

Page 5

(1)
(2) and it's court reporter's duty to record everything
(3) we are saying, to take everything down that I say
(4) and that you say. If you need a break at any time,
(5) that is fine. I can't give you a break while a
(6) question is pending. Feel free to talk to your

(7) attorney at any point if you need to. And other
(8) than that, we'll get started. Is that all clear?
(9)  A.  Fine.
(10) Q.  Have you been deposed before, sir?
(11) A.  Yes.
(12) Q.  On how many occasions?
(13) A.  2 to 4.
(14) Q.  Do you mean 3 or approximately 2 to 4?
(15) A.  Correct.
(16) Q.  And on those 2 to 4 occasions, was that
(17) while working for Encompass, Glens Falls Insurance
(18) Company?
(19) A.  Yes.
(20) Q.  When was the most recent time you were
(21) deposed?
(22) A.  10 years ago.
(23) Q.  What is your recollection of the kind
(24) of case you were deposed in?
(25) A.  I believe it was a coverage issue.

Page 6

(1)
(2) Q.  Prior to that, when were you last
(3) deposed?
(4) A.  I don't recall.
(5) Q.  What is your date of birth?
(6) A.  April 9, 1950.
(7) Q.  Where were you born?
(8) A.  Bridgeton, New Jersey.
(9) Q.  What is your highest level of education
(10) to date?
(11) A.  I have 4 years of college.
(12) Q.  Where did you attend college?
(13) A.  Dean Junior College and Belmat College.
(14) Q.  Did you graduate from either of those
(15) colleges?
(16) A.  No.
(17) Q.  Did you graduate from high school?
(18) A.  Yes.
(19) Q.  Where did you attend high school?
(20) A.  Pennington school.
(21) Q.  Where is that located?
(22) A.  Pennington, New Jersey.
(23) Q.  Are you presently employed?
(24) A.  Yes.
(25) Q.  By whom?

Page 7

(1)
(2) A.  Encompass Insurance.
(3) Q.  What is your job title there?
(4) A.  General adjuster.
(5) Q.  For what period of time have you been a
(6) general adjuster for encompass?
(7) A.  4 years.
(8) Q.  Does that represent the totality of the
(9) time that you've been employed by Encompass?
(10) A.  No.
(11) Q.  Tell me when you were first employed by
(12) Encompass.
(13) A.  1983, actually I was employed by
(14) Continental, and they had several – the insurance

(15) companies have had several buy outs.
(16) Q.  For what period of time were you
(17) employed by continental while it was known as
(18) Continental, from 1983 until what year?
(19) A.  Probably 1995.
(20) Q.  What was your job title with
(21) Continental?
(22) A.  I was an adjuster and a supervisor.
(23) Q.  What kind of claims would you adjust?
(24) A.  First party property, property.
(25) Q.  And at some point after 1995,

Page 8

(1)
(2) Continental was bought out or became –
(3) A.  No. Continental was bought out by CNA
(4) Insurance, and CNA in turn was bought out by
(5) Allstate Insurance.
(6) Q.  How did it become Encompass?
(7) A.  Allstate bought us; that is the new
(8) name for the company. The insurance was changed to
(9) Encompass Insurance.
(10) Q.  Is Encompass a totally owned subsidiary
(11) of Allstate today?
(12) A.  I don't know that answer.
(13) Q.  Is there any relationship today between
(14) Encompass Insurance and CNA Insurance?
(15) A.  I don't have that answer.
(16) Q.  Do you know anyone that would know?
(17) A.  Probably corporate legal.
(18) Q.  How long large a company is Encompass
(19) Insurance?
(20) A.  Employee-wise?
(21) Q.  Sure, that is fine.
(22) A.  I think probably 4,000 employees.
(23) Q.  Where is its home office?
(24) A.  I don't know the answer. I do,
(25) Chicago.

Page 9

(1)
(2) Q.  Is it accurate that I'm looking at a
(3) business card, that you are located in Manasquan,
(4) New Jersey on a daily basis for your job?
(5) A.  That is correct. I work from home.
(6) Q.  You are the only employee of Encompass
(7) at the location that you at on a daily basis there,
(8) correct, at your home?
(9) A.  Yes.
(10) Q.  Who do you report to, if anyone?
(11) A.  My supervisor is in Mammoth Junction,
(12) New Jersey.
(13) Q.  What is the name?
(14) A.  Susan Mckenna.
(15) Q.  What is her job title?
(16) A.  Property supervisor.
(17) Q.  What are your job functions or
(18) responsibilities in the capacity as a general
(19) adjuster for Encompass Insurance?
(20) A.  I investigate claims, evaluate claims,
(21) and conclude claims.
(22) Q.  How long have you had those job

(23) responsibilities for this company?
(24)   A.   As a general adjuster, 4 years. As I
(25) say, I've been with the company 22 years either as

Page 10

(1)
(2) an adjuster or a supervisor. I supervised for
(3) about 10 years.
(4)   Q.   Is the position of general adjuster
(5) below the position of a supervisor?
(6)   A.   No.
(7)   Q.   Explain to me in the hierarchy of
(8) Encompass Insurance where general adjuster fits in
(9) with the supervisor.
(10)   A.   General – supervisor is an office
(11) managerial position, and a general adjuster is a
(12) field adjuster handling larger claims.
(13)   Q.   I see you are the general adjuster for
(14) the Northeast region?
(15)   A.   Correct.
(16)   Q.   Can you tell me what the Northeast
(17) region encompasses at Encompass Insurance?
(18)   A.   Generally New Jersey and New England
(19) states, but I also have gone to Pennsylvania,
(20) Maryland, Delaware.
(21)   Q.   Have you ever been convicted of a
(22) crime?
(23)   A.   No.
(24)   Q.   Have you ever plead guilty to a crime?
(25)   A.   No.

Page 11

(1)
(2)   Q.   Have you ever served in the military?
(3)   A.   No.
(4)   Q.   Who is Mike Moeller, M-O-E-L-L-E-R?
(5)   A.   He was a home office supervisor.
(6)   Q.   When you say was, he is no longer with
(7) the company?
(8)   A.   He retired, yes.
(9)   MR. MASCARO:   Let him finish the
(10) questions before you answer the question.
(11)   Q.   When did he retire?
(12)   A.   2 months ago.
(13)   Q.   Where does he live today, if you know?
(14)   A.   Nashville, Tennessee.
(15)   Q.   Did Mr. Moeller have any
(16) responsibilities with adjusting this claim
(17) involving Harold and Lauren Heinz for their home at
(18) 34 Wildwood Drive in the town of Wilton
(19) Connecticut?
(20)   MR. MASCARO:   You can answer the
(21) question, to the best of your recollection.
(22)   A.   The question was again?
(23)   Q.   Did Mr. Moeller have any responsibility
(24) or function with the adjusting this loss that we're
(25) here for today?

Page 12

(1)
(2)   A.   He would authorize my settlement and
(3) adjustment. He would authorize my adjustment.
(4)   Q.   Do you have a recollection of him doing
(5) that in this case?
(6)   A.   Yes.
(7)   Q.   Did Mr. Moeller make my changes to your
(8) settlement or your recommendations on adjusting
(9) this loss?
(10)   A.   I don't recall.
(11)   Q.   Where would that be documented, if
(12) anywhere?
(13)   A.   File notes.
(14)   Q.   Are those files notes maintained at
(15) your office or somewhere else?
(16)   A.   They would be maintained in the field
(17) file.
(18)   Q.   Where is the field file today for this
(19) loss?
(20)   A.   My office.
(21)   Q.   Did you bring that with you today?
(22)   A.   No.
(23)   MR. MEZZACAPPA:   At this time, we're
(24) going to request for the production for the
(25) field file for the loss filed. Just please

Page 13

(1)
(2) put all of the requests at the end of the
(3) transcript so I can follow up in writing.
(4)   MR. MASCARO:   For the record, I don't
(5) know. That may have been something that has
(6) been produced, so I'm not sure whether it has
(7) been or not. I believe we produced our entire
(8) file minus some documents which I believe are
(9) objected to by various privileges, protected
(10) by privileges. I can discuss that later for
(11) the record. That may have been produced.
(12)   MR. MEZZACAPPA:   I mean the reason I'm
(13) making the request, I wasn't given a
(14) privileged log. I don't know what has been
(15) withheld. So, the totality of what might be
(16) available, I need to know at some point.
(17)   Q.   Did you review any documents before
(18) coming here to testify today?
(19)   A.   Yes.
(20)   Q.   Which documents did you review?
(21)   A.   Statement of loss.
(22)   Q.   That is what your attorney handed me at
(23) the beginning of the deposition?
(24)   A.   Yes, 2 reports.
(25)   Q.   Which 2 reports did you look at?

Page 14

(1)
(2)   A.   2 file reports.
(3)   Q.   When you say 2 file reports, what do
(4) you mean by that?
(5)   A.   The reports I would have sent to the
(6) company recommending the adjustment.
(7)   Q.   May I see those?
(8)   MR. MASCARO:   We weren't asked to
(9) produce the documents here today. He didn't
(10) bring the documents here today. That may not
(11) be something that was produced in response to
(12) the request for production of documents. Or

(13) it may be documents that were withheld as
(14) privileged. I don't know offhand, but he did
(15) not bring any documents with him today.
(16) MR. MEZZACAPPA: Because he testified
(17) he reviewed them, they are discoverable. I'm
(18) calling for the production of them. If them
(19) not already been produce. I need to know
(20) which documents it is that he has specifically
(21) reviewed.
(22) Q. Do you remember the dates of the
(23) reports that you reviewed?
(24) A. No.
(25) Q. Did you author the reports?

