(19) form of what they paid?
(20) MR. MASCARO: He is asking about the
(21) form.
(22) Q. Based on that form, can you total, is
(23) it represented on that form, the total?
(24) A. I think you have would add the 810,166
(25) and 25,000; 835,166.76. That is probably not the

Page 84

(1)
(2) final figure paid, though.
(3) Q. Is the final figure paid represented
(4) somewhere in your notes?
(5) A. Yes.
(6) Q. Do you have the fire reports by TJ Klem
(7) with you?
(8) MR. MASCARO: I should.
(9) Q. I'm going to ask –
(10) MR. MASCARO: No, I don't have it here,
(11) in my car. I didn't bring the entire file
(12) with me.
(13) MR. MEZZACAPPA: Mark this as Exhibit C
(14) for identification.
(15) (Whereupon, the aforementioned TJ Klem
(16) report was marked as Defendant's Exhibit C for
(17) identification as of this date by the
(18) Reporter.)
(19) Q. Mr. Mollenkopf, I now show you what I
(20) had marked Defendant's Exhibit C for identification
(21) 8 page report prepared by TJ Klem and Associates,
(22) certified fire investigators and fire protection
(23) engineers. It has on the front page which appears
(24) to be a cover page an indication on the bottom
(25) right corner that it was prepared for you or your

Page 85

(1)
(2) name appears, is misspelled there, PH at the end,
(3) but that is it was prepared by you; is that
(4) correct?
(5) MR. MASCARO: For him.
(6) Q. For you?
(7) A. Yes.
(8) Q. Not by you, prepared for you?
(9) A. That is correct.
(10) Q. Did you ask that this be prepared?
(11) A. This specific – well, probably I mean,
(12) yes.
(13) Q. Do you see the top left corner on the
(14) first page indicating it was prepared by Joseph
(15) Folger, CFI and Tom J. Klem, CFI?
(16) A. Yes.
(17) Q. Underneath Tom Klem's name, it says
(18) prior protection engineer; is that correct?
(19) A. Yes.
(20) Q. Before today did you raid this report?
(21) A. Couple of years ago.
(22) Q. Did you utilize this report in making
(23) your determination on the cause in origin of the
(24) fire?
(25) A. Yes.

Page 86

(1)
(2) Q. Could you turn to Page 1 which is the
(3) very next page, the first page is the cover page,
(4) do you see the bottom paragraph starting with the
(5) building, it says the building contained a fire
(6) detection alarm system open paren (with smoke
(7) detectors positioned about the home according to
(8) the national standards at the time of their
(9) installation), close paren that was operable at the
(10) time of the incident and monitored by Command Force
(11) Security, etcetera, do you see that?
(12) A. Yes, I do.
(13) Q. Did you have a conversation with
(14) Mr. Klem or Mr. Folger about that paragraph?
(15) A. I don't recall.
(16) Q. Did you understand that paragraph to
(17) mean there was smoke detectors at the time of the
(18) installation which were appropriate under the
(19) national standard that were installed?
(20) A. I don't recall.
(21) Q. Do you see Page 2, the second full
(22) paragraph, the second sentence which indicates
(23) Deputy Fire Marshal Kohn has determined that the
(24) source of the fire was related to a lamp that was
(25) located on a night table and knocked over by the

Page 87

(1)
(2) family cat. The lamp landed in the bed adjacent to
(3) the table and ignited combustible materials on the
(4) bed. Do you see that?
(5) A. Yes, I do.
(6) Q. Did you ever learn that the lamp was
(7) energized at the time of the fire?
(8) A. I don't recall.
(9) Q. If you had learned that the lamp was
(10) energized at the time of the fire, would you have
(11) determined that the Heinz were negligent in leaving
(12) a lamp on in a room and a sick cat trapped by a
(13) gate at the door?
(14) MR. MASCARO: Objection to the form.
(15) You can answer.
(16) A. I can't comment on that.
(17) Q. Before, you testified that you did not
(18) determine that the Heinz were negligence under the
(19) scenario in this case. Earlier in morning, I asked
(20) you if you felt that the Heinz were negligent in
(21) this case; I believe you testified no. Do you
(22) remember that testimony?
(23) A. Yes.
(24) Q. What do you base that on?
(25) A. I can't comment whether they were

Page 88

(1)
(2) negligent or not. It's not –
(3) Q. If you in adjusting your loss and you
(4) had determined that a the insureds of Encompass
(5) Insurance Company were negligent or careless, would
(6) you still have paid the policy?
(7) MR. MASCARO: Speaking about in
(8) general?

(9) MR. MEZZACAPPA: Yes.
(10) Q. In your job as general adjuster, is it
(11) fair to say that you determined what causes losses
(12) and you make a determination whether to pay out on
(13) a policy or not; is that correct?
(14) A. Yes.
(15) Q. The policy issued to the Heinz for
(16) property damage issued in this case would
(17) compensate or pay out if someone were negligent; is
(18) that correct, as a homeowner?
(19) A. That is correct.
(20) Q. And if they intentionally lighted the
(21) fire by lighting gasoline, you wouldn't pay out?
(22) A. That is correct.
(23) Q. A homeowner can be negligent or
(24) careless and still recover for an accidental fire
(25) under their policy of insurance?

Page 89

(1)
(2) A. Completely correct. It happens all of
(3) the time.
(4) Q. In this case, did you make a
(5) determination as to whether or not the homeowners,
(6) the Heinz, were negligent or careless by trapping a
(7) sick cat in the room of fire origin which then
(8) subsequently knocked over the lamp and ignited
(9) combustible materials?
(10) A. I can't –
(11) MR. MASCARO: Objection to the form.
(12) A. I can't comment on that.
(13) Q. Why can't you comment?
(14) A. Because that would be my personal
(15) opinion.
(16) Q. What opinion did you arrive at?
(17) Careless, what I mean by negligence, is falling
(18) below the standard of an average homeowner in the
(19) Connecticut area where the policy is issued.
(20) Negligence is defined under our law in this state
(21) and every state as a breach of duty which equates
(22) to carelessness. So that if the homeowner was
(23) careless and caused the fire by their carelessness,
(24) that would be intentional. What I'm asking you did
(25) you do an analysis to determine if the Heinz were

Page 90

(1)
(2) negligent in order to pay this policy of insurance?
(3) A. That has no bearing on my adjustment.
(4) Q. What has bearing on your adjustment?
(5) A. If they intentionally caused the fire.
(6) Q. Once you determine that they don't
(7) intentionally cause the fire, then you decide to
(8) pay out on the loss?
(9) A. Accidental fire, yes.
(10) Q. After you determined it's an accidental
(11) fire, do you do an analysis of who any of the
(12) endorsements in the policy or exclusions in the
(13) policy apply?
(14) A. Yes.
(15) Q. In this case, we had a discussion with
(16) the exclusions to the animal, if it existed in this

(17) policy, and you made a determination that it would
(18) be covered regardless?
(19) A. That is correct.
(20) Q. Looking at the full paragraph on Page 2
(21) which ends at the top of Page 3, it indicates that
(22) halfway down the first sentence, that Mr. Klem –
(23) actually the second sentence, Mr. Klem had been
(24) notified of the loss by David Bostrom of Encompass
(25) Insurance and requested to conduct an origin and

Page 91

(1)
(2) cause of that fire that was reported to have caused
(3) extensive damage to the building. Do you see that?
(4) A. Yes.
(5) Q. Does this refresh your recollection
(6) that Dave Bostrom of the Quincy Massachusetts
(7) office of Encompass was actually the one that hired
(8) Mr. Klem to be the fire cause in origin
(9) investigator?
(10) A. It appears that way.
(11) Q. Do you know who the actual author of
(12) this report is?
(13) A. It says it's prepared by Joe Folger and
(14) Tom Klem.
(15) Q. The reason I ask is in that paragraph
(16) further down, there is a sentence that starts in
(17) turn, Mr. Klem provided me with an initial overview
(18) of the fire and requested that I conduct a cause in
(19) origin investigation of the incident. Does it
(20) appear that Mr. Folger authorized this report?
(21) A. It's possible. I believe Joe was the
(22) initial investigator out there.
(23) Q. Did you meet him out there?
(24) A. I believe I did, yes.
(25) Q. Did you ever ask him, while you were

