(9) marked as Exhibit L 3-page document similar to the
(10) other proof of loss statement, a letter dated
(11) October 16 to you from Mr. Richard Alouette. The
(12) second document is a statement as to the full cost
(13) of repair or replacement under the replacement cost
(14) coverage, and the last page is an envelope. Take a
(15) look at that. Have you seen that before today?
(16)    A.   Yes.
(17)    Q.   That letter thanks you for sending a
(18) check in the amount of $661,000 plus and also
(19) indicates that they gave you a statement as to the
(20) full cost of the repair or replacement. Indicating
(21) the insured's intent to make a claim, you withheld
(22) the 65 plus; is that correct?
(23)    A.   That is correct.
(24)    Q.   The document that is attached as page
(25) 2, what is that?

Page 149

(2)    A.   Placement cost, proof of loss for the
(3) building portion of the loss.
(4)    Q.   On the Paragraph 2 No. 2 full
(5) replacement cost indicates undetermined, what do
(6) you mean?
(7)    A.   That means he did not determine the
(8) replacement cost of the dwelling.
(9)    Q.   Why?
(10)    A.   I don't know.
(11)    Q.   Is the amount that you pay out on the
(12) policy determinative of the replacement cost, in
(13) other words, don't you need to know what the
(14) replacement cost is in order to make a payment
(15) under the policy?
(16)    A.   Replacement cost for the dwelling or
(17) the repair cost?
(18)    Q.   I don't know. What do you make your
(19) determination on in order to pay moneys under the
(20) policy in terms of the structure?
(21)    A.   The question, again, please.
(22)    Q.   How do you determine how much money to
(23) pay an insured like the Heinz – I'm not asking
(24) generality – in this case, how did you determine
(25) how much to pay them, based on Nutmeg's figures?

Page 150

(2)    A.   As far as the building, based on our
(3) builder's figures.
(4)    Q.   It was not based on Nutmeg's figures?
(5)    A.   No.
(6)    Q.   Did Nutmeg come up with figures?
(7)    A.   Yes.
(8)    Q.   What figures did they come up with?
(9)    A.   I don't recall.
(10)    Q.   Did this document that is in front of
(11) you demonstrate what figures they came up with?
(12)    A.   No.
(13)    Q.   So, the figures you came up with which
(14) is the $727,000 to replacement cost, was that based
(15) on Mr. Klein's estimate of that; is that correct?
(16)    A.   That is correct.

(17)    Q.   We discussed that before?
(18)    A.   Correct.
(19)    Q.   In terms of the contents of it, were
(20) they based on Miss Wendy French's evaluation?
(21)    A.   Correct.
(22)    Q.   What is it based on, anything else?
(23)    A.   I don't think so.
(24)    Q.   Did Nutmeg's adjuster do any other
(25) adjustment or estimating for the loss to the

Page 151

(2) contents?
(3)    A.   I don't recall.
(4)    Q.   How much was paid to the Heinz as a
(5) result of the contents loss?
(6)    MR. MASCARO:   Do you need to refer to a
(7) document?
(8)    THE WITNESS:   Yes.
(9)    MR. MASCARO:   You can use D, B.
(10)    A.   $188,000. They also would have paid
(11) some – incidentally, could have been paid some
(12) other figures. But I have to look at my draft
(13) sheets.
(14)    Q.   Do you know how it is that you arrived
(15) at that number to pay them?
(16)    A.   Yes.
(17)    Q.   Tell me.
(18)    A.   Off the sheets you have in your hands,
(19) I believe.
(20)    MR. MEZZACAPPA:   I'll mark them. I'm
(21) going show you 5 pages, the tops of which
(22) indicates November 8, 2001, Encompass
(23) Insurance. It's a fax. It indicates Page 1
(24) of 4, 2 of 4 etcetera. The 5th page I'm
(25) showing to you seems like a printout from a

Page 152

(2) calculator that relates to the documents. So
(3) altogether, we'll call them the worksheets
(4) that you just referred to. Mark them
(5) collectively as 5 pages as one exhibit.
(6)    (Whereupon, the aforementioned
(7) worksheets was marked as Defendant's Exhibit M for
(8) identification as of this date by the Reporter.)
(9)    Q.   Let's start with Exhibit M, the 5 pages
(10) I defined for you. Are those the worksheets that
(11) you just referred to?
(12)    A.   Yes.
(13)    Q.   Do you know who prepared those?
(14)    A.   The writing is mine. Everything else,
(15) Wendy French.
(16)    Q.   Wendy French was an employee of your
(17) insurance company, correct?
(18)    A.   Correct.
(19)    Q.   Did she explain those sheets to you?
(20) The first one which indicates one of 4 on the top
(21) fax cover sheet, what is that?
(22)    A.   These are just recaps.
(23)    Q.   Of what?
(24)    A.   Probably 40, 50 pages of individual

(25) items.

### Page 153

(1)
(2) Q. Is that based in your experience with
(3) Miss French on a room by room calculation of what
(4) was damaged in the fire?
(5) A. That is correct.
(6) Q. Before, you told me there was extensive
(7) smoke damage in the house?
(8) A. Correct.
(9) Q. Did that account for most of the damage
(10) versus things that were damaged by the fire itself?
(11) A. I would say so, yes.
(12) Q. Do you know when in the sequence of the
(13) fire that the smoke damage took place?
(14) A. No.
(15) Q. What percentage or part of the actual
(16) house or structure was demolished by fire from in
(17) your experience from viewing it on the 2 or 3
(18) occasions you went there?
(19) A. What do you mean?
(20) Q. In other words, what number of rooms or
(21) what percentage of the actual dwelling was
(22) completely unusable as a result of the flame that
(23) occurred during the fire? Was there a whole room
(24) completely gutted?
(25) A. Yes, downstairs was pretty well

### Page 154

(1)
(2) gutted. In addition, well, downstairs, the one
(3) room where the fire originated, gutted, down the
(4) hall, a lot of heat downstairs and smoke, upstairs
(5) a lot of smoke, and the fire exited out the bedroom
(6) and burned up the side of the house, too.
(7) Q. Other than the room of fire origin and
(8) the exterior where the flame left the room of fire
(9) origin and burned on the exterior of the house, was
(10) there any other room in the house that was damaged
(11) by flame?
(12) A. Downstairs there was a lot of flame and
(13) heat damage in addition to the smoke.
(14) Q. In addition to the room of fire origin,
(15) what else was downstairs?
(16) A. The laundry room, a game room, a pool
(17) room, utility room.
(18) Q. Out of all of those rooms in addition
(19) to the room of fire origin, which were damaged by
(20) the flame or the heat from the flame?
(21) A. I would consider the complete basement,
(22) finished basement.
(23) Q. The second floor, was that the highest
(24) floor in that premises at that time?
(25) A. Yes.

### Page 155

(1)
(2) Q. How many rooms were damaged by the
(3) flame, if any?
(4) A. I think master bedroom the fire climbed
(5) up that wall, and then the rest of the house just
(6) smoke heavy smoke.
(7) Q. The kitchen, for example, had heavy
(8) smoke damage but no claim of damage?
(9) A. Yes.
(10) Q. Did anyone go with Wendy French
(11) throughout the house to verify or check her figures
(12) of what was damaged?
(13) A. Probably.
(14) Q. Is there any differentiation made by
(15) you or your company as to damage from smoke versus
(16) damage from flames when it comes to replacement
(17) cost on the contents?
(18) A. If it's smoke damage, sometimes things
(19) are cleanable, sometimes they are not.
(20) Q. Was there anything like closets that
(21) your company attempted to clean or have a salvage
(22) company attempt to buy used while you were
(23) adjusting this loss?
(24) A. A cleaning firm goes in.
(25) Q. Who was the firm?

### Page 156

(1)
(2) A. Crystal Restoration.
(3) Q. Did Crystal Restoration indicate that
(4) they could clean some of the contents?
(5) A. I believe some.
(6) Q. Do you know what amount they were able
(7) to salvage or clean or claim that they could
(8) salvage?
(9) A. Not much in the big picture of things.
(10) Q. Do you remember a dollar amount?
(11) A. No.
(12) Q. Do any of the documents that I've shown
(13) you so far indicate the dollar amount that the
(14) cleaners came up with?
(15) A. No.
(16) MR. MEZZACAPPA: Let's mark this as the
(17) next exhibit, Exhibit N for identification.
(18) (Whereupon, the aforementioned proof of
(19) loss statement was marked as Defendant's
(20) Exhibit N for identification as of this date
(21) by the Reporter.)
(22) Q. Look at Exhibit N, a 3-page document
(23) which I believe starts out with a letter of October
(24) 16, 2001. It's a proof of loss statement there for
(25) the building or the structure, is that accurate?

