1              UNITED STATES DISTRICT COURT

2                DISTRICT OF CONNECTICUT

3

4   GLEN FALLS INSURANCE COMPANY      :    CIVIL ACTION NO.
    a/s/o HAROLD AND LAUREN HEINZ,         3:03CV1015(DJS)
5         Plaintiff                  :

6   VS.                              :

7   COMMAND FORCE SECURITY            :
8   SYSTEMS, INC.,
          Defendant                  :    FEBRUARY 9, 2004
9

10

11

12
                DEPOSITION OF MATTHEW MATZA
13

14

15

16

17

18

19

20

21

22              SUSAN K. WHITT, LSR, RPR
              Licensed Shorthand Reporter No. 1
23                ALLAN REPORTING SERVICE
                    49 Longview Drive
24              Simsbury, Connecticut 06070
25  Telephone (860) 658-0500      Facsimile (860) 658-1199



1    A P P E A R A N C E S:

2

3

        For the Plaintiff:
4            MORRISON, MAHONEY & MILLER
             One Constitution Plaza, 10th Floor
5            Hartford, Connecticut 06103-1810
                 BY:   JOSEPH E. MASCARO, ESQ.
6

7

        For the Defendant:
8            KAUFMAN, BORGEEST & RYAN, LLP
             200 Summit Lake Drive
9            Valhalla, New York 01595
                 BY:   MICHAEL P. MEZZACAPPA, ESQ.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Deposition of Matthew Matza, a non-party

2   witness, taken at the request of the Plaintiff, pursuant to

3   the Federal Rules of Civil Procedure, for purposes of

4   discovery and/or use at trial, on February 9, 2004,

5   commencing at 10:50 a.m., before Susan K. Whitt, LSR, RPR,

6   a Notary Public qualified by law to administer oaths, at

7   the law offices of Kaufman, Borgeest & Ryan, 200 Lake

8   Summit Drive, Valhalla, New York.

9

10

11

12                        STIPULATIONS

13          It was stipulated and agreed by counsel that all

14  formalities in connection with the taking of the

15  deposition, including time, place and sufficiency of

16  notice, were complied with; that the qualifications of the

17  Notary Public were waived; and that all objections except

18  as to form were reserved to the time of trial.

19

20

21

22

23

24

25

1   MATTHEW MATZA,

2        a non-party witness herein, having been first duly

3        cautioned and sworn by Susan K. Whitt, LSR, RPR, a

4        Notary Public duly commissioned and qualified within

5        and for the State of Connecticut, deposed and

6        testified as follows:

7

8   DIRECT EXAMINATION BY MR. MASCARO:

9        Q     Good morning, Mr. Matza.  My name is Joseph

10  Mascaro, and I represent Glen Falls Insurance Company in a

11  case we've instituted against Command Force Security.

12  We're here today for your deposition.  Have you ever gone

13  through the deposition process before today?

14       A     No, sir.

15       Q     I'm going to go over some ground rules with you.

16  Obviously, there is a court reporter here taking down

17  everything you say.  One, I'll let you finish your answer

18  to the question if you let me finish the next question.

19  It's common in everyday conversation to anticipate what the

20  person is saying and answer before they're done.  It makes

21  her job more difficult.

22            If there is a question you don't understand, let

23  me know, because if you answer it I'll assume you

24  understood it.  Okay?

25       A     Yes, sir.

1      Q      All of your answers should be audible, meaning

2    if you use your hands to answer questions, or a shrug or

3    nod of the head, that might not be as accurate as we all

4    want, so I want to make sure your answers are all audible.

5      A      All right.

6      Q      Can you give me your date of birth, please?

7      A      March 26, 1955.

8      Q      And what is your business address?

9      A      81-03 252nd Street, Bellerose, New York 11426.

10     Q      And what do you do for a living?

11     A      I install alarm systems.

12     Q      And with which company do you do that?

13     A      Command Force Security Systems.

14     Q      What is your position with Command Force?

15     A      President.

16     Q      And how long have you been the president of

17   Command Force?

18     A      Twenty-three years.

19     Q      Did you start Command Force or was it already an

20   existing business when you got involved?

21     A      I started it.

22     Q      I'm just going to go over some background.

23   Before you started Command Force, what did you do as far as

24   your employment before you started Command Force?

25     A      I graduated Hofstra University in 1977, and I

1    went to work for a photographer in Manhattan, and I was his

2    sales representative.

3        Q    And how long did you do that?

4        A    About a year or so.  And then from there I got a

5    job as a salesperson with a manufacturer of women's

6    sportswear.

7        Q    How long did you do that?

8        A    For about three years or so.

9        Q    And after that job what did you do?

10       A    I got a job with an alarm company as an

11   apprentice.

