1              MR. MEZZACAPPA:  Objection to form.

2              You may answer.

3      A    I'm sorry.  Could you repeat that?

4  BY MR. MASCARO:

5      Q    I'd better rephrase it.  Basically it's just

6  asking how the system worked in the event of a fire.  What

7  was it supposed to do?

8      A    Smoke detectors are supposed to detect smoke.

9  When they do that, the siren would ring.

10     Q    And then other than the siren ringing at the

11 residence, would something else happen?

12     A    In this case central station would get a

13 fire-alarm signal and would call the fire department.

14     Q    Would the central station call the fire

15 department first or would they call Mr. Heinz?

16     A    Typically it would call the prem first in case

17 you burned toast.

18     Q    When you say "it would call the prem," call the

19 actual residence?

20     A    Call the residence.

21              MR. MEZZACAPPA:  Do you mean the premises

22              when you say "prem"?

23              THE WITNESS:  Yes.

24 BY MR. MASCARO:

25     Q    And if they get no answer on that call?

1    A    They call the fire department if you get no

2    answer on that signal.  Obviously, you call the police on a

3    burglary signal.

4    Q    Going back to page 5 where we were talking about

5    before, the next individual listed is a Debra Moeller,

6    executive director of Command Force Security Systems, Inc.

7    What was Ms. Moeller's role in the design or installation

8    of the system at the Heinz residence?

9    A    Debra is administrative assistant and would have

10   typed up the proposal.

11   Q    Did she do anything else other than typing up

12   the proposal?

13              MR. MEZZACAPPA:  Objection to form.

14   A    Like what?

15   BY MR. MASCARO:

16   Q    That's my question to you.  She is identified as

17   a person who --

18   A    She does the paperwork.

19   Q    Okay.  She didn't have any part in designing the

20   actual system or installing it?

21   A    No.

22   Q    Then you list Harold Heinz and then Lauren Heinz

23   in answer to this question, Interrogatory 2.  Starting with

24   Mr. Heinz, what was his role in design and installation of

25   the system at his residence?

1          MR. MEZZACAPPA:  Other than what's already

2          been testified to?

3    BY MR. MASCARO:

4          Q     If there is anything more than what's already

5    been testified to.

6          A     We discussed what his needs are, what he wanted.

7          Q     So what we talked about before?

8          A     Yes.

9          Q     Did you have any more conversation with

10   Mr. Heinz after that first meeting we talked about and

11   before this system was installed by Mr. Pasquarella?

12         A     No.

13         Q     You have Mrs. Heinz listed here.  What was her

14   role in the design or installation of the system?

15         A     Only an agreement, I would say.

16         Q     The fact that she signed the contract?

17         A     Right, right.

18         Q     Did you have any conversations specifically with

19   Mrs. Heinz about the system to be installed at their

20   residence?

21         A     I don't believe so.

22         Q     When you walked through and took a look at the

23   Heinz residence with Mr. Heinz, did anything strike you as

24   either unusual or an area of concern about the way that the

25   residence was constructed?

1              MR. MEZZACAPPA:  Note my objection.

2              You may answer.

3       A     No.

4    BY MR. MASCARO:

5       Q     Mr. Heinz described his residence at his

6    deposition as sort of a post-and-beam design.  Does that

7    phrase mean anything to you?  If I were to use it, would

8    you understand what I'm talking about?

9       A     I remember the design of his house.

10      Q     Maybe that's an easier way to ask it.  Can you

11   just tell me what you remember about the design of his

12   house?

13      A     It's kind of an A-frame ranch, almost looked

14   like an Aspen type of house I would call it.

15      Q     Anything else that you recall about the design

16   of the house?

17      A     The kitchen was in the middle.

18      Q     Did Command Force install any other smoke

19   detectors other than what we went through on the actual

20   contract?

21      A     No, sir.

22      Q     The smoke detectors that Command Force

23   installed, were they wired to the control panel?  In other

24   words, how would the smoke detector notify the control

25   panel that it picked up a fire?

1          MR. MEZZACAPPA:  Objection to the form.

2          You may answer.

3     A     These smoke detectors were, I believe, a

4  wireless device that transmits a signal to a receiver at

5  the main control panel.  When it detects smoke, it tells

6  the panel to go into an alarm state, which then sounds the

7  siren, which is that pulsing noise, to alert the people in

8  the home that there is a fire.

9  BY MR. MASCARO:

10    Q     And I may have asked this before, but were there

11  any other smoke detectors in the residence?

12    A     I don't recall.

13    Q     You don't recall?

14    A     My company didn't put in any other smoke

15  detectors.

16    Q     Command Force didn't put in any other than what

17  we went over on the contract?

18    A     That's correct.

19    Q     Did you have any conversations with

20  Mr. Pasquarella regarding this system installed at the

21  Heinz residence?

22    A     Yes.

23    Q     Did you have that conversation with him before

24  he installed it or after he installed the system or both?

25    A     Both.  We talk every day about all our jobs.

1      Q      Prior to the installation of the system at the

2  Heinz residence, what did you and Mr. Pasquarella talk

3  about regarding the system?

4      A      Location.

5      Q      Anything else?  The design of the residence, the

6  location of the residence, anything like that?

7      A      I can't recall any other conversation.

8      Q      Would you have given some sort of written

9  directions or instructions or anything of that nature to

10  Mr. Pasquarella?

11      A      Verbal direction.

12      Q      And that would include the placement of the

13  smoke detectors?

14      A      Yes.

15      Q      Do you know whether when Mr. Pasquarella

16  installed the system at the Heinz residence anyone was

17  present other than Mr. Pasquarella and perhaps someone

18  assisting him?  In other words, was Mr. or Mrs. Heinz

19  there?

20      A      I don't believe so.

21      Q      What was the nature of your conversation with

22  Mr. Pasquarella after he installed a system at the Heinz

23  residence?

24      A      Usually it's, "How did it go?  Are the clients

25  happy?"

1    Q    What did he tell you, if you recall?

2    A    I know I would have remembered if they weren't

3    happy --

4    Q    Of course.

5    A    -- so I don't really recall that exact

6    conversation.

7    Q    In your conversations with Mr. Heinz when you

8    went to the residence, did you at any time ever suggest or

9    propose that he get more of a system than was eventually

10    installed in his residence?

11            MR. MEZZACAPPA:  Objection to form.

12            You may answer.

13    A    I always want to put as much detection in

14    someone's home as I can.  That's how I make my money.  I do

15    listen to my clients, though, and try to fit that in to

16    what their needs are, so we may have said, "You need to

17    alarm every window and door in your home," which is what I

18    would prefer, but that wasn't what Mr. Heinz wanted.

19    BY MR. MASCARO:

20    Q    When you say "alarm every window and door," that

21    relates to the burglary system?

22    A    Yes.

23    Q    Did you say anything to Mr. Heinz specifically

24    on the fire-detection system?

25            MR. MEZZACAPPA:  Objection to form.

1              You may answer.

2      A      We always want to install as many devices as we

3   can without trying to take advantage of a client, so I

4   can't recall the specifics of that, but this is what

5   Mr. Heinz was requesting at the time.

6   BY MR. MASCARO:

7      Q      Do you recall whether you ever said to

8   Mr. Heinz, "You need more than one smoke detector on the

9   lower level"?

10     A      I can't recall that.

11             MR. MEZZACAPPA:  I have a form objection to

12             the last question.  Sorry.

13  BY MR. MASCARO:

14     Q      You can't recall if you said anything to that

15  effect to Mr. Heinz?

16             MR. MEZZACAPPA:  Objection to the form.

17             You may answer.

18     A      No.

19  BY MR. MASCARO:

20     Q      You have a general recollection of what the

21  design or the layout was of the lower level; is that

22  correct?

23             MR. MEZZACAPPA:  Objection.

24     A      Yes.

25

BY MR. MASCARO:

Q    Knowing that, do you think you would have said something to Mr. Heinz about having more than one smoke detector?

MR. MEZZACAPPA:  I think it's an inappropriate question that you're asking him now because he doesn't recall if he did and now you're asking if he would have.

MR. MASCARO:  I'll withdraw that question. It's well taken.

BY MR. MASCARO:

Q    If you would walk into a residence today that was identical to the Heinz residence as you remember it, what would your recommendation be regarding the number of smoke detectors on the lower level?

MR. MEZZACAPPA:  Objection.

You may answer.

A    The same.

BY MR. MASCARO:

Q    The one smoke detector in the hallway?

A    Yes.

Q    Turning again to Plaintiff's Exhibit No. 1, starting on page 5 where there is Question No. 3 and the answer starts on page 5 and spills over on to page 6, if you look at the section labeled with a small E, subsection

1    E, it states, "Debra Moeller had several telephone

2    conversations with Mr. Heinz relative to the security

3    system, wherein Mr. Heinz made it clear that with regard to

4    the price and design of the system, in his opinion, 'less

5    was better,' or words to that effect."

6          Is that something you recall Ms. Moeller telling

7    you about her conversations with Mr. Heinz?

8       A    Now that I read it, yes.

9       Q    Did she have her conversation or

10   conversations -- I guess it's several telephone

11   conversations, so did she have her conversations with

12   Mr. Heinz prior to the date that you went out to visit the

13   residence or afterwards?

14          MR. MEZZACAPPA:  Objection to form.

15          You may answer.

16      A    Did she have conversation with Harold before we

17   installed the system?

18   BY MR. MASCARO:

19      Q    No.  I'll try to make it clearer.  This section

20   I just read said that Ms. Moeller had several conversations

21   with Mr. Heinz where he said several things about the price

22   and design of the system.  Did she have those conversations

23   with Mr. Heinz before you went out to the property or

24   after?

25      A    After.

1      Q     So you met with Mr. Heinz at his property, and

2   sometime after that date she had some telephone

3   conversations with him, "she" being Debra Moeller, wherein

4   he said the things that we just read into the record; is

5   that correct?

6      A     Yes.

7      Q     Staying on page 6 of Plaintiff's Exhibit 1,

8   Interrogatory No. 4, there is a question regarding

9   statutes, regulations, standards and codes relied upon,

10  consulted or complied with by the defendant when it

11  designed and installed the security system at 34 Wildwood

12  drive, and the response specifically mentions NFPA 72.

13  First of all, for the record, what does NFPA stand for?

14     A     National Fire Protection -- I don't know what

15  the A stands for.

16     Q     And is that a code or a set of standards

17  relating to fire protection?

18               MR. MEZZACAPPA:  Objection.

19               You may answer.

20     A     Yes.

21  BY MR. MASCARO:

22     Q     The specific citation to NFPA 72, at the time

23  that the system was installed in the Heinz residence was

24  NFPA 72 something you were aware of?

25     A     Was I aware of NFPA 72 at the time that we

1  installed at the Heinzes'?

2      Q      Correct.

3      A      Yes.

4      Q      And did you rely on NFPA 72 as far as the type

5  of system that was ultimately installed at the Heinz

6  residence?

7              MR. MEZZACAPPA:  Objection to form.

8              You may answer.

9      A      You're asking me if -- I'm sorry.  Repeat that

10 question.

11             MR. MASCARO:  Can you just read that for me,

12         please.

13             (The court reporter read the pending

14         question.)

15             MR. MEZZACAPPA:  Do you understand his

16         question?

17             THE WITNESS:  I understand the question.

18     A      I'm thinking about what we did at the time, and

19 I'm not sure if NFPA at that time -- I guess my answer

20 would be yes to your question.

21 BY MR. MASCARO:

22     Q      Other than NFPA 72, were there any building

23 codes or fire codes that were applicable to the Heinz

24 residence when the system was installed?

25             MR. MEZZACAPPA:  Just note my objection.  I

1    would ask that you let him read the response to

2    that before asking him that in that he helped

3    prepare the responses that he signed and you're

4    asking the same question here.  That's my

5    only --

6     MR. MASCARO:  I understand your objection.

7    Let me rephrase that question.

8 BY MR. MASCARO:

9   Q The answer to Interrogatory No. 4 states, "Other

10 than NFPA 72, no other requirements, statutes, regulations,

11 standards and codes were specifically relied upon for the

12 existing residential dwelling, other than the extensive

13 knowledge and expertise of the defendant."

14    As you sit here today do you believe that answer

15 is still correct?

16   A Yes.

17   Q When you were considering and designing this

18 system that was ultimately installed in the Heinz

19 residence, did you take into consideration at all the type

20 of fire department the town of Wilton had?

21   A No.

22   Q At the time that this system was installed, did

23 you know whether Wilton had a volunteer fire department or

24 a -- I'll use the word "professional," meaning paid

25 firemen.  Did you have any knowledge to that?

54

1                    MR. MEZZACAPPA:  Objection to form.

2                    You may answer.

3        A    No.

4    BY MR. MASCARO:

5        Q    Did you take into consideration where the

6    closest hydrant or other source of water would have been to

7    the premises in the event of fire?

8                    MR. MEZZACAPPA:  Objection to form.

9                    You may answer.

10       A    No.

11   BY MR. MASCARO:

12       Q    On page 7 of Plaintiff's Exhibit 1, at the

13   bottom of the page is Interrogatory No. 6, and the answer

14   to that question is on page 8, and the answer consists of

15   three paragraphs.  The third full paragraph states,

16   "Mr. Heinz advised Mr. Matza and Ms. Moeller several times

17   that he was interested in simplicity and low cost of the

18   system.  Specifically, he did not want to incur costs above

19   that which he had already incurred in purchasing the home."

20           I'm not sure what that second sentence means,

21   "Specifically, he did not want to incur costs above that

22   which he had already incurred in purchasing the home."  Can

23   you explain what that means?

24                   MR. MEZZACAPPA:  Just note my objection in

25           that, based on the response, this is something

1          your client said to my client.  Now you're

2          asking my client what your client meant by that.

3          That's my objection.

4               MR. MASCARO:  Understood.  Let me rephrase

5          it.

6               MR. MEZZACAPPA:  I think it calls for state

7          of mind for Mr. Heinz.

8               MR. MASCARO:  I'll rephrase it.

9   BY MR. MASCARO:

10      Q     Did Mr. Heinz say to you he did not want to

11  incur costs above that which he had already incurred in

12  purchasing the home?

13      A     He did not want to spend a lot of money on his

14  security system.

15      Q     He said he did not want to spend a lot of money

16  on it?

17      A     Yes.

18      Q     What's confusing me is in relation to what he

19  paid in purchasing the home.  Did he make any type of

20  statement to you such as what he paid for the home?

21      A     The house cost him a lot of money.

22      Q     So he didn't want to spend too much money on an

23  alarm system?

24               MR. MEZZACAPPA:  Objection to form.

25

```
 1   BY MR. MASCARO:

 2       Q     Is that basically what your interpretation of it

 3   was?

 4                   MR. MEZZACAPPA:  Objection to form.

 5                   You may answer.

 6       A     Yes.

 7   BY MR. MASCARO:

 8       Q     Mr. Matza, turning to what's Exhibit B to

 9   Plaintiff's Exhibit 1, can you identify that document for

10   me?

11       A     Yes.

12       Q     And what is that document?

13       A     A thank-you.

14       Q     When I say "that document," I mean page 1 of

15   what's included as Exhibit B.  Can you identify page 1 for

16   me?

17                   MR. MEZZACAPPA:  This is the one we're

18               talking about.  He had to make it clear for the

19               record because there are a bunch of pages there.

20   BY MR. MASCARO:

21       Q     The top page.

22       A     This is a thank-you to Hal and Lauren.

23       Q     For entering the contract with Command Force; is

24   that correct?

25       A     Yes.
```

1    Q    There is a reference to Gold Coast Data &

2    Communications.

3    A    Yes.

4    Q    Who are they?

5    A    A d/b/a of Command Force.

6    Q    So Gold Coast Data & Communications, is that a

7    separate business from Command Force?

8    A    No, no, same business.  We were expanding to

9    phone systems and data, and people didn't want to purchase

10   that from a security company, so we had a d/b/a Gold Coast

11   so we could try to do business that way.

12   Q    Gold Coast wasn't separately incorporated?

13   A    No, d/b/a.

14   Q    Going to the next page of what's part of

15   Exhibit B to Plaintiff's Exhibit 1, can you identify what

16   page 2 is?

17   A    It looks like a parts list with a price

18   breakdown.

19   Q    Is that your handwriting?

20   A    No.

21   Q    Do you recognize whose handwriting that is?

22   A    I do.

23   Q    Whose handwriting is that?

24   A    That's Anthony's.

25   Q    Mr. Pasquarella's?

58

1      A      Yes.

2      Q      Do you know when Mr. Pasquarella prepared this

3  document?

4      A      I do not.

5      Q      To your knowledge, does it relate to the Heinz

6  residence in Wilton?

7      A      Yes.

8      Q      And you stated that this was a parts list.  Is

9  this the cost of the parts that were eventually installed

10 in the Heinz residence?

11     A      Yes.

12     Q      There is a dollar figure on the bottom there,

13 $1,853.  Is that what the parts ultimately cost the

14 Heinzes?

15     A      No.  The Heinzes paid $1,700.  They negotiated

16 it down.

17     Q      The next page on Exhibit B to Plaintiff's

18 Exhibit 1, can you identify that document for me?

19     A      This is a notification list to the central

20 monitoring station.

21     Q      The central monitoring station, is that part of

22 Command Force or is that a separate entity?

23     A      Separate entity.

24     Q      The people who worked at the central monitoring

25 station, were they employees of Command Force?

1       A       No.

2       Q       You stated this was a notification list to the

3    central monitoring.  Starting about a third of the way down

4    on this document there are headings:  "Alarm code,

5    condition, call back, notify."  Starting with "alarm code,"

6    what does that relate to?

7       A       Central station gets alarm codes, depending on

8    what device has been activated.  In this case this is

9    saying if they get a signal between 31 and 33 that that is

10   a burglary signal; 11, 12, 13 is a smoke; 17 is a water; 18

11   is a battery; and 19 is low power fail.

12      Q       And a little below that is a notification list,

13   and then it lists three lines filled out.  Starting with

14   Line No. 1 where it says, "Premise -- PD," what does that

15   mean?

16      A       We call back the premises first and try to get

17   the password.  In this case it's Cortney, and if we don't

18   get that password we call the police, and if the police are

19   notified, in this case we'll call the work number.

20      Q       So the PD in Line 1 refers to the police

21   department?

22      A       Yes.

23      Q       And that's in the event the burglar alarm was

24   activated?

25      A       It would be the fire department if the fire

1   alarm was activated.

2       Q       And No. 2 is what?

3       A       The Heinzes' work number.

4       Q       And what does No. 3 refer to?

5       A       Lauren Heinz's cell phone number.

6       Q       Going down to the bottom of the page where it

7   says, "Alarm Company CFSS," I assume that relates to

8   Command Force Security Systems?

9       A       Yes.

10      Q       "Notify," whose number is that?

11      A       That's my company.

12      Q       And on the last line of this document,

13  "Equipment on job," there is some writing that appears to

14  have been scratched out and some handwriting underneath the

15  line.  What does the writing underneath the line refer to?

16      A       The type of equipment that was installed.

17      Q       Can you just read that for me?

18      A       ITI Simon 2 contact ID.

19      Q       Does that refer to the alarm equipment in

20  general?

21      A       It would actually refer to all of the equipment.

22      Q       The next document of Exhibit B to Plaintiff's

23  Exhibit 1 --

24              MR. MEZZACAPPA:  Hold on.  You have to make

25              a correction.

1              THE WITNESS:  I do, because I'm looking at

2         this and this is what was installed after the

3         original installation.  I believe that this was

4         the original installation.

5              MR. MEZZACAPPA:  The next page.

6              THE WITNESS:  And this was notification of

7         what was done on the second alarm system to the

8         home.

9              MR. MEZZACAPPA:  Okay.

10   BY MR. MASCARO:

11        Q    To be clear --

12        A    I'm not sure, though, Joe.

13        Q    That's what we're trying to find out.  Just to

14   be clear for the record, on page 3 of the documents that

15   are part of Exhibit B to Plaintiff's Exhibit 1, we've just

16   gone through this and you've identified it as a

17   notification to the central monitoring, I believe.

18        A    Yes.

19        Q    You raised an issue as to which system this

20   applied to.  I interpret that to mean as to the system

21   installed before the fire or after the fire.

22        A    Yes.

23        Q    Do you know which this applies to?

24        A    Well, the information would pretty much be the

25   same on either case, and I'm not sure.

1      Q      There is no date on this document, as far as I

2   can see.

3      A      Right.

4      Q      Starting on the next document which is part of

5   Exhibit B to Plaintiff's Exhibit 1, can you identify that

6   for me?

7      A      This is the instruction booklet of how to

8   install the system programming.

9      Q      Is this something that's given to the Heinzes?

10     A      No, this is for the installer.

11     Q      Do you know whose handwriting is on the document

12  entitled "Programming Work Sheets"?

13     A      Anthony's.

14     Q      The document entitled "Programming Work Sheets,"

15  that's Anthony Pasquarella's handwriting?

16     A      Yes.

17            (A recess was taken from 12:07 p.m. until

18            12:17 p.m.)

19  BY MR. MASCARO:

20     Q      Mr. Matza, before we took a break we were

21  talking about some documents which were part of Exhibit B

22  to Plaintiff's Exhibit 1, and we were discussing some

23  instructional booklet that would be given to the installer.

24  Was this the instructional booklet relating to the system

25  that was installed at the Heinz residence?

1       A       Yes.

2       Q       And this would have been given to or it would

3   have been in the possession of Mr. Pasquarella?

4       A       It comes in the control panel box.

5       Q       I am going on to the next document, not the next

6   page, but moving on from the instructional booklet -- and I

7   think the last page -- it's not numbered, unfortunately,

8   but --

9               MR. MEZZACAPPA:  I'm where you are.

10  BY MR. MASCARO:

11      Q       The next document is a copy of a handwritten

12  note which states, "Anthony, please make the alarm code the

13  same as our other house (call us).  Do not code it 2190.

14  Thanks."  And then it's signed "Lauren and Harold."

15              Do you know who this note was addressed to,

16  Anthony who?

17      A       Anthony Pasquarella.

18      Q       There is no date on this note.  Do you know when

19  it would have been written?

20      A       No.

21      Q       Assuming it was written by either or both

22  Mr. and Mrs. Heinz, do you know what the phrase "please

23  make the alarm code the same as our other house" means?

24      A       Yes.  I see a number 8143 at the top, and if I

25  saw it I would say make it 8143, which is the same code

1    number as their old home.

2        Q      Their old home?

3        A      In Dix Hills.

4        Q      And this refers to the code to be used at 34

5    Wildwood Drive in Wilton, Connecticut?

6        A      I believe so.

7        Q      The next page which is part of Exhibit B, can

8    you identify that document for me?

9        A      It's an invoice to the Heinzes for payment of

10   the installation with central station monitoring added to

11   it.

12       Q      And all the items listed in this invoice are the

13   same as what were listed on the contract and proposal

14   signed by Mrs. Heinz?

15       A      Yes.

16       Q      It's dated April 10, 2000.  Would the

17   installation have been completed by or on that date, April

18   10, 2000?

19       A      Correct.

20              MR. MEZZACAPPA:  Objection.

21              You may answer.

22       A      It means we haven't been paid, at least up until

23   that point, yes.

24   BY MR. MASCARO:

25       Q      Would the issuing of the invoice mean the work

1  had been done?

2      A      Yes.

3      Q      That's what I wanted to ask you.  Thank you.

4             Looking at the next document, can you identify

5  this document for me?

6      A      This is a proposal that we sent to the Heinzes

7  for the rebuilding of their new home.

8      Q      So this is a proposal sent after the fire which

9  occurred on, I think it was, July 23, 2001; is that

10  correct?

11      A      Yes.

12      Q      Did Command Force install an alarm system in the

13  residence that was built or rebuilt after the fire?

14      A      Yes, but not this alarm, not the one you're

15  looking at.

16      Q      This was not accepted --

17      A      Correct.

18      Q      -- or agreed upon ultimately?

19      A      That's correct.

20      Q      This document that we're looking at -- I'm

21  trying to see if there is a date on it, but it doesn't look

22  like it, and it's not signed.  Does it relate to both a

23  burglar and a fire-detection alarm system or is it just a

24  burglar alarm?

25      A      A burglar and fire -- one second.  This is just

1  burglar.

2      Q      Okay.  Do you have any idea when this document

3  was produced or generated?

4      A      No.  This is a separate --

5                  MR. MEZZACAPPA:  Go ahead.

6  BY MR. MASCARO:

7      Q      Looking at the next page --

8      A      It's a separate proposal for an access control

9  system to the pool.

10                 MR. MEZZACAPPA:  And just note for the

11                 record that this proposal goes on.  It's four

12                 pages long.

13  BY MR. MASCARO:

14     Q      Is that correct, Mr. Matza?  It's a four-page

15  proposal?

16     A      Yes.

17     Q      And this proposal was ultimately not accepted or

18  entered into by Command Force and the Heinzes?

19     A      That's correct.

20     Q      Was there a proposal that was ultimately entered

21  into after the fire regarding an alarm system at their

22  residence?

23     A      Yes.  We installed an alarm system after the

24  fire in the same home before it was renovated.

25     Q      And that was just a burglar alarm system?

1      A      No.  It had, I believe, both aspects to it,

2   burglary and fire, but I'm not 100 percent sure of that.

3      Q      Did you ever go out to the residence after the

4   fire?

5      A      Yes.

6      Q      Do you remember when you went out to the

7   residence after the fire?

8      A      I believe I was called that there was a fire and

9   the next day I went there.

10      Q      The day after the fire?

11      A      Yes.

12      Q      And was anyone there when you went out to the

13   property?

14      A      Mr. Heinz.

15      Q      Was anyone else there?

16      A      An adjustor.

17      Q      From his insurance company?  Was that your

18   understanding, an adjustor from his insurance company?

19                MR. MEZZACAPPA:  Objection to the form.

20                You have may answer.

21      A      Yes.

22   BY MR. MASCARO:

23      Q      Was anyone else there?

24      A      I don't believe so.

25      Q      Do you remember the adjustor's name?

1      A      I don't.

2      Q      Do you remember what company he was from?

3      A      I don't.

4      Q      How long did you stay at the property then on

5  that visit after the fire?

6      A      Approximately one hour.

7      Q      Did you have any conversations with Mr. Heinz

8  when you were out there?

9      A      Yes.

10      Q      What was the nature of your conversation with

11  him?

12      A      Well, I felt very bad for Mr. Heinz, that his

13  property had suffered such a thing, and we were discussing

14  putting in a temporary system while repairs were being

15  made.

16      Q      And that was something that was ultimately done;

17  is that correct?

18      A      Yes.

19      Q      Did you have a chance to observe the damage to

20  the property?

21      A      Yes.

22      Q      Can you just describe for me the damage that you

23  saw?

24      A      Smoke damage, black.

25      Q      Did you actually go inside the property or did

69

1  you stay outside?

2      A      I went inside.

3      Q      Both levels?

4      A      Yes.

5      Q      Did anyone make any representation to you about

6  how they believe the fire started?

7      A      No.

8      Q      Did you have any idea when you visited the

9  property as to how the fire started?

10     A      No.

11     Q      From examining or from seeing the property after

12 the fire did you reach any ideas or conclusions as to where

13 the fire started?

14     A      No.

15             MR. MEZZACAPPA:  Objection as to form.

16             You may answer.

17 BY MR. MASCARO:

18     Q      Was damage greater on the lower level or on the

19 upper level, from the fire?

20     A      I couldn't say.

21     Q      Were there any parts of the structure, the Heinz

22 residence, that were not damaged at all from either smoke

23 or fire?

24             MR. MEZZACAPPA:  Objection to form.

25     A      The garage looked okay.

```
 1   BY MR. MASCARO:

 2        Q     Did you ever go back out to the property other

 3   than that visit we just talked about after the fire?

 4        A     Yes.

 5        Q     How many more times did you go out to the

 6   property?

 7        A     I think once.

 8        Q     Do you remember when that was in relation to the

 9   visit we just talked about?

10        A     Timewise?  Shortly afterwards.  I installed the

11   temporary system myself.

12        Q     What was the temporary system?

13        A     It was a wireless system.

14        Q     Was it burglar and fire?

15        A     I believe so, yes.

16        Q     Were the Heinzes living in the residence after

17   the fire?

18        A     No.  They were concerned that it would be

19   vandalized.

20        Q     That first visit you made to the property after

21   the fire, did you have any conversations directly with the

22   adjustor?

23        A     Just pleasantries.

24        Q     "Hi, how are you," that type of thing?

25        A     Yes.
```

1      Q      Nothing about the structure or the fire?

2      A      No.

3      Q      The next time that you went out to the property

4   when you installed the temporary system, was anybody else

5   there other than you?

6      A      No.

7      Q      You installed it on your own?

8      A      Yes.

9      Q      The Heinzes weren't there?

10     A      No.

11     Q      No insurance adjustor was there on that visit?

12     A      No.

13     Q      Did you ever have any conversations about the

14   fire with anyone associated with the Wilton Fire

15   Department?

16     A      No.

17     Q      Nobody from the Wilton Fire Marshal's office

18   either?

19     A      No.

20     Q      Going back to before the fire when you went out

21   to the property to speak with Mr. Heinz about the system,

22   to your observation was there any work going on at the

23   Heinz residence, any remodeling, additions, reconstruction,

24   anything of that nature going on that you could observe?

25              MR. MEZZACAPPA:  Let me hear the question

```
 1            again.  I didn't hear when you're asking him.

 2            After the fire?

 3                 MR. MASCARO:  No, this is before the fire.

 4                 THE WITNESS:  The first visit.

 5                 MR. MASCARO:  Yes.

 6                 MR. MEZZACAPPA:  Okay.  Go ahead.

 7   BY MR. MASCARO:

 8       Q    Was there anything in the process of going on,

 9   any remodeling or anything?

10       A    No.

11       Q    Do you know if the Heinzes had done any kind of

12   remodeling of the property or an additions?

13                 MR. MEZZACAPPA:  At what time?

14   BY MR. MASCARO:

15       Q    Prior to your visit before the fire.  In other

16   words, let me ask it this way:  Did Mr. Heinz say, "We just

17   added this room," or, "We just added another level," or,

18   "We just gutted this room," or anything of that nature in

19   talking about the work done on the property?

20       A    No.  I had alarmed the house very soon after

21   they took possession of the house.

22       Q    Did it look to you like any work was going on at

23   the property?

24       A    No.

25                 (Plaintiff's Exhibit No. 2:  Marked for
```

1            identification.)

2  BY MR. MASCARO:

3      Q      Mr. Matza, I'm going to show you what's been

4  marked as Plaintiff's Exhibit 2.  On this document there is

5  also a copy of another exhibit sticker because it was

6  marked as an exhibit at another deposition, but I'm going

7  to refer to it as Plaintiff's Exhibit 2, which is the

8  yellow sticker on the bottom right corner.  Can you

9  identify that document for me?

10     A      This is a central station activity report.

11     Q      And what does it contain?  What information does

12 it contain?

13     A      This is the dispatch of the Wilton Fire

14 Department to the Heinzes' home on the day of the fire.

15     Q      Do you know who produced or generated this

16 document?

17     A      The central monitoring station.

18     Q      And is this something that would have been

19 provided to Command Force after the fire?

20     A      Yes.

21     Q      And is that a matter of course, that they would

22 provide that to you?

23     A      Yes.

24     Q      Would the central monitoring station provide

25 this type of report every time a system is activated, even

74

1    if it is a false alarm?

2                    MR. MEZZACAPPA:  Objection to form.

3                    You may answer.

4         A       Every time an alarm occurs on one of our

5    clients, we are notified.

6    BY MR. MASCARO:

7         Q       Does this subscriber activity report indicate

8    when the fire at the Heinz residence was first detected?

9         A       I'm reading a date and a time of 7/23/01, Monday

10   at 11:06 and 19 seconds.

11        Q       Putting aside whether that's accurate, I'm not

12   asking you to say whether it's accurate, but as being part

13   of this subscriber activity report, is that time supposed

14   to be the time that the system was first activated at the

15   time of the fire on July 23, '01?

16                    MR. MEZZACAPPA:  Note my objection.

17                    You may answer.

18        A       This would appear as the time that the central

19   system got the signal.

20   BY MR. MASCARO:

21        Q       And where it looks like it says, "Premises --

22   left MSG, 11:06:26 a.m.," what does that mean?

23        A       They called the home, and they didn't get a

24   response, and they left a message.

25        Q       Underneath that line --

1     A     That's the phone number that they called.

2     Q     And the next line?

3     A     And then it looks like they -- oh, they're just

4 saying that they got a male voice, and then they called

5 again and left a message, and they got the same male voice,

6 and then they contacted the Wilton Fire Department at 11:08

7 and 13 seconds.

8     Q     It looks like, according to this report, the

9 central station contacted the premises twice before

10 contacting the fire department; is that correct?

11    A     Yes, and then contacted Mr. Heinz at work.

12    Q     Going down to the next time that's listed, 11:08

13 and 58 seconds a.m., and it says "Fire," what does that

14 mean?

15    A     That's the code that they got.  They got a fire

16 signal, fire condition.

17    Q     And that's the same condition that was recorded

18 at 11:06 and 19 seconds, right?

19    A     Right.  It transmitted again.

20    Q     The next line for the time, it says 1:14 and 31

21 seconds p.m.?

22    A     "Officer Godfrey called.  There was a fire at

23 the prem.  Gave me" --

24    Q     It looks illegible there.

25    A     Something for Mr. Heinz to call.

1      Q      And going down to the next line, what does that

2   represent?

3      A      They called Mr. Heinz at work and contacted him,

4   so it looks like they contacted him twice.

5                   (Plaintiff's Exhibit No. 3:  Marked for

6                   identification.)

7   BY MR. MASCARO:

8      Q      Mr. Matza, I'm going to show you what's been

9   marked as Plaintiff's Exhibit 3.  It is a sketch or drawing

10  which in the right-hand corner lists the name of Schleifer

11  Associates, Inc., with an address in Whippany, New Jersey.

12  I want you to take a look at that sketch for a moment.

13  This purports to be a sketch or a layout or a design of the

14  Heinz home at 34 Wildwood Drive in Wilton, Connecticut.  To

15  your recollection is this an accurate representation of the

16  layout of the residence that you visited prior to the fire

17  on July 23, 2001?

18                   MR. MEZZACAPPA:  Just note my objection.

19                   Can I ask you to leave the room?  I have to

20                   put certain objections on the record. I don't

21                   want you to hear.

22                   (The witness left the room.)

23                   MR. MEZZACAPPA:  Just based on the fact that

24                   Schleifer Associates prepared it after the fire

25                   and that my client doesn't remember any

1    renovations based on your questioning of him or

2    Mr. Heinz telling him that they recently

3    renovated anything, by the time this was

4    sketched on 7/31/01, if that's an accurate date

5    when Schleifer did it, I don't know if this

6    layout in this is accurate to what my client

7    would have seen when they installed the alarm,

8    so that's the problem I have with it, in case he

9    says yes but he is not noticing things like

10   second-story loft and things like that.  I'll

11   let you use it to refresh his recollection

12   because I don't have anything better either.

13        MR. MASCARO:  That's all I'm trying to be

14   clear about.

15        MR. MEZZACAPPA:  I just wanted to do it

16   without him being coached.

17        MR. MASCARO:  Sure.  I appreciate that.

18        (The witness re-entered the room.)

19        MR. MEZZACAPPA:  There is basically a

20   question pending, and I stated an objection and

21   my reasons for it.

22        (The court reporter read the pending

23   question as follows:

24        "QUESTION:  To your recollection is this an

25   accurate representation of the layout of the

1            residence that you visited prior to the fire on

2            July 23, 2001?")

3       A    Is this what the house looked like?

4  BY MR. MASCARO:

5       Q    Yes, that's essentially the question.  If you

6  recall.

7       A    That part of it, the design part of it, looks

8  accurate to me.  It was a long house.

9            MR. MASCARO:  Can you mark that.  We'll make

10            it a group exhibit, instead of marking each

11            page, and try to identify it as particularly as

12            possible.

13            MR. MEZZACAPPA:  No objection.

14            (Plaintiff's Exhibit No. 4:  Marked for

15            identification.)

16  BY MR. MASCARO:

17       Q    Mr. Matza, I'm going to show you what's been

18  marked Plaintiff's Exhibit 4.  It is a group of

19  photographs.  There are 13 sheets, some of which contain

20  two photographs, some of which contain one, and each sheet

21  contains the name Schleifer Associates in the upper

22  left-hand corner.  Looking at just page 1, which contains

23  two photographs, looking at just that top page, can you

24  tell me what's represented in the photographs?

25       A    Mr. Heinz's house.

79

1      Q      That was the house that existed before the fire?

2             MR. MEZZACAPPA:  Note my objection.

3   BY MR. MASCARO:

4      Q      I don't mean in every little particular detail.

5   When you went to visit the house to talk to Mr. Heinz about

6   installing a security system for the first time at the 34

7   Wildwood Drive address, was this the house as depicted on

8   the two photographs on page 1 of Exhibit 4?

9             MR. MEZZACAPPA:  Note my same objection as I

10            had to the Schleifer Associates drawing based on

11            the fact that Schleifer Associates apparently

12            took these photos.

13            You may answer the question.

14     A      I don't recall this section of the house, which

15   is a section above the garage, or ever being in it or

16   seeing it.

17  BY MR. MASCARO:

18     Q      Just to be clear for the record, you were

19  pointing to the bottom photograph on page 1 of Exhibit 4 --

20     A      This section.

21     Q      -- on the right-hand side of the photo, the --

22            MR. MEZZACAPPA:  Topmost section toward the

23            trees.

24  BY MR. MASCARO:

25     Q      You don't recall that --

1        A        It shows it here also.

2        Q        When you say "here," you're pointing to page 2,

3    the bottom photograph again.  You don't recall seeing that

4    when you went to visit the property to talk to Mr. Heinz

5    about the alarm system?

6        A        Right.  I was never in this section of the home.

7        Q        Was the garage attached to the home?

8        A        Yes.  You walk through the garage --

9                  MR. MEZZACAPPA:  Let him finish the

10                 question.  It's for her.  She can't take --

11                 THE WITNESS:  Sorry.

12   BY MR. MASCARO:

13       Q        When you first visited the Heinz residence at 34

14   Wildwood Drive in Wilton, was the garage attached to the

15   home?

16       A        Yes.

17       Q        And do you recall any levels or rooms above the

18   garage, to your knowledge?

19       A        To my knowledge, there was no level above the

20   garage.

21       Q        Did you walk in through the garage to get into

22   the Heinz residence?

23       A        Yes.

24       Q        And when you walked into the garage or through

25   the garage, did you enter the Heinz residence at the upper