31

1        A.    I believe I've only taken one of their
2    courses.
3        Q.    And do you remember the name of their
4    course?
5        A.    It was a course involving investigation and
6    analysis of appliance fires.
7        Q.    Do you remember how long that course was?
8        A.    It was a week.
9        Q.    Do you remember where it was held?
10       A.    It was in Saint Louis.
11       Q.    And you say it was one week long.  Was it a
12   full day for one week?
13       A.    Pretty much, yes.
14              MR. MEZZACAPPA:  Objection to form on
15              the last question.
16   BY MR. MASCARO:
17       Q.    Have you ever been a presenter or
18   instructor at any course or program through the
19   International Association of Arson Investigators?
20       A.    No, I haven't.
21       Q.    And the last listing -- it looks like an
22   award -- Fan Makers Company Prize in Aerodynamics,
23   1977, Cranfield Institute of Technology.  Was that an
24   award?
25       A.    Yes, it was.

ALLAN REPORTING SERVICE

32

1        Q.    What was that for?

2        A.    It was for basically my thesis in

3  aerodynamics when I completed the Master's degree

4  program at Cranfield.

5        Q.    Have you ever authored any publications or

6  articles?

7        A.    Yes, I have.

8        Q.    Do you know how many you've authored?

9        A.    I don't recall right offhand.  I think

10  there's about eight or nine.

11        Q.    Do any of the articles or publications

12  you've authored have to do with the topic of fire

13  investigation?

14                MR. MEZZACAPPA:  Objection to form.

15                You may answer.

16        A.    One does.

17        Q.    And do you remember the title of that

18  publication?

19        A.    Yes.  It was -- I don't remember the exact

20  title.  I remember a general --

21        Q.    Sure.

22        A.    It was *Field Modeling Analysis of the San*

23  *Juan Dupont Plaza Hotel Fire.*

24        Q.    Where was that publication published?

25        A.    It was in the proceedings from the Society

33

1   of Fire Protection Engineers conference in Orlando,

2   1993 or 1994.  I don't have the exact date with me.

3        Q.    Did you make any kind of presentation or

4   speak at these proceedings regarding your article?

5        A.    Yes, I did.

6        Q.    Was it a presentation or were you part of a

7   panel discussion?  What was it exactly?

8        A.    No, it was a presentation.

9        Q.    Generally speaking, what was your -- I know

10  you've given us the title or the approximate title of

11  the article.  What exactly was the article about?

12       A.    Let me try and be as complete as I can.

13  The San Juan Dupont Plaza Hotel fire was a big fire

14  that occurred in the 1987 or 1988 time frame.  It

15  involved over 200 defendants and a large number of

16  plaintiffs as well, and there was also a large degree

17  of public sector involvement in the early

18  investigation:  ATF, National Bureau of Standards,

19  NFPA.  And it was the first really major fire where

20  the developing application tool of computer fire

21  modeling was used in a practical investigation used to

22  supplement the investigation.

23            And my role and my paper that resulted out

24  of it was applying a more complex fire model that

25  could predict the progression of the fire and the

34

1   impact of the fire on objects throughout a large

2   building complex on products that were in that area

3   and what impact that would have had on the spread and

4   development of that fire.

5        Q.    I wish I could say I read that, but I

6   didn't.  I don't think I would understand even if I

7   did.

8            The next section on your CV is entitled

9   "Areas of Expertise."  The first one listed is

10  "Mechanical Design and Analysis."  Very generally,

11  what does that mean?

12       A.    I mean, I didn't write this.

13       Q.    Let me ask this question first, then:  Do

14  you know who prepared this CV?

15       A.    Yes.  It was prepared by Chesapeake

16  Engineering & Design.  Exactly who at Chesapeake

17  Engineering & Design, I don't know.

18       Q.    Did they prepare it based on information

19  you provided to them?

20       A.    Correct.  They prepared it based on my CV

21  at the time.

22       Q.    Do you have a different current CV other

23  than the one that has been marked as Exhibit A?

24       A.    Yes.  I maintain a separate CV.

25       Q.    And that separate one is current?

35

1          A.      It's current --

2          Q.      Meaning it's not from 10 years ago that you

3    happen to have a copy of?

4          A.      It's current and been updated maybe a year

5    ago.

6          Q.      I don't believe I've been provided a copy

7    of that CV.

8          A.      No, you haven't.

9                  MR. MASCARO:  And for the purposes of

10                 the record, I will be making a

11                 request for a copy of that CV.

12                 MR. MEZZACAPPA:  And we will

13                 provide it.

14   BY MR. MASCARO:

15         Q.      We were going through your areas of

16   expertise, and we went through that first one; and

17   your response was that you didn't prepare this.  So

18   rather than go through what's listed here, let me just

19   ask you if you were preparing this, under your areas

20   of expertise, what would you list?

21                 MR. MEZZACAPPA:  Objection to form.

22                 You may answer the question.

23         A.      Well, I would list all of those except for

24   the first one.  The mechanical design and analysis is

25   not an area that I would list on my CV.  I would

36

1    probably consider analysis of aeronautical systems.  I

2    would consider an area of expertise equipment fires,

3    and as well as equipment fires, I would consider

4    structure fires, building fires, and cause and origin

5    determinations.  I definitely consider fire spread

6    analysis as an area of expertise, and I would even

7    subdivide it further into certain disciplines:  Fire

8    science, fuels and combustion, mechanical systems

9    analysis.  And in conjunction with the fire spread

10   analysis, I would also include fire detection and fire

11   suppression.

12       Q.    I just want to back up for one second,

13   since this isn't your only CV.  Are there other

14   societies which you're currently -- or organizations

15   which you're currently a member of which are not

16   listed on Exhibit A?

17       A.    No, there are not.

18       Q.    The CV that we have marked as Exhibit A,

19   does that contain your complete academic background?

20       A.    Yes, except for, you know, other -- I

21   believe on my current CV I list a catchall subject of

22   numerous short courses.

23       Q.    And your other current CV, as far as your

24   work history on that current CV, is that generally the

25   same as the work history that's on Exhibit A?

37

1      A.    Pretty much so.  It's not phrased exactly

2    the same way.

3      Q.    That's what I meant.  I'm not worried about

4    the wording.  It's just if your work history is

5    complete as we have it on Exhibit A is what I was

6    getting to.  In other words, are there other jobs that

7    aren't listed there on Exhibit A?

8                    MR. MEZZACAPPA:  Objection to form.

9                    You may answer.

10     A.    No, I don't believe there are.

11     Q.    Turning to page 2 of what has been marked

12    as Exhibit A, that's entitled a fee schedule for CED/

13    Accident Analysis, Inc.  I'm going to pass over that

14    page and go to pages 3 and 4.  I believe it's page 4

15    that is actually --

16     A.    4 and 3, right.

17     Q.    -- entitled "Current Testimony Record, John

18    E. Allen, Ph.D."  First, all the cases listed on these

19    two pages, the third and fourth pages of Exhibit A,

20    are these all the cases that you've either been

21    deposed or testified at trial for assignments that

22    have come through CED?

23     A.    No.

24     Q.    There are more cases than are listed here

25    or there are cases listed here that aren't related to

38

1    CED?  Which one is it?

2        A.    Actually, both.

3        Q.    Are there any cases that you've been

4    deposed in or testified at trial where that happened

5    later than the last case listed on these two pages,

6    which I have as 5/16/03?

7        A.    I think I've been deposed in one case since

8    the last one that's listed in these two pages.

9        Q.    Do you remember the name of that case?

10       A.    I believe it's Knutson, K-n-u-t-s-o-n,

11   versus Potter Oil.

12       Q.    And in what state was that case?

13       A.    That's in Maine.

14       Q.    And did you conduct some sort of an

15   investigation in relation to that case that you just

16   gave me the name of?

17       A.    Well, in general, the file review and

18   examination of fire scene artifacts.

19       Q.    That case had to do with a fire?

20       A.    Yes, it did.

21       Q.    And which party retained you as an expert

22   in that case, the plaintiff or the defendant?

23       A.    Potter Oil.

24       Q.    The defendant?

25       A.    The defendant.

39

1          Q.     What type of fire was involved in that

2     case?  Meaning was it in a structure, in a car?

3          A.     It was in a private residence.

4          Q.     And what were you asked to determine?

5          A.     Well, specifically I can't tell you.  In

6     general, I was asked to -- The allegations of the

7     plaintiff experts were that the oil boiler -- oil fire

8     boiler in the basement of the home and its chimney

9     were the cause of the fire that subsequently burned

10    the house down, and I was asked to address that issue.

11         Q.     Is that the only issue that you were asked

12    to address?

13         A.     It was the --

14                     MR. MEZZACAPPA:  Objection to form.

15                You may answer.

16         A.     It was the cause and origin of the

17    fire, in general terms.  Specifically, those related

18    to the boiler and the chimney.

19         Q.     Did that case involve any assessment on

20    your part regarding a fire detection system?

21         A.     No, it did not.

22         Q.     And were you deposed or did you testify at

23    trial in that Knutson case?

24         A.     I was deposed.  It's an ongoing case.

25         Q.     Any of the cases listed in the last two

40

1   pages of Exhibit A, did any of those cases involve

2   Attorney Mezzacappa?

3        A.    None of the cases listed here, no.

4        Q.    Have you ever been involved in a case in

5   which Attorney Mezzacappa was involved in prior to

6   this one?

7        A.    No, I have not.

8        Q.    Any of the cases listed in pages 3 and 4 of

9   Exhibit A, did any of those cases involve the law firm

10  that Attorney Mezzacappa is affiliated with, which I

11  believe is Kaufman Borgeest & Ryan?

12       A.    No, they did not.

13       Q.    How many of the cases on pages 3 and 4 of

14  Exhibit A have to do with fires?

15              MR. MEZZACAPPA:  Objection to form.

16              You may answer.

17       A.    Let's start on page 3.  Before I give you a

18  number, I want to make note of the fact that there are

19  multiple entries on here for some cases where there

20  was either a trial and a deposition in that case or

21  multiple depositions.  So --

22       Q.    Understood.

23       A.    So you just want the number of cases?

24       Q.    Exactly.

25       A.    A number, 12.

ALLAN REPORTING SERVICE

41

1    Q.    Twelve of the cases listed on pages 3 and 4

2    of Exhibit A involve fires?

3    A.    That's correct.  There are 12 fire cases

4    listed.

5    Q.    Why don't we just go through the list, and

6    you can tell me which ones are fire cases.  The first

7    one I have is the Tatroe versus PPG Industries,

8    starting on that page.

9    A.    Yes.

10   Q.    Can you just go through the list and tell

11   me which one were fire cases.

12   A.    Tatroe.  The next one, Driggin, was also a

13   fire case.  Akins was also a fire case.  Skipping over

14   Driggin, which is repeated.  The Cardozo was a fire

15   case.  Oxford Presbyterian was a fire case.  The next

16   one is Cardozo again.  Chubb versus Access is a fire

17   case.  Martinez was a fire case.  Pekin, P-e-k-i-n,

18   was a fire case.  New Jersey Pulverizing was a fire

19   case.  Flushing Jewish Center is a fire case.  Hood is

20   a fire case, and Craig is a fire case.

21   Q.    In any of the fire cases that you just went

22   through for me, were you retained on behalf of the

23   plaintiff in any of those cases?

24   A.    Yes.

25   Q.    Which cases were you retained on behalf of

ALLAN REPORTING SERVICE

42

1    the plaintiff?

2        A.    Travelers versus Cardozo was a plaintiff

3    case.  The New Jersey Pulverizing, H.P. Hood, and

4    Craig.

5        Q.    In any of the cases that are fire cases

6    that are on the last two pages of Exhibit A, did any

7    of those cases involve, as far as your involvement

8    goes, assessing the adequacy of the fire detection

9    system?

10                MR. MEZZACAPPA:  Objection.

11       A.    That's hard to think in those terms.

12       Q.    And I'm not trying to be -- trying to

13   confuse you in any way.  I think you get the import of

14   where I'm coming from.

15                Did any of those cases involve an issue or

16   issues that are somewhat similar to the issue in this

17   particular case?

18                MR. MEZZACAPPA:  Objection.  You may

19                answer.

20   BY MR. MASCARO:

21       Q.    That's really where I'm coming from.  I'm

22   not trying to be vague or confuse you.

23                MR. MEZZACAPPA:  Continuing objection.

24                You may answer, over objection.

25       A.    I'm still having a hard time with answering

ALLAN REPORTING SERVICE

43

1    that, but let me try this.  The issue of fire

2    detection played a role in the Driggin case, the Akins

3    case.

4        Q.    I got Driggin.  What was the next one?

5        A.    Akins.  The Chubb versus Access Security,

6    the Martinez case, the Flushing Jewish Center case.

7    Of the cases that are listed on these two pages, those

8    were the ones that had an issue that involved fire

9    detection.

10       Q.    And I'm going to go through each of those

11   cases in a second.

12            I know you said you had another CV which

13   you maintain.  Do you have a more complete list of

14   cases in which either you've been deposed or testified

15   at trial other than what we have here as part of

16   Exhibit A?

17       A.    No, I do not.

18       Q.    I want to discuss those cases you just

19   listed for me where fire detection played a role,

20   starting with the Driggin case.

21       A.    Yes.  I'd like to clarify my last answer

22   because I'm getting the sense you don't understand

23   what this is.  This is not a complete list of all the

24   cases that I've ever testified in.

25       Q.    I understand that.  And all I have in front

ALLAN REPORTING SERVICE

44

1  of me is this list, and I'll ask you about other ones

2  after we go through the list.

3      A.    But when I update this, I do not retain the

4  previous ones.

5      Q.    I'll be asking you what you may or may not

6  recall other than what's on this list, but for the

7  time being, I just want to work off the list; but I

8  appreciate you telling me that, and I got the sense of

9  that when we first talked about the list.

10          In the Driggin case, do you remember where

11  the fire in that case occurred?

12              MR. MEZZACAPPA:   Objection to form.

13          You may answer, if you

14          understand the question.

15      A.    You mean in what town?

16      Q.    No.   Let me be more specific; whether it

17  occurred in a residence, in a commercial high-rise,

18  really identify the location, the general location.

19      A.    It was a restaurant and in the basement.

20      Q.    And you were retained on behalf of a

21  defendant in that case; is that correct?

22      A.    That's correct.

23      Q.    What were you asked to do when you were

24  retained in that case?

25      A.    Basically the cause, origin, and spread

45

1    analysis of the fire.

2        Q.    Do you recall what your conclusion was as

3    to the cause of the fire in that case?

4        A.    I believe the cause and my conclusion was

5    that it was an electrical cause having to do with feed

6    wiring to the kitchen area of the restaurant above the

7    crawl space portion under the building.

8        Q.    Was there any fire detection equipment in

9    that restaurant at the time of the fire?

10       A.    Yes, there was.

11       Q.    Did you provide any opinions in that case

12   regarding the fire detection equipment?

13       A.    I believe I was questioned regarding fire

14   detection issues, and I provided opinions during a

15   deposition.

16       Q.    And do you remember what those opinions

17   were?

18                MR. MEZZACAPPA:  Objection to this

19                line of questioning.

20                You may answer it.

21       A.    Very generally.  The opinions had to do

22   with the lack of a -- or the advisability of using a

23   fire detector -- a smoke detector in the basement in

24   the basement portion where the fire originated as well

25   as the system that protected the rest of the building.

46

1        Q.    And do you remember with any more

2  specificity what your opinion was regarding that area?

3        A.    There were a couple of issues; one, that it

4  was not practical to use a smoke detector in the

5  basement because of the dustiness that would have one

6  blocked the ability of the detector to activate in

7  that dusty environment; and two, it might have created

8  a situation where you had false alarms if that system

9  were tied in with the system for the rest of the

10  building.

11          I believe my opinion was that a more

12  appropriate type of detector for that installation

13  would have been a thermal heat detector or rate of

14  rise detector as opposed to the smoke detector in that

15  installation.

16        Q.    The second case you had listed for me was

17  the Akins case?

18        A.    Correct.

19        Q.    And that was a case where you were retained

20  on behalf of the defendant; is that correct?

21        A.    The defendant, Toyotomi, yes.

22        Q.    And do you recall where the fire in that

23  case occurred, and by that, again, I mean the

24  location?

25        A.    Yeah.  This was in a trailer, a mobile

47

1    home, and there was a dispute as to -- among various

2    parties, various people, as to where the fire

3    occurred, and it was my opinion that the fire occurred

4    in a hallway.

5         Q.    In a hallway?

6         A.    In a hallway.

7         Q.    Were you asked to provide an opinion about

8    cause and origin in that case?

9         A.    Yes.  My opinion was related to the cause

10   and origin.  There were a number of people who worked

11   for the same defendant who provided other elements of

12   the cause and origin opinion.

13        Q.    Did they have any type of fire detection

14   equipment in that trailer or mobile home?

15        A.    Just single-station, battery-operated smoke

16   detectors.

17        Q.    Were you asked to provide any opinions

18   relative to that smoke detector?

19        A.    Just that the -- just relative to the

20   timing over which the detectors would have activated

21   and what the size of the fire would have been and how

22   it would have impacted on the egressibility of the

23   occupants had the detectors been properly installed

24   and maintained.

25        Q.    And was it your opinion that the detector

ALLAN REPORTING SERVICE

48

1    in that case had been properly installed and

2    maintained?

3         A.    No.  It was my opinion in that case that

4    the detectors had not been properly installed and/or

5    maintained or else they would have provided adequate

6    warning so the consequences of that fire would not

7    have been as severe to the occupants.

8         Q.    And do you recall, in your opinion, what

9    was improper about the installation and maintenance of

10   that smoke detector?

11        A.    Basically they didn't replace the

12   batteries.

13                  I'd like a break.

14                  (Whereupon, a recess was taken.)

15   BY MR. MASCARO:

16        Q.    Mr. Allen, the next case on the list I

17   believe that I want to talk about is the Chubb case.

18   Do you remember where the fire in the Chubb case --

19   where the location of that fire was?

20        A.    Yeah.  It was in a generator room.

21        Q.    Was that in a commercial structure?

22        A.    No.

23        Q.    Where was that in?

24        A.    It was a private residence.

25        Q.    And you were retained on behalf of a

49

1    defendant in that case; is that correct?

2        A.    Yes.

3        Q.    Do you remember the name of the defendant

4    you were retained for?

5        A.    FSS.

6        Q.    And what were you asked to do in that case?

7        A.    I was asked to analyze the fire spread and

8    detection and, to a certain extent, the suppression.

9        Q.    Was there fire detection equipment at the

10   location where that fire occurred?

11       A.    Yes.

12       Q.    What kind of fire detection equipment was

13   at that location where that fire occurred?

14       A.    They had a couple of different types of

15   detectors.  They had rate of rise detectors as well as

16   smoke detectors.

17       Q.    What is a rate of rise detector?

18       A.    A rate of rise detector is a detector

19   that -- It's like a heat detector.  It detects heat,

20   but it doesn't detect the specific temperature to be

21   triggered.  It's the -- It detects the fact that the

22   temperature has all of a sudden spiked up, and hence

23   the name rate of rise of temperature.

24       Q.    I just want to be clear.  The fire in that

25   Chubb case that occurred in a generator room -- Is

ALLAN REPORTING SERVICE

50

1   that what you said?

2       A.   Yes.

3       Q.   Was that located in the basement of the

4   structure?

5       A.   No.  It was the ground-floor level.

6       Q.   And did you provide any opinions in that

7   case, the Chubb case, regarding the fire detection

8   equipment at the location?

9       A.   I provided opinions that related to the

10  fire detection.

11      Q.   And do you remember what those opinions

12  were?

13      A.   There were a lot of opinions.

14      Q.   Let me try to narrow it down.  Did you

15  provide any opinions regarding, say, the location of

16  any of the fire detection equipment?

17      A.   No.  I didn't provide any opinions

18  regarding location.

19      Q.   Did you provide any opinion regarding the

20  effectiveness of the fire detection equipment?

21              MR. MEZZACAPPA:  Over objection, you

22              may answer.

23      A.   Yes.  I think my opinions related

24  to the effectiveness of the detectors.

25      Q.   And what were your opinions regarding the

ALLAN REPORTING SERVICE

51

1    effectiveness of the detectors?

2         A.    This is a very complex case, and it's hard

3    to put it in simple terms.  This was a complex

4    multi-zone system.  Some detectors within the building

5    were connected and operational, and other detectors in

6    another part of the building were not.

7         Q.    And let me just ask a question there.  I

8    think you said before the location where this fire

9    occurred was a residence; is that correct?

10        A.    That's correct.

11        Q.    Do you recall what type of style the

12   residence was, meaning was it a ranch house, a

13   colonial, a mansion, something like that?

14                    MR. MEZZACAPPA:  Objection to form.

15                    You may answer it.

16        A.    Mansion fits.

17        Q.    Approximately how big was this location?

18        A.    It was huge.  It started out at, I believe,

19   8,000 square feet and ended up around 40,000 square

20   feet after years of renovations.

21        Q.    Any of the detectors in that location that

22   we're talking about, any of those detectors connected

23   to central station monitoring?

24        A.    Yes.

25        Q.    And you used the phrase before multi-zoned

ALLAN REPORTING SERVICE

52

1    system, I believe?

2        A.    Correct.

3        Q.    What does that mean?

4        A.    Since it was such a large structure, they

5    had various fire detection zones.  So all the

6    detectors in a certain portion of the house or all the

7    detectors of a certain kind were on one zone, and they

8    reported through the same control panel and dialing-

9    out device so that when the signal was received off

10   premises, they would not only know that there was a

11   fire but also which component of the system the fire

12   was in.

13       Q.    Did you provide any opinions in that case

14   regarding the adequacy of the fire detection system?

15   By that I mean the entire system at that location?

16              MR. MEZZACAPPA:  Objection to form.

17              You may answer.

18       A.    No, I did not.  I didn't address that

19   issue.

20       Q.    Did you provide an opinion regarding the

21   appropriate location for the detectors at that

22   location?

23       A.    No.  I think I answered that before, that I

24   didn't get into location issues.

25       Q.    Do you recall what opinions you provided

ALLAN REPORTING SERVICE

53

1    specific to the fire detection equipment?

2          A.    My opinions -- the detection equipment and

3    the zones that were active were determined at the time

4    of the fire.  By that I mean a certain number of the

5    detectors were deactivated because of ongoing

6    construction, and my opinion had to do with the impact

7    of the lack of detection in that portion of the house

8    on the fire spread after it was initiated and the

9    impact of that lack of detection on the extent of the

10   fire spread as it related to the subsequent damages to

11   the structure.

12         Q.    The next case I want to ask you about is

13   the Martinez case, and do you remember the location of

14   the fire in that case?

15         A.    Yes.

16         Q.    And where did that fire occur?

17         A.    In New York City.

18         Q.    And was it in a -- What type of structure

19   was it?

20         A.    A high-rise.

21         Q.    And you were retained on behalf of the

22   defendant in that case?

23         A.    Correct.

24         Q.    And that would have been the New York City

25   Housing Authority?

54

1      A.      That's correct.

2      Q.      What were you asked to do on behalf of the

3 defendant in that case?

4      A.      I was asked to assess the capabilities of

5 the fire detection -- fire detector or the smoke

6 detector that was actually installed in detecting the

7 particular fire that occurred.

8      Q.      And do you remember where the fire started

9 in that case?

10      A.      Yes.  This was one apartment on the 15th

11 floor.  The fire occurred in a bedroom.

12      Q.      And do you remember the cause of that fire?

13      A.      Yes, a child playing with matches.

14      Q.      Was there any fire detection equipment

15 within the apartment where the fire started?

16      A.      Yes.

17      Q.      What was in that apartment as far as fire

18 detection equipment?

19      A.      A smoke detector.

20      Q.      What kind of smoke detector was it?

21      A.      It was a single-station, battery-powered.

22      Q.      And when you use the phrase "single

23 station," what does that mean?

24      A.      It wasn't wired together with another

25 detector, and it had a local horn or, you know, some

55

1    sort of enunciation device that when the alarm went

2    off, it emitted a sound.

3         Q.    And it was not connected to any central

4    station?

5         A.    And it was not connected.

6         Q.    Was there only one smoke detector in that

7    apartment?

8         A.    That is correct.

9         Q.    Where was it located?

10        A.    In the hallway outside the bedroom.

11        Q.    The bedroom where the fire started?

12        A.    All the bedrooms.

13        Q.    So the hallway was outside all the

14   bedrooms?

15        A.    Yes.

16        Q.    What was the opinions you provided in that

17   case?

18        A.    In general, that the smoke detector didn't

19   activate.  People discovered the fire by seeing smoke

20   out the window, and by that time the fire was too

21   intense for them to get into the room and rescue the

22   occupant, and that because the door was closed and the

23   window was open that the -- and because of the

24   location of the smoke detector, that it wouldn't have

25   activated, even if the battery were replaced, in

56

1    sufficient time to rescue the occupant.

2        Q.    So the smoke detector didn't activate in

3    that fire?

4        A.    Well, it didn't activate before they

5    discovered the fire.

6        Q.    Was it functional at the time of the fire,

7    meaning were the batteries still working?

8        A.    I don't think that was ever determined

9    completely.

10       Q.    Did you provide any opinions in that case

11   as to whether there should have been other smoke

12   detectors in the apartment?

13       A.    I don't think I --

14       Q.    Were you asked by anyone to address that

15   question?

16                   MR. MEZZACAPPA:  Objection to the

17                   form.

18                   You may answer the question.

19       A.    I think there was some discussion about it,

20   but I don't know if I was specifically asked about

21   that.

22       Q.    Did you ever form an opinion as so whether

23   there should have been other smoke detectors in that

24   apartment?

25                   MR. MEZZACAPPA:  Over objection, you

ALLAN REPORTING SERVICE

57

1              may answer.

2         A.    I remember there was an issue regarding

3    whether there should have or shouldn't have been

4    another detector.   I don't remember what the

5    conclusion was.

6         Q.    Do you remember whether you reached an

7    opinion on that issue, regardless of whether you

8    actually remember the opinion or not, but were you

9    asked to address that question?

10              MR. MEZZACAPPA:   Objection to form.   I

11              think your question, even though

12              it's not intentional, misstates

13              what he said.  You asked him about

14              an opinion, and he's testified

15              about a conclusion.  So that's my

16              objection to the form.  Over

17              objection, I will allow him to

18              answer it, as long as he

19              understands the question.

20         A.    Yes.  As far as my opinion in that case and

21    what I was asked to do, I was asked to evaluate the

22    impact of the detector that was, in fact, installed.

23    I was not asked to evaluate the hypothetical of if an

24    additional detector had been installed, whether it

25    would be different locations for the detector.

58

1       Q.    The next case I want to ask you about is

2  the Flushing Jewish Center case, I believe it's

3  called.  Do you remember the location of the fire

4  that's the subject of that case?

5       A.    Yes, I do.

6       Q.    And where did that fire occur?

7       A.    Flushing.

8       Q.    At the Jewish Center.

9               MR. MEZZACAPPA:  Oh, boy.  This is

10           before lunch.  Wait until tonight.

11  BY MR. MASCARO:

12       Q.    What type of a structure was the Jewish

13  Center?  Meaning how big was it, how many floors, that

14  type of thing?

15       A.    It was, I believe, two or three floors.

16  It's a synagogue with an attached school.

17       Q.    And you were retained on behalf of the

18  defendant in that case?

19       A.    Defendants, yes.

20       Q.    Do you remember the name of the defendant

21  you were retained on behalf of in that case?

22       A.    I believe it's United Security Systems.

23       Q.    What were you asked to do in that case?

24       A.    In general, evaluate the fire origin,

25  cause, and spread.

59

1      Q.      Were you asked to provide an opinion --

2  Strike that.

3          Was there any fire detection equipment in

4  the building where the fire occurred?

5      A.      There was fire detection equipment in the

6  building, though not the portion of the building where

7  the fire occurred.

8      Q.      In what portion of the building did the

9  fire start?

10      A.      In the synagogue portion.

11      Q.      And there was no fire detection equipment

12  in the synagogue?

13      A.      No.

14      Q.      Were you asked to provide an opinion as to

15  whether there should have been fire detection

16  equipment in the synagogue?

17      A.      No.  I wasn't specifically asked that.

18      Q.      What was your conclusion regarding the

19  cause and origin of that fire?

20      A.      The area of origin was in a stairwell

21  connecting the synagogue to a hallway, and the cause

22  was discarded smoking materials, most likely a

23  cigarette or matches.

24      Q.      As far as the spread of that particular

25  fire, what was the opinion you provided regarding the

60

1    spread of the fire?

2        A.    I mean, this is still an ongoing case, so I

3    haven't testified in trial in this case.  I've been

4    deposed a couple of times.  As far as what all

5    opinions were covered during those depositions

6    relating to the spread --

7        Q.    You don't remember everything you said in

8    your deposition?

9        A.    I certainly don't.

10       Q.    Did you prepare a written report in that

11   case?

12       A.    Yes, I did.

13       Q.    When you listed the cases for me that fire

14   detection played a role, this was one of the cases,

15   the Flushing Jewish Center case?

16       A.    Yes.

17       Q.    What aspect of the fire detection equipment

18   played a role in this case?

19       A.    Well, in this particular case, the -- one

20   of the plaintiff experts is claiming that the

21   particular alarm system, which was installed in the

22   synagogue, should have detected the fire, and as such,

23   the fire department would have been notified and got

24   there and suppressed it earlier.

25       Q.    Have you been asked to address the opinion

61

1     of the plaintiff's expert, that particular opinion of

2     the plaintiff's expert?

3          A.     I've been asked about certain parts of

4     that, yes.

5          Q.     And what parts of that have you been asked

6     to address?

7          A.     I've been asked to address does it make any

8     sense and what's the efficacy of that from a fire

9     spread point of view, not from the alarm system point

10    of view.

11         Q.     Understood.

12                We've gone through the cases that are

13    contained in the document marked Plaintiff's Exhibit

14    A, and you've mentioned earlier that there are other

15    cases in which you've been deposed or testified at

16    trial that are not on this list, Exhibit A; is that

17    correct?

18         A.     That is correct.

19         Q.     Do you recall any other cases which you've

20    been deposed or testified at trial which involved a

21    fire and where the fire detection equipment played a

22    role?

23                    MR. MEZZACAPPA:  Objection to the form

24                of the question.

25                    You may answer it.

ALLAN REPORTING SERVICE

62

1          A.    I recall that there are cases, but I don't

2    recall specific ones right off the top of my head.

3          Q.    And you may have addressed this earlier,

4    but do you have any other list of cases in which

5    you've testified either at deposition or trial other

6    than what we have as part of Exhibit A?

7          A.    No.   When I update my trial testimony

8    record, according to the federal rules --

9          Q.    Sure.

10         A.    -- I include all of the testimony over the

11   last four years, and I discard the previous

12   submissions on this.

13         Q.    Have you ever been retained as an expert in

14   any case in which the defendant in this case, Command

15   Force Security Systems, was a party?

16              MR. MEZZACAPPA:   Over objection, you

17              may answer it.

18   BY MR. MASCARO:

19         Q.    Other than this case, obviously?

20         A.    No, I have not.

21              MR. MASCARO:   Off the record for one

22              second.

23              (Discussion off the record.)

24         (Whereupon, a luncheon recess was taken.)

25

ALLAN REPORTING SERVICE

63

BY MR. MASCARO:

Q.    Mr. Allen, before we broke for lunch, I was
at the point where I was going to go through the
material that was provided to me in response to a
Request for Production of documents for this
deposition today, and I'm going to just go through the
material, first, as the way it was provided to me, and
mark the various portions of your file; and obviously
we'll go back and ask you some questions about it.

MR. MASCARO:  Can you mark that as one
exhibit for me.

(Whereupon, the seven-page packet of CED
bills  was marked as Plaintiff's Exhibit B for
Identification.)

BY MR. MASCARO:

Q.    Mr. Allen, did you produce any documents in
response to a Request for Production of documents that
I sent to your attorney?

A.    Yes, I did.

Q.    And I received a package of documents
Federal Expressed.  I don't recall if they came
directly from you or from Attorney Mezzacappa's
office.  Are you the one who sent the FedEx to me?

A.    No.

Q.    What was provided to me is here in front of

64

1    me, and I'm going to go through this as it was

2    provided to me and try to identify the various

3    portions of your file.

4              I'm going to show you what has been marked

5    as Plaintiff's Exhibit B for Identification.  It is

6    seven pages, which were paper-clipped together, and

7    they all appear to be similar; and I'm going to ask

8    you if you can identify those seven pages which are

9    marked Plaintiff's Exhibit B.

10                   MR. MEZZACAPPA:  For the record, what

11                   might help is we did produce to

12                   you everything that he gave me;

13                   but I also had to get the bills

14                   from CED, and that's what I

15                   believe you've marked as Exhibit

16                   B.

17                   MR. MASCARO:  I believe

18                   you're correct.

19                   MR. MEZZACAPPA:  So he may

20                   answer the question.  I just want

21                   to facilitate that to you.  We

22                   didn't take anything out of what

23                   he gave me in response to your

24                   notice for production.  We gave

25                   you everything he gave us.  It

65

1              just came to our office so we

2              could make a copy of it.  We

3              Federal Expressed it to you, and

4              the only thing he did not supply

5              me with was most of these

6              statements.  I think he had one of

7              them.

8                   THE DEPONENT:  No, I didn't

9              have any.

10                  MR. MEZZACAPPA:  Then they

11             all came from --

12                  MR. MASCARO:  I appreciate

13             that.

14        A.    I contacted CED and asked that they forward

15   all billing to Mr. Mezzacappa for him to forward to

16   you.  The rest of my -- the materials that I had in my

17   possession I copied and sent them to Mr. Mezzacappa to

18   be forwarded to you.

19        Q.    Let me just go through what has been marked

20   as Plaintiff's Exhibit B, which Mr. Mezzacappa has

21   helped identify for us.  Again, they clearly appear to

22   be billing records.

23             The question I have for you is how would

24   you record and then transfer, I guess to CED, the time

25   spent on the file that brings us here today?

66

```
1          A.    I would keep track of the time that I spent
2     on my calendar or some other piece of paper in my
3     office, and at various times, usually about once a
4     month at the end of the month, I would get a phone
5     call or an e-mail from Jeff Richard at CED asking to
6     submit billing, any billings that I might have, on any
7     of the cases that I'm working on for CED, at which
8     time I would e-mail him the times, and then he would
9     bill the client; and with CED, they would pay me right
10    away and then bill the client.
11         Q.    And I'm going to show you one of the seven
12    pages from what has been marked as Plaintiff's Exhibit
13    B, which, by my review, contains the record of the
14    earliest work performed relative to this file.  It's
15    the last page on the document.  I want to give you all
16    of Exhibit B so I'm not withholding anything.  But the
17    very last page in that pile of material seems to
18    contain the first work at least billed for on this
19    file.  I just want you to take a look at that first
20    page or last page, actually.
21              MR. MEZZACAPPA:  First date, last page
22              of the document.
23         A.    The last page is the first date.
24         Q.    Exactly.
25              I think the first dated entry is
```

67

1      sometime dated January 2nd, '04, and it's labeled

2      "Initial Case File Review."  My question to you is

3      does that reflect your work or is someone else billing

4      for the initial case file review?

5           A.    I can't tell by looking at this.

6           Q.    There may be other portions of your file

7      that would reflect that?

8           A.    Yes.

9           Q.    We're going to go through your file so

10     we'll get to that.  The second entry is for January 8

11     where it says file review consultation with client and

12     then in parentheses it says "C. Doty."  Do you recall

13     whether that reflects time you spent on the file?

14          A.    Yes.  That definitely -- that definitely

15     reflects time that I spent.

16          Q.    Was that the first contact that you

17     had -- Strike that for a moment.

18                I believe Ms. C. Doty is an attorney in

19     Mr. Mezzacappa's office?

20                    MR. MEZZACAPPA:  So stipulated.

21     BY MR. MASCARO:

22          Q.    Is that the first contact you had with

23     anyone from Attorney Mezzacappa's office?

24          A.    I believe so, yes.

25          Q.    And I think earlier this morning you

ALLAN REPORTING SERVICE

68

1    testified that you had never worked with Attorney

2    Mezzacappa or someone in his office before.

3         Did they contact you directly regarding

4    this case or did the contact first go to CED?

5              MR. MEZZACAPPA:  Over objection, you

6              may answer.

7         A.    It's my understanding they contacted CED

8    and sent some file materials to CED, which was then

9    forwarded to me when I was assigned the case, and then

10   I initiated the contact with Ms. Doty.

11        Q.    And do you have notes contained somewhere

12   in your file regarding your conversation with either

13   Ms. Doty or Mr. Mezzacappa or anyone else in his

14   office?

15             MR. MEZZACAPPA:  Objection to form.

16             You may answer.

17        A.    I don't -- There may be some notes that

18   were taken during conversations, but I don't have

19   specific records of every conversation.

20        Q.    And Plaintiff's Exhibit B, the billing

21   records, goes up through March 31, I guess, of 2004.

22   Does this billing record, Plaintiff's Exhibit B,

23   contain entries for all the work that you performed up

24   through March 31st, 2004?

25        A.    Well, I'm looking at a statement date here

ALLAN REPORTING SERVICE

1   of April 30th, so that yes, I believe that's correct.

2       Q.    In other words, a clearer way to ask it

3   would have been does Plaintiff's Exhibit B reflect all

4   of the work that was performed up through -- and the

5   last date of entry, again, was March 31st of 2004?

6       A.    It looks like it does.

7       Q.    In looking at that, do you believe that

8   there's other things that you did on this file that

9   are not reflected in the billing records?

10                  MR. MEZZACAPPA:  Objection to form.

11                  You may answer.

12      A.    I don't -- You know, I don't remember

13  exactly when the last deposition for Mr. Klem was, but

14  I know that reviewing that was the last thing that I

15  billed for.  So if it's within those dates, then it

16  does include everything.

17      Q.    You testified that you believe that CED was

18  contacted first and provided file material on this

19  file.  Do you know whether Attorney Mezzacappa has

20  ever retained CED or relative to any other case other

21  than this one?

22                  MR. MEZZACAPPA:  Over objection, you

23                  may answer.

24      A.    No, I don't.

25      Q.    Do you have any knowledge as to how

70

1    Attorney Mezzacappa or his firm came to contact CED

2    regarding this case?

3                    MR. MEZZACAPPA:  Over objection, you

4            may answer.

5        A.    No, I don't.

6                    MR. MASCARO:  Can we go off the record

7            for a second.

8            (Discussion off the record.)

9            (Whereupon, the *National Fire Alarm Code*

10   *Handbook* was marked as Plaintiff's Exhibit C for

11   Identification.)

12   BY MR. MASCARO:

13       Q.    Mr. Allen, I'm going to show you what has

14   been marked as Plaintiff's Exhibit C for

15   Identification.  It's two pages stapled together.

16   Could you identify that for me, please.

17       A.    Yes.  Basically it's the title page from

18   two publications that I used in connection with this

19   case.

20       Q.    Can you identify the publications for me.

21       A.    Yes.  One is the *National Fire Alarm Code*

22   *Handbook* based on the 1993 edition of NFPA 72.  And

23   the other is the 1999 edition of NFPA 72.

24       Q.    These cover pages, are they for different

25   editions of the same publication or are they two