Page 15

(1)
(2) A. Yes.
(3) Q. What do they look like in terms of
(4) physical layout, how many pages?
(5) A. Anywhere from 2 to 3 pages.
(6) Q. Did they refresh your recollection
(7) about this loss?
(8) A. Yes.
(9) Q. When did you review them?
(10) A. Yesterday.
(11) Q. Were you alone or with someone else
(12) when you reviewed them?
(13) A. With my attorney.
(14) Q. I don't want you to testify about any
(15) conversation you had with your attorney, because
(16) those are privileged. I don't want you to make a
(17) mistake in answering the question and blurt out
(18) anything that your attorney told you, but I'm going
(19) to ask you, based on review of the documents
(20) yesterday, what you recall them saying.
(21) A. Basically the adjustment of the claim,
(22) extent of damages, adjustment of the claim.
(23) Q. Can you be more specific, what was
(24) contained in them?
(25) A. Covers background information of the

Page 16

(1)
(2) insured, the type of policy they have, amount of
(3) coverage, the extent of the damages.
(4) Q. What kind of policy did they have?
(5) A. The deluxe.
(6) Q. Meaning what?
(7) A. They had – it's a policy that covers
(8) building contents and additional living expenses.
(9) Q. When you say additional living
(10) expenses, is there a limit on additional living
(11) expenses?
(12) A. I believe it's 25 percent of the policy
(13) limit.
(14) Q. What is the policy limit in this case?
(15) A. Around 1.2.
(16) Q. Is that 1 policy or broken down into a
(17) primary and access?
(18) A. One policy.
(19) Q. What was the premium for that policy
(20) from what you recall?

(21) A. I don't get involved with that. I
(22) don't know.
(23) Q. Who does, the underwriting department?
(24) A. Yes.
(25) Q. Do you know the underwriter on this

Page 17

(1)
(2) file?
(3) A. No.
(4) Q. Do you have any way of identifying the
(5) underwriter on this file from review of your
(6) documents maintained in your office?
(7) A. I don't know.
(8) Q. Do you have a recollection from
(9) reviewing the documents yesterday or from being
(10) involved in adjusting this loss as to what period
(11) of time the Heinz were insured with Encompass prior
(12) to the claim for the fire in July?
(13) A. No.
(14) Q. From review of your documents yesterday
(15) or in adjusting this loss, was there a rebate or
(16) decrease or savings off of the premium base on the
(17) installation of a fire detection system at this
(18) home?
(19) A. I don't know.
(20) Q. Who would know that at your insurance
(21) company?
(22) A. Underwriting.
(23) Q. At the time that this policy was
(24) initially issued to the Heinz for 34 Wildwood
(25) Drive, would the underwriting department have sent

Page 18

(1)
(2) out a live person to the home to do their own
(3) inspection before insuring it?
(4) A. Possibly.
(5) Q. When you say possibly, is there a way
(6) that we would know whether Encompass Insurance sent
(7) out a live person before they insured the home?
(8) A. We can get the underwriting file,
(9) hopefully reflected in the underwriting file.
(10) MR. MEZZACAPPA: At this time, I'm
(11) going to make a request for the underwriting
(12) file.
(13) MR. MASCARO: In response, I don't know
(14) whether – they may have been produced with
(15) these documents, it may not have been. We'll
(16) respond to the request when we get it in the
(17) form, in writing from the attorney
(18) Mr. Mezzacappa Pap. We reserve all our rights
(19) as to that request.
(20) Q. In your numerous years with Encompass
(21) Insurance Company and its predecessors, did you
(22) have any experience in the underwriting department?
(23) A. No.
(24) Q. Did you ever learn that there were
(25) rebates or premium reductions based on the

Page 19

(1)
(2) installation of a fire detection system?

Case 3:03-cv-01015-DJS Document 19-33 Filed 08/30/2004 Page 6 of 19

BSA 1/07/04 HEINZ vs. COMMAND FORCE SECURITY SYSTEMS XMAX(5/5)

(3) A. Yes.
(4) Q. Was there a routine policy or procedure
(5) at the insurance company as to what it required to
(6) be installed?
(7) A. I don't know that answer.
(8) Q. Who would have that answer?
(9) A. Underwriting.
(10) Q. In your experience with Encompass
(11) Insurance, was there a particular fire detection
(12) system which needed to be installed in order for
(13) Encompass to lower the premium on a given policy?
(14) A. I don't have that answer.
(15) Q. Would underwriting have that answer?
(16) A. Yes.
(17) Q. Whether or not underwriting went out to
(18) see the home before they issued a policy insurance
(19) to the Heinz at 34 Wildwood Drive, do you have any
(20) knowledge as to whether they would have gone out
(21) before or after a fire detection system was
(22) installed?
(23) A. I don't have that answer.
(24) Q. Would that be reflected in the
(25) underwriting file on this maintained by Encompass

Page 20
(1)
(2) on this house?
(3) A. Possibly.
(4) Q. As a general adjuster on this loss,
(5) when for the first time were you apprised of this
(6) loss, to the best of your recollection?
(7) A. I don't recall the exact date.
(8) Q. Do you recall whether it was in close
(9) proximity to the actual fire?
(10) A. It would have been.
(11) Q. Is your recollection from reviewing the
(12) documents yesterday that the fire occurred on July
(13) 23, 2001?
(14) A. I would have to check that again for
(15) the date of loss.
(16) Q. Do you have anything with you that you
(17) can check?
(18) A. No.
(19) Q. You prepared the interrogatory
(20) responses based on our questions in this case and
(21) signed off on them; is that correct?
(22) A. Yes.
(23) MR. MEZZACAPPA: At this time we're
(24) going to have these marked as Defendant's
(25) Exhibit A for identification, mark as

Page 21
(1)
(2) Defendant's Exhibit A, Notice of Compliance
(3) dated November 11th of 2003, which includes
(4) plaintiff's responses to the defendant's
(5) interrogatories.
(6) (Whereupon, the aforementioned Notice
(7) of Compliance was marked as Defendant's
(8) Exhibit A for identification as of this date
(9) by the Reporter.)
(10) Q. Sir, could you please take a look at
(11) what has been marked Defendant's Exhibit A. It
(12) starts off with Notice of Compliance, and after
(13) those 2 pages, basically are the responses to the
(14) defendant's interrogatories that span over the next
(15) 15 pages. Turn to Page 15. Is that your name and
(16) signature?
(17) A. Yes, it is.
(18) Q. I see it says John Mollenkopf. It's
(19) the same as Jake?
(20) A. Yes, I am.
(21) Q. And is Jake a nickname?
(22) A. Yes.
(23) Q. Did you prepare the answers to these
(24) interrogatories over the 15 page that precede your
(25) signature?

Page 22
(1)
(2) A. Yes.
(3) Q. Did anyone assist you in the
(4) preparation of those interrogatory responses?
(5) A. No.
(6) MR. MASCARO: Obviously came through –
(7) Q. Other than your lawyer?
(8) A. Right.
(9) Q. Could you turn to paragraph 29 for a
(10) minute?
(11) MR. MASCARO: What page?
(12) Q. I'm sorry– withdraw. Paragraph 25,
(13) page 13, do you see that your answer to
(14) interrogatory 25 indicates that there are 2
(15) contracts between the plaintiff and Harold and
(16) Lauren Heinz?
(17) A. Repeat the question.
(18) Q. Do you see the answer to that
(19) interrogatory No. 25 indicates that the plaintiff
(20) is aware of 2 contracts between the plaintiff and
(21) Harold and Lauren Heinz?
(22) A. Yes.
(23) Q. Do you know what 2 contracts you're
(24) referring to there?
(25) A. No.

Page 23
(1)
(2) Q. Did you know at the time in November,
(3) when you signed the interrogatories, which 2
(4) contracts you were referring to?
(5) A. I believe the contracts between the
(6) alarm company.
(7) Q. Based on your answer, where it says the
(8) plaintiff, I'm assuming is the plaintiff Glens
(9) Falls Insurance Company and Harold and Lauren Heinz
(10) are the homeowners. So, you are not mentioning
(11) Command Force in there. Do you know what 2
(12) contracts you're referring to in your answer here?
(13) A. I believe the 2 alarm contracts.
(14) MR. MASCARO: I believe that is
(15) correct. There's a mistake in No. 25. It
(16) should be contracts between the defendant and
(17) the insured Heinz. When we prepared that, we
(18) made a mistake. We typed plaintiff instead of

(19) defendant.
(20) MR. MEZZACAPPA: Okay.
(21) MR. MASCARO: I believe they were
(22) produced with the production of documents.
(23) MR. MEZZACAPPA: We'll look at those.
(24) Q. Were there any e-mail correspondence,
(25) was there any e-mail correspondence regarding this

Page 24

(1)
(2) case that you located when you were answering
(3) interrogatories but you did not produce, to your
(4) knowledge?
(5) A. Repeat the question, please.
(6) Q. Did you locate any e-mail
(7) correspondence concerning this loss that was not
(8) produced which you located, when you were answering
(9) your interrogatories?
(10) A. I don't recall.
(11) Q. Do you have a computer in your home
(12) office?
(13) A. Yes.
(14) Q. Do you utilize e-mail?
(15) A. Yes.
(16) Q. What system or server do you utilize
(17) for the e-mails?
(18) A. I believe Microsoft.
(19) Q. Do you save old e-mails?
(20) A. Sometimes.
(21) Q. Do you print the e-mails on a given
(22) file and put them in the hard copy of the file?
(23) A. Sometimes.
(24) Q. Were there or are there, to your
(25) knowledge, any e-mail concerning your loss

Page 25

(1)
(2) adjustment on this case?
(3) A. I don't know.
(4) MR. MEZZACAPPA: At this time, I'm
(5) going to request production of any e-mail. I
(6) request first a search be made of computer
(7) files as well as hard files for electronic or
(8) hard copies of any e-mails maintained in the
(9) ordinary course of business of Encompass
(10) prepared by this witness or anyone on behalf
(11) of Encompass for the adjustment of this loss.
(12) MR. MASCARO: We'll reserve our rights
(13) to respond after the deposition.
(14) Q. Did you go to the scene of the fire
(15) after the date of the loss?
(16) A. Yes.
(17) Q. Do you know how many days after it was
(18) that you arrived there?
(19) A. No.
(20) Q. Did you take any photographs yourself
(21) while you were there?
(22) A. I believe I did.
(23) Q. Have you produced those photographs in
(24) your answers to interrogatories in our document
(25) demands?

Page 26

(1)
(2) A. I don't know.
(3) Q. We do have color photographs that were
(4) given by your attorney in response to the
(5) documents. We'll show you those today. Do you
(6) have a recollection of how many photographs you
(7) took?
(8) A. No.
(9) Q. Do you take photographs with a digital
(10) camera or some other method?
(11) A. Both.
(12) Q. What is the other method?
(13) A. 35 millimeter.
(14) Q. Are you aware in this case whether
(15) there are both digital photos as well as regular
(16) photos?
(17) A. I would have to check.
(18) MR. MEZZACAPPA: At this time, to the
(19) extent that there exits photos which were not
(20) produced, we would ask for all photos in hard
(21) copy or digital be produced in duplicate laser
(22) color; we'll pay for the reproduction of
(23) that. To the extent they are only maintained
(24) digitally on the computer, we would request
(25) that they be mailed first to the attorney and

Page 27

(1)
(2) then forward on to me. We can print them out,
(3) reproduced from a digital, if that is
(4) possible.
(5) MR. MASCARO: I have produced all
(6) photos that I have been in possession of. We
(7) can certainly look to see if there are and
(8) produce them if there are.
(9) Q. Did you go to the home on one or more
(10) than one occasion after the fire?
(11) A. More than once.
(12) Q. How many times did you go?
(13) A. I don't recall.
(14) Q. Was it more than 3 times?
(15) A. Possibly.
(16) Q. On the occasion that you went there,
(17) did you travel there from your home office alone?
(18) A. Yes.
(19) Q. When you went there, what is your
(20) recollection of the first visit, did you meet
(21) anyone at the premises?
(22) A. Yes.
(23) Q. Who did you meet at the premises during
(24) your first visit?
(25) A. Mr. and Mrs. Heinz, I believe their

Page 28

(1)
(2) public adjuster was there.
(3) Q. Who was their public adjuster?
(4) A. Richard Alouette, Nutmeg, and there was
(5) probably I believe 2 other adjusters from the
(6) Quincy office.
(7) Q. When you say the – Quincy office of
(8) Encompass?

(9) A. Yes.
(10) Q. Where is Quincy located?
(11) A. Quincy, Massachusetts.
(12) Q. Was this a prearranged meeting?
(13) A. Yes.
(14) Q. Who were the 2 adjusters from the
(15) Quincy, Massachusetts office?
(16) A. Jerry Green and Dave Bostrom.
(17) Q. Spell –
(18) A. B-O-S-T-R-O-M.
(19) Q. What function would Jerry Green and
(20) Dave Bostrom serve during that first meeting at the
(21) house?
(22) A. Dave is the branch adjuster and Jerry
(23) was a reinspector.
(24) Q. What do you mean by a reinspector?
(25) A. Quality assurance.

Page 29

(1)
(2) Q. Was he watching what you were doing, in
(3) other words?
(4) A. You can say that.
(5) Q. Did either Jerry or Dave take any
(6) pictures in your presence?
(7) A. I don't recall.
(8) Q. Would there be a record of them having
(9) done something like that?
(10) A. Possibly in the file.
(11) Q. Where would that file be?
(12) A. There might be a small file in Quincy,
(13) but I have the field file.
(14) Q. What would be contained in this small
(15) file in Quincy?
(16) A. I don't know.
(17) Q. What is the address of the Quincy,
(18) Massachusetts office of Encompass?
(19) A. Battery March Plaza, Quincy, I don't
(20) know the exact.
(21) MR. MEZZACAPPA: At this time, we're
(22) going to request production of the contents of
(23) the file maintained by Encompass which is in
(24) the Quincy, Massachusetts office.
(25) MR. MASCARO: Again, we take the same

Page 30

(1)
(2) position on this request as on the others.
(3) Q. Are you aware of whether anyone other
(4) than yourself took photographs on any of the
(5) occasions that you were at the house after the date
(6) of the fire?
(7) A. Cause of origin investigators.
(8) Q. By that who do you mean?
(9) A. Tom Klem and Associates.
(10) Q. Who hired them?
(11) A. The insurance company.
(12) Q. When you say the insurance company, you
(13) mean Encompass?
(14) A. Yes.
(15) Q. Who specifically on behalf of Encompass
(16) hired Tom Klem?

(17) A. I don't recall.
(18) Q. Did you have anything to do with that?
(19) A. Possibly.
(20) Q. Who else might have had something to do
(21) with that?
(22) A. Dave Bostrom.
(23) Q. Anyone else?
(24) A. Not to my knowledge.
(25) Q. Have you ever hired Tom Klem or anyone

Page 31

(1)
(2) on his behalf at his company to act as a cause in
(3) origin expert in any other cases?
(4) A. Yes.
(5) Q. How many other cases prior to this one
(6) have you hired Mr. Klem or his business?
(7) A. I don't recall.
(8) Q. Can you approximate for me or narrow it
(9) down?
(10) A. 10.
(11) Q. Have you hired them on any cases since
(12) this fire?
(13) A. I don't recall.
(14) Q. Are you aware of, can you estimate how
(15) many times that the Quincy office including Dave
(16) Bostrom or if anyone else there hired Klem or
(17) anyone associated with TJ Klem to act as
(18) investigator or cause in origin experts prior to
(19) the date of this loss?
(20) A. They have used them in the past.
(21) Q. Do you know how many occasions that
(22) they used them in the past?
(23) A. No.
(24) Q. Do you have a recollection, now that
(25) we're discussing TJ Klem, whether it was you or

Page 32

(1)
(2) Mr. Bostrom that initially hired Tom Klem to do an
(3) investigation on this loss?
(4) A. I don't recall.
(5) Q. Are you aware that Mr. Klem or persons
(6) within his office issued 2 different and separate
(7) reports regarding this incident?
(8) A. I don't recall.
(9) Q. Did you ever ask Mr. Klem, after
(10) reviewing the first report, to issue a different
(11) report or to give you an addendum on this fire
(12) after he first came to his initial opinions?
(13) A. I don't recall.
(14) Q. Were you aware that Mr. Bostrom or
(15) anyone in the Quincy office ever asked Mr. Klem or
(16) anyone on his behalf in his company to issue a
(17) different report or addendum after they came to
(18) their initial opinions or conclusions?
(19) A. I don't know.
(20) Q. When you say you don't recall, could it
(21) have been that you asked Mr. Klem to issue a
(22) different report on this case or an addendum to his
(23) initial report?
(24) A. It's possible.

### Page 33

(25) Q. Do you have a recollection of reviewing
(2) any of the reports issued by Mr. Klem concerning
(3) this loss?
(4) A. No.
(5) Q. Did you rely on Mr. Klem's reports that
(6) he prepared concerning the cause in origin of this
(7) fire and his investigation of it in order to
(8) recommend a third party action against my client
(9) Command Force security systems?
(10) A. Probably.
(11) Q. Are you the one that recommended that a
(12) third party action be brought against my client
(13) Command Force?
(14) A. The question again, please.
(15) Q. Are you the one that recommended a
(16) third party action be brought against my client
(17) Command Force?
(18) A. I probably recommended subrogation. I
(19) don't recommend -- I didn't recommend a suit to be
(20) filed.
(21) Q. Who would have recommended a suit to be
(22) filed?
(23) A. My attorney.
(24) Q. Did you recommend subrogation against a
(25) particular entity including but not limited to my

### Page 34

(2) client?
(3) A. The question, again.
(4) Q. Did you recommend subrogation against a
(5) particular third party?
(6) A. The alarm installer.
(7) Q. When did you make that recommendation?
(8) A. I don't recall.
(9) Q. Do you have documents that would
(10) refresh your recollection as to whether you made
(11) that recommendation?
(12) A. In the file.
(13) Q. Did you make that recommendation after
(14) reviewing TJ Klem's first initial report?
(15) A. I don't recall.
(16) Q. Did you ask TJ Klem to come up with an
(17) addendum or a second report in order to justify
(18) your decision to go after Command Force on a third
(19) party action?
(20) A. I don't recall.
(21) MR. MASCARO: I object to the form of
(22) that question. But you can answer it.
(23) Q. When you were at the house on the first
(24) occasion, is that when you took your photographs?
(25) A. Probably.

### Page 35

(2) Q. Did you take photographs on any other
(3) occasion?
(4) A. I don't recall.
(5) MR. MEZZACAPPA: I think I've asked for
(6) all photographs, but so the record is clear, I
(7) want to make sure I have any photographs taken
(8) on each occasion. If he took any on the
(9) second, third or fourth occasion or however
(10) many occasions he went there.
(11) MR. MASCARO: Again, if there are any
(12) that haven't been provided, they will be
(13) provided. We have provided everything that is
(14) in our file at this time.
(15) Q. What is your recollection of your first
(16) visit to the house in terms of your conversations
(17) with others who were there?
(18) A. Rephrase the question.
(19) Q. Sure. Did you have any discussions
(20) when you went to the house for the first occasion?
(21) A. Discussions with?
(22) Q. Anyone.
(23) A. Yes. The insureds, the rest of the
(24) people there.
(25) Q. What discussion do you remember? And

### Page 36

(2) let's break it down. Did you speak to Harold and
(3) Lauren Heinz, the husband and wife and homeowners?
(4) A. Yes.
(5) Q. What was the sum and substance of your
(6) conversations with them?
(7) A. Background information, ownership of
(8) the property, advising them of the adjustment
(9) procedures we're going to do and need.
(10) Q. When you went out to the house on the
(11) first occasion, was Rich Alouette from Nutmeg
(12) adjusters there on that first occasion?
(13) A. Yes, I believe.
(14) Q. Was it understanding that the Heinz had
(15) individually retained them to protect their
(16) insurance in this adjustment?
(17) A. If he was there, yes, to your question.
(18) Q. It wasn't that Encompass was paying
(19) Mr. Alouette or Nutmeg to adjust this loss for the
(20) homeowner, correct?
(21) A. Correct.
(22) Q. It was your understanding that they
(23) retained and paid him for his services on their
(24) own?
(25) A. Correct.

### Page 37

(2) Q. Do you recall him being there the first
(3) time that you went?
(4) A. I believe -- I believe he was.
(5) Q. When you spoke to the Heinz, was
(6) Mr. Alouette present for those conversations, to
(7) the best of your recollection, on the first
(8) occasion you went at the house?
(9) A. I don't recall.
(10) Q. Do you recall having an independent or
(11) separate conversation with Mr. Alouette there out
(12) of the presence of the Heinz?
(13) A. I don't recall.
(14) Q. Did the Heinz respond to you in any way

(15) when you told them what the adjustment procedures
(16) were going to be and the background information?
(17)     A.    I don't recall.
(18)     Q.    Did you take any notes based on your
(19) conversations with the Heinz on that first
(20) occasion?
(21)     A.    Yes.
(22)     Q.    That would be contained in the file?
(23)     A.    Yes.
(24)     Q.    Were those notes turned over to us in
(25) the discovery of this case?

Page 38
(1)
(2)     A.    I don't know.
(3)     MR. MASCARO:    For the record, I believe
(4) they were, handwritten notes.
(5)     Q.    Do you recall the Heinz telling you
(6) anything about a cat at that time?
(7)     A.    Yes.
(8)     Q.    What do you recall about the cat?
(9)     A.    Killed in the fire.
(10)    Q.    Do you recall anything else about the
(11) cat?
(12)    A.    No. I'm sorry. It had a disease or
(13) something.
(14)    Q.    What disease did it have?
(15)    A.    I don't recall.
(16)    Q.    Do you recall them saying that the cat
(17) had cancer?
(18)    A.    No.
(19)    Q.    Did you ever learn that the cat had had
(20) cancer?
(21)    A.    Yes.
(22)    Q.    When did you learn that the cat had
(23) cancer?
(24)    A.    I don't recall.
(25)    Q.    Did the Heinz tell you at that time

Page 39
(1)
(2) where the cat was located at the time of the fire?
(3)     A.    Yes.
(4)     Q.    What did they tell you?
(5)     A.    In the bedroom on the first floor lower
(6) level.
(7)     Q.    Did you learn on the first occasion,
(8) when you went out to the house, that that was the
(9) room of fire origin?
(10)    A.    Yes.
(11)    Q.    Did you see with your own eyes or did
(12) you learn with your own senses on that first
(13) occasion that the Heinz had put up a child safety
(14) gate to keep the cat in the room of fire origin?
(15)    A.    I do recall that.
(16)    Q.    Did you see the gate?
(17)    A.    I believe I did.
(18)    Q.    Was the gate in the upright position
(19) blocking part of the doorway?
(20)    A.    I don't recall.
(21)    Q.    What did the Heinz tell you about
(22) keeping the cat in that bedroom, if you recall?

(23)    A.    I don't really recall.
(24)    Q.    Did you learn on the first occasion out
(25) to the house that it was the belief the fire

Page 40
(1)
(2) marshal or the fire investigating personnel from
(3) the Wilton Fire Department that the cat knocked
(4) over a lamp which in turn caused the fire when this
(5) ignited combustible material located on the bed?
(6)     A.    I believe so.
(7)     Q.    First occasion that you learned that?
(8)     A.    I don't recall.
(9)     Q.    Do you know what combustible materials
(10) were placed on the bed or left on the bed by the
(11) Heinz?
(12)    A.    No.
(13)    Q.    Did the Heinz inform you during your
(14) first occasion or any subsequent occasion whether
(15) they or anyone on their behalf had left the lamp
(16) lighted?
(17)    A.    I don't recall.
(18)    Q.    Did you ever come to a conclusion in
(19) adjusting this loss that the Heinz were negligent
(20) for leaving a cat trapped in a room with a lamp
(21) lighted there?
(22)    MR. MASCARO:    I object to the form.
(23) You can answer.
(24)    A.    Repeat the question, please. The
(25) question again, please.

Page 41
(1)
(2) (Question read).
(3)     A.    No.
(4)     Q.    Did you come to any conclusion that the
(5) lamp was not energized at the time of the fire?
(6)     A.    I don't recall.
(7)     Q.    Do you know what caused the fire?
(8)     A.    As I recall, the lamp was knocked over
(9) by the cat and ignited combustibles.
(10)    Q.    In your 20 years of adjusting property
(11) loss, did you ever have a fire involving a lamp
(12) before?
(13)    A.    Yes.
(14)    Q.    And did you ever learn how a lamp works
(15) in terms of the electricity flowing through it?
(16)    A.    No.
(17)    Q.    Did you ever learn how a light bulb
(18) lights in terms of adjusting fire loss cases?
(19)    A.    No.
(20)    Q.    Did you ever learn, while adjusting
(21) this loss, that Mr. Heinz left the lamp on or
(22) energized it?
(23)    A.    I don't recall.
(24)    Q.    Do you recall from reviewing any
(25) documents in this case, including fire marshal

Page 42
(1)
(2) reports, fire cause in origin from Klem or any
(3) other source, that in order for the light to ignite
(4) combustible material, this had to be energized?

(5) A. I don't recall.
(6) Q. Did you ever investigate whether the
(7) outlet in the house into which the lamp was plugged
(8) was defective?
(9) A. I don't recall.
(10) Q. Did you ever investigate whether any of
(11) the lamp parts on this particular lamp that the cat
(12) knocked over were defective?
(13) A. I don't recall.
(14) Q. Did you ever investigate whether
(15) Mr. Heinz or anyone in his family left the lights
(16) energized, the lamp energized?
(17) A. I don't recall.
(18) Q. Did you ever hear a theory in this case
(19) that there a 3-way bulb in the subject lamp?
(20) A. Yes.
(21) Q. Did you ever hear whether the 3-way
(22) lamp was operational in all 3 positions prior to
(23) the fire?
(24) A. I don't recall.
(25) Q. Did you ever hear in this case or

Page 43

(1)
(2) investigate whether the filament in the 3-way light
(3) bulb was partially broken prior to the loss?
(4) A. Possibly.
(5) Q. Do you recall some discussion about
(6) that? What do you recall?
(7) A. Basically nothing other than what you
(8) said.
(9) Q. Did anyone, to your recollection, come
(10) to the conclusion that the lamp was not lighted but
(11) was energized, and then when the cat knocked the
(12) lamp over, it somehow made the filament in the
(13) light bulb connect the light bulb thereby causing
(14) heat which ignited the combustible materials?
(15) A. I don't recall.
(16) Q. Did you ever ask TJ Klem, Tom Klem, or
(17) anyone on behalf of his company what the likelihood
(18) of that scenario that was?
(19) A. I don't remember. I don't recall.
(20) Q. In adjusting this loss, did you ever
(21) speak to anyone from the Wilton Fire Department?
(22) A. I don't recall.
(23) Q. Did you ever review any documents
(24) prepared by the Wilton Fire Department either the
(25) reports regarding the fire fighting efforts or the

Page 44

(1)
(2) marshal report?
(3) A. I believe I saw the fire report. I
(4) don't know whether I saw the marshal, fire marshal
(5) report.
(6) Q. Do you have any recollection whether
(7) the Wilton Fire Department issued any violations
(8) for an inappropriate number or inappropriate
(9) placement of smoke detectors to anyone in this
(10) case?
(11) A. I don't know.
(12) Q. Are you aware of how the Wilton Fire

(13) Department was alerted to the fact that there was a
(14) fire at 34 Wildwood Drive on 7/23/01?
(15) A. I believe it came through the monitor.
(16) Q. The central station alarm?
(17) A. That is correct.
(18) Q. Did you learn how the central station
(19) alarm received the information that there was a
(20) fire in the home of 34 Wildwood Drive?
(21) A. I don't know that answer.
(22) Q. Did Encompass Insurance ever request of
(23) the Heinz prior to this fire that they put a better
(24) fire detection system in than was existing in the
(25) house on the date of the loss?

Page 45

(1)
(2) A. I don't have that information.
(3) Q. Are you aware that the Heinz from any
(4) of your conversations with them or from any source
(5) had utilized the services of my client Command
(6) Force on 2 prior occasions when they had this house
(7) wired with a smoke detection and burglary alarm
(8) system?
(9) A. I'm not aware of that information.
(10) Q. Are you aware that after the fire, the
(11) Heinz asked my client to go back in and re-alarm
(12) what remained of this home to prevent any burglary
(13) or further damage while the adjustment was being
(14) done?
(15) A. I do recall that.
(16) Q. Did you ever meet my client Matthew
(17) Matza?
(18) A. No.
(19) Q. You never met him?
(20) A. No.
(21) Q. But you do recall that the Heinz
(22) contracted with him after the date of the fire to
(23) go back in and put some kind of alarm system in
(24) that house?
(25) A. I do recall that.

Page 46

(1)
(2) Q. While you were adjusting your loss on
(3) the home, did you ever tell the Heinz not to
(4) utilize Mr. Matza again to re-wire their new house
(5) which they built as a result of the money?
(6) A. No.
(7) Q. Did anyone from Encompass tell the
(8) Heinz not to use Mr. Matza to re-alarm their new
(9) house which exists today?
(10) A. I don't have that answer.
(11) Q. Is it possible that someone on behalf
(12) of Encompass Insurance Company told the Heinz not
(13) to utilize Mr. Matza because they intend – because
(14) Encompass intended to bring a third party action of
(15) subrogation against my client?
(16) A. I don't have that answer.
(17) Q. Do you know who would have that answer?
(18) A. No.
(19) Q. Do you have a recollection from
(20) visiting the bedroom of fire origin on the first

(21) floor of the premises where in the room the origin
(22) of the fire was?
(23) A. It would be towards the far end of the
(24) house, as I recall.
(25) Q. Do you have any training in

Page 47

(1)
(2) investigating fires from a cause in origin
(3) standpoint?
(4) A. Somewhat.
(5) Q. Where did you get that training?
(6) A. Through the company.
(7) Q. Through Encompass or any one of its
(8) predecessors?
(9) A. Predecessor.
(10) Q. Which predecessor?
(11) A. Continental, CNA, through Encompass,
(12) too, we do have some training.
(13) Q. Do you know at what time precisely the
(14) fire started on 7/23/01?
(15) A. No.
(16) Q. Did any of the fire marshal reports or
(17) any fire reports you looked at determine with an
(18) engineering degree of certainty what time the fire
(19) started on 7/23/01?
(20) A. I really don't recall. But they would
(21) indicate the time, the call in time.
(22) Q. Meaning the time that the Wilton Fire
(23) Department got the fire call?
(24) A. Yes.
(25) Q. When you visited the house for the

Page 48

(1)
(2) first time, in addition to talking to the Heinz and
(3) taking some photograph what, if anything, else
(4) going to the room of fire origin, what, if
(5) anything, else did you do there that day?
(6) A. Basically walked around the property,
(7) assess the damage, take some measurements, some
(8) field notes.
(9) Q. Would the file notes be included with
(10) your file contents?
(11) A. Yes.
(12) Q. To your knowledge, were the field notes
(13) turned over to us in discovery?
(14) A. I don't know.
(15) MR. MEZZACAPPA: To the extend that the
(16) file notes were not turned over in discovery,
(17) I would request production of them.
(18) MR. MASCARO: Again, I believe we have
(19) but will check that, and we don't have an
(20) objection to producing those.
(21) Q. What percentage of the home from the
(22) exterior was damaged, to the best of your
(23) recollection?
(24) A. Repeat that.
(25) Q. What percentage of the home on the

Page 49

(1)
(2) exterior, to the best your recollection, was

(3) damaged by the fire?
(4) A. 10, 15, 20 percent.
(5) Q. What percentage of the interior, to the
(6) best of your recollection, was damaged by the fire?
(7) A. Basically 100 percent.
(8) Q. Is it true, too, there was a built-in
(9) pool in the basement or first floor of this home?
(10) A. Yes.
(11) Q. Was that in any way destroyed by this
(12) fire?
(13) A. I don't recall.
(14) Q. Did the firemen utilize the water in
(15) the pool to fight the fire, to your knowledge?
(16) A. I'm not aware of that.
(17) Q. Do you know from where the firemen
(18) obtained the water to fight the fire?
(19) A. No.
(20) Q. Was there a hydrant located near the
(21) house, to your knowledge?
(22) A. I believe there was one in the street.
(23) I can't be 100 percent certain.
(24) Q. Would you have taken any photographs of
(25) a hydrant located in the street in a house like

Page 50

(1)
(2) this?
(3) A. No.
(4) Q. What is your recollection. What makes
(5) you think there was a fire hydrant located in the
(6) street, what is the basis for the answer to that
(7) question?
(8) A. I just believe or seeing one in the
(9) street possibly because I parked there or someone
(10) else parked there.
(11) Q. Do you know if the hydrant was utilized
(12) in fighting the fire by the Wilton Fire Department?
(13) A. I don't know the answer.
(14) Q. At the time of this fire, do you know
(15) if the Wilton Fire Department was volunteer or paid
(16) or something else?
(17) A. I don't have that answer.
(18) Q. Do you know what the response time was
(19) between the receipt by the Wilton Fire Department
(20) of this call and their arriving in the home and
(21) putting water on the fire?
(22) A. No.
(23) Q. Do you know if, after they started
(24) putting water on the fire, there was anytime within
(25) which they ran out of the initial water and could

Page 51

(1)
(2) not continue to fight the fire?
(3) A. I don't have that answer.
(4) Q. Does anyone in your office, company
(5) have that answer?
(6) A. Probably not.
(7) Q. During your investigation of this fire,
(8) did you determine that my client's hardware, by
(9) that I mean the fire detection system in the house
(10) in any way caused this fire?

(11) A. Do you want to restate that?
(12) Q. During your investigation of this fire,
(13) other than the cat knocking over the lamp and
(14) igniting the combustible material, did you come to
(15) any other conclusion about the origin or cause of
(16) the fire?
(17) A. No.
(18) Q. Do you know whether, when the fire
(19) first started, it was smoldering or it had ignited
(20) or something else?
(21) A. I don't have that answer.
(22) Q. Do you know anyone that has that
(23) answer?
(24) A. No.
(25) Q. Was there a videotape or some kind of

Page 52

(1)
(2) recording device within the house that you learned
(3) of that captured the events of the fire from the
(4) minute it started until the fire department
(5) arrived?
(6) A. I don't have that answer.
(7) Q. Do you know who has that answer?
(8) A. No.
(9) Q. Do you know for what period of time the
(10) fire was active or burning before the fire
(11) department arrived on the scene?
(12) A. I don't have that answer.
(13) Q. Do you know for what period of time the
(14) fire was smoldering, smoking or burning before the
(15) smoke detector on the main level triggered?
(16) A. I don't have that answer.
(17) Q. Do you know when this house was built?
(18) A. Not of the top of my head. I would
(19) have to check the file.
(20) Q. Do you know when the Heinz bought the
(21) house?
(22) A. I don't recall.
(23) Q. Do you recall from talking to them or
(24) during adjusting your loss that, when they bought
(25) the house, it wasn't new, do you recall that?

Page 53

(1)
(2) A. I do recall that.
(3) Q. Do you recall any recollection of how
(4) old it was when they purchased it?
(5) A. I don't have a definitive answer.
(6) Q. Do you have any recollection of any
(7) renovation additions or any such work to the house
(8) that the Heinz did after they bought it and before
(9) the fire?
(10) A. I believe a year or 2 prior to the
(11) fire, but they put a second story addition, I
(12) believe, a new kitchen and garage.
(13) Q. Do you know for what period of time
(14) they lived in the home after purchasing it before
(15) doing these renovations?
(16) A. No.
(17) Q. Do you know whether my client Command
(18) Force originally installed the smoke detention

(19) system which was present and triggered on 7/23/01?
(20) A. No.
(21) Q. Did Encompass Insurance Company, based
(22) on your review of this file, require, before they
(23) initially insured the home, that the smoke
(24) detention system be present?
(25) A. I don't have that answer.

Page 54

(1)
(2) Q. Who would have that answer?
(3) A. Underwriting.
(4) Q. That would be in the underwriting file
(5) that we discussed before?
(6) A. Yes.
(7) Q. If it's anywhere, it would be there, no
(8) other file that it would be contained in?
(9) A. I don't believe so.
(10) Q. When the Heinz made the addition to the
(11) house 1 to 2 years prior to the fire by adding a
(12) second story and the garage work, did the insurance
(13) company Encompass, your insurance company, charge a
(14) greater premium for the coverage on the house at
(15) that time because of the increase in the property
(16) value, the increase in the contents, the increase
(17) in the structure?
(18) A. I don't have that answer.
(19) Q. Did the Heinz alert Encompass Insurance
(20) Company that they were doing the renovations on the
(21) house?
(22) A. I don't have that answer.
(23) Q. If the Heinz had alerted the insurance
(24) company, Encompass, in your experience, that they
(25) were doing an addition or renovation, would

Page 55

(1)
(2) underwriting revisit the premium or recalculate the
(3) premium for that house?
(4) A. Generally, yes, I mean if you are going
(5) to increase, you know, the value, generally, they
(6) are going to increase the premium.
(7) Q. Today is Encompass Insurance Company
(8) the insurer for the Heinz on the new home that was
(9) built at the site?
(10) A. I don't have that answer.
(11) Q. Who would have that answer?
(12) A. The Heinz.
(13) Q. As a result of paying this loss after
(14) you adjusted the loss, do you know if the Heinz
(15) were dropped by Encompass Insurance?
(16) A. I don't know.
(17) Q. Who would have that answer?
(18) A. The Heinz or underwriting or their
(19) agent.
(20) Q. Do you know who their agent was?
(21) A. No.
(22) Q. Do you know if it was an agent that
(23) originally placed this insurance through your
(24) company for the home?
(25) A. I don't know.

Page 56

(1)
(2) Q. What part of file would indicate that?
(3) A. The underwriting file.
(4) Q. You say that as if you are guessing, it
(5) might not be?
(6) A. Restate the question.
(7) Q. Sure. By your answer, you are guessing
(8) that it might be underwriting?
(9) A. It should be.
(10) Q. When you went to inspect the home for
(11) the first time, were the renovations that you
(12) mentioned fully completed?
(13) A. I believe they were.
(14) Q. Do you have any recollection, when you
(15) were there and photographed the premises, whether
(16) there were still Anderson window stickers on some
(17) of the windows in the new addition?
(18) A. I don't recall that.
(19) Q. In adjusting this loss, did you come to
(20) a determination that the existing structure could
(21) be rebuilt with Sheetrock some new studs in the
(22) fire room and other interior construction materials
(23) without needing to demolish the entire structure?
(24) A. I would have to check my file notes.
(25) Q. Do you have a recollection of whether,

Page 57

(1)
(2) after you adjusted your loss, the existing
(3) structure was rebuilt or was it completely
(4) demolished and the new structure was rebuilt there?
(5) A. I think, I think they rebuilt on the
(6) same foundation but went up with, went up with a 2
(7) story. I recall seeing photos that to effect.
(8) Q. Did you take those photos?
(9) A. No.
(10) Q. Who took those photos?
(11) A. I believe the public adjuster.
(12) Q. That is theirs, Nutmeg?
(13) A. Yes.
(14) Q. Did your company hire an adjuster or an
(15) outside independent company to help you adjust the
(16) loss?
(17) A. No.
(18) Q. For what period of time did you remain
(19) at the fire scene on your first visit after the
(20) fire, to the best of your recollection?
(21) A. A few hours.
(22) Q. When was the next time you went out to
(23) the house with relation to that first date, was it
(24) the next day, a week later or something like that?
(25) A. I don't recall.

Page 58

(1)
(2) Q. When you went out for the second visit,
(3) what was the purpose of that visit?
(4) A. I believe I took my builder back.
(5) Q. Who was your builder?
(6) A. Schleiffer Associates.
(7) Q. Spell that.
(8) A. S-C-H-L-E-I-F-F-E-R Associates.

(9) Q. When you say your builder, what do you
(10) mean by that?
(11) A. My building consultant evaluated
(12) damages and the cost to repair the structure.
(13) Q. Have you ever used them before this
(14) fire, also?
(15) A. Yes.
(16) Q. On how many occasions before this fire
(17) loss had you used him?
(18) A. Personally?
(19) Q. Yes.
(20) A. 30, 40, 50.
(21) Q. What was the purpose for which he was
(22) retained by your insurance company?
(23) A. He was retained to evaluate the extent,
(24) at the time, extent of the damages, determine a
(25) scope to repair and a cost to repair.

Page 59

(1)
(2) Q. When he calculated the scope and cost
(3) to repair, was that based on leaving the existing
(4) structure there, the exterior and redoing the
(5) Sheetrock and some of the studs on the interior and
(6) the floors and the ceiling and those kinds of
(7) things?
(8) A. I would have to check his report.
(9) Q. Were you surprised when you saw the
(10) pictures of the 2-story home on the same
(11) foundation?
(12) A. No.
(13) Q. Would you admit that the pictures
(14) showing the 2-story home on the same foundation
(15) demonstrate a house that has a significantly higher
(16) retail market value than the house which the Heinz
(17) occupied before 7/23 01?
(18) MR. MASCARO: Objection to the form.
(19) A. I can't comment on that.
(20) Q. On whose behalf of Schleiffer
(21) Associates did you deal with?
(22) A. Rick re-estimated.
(23) Q. Had you dealt with Mr. Re-estimated on
(24) prior occasions?
(25) A. Yes.

Page 60

(1)
(2) Q. Is it fair to say that you dealt with
(3) him on all of the occasions that you previously
(4) hired Schleiffer Associates?
(5) A. No.
(6) Q. What percentage of the 30, 40 or 50
(7) times that you used Schleiffer Associates
(8) previously did you deal specifically with
(9) Mr. Re-estimated before this loss?
(10) A. I don't have that answer.
(11) Q. Did Mr. Re-estimated render any
(12) conclusions as a result of his inspection in terms
(13) of the scope and cost to repair this premises?
(14) A. The question, again.
(15) Q. Did Mr. Re-estimated render any
(16) conclusions or come up with bottom figures for the

Page 60

(17) scope and cost to repair this premises?
(18) A. Yes.
(19) Q. Did you agree with those figures?
(20) A. Probably.
(21) Q. When you say probably?
(22) A. I would have to check the file.
(23) Q. Have there been occasions when you have
(24) disagreed with Mr. Re-estimated or Schleiffer
(25) Associates regarding what they find?

Page 61

(1)
(2) A. Occasionally.
(3) Q. When you say occasionally, what
(4) percentage of time do you disagree with
(5) Mr. Re-estimated or Schleiffer Associates regarding
(6) their bottom figures to rebuild a property loss?
(7) A. Rarely.
(8) Q. Is rarely under 5 percent?
(9) A. Probably around 5 percent.
(10) Q. Do you have a distinct recollection in
(11) this case without reviewing his report whether you
(12) agreed with it or not?
(13) A. No.
(14) Q. Did Nutmeg adjusters on behalf of the
(15) homeowners come up with their own figures that it
(16) would take to rebuild the premises?
(17) A. Yes.
(18) Q. Were those figures significantly
(19) different from Mr. Re-estimated's figures?
(20) A. I would have to check the file.
(21) Q. Is it standard in your industry that
(22) you see a difference between a public adjuster
(23) hired by a homeowner's figures versus the builder
(24) hired by the insurance company's figures?
(25) A. The question again, please.

Page 62

(1)
(2) (Question was read).
(3) Q. Withdraw the question.
(4) Is it common in your business to see
(5) different figures between a public adjuster hired
(6) by a homeowner versus the builder hired by your
(7) company in terms of what it will cost to repair or
(8) repair a structure?
(9) A. It happens.
(10) Q. Does that negotiation process go on at
(11) which a financial figure is finally arrived at and
(12) both parties can agree on it, and then the
(13) insurance company such as you issues the check to
(14) the homeowner, and they chose who will rebuild a
(15) premises?
(16) A. One option.
(17) Q. Did that process I described in the
(18) last question happen here?
(19) A. I believe it did.
(20) Q. Is it your belief then that you at some
(21) point agreed to pay a greater amount than what
(22) Mr. Re-estimated found to rebuild this premises
(23) based on Nutmeg adjuster's figure that they came
(24) up, the homeowners adjuster, the Heinz?
(25) A. I would have to check the file.

Page 63

(1)
(2) Q. Was Mr. Re-estimated, Schleiffer
(3) Associates just retained by Encompass in this case
(4) to just estimate the repair to the building or the
(5) structure itself?
(6) A. That is correct.
(7) Q. In addition to Schleiffer Associates,
(8) did your company retain anyone else to go through
(9) the contents of the premises to determine what
(10) damages there was to the contents such as clothes,
(11) furniture, things of that nature?
(12) A. No.
(13) Q. Where did you or how did your company
(14) arrive at the damage figure for the contents in
(15) this case?
(16) A. In-house contents specialist.
(17) Q. Who is your in-house contents
(18) specialist?
(19) A. Wendy French.
(20) Q. What office did she work out of at the
(21) time that this loss was adjusted?
(22) A. Out of the Quincy office.
(23) Q. Did you ever see her at the premises on
(24) any of the occasions that you were there?
(25) A. Yes.

Page 64

(1)
(2) Q. On some occasions, did you see her
(3) there?
(4) A. Once or twice.
(5) Q. Was she there on the first occasion
(6) that you were there?
(7) A. I don't believe so.
(8) Q. Was she there on the second occasion?
(9) A. I don't have a recollection of that.
(10) Q. What is her purpose or job function
(11) specifically on behalf of your company?
(12) A. At the time, she would investigate or
(13) evaluate and determine replacement cost and
(14) actually cash value of personal property.
(15) Q. Do you know what formulas she uses to
(16) calculate those?
(17) A. What do you mean by formulas?
(18) Q. In other words, if there is a couch
(19) that is five years old and has to be replaced, do
(20) you know how she arrived at a figure for a couch
(21) that is five years old?
(22) A. Checking Internet. Checking retail
(23) sources.
(24) Q. When you say checking the Internet, are
(25) there sites that she checked that you are aware of

Page 65

(1)
(2) that where Internet providers or service providers
(3) price things which might be in a given person's
(4) home which are not new, in other words, to price
(5) she used for the couch, how does Wendy French go
(6) about pricing a used couch?

(7) A. Understanding the insurance contract,
(8) the cost to replace today.
(9) Q. Was that the contract that your company
(10) had with the Heinz?
(11) A. Yes.
(12) Q. So, it's not market value on an old
(13) piece of furniture, cost to replace it today; is
(14) that correct?
(15) A. Not really. We would pay the
(16) replacement cost today less depreciation; thus we
(17) would pay the actual cash value today and release
(18) the depreciation when they replace the item.
(19) Q. Is that called a holdback?
(20) A. Yes.
(21) Q. The holdback, I just want you to
(22) explain to me how your company Encompass works with
(23) the holdback feature, in other words, if we have a
(24) couch 5 years old and Wendy French determines it
(25) has been damaged or needs to be replaced because of

Page 66
(2) the fire, what does she do to calculate how much
(3) money the Heinz will get from your company just for
(4) that couch?
(5) A. You will determine the replacement cost
(6) today and determine the age, condition, and apply
(7) the depreciation and thus pay the actual cash value
(8) initially.
(9) Q. Okay. After you pay the Heinz the
(10) actual cash value for the couch, they go out and
(11) replace it, then what happens?
(12) A. If they spend the amount we agreed upon
(13) to replace the cost, we release the depreciation
(14) moneys.
(15) Q. To them?
(16) A. Correct.
(17) Q. So, there is a lag time between the
(18) initial check and the holdback moneys that are
(19) given; is that correct?
(20) A. That is correct.
(21) Q. In this case, did the Heinz have a
(22) holdback amount or depreciation amount based on the
(23) contents of the home?
(24) A. They did, yes.
(25) Q. Did there come a time that the Heinz

Page 67
(2) replaced everything in the home and then Encompass
(3) released the holdback amount to them?
(4) MR. MASCARO: Answer from recollection
(5) not without the document now.
(6) A. The question, again.
(7) Q. Did there come a time that the Heinz
(8) replaced everything in the house, and then the
(9) insurance company gave them the depreciation or
(10) holdback amount in a separate check?
(11) A. I don't recall.
(12) Q. Just so I understand, because I don't
(13) on this particular point, the depreciation that is
(14) taken for an old couch, since you are doing the

(15) replacement cost, you are only holding back the
(16) depreciation until such time as they replace the
(17) couch. They are getting their money back?
(18) A. They get the depreciation moneys back,
(19) that is correct.
(20) Q. They are in a better position after the
(21) fire because they have a new couch and all their
(22) money back then they were before the fire with that
(23) couch, taking that as an example; is that correct?
(24) A. They would have a new couch.
(25) Q. They would have a new couch, they

Page 68
(2) wouldn't be out of pocket for anything to purchase
(3) that new couch, is that correct, after they
(4) replaced the couch and bought it; is that correct?
(5) A. That is correct.
(6) Q. Is that how the policy of insurance
(7) issued by Encompass worked for this home?
(8) A. For this home, yes.
(9) Q. Is that because of the deluxe policy?
(10) A. That is correct.
(11) Q. How would a normal policy differ from
(12) the deluxe policy in terms of replacing the
(13) contents of the home, if any?
(14) A. Some policies only cover actual cash
(15) value, meaning if you had a 3-year old couch, we
(16) reimburse for a 3-year old couch.
(17) Q. This policy was better than that; is
(18) that correct?
(19) A. That is correct.
(20) Q. Was this the best homeowner policy that
(21) the Heinz could have purchased?
(22) A. I can't comment on that.
(23) Q. And when the underwriters decide on a
(24) premium based on the kind of policy that the
(25) homeowners want, is that factored in, the kind of

Page 69
(2) policy that they have?
(3) A. I can't comment on that.
(4) Q. Who would have to, underwriting?
(5) A. Correct.
(6) MR. MEZZACAPPA: We're going to reserve
(7) our rights to depose someone else from the
(8) company from basically inability of the
(9) witness to answer several questions in the
(10) area that is posed. Someone from
(11) underwriting. Based on the claim in this
(12) case, and the fire detection system and the
(13) claims that are in the interrogatories from
(14) the summons and complaint, I have to reserve
(15) my right to depose someone from the
(16) underwriting department and to see the file
(17) before I do that. I just want to state that
(18) before I forget. I'll move on.
(19) MR. MASCARO: Again, we will won't take
(20) any position on that at this point. We
(21) reserve all our rights for a request to depose
(22) someone from the company.

(23) MR. MEZZACAPPA: Mark this statement
(24) the loss as Exhibit B for identification.
(25) (Whereupon, the aforementioned

Page 70

(1)
(2) statement of loss was marked as Defendant's
(3) Exhibit B for identification as of this date
(4) by the Reporter.)
(5) Q. Before I show you Exhibit B, did you
(6) ever speak to Deputy Sheriff David Kohn from the
(7) Wilton Fire Department?
(8) A. I don't recall that.
(9) Q. I'm know showing you, sir, what has
(10) been marked as Exhibit B, statement of the loss,
(11) first produced to me by your counsel this morning.
(12) Did you prepare that statement of loss?
(13) A. Yes.
(14) Q. When did you first prepare that?
(15) A. I don't recall the date.
(16) Q. Was it recently or was it back when you
(17) adjusted the loss?
(18) A. Adjusted, during the adjustment
(19) process.
(20) Q. What was the purpose of preparing such
(21) a document?
(22) A. Basically spells out the figures for
(23) the adjustment.
(24) Q. At the top is the file number and the
(25) name of the Heinz and their address, date of loss

Page 71

(1)
(2) of the fire, you have a figure of $1,240,000, USP
(3) deluxe, what does that represent?
(4) A. The 1.2 represents the amount of
(5) coverage for dwelling and contents and the USP
(6) deluxe, that type of policy.
(7) Q. Did you review that policy before
(8) paying this loss?
(9) A. Yes.
(10) Q. Does that policy contain an endorsement
(11) which precludes any loss caused by animals, to your
(12) knowledge?
(13) A. I don't recall. Actually, we would
(14) pick up the ensuing loss, covered loss and the fire
(15) was ensuing covered loss.
(16) Q. I'm going to move to strike the
(17) unresponsive portion to the question, but based on
(18) your response, what do you mean by we would pick up
(19) the ensuing covered loss, what do you mean?
(20) A. There may be an exclusion for losses
(21) caused by animals, but in ensuing covered loss, we
(22) would be covered under the policy. In other words,
(23) if the dog chewed the electrical cord and started
(24) the fire, that would be a covered loss because the
(25) fire is ensuing covered loss.

Page 72

(1)
(2) Q. What do you mean, do you base that on?
(3) A. The policy language.
(4) Q. In the exclusion for damage caused by

(5) animals, does that state that you would pay for the
(6) ensuing covered loss?
(7) A. I believe it does.
(8) Q. Who makes the determination as to what
(9) is an ensued covered loss under a policy like this?
(10) A. The adjuster.
(11) Q. Was that you?
(12) A. Yes.
(13) Q. Did you ask for a coverage opinion from
(14) an attorney before making the determination to pay
(15) the loss in this case learning that the cat had
(16) knocked over the lamp and ignited combustible
(17) materials?
(18) A. I don't recall.
(19) Q. If you did get a coverage opinion from
(20) a lawyer, would that be documented in your file?
(21) A. It should be.
(22) MR. MEZZACAPPA: At this time, I'm
(23) going to request production of coverage
(24) opinions rendered by any attorneys
(25) specifically with regard to the endorsement

Page 73

(1)
(2) excluding coverage for losses caused by
(3) animals.
(4) MR. MASCARO: Again, we will, if such a
(5) record exists, we reserve all our rights to
(6) that request. I want to note that the witness
(7) said he wasn't sure whether there was
(8) endorsement on this particular policy. He
(9) responded if -- he responded to the
(10) hypothetical if there was, so I want to make
(11) sure that it is clear on the record.
(12) MR. MEZZACAPPA: We'll go over the
(13) policy before we leave today. We'll find the
(14) endorsement. We'll have a more accurate
(15) answer to that question.
(16) Q. Assuming there was an endorsement in
(17) this policy, sir, and it precluded coverage for a
(18) loss caused by an animal, did your supervisor have
(19) a discussion with you that you recall regarding
(20) that in this case?
(21) A. I believe we did discuss that.
(22) Q. What was the sum and substance of the
(23) discussion you had with your supervisor?
(24) A. Specifically -- I don't recall
(25) specifically.

Page 74

(1)
(2) Q. Did you document that conversation?
(3) A. I don't recall.
(4) Q. If you did document it, where would it
(5) be documented in the ordinary course of your
(6) business?
(7) A. In the file notes.
(8) Q. Are those handwritten notes typewritten
(9) or e-mail or something else?
(10) A. Electronic file notes, could be.
(11) MR. MEZZACAPPA: At this time, I
(12) request production of the electronic notes

(13) regarding the endorsement regarding animals,
(14) in this case, any discussion or decisions you
(15) had with your supervisor regarding that.
(16)     MR. MASCARO: Same position on this
(17) request. We reserve all our rights as to the
(18) request.
(19)     Q. When an adjuster such as yourself makes
(20) a decision to pay on a policy, if there is no legal
(21) basis to do so, is that known in the business as a
(22) gratuitous payment?
(23)     A. I can't comment on that.
(24)     Q. Why not?
(25)     A. Because you are asking my personal

Page 75

(1)
(2) opinion, I think.
(3)     Q. You are the one that decided to make
(4) the payment in this case, is that correct?
(5)     A. Yes.
(6)     Q. That was based on your opinions about
(7) the fire and your investigation that you did,
(8) correct?
(9)     A. That is correct.
(10)     Q. You made the decision to pursue or you
(11) recommended that the company Encompass pursue in
(12) subrogation my client specifically, correct?
(13)     A. That is correct.
(14)     Q. Before doing that, you made a decision
(15) to pay the Heinz based on the policy which was the
(16) USP deluxe policy, correct?
(17)     A. Yes.
(18)     Q. In order to do that, you had to make a
(19) determination based on the policy language whether
(20) a payment was owed under that, correct?
(21)     A. That is correct.
(22)     Q. If you did not seek legal
(23) interpretation of the policy, then you came to an
(24) opinion or formed an opinion as to whether a
(25) payment was due under that by yourself; is that

Page 76

(1)
(2) correct?
(3)     A. That is not correct.
(4)     Q. What did you base your opinion or your
(5) decision to pay the policy on in this case?
(6)     A. The terms of the policy.
(7)     Q. So, you interpreted the terms of the
(8) policy and determined that they triggered coverage,
(9) in your opinion; is that correct?
(10)     A. That is correct.
(11)     Q. I'm asking you if you made that payment
(12) to the Heinz, if there is another interpretation of
(13) the policy that a lawyer comes up with, if it was a
(14) gratuitous payment for which subrogation is not
(15) permitted?
(16)     MR. MASCARO: Objection to the form.
(17) You can answer.
(18)     A. I don't have an answer.
(19)     Q. Why not?
(20)     A. Because I don't, I don't know what you
(21) are driving at. Do you want to rephrase the
(22) question?
(23)     Q. I'll try.
(24) You made a determination to pay under
(25) this policy to the Heinz based on the cat knocking

Page 77

(1)
(2) over the lamp and causing the fire, correct?
(3)     A. That is correct.
(4)     Q. And you paid not only the contents
(5) damage but the damage to the structure to rebuild;
(6) is that correct?
(7)     A. That is correct.
(8)     Q. That was all paid on the same policy?
(9)     A. That is correct.
(10)     Q. Do you know what a gratuitous payment
(11) is?
(12)     A. More less.
(13)     Q. What is your understanding of a
(14) gratuitous payment?
(15)     A. Payment where someone – is just a
(16) token payment, good faith payment for some reason.
(17)     Q. Is that done sometimes in the industry
(18) to keep a customer happy or for goodwill?
(19)     A. I can't comment on that.
(20)     Q. Have you ever made a gratuitous payment
(21) as a property adjuster in your many years within
(22) the company?
(23)     A. Possibly.
(24)     Q. When a gratuitous payment is made, is
(25) it true from your understanding that there is no

Page 78

(1)
(2) legal basis in doing it or duty to do it, it's just
(3) done for goodwill?
(4)     A. That is correct. I mean it's a gray
(5) issue. You may, it's not a rule, but.
(6)     Q. If a gratuitous payment is made, then a
(7) third party such as my client in this case can
(8) question that because that payment is the basis for
(9) the third party action against my client, correct?
(10)     MR. MASCARO: Objection to the form.
(11) You can answer, if you think you can.
(12)     A. I don't understand the question.
(13)     Q. I'll move on.
(14) Did you have any discussions with your
(15) supervisor -- who is your supervisor that you
(16) discussed the endorsement concerning the animal in
(17) this case, was it Susan Mckenna?
(18)     A. No. Mike Moeller, if we did discuss
(19) that.
(20)     Q. He is retired now; is that correct?
(21)     A. Yes.
(22)     Q. To the best your recollection, did Mike
(23) agree with your interpretation of the policy in
(24) making a payment by Encompass to the Heinz based on
(25) this loss?

Page 79

(1)
(2)     A. He would have.

(3) Q. What is your basis for saying he would
(4) have?
(5) A. Because he would have to authorize the
(6) payments in this amount of money.
(7) Q. Indeed, did he authorize these
(8) payments?
(9) A. Probably.
(10) Q. Would there have been anyone else that
(11) could have authorized the amount that we're talking
(12) about?
(13) A. No.
(14) Q. Under the left column on the statement
(15) of loss Exhibit B, we see dwelling stated value,
(16) what does that represent?
(17) A. The is the value I would assume under
(18) any, on the risk, that is kind of a stated value of
(19) the dwelling on the policy.
(20) Q. That is before the loss; is that
(21) correct?
(22) A. That is correct.
(23) Q. And underneath that on the left column,
(24) it says building EST, estimated, RC replacement
(25) cost?

Page 80

(1)
(2) A. That is correct.
(3) Q. $819,100?
(4) A. That is correct.
(5) Q. Represents?
(6) A. My assessment of the value to replace
(7) the dwelling.
(8) Q. Since that figure is greater by almost
(9) $200,000 above the dwelling stated value, what
(10) happens?
(11) A. I would notify underwriting.
(12) Q. What happens as a result of your
(13) notifying underwriting?
(14) A. They, I don't know. They may or may
(15) not increase the coverage.
(16) Q. This statement of loss is already after
(17) the fire occurs; is that correct?
(18) A. That is correct.
(19) Q. So, you estimated to replace the
(20) building itself that would cost $819,100?
(21) A. That is correct.
(22) Q. But the dwelling stated value based on
(23) the original underwriting decision, was that the
(24) structure was worth $624,000?
(25) A. That is correct.

Page 81

(1)
(2) Q. So, what happens in terms of making a
(3) payout on a total loss of a building with a stated
(4) value of 624 and replacement cost of the 819?
(5) A. This is a combined limit 1.2. You can
(6) flip the money anywhere you need it as far as
(7) building or contents.
(8) Q. Even though the building was originally
(9) valued at $624,000, if the contents damage is
(10) somewhat less than what it was insured for, you can

(11) take the insurance money for the contents value and
(12) put it over to the building?
(13) A. That is correct.
(14) Q. Is that what happened here?
(15) A. Yes, this is was – this is $800,000
(16) loss because of 1.2 in coverage.
(17) Q. $800,000 loss, did that include the
(18) contents or just the building?
(19) A. That includes the contents.
(20) Q. The figure that you came up with for
(21) the estimated replacement cost, that was just for
(22) the building, not the contents; is that correct?
(23) A. That is correct.
(24) Q. Now, I'm just trying to understand the
(25) bottom figure on the value loss claim is

Page 82

(1)
(2) $850,160.76, and next to it, there is a claim of
(3) $810,160.76. Can you explain the $40,000
(4) difference between those 2 numbers in the bottom
(5) row of the statement of loss figures?
(6) A. Because there was an advance given of
(7) $40,000 against contents, so the claim for the
(8) contents is 148.
(9) Q. When you say advance, is that so the
(10) homeowners can go out and live while the home is
(11) being rebuilt?
(12) A. For the contents, no. That would be
(13) is – well, you can say that, yes. I mean they can
(14) use that money to replace the contents and or some
(15) initial living expenses.
(16) Q. It might be easier instead of me asking
(17) you questions about this form, for you to explain
(18) starting from top to bottom. We already
(19) established the replacement amount of 819, next to
(20) it you have a value of 696,235. Explain that, go
(21) down the form.
(22) A. Okay; okay, the 727 and change, that
(23) would be the cost to repair the structure, $65,000
(24) and change, that would be the depreciation applied
(25) initially. That would leave the actual cash value

Page 83

(1)
(2) 661 and change for the dwelling, and we would pay
(3) that initially. Repairs are completed and they
(4) spend 727, they release the 65.
(5) Q. In this case, did they spend the
(6) $727,000?
(7) A. I believe they did. I believe they
(8) spent more than that.
(9) Q. What is the total amount based on that
(10) form if you can tell that Encompass Insurance paid
(11) to the Heinz including the depreciation, the
(12) contents and for the building?
(13) A. Based on this piece of paper?
(14) Q. Yes.
(15) A. 727 and change on the building, 188 and
(16) change on the contents, and at least $25,000 for
(17) additional living expenses.
(18) Q. Do you have a total somewhere on that