Page 92

(1)
(2) out there, about the smoke detectors?
(3) A. I don't recall.
(4) Q. Did he ever opine or give you an
(5) opinion in his words about the smoke detectors in
(6) any manner?
(7) A. I don't recall.
(8) Q. Did Mr. Klem ever discuss with you the
(9) smoke detectors?
(10) A. Yes, at some point we did have a
(11) discussion about the configuration of the house and
(12) the smoke detection system.
(13) Q. Was that after receipt of this report
(14) which is marked as Exhibit C?
(15) A. I don't recall.
(16) Q. Do you know whether this report was
(17) received by you?
(18) A. No.
(19) Q. Do you know when this report was
(20) prepared?
(21) A. No.
(22) Q. Do you know how much time elapsed
(23) between the preparation of this report and any
(24) other report you received by the TJ Klem company

(25) concerning this loss?

Page 93

(1)
(2) A. No.
(3) Q. Do you have a recollection of getting
(4) another report or addendum report after this
(5) report?
(6) A. I don't recall.
(7) Q. Do you see at the top of Page 3 that
(8) another investigator by the name of Kevin Murphy
(9) was also so assigned by TJ Klem to assist in the
(10) cause in origin on this fire, do you see that?
(11) A. Yes, I do.
(12) Q. Do you see in the first paragraph on
(13) Page 3 under the title fire investigation, it
(14) indicates as previously arranged this investigator
(15) and Mr. Murphy met with Mr. Bostrom, Mr. Green and
(16) Mr. Mollenkopf at 34 Wildwood Drive on July 25,
(17) 2001, at 10 a.m. Do you see that?
(18) A. Yes, I do.
(19) Q. Does that refresh your recollection as
(20) 2 days after 7/23/01 is the first time you were at
(21) the scene.
(22) A. I don't know whether I was there prior
(23) to that or at that date. What is the date of
(24) loss?
(25) Q. July 23, 2001.

Page 94

(1)
(2) A. That was probably my initial inspection
(3) then, 2 days later, because --
(4) Q. Down to the last paragraph on Page 3 in
(5) the middle of that paragraph, it is a sentence that
(6) indicates Mr. Heinz stated that the lamp in
(7) question was on the night table next to the bed,
(8) lamp was of a 3-way type but did not go quote "on
(9) in all 3 positions." Do you see that?
(10) A. Yes, I do.
(11) Q. Were you present when Mr. Heinz made
(12) those statements?
(13) A. I don't recall.
(14) Q. Down further in that paragraph, the
(15) last sentence says on the bed were 5 or 6 bags of
(16) clothes, a cardboard box, over to the top of the
(17) page, these items were put there to prevent the cat
(18) from jumping onto the bed?
(19) A. Yes.
(20) Q. Did you have a discussion with
(21) Mr. Heinz about that?
(22) A. I don't recall that.
(23) Q. On Page 5, the paragraph starting
(24) following the examination of the scene, this
(25) investigator called Deputy Marshal Kohn and

Page 95

(1)
(2) discussed ignition, a scenario that he determined
(3) caused the fire. Do you see that?
(4) A. Yes.
(5) Q. Were you present on the phone or that
(6) conversation between --

(7) A. No.
(8) Q. -- Mr. Folger and Fire Marshal Kohn?
(9) A. No.
(10) Q. Do you see where it says Fire Marshal
(11) Kohn said that the lamp was found on the bed among
(12) other items on the bed. He further reiterated the
(13) cat was also found on the top of the debris on the
(14) bed, ruling out all other possible causes. He
(15) believes that the fire started from the lamp
(16) knocked over by the cat. Do you see that?
(17) A. Yes, I do.
(18) Q. Did you or anyone on behalf of your
(19) insurance company come to a different conclusion
(20) other than what is articulated here?
(21) A. I don't believe we did.
(22) Q. Did you ever learn that Mr. Heinz's son
(23) smoked?
(24) A. I don't recall that.
(25) Q. Do you know if Mr. Heinz had a son?

Page 96

(1)
(2) A. Yes.
(3) Q. Do you know that he would come from
(4) being away at college and stay in the room of fire
(5) origin?
(6) A. I believe I recall.
(7) Q. What else do you recall about that?
(8) A. That is about it.
(9) Q. Going to Page 6, there is a what
(10) appears to be a new paragraph not indented under
(11) the one that says considering. It starts with the
(12) lamp was reported not illuminated, do you see that?
(13) A. Yes.
(14) Q. The lamp was reported not illuminated
(15) when Mr. Heinz left the room in the morning. But
(16) the 3-way switch on the lamp holder would have to
(17) be in one of the quote "on positions" when one of
(18) the light bulb filaments burned out. When the lamp
(19) was knocked over, the filament in the bulb made
(20) contact with the lead that it was previously
(21) connected to and caused the bulb to illuminate and
(22) produce heat. The light bulb came into contact
(23) with the lamp shade or other combustible items on
(24) the bed and caused ignition. Do you see that?
(25) A. Yes, I do.

Page 97

(1)
(2) Q. Do you remember discussing that with
(3) anyone?
(4) A. Vaguely.
(5) Q. Did anyone say this was more likely
(6) than not in your presence that the lamp was left on
(7) rather than the scenario outlined here with the
(8) filament making contact after the lamp was knocked
(9) over?
(10) A. I don't recall that.
(11) Q. On Page 7, it indicates a paragraph
(12) that also is not indented, starts with finally we
(13) were requesting to comment on the fire alarm
(14) sequencing considering the arrival of the fire

(15) department?
(16) A. Yes.
(17) Q. Are you the one that requested Klem to
(18) comment on the fire alarm sequencing?
(19) A. I could have been.
(20) Q. Do you know that you were?
(21) A. Not specifically on this file.
(22) Q. Do you see the next sentence with the
(23) bedroom door open and considering the location of
(24) the smoke detector, we would expect that the alarm
(25) would have been transmitted to the fire alarm

Page 98
(1)
(2) company while the fire was still in the
(3) controllable phase. Do you see that?
(4) A. Yes.
(5) Q. The time to notify the fire department
(6) seems reasonable considering the time of the
(7) registration of the alarm by dispatchers on both
(8) ends of the reporting process although the actions
(9) of the alarm company evaluated initially called the
(10) residents twice before reporting the alarm to the
(11) fire department. Do you see that?
(12) A. Yes.
(13) Q. However, records and the contract at
(14) the alarm companies and the insured should be
(15) examined, should be obtained to examine for routine
(16) maintenance of the smoke detector; is that correct,
(17) of the alarm company's responsibility? Did anyone
(18) tell you that the smoke detector did not ring?
(19) A. No.
(20) Q. Indeed, isn't it a fact that you
(21) learned from your investigators for the cause in
(22) origin and from the fire marshal's report or the
(23) fire documents you received that the smoke detector
(24) did work and send a signal to central station
(25) alarm; isn't that correct?

Page 99
(1)
(2) A. That is correct.
(3) Q. And the central station alarm then
(4) attempted to contact the homeowners both at home
(5) and at work before calling the fire department;
(6) isn't that correct?
(7) A. I don't recall that.
(8) Q. Do you see the sentence, if the
(9) detectors were not maintained or cleaned at
(10) frequent intervals as required by the detector's
(11) manufacturers, then the fire may have been in the
(12) more advanced state at detection, do you see?
(13) A. Yes.
(14) Q. Did you ever inquire of the Heinz
(15) whether they cleaned or vacuumed their smoke
(16) detectors?
(17) A. I don't recall that.
(18) Q. Did you ever make any inquiry from
(19) anyone about whether those smoke detectors were
(20) cleaned by the Heinz or anyone else on their
(21) behalf?
(22) A. I don't recall that.

(23) Q. To lay a foundation for the next
(24) question, going back to my initial inquiry of this
(25) morning when I was questioning you about contracts

Page 100
(1)
(2) and you indicated that you reviewed 2 contracts
(3) between the Heinz and Command Force, did you ever
(4) review those contracts?
(5) A. Not really review. I just recall, you
(6) know, they had the initial alarm contract, and then
(7) after the fire, they had a second alarm system put
(8) in, and the public adjuster gave me those records
(9) for our review.
(10) Q. Did you ever make a determination that
(11) Command Force, my client, was supposed to go back
(12) out to the house and vacuum the smoke detectors for
(13) the Heinz?
(14) A. No.
(15) Q. Do you see the bottom of Page 7, the
(16) fire department indicates that the response time of
(17) the fire department was 9 minutes?
(18) MR. MASCARO: What page?
(19) Q. Bottom of Page 7, the last full
(20) sentence, further in this regard?
(21) A. Yes.
(22) Q. The response time of the fire
(23) department of 9 minutes?
(24) A. Yes.
(25) Q. Do you have any basis to disagree with

Page 101
(1)
(2) that?
(3) A. No.
(4) Q. And from investigating fires in your 20
(5) years as a property adjuster, do you know the
(6) nature and extent of the damage that can be done by
(7) a fire in 9 minutes?
(8) A. Not from a scientific standpoint.
(9) Q. Did you ever receive any training on
(10) how fast a fire can spread in 9 minutes?
(11) A. Not specifically.
(12) Q. Did you ever see any videotapes of
(13) fires and how they spread?
(14) A. Yes.
(15) Q. Isn't it a fact that the they spread
(16) very rapidly and each minute that goes by is
(17) crucial?
(18) MR. MASCARO: Objection to the form.
(19) You can answer.
(20) A. It makes sense.
(21) Q. Do you know what level of damage was
(22) done between the fire department getting the call
(23) and arriving at the scene 9 minutes later?
(24) A. No.
(25) Q. Do you have a videotape or are you

Page 102
(1)
(2) aware of any witnesses to the fire that can comment
(3) on what occurred in those 9 minute of time?
(4) A. No.

| | |
|---|---|
| (5) Q. Do you see the last sentence which | (13) Q. What is your recollection about that |
| (6) starts on bottom of page 7 goes over to 8 where | (14) possibility? Was it you who asked for it or |
| (7) additional time is also spent by the arriving fire | (15) Mr. Bostrom or was it someone else on behalf of |
| (8) fighters, open paren (independent mission – | (16) Encompass? |
| (9) spelled DNT on the number spelled DEPENDANNT of | (17) A. I don't recall. |
| (10) first arriving fire fighters) close paren, advanced | (18) Q. Did you see an addendum to that report? |
| (11) hose lines into the building. Do you see that? | (19) A. I don't recall. |
| (12) A. Yes. | (20) MR. MEZZACAPPA: Let's mark this report |
| (13) Q. Do you see the next sentence that says | (21) as Exhibit D for identification. |
| (14) flash over 2 words of a bedroom during this – is | (22) (Whereupon, the aforementioned fire |
| (15) expected and when this occurs, extension of the | (23) investigative report was marked as Defendant's |
| (16) fire to the next floor via the exterior, the | (24) Exhibit D for identification as of this date |
| (17) exterior of the building occurred. Do you see | (25) by the Reporter.) |

Page 103 / Page 105

(Page 103)
(2) Q. Did TJ Klem or Mr. Folger or anyone
(3) that prepared this report, maybe Mr. Murphy, at all
(4) comment that Command Force was negligent in its
(5) installation or maintenance of the fire detection
(6) system?
(7) A. Could I have that question, again?
(8) That is kind of why we're here, isn't it?
(9) MR. MASCARO: Do you mean the time this
(10) report was first prepared or at any time?
(11) MR. MEZZACAPPA: The question back.
(12) (Record read.).
(13) MR. MEZZACAPPA: I will stand on this
(14) question.
(15) I move to strike which is not
(16) responsive to the question.
(17) Q. I'm asking you if in that initial
(18) report which your company asked for specifically
(19) Mr. Bostrom out of the Quincy Massachusetts office
(20) indicates in any way that Command Force was
(21) negligent or responsible for the damages in this
(22) case?
(23) A. Based on this report?
(24) Q. Yes.
(25) A. Are you asking my personal opinion?

(Page 104)
(2) Q. No. I'm asking you now that we've gone
(3) through the report which your company asked for, if
(4) in that report it says that Command Force was
(5) responsible or negligent in any manner.
(6) A. No.
(7) Q. Did there come a time after receipt of
(8) that report that either or, to your knowledge
(9) Mr. Bostrom communicated in any way, telephone,
(10) e-mail, or correspondence with TJ Klem and asked
(11) for an addendum or a supplemental analysis by Klem?
(12) A. That is possible.

(Page 105)
(2) Q. You can define as Exhibit D a fire
(3) investigative analysis 7 pages in length, also
(4) prepared by Thomas J. Klem and Associates. I show
(5) you now what has been marked as Exhibit D for
(6) identification. Can you take a look at that 7 page
(7) report prepared by TJ Klem and Associates and tell
(8) me if you have ever seen it before today.
(9) A. I don't recall, but I probably have.
(10) Q. Could you look at the first sentence on
(11) the page that says TJ Klem and Associates has been
(12) asked to supplement its fire investigative analysis
(13) of this 7/23/01 fire at 34 Wildwood Drive in
(14) Wilton, Connecticut. The author of this
(15) supplemental analysis is Tom J. Klem?
(16) A. Yes.
(17) Q. Does the paragraph reflect who asked
(18) for this initial report Exhibit C that I showed you
(19) to be supplemented?
(20) A. No.
(21) Q. Were you present when Mr. Klem
(22) authorized this report?
(23) A. No.
(24) Q. Were you present when Mr. Klem may have
(25) gone back to the house?

(Page 106)
(2) A. I don't recall.
(3) Q. Could you just look through this
(4) briefly? I'm not going to ask you to read the
(5) whole thing. Look over the 7 pages and tell me if
(6) you recall receiving this report yourself.
(7) A. I really don't recall receiving this.
(8) It's possible that I did.
(9) Q. Do you know when you may have received
(10) it?
(11) A. No. I would have to check my file.
(12) Q. Do you have a recollection of receiving
(13) the 2 different reports from Mr. Klem's company on
(14) 2 different occasions?
(15) A. No, I don't.
(16) Q. After reading the first report by
(17) Mr. Klem, did you make a determination or
(18) suggestion to bring a third party action against my
(19) client Command Force?
(20) A. I don't recall.

(21) Q. After reading the second report, you
(22) did receive it, because I understand you said it's
(23) possible you have a recollection of making the
(24) decision to bring a separate lawsuit that we're
(25) sitting for here against my client Command Force.

Page 107

(1)
(2) A. I don't recall the exact sequence.
(3) Q. Do you have a recollection other than
(4) the questions I asked you about any conversations
(5) you had with Mr. Klem or anyone else from his
(6) agency with regard to the contents of either one of
(7) these reports?
(8) A. Not specifically.
(9) MR. MEZZACAPPA: I'm going to mark now
(10) Exhibit E, we're going to mark as Exhibit E
(11) the fire marshal office, fire investigation
(12) report which has an incident date at the top
(13) of 7/23/01, and for purposes of ease we'll
(14) leave attached to this the press releases from
(15) the Wilton Fire Department, the dispatch logs,
(16) other information prepared by the fire
(17) department like the volunteer sign-in sheet,
(18) etcetera, and I'll just count the number of
(19) pages. We'll leave a clip in like that.
(20) MR. MASCARO: That is fine.
(21) MR. MEZZACAPPA: 22 pages that I have,
(22) it ends with the last page, the press release
(23) which is page 2 of 2, prepared by William
(24) Vonseal.
(25) (Whereupon, the aforementioned fire

Page 108

(1)
(2) report was marked as Defendant's Exhibit E for
(3) identification as of this date by the
(4) Reporter.)
(5) Q. Sir, I'm showing you what has been
(6) marked as Defendant's Exhibit E for identification,
(7) can you please look at that? It's the documents
(8) prepared by the fire department in Wilton, having
(9) an investigative report, the report of their
(10) activities at the fire scene as well as press
(11) releases. Have you seen any of those documents
(12) before today?
(13) A. Probably.
(14) Q. You can finish looking at this. Do you
(15) recall from a review of these that I'll show you,
(16) specifically one of the pages which is labeled
(17) Wilton Fire Department on the top, preprinted boxes
(18) some of which are checked, some are not checked.
(19) At the top right corner, it says NTRIS-2 fire.
(20) MR. MASCARO: I have that page.
(21) Q. Do you see under the Section E-2
(22) factors contributing, do you see that?
(23) A. Yes.
(24) Q. Do you see the code 66 and next to the
(25) word animal?

Page 109

(1)
(2) MR. MASCARO: That actually isn't on

(3) mine.
(4) Q. Do you see?
(5) A. Yes.
(6) Q. Do you see on the next page of the
(7) exhibit under box L-3 labeled the detector power
(8) supply, L-4 detector operation, do you see that
(9) box?
(10) A. Yes.
(11) Q. Do you see box No. 2 is checked
(12) operated?
(13) A. Yes.
(14) Q. Do you recall from reviewing the fire
(15) documents, when you did receive them, whether there
(16) was anything contained in them that in any way
(17) placed responsibility for this fire on my client?
(18) A. Not really.
(19) MR. MEZZACAPPA: Make a note at the end
(20) of the transcript that I should copy the
(21) entire Exhibit E for plaintiff's counsel and
(22) give it to him.
(23) MR. MASCARO: Thank you.
(24) MR. MEZZACAPPA: I'm going to have this
(25) page, document marked Exhibit F, a letter from

Page 110

(1)
(2) Richard re-estimated of Schleiffer Associates
(3) dated October 5, 2001, with a worksheet
(4) attached, Defendant's Exhibit F for
(5) identification.
(6) (Whereupon, the aforementioned letter
(7) was marked as Defendant's Exhibit F for
(8) identification as of this date by the
(9) Reporter.)
(10) Q. Sir, I'm showing you what has been
(11) marked Exhibit F for identification. Do you recall
(12) receiving that letter which is addressed to you?
(13) A. Not specifically.
(14) Q. Taking a look at the letter in
(15) enclosure, does it refresh your recollection as to
(16) what it is?
(17) A. I guess revises an estimate from the
(18) initial estimate.
(19) Q. The revised estimate, why was that
(20) necessary, if you recall?
(21) A. I think there was a – yes, when some
(22) of the wall finishes and ceiling finishes were
(23) going to hold a smoke odor.
(24) Q. Who had questioned that, was that
(25) Nutmeg investigators?

Page 111

(1)
(2) A. It could have been.
(3) Q. Was this adjustment or revised
(4) worksheet by Mr. Re-estimated, did it increase the
(5) amount of the damage?
(6) A. It probably did.
(7) Q. What was the amount of damage finding
(8) on October 5 of 2001, based on that worksheet?
(9) A. 727 and change.
(10) MR. MASCARO: $727,000 change?

(11) THE WITNESS: Yes.
(12) Q. Revise upward from some other figure?
(13) A. It appears it was.
(14) Q. To your recollection, based on your
(15) statement of loss Exhibit B, is that 727 figure
(16) that he came up with the last revised figure that
(17) Mr. Schleiffer came up with?
(18) A. Yes.
(19) Q. The full figure is 727,919.80, is that
(20) correct?
(21) A. Yes, that is correct.
(22) Q. To your knowledge, was a check cut in a
(23) greater amount than what Mr. Schleiffer recommended
(24) in his revised estimate? Were the Heinz paid by
(25) Encompass Insurance an amount greater than $727,000

Page 112

(1)
(2) and change for the building to be repaired?
(3) A. Not to my knowledge.
(4) MR. MEZZACAPPA: This will be 10/5/01
(5) appraisal of damage. Appraisal of damage
(6) marked as Exhibit G for identification. It's
(7) I'm estimating 20 pages long, and the grand
(8) total is 26 pages long, it ends on Page 26
(9) with a grand total of 727,919.80, that will be
(10) Exhibit G for identification.
(11) Q. Sir, I'm showing you what has been
(12) marked Defendant's Exhibit G for identification,
(13) take a look at the 26-page appraisal of damage.
(14) Tell me if you have seen it before today.
(15) A. Yes.
(16) Q. Was this prepared by Richard
(17) re-estimated, to the best of your knowledge?
(18) A. Yes, it was.
(19) Q. What is the purpose of this document?
(20) A. To determine the cost to repair the
(21) building, cost and scope to repair the building.
(22) Q. It breaks it down room by room, what
(23) needs to be replaced or cleaned or stained,
(24) etcetera?
(25) A. Yes, that is correct.

Page 113

(1)
(2) Q. It is broken down into the columns with
(3) the number or square footage like, for example, on
(4) Page 3, replace baseboard radiation, he has 13 LF,
(5) linear feet, is that correct?
(6) A. Yes.
(7) Q. That same area replace dryer vent 1,
(8) each meaning 1 dryer vent that needs to be
(9) replaced?
(10) A. That is correct.
(11) Q. Where does Mr. Re-estimated, to your
(12) knowledge, based on this figures with come up with
(13) the second column which appears to be a dollar
(14) figure for each unit, for example, the dryer vent
(15) is going to be a $75 cost?
(16) A. Yes.
(17) Q. Where does he come up with those
(18) figures?

(19) A. Just experience.
(20) Q. Is there a book that he relies on?
(21) A. I don't know.
(22) Q. Do you ever question these figures that
(23) Mr. Schleiffer comes up with?
(24) A. Sometimes.
(25) Q. Did you question them in this case?

Page 114

(1)
(2) A. No.
(3) Q. So, you took as gospel everything that
(4) is in here?
(5) A. He is the building consultant.
(6) Q. Can you look at Page 5 under family
(7) room?
(8) A. Yes.
(9) Q. Can you see halfway down that category,
(10) replace battery smoke alarm?
(11) A. Yes.
(12) Q. One each at $45?
(13) A. Yes.
(14) Q. Was there a battery smoke alarm in
(15) addition in this case, for this house to hard wire
(16) the smoke alarm?
(17) A. I don't recall.
(18) Q. Did you ever ask the Heinz whether they
(19) had battery smoke detectors?
(20) A. I don't recall.
(21) Q. Did Encompass Insurance have a
(22) requirement of the number of smoke detectors that
(23) had to be in the house given the square footage of
(24) the house?
(25) A. I'm not aware.

Page 115

(1)
(2) Q. Did the underwriting department ever
(3) make a determination as to the placement of smoke
(4) detectors in the house such as the Heinz prior to
(5) insuring it?
(6) A. I'm not aware of that information.
(7) Q. Does Encompass have a person who is an
(8) expert about smoke detector installation that goes
(9) out to houses that Encompass insures to make
(10) certain that the right number and placement of
(11) smoke detectors are installed in the house before
(12) they insure it?
(13) A. I know -- I can't answer that question.
(14) Q. Why not?
(15) A. Because some homes they do inspection,
(16) some homes they don't do inspections. I don't know
(17) whether they specifically look for locations of
(18) smoke detectors.
(19) Q. Did they inspect this home?
(20) A. I don't recall.
(21) Q. Assuming that they did, did Encompass
(22) have a person who was an expert in smoke detention
(23) installation that would comment on and look at that
(24) specific function or item?
(25) A. I don't know.

Page 116

Page 116

(1)
(2) Q. Do you see on the next page, Page 6
(3) Mr. Re-estimated, again, articulated the placement
(4) of the battery smoke alarm?
(5)   A. Yes.
(6) Q. This apparently refers to the utility
(7) room that starts at Page 5, correct?
(8)   A. Yes.
(9) Q. So, when he went through the house, he
(10) found a battery smoke alarm in the family room that
(11) needed to be released in the other utility room,
(12) correct?
(13)   A. It appears that way.
(14) Q. Do you know who installed those?
(15)   A. No.
(16) Q. Now, when Mr. Re-estimated finished his
(17) entire summary, submitted it to you and you based
(18) the accuracy of the payment upon this, the payment
(19) was made, but the Heinz didn't replace certain of
(20) these things as they rebuilt the entire house,
(21) correct?
(22)   A. I'm not aware of that information.
(23) Q. Maybe my question was not clear. Let's
(24) look at Page 8 where he has at the top lower
(25) passage, the first thing he has to replace is

Page 117

(1)
(2) Sheetrock on the walls open paren (partial) close
(3) paren, correct?
(4)   A. Yes.
(5) Q. The house essentially was rebuilt by
(6) the Heinz or their builder after this fire and
(7) after your payments were paid, right?
(8)   A. Correct.
(9) Q. And because there were 2 stories, now
(10) it was only one story before the fire, the
(11) configuration obviously changed to a great extent?
(12)   A. Correct.
(13) Q. So that they didn't just replace
(14) Sheetrock on the existing wall in the house at some
(15) point. They had an architect to reconfigure the
(16) whole house and the rebuild the house with the
(17) money, correct?
(18)   A. Correct.
(19) Q. The thing that Mr. Re-estimated
(20) articulated in his appraisal on damage in this
(21) report don't necessarily equate to what the Heinz
(22) did with the house; is that correct?
(23)   A. That is correct.
(24) Q. He just used this to show you what was
(25) damaged and needing replacement?

Page 118

(1)
(2)   A. That is correct, that is what we cover
(3) in the contract, as is, like kind and like quality.
(4) Q. Do the Heinz under this contract of
(5) insurance that you have with them need to tell you
(6) whether they're going to repair the house or
(7) demolish and replace the house; do they need to
(8) tell you before you pay them the money?
(9)   A. Not the actual, no.
(10) Q. Why don't they need to tell you that?
(11)   A. Contractually, you know, we owe the
(12) actual cash value, we may pay that first. They are
(13) entitled to no matter what they do. Now, they make
(14) the repairs and spend the agreed replacement cost,
(15) repair cost which is the 727, then we would pay
(16) them the 65.
(17) Q. Was the 65 the depreciation or the
(18) holdback, as we defined, we're talking about
(19) $65,000 plus change?
(20)   A. Correct.
(21) Q. Was that amount ever paid to them based
(22) on the fact they rebuilt this house, didn't
(23) necessarily replace walls, sheet rock, trim and
(24) those things?
(25)   A. Right. It was because they spent more

Page 119

(1)
(2) than the 727, as long as they spend the money.
(3) Q. As long as they spent the money given
(4) to them, $661,000, they give them the holdback of
(5) $65,000; you arrive at 727?
(6)   A. That is correct. If they spent more
(7) than the 727 or more, we release the $65,000 and
(8) change.
(9) Q. Based on your review of the pictures of
(10) the new house that was built and your going to the
(11) premises in Wilton and seeing the old house had
(12) been damaged, I believe you testified before that
(13) they spent more money than the insurance company
(14) gave to them in making a newer home?
(15)   A. I believe the public adjuster
(16) provided documentation to that effect, yes.
(17) Q. He had to provide that in order for you
(18) to release the holdback?
(19)   A. That is correct.
(20) Q. Isn't it true, then, that the Heinz
(21) ended up in a better position here than just being
(22) made whole after this fire because they made a
(23) better house on that premises?
(24)   MR. MASCARO:  Objection to the form.
(25) You can answer, if you can.

Page 120

(1)
(2)   A. Well, they obviously had to pay some
(3) money out of their own pocket for the bigger house.
(4) Q. Do you know how much money?
(5)   A. I don't recall.
(6) Q. Do you know that they actually paid the
(7) money out of their pocket or did they just get
(8) inflated estimates from builders?
(9)   A. I don't recall.
(10) Q. Did you insure that the money actually
(11) was spent by them, in other words, did you ask for
(12) an accounting or canceled checks to add up?
(13)   A. I believe I did.
(14) Q. Did you get that?
(15)   A. I believe I did. I would have to check
(16) the file.

(17) MR. MEZZACAPPA: To the extent that is
(18) not in the file, we're going to the ask for
(19) documentation to prove that the Heinz indeed
(20) spent more money, and it wasn't just estimated
(21) but actually spent more money than was given
(22) to them by the insurance company.
(23) MR. MASCARO: Again, same position in
(24) regards to the replacement.
(25) Q. Mr. Re-estimated has, for example, in

Page 121

(1)
(2) the kitchen, replaced a Whirlpool range, the Maytag
(3) electric stove, replaced the Maytag dishwasher,
(4) those things are considered part of the structure
(5) of the home?
(6) A. If they were built in, yes.
(7) Q. They are not considered contents?
(8) A. Not really.
(9) Q. When you say not really, do they fit
(10) within one category or another?
(11) A. As I recall, these were built into the
(12) counters and thus considered part of the building.
(13) Q. Now, when Mr. Re-estimated came up with
(14) his figures for the Sheetrock, the wood, etcetera,
(15) where do these figures come from other than his
(16) experience?
(17) A. They probably come out of a
(18) computerized estimate system.
(19) Q. Are they required to shop this around
(20) and find the cheap price buying wood at Home Depot
(21) versus buying it the lumbar yard?
(22) A. Not really.
(23) Q. Would you agree then that you could, if
(24) you wanted to, find many of these items for less
(25) money, that is, than Mr. Re-estimated came up with,

Page 122

(1)
(2) if you really shopped it round and told the
(3) homeowner to buy the wood at Home Depot?
(4) A. Some things could be low and some
(5) things could be high.
(6) Q. The big ticket Sheetrock, body, wood,
(7) flooring, ceiling tiles, that you are not just
(8) buying a coat hook, for example, but the big ticket
(9) items including an appliance for a kitchen, would
(10) you agree today in 2001, when the Heinz had to
(11) rebuild and replace them, could he purchased more
(12) cheaply in bulk at Home Depot or places like that?
(13) A. I'm not privy to that information. I
(14) know what you are driving at.
(15) MR. MASCARO: Just answer the
(16) question.
(17) A. Next question.
(18) Q. Are you done with the answer?
(19) A. Yes.
(20) Q. In addition to Mr. Re-estimated, did
(21) you seek any other estimates from any other
(22) builders as to what it would have cost to repair or
(23) replace the Heinz home, the structure of it?
(24) A. No.

(25) Q. How is Mr. Re-estimated of Schleiffer

Page 123

(1)
(2) Associates paid by your company to do this work?
(3) A. I believe they get a percent of the
(4) estimate.
(5) Q. What percent?
(6) A. I don't recall.
(7) Q. Let's assume for argument sake for
(8) purposes of my next question, 10 percent of
(9) equipment?
(10) A. It's not 10 percent.
(11) Q. 5 percent, I'm trying to pick a figure,
(12) 1 percent, 2 percent, let's assume it's 2 percent,
(13) is it 2 percent of the entire value that he comes
(14) up with?
(15) A. Generally yes.
(16) Q. So, there is an incentive there for
(17) Mr. Re-estimated because he is going to get a
(18) percentage of the whole, so he adds more, as much
(19) as he can; isn't that correct?
(20) A. That is not correct, I wouldn't say
(21) that.
(22) Q. If he gets paid in percentage of the
(23) whole, then he gets paid more if the percentage is
(24) greater; is that correct?
(25) A. That is correct.

Page 124

(1)
(2) Q. He gets paid less, if the percentage of
(3) the whole is less; is that correct?
(4) A. That is correct.
(5) Q. Do you know what percentage of
(6) Schleiffer Associates income is derived from
(7) contracts with or being retained by Encompass
(8) Insurance Company?
(9) A. I have no idea.
(10) MR. MEZZACAPPA: I'm going to mark now
(11) the appraisal of damage from Mr. Re-estimated
(12) that is dated 9/18/2001 Exhibit H for
(13) identification. This is dated 9/18/2001, a
(14) similar appraisal by Richard re-estimated. It
(15) has a total $637,907.13.
(16) Q. Take a look at that. Tell me when
(17) you've seen if before today.
(18) MR. MASCARO: 26 pages.
(19) MR. MEZZACAPPA: 26 on the actual
(20) report, and there are 2 page attached to it
(21) which appear to be some specifications by the
(22) deck builder which is a home package of some
(23) sort. Classic deck house package.
(24) (Whereupon, the aforementioned
(25) appraisal was marked as Defendant's Exhibit H

Page 125

(1)
(2) for identification as of this date by the
(3) Reporter.)
(4) Q. Have you ever seen that before today?
(5) A. Yes.
(6) Q. In September of 2001, when Mr. Klein

(7) came up with a total figure of $637,000 and change,
(8) was this based on any review of the interior and
(9) exterior of the structure?
(10) A. That would have been his initial
(11) inspection, yes, it would have.
(12) Q. And do you know why there is a
(13) difference of approximately $90,000 between his
(14) appraisal of September 18 and his appraisal of
(15) October 5th, which was Exhibit G that I showed to
(16) you before?
(17) A. We discussed that a few minutes ago,
(18) the cover letter indicates there was a question of
(19) smoke odor in a few rooms.
(20) Q. Can you be more detailed for me about
(21) that smoke odor attaching to things that he didn't
(22) anticipate replacing in the first instance?
(23) A. That is correct, ultimately we agreed
(24) that we would pay for that, and thus he adjusted
(25) his estimate.

Page 126

(1)
(2) Q. So, when you say smoke odor, did you go
(3) back into the premises in order to agree on the
(4) $90,000 change?
(5) A. Probably.
(6) Q. Did you use any sophisticated
(7) engineering devices to determine if something would
(8) have a smoke odor after it was repaired?
(9) A. No. This house was blacker than
(10) blacker. Any benefits of the doubt is going to be
(11) insured, because she had physical problems. As I
(12) said, this house was caked with smoke.
(13) Q. What physical problems did the insured
(14) Lauren Heinz have?
(15) A. Something wrong with her throat.
(16) Q. Do you know what specifically was wrong
(17) with her throat?
(18) A. No.
(19) Q. Did they produce any documents from the
(20) doctor to show you that that smoke damage would
(21) somehow interfere with her health in order to get
(22) the figure up $90,000?
(23) A. No.
(24) Q. After increasing the value on the
(25) structure $90,000, and then learning that they

Page 127

(1)
(2) demolished what was there except for the foundation
(3) and rebuilt the house, did you then subtract the
(4) $90,000 because those smoke damaged items were not
(5) going to be replaced?
(6) A. I don't understand your question.
(7) Q. You indicated that some finishes and
(8) things in the house had extensive smoke damage.
(9) You increased the estimate from 637 to $727,000?
(10) A. Correct.
(11) Q. Those things that were smoked damaged
(12) and needed to be replaced were walls and ceilings
(13) and structure of the house, correct?
(14) A. Correct.

(15) Q. After you paid the money on the house
(16) that existed and it was demolished in order to
(17) rebuild a new structure albeit on the same
(18) foundation, isn't it true that the items that you
(19) found smoke damaged such as walls and ceiling and
(20) things of that nature didn't really factor in after
(21) they demolished the house because they built a
(22) whole new house?
(23) A. You can say that was – as I say, as we
(24) discussed before, they are always entitled to the
(25) actual cash value of the loss, which was 661, and

Page 128

(1)
(2) if they spend the 727, we released the 65. The
(3) bottom line is that he spent the 727 or more, so we
(4) released the 65.
(5) Q. Before you got or arrived at the 727
(6) figure, you had arrived at the 637 figure?
(7) A. Right.
(8) Q. The holdback on 637 would have been
(9) different from $65,000, correct?
(10) A. Correct.
(11) Q. When was it that you learned that they
(12) weren't replacing it or repairing the existing
(13) structure but rather demolished it and built a new
(14) home on that foundation?
(15) A. I don't recall.
(16) Q. Was it after you had paid your check?
(17) A. Probably.
(18) Q. Wouldn't he be entitled to some money
(19) back because they didn't replace or repair the
(20) wall, studs, ceilings that existed but rather they
(21) demolished and built a new home with new materials?
(22) A. No. As I said, the insured was always
(23) entitled to the actual cash value settlement, no
(24) matter what, the 661 and change.
(25) Q. Where did you arrive at the 661 figure,

Page 129

(1)
(2) where, if you know?
(3) A. If you look at the back page of the
(4) revised estimate, you should come up with 661 there
(5) somewhere.
(6) Q. Exhibit G revised one, last page, Page
(7) 26, you want me to look at?
(8) A. I believe I saw it on your copy.
(9) MR. MEZZACAPPA: Let the record reflect
(10) we're going to back to Exhibit F.
(11) Q. The second page of that which was a
(12) worksheet?
(13) A. This is not actually the worksheet.
(14) This is what we call a trade recap for the agreed
(15) loss, and this is where depreciation is applied, is
(16) that your question?
(17) Q. Not really, but you can explain how you
(18) arrived and I'll ask about the 661 figure that is
(19) depicted at bottom of that exhibit.
(20) A. That is the replacement cost less
(21) depreciation.
(22) Q. The replacement cost on this form we're

(23) looking at Page 2 of Exhibit F indicates that the
(24) replacement cost of 727, depreciation of 65 for the
(25) actual cash value ACV $661,000 and change, correct?

Page 130

(1)
(2) A. Correct.
(3) Q. But this is using the replacement cost
(4) of 727?
(5) A. That is correct, agreed loss.
(6) Q. I'm asking you, though, based on what
(7) you testified to with the smoke damage going back
(8) to the appraisal on 9/18 to 10/05, wouldn't that
(9) $661,000 figure be different because of subtracting
(10) the depreciation of 636, yielding a number in the
(11) $500,000 range, which would be all actual cash
(12) value placed on an appraisal?
(13) A. No. I'm not really – basically the
(14) amount of depreciation is going to be somewhat
(15) less, divide 65 by 727, I mean basically going to
(16) be the same percentage, less than 10 percent,
(17) roughly there is replacement 8 percent depreciation
(18) here.
(19) Q. Maybe I'm not making myself clear. In
(20) between the appraisal of 9/18 and the appraisal
(21) 10/05, the cost to replace the structure increased
(22) by $90,000, more or less 637 to 727?
(23) A. Yes, you can say that.
(24) Q. The homeowner would be entitled to
(25) actual cash value, what the actual cash value is

Page 131

(1)
(2) based on the 9/18 estimate, the actual cash value?
(3) A. No bearing on these.
(4) MR. MASCARO: He is asking you a
(5) question. If you use the 9/18 as opposed to
(6) the 10/05.
(7) A. 8 percent, I'm sorry, was that –
(8) Q. On the 9/18 estimate.
(9) A. How much is that?
(10) MR. MASCARO: Look at that. Don't ask
(11) any questions.
(12) A. Using 8 percent roughly $40,000, 50
(13) percent depreciation.
(14) Q. You would subtract from 637, correct?
(15) A. If that was what the loss was going to
(16) be. That is not the loss. That was the
(17) preliminary estimate, an estimate.
(18) Q. The difference between the preliminary
(19) estimate and the final estimate had to do with
(20) smoke damage to items like walls, Sheetrock?
(21) A. That is correct. Normally, I mean, as
(22) I said, normally, you know, we go back into another
(23) individual risk and re-inspect to, with the
(24) estimate to make sure it is accurate. Everybody is
(25) in agreement.

Page 132

(1)
(2) Q. I'm just saying here, based on
(3) the Heinz's – based on smoke damage here, you went
(4) back in and re-estimated or Richard re-estimated

(5) re-estimated the damage from one month to the next
(6) and he came up between 9/18 and 10/05 with another
(7) $90,000 based on smoke damage to existing things in
(8) the house?
(9) A. That is correct.
(10) Q. Which ended up not being replaced in
(11) terms of walls, Sheetrock, etcetera, because the
(12) entire house that was there that you looked at that
(13) you praised was demolished, correct?
(14) A. That is correct.
(15) Q. So, in order to rebuild the house, they
(16) are to rebuild every room, every piece of molding,
(17) every stud, every piece of Sheetrock; isn't that
(18) true?
(19) A. Yes.
(20) Q. Did you then go back and say to the
(21) Heinz that $90,000 is not really allowed because
(22) you knocked the whole house down, we didn't replace
(23) the molding, that there is more smoke damage than
(24) originally estimated?
(25) A. No. That is, again, per contract, we

Page 133

(1)
(2) agreed the replacement cost loss is $727,000, we
(3) only paid them 661. We withheld 65. So, if they
(4) took the money, only get to the 661. Now, if they
(5) spent the 727, I don't care whether they put any
(6) yellow or pink paint as long as they spent the 727,
(7) we release the 65.
(8) Q. The usual understanding, they spent the
(9) 727, you released the 65, and at some point, you
(10) paid them close to $128,000 on the structure?
(11) A. No. 727. Initial payment 661.
(12) Q. You just held back the $65,000?
(13) A. That is correct. They are only in –
(14) contractually always entitled to the actual cash
(15) value.
(16) Q. Regardless, is it true that they are
(17) entitled to the actual cash value regardless of
(18) whether they build a new home or they replace the
(19) existing home?
(20) A. Completely correct. They can take this
(21) money and move to Florida, and we're done.
(22) Q. Unless they spend a certain amount,
(23) they are not going to get their depreciation back?
(24) A. Correct.
(25) Q. Unless they spend a certain amount?

Page 134

(1)
(2) A. Yes.
(3) Q. They spent more than a certain amount
(4) because they built a new house?
(5) A. That is my understanding.
(6) Q. I'm still going to go back to the
(7) $90,000, the difference between 3 weeks from 9/18
(8) 2001 until 10/05/2001, had to do with the smoke
(9) damage to parts of the contents, parts of the
(10) structure of the house; is that correct?
(11) A. Correct.
(12) Q. So, because Mrs. Heinz had a health

Page 134

(13) problem and because certain things in the house
(14) were going, to the walls, floors, structures of the
(15) house need to be replaced, you increased the
(16) appraisal from 637 to 727?
(17) A. That is your words. That is not really
(18) I –
(19) MR. MASCARO: Objection to the form.
(20) Mr. Re-estimated revised his appraisal.
(21) Q. Mr. Re-estimated revised the appraisal
(22) based on the fact that the things in the old house
(23) needed to be replaced because of smoke damage to
(24) them, correct?
(25) A. Yes.

Page 135

(1)
(2) Q. Once the entire house was knocked down,
(3) that point became moot, did it not?
(4) A. That is a moot point to me.
(5) Q. You didn't go back to the homeowners
(6) and ask for any portion of the $90,000 difference
(7) between appraisal one and appraisal 2, correct?
(8) A. Contractually, we can't do that; no.
(9) (Lunch break).
(10) Q. Mr. Mollenkopf, do you know if the fire
(11) detection system installed in the house needed to
(12) be monitored by a central station in order to get a
(13) reduction in premium?
(14) A. I don't know.
(15) Q. Do you know when the investigator talks
(16) about combustible material in his report, what
(17) combustible material he is referring to?
(18) A. Not specifically.
(19) Q. Did you observe any materials in the
(20) room of fire origin that you could make out after
(21) they had been burned, in other words, did you
(22) recognize anything in that room?
(23) A. I think a mattress frame, maybe a
(24) table, old desk.
(25) Q. Did you see parts or remnants of the

Page 136

(1)
(2) lamp?
(3) A. I don't recall.
(4) Q. Are you aware if anyone is storing the
(5) lamp today?
(6) A. I'm not aware of that.
(7) Q. Did you see any forms filled out by my
(8) client in your files about the installation of the
(9) fire detection system?
(10) A. Just the alarm contracts.
(11) Q. Did you ever meet with or speak to on
(12) the telephone Matthew Matza, my client?
(13) A. No.
(14) Q. Did you ever meet with or speak to
(15) anyone from his company Command Force?
(16) A. No.
(17) Q. Did Mr. Heinz in your discussions with
(18) him ever express dissatisfaction with the service
(19) he received from Command Force, my client?
(20) A. I don't think so.
(21) Q. Did Mr. Heinz tell you or did you learn
(22) from any source that he had any input into the
(23) design of the fire detection system installed in
(24) his home by Command Force?
(25) A. Just after the loss I guess there was

Page 137

(1)
(2) some discussion about the type of alarm he wanted
(3) installed.
(4) Q. What do you recall him telling you
(5) about the type of alarm he wanted to install?
(6) A. I don't recall who I heard that from.
(7) That was not from Mr. Heinz.
(8) Q. Whatever it is you heard regarding
(9) that, what is it that you heard?
(10) A. Something he wanted the least expensive
(11) alarm system or something to that effect.
(12) Q. Do you know the source of that
(13) information?
(14) A. I don't recall, no.
(15) Q. Did you ever ask Mr. Heinz if that was
(16) true?
(17) A. No.
(18) Q. Did you ever ask Mr. Heinz how much he
(19) wanted to spend on the alarm system?
(20) A. No.
(21) Q. Did you ever consider or recommend a
(22) third party action or lawsuit against the Wilton
(23) Fire Department based on your investigation of this
(24) fire?
(25) A. No.

Page 138

(1)
(2) Q. Did you ever receive any documents from
(3) Mr. Heinz as of the date, within the date that he
(4) did the renovation to his home after initially
(5) moving in?
(6) A. No.
(7) Q. Did you ever privately speak to any
(8) firemen, including the marshal?
(9) A. No.
(10) Q. Did you ever have any investigation
(11) taken of the firemen or the marshal?
(12) A. No.
(13) Q. Did you ever consider or recommend a
(14) products liability case against the manufacturer of
(15) the lamp?
(16) A. No.
(17) Q. Did you ever consider or recommend a
(18) products liability action against the manufacturer
(19) of the outlet into which the lamp was plugged at
(20) the time the fire commenced?
(21) A. No.
(22) Q. I'm going to show you what has been
(23) marked Defendant's Exhibit H for identification.
(24) It's a contract dated August 2, 2001, with Command
(25) Force letterhead on the top. Have you ever seen

Page 139

(1)
(2) that before?

(3) A. Yes.
(4) Q. Let me simultaneously show you what has
(5) been marked I, a February 4, 2000, contract with
(6) Command Force letterhead on the top. Have you ever
(7) seen that before today?
(8) A. Yes.
(9) (Whereupon, the aforementioned contract
(10) was marked as Defendant's Exhibit I for
(11) identification as of this date by the Reporter.)
(12) Q. Are these 2 contracts that you were
(13) referring to before?
(14) A. Yes.
(15) Q. These are the 2 contracts that you
(16) referred to in your interrogatories responses?
(17) A. Yes.
(18) Q. Looking at Exhibit I, first, which is
(19) February 4, 2001, does that refresh your
(20) recollection as to the system that was in place at
(21) the time the fire occurred on 7/23/01?
(22) A. Yes. That is my writing on the bottom.
(23) Q. It says original agreement encircled?
(24) A. That is correct.
(25) Q. Do you see the total security

Page 140

(1)
(2) investment of the 2,100?
(3) A. Yes.
(4) Q. Did you ask Mr. Heinz about this?
(5) A. No.
(6) Q. Did you ask Mr. Heinz if he designed
(7) part of this system or requested that the system be
(8) installed with certain features and functions?
(9) A. No.
(10) Q. Do you see from review of the items in
(11) this contract that there is both a burglary alarm
(12) and fire detection system? For example, you see
(13) one motion on downstairs level? Do you see that?
(14) A. Yes.
(15) Q. In your experience with property and
(16) homes, does that indicate to you or is it your
(17) understanding that that is a motion detector for a
(18) burglary system rather than a fire detection
(19) system?
(20) A. I can't comment on that.
(21) Q. Taking a look at Exhibit H, the August
(22) 2, 2001, document is after the fire, is that
(23) correct? 7/23/01 is the date of the fire?
(24) A. Yes.
(25) Q. Does that refresh your recollection as

Page 141

(1)
(2) to any new system being installed after the loss
(3) date?
(4) A. Yes.
(5) Q. Is that your handwriting at the bottom?
(6) A. Yes.
(7) Q. In paren?
(8) A. Yes.
(9) MR. MEZZACAPPA: Mark this as J for
(10) identification.

(11) (Whereupon, the aforementioned activity
(12) report was marked as Defendant's Exhibit J for
(13) identification as of this date by the
(14) Reporter.)
(15) Q. I'm going to show you now what has been
(16) marked Exhibit J for identification. It is a
(17) scriber activity report for the alarm installed at
(18) the insured's home on 7/23/01. Do you see that?
(19) A. Yes.
(20) Q. Have you seen it before today?
(21) A. I believe I have.
(22) Q. And does it indicate on Monday 7/23/01
(23) at 11:06, 19 seconds there was an indication of a
(24) fire at the premises?
(25) A. Yes.

Page 142

(1)
(2) Q. And do you see that the central station
(3) attempted to -- they left a message at 11:06 and 26
(4) seconds, which is 7 seconds after the initial alarm
(5) came in at that phone No. 203-834-9574?
(6) A. If that is what this represents, yes, I
(7) see it.
(8) Q. And then several other calls were made
(9) including to the fire department and to Mr. Heinz
(10) at work, is that correct?
(11) A. If that is what that represents, yes.
(12) Q. When you were talking to Mr. Heinz, do
(13) you ever recall him saying, when he got the call,
(14) he could not respond to his home because he was at
(15) work?
(16) A. I do recall that.
(17) Q. Do you know where he worked?
(18) A. The Bronx, Brooklyn.
(19) Q. If I tell you the Bronx in his own
(20) store, would that refresh your recollection?
(21) A. Yes.
(22) Q. And did Mr. Heinz tell you whether he
(23) called anyone else to respond to his house at the
(24) same time the fire department was going to get
(25) there?

Page 143

(1)
(2) A. I don't recall that.
(3) Q. Did Mr. Heinz ever tell you where his
(4) wife was at the time of the fire?
(5) A. I believe both in the city.
(6) Q. Do you believe she worked with him at
(7) their own stores?
(8) A. I believe so.
(9) Q. Do you have any recollection of when
(10) the Heinz first moved into the house?
(11) A. No.
(12) MR. MEZZACAPPA: Let's mark this as
(13) Defendant's Exhibit K for identification.
(14) (Whereupon, the aforementioned letter
(15) November 12 was marked as Defendant's Exhibit
(16) K for identification as of this date by the
(17) Reporter.)
(18) Q. Let me show you what has been marked as

(19) Exhibit K for identification, 3-page document, 3
(20) pages to the exhibit, I should say. The first is a
(21) letter dated November 12, to you from Nutmeg
(22) adjusters, specifically Richard wrote – this is
(23) the letter, and the sworn statement and proof of
(24) loss. Third page appears to be an envelope that
(25) the November 12 letter came in. Do you have that

Page 144

(1)
(2) in front of you?
(3)  A.  Yes.
(4)  Q.  Did you ever seen it before?
(5)  A.  Yes.
(6)  Q.  This represents?
(7)  A.  The proof of loss for the contents.
(8)  Q.  Who prepared that proof of loss?
(9)  A.  Nutmeg adjusters.
(10) Q.  That is the homeowners's adjustment
(11) company; is that correct?
(12) A.  That is correct.
(13) Q.  Was it standard for them to prepare
(14) something like that for you?
(15) A.  Yes, it is.
(16) Q.  What is the proof of loss, does this
(17) one represent?
(18) A.  It basically represents that in our
(19) agreed figure on the contents and basic policy
(20) information and the insured didn't cause the fire.
(21) Q.  And where does it say the insured
(22) didn't cause the fire?
(23) A.  Below 148 figure.
(24) Q.  You are looking at Page 2, the sworn
(25) statement?

Page 145

(1)
(2)  A.  Yes, three-quarters of the way down,
(3) the said loss did not originate by the act on the
(4) part of the insured.
(5)  Q.  That rules out intentional conduct; is
(6) that correct?
(7)  A.  I don't have that answer.
(8)  Q.  Who would have filled in that section
(9) of this?
(10) A.  This is typically standard for proof of
(11) loss, that is what it says.
(12) Q.  Was this amount 188,198.48 the proof of
(13) loss for the contents of the home?
(14) MR. MASCARO:  Just answer the question
(15) about the document.
(16) A.  The question, again.
(17) Q.  Was this proof of loss related only to
(18) the contents?
(19) A.  Yes.
(20) Q.  Is this a separate proof of loss, is
(21) not there for the structure?
(22) A.  There should be.
(23) Q.  The top right corner indicates BG
(24) Group, Inc. out of Plainview, New York as the
(25) agent. Is that the broker that placed the

Page 146

(1)
(2) insurance?
(3)  A.  Either the broker or the agent.
(4)  Q.  This proof of loss statement is
(5) prepared by Nutmeg after you agreed with them on
(6) the contents, is that accurate?
(7)  A.  This form, yes.
(8)  Q.  So, this is towards the end right
(9) before payment is made?
(10) A.  That is correct.
(11) Q.  It indicates a $40,000 advance payment
(12) was given to the Heinz at some point?
(13) A.  That is correct.
(14) Q.  I think you explained to me before that
(15) was for their living expenses while they were out
(16) of the house, while it was being repaired?
(17) A.  Yes.
(18) Q.  How does one arrive at the figure of
(19) $40,000, is that a certain percentage of the
(20) contents?
(21) A.  No. Depending on the severity of the
(22) loss, the amount of the family, their financial
(23) needs.
(24) Q.  Do they have to give you an accounting
(25) of how they spend that money?

Page 147

(1)
(2)  A.  Yes.
(3)  Q.  How do you spend that money in this
(4) case?
(5)  A.  I don't recall.
(6)  Q.  The additional living expenses that
(7) you've mentioned before under the policy, what are
(8) the insurers allowed to do with that kind of money,
(9) in other words, can they get cable TV, cell phones,
(10) you know, is there a line drawn somewhere in terms
(11) of how much money someone can spend when they are
(12) out of their house and the insurance companies
(13) paying?
(14) A.  Normal life-style expenditures, in
(15) other words, if they have got a 4 bedroom home, we
(16) would reimburse them for a 4 bedroom home, not 8
(17) bedroom home.
(18) Q.  What about cable TV, you'll pay?
(19) A.  If it's an additional cost, yes.
(20) Q.  Is that only if they had cable TV at
(21) the other home?
(22) A.  That is correct.
(23) Q.  Did Nutmeg provide you with a breakdown
(24) of the contents loss as they found them?
(25) A.  I don't recall.

Page 148

(1)
(2) MR. MEZZACAPPA:  Mark this as the
(3) Defendant's Exhibit L for identification.
(4) (Whereupon, the aforementioned proof of
(5) loss statement was marked as Defendant's
(6) Exhibit L for identification as of this date
(7) by the Reporter.)
(8)  Q.  I'm going to show you what has been