### Page 157

(1)
(2) A. Yes.
(3) Q. Is that the one that has a $727,000
(4) figure?
(5) A. Yes.
(6) Q. The agreed upon amount?
(7) A. Yes, it was.
(8) Q. So, in total, the damages in this case
(9) that Encompass paid to the homeowners are from the
(10) 2 statements or proofs of loss are how much? How
(11) much in contents and how much on the structure were
(12) actually paid at the end of the day?
(13) A. I would have to check my records,
(14) again.

(15) Q. What records would you need to check?
(16) A. My draft disbursements.
(17) Q. Where would this be?
(18) A. In the pile of documents, if at all.
(19) Q. Better question have you given those
(20) draft disbursements or canceled checks?
(21) MR. MASCARO: I believe that they were.
(22) Q. From the documents in front of you, are
(23) you able to tell me the overall amount that was
(24) paid on this loss?
(25) A. The whole thing exact?

Page 158

(1)
(2) Q. Yes.
(3) A. No. There were additional living
(4) expenses that were paid. We may have paid some
(5) vendors. And we may have paid for board-up.
(6) Q. Do you have an estimate or a close
(7) approximation of what it was?
(8) MR. MASCARO: Off the record.
(9) (Off the record.)
(10) MR. MEZZACAPPA: Let's mark this as O
(11) for identification.
(12) (Whereupon, the aforementioned letter
(13) from Nutmeg Adjusters was marked as
(14) Defendant's Exhibit O for identification as of
(15) this date by the Reporter.)
(16) Q. I'm going to show you what has been
(17) marked as Exhibit O for identification. It's an
(18) one page letter from Nutmeg Adjusters indicating a
(19) contents statement of loss.
(20) A. Yes.
(21) Q. Do you know what that is?
(22) A. This could be their claim.
(23) Q. So, essentially, Nutmeg made a claim of
(24) $251,000 plus for the contents loss, correct?
(25) A. That is the way it appears.

Page 159

(1)
(2) Q. You paid approximately $188,000 plus?
(3) A. Yes.
(4) Q. On that?
(5) A. Yes.
(6) Q. And was that an agreed upon amount
(7) before it was paid, the 188 plus?
(8) A. Yes.
(9) Q. In other words, before you paid it, the
(10) Heinz had to agree on that figure?
(11) A. Yes.
(12) MR. MEZZACAPPA: Mark this as P for
(13) identification.
(14) (Whereupon, the aforementioned letter
(15) dated September 24, 2001 was marked as
(16) Defendant's Exhibit P for identification as of
(17) this date by the Reporter.)
(18) Q. I'm going to show you what has been
(19) marked Exhibit P for identification. Do you
(20) remember receiving the September of 24, 2001,
(21) letter from Nutmeg Adjusters by Richard Alouette
(22) enclosing a complete breakdown of the building

(23) estimate for the structure?
(24) A. I really don't recall, but.
(25) Q. From review of it now, which is a

Page 160

(1)
(2) letter, 2-page letter and a 19-page document
(3) attached to it, does it refresh your recollection
(4) that the homeowners Heinz through the Nutmeg
(5) Adjusters were making a claim for $1,184,660.20 to
(6) replace the structure?
(7) A. Yes, that was their claim for repairs
(8) or replacement.
(9) Q. Just for the structure; is that
(10) correct?
(11) A. Yes.
(12) Q. Not the contents?
(13) A. No.
(14) Q. That at some point, you agreed on a
(15) lesser value which we have been discussing today
(16) approximately $727,000 plus?
(17) A. Correct.
(18) Q. And that your figure is based on your
(19) -- your decision to pay was based on
(20) Mr. Re-estimated's estimate rather than the one
(21) that Nutmeg adjusters gave, correct?
(22) A. Completely correct.
(23) Q. Take a look at what we will mark this
(24) CNA underwriting supplement as Q for
(25) identification.

Page 161

(1)
(2) (Whereupon, the aforementioned
(3) underwriting supplement was marked as Defendant's
(4) Exhibit Q for identification as of this date by the
(5) Reporter.)
(6) MR. MEZZACAPPA: 10-page document
(7) missing Page 1, what appears to be part of the
(8) underwriting file.
(9) Q. Sir, I show you what has been marked as
(10) Defendant's Exhibit Q for identification. Is it
(11) fair to say that this is part of the underwriting
(12) file for this home?
(13) A. Yes.
(14) Q. The second page of the document which
(15) is the first page that I hand to you, labeled as
(16) Page 2, we don't have Page 1 -- let me just on the
(17) record make a formal request for Page 1 of the
(18) document where it might be a fax cover sheet. In
(19) what year was this built?
(20) A. Yes.
(21) Q. 1990?
(22) A. Yes.
(23) Q. Does that refresh your recollection as
(24) to when this house was built?
(25) A. Not really.

Page 162

(1)
(2) Q. Do you see effective date 7/3/99?
(3) A. Yes.
(4) Q. On the policy information?

(5) A. Yes.
(6) Q. That is when the first policy was
(7) issued by your company to the Heinz?
(8) A. I don't have that answer.
(9) Q. What is at the top, Millennium
(10) Information Services, Inc. who is that?
(11) A. I don't know.
(12) Q. Turn to the next page labeled Page 3
(13) CNA underwriting supplement, do you see that?
(14) A. That.
(15) Q. Do you see inspection date upper left
(16) hand corner?
(17) A. Yes.
(18) Q. 10/22/99?
(19) A. Yes.
(20) Q. Someone physically went to inspect this
(21) home?
(22) A. I can't comment on that.
(23) Q. At the time that this was done in 1999,
(24) was there any relationship between CNA and
(25) Encompass Insurance Company?

Page 163

(1)
(2) A. No. That was just – I don't believe
(3) so.
(4) Q. Could that be this form was just used
(5) as a form that was left around?
(6) A. It could be.
(7) Q. But it was Encompass Insurance Company
(8) that was doing the inspection of the home; is that
(9) correct, if there was one?
(10) A. I don't recall the actual date of any
(11) mention here about Encompass; if not, this could
(12) have been under CNA.
(13) Q. Let me back up further. I should have
(14) asked you at the very beginning of the deposition.
(15) Glens Falls Insurance Company, who is that?
(16) A. I believe they are one of the
(17) underwriting companies for Encompass. We have 10
(18) or 20 companies that we issue policies under.
(19) Q. So, Encompass adjusted the loss and
(20) made the payments, but the plaintiff in this suit
(21) is Glens Falls Insurance Company, you are an
(22) employee of Glens Falls Insurance Company, are you?
(23) A. I don't believe so, no.
(24) Q. Do you get issued a W-2 employee?
(25) A. Direct deposit. I'm employed by

Page 164

(1)
(2) Allstate, which owns Encompass, which owns Glens
(3) Falls and 15 other companies.
(4) Q. To your knowledge, Glens Falls
(5) Insurance Company, the plaintiff here, has some
(6) kind of business relationship with Encompass?
(7) A. Yes.
(8) Q. And with Allstate?
(9) A. Yes.
(10) Q. The checks that were paid out on this
(11) case to the Heinz, do you know who issued those
(12) checks?

(13) A. You mean what bank or what?
(14) Q. What insurance company?
(15) A. I don't know. I would have to – I
(16) know it sounds confusing. It's just confusing to
(17) me as it is to you.
(18) MR. MEZZACAPPA: Off the record.
(19) (Off the record.)
(20) Q. On the CNA form, do you see question
(21) 25, distance to a fire hydrant?
(22) A. Yes.
(23) Q. Do you see the word none?
(24) A. Yes.
(25) Q. Does that refresh your recollection

Page 165

(1)
(2) that there was no fire hydrant near this home?
(3) A. No.
(4) Q. Turn to the next page, Page 4, do you
(5) see the memo to Lynn re-estimated Smith at CNA
(6) Insurance from Edward Duffy?
(7) A. Yes.
(8) Q. Do you know who those people are?
(9) A. No.
(10) Q. Do you know what this memo is?
(11) A. It looks like a memo from the
(12) inspection company to the underwriter, just
(13) detailing special features of the house.
(14) Q. Inspection company is data Datalath
(15) Inspection Services?
(16) A. That could be. I don't know.
(17) Q. Does the insurance company typically
(18) hire outside inspection companies?
(19) A. I don't have that answer.
(20) Q. Turn to the next page, Page 52
(21) underwriting supplement, also to Lynn re-estimated
(22) Smith from Ed Duffy, policy number, dated of
(23) October 29, 1999. It speaks about – the first
(24) paragraph there is that the insureds plan to make a
(25) renovation to the house. Do you see that?

Page 166

(1)
(2) A. Yes.
(3) Q. Do you know whether the renovations
(4) were made?
(5) A. No.
(6) Q. Do you know if the underwriting
(7) department took an extra premium in advance for
(8) that?
(9) A. No.
(10) Q. Do you see on the next page under fire
(11) protection?
(12) A. Yes.
(13) Q. It says the house has only a local fire
(14) alarm, essentially monitored alarm system is
(15) recommended?
(16) A. Yes.
(17) Q. You said yes?
(18) A. Correct, yes, I see those sentences.
(19) Q. Do you see paragraph 15, both spouses
(20) work outside of the home?

(21) A. Yes.
(22) Q. The next page, Page 7 comes up with a
(23) combined total replacement, $560,267 replacement of
(24) the cost on the house?
(25) A. Yes.

Page 167

(1)
(2) Q. Is that –
(3) A. That is their estimate to replace the
(4) dwelling.
(5) Q. Does that factor into how much
(6) insurance the insurance company will be giving to a
(7) premises owner such as the Heinz?
(8) A. Probably.
(9) Q. This was the cost as of 8/19, according
(10) to the form?
(11) A. Yes.
(12) Q. Have you ever dealt with this inspector
(13) before?
(14) A. No, no.
(15) Q. Is this inspector employed by a company
(16) that is wholly owned by CNA, Glens Falls or
(17) Encompass?
(18) A. I don't have an answer for that.
(19) MR. MEZZACAPPA: Just for the record,
(20) it appears that we don't have a section of
(21) this called system updates because the other
(22) section refers to the attention of homeowners
(23) to make a renovation to the house, referred to
(24) the section called system updates. If that
(25) document exists in the underwriting file, we

Page 168

(1)
(2) are asking for that here.
(3) MR. MASCARO: If that exists, I don't
(4) have any objection to providing that.
(5) MR. MEZZACAPPA: Mark this as R.
(6) (Whereupon, the aforementioned policy
(7) was marked as Defendant's Exhibit R for
(8) identification as of this date by the
(9) Reporter.)
(10) Q. I'm going to show you now what has been
(11) marked as Exhibit R for identification. It's
(12) stapled together. There are some dec sheets on top
(13) of what appears to be an Encompass Insurance
(14) policy, is that correct?
(15) A. That is correct.
(16) Q. The dec sheet outlines vehicle coverage
(17) for several different vehicles?
(18) A. Yes.
(19) Q. And they also outline some property
(20) coverage; is that correct?
(21) A. Correct.
(22) Q. The property coverage starts on Page 3
(23) of this document 34 Wildwood Drive. It indicates a
(24) limit of 1.248 million dollars; is that correct?
(25) A. That is correct.

Page 169

(1)
(2) Q. The premium is $2,013.213?

(3) A. Correct, for the dwelling.
(4) Q. Is this a fair and accurate
(5) representation of the deluxe homeowner policy that
(6) the Heinz had applicable during the time of the
(7) fire for their residence that we have been
(8) discussing today?
(9) A. Yes.
(10) Q. Looking through this policy, is there
(11) an exclusion for damage caused by pets?
(12) A. Yes, probably.
(13) Q. I would like you to find that.
(14) A. Page 11 of 23, halfway through.
(15) Q. Go ahead. Page 11 of 23. Does that
(16) contain an exclusion for damage caused by animals?
(17) A. Question, again.
(18) Q. Does Page 11 of 23 of the insurance
(19) policy issued by Encompass to those homeowners
(20) include an exclusion which exclusion is to damage
(21) caused by animals?
(22) A. No.
(23) Q. Does the policy include an exclusion to
(24) damage by animals?
(25) A. Yes.

Page 170

(1)
(2) Q. Where is that found?
(3) A. Page 13.
(4) Q. Of 23?
(5) A. Yes.
(6) Q. And what paragraph is that?
(7) A. D 6.
(8) Q. Under D 6 it indicates birds, vermin,
(9) insects, rodents, or animals kept or owned by a
(10) covered person, covered person is highlighted. Was
(11) this cat determined to be an animal owned by the
(12) Heinz?
(13) A. Yes.
(14) Q. Are the Heinz covered persons under the
(15) policy?
(16) A. Yes.
(17) Q. Regarding this paragraph, did you ask
(18) an attorney or a law firm for a legal opinion as to
(19) how it applied to the facts of this case?
(20) A. I don't recall.
(21) Q. If you did, would there be a coverage
(22) opinion in your file contents?
(23) A. Possibly.
(24) MR. MEZZACAPPA: To the extent that I
(25) haven't already asked for that, I will ask for

Page 171

(1)
(2) that. I understand your response. I'll take
(3) it up in writing.
(4) MR. MASCARO: Same response, sure.
(5) Q. Did you discuss this with your
(6) supervisor?
(7) A. I believe we did.
(8) Q. At the time, you decided to make a
(9) payment under this policy?
(10) A. I believe we did discuss this prior to,

(11) earlier in the loss.
(12) Q. Was there a determination reduced to
(13) writing as a result of your discussion?
(14) A. I don't recall.
(15) Q. Do you recall the sum and substance of
(16) your discussion with your supervisor?
(17) A. If there was a discussion, it was not
(18) with the supervisor. It would have been with Mike
(19) Moeller.
(20) Q. Mike Moeller was who, again?
(21) A. Home office analyst.
(22) Q. So, you are not sure you had a
(23) discussion, but you if you did or – I don't want
(24) to mischaracterize, do you recall a discussion with
(25) Mike Moeller regarding this exclusion in this

Page 172

(1)
(2) policy?
(3) A. I believe we did discuss that.
(4) Q. Do you remember the sum and substance
(5) of the discussion? I don't want you to guess. If
(6) you do have a recollection of that, I want to know
(7) what it was.
(8) A. We determined the loss was covered.
(9) Q. What was that determination based on?
(10) A. The policy language.
(11) Q. What policy language are you
(12) indicating?
(13) A. Page 13 of 23.
(14) Q. Where on Page 13 of 23?
(15) A. Upper right-hand corner.
(16) MR. MASCARO: Second column.
(17) Q. Where it says under exclusion 2 A, B,
(18) C, D?
(19) A. Yes.
(20) Q. Ensuing loss from a covered peril to
(21) covered property not excluded or excepted in this
(22) policy. Ensuing is covered?
(23) A. That is correct.
(24) Q. Where does it, where in policy did they
(25) define ensuing loss, if they do?

Page 173

(1)
(2) A. If they do, under definitions.
(3) Q. Is it fair to say that the paragraph
(4) you determined with Mr. Moeller caused coverage to
(5) be effectuated as a result of this loss?
(6) A. That is correct.
(7) Q. To your knowledge, is there a
(8) definition of ensuing loss in this policy?
(9) A. It doesn't appear that way.
(10) Q. Are there any other definitions in that
(11) little paragraph that we read that we can refer to
(12) under exclusion, that is the question?
(13) A. It doesn't appear that way.
(14) Q. Did either Mr. Moeller – is
(15) Mr. Moeller an attorney?
(16) A. No.
(17) Q. Are you an attorney?
(18) A. No.

(19) Q. Did either you or Mr. Moeller go
(20) outside this policy and any legal treatise or
(21) anything of that nature in order to determine
(22) whether this was an, in your opinion, covered loss?
(23) A. I don't recall.
(24) Q. Is there anything else in the policy
(25) that you looked at to determine if this exclusion

Page 174

(1)
(2) did not apply, in your opinion?
(3) A. No.
(4) MR. MASCARO: Are you certain there was
(5) nothing else?
(6) A. As far as exclusion?
(7) MR. MEZZACAPPA: Yes. Note my
(8) objection.
(9) MR. MASCARO: I want to make sure you
(10) have a complete recollection of it.
(11) A. No.
(12) Q. Other than this policy that we're
(13) looking at here, were there any other policies
(14) issued by Encompass Insurance to these homeowners
(15) that applied to this fire?
(16) A. Not to my knowledge.
(17) Q. Were there any excess policies of
(18) insurance issued by Encompass to this homeowner?
(19) A. Not to my knowledge.
(20) MR. MEZZACAPPA: Mark this 3 page
(21) document entitled PH or payment history that
(22) was contained in the documents your attorney
(23) exchanged with us as S for identification.
(24) Q. You have that document Exhibit S in
(25) front of you?

Page 175

(1)
(2) A. Yes.
(3) Q. What does this payment history
(4) represent?
(5) A. This is a printout from my computer
(6) indicating drafts issued and amounts and dates of
(7) issue.
(8) Q. Relevant to this loss, correct?
(9) A. Completely to this loss, that is
(10) correct.
(11) Q. We see line No. 1 on the first page, a
(12) check in the amount of 6375 to Schleiffer
(13) Associates; is that correct?
(14) A. Correct.
(15) Q. Does that represent that they were paid
(16) $6,375 for their work in estimating the structure
(17) damage?
(18) A. Correct.
(19) Q. And underneath that TJ Klem Associates,
(20) the fire investigators were issued, according to
(21) these 3 pages, different checks, one in the amount
(22) of 4,163.70; and on Page 3 a check in the amount of
(23) $120; is that correct?
(24) A. Yes.
(25) Q. And do you see the check in the amount

Page 176

(1)
(2) of $120 indicating storage?
(3)  A.  Yes.
(4)  Q.  Dash Heinz loss?
(5)  A.  Yes.
(6)  Q.  Do you know what that refers to?
(7)  A.  Apparently he got something in storage.
(8)  Q.  A lamp?
(9)  A.  I don't know, I don't recall.
(10)  Q.  And he was paid on Page 14 $1,163.70
(11) for his work in the preparation of the reports that
(12) we went through before?
(13)  A.  Yes.
(14)  Q.  And the other – sticking with the
(15) first page Harold and Lauren Heinz were paid
(16) $40,000 as a contents advance, correct?
(17)  A.  Yes.
(18)  Q.  Then on Page 2, they were paid $25,000
(19) as a contents advance, correct?
(20)  A.  It says contents advance but actually
(21) paid under additional living expenses, ALE advance
(22) as far as bookkeeping goes.
(23)  Q.  Which portion of the policy paid out on
(24) that? Is it the contents portion of the policy?
(25)  A.  No. Like a separate.

Page 177
(1)
(2)  Q.  That is the one that's up to 25 percent
(3) of the value?
(4)  A.  Yes.
(5)  Q.  Above and beyond the 1.248 million
(6) dollar policy limit?
(7)  A.  Yes.
(8)  Q.  Separate and distinct, if they had a
(9) loss of 1.248 million, you had to pay additional
(10) living expenses, insurance had ended up paying out
(11) more than the estimated policy?
(12)  A.  That is correct.
(13)  Q.  Was that the only additional living
(14) expense that was paid out? Actually there is
(15) another one on the third page, ALE advance another
(16) $25,000 check.
(17)  A.  January 31 and July.
(18)  Q.  2 different payments?
(19)  A.  2 different advances.
(20)  Q.  $25,000 in ALE, correct?
(21)  A.  That is correct.
(22)  Q.  Then there was $148,000 plus with fire
(23) damage to contents and $661,000 plus in fire damage
(24) to dwelling?
(25)  A.  Correct.

Page 178
(1)
(2)  Q.  Is this a fair and accurate
(3) representation of all of the checks paid to the
(4) Heinz in total on this loss?
(5)  A.  I think it should be.
(6)  Q.  So, that if we add up each check that
(7) is delineated over the 3 pages, we'll know what the
(8) actual damages were to Encompass as a result of
(9) this fire?
(10)  A.  That is correct, including expenses.
(11)  Q.  When you are including expenses, what
(12) do you mean?
(13)  A.  Adjustment expenses, billing, estimated
(14) fees. We have to add up the checks to the other
(15) companies here like advance remodeling and
(16) restoration, board up, abstract associates, title
(17) search. Top 2 lines, their expenses, they are not
(18) payments to the insureds. 25, that is payment to
(19) the insured. The top 2 of the last page are
(20) expenses.
(21)  Q.  Who is Dawson Engineering, Inc.?
(22)  A.  Engineering firm, I think electrical
(23) engineers.
(24)  Q.  Is that an expert in this case for
(25) purposes of this litigation?

Page 179
(1)
(2)  A.  I believe it is.
(3)  Q.  So, these 3 pages delineate the amounts
(4) of money that Encompass spent, either expenses or
(5) actual payments to the homeowners as a result of
(6) this fire?
(7)  A.  That is correct.
(8)  Q.  Are there any other pages in addition
(9) to these pages?
(10)  A.  I don't think there are.
(11)  MR. MASCARO:  If they are any other
(12) pages that haven't been produced, we'll
(13) produce them.
(14)  MR. MEZZACAPPA:  Okay. Thank you.
(15) Let's mark this as the next exhibit, Exhibit T
(16) for identification.
(17)  (Whereupon, the aforementioned notes
(18) was marked as Defendant's Exhibit T for
(19) identification as of this date by the
(20) Reporter.)
(21)  Q.  I'm going to show you now several loose
(22) pages making up Exhibit T, 5, clip them together.
(23) Are these documents prepared by you, sir?
(24)  A.  Yes.
(25)  Q.  What do they represent?

Page 180
(1)
(2)  A.  They look like notes about – they are
(3) just I guess rough notes of, I don't know, to be
(4) honest. They are notes probably from a meeting.
(5) It looks like the second page, that is a scope of
(6) damage. Maybe the PA was looking for these
(7) additional damages.
(8)  Q.  On the second page, do you see another
(9) 100 K, question mark?
(10)  A.  Yes.
(11)  Q.  What do you mean by that?
(12)  A.  I don't recall.
(13)  Q.  Do you see on the 4th page at the
(14) bottom under the drawing it says deck house, do you
(15) know what you mean by that 4th page?
(16)  A.  Yes, a portion of that house was a

(17) prefab deck house kit or something, a manufactured
(18) Acorn type of house, portion of that dwelling was a
(19) deck house.
(20)  Q. Was that the new renovation, to your
(21) knowledge?
(22)  A. I believe this was the new renovation,
(23) because we had a pamphlet from them.
(24)  Q. Did your company pay for the demolition
(25) of the existing structure?

Page 181

(1)
(2)  A. Include – there would have been a
(3) demolition, the 727 – to answer your question, we
(4) paid for demolition of like kind and like quality.
(5)  Q. How much did you pay for the demo?
(6)  A. I have to see the estimate.
(7)  Q. Where?
(8)  A. Re-estimated.
(9)  Q. Same folder?
(10)  A. The 727 Schleiffer Associates packet.
(11) We have a 2 pager there with my trade recap
(12) Schleiffer cover letter.
(13)  Q. Did you pay for the demolition of the
(14) existing structure after the fire? How much do you
(15) think you indicated – I was trying to figure out
(16) –
(17)  A. 59 plus, 10 percent.
(18)  Q. $59,000?
(19)  A. Plus 10, plus 10 percent, plus 10
(20) percent.
(21)  Q. $59,000, plus 10 percent of $59,000?
(22)  A. Correct.
(23)  Q. Then plus 10 percent of 59?
(24)  A. 10 and 10.
(25)  Q. How did you arrive at that figure?

Page 182

(1)
(2)  A. That was Schleiffer's estimate.
(3)  Q. In the policy?
(4)  A. Demolition of the –
(5)  Q. In the policy, when they say
(6) demolition, what are they talking about, demolition
(7) of the burned structure or demolition of the entire
(8) house so they can build a new house?
(9)  A. This figure represents demolition and
(10) rebuilding the house, this figure is.
(11)  Q. $59,000 plus 10, plus 10?
(12)  A. Yes.
(13)  Q. The demo?
(14)  A. And rebuild as is.
(15)  Q. Of the existing structure?
(16)  A. Yes.
(17)  Q. Was the house rebuilt as pre-loss?
(18)  A. No.
(19)  Q. You still paid for something that
(20) doesn't happen; is that correct?
(21)  A. You are going back to this?
(22)  Q. I'm just asking a question now.
(23)  A. Contractual.
(24)  Q. Just demolition. You paid $59,000 plus
(25) 10 plus 10 percent, which comes to $60,000

Page 183

(1)
(2) something, correct?
(3)  A. Correct.
(4)  Q. More than – close to 70?
(5)  A. Correct.
(6)  Q. To demolish what was there and rebuild
(7) what was there to the existing structure on
(8) 7/22/01, the day before the fire?
(9)  A. Correct.
(10)  Q. That was never rebuilt in that same
(11) manner, correct?
(12)  A. Correct.
(13)  Q. What was rebuilt was significantly more
(14) and different than had existed on 7/22/01, the day
(15) before the fire, right?
(16)  A. Still a one-family dwelling.
(17)  Q. But it was significantly different.
(18) We'll get to the pictures. Did you go back to the
(19) Heinz and discount for that later or ask for some
(20) of the money back?
(21)  A. No. I'm contractually bound by the
(22) insurance contract.
(23)  Q. Where in the insurance contract does it
(24) say that you have to pay for something that is not
(25) rebuild in like kind and like structure?

Page 184

(1)
(2)  A. Where did does it not say it?
(3)  Q. That is not my question. Where in the
(4) insurance contract does it say that you're
(5) contractually bound – I have to go back to the
(6) original question, the one –
(7)  MR. MASCARO: Objection to the form to
(8) attorney Mezzacappa's question.
(9)  MR. MEZZACAPPA: I will stand on the
(10) form. He answered my question with a
(11) question. If he wants to stand on that
(12) answer, he can. I'll move on. I still have a
(13) question, not really an answer.
(14)  MR. MASCARO: I thought he said he's
(15) contractually bound by the contract.
(16)  MR. MEZZACAPPA: I said where in the
(17) contract.
(18)  Q. She can read it back.
(19)  MR. MASCARO: I objected to the form of
(20) that question because he didn't use a specific
(21) – he didn't use a specific phrase in the
(22) contract.
(23)  MR. MEZZACAPPA: He said contractually
(24) bound. I said where in the contract. And
(25) that was the question. He asked me a question

Page 185

(1)
(2) before.
(3)  MR. MASCARO: I understand. I object
(4) to the form.
(5)  A. I would have to look at the policy for
(6) the answer.

(7) Q. Okay, please do.
(8) A. Could I have the question, again?
(9) Q. Basically without driving her nuts to
(10) find this, where in the contract does it say you
(11) are contractually bound to?
(12) MR. MASCARO: Objection to the form.
(13) A. Limited liability Page 3 and 4 of 23.
(14) Q. What does it say?
(15) A. Payment will not exceed a smallest of
(16) recap for you -- the cost to repair to its
(17) condition prior to the loss, the actual cost to
(18) repair the real property or the aggregate limit
(19) shown in the dec page. Further goes on to state
(20) that we pay no more than the actual cash value
(21) until the repair or replacement is complete.
(22) Q. There was no actual repair of the
(23) existing structure here, correct?
(24) A. No. They took -- there was going to be
(25) a repair, but they opted to go with the larger

Page 186
(1)
(2) house, take the existing structure down.
(3) Q. Was there any damage to the real
(4) property here, to the land as a result of this
(5) fire?
(6) A. Maybe some trees and shrubs.
(7) Q. Were they calculated into any of the
(8) payments that we saw?
(9) A. I don't believe they were.
(10) Q. Sir, I'm going to show you what has
(11) been marked as Defendant's Exhibit U through double
(12) GG, a series of photographs apparently taken by the
(13) Schleiffer Associates. Could you please take a
(14) look at them and tell me if you've seen them before
(15) today?
(16) A. Yes, I have.
(17) (Whereupon, the aforementioned photos
(18) was marked as Defendant's Exhibit U thru GG for
(19) identification as of this date by the Reporter.)
(20) Q. And were you present when those
(21) photographs were taken by Mr. Re-estimated or
(22) someone on behalf of Schleiffer?
(23) A. I don't recall.
(24) Q. Do those photographs represent a fair
(25) and accurate representation of the damage to the

Page 187
(1)
(2) exterior and the interior the home 34 Wildwood
(3) Avenue?
(4) A. Yes, they do.
(5) Q. From looking at these photographers,
(6) can you tell me which part of the house was the
(7) addition?
(8) A. That we have been discussing today?
(9) Q. If it's depicted here.
(10) A. I believe it was this portion here.
(11) That is the garage in a room above it or something.
(12) Q. Indicating on Exhibit U the bottom
(13) photograph of the 2, do you see in that photograph
(14) the Anderson stickers on the windows?

(15) A. Yes.
(16) Q. Does that refresh your recollection
(17) that that renovation was not completed and or being
(18) lived in as of 7/23/01? Does that help refresh
(19) your recollection?
(20) A. Not really.
(21) Q. Do you have a recollection that that
(22) room depicted in the bottom photograph of Exhibit U
(23) was occupied or furnished or fully furnished in any
(24) way?
(25) A. I think it was just a loft above the

Page 188
(1)
(2) garage, as I recall.
(3) Q. Was it furnished?
(4) A. I don't recall.
(5) Q. Do you know whether this addition was
(6) put onto this house prior to the fire?
(7) A. I don't recall the exact date.
(8) Q. Do you know if it was before or after
(9) my client installed the alarm prior to the fire?
(10) A. I don't know.
(11) Q. Look at Exhibit V. Does the bottom
(12) photograph also show that loft above the garage?
(13) A. Yes.
(14) Q. Was it your understanding that the
(15) garage was preexisting and just the loft above was
(16) added?
(17) A. I don't recall.
(18) Q. Looking at the photographs Exhibits DD,
(19) EE, FF, which depict I believe the kitchen, can you
(20) tell me if there were any plans to refurbish or
(21) clean those wooden cabinets which are merely smoke
(22) damaged when you came up with the calculations?
(23) A. The question again, please.
(24) Q. Looking at those photographs, would you
(25) agree that the damage in the kitchen to the

Page 189
(1)
(2) cabinets is smoke related only?
(3) A. Yes.
(4) Q. When you calculated your damages with
(5) the kitchen cabinet, would they go under the
(6) structure or go under the contents?
(7) A. The structure.
(8) Q. Under the structure portion of the
(9) damages outlined by Mr. Re-estimated and accepted
(10) by you, was the damage to the cabinets viewed as
(11) needing to be completely replaced or could those
(12) cabinets have been refurbished or cleaned in some
(13) manner?
(14) A. I would have to check but replaced them
(15) due to the smoke.
(16) Q. Are there companies that would refinish
(17) or put new doors and wood veneer on the exterior of
(18) those cabinets?
(19) A. Sure.
(20) Q. Do you see from looking at the pictures
(21) where they show the cereal box, it appears that the
(22) inside contents don't appear to be smoke damaged.

Page 190

(23) A. You could say that as an attorney
(24) sitting here, but you didn't see this loss.
(25) Q. I'm asking you the question, you can't,

Page 190

(1)
(2) with all due respect, you can't answer my questions
(3) with questions.
(4) A. What is the question?
(5) MR. MASCARO: Make sure that the
(6) photograph --
(7) Q. Looking at Exhibit FF, okay, do you see
(8) the interior of what appears to be a pantry in the
(9) kitchen?
(10) A. Yes, I do.
(11) Q. Do you see the shelves in there?
(12) A. Yes.
(13) Q. Do you have a recollection of them
(14) being burned in any manner?
(15) A. No recollection.
(16) Q. Do you have a recollection of them
(17) being smoke damaged in any manner?
(18) A. Yes.
(19) Q. What is your recollection?
(20) A. There was heavy smoke throughout the
(21) whole house.
(22) Q. Was there heavy smoke on the interior
(23) of this cabinet?
(24) A. I don't recall.
(25) Q. Can you see that there is a Crispix box

Page 191

(1)
(2) of cereal on the bottom shelf?
(3) A. Yes.
(4) Q. You read that?
(5) A. Yes.
(6) Q. Does there appear to be smoke damage to
(7) that box of cereal?
(8) A. I can't tell from the photo.
(9) Q. Do you see the popcorn?
(10) A. Yes.
(11) Q. Do you Cheesits on the top shelf?
(12) A. Yes.
(13) Q. Do you see the box of Macaroni?
(14) A. Yes.
(15) Q. You can make out the labeling?
(16) A. Yes.
(17) Q. That is not blackened by smoke in this
(18) picture?
(19) A. You can't tell.
(20) Q. You can't tell if they are blackened by
(21) smoke?
(22) A. Not from this picture, no.
(23) Q. If it's blackened by smoke, you
(24) wouldn't be able to read the words?
(25) A. Not really. Also odor involved, too?

Page 192

(1)
(2) MR. MEZZACAPPA: Move to strike.
(3) Q. Was Mr. Re-estimated, to your
(4) knowledge, instructed to obtain any persons who
(5) would refurbish kitchen cabinets and the things we
(6) see in Exhibit DD, Exibit EE and FF rather than
(7) replacing them but repairing and cleaning them?
(8) A. I believe we discussed it, but we
(9) thought, due to the extent of the smoke and the
(10) odor, that we were throwing good money after bad.
(11) Q. Again, you don't know at what point in
(12) the fire from the point of origin until the point
(13) it was extinguished the smoke damage that we're
(14) viewing in this picture occurred, is that right?
(15) A. No, no.
(16) MR. MEZZACAPPA: Mark 6 series of
(17) photographs now the same way we marked this --
(18) off the record.
(19) (Discussion off the record).
(20) MR. MEZZACAPPA: Mark the photograph as
(21) Defendant's Exhibit HH for identification mark
(22) them collectively.
(23) (Whereupon, the aforementioned photos
(24) was marked as Defendant's Exhibit HH for
(25) identification as of this date by the

Page 193

(1)
(2) Reporter.)
(3) MR. MEZZACAPPA: They are from
(4) Schleiffer or Klem, anything other than --
(5) mark that as HH as a number of sheets, 18
(6) sheets of photographs just mark as one mark
(7) exhibit.
(8) (Whereupon, the aforementioned photos
(9) was marked as Defendant's Exhibit HH for
(10) identification as of this date by the
(11) Reporter.)
(12) Q. I'm going so show you for purposes of
(13) expediency a group of 18 sheets of photographs
(14) marked collectively as Exhibit HH, some of the
(15) sheets have one picture, most have 2 pictures on
(16) them. Some of them have handwriting in the margin,
(17) some of them do not. Do you recall taking any of
(18) these photographs?
(19) A. I recall taking that one.
(20) Q. Indicating the smoke detectors?
(21) A. Yes. I recall taking them actually.
(22) Specifically it's my handwriting, labeling.
(23) Q. The ones that are labeled with printing
(24) is your handwriting, are your handwriting?
(25) A. That is correct.

Page 194

(1)
(2) Q. You see numerous photographs have dates
(3) stamp 7/25/2001 on them?
(4) A. I don't know whether I took those or
(5) not.
(6) Q. Do you remember before when I showed
(7) you one of the investigators's reports where it
(8) established that you were there on 7/25?
(9) A. I don't recall that.
(10) Q. Are they fair and accurate
(11) representations of how the contents and structure
(12) of the house looked to you on 7/25 or 2001 wherein

(13) you took those pictures which you recall?
(14) A. Yes, they do.
(15) Q. And was anyone present with when you
(16) took these pictures?
(17) A. I don't recall, probably the other
(18) adjusters and maybe the cause in origin
(19) investigator.
(20) Q. Do you remember taking the pictures of
(21) the smoke detectors, correct?
(22) A. I remember, yes.
(23) Q. Is that the same smoke detector in both
(24) pictures?
(25) A. No. The bottom is – I tried to get a

Page 195

(1)
(2) photo of manufacturer.
(3) Q. Do you have – there is a label of
(4) Norelco hard wire smoke detector. Is that who
(5) manufactured it?
(6) A. Yes.
(7) Q. Hard wire smoke detector?
(8) A. Apparently so.
(9) Q. So, can you take a look at the picture
(10) of the garage, bottom of the photo?
(11) A. Yes.
(12) Q. Does there appear to be from that
(13) photograph to be any damage to the exterior or
(14) interior of the garage?
(15) A. Not at all.
(16) Q. What about the room above it, the loft,
(17) does it appear to be damaged on the exterior of it?
(18) A. No.
(19) Q. Those were not broken in the fire; is
(20) that correct?
(21) A. I don't recall.
(22) Q. Looking at the picture labeled by you
(23) as front of dwelling, do you see that, this one
(24) with the Jeep in the garage and the car?
(25) A. Yes.

Page 196

(1)
(2) Q. Did you experience as an adjuster to
(3) the exterior of this house the need to be rebuilt
(4) depicted in this photograph?
(5) A. As depicted in that photograph.
(6) Q. Is the portion of the house depicted in
(7) those 2 photographs on that page demonstrating any
(8) need to be rebuilt?
(9) A. Not from the pictures.
(10) Q. All of the windows are intact, not
(11) broken, correct?
(12) A. From what I can see in the pictures.
(13) Q. Were any of these windows reused in the
(14) new structure, to your knowledge?
(15) A. I have no idea.
(16) Q. Was any salvage company retained by you
(17) in order to try to sell some of the slightly
(18) damaged contents of the house?
(19) A. No.
(20) Q. Was there any reason for that?

(21) A. It's generally economically not
(22) feasible.
(23) Q. When you say it's economically not
(24) feasible, what do you base that on?
(25) A. Expenses and handling cost are going to

Page 197

(1)
(2) exceed the value of normal household furnishings.
(3) Q. Did you ever see the pictures taken by
(4) TJ Klem?
(5) A. I don't recall.
(6) Q. Without marking this I'll show you I
(7) think we have had enough pictures today, I'll use
(8) them, take a look at and tell me if you ever seen
(9) them before right now, to the best of your
(10) recollection.
(11) A. I don't recall to be honest.
(12) MR. MEZZACAPPA: Mark that as the next
(13) Exhibit II for identification.
(14) (Whereupon, the aforementioned photo
(15) was marked as Defendant's Exhibit II for
(16) identification as of this date by the
(17) Reporter.)
(18) Q. I show you now what has been marked II
(19) for identification, can you take a look at that
(20) document, I just took it out and marked only it.
(21) Do you recognize this document?
(22) A. There might, they are my notes.
(23) Q. They are your notes?
(24) A. Yes, my writing.
(25) Q. Can you tell me what the second line

Page 198

(1)
(2) says, it looks like expand house?
(3) A. Notify CNA time require alarm system,
(4) me.
(5) Q. What do you mean by require alarm
(6) system? Who required the alarm system based on
(7) those notes?
(8) A. I couldn't tell you.
(9) Q. And then you see the next line says was
(10) set up hyphen – read the rest to me.
(11) A. Set of smoke 21 set of beams, set
(12) beams.
(13) Q. Do you know what you mean by that?
(14) A. No, probably something about the way
(15) the alarm system was set up and the beams.
(16) Q. Next line, read that.
(17) A. Gate with door open.
(18) Q. What do you mean by that?
(19) A. Probably where that cat was.
(20) Q. The next line?
(21) A. Wall switch, used wall switch.
(22) Q. Do you know what you mean by used wall
(23) switch?
(24) A. No.
(25) Q. Did you find the wall switch that

Page 199

(1)
(2) controlled the lamp that wasn't new or somehow

(3) used, in your opinion?
(4) A. No, I don't recall that.
(5) Q. Next line lamp was plugged in?
(6) A. Yes.
(7) Q. Top night table?
(8) A. Yes.
(9) Q. Did the have cat terminal cancer?
(10) A. Yes.
(11) Q. I can't read?
(12) A. Surgery medication.
(13) Q. Not well cat?
(14) A. Correct.
(15) Q. Could not clean itself?
(16) A. Correct.
(17) Q. The next words?
(18) A. The couch was.
(19) Q. The couch?
(20) A. Brown.
(21) Q. Supervised cat?
(22) A. Likes dark places.
(23) Q. Do you know does mean anything to you?
(24) A. Not really, just notes I took probably
(25) speaking to someone.

Page 200
(1)
(2) MR. MEZZACAPPA: Mark this serious
(3) personal report loss, report personal lines.
(4) (Whereupon, the aforementioned report
(5) loss was marked as Defendant's Exhibit JJ for
(6) identification as of this date by the
(7) Reporter.)
(8) Q. I'm going so show you what has been
(9) marked JJ. Take a look at that. Do you see your
(10) name at the bottom as having prepared it?
(11) A. Yes.
(12) Q. What is this?
(13) A. This is basically a form, internal form
(14) for a large loss as completed for anything over
(15) $250,000.
(16) Q. Do you see in the middle of the
(17) description of loss, you see one section of the
(18) structure will require complete replacement with
(19) the remainder cosmetic repairs, do you see that?
(20) A. Yes.
(21) Q. Do you see the last sentence
(22) subrogation possibilities are being developed and
(23) assessed in conjunction with counsel?
(24) A. Yes.
(25) Q. Which counsel did you mean?

Page 201
(1)
(2) A. Morrison, Mahoney & Miller.
(3) Q. Without telling me what you might have
(4) discussed with Morrison, Mahoney & Miller, does
(5) your company typically employ them to subrogate the
(6) property losses that you adjust?
(7) A. We had dealt with them in the past.
(8) Q. On how many cases previously to this?
(9) A. I don't recall.
(10) Q. Can you give me an estimate?
(11) A. No.
(12) Q. Can you give me an approximation?
(13) A. No.
(14) Q. Is it a large number?
(15) A. I don't know.
(16) Q. And is Morrison, Mahoney & Miller paid
(17) by the hour or some other arrangement on a
(18) subrogation case such as this?
(19) A. I believe a contingent fee.
(20) Q. What date was this filled out by you?
(21) A. Looks like August 10th.
(22) Q. Was there --
(23) A. I'm sorry, I don't know the date this
(24) was filled out.
(25) Q. The August 10, 2001, date, what does

Page 202
(1)
(2) that refer to?
(3) A. The report ordered and clue report
(4) ordered and the date.
(5) Q. Clue --
(6) A. Then probably under insurance, informed
(7) underwriting that they are not carrying another
(8) insurance, or could have been wood stove or a large
(9) loss.
(10) Q. What physically does clue stand for?
(11) A. Notification to the underwriting
(12) department.
(13) Q. What is ITV?
(14) A. Insurance to value.
(15) Q. What does that mean?
(16) A. Proposed insurance, the amount of
(17) insurance to the actual value of the house, the
(18) current building replacement cost of 624, do you
(19) see that? It should be the proposed insurance
(20) value, would be 819, thus it's under insured.
(21) Q. Who determines how much insurance to
(22) put on a dwelling like this if this is inspected?
(23) A. Underwriters, the underwriting
(24) department.
(25) MR. MEZZACAPPA: Let's mark this

Page 203
(1)
(2) document KK for identification, handwritten
(3) document under Encompass Insurance letter of
(4) July 31. It's like 20 pages down.
(5) (Whereupon, the aforementioned letter
(6) dated July 31 was marked as Defendant's
(7) Exhibit KK for identification as of this date
(8) by the Reporter.)
(9) Q. I'll show -- sir, I'm showing you what
(10) has been marked Defendant's Exhibit KK. Is that
(11) your handwriting?
(12) A. Yes.
(13) Q. Can you look at the first full line,
(14) starts with owned looks like 4 years?
(15) A. Yes.
(16) Q. Read the rest.
(17) A. Renovation started 2 years ago.
(18) Q. When was the house originally built?

(19) A. 1968.
(20) Q. Do you see where it says Harold 52,
(21) Lauren 48 self-employed, can you read the last
(22) word?
(23) A. Looks like corporation.
(24) Q. Continue to read it Williamsbridge.
(25) A. Williamsbridge Discount Store in the

Page 204

(1)
(2) Bronx.
(3) Q. Read the line says central fire alarm?
(4) A. Yes.
(5) Q. Continue to read that.
(6) A. 11:01 a.m., someone here, a fire
(7) company was there 11:15 a.m.
(8) Q. The next line central alarm sound?
(9) A. In-house.
(10) Q. In-house called fire department?
(11) A. Fire department.
(12) Q. Alarm company fired department
(13) responded, do you see that?
(14) A. Yes.
(15) Q. Both left 8:05. Does that mean the
(16) people, the homeowner left at 8:05?
(17) A. Yes.
(18) Q. Separate cars?
(19) A. Yes.
(20) Q. Called insured at Bronx, alarm
(21) activated?
(22) A. Yes.
(23) Q. Son 20, what does that say, 2
(24) daughters?
(25) A. Yes.

Page 205

(1)
(2) Q. 11 year old was there?
(3) A. Yes.
(4) Q. Do you know what that means?
(5) A. No.
(6) Q. Actually that line starts with daughter
(7) underlined 11 years old was there dropped for camp
(8) bus?
(9) A. It looks like it.
(10) Q. 17 going to work?
(11) A. Right.
(12) Q. No electric repairs, no electric
(13) problems, BX wiring?
(14) A. Yes.
(15) Q. The next line down fire something to
(16) pond?
(17) A. Yes.
(18) Q. The word something is?
(19) A. Fire line to pond.
(20) Q. What does that mean to you?
(21) A. I guess run a line to a pond to get
(22) water.
(23) Q. Finally, the last sentence Mr. Heinz
(24) leaves work?
(25) A. Right.

Page 206

(1)
(2) Q. Left at 1:30?
(3) A. Right.
(4) Q. 1.5 hour ride from Bronx?
(5) A. Yes.
(6) Q. Does that refresh your recollection
(7) that he couldn't leave at the time that the fire,
(8) when he was called?
(9) A. Yes.
(10) Q. Were you given any receipts from
(11) Internet searches to figure out what the contents
(12) of the home were worth?
(13) A. No.
(14) Q. Did Wendy French, to your knowledge,
(15) undertake a search on the Internet to get prices on
(16) things like television and DVD carousels,
(17) throughout the home?
(18) A. Yes, we have a service we use.
(19) Q. What si the service?
(20) A. VIA.
(21) Q. What does VIA stand for?
(22) A. A database of replacement cost items
(23) and the cost to replace them today.
(24) Q. Who, does VIA stand for?
(25) A. I don't know.

Page 207

(1)
(2) Q. VIA, correct?
(3) A. Yes.
(4) Q. And how does one subscribe to such a
(5) database, your own in-house database?
(6) A. No. A service we subscribe to.
(7) Q. Is it something that only insurance
(8) companies can subscribe to?
(9) A. I don't know.
(10) Q. Does anyone ever check the accuracy of
(11) the VIA?
(12) A. I don't know.
(13) Q. How does VIA in turn, to your
(14) knowledge, get its prices on things?
(15) A. I don't know.
(16) Q. Did the Heinz have any original
(17) receipts for anything that they claimed was
(18) damaged, the contents to the house?
(19) A. I don't recall.
(20) Q. If they did, who would they have given
(21) them to?
(22) A. Wendy French.
(23) Q. Did Wendy then turn over any original
(24) receipts to you or would you just base your
(25) contents damages on what she compiled for you at

Page 208

(1)
(2) the end?
(3) A. Basically based on what she compiled.
(4) Q. You are not going to look through the
(5) accuracy of things she was pricing out?
(6) A. Correct.
(7) Q. In addition to VIA, did she use any
(8) other Internet service provider or any other web

(9) sites or any other computer model generated sites
(10) to determine the contents loss of the home?
(11)    A.   I don't recall.
(12)    MR. MEZZACAPPA:   Let's have this accord
(13) property loss notice marked as LL.
(14)    (Whereupon, the aforementioned property
(15) loss notice was marked as Defendant's Exhibit
(16) LL for identification as of this date by the
(17) Reporter.)
(18)    Q.   Let me show you what has been marked LL
(19) for identification. Is that in front of you?
(20)    A.   Yes.
(21)    Q.   Can you tell me what this is?
(22)    A.   It is something that an agent would
(23) type out and fax the claim office notification of a
(24) new loss.
(25)    Q.   There is a date in the upper right

Page 209

(1)
(2) corner, 7/23/01, correct?
(3)    A.   Yes.
(4)    Q.   At that time, the policy holder or
(5) company is Continental Insurance Company, correct,
(6) at least on this form?
(7)    A.   That is what the form says.
(8)    Q.   Down at the bottom, do you see under
(9) remarks LOC 1 PDDIS, in all caps, protective device
(10) discount 2 percent?
(11)    A.   Yes.
(12)    Q.   Can you decipher that for me, do you
(13) know what it means?
(14)    A.   Not definitely, I have an idea.
(15)    Q.   What is your best idea?
(16)    A.   2 percent premium discounts for alarm
(17) system.
(18)    MR. MEZZACAPPA:   Let's mark this as MM
(19) clipped together starts with Service Master
(20) and Restoration, which is a cover sheet on to
(21) this and a bunch of grid like numbers on
(22) contents, it appears to be.
(23)    (Whereupon, the aforementioned numbers
(24) on contents was marked as Defendant's Exhibit
(25) MM for identification as of this date by the

Page 210

(1)
(2) Reporter.)
(3)    Q.   I'm showing you Exhibit MM. Do you
(4) know what that group of documents represents?
(5)    A.   It looks like Wendy French's numbers on
(6) the contents.
(7)    Q.   Submitted to you at some point?
(8)    A.   Apparently so.
(9)    Q.   Out of all of these numerous pages, is
(10) there a total somewhere?
(11)    A.   Second page.
(12)    Q.   $157,000?
(13)    A.   Cash value, yes.
(14)    Q.   Is that your handwriting at the bottom
(15) of that page, contents numbers?
(16)    A.   That is correct.

(17)    Q.   The number sign and appositive S, pound
(18) sign appositive S?
(19)    A.   That is the 200 replacement cost.
(20)    Q.   What is the $44,000?
(21)    A.   101, depreciation.
(22)    Q.   The 157?
(23)    A.   Actual cash value.
(24)    Q.   What did you pay on the contents? I
(25) know we went through the figure before 188, but how

Page 211

(1)
(2) did you arrive at 188 when we've these 3 figures
(3) that we discussed?
(4)    A.   I would have to look at my file notes
(5) actually.
(6)    Q.   Is there a standard formula that you
(7) arrive at once you have the actual cash value and
(8) depreciation figures, is there a formula you use to
(9) arrive at a figure like 188, based on Miss French's
(10) number on the second page?
(11)    A.   According to Exhibit B, the contents
(12) also 215, the depreciation of 44, I guess I made an
(13) allowance of another $14,000.
(14)    Q.   What was that based on?
(15)    A.   I have to look through the file.
(16)    Q.   Do you have the portions of the file in
(17) front you?
(18)    A.   No.
(19)    Q.   That would help you to determine that?
(20)    A.   No.
(21)    Q.   Do you have them back at the office?
(22)    A.   Yes.
(23)    MR. MEZZACAPPA:   At this time, I'm
(24) going to request those portions of the file
(25) which you need to look at to answer the

Page 212

(1)
(2) question. Leave a blank in the transcript,
(3) fill in the answer.
(4)    MR. MASCARO:   That is fine.
(5) ------------------------------------------X
(6) .
(7)    Q.   There are various invoices that were
(8) turned over by your attorney some for the Home
(9) Depo, some are Yankee Doodle Ridgefield Supply
(10) Company. Do you know what these receipts and
(11) invoices represent without marking each one of them
(12) which?
(13)    A.   Probably for billing, related building
(14) items.
(15)    Q.   It appear –
(16)    A.   That is probably a claim for the
(17) holdback moneys.
(18)    Q.   In other words, in order to prove that
(19) they spent the money to homeowners when rebuilding,
(20) keep receipts for what they purchase, they supply
(21) it to you, they give the holdback moneys to them;
(22) is that accurate?
(23)    A.   Yes.
(24)    Q.   Do they have to show the receipts that

(25) exceed $727,000 in order to –

Page 213

(1)
(2) A. That is correct.
(3) Q. They have to spend at least that much
(4) or more in rebuilding the house, that is why they
(5) provided these receipts?
(6) A. That is correct.
(7) Q. One of these receipts, it appears that
(8) Home Depot Expo in New Rochelle, New York, they
(9) purchased cherry wood cabinets for the kitchen, is
(10) that what they had in the house beforehand?
(11) A. I don't recall.
(12) Q. From looking at the pictures I showed
(13) to you, can you tell me what kind of wood that was?
(14) A. No.
(15) Q. Is there anything in the documents that
(16) we have so far that demonstrates what kind of wood
(17) was in the kitchen; would that be in
(18) Mr. Re-estimated's breakdown?
(19) A. It could be.
(20) Q. On one of the forms submitted by the
(21) Heinz, there is a 795 for the YMCA membership under
(22) the policy?
(23) A. Yes.
(24) Q. Why?
(25) A. Because, as I recall, she needed a pool

Page 214

(1)
(2) for therapy, and the rental house didn't have a
(3) pool, so I paid the YMCA for club membership.
(4) Q. Did she have to get a doctor's note for
(5) that?
(6) A. From me?
(7) Q. Yes.
(8) A. No.
(9) Q. Did you ask her to look in the area to
(10) find cheaper than $795 for a membership for a pool?
(11) A. No.
(12) MR. MEZZACAPPA: I suppose I should
(13) mark this document. Let me mark this it deals
(14) with partial additional living expenses.
(15) (Whereupon, the aforementioned living
(16) expenses was marked as Defendant's Exhibit NN
(17) for identification as of this date by the
(18) Reporter.)
(19) Q. Allow me to show you exhibit NN,
(20) partial additional living expenses in addition to
(21) the YMCA membership that we talked about. She also
(22) had a Fleet savings deposit box, which apparently
(23) you okayed for the amount of $81. What does that
(24) represent?
(25) A. I don't recall.

Page 215

(1)
(2) Q. Do you remember paying for phone
(3) service for the Heinz while they were out of the
(4) house?
(5) A. Probably I did pay for that.
(6) Q. Did you ever question any of the bills
(7) or ask if they can get phone service cheaper?
(8) A. No.
(9) MR. MEZZACAPPA: Mark these pictures
(10) collectively, 4 sheets of new construction on
(11) the new house.
(12) (Whereupon, the aforementioned pictures
(13) was marked as Defendant's Exhibit OO for
(14) identification as of this date by the
(15) Reporter.)
(16) Q. Did you take these photographs?
(17) A. No.
(18) Q. Do you know who took them?
(19) A. I believe the PA took them.
(20) Q. PA, public adjuster?
(21) A. I believe so.
(22) Q. Nutmeg. Is this a fair and accurate
(23) representation of the new structure that was built
(24) at 34 Wildwood Avenue after the fire?
(25) A. I would say so, yes.

Page 216

(1)
(2) Q. Is it fair to say that this structure
(3) increased significantly the square footage of the
(4) living space?
(5) A. You could say that.
(6) Q. Is it your understanding that the same
(7) foundation that previously existed was used?
(8) A. It appears that way.
(9) Q. Did any part of the new foundation or
(10) slab need to be poured in order to build this
(11) structure?
(12) A. Possibly.
(13) Q. Do you know if the Heinz had installed
(14) a smoke detention system in this house after it was
(15) completed?
(16) A. I have no idea.
(17) Q. Is there a way to check today to see if
(18) they have a reduction in their premium through your
(19) company assuming your company still insures them?
(20) A. We can check that, if they still insure
(21) them.
(22) Q. I would just ask for a check, if you
(23) still insure them and fill in the blank in the
(24) transcript, if so, whether they were given a
(25) reduction in the premium for the installation of a

Page 217

(1)
(2) smoke detention system.
(3) MR. MASCARO: You are asking him to
(4) tell you whether they have a smoke detention
(5) now?
(6) MR. MEZZACAPPA: If she is still
(7) insured by them, only for the purpose of
(8) finding out if there is a reduction in the
(9) premium, not the type of smoke alarm system.
(10) If there is new construction, there is a
(11) different code. If they still insure them,
(12) there may be a reduction in premium for the
(13) installation of the smoke detection system by
(14) law with new construction, there has to be.

(15) ------------------------------------------------x
(16) .
(17)    Q.   Did you ever install smoke alarm
(18) detection systems?
(19)    A.   Yes.
(20)    Q.   When for the first time did you install
(21) smoke alarm detection systems?
(22)    A.   Probably when they first came out.
(23)    Q.   Did you do it professionally for a
(24) living?
(25)    A.   No.

Page 218

(1)
(2)    Q.   Did you just do it on your own?
(3)    A.   That is correct, battery operated.
(4)    Q.   Did you ever install a hard wire
(5) system, hook up to a central station?
(6)    A.   No.
(7)    Q.   Do you have any personal knowledge of
(8) the codes required, not from anything you gained
(9) from experts, do you have personal knowledge of the
(10) codes required on 7/23/01 in Wilton, Connecticut
(11) applied to this home?
(12)    A.   None whatsoever.
(13)    MR. MEZZACAPPA:   Other than my rights
(14) to reserve, I reserve to depose someone
(15) potentially in the underwriting department
(16) depending on what is in the files when I get
(17) them or if they are available. I have no
(18) further questions for this witness at this
(19) time.
(20) Thank you, sir.
(21)    (Whereupon, at 4:15 p.m., the
(22) Examination of this Witness was concluded.)
(23)
(24)
(25)

Page 219

(1)
(2)
   Subscribed and sworn to before me
(3) this       day of       2004.
(4)
(5) NOTARY PUBLIC
(6)
(7)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)

(21)
(22)
(23)
(24)
(25)

Page 220

(1)
(2) E X H I B I T S
(3)
(4)    **DEFENDANT'S EXHIBITS:**
(5)
(6) EXHIBIT EXHIBIT PAGE
(7) NUMBER DESCRIPTION
(8)
(9)    A   Notice of compliance 17
(10) B Statement of loss 66
(11) C TJ Klem report 81
(12) D Report 101
(13) E Fire report 104
(14) F Letter from Mr. Klein 106
(15) G Appraisal of damage 108
(16) H Appraisal 120
(17) I Contract 135
(18) J Activity report 138
(19) K Letter November 1 140
(20) L Loss of statement letter 144
(21) M Worksheets 149
(22) N Proof of loss statement 153
(23)
(24)
(25)

Page 221

(1)
(2) O Letter from Nutmeg 155
(3) P Letter dated September 24 156
(4)    Q   Underwriters supplement 157
(5) R Policy 164
(6) S Payment history 171
(7) T Notes 176
(8) Q thru GG Photos 183
(9) HH Photos 189
(10) II Photo 194
(11) JJ Report of loss 196
(12) KK July 31 letter 200
(13) LL Property loss notice 205
(14) MM Number of contents 206
(15) NN Living expenses 211
(16) OO Pictures 212
(17)
(18)
(19) INFORMATION AND/OR DOCUMENTS REQUESTED
(20) INFORMATION AND/OR DOCUMENTS
(21) PAGE
(22) Field notes 9
(23) Documents 11
(24) Underwriting file 15
(25) E-mails 21

Page 222

(1)
(2) Photos 23

(3) File from Quincey 26
(4) Photos 31
(5) File notes 45
(6) Coverage opinions 69
(7) Electronic notes 71
(8) Documentation 117
(9) Coverage opinion 167
(10) Information 208
(11) Information 213
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 223

(1)
(2) **C E R T I F I C A T E**
(3)
(4) STATE OF NEW YORK )
: SS.:
(5) COUNTY OF KINGS )
(6)
(7)
(8) I, SARI SERBER, a Notary Public for and
(9) within the State of New York, do hereby
(10) certify:
(11) That the witness whose examination is
(12) hereinbefore set forth was duly sworn and that
(13) such examination is a true record of the
(14) testimony given by that witness.
(15) I further certify that I am not related
(16) to any of the parties to this action by blood
(17) or by marriage and that I am in no way
(18) interested in the outcome of this matter.
(19) IN WITNESS WHEREOF, I have hereunto set
(20) my hand this 17th day of January, 2004.
(21)
(22)
     SARI SERBER
(23)
(24)
(25)