12       Q    And what was the name of that alarm company?

13       A    Advance Security Systems.

14       Q    And where are they located?

15       A    Tenafly, New Jersey.

16       Q    And can you describe for me what it means to be

17   an apprentice?

18       A    I swept the floor, I did whatever they requested

19   me to do so that I could learn my trade.

20       Q    And what was the trade that you were learning?

21       A    Installation of burglar alarms.

22       Q    How long were you an apprentice at Advance

23   Security Systems?

24       A    I'd say about a year or year and a half.  It's

25   been a while.

1      Q      Sure.  I understand.  And after being an

2  apprentice there for whatever period of time you were an

3  apprentice, did you move up within that company or go

4  somewhere else?

5      A      I went to another company called Telcoa Alarms

6  or Telcoa Security.  I don't remember.  They're in

7  Connecticut.

8      Q      Do you know where in Connecticut?

9      A      Greenwich.

10     Q      Just to go back to your apprenticeship with

11  Advance Security, were they providing any type of

12  education, classes or anything like that for you as far

13  as --

14     A      On-the-job training.

15     Q      What would that consist of?  Aside from all the

16  duties like sweeping floors and everything they told you to

17  do, as far as the installation of alarm systems, what type

18  of training did they give you as far as that went?

19     A      How to run wires, mounting parts, that sort of

20  thing.

21     Q      Did they give you any training or did your

22  training include analysis of structures where you would be

23  installing systems, what they were constructed of, how they

24  were constructed, how that might influence the installation

25  of alarm systems?

1          MR. MEZZACAPPA:  Objection to the form of

2      the question.

3          You may answer it.

4    A     Not in a formal way, but you talk with other

5 guys, and they talk to you and teach you, and you look and

6 you learn.

7 BY MR. MASCARO:

8    Q     And did you have to get some sort of permit or

9 license to be an apprentice?

10    A     No.

11    Q     You did that for a year, year and a half, I

12 think you said?

13    A     With Advance, and then I moved to Telcoa.

14    Q     And what was your position when you started with

15 Telcoa?

16    A     Serviceman.

17    Q     And why did you leave Advance to go to Telcoa?

18    A     More opportunity, more money.

19    Q     And when you say you were a serviceman, what

20 were you doing?

21    A     I repaired alarm systems.

22    Q     When you say "alarm systems," was it fire alarm,

23 security or both?

24    A     Both.

25    Q     Just jumping back for a second to your

1  apprenticeship at Advance Security, was that fire alarm

2  systems, security systems or both?

3                    MR. MEZZACAPPA:  Let him finish.

4      A      Both.

5  BY MR. MASCARO:

6      Q      Was there one area when you were an apprentice

7  at Advance that was more dominant as far as your training

8  and your time, meaning did you work more with security

9  systems as opposed to fire systems or vice versa, or was it

10 about an equal split?

11                    MR. MEZZACAPPA:  Objection to form.

12                    You may answer.

13     A      I would say more houses probably had straight

14 burglar alarms, but certainly many houses had burglary and

15 fire systems.

16 BY MR. MASCARO:

17     Q      When you were an apprentice with Advance, did

18 your work involve residential or commercial or both?

19     A      With Advance it was all residential, and with

20 Telcoa it was almost all commercial.

21     Q      You anticipated my next question.

22                    MR. MEZZACAPPA:  Just wait and answer the

23                    question he gives you.

24 BY MR. MASCARO:

25     Q      Prior to your apprenticeship at Advance, did you

1  take any type of class or have any experience in installing

2  alarm systems?

3      A    No.

4      Q    How long were you with Telcoa?

5      A    Approximately a year, year and a half.

6      Q    And you said that that was all commercial

7  structures; is that correct?

8      A    Yes.

9      Q    Was that more security systems or fire systems

10 or was it an equal split?

11              MR. MEZZACAPPA:  Objection to form.

12              You may answer.

13     A    It was more burglar than fire.

14 BY MR. MASCARO:

15     Q    You're at Telcoa for about a year and a half.

16 Were you a serviceman for that entire time that you were at

17 Telcoa?

18     A    Yes.

19     Q    Where did you go after Telcoa?

20     A    I started my own company.

21     Q    Was that Command Force or a different company?

22     A    No, it was called Alarm-o-Mat.

23          (Discussion off the record.)

24 BY MR. MASCARO:

25     Q    Where was this company located?

1     A     In Queens.  I had a partner, Benny Ragona, and

2  we worked out of his basement.

3     Q     And what did Alarm-o-Mat do?

4     A     Installation of security systems and low-voltage

5  wiring.

6     Q     When you say "security systems," did that

7  include fire-detection systems?

8     A     Yes.

9     Q     Did it include burglar systems as well then?

10    A     Yes.

11    Q     Other than you and Benny, did Alarm-o-Mat have

12 any other employees?

13    A     No.

14    Q     When you started Alarm-o-Mat, did Alarm-o-Mat

15 have to be licensed or did you and Benny have to be

16 licensed to start that business?

17    A     No.

18    Q     The State of New York didn't require any type of

19 licensing at that time for that?

20              MR. MEZZACAPPA:  Just note my objection.

21              You may answer.

22    A     That's correct.

23 BY MR. MASCARO:

24    Q     And how long did you operate that business,

25 Alarm-o-Mat?

1    A    About two years.

2    Q    And what happened after that?

3    A    Alarm-o-Mat was dissolved and Command Force was

4 incorporated.  I was the only person.  Benny wasn't with me

5 at that time.

6    Q    So when you started Command Force you started it

7 on your own without Benny or anyone else?

8    A    That's correct.

9    Q    And Command Force is incorporated in New York;

10 is that correct?

11    A    Yes.

12    Q    Do you remember what year that was?

13    A    1981, I believe, in March.

14        MR. MEZZACAPPA:  Just answer the question.

15 BY MR. MASCARO:

16    Q    And when you started Command Force were there

17 any other employees of Command Force?

18    A    No.

19    Q    It was just you?

20    A    Yes.

21    Q    And what was Command Force's business?

22    A    Installation of alarm systems.

23    Q    Did those alarm systems include fire-detection

24 systems?

25    A    Yes.

13

```
 1      Q      And burglar systems?

 2      A      Yes.

 3      Q      And Command Force has continued in operation

 4  since its inception to the present time?

 5      A      Yes.

 6      Q      How many employees does Command Force have at

 7  the present time?

 8      A      Five.

 9      Q      Does Command Force have any type of licenses or

10  is it required to have any licenses in the state of New

11  York?

12                  MR. MEZZACAPPA:  Note my objection to the

13              form of the question.

14                  You may answer the question.  There are two

15              questions there, but if you understand the

16              question, you may answer it.

17  BY MR. MASCARO:

18      Q      Let me rephrase it.  It was two questions there,

19  and I apologize.  To your knowledge does the State of New

20  York require Command Force to acquire any type of licenses?

21                  MR. MEZZACAPPA:  Note my objection.

22                  You may answer.

23      A      Yes.

24  BY MR. MASCARO:

25      Q      And what does the State of New York require?
```

```
 1     A      An alarm license.

 2     Q      Is the license issued to the business or to the

 3 individuals in the business?

 4     A      To the individual.

 5     Q      And would that be you?

 6     A      Yes.

 7     Q      Are you still the only owner of Command Force?

 8     A      Yes.

 9     Q      Any other individuals who are employed by

10 Command Force, do any of them hold any licenses?

11              MR. MEZZACAPPA:  Objection to the form.

12              You may answer.

13     A      There are low-voltage licenses for some

14 municipalities and districts that other guys have.

15 BY MR. MASCARO:

16     Q      To get the license that the State of New York

17 requires, what did you have to do to get that license?

18     A      There is a test, which is an alarm certification

19 test.

20     Q      And when did you take that test?

21     A      When it was required, which was -- and I'm

22 guessing --

23              MR. MEZZACAPPA:  Don't guess.

24 BY MR. MASCARO:

25     Q      Don't guess if you don't remember.
```

1      A      I don't know.

2      Q      Is it something that happened in the last couple

3  of years?

4      A      Last four years, five years.  Before that there

5  was no alarm license.

6      Q      Does the license have to be renewed at all?

7      A      Yes.

8      Q      How often does it have to be renewed?

9      A      Once a year.

10     Q      What process is involved in renewing it?

11     A      Send your check.

12     Q      And that's it?  You don't have to be retested at

13  all?

14     A      No.

15     Q      The alarm certification test that you had to

16  take, was that a written test or a test where you were

17  actually required to perform something?

18     A      Written.

19     Q      Generally speaking, what type of things were you

20  tested on?

21     A      The different types of devices, wiring, how

22  things worked.

23     Q      Was there any testing as far as questions

24  regarding fire codes or things of that nature?

25     A      No codes.

```
 1        Q      Currently what percentage of Command Force's
 2   business is residential and what percentage is commercial?
 3        A      I would say about half and half.
 4        Q      Generally has it always been that type of ratio?
 5        A      No.   It's more commercial now than it's ever
 6   been.
 7        Q      Back in, say, February of 2000, was it about a
 8   50/50 split back then as well or different?
 9                    MR. MEZZACAPPA:  Objection ot the form.
10                    You may answer.
11        A      Close.   It's probably 40/60 today.
12   BY MR. MASCARO:
13        Q      A little more commercial now than it was four
14   years ago?
15        A      Than it was, yes.
16        Q      Do you recall an individual named Harold Heinz?
17        A      Yes.
18        Q      This lawsuit has to do with a fire that occurred
19   at a piece of property he owned in Wilton, Connecticut.
20   Did you ever install any type of alarm system -- by that I
21   mean either fire detection or burglar -- for Mr. Heinz at
22   any other properties other than the one at 34 Wildwood
23   Drive in Wilton, Connecticut?
24                    MR. MEZZACAPPA:  Objection to form.
25                    You may answer.
```

```
 1      A      Yes.
 2  BY MR. MASCARO:
 3      Q      Can you just tell me where you installed a
 4  system for him?
 5      A      Harold had a house in Dix Hills --
 6      Q      When you say "Dix Hills," where is that?
 7      A      Long Island.  I'm sorry.  -- and we installed an
 8  alarm system in his home.
 9      Q      Now, was that the first system ever installed
10  for Mr. Heinz?
11      A      Yes.
12      Q      How was it that Mr. Heinz and Command Force, if
13  you know, formed a business relationship?
14      A      I believe he was referred to us.
15      Q      And what type of system was installed in his
16  home in Dix Hills, Long Island?
17      A      A burglar alarm system, and I'm not sure --
18             THE WITNESS:  Mike --
19  BY MR. MASCARO:
20      Q      If you don't remember, you can just say that.
21             MR. MEZZACAPPA:  This is all based on your
22             knowledge.  Unfortunately, you can't ask me.
23             It's based on your knowledge.
24      A      I remember it was a burglar alarm system.  I
25  don't remember if it was fire.
```

1    BY MR. MASCARO:

2        Q      And when you say "a burglar alarm system," can

3    you just tell a layperson like me how that operated?  Was

4    it essentially monitored at another station?

5        A      No, he didn't want central station monitoring at

6    his house.

7        Q      So was it just a local --

8        A      We would call it a local.

9        Q      If that system was activated, does that mean it

10   would sound an alarm in the residence and that's it?

11                   MR. MEZZACAPPA:   Objection to form.

12       A      Yes.

13   BY MR. MASCARO:

14       Q      And that's referred to as a local alarm system?

15       A      Yes, sir.

16       Q      Do you remember when that work was done?

17       A      I don't remember what year.

18       Q      Did there come a time when Command Force

19   installed a security system, an alarm system, at another

20   property owned by Mr. Heinz other than the one in Dix

21   Hills, Long Island?

22       A      Yes.

23       Q      And what other property?

24       A      His business in the Bronx.

25       Q      Do you remember the name of the business?

1     A     Williamsburg Discount -- Williams Bridge
2 Discount.
3     Q     Just to back up on the Dix Hills, Long Island
4 residence, did you physically install the system or was it
5 other people at Command Force that did it?
6     A     I can't recall.
7     Q     What type of system was installed for Mr. Heinz
8 at his business in the Bronx?
9     A     Security system.
10     Q     And when you say "security system," did that
11 include a fire-detection component?
12     A     I don't know.
13     Q     Did you take part in the installation of the
14 system at the business in the Bronx?
15     A     I don't really remember whether I did or I
16 didn't.  I may have, but it's been a while ago.
17     Q     Sure.  Do you remember when this was done?
18     A     It was before we did his house in Wilton.
19     Q     Do you recall whether you went to look at the
20 location in the Bronx where the system was going to be
21 installed?
22     A     Yes.
23     Q     And what was your purpose of going to look at
24 the location?
25     A     Mr. Heinz requested an alarm system for his

1    store.

2        Q      And you went out to talk to him about it and

3    look at the place?

4        A      Yes.

5        Q      Is that customary for you to do that for any job

6    that Command Force gets?

7                    MR. MEZZACAPPA:  Objection to form.  You

8                    mean him versus another employee?

9    BY MR. MASCARO:

10       Q      Specifically you.

11                   MR. MEZZACAPPA:  You may answer.

12       A      Yes.

13   BY MR. MASCARO:

14       Q      Most of the time you try to do that?  Is that a

15   fair statement?

16       A      Yes.

17                   MR. MEZZACAPPA:  Objection to form.

18                   You may answer.

19   BY MR. MASCARO:

20       Q      And you may have answered this, but you don't

21   recall whether it was just a burglar system at the business

22   in the Bronx or also a fire-detection component?

23                   MR. MEZZACAPPA:  Asked and answered.

24                   You may answer it again.

25       A      I don't recall.

BY MR. MASCARO:

Q    The system that was installed, was it local or centrally monitored?

A    The store is centrally monitored.

Q    And if you could, explain for me just exactly what that means.

A    When the alarm rings, a central monitoring office receives the signal.  They call back the prem first to see if it's an actual emergency.  If they get the correct password, that's the end of it.  If they don't receive the correct password, then they dispatch the police and call a predetermined notification list.

Q    Did Command Force install any other systems for Mr. Heinz at any other locations other than the one at 34 Wildwood Drive in Wilton?

MR. MEZZACAPPA:  Objection to form.

You may answer.

BY MR. MASCARO:

Q    In other words, you told me about Long Island. You told me about his business.  We're going to talk about Wilton in a few minutes.  Any other property where you installed any other type of alarm systems for him?

A    After the fire, Mr. Heinz hired us again to install a security device for his home while it was being renovated, I guess.

1    Q     This is the home that was being reconstructed at

2   34 Wildwood Drive in Wilton?

3    A     Yes, sir.

4    Q     And we'll talk about that property.  I'm just

5   trying to make sure we cover all other properties before we

6   get to the one in Wilton.  Any other properties where

7   Command Force did work for Mr. Heinz other than the ones

8   you told me about and other than the one where the fire

9   occurred?

10   A     No.

11   Q     As I understand it, there comes a point in time

12  when Command Force is contacted about installing some sort

13  of system at Mr. Heinz's property at 34 Wildwood Drive in

14  Wilton, Connecticut; is that correct?

15   A     Yes.

16   Q     Do you remember how Command Force was contacted?

17   A     Telephone.

18   Q     Do you know who made that call?

19   A     I don't know whether it was Mr. or Mrs. Heinz.

20   Q     Do you know who with Command Force received the

21  call?

22   A     No.

23   Q     Do you remember talking to Mr. and Mrs. Heinz

24  about it, you personally talking to Mr. and Mrs. Heinz

25  about it?

```
 1       A      Yes.

 2       Q      The first time you spoke to Mr. or Mrs. Heinz

 3   about it, was it on the phone or in person?

 4                     MR. MEZZACAPPA:  Objection to form.

 5                     You may answer.

 6       A      It could have been either one.

 7   BY MR. MASCARO:

 8       Q      You don't remember?

 9       A      I could have been in the store and they said

10   something.  They could have called me on the phone.

11       Q      Did you go to his store in the Bronx on some

12   sort of a regular basis?

13       A      No.

14       Q      Is there a routine where you go to the store

15   once a year or anything like that to check on the system?

16       A      No.

17       Q      Do you remember speaking to Mr. Heinz or

18   Mrs. Heinz about the system that was going to be installed

19   in Wilton?

20                     MR. MEZZACAPPA:  Objection to the form.

21                     You may answer.

22       A      I would say both.

23   BY MR. MASCARO:

24       Q      In all of your dealings with the Heinzes, was

25   there one that you dealt with more?  When I say "one,"
```

1  either Mr. or Mrs. Heinz.  Did you deal more with one than

2  the other?

3      A     Probably Harold.

4      Q     Do you remember when you may have first spoken

5  to either Mr. or Mrs. Heinz about a system at their

6  property in Wilton, an alarm system at their property in

7  Wilton?

8      A     No, I don't.

9              (Plaintiff's Exhibit No. 1:  Marked for

10             identification.)

11 BY MR. MASCARO:

12     Q     Mr. Matza, I'm going to show you a document that

13 has been marked Plaintiff's Exhibit No. 1 for

14 identification.  The first page is entitled "Defendant's

15 Response to Plaintiff's Interrogatories and Request for

16 Production."  It's a document with numerous pages and

17 Exhibits A, B and C attached to it.  I'm going to direct

18 your attention to one of the pages and have you take a look

19 at it.  It's entitled "Defendant's Certification."  Is your

20 signature on that page?

21     A     Yes.

22     Q     Do you remember signing this document?

23     A     I haven't seen the document.  I'm only looking

24 at a page.

25     Q     Do you remember signing it, in other words?

```
 1      A      It's my signature.

 2      Q      There is no issue about that?

 3      A      No.

 4             (Discussion off the record.)

 5             MR. MEZZACAPPA:  What page are you on?

 6             MR. MASCARO:  Page 5.

 7   BY MR. MASCARO:

 8      Q      At the top of the page is a question, Question

 9   No. 2.  It says, "Identify each individual who had any part

10   in the design and installation of the security system at

11   the premises," and the premises is the Heinzes' property in

12   Wilton, Connecticut, and it lists several people there,

13   starting with you.

14      A      Yes.

15      Q      Can you just tell me what part you had in the

16   design and installation of the system at the Heinzes'

17   premises?

18      A      I met with Harold Heinz.

19      Q      When you met with Mr. Heinz, where did you meet

20   with him?

21      A      In Wilton at their home.

22      Q      At the property?

23      A      Yes.

24      Q      I'm sorry.  Go on.

25      A      And we discussed what his requirements were for
```

1    a security system.

2        Q    Can you tell me everything that you recall that

3    Mr. Heinz said to you?

4                   MR. MEZZACAPPA:  On that first occasion or

5                   on any occasion?

6    BY MR. MASCARO:

7        Q    On the first occasion now, the meeting that took

8    place at the Heinzes' residence.

9        A    He wanted a security system.  He was only doing

10   it because of the insurance company.  He never really used

11   the alarm system.  And we walked through the house, and we

12   designed it together.

13       Q    He told you he wanted a system because his

14   insurance company wanted it?

15       A    Yes.  He, in my opinion -- we call it a security

16   quotient, and he had a very low one.

17       Q    What do you mean by --

18       A    Well, some people want every single window and

19   door alarmed, and they're concerned for their peace of

20   mind, and Mr. Heinz wasn't like that.

21       Q    How long were you at the property during this

22   meeting?

23       A    I'd say about two hours.

24       Q    Was anyone else there other than you and

25   Mr. Heinz?

1    A    I don't believe so.

2    Q    No one else from Command Force was there at that

3  meeting?

4    A    No, just myself.

5    Q    Was there any type of security system or alarm

6  system already in place at the property when you were there

7  to meet with Mr. Heinz?

8              MR. MEZZACAPPA:  Objection to form.

9              You may answer.

10    A    No.

11  BY MR. MASCARO:

12    Q    In other words, he wasn't replacing an old one

13  with something from Command Force?  There was nothing in

14  the property already?

15    A    That's correct.

16              MR. MEZZACAPPA:  Objection to form.  You're

17              talking about a --

18    A    I didn't see an alarm system there.

19              MR. MASCARO:  I'll withdraw the question.

20              MR. MEZZACAPPA:  I don't want to coach the

21              witness by my objection.

22              MR. MASCARO:  I understand.

23              MR. MEZZACAPPA:  It's unclear to me exactly

24              what you're asking.

25              MR. MASCARO:  It was an unclear question.

```
 1              I'll withdraw it and move on.  We'll get to it
 2              in other ways later.
 3   BY MR. MASCARO:
 4       Q      I think you said you designed it together with
 5   Mr. Heinz; is that correct?
 6       A      Yes.
 7       Q      What do you mean by that?  What role did he have
 8   in it?
 9       A      Well, we always listen to what our clients are
10   requesting, so we could go in there and alarm every single
11   window and door.  We could put all kinds of devices in
12   every single room if that's what the client wants, but
13   there are usually parameters that a client has.
14       Q      Now, when you say you listen to what the client
15   wants, is that related specifically to burglary systems, to
16   fire systems, or to both?
17       A      Everything.
18       Q      And what, again, did Mr. Heinz tell you he
19   wanted?
20       A      We designed a fairly simple burglar alarm and
21   fire alarm system for Mr. Heinz.
22       Q      Did he give you any parameters as to what he
23   wanted?
24       A      His parameters were that he didn't have a high
25   security quotient and he wasn't looking for the most
```

1    modern, advanced, you know, system.

2        Q    When you use the phrase "security quotient," is

3    that security related only to burglary systems, or does

4    that also encompass fire-detection systems?

5        A    Both.

6        Q    Is that customary for Command Force then to

7    consider and design a system based on the customer's

8    parameters?

9                MR. MEZZACAPPA:  Objection to the form.

10               You may go ahead.

11       A    We always listen to our clients.

12   BY MR. MASCARO:

13       Q    Did you in any way tell Mr. Heinz that the

14   parameters he was laying out to you were inadequate or

15   unsafe in any way?

16               MR. MEZZACAPPA:  Objection to form.

17               You may answer.

18       A    No.

19   BY MR. MASCARO:

20       Q    Did you think that the parameters he was laying

21   out to you were inadequate or unsafe?

22               MR. MEZZACAPPA:  Note my objection.

23               You may answer.

24       A    No.

25

BY MR. MASCARO:

Q     Prior to the installation of the system at the Heinz residence in Wilton, Connecticut, if a customer of Command Force sets some parameters to the type of system that they wanted in their residence and you felt it was inadequate to protect the home or the residence, would you tell that to the customer?

          MR. MEZZACAPPA:   Objection to form.

          You may answer.

A     Yes.

BY MR. MASCARO:

Q     Did Mr. Heinz say anything to you specifically about the fire-detection system at his home, what he wanted for that?

A     He was trying to satisfy his insurance company's request.

Q     Did he specify what his insurance company had requested of him?

A     No.

Q     Did he give you any specific parameters as far as a fire-detection system?

A     We spoke about placement of both burglar and fire alarm devices.

Q     And what was the nature of the conversation as far as the placement of the fire-detection system?

1    A    Where did I put them?  Is that what you're

2  asking?

3    Q    You say you and Mr. Heinz discussed placement of

4  both the burglar-detection equipment and the fire-detection

5  equipment.

6    A    I explained to Mr. Heinz -- his kitchen was in

7  the middle of the home.  Do you know what the house looked

8  like?

9    Q    I'm fairly familiar, but you answer as best as

10 you can.

11        MR. MEZZACAPPA:  You can't ask any

12        questions.

13    A    His kitchen was in the middle of the home.  You

14 want to stay away from the kitchen as far as smoke

15 detectors.  Otherwise, you get false alarms, so we put a

16 smoke detector on the right side of the kitchen, a smoke

17 detector on the left side of the kitchen and a smoke

18 detector downstairs.

19 BY MR. MASCARO:

20    Q    Can you describe for me the layout of the house?

21    A    It was basically a ranch house.  It had a couple

22 of steps down and you went down to the basement or lower

23 level.

24    Q    So there were two levels to the house; is that

25 correct?

1      A      Yes.

2      Q      When you walk in the front door of the house,

3  are you in the basement or the upper level?

4      A      You're in the upper level.

5      Q      So when you said the kitchen was in the center

6  of the house, the kitchen was in the upper level?

7      A      Yes.

8      Q      And you said you put a smoke detector on the

9  right side of the kitchen; is that correct?

10      A      Yes.

11      Q      And then one on the other side?

12      A      Yes.

13      Q      So basically one on each side of the kitchen?

14              MR. MEZZACAPPA:  Objection to form.  I don't

15              want it to sound like they're in the kitchen

16              when you say one on either side of the kitchen.

17  BY MR. MASCARO:

18      Q      One on the right and one on the left but not in

19  the kitchen?  In the rooms on either side of the kitchen;

20  is that correct?

21      A      Yes.

22      Q      The one that you said was on the right side of

23  the kitchen, where exactly was it placed, the smoke

24  detector?

25      A      I would have called that the den/living room

1   area.

2       Q       And the one we've referred to as the left side,

3   where did that go?

4       A       Outside the bedrooms.

5       Q       Was that in a hallway?

6       A       Yes.

7       Q       And I think you said there was also a smoke

8   detector placed on the lower level or the basement level;

9   is that right?

10      A       Yes.

11      Q       I'll just refer to it as the lower level.  Where

12  in the lower level was this smoke detector placed?

13      A       In the hall.

14      Q       In his hallway?

15      A       Yes.  When you come down the steps, that's a

16  hall, and to the right was the pool and to the left was

17  kind of an open rec room.

18      Q       Can you describe the entire lower level for me?

19  You've got the pool and the rec room, and any other rooms

20  in the lower level that you can recall?

21      A       There was a boiler room.

22      Q       Were there any bedrooms other than what you've

23  talked about already?

24      A       On the lower level, no.

25      Q       And how long was this hallway on the lower

1    level?

2        A    In footage?

3        Q    Yes.

4        A    Sixteen feet.

5            MR. MEZZACAPPA:  Are you guessing?  You can

6        approximate.  Don't guess.

7        A    Approximately sixteen feet.

8    BY MR. MASCARO:

9        Q    You come down a set of stairs to get to the

10   lower level, correct?

11       A    Yes.

12       Q    Where exactly in the hallway was the smoke

13   detector placed?

14       A    At the foot of the steps.

15       Q    Was it placed on the ceiling or on a wall?

16       A    Ceiling.

17       Q    At the time that you went to the Heinz residence

18   in Wilton, were there any smoke detectors already installed

19   in the residence?

20       A    I don't recall.

21       Q    In Part B of the answer to Interrogatory No. 2

22   you list an Anthony Pasquarella, employee of Command Force

23   Security System.  What did Mr. Pasquarella do in relation

24   to the installation of the security system at the Heinz

25   residence?

1      A      He installed it.

2      Q      Did anybody else other than Mr. Pasquarella

3  install the system?

4      A      Most likely he had a helper with him, but I

5  don't recall who that would be.

6      Q      Is Mr. Pasquarella still employed at Command

7  Force?

8      A      Yes.

9      Q      What is his position at Command Force?

10      A      Vice president.

11      Q      Was he a vice president back in February of

12  2000?

13      A      No.

14      Q      What was he then?

15      A      Untitled.

16      Q      Were you there when Mr. Pasquarella installed

17  the system?

18      A      No.

19      Q      Did you go inspect the system after it was

20  installed?

21      A      No.

22      Q      Did you ever go back to the Heinz residence

23  after the meeting you talked about with Mr. Heinz and up to

24  the date of the fire?

25      A      I don't believe so.

1    Q    So do you know how much time elapsed from the

2    date of your meeting with Mr. Heinz to the time that the

3    system was actually installed?

4    A    I don't.

5    Q    Do you know whether it was installed shortly

6    after your meeting, like one or two months, or something

7    later than that?

8             MR. MEZZACAPPA:  Objection to the form of

9             the question.

10            You may answer the question.

11   A    It most likely was installed very soon after we

12   came to an agreement.

13   BY MR. MASCARO:

14   Q    As part of the package that's been marked

15   Plaintiff's Exhibit No. 1, there are some exhibit tabs in

16   there.  If you look at Exhibit A, can you identify that

17   document for me?

18   A    Yes.  This is what we presented to the Heinzes

19   for that home.

20   Q    And it appears to be a signature of Lauren Heinz

21   on 2/14/2000 on the bottom of the contract; is that

22   correct?

23            MR. MEZZACAPPA:  Objection to asking him

24            what it appears to be.  I would stipulate that

25            based on the husband's testimony, but you can

1         ask him.

2    BY MR. MASCARO:

3        Q     Were you there when this document was signed?

4        A     I don't recall.  It may have been faxed to us.

5    I don't know.  I do know it's Valentine's Day, though.

6        Q     I'm aware of that as well.  I just want to go

7    through the contract with you, and we'll go into the

8    particulars in a minute, but is what is set forth in this

9    document, Exhibit A of Plaintiff's Exhibit 1, what was

10   eventually installed in the Heinz residence in Wilton?

11       A     Yes.

12       Q     It says about halfway down in the document,

13   "Command Force will alarm and install the following:  One

14   DSC Power 832 Control Panel and Digital Communicator."

15   What is that?

16       A     It's the brains of the unit.

17       Q     And when you say it's the brains of the unit,

18   what would it do?

19       A     It directs the devices and tells it what to do,

20   gives it power.  All your connections go to that panel.

21       Q     Where was that control panel installed in the

22   Heinz residence?

23       A     I don't recall.

24       Q     You don't recall whether it was the upper level

25   or the lower level?

1      A      No.

2      Q      The next line says, "One backup power supply."

3  What form did that take?  What does that mean?

4      A      It's a battery.

5      Q      And where was that installed or put?  Do you

6  know?

7      A      That's in the panel itself.

8      Q      The next thing on that line, it says, "One

9  inside siren."  What does that mean?

10     A      When the alarm is in an alarm state, it would

11  ring.

12     Q      Is that inside siren pertaining to the burglary

13  system or the fire-detection system or both?

14     A      Both.

15     Q      So if the system detected a fire, that siren

16  would go off on the property?

17     A      It's two different sounds.  A burglar alarm is a

18  warble and a fire alarm is a pulsing.

19     Q      So if the system picked up a fire, there would

20  be a sound that would go off inside the residence?

21     A      Yes.

22     Q      The next thing on there is two LCD keypads.

23  Generally speaking, what are those?

24     A      That's how you turn the alarm on and off.

25     Q      The next line says, "One water sensor by pool."

1   What was the water sensor?

2       A    Because he had a pool, he was concerned about

3   water -- the pool was in his home, and he was concerned

4   about water there.  This water sensor measures if water

5   rises above a certain amount of millimeters.

6       Q    Would that have been limited to the pool room or

7   the entire house?

8       A    It would detect where it is, so it was placed by

9   the pool area.  If there was too much water, it would go

10  off there.

11      Q    The water sensor is a separate device from the

12  smoke detector, not one device that has two functions?

13  It's a separate piece of equipment, correct?

14              MR. MEZZACAPPA:  Objection to form.

15              You may answer.

16      A    Correct.

17  BY MR. MASCARO:

18      Q    Did the water sensor do anything else other than

19  measure the water level?

20      A    No.

21      Q    It says, "One motion on downstairs level,"

22  downstairs being the basement or what we've referred to as

23  the lower level?

24      A    Yes.

25      Q    Motion being a motion detector; is that correct?

1      A      Yes.

2      Q      And did that relate solely to the burglary

3 system?

4      A      Yes.

5      Q      Then it says, "One smoke on downstairs level."

6 Is that the smoke detector we spoke about briefly that was

7 placed in the hallway downstairs?

8      A      Yes.

9      Q      Next line says, "Two smokes on main level."

10 Again, those are the two smoke detectors we've already

11 talked about?

12     A      Yes.

13     Q      "Two motions on main level."  Again, motion

14 detectors are related to the burglary system?

15     A      Yes.

16     Q      It looks like the total price for that system is

17 $1,700.  Total security investment was $1,700; is that

18 correct?

19     A      Yes.

20     Q      Then it looks like there is a monthly fee for

21 central station monitoring?

22     A      Yes.

23     Q      In the event the system picked up a fire at the

24 residence, at the Heinz residence, how would the system

25 operate?