71

1    different publications?

2        A.    They're two separate publications.

3        Q.    And if I remember correctly, you testified

4    that you used or referred to these publications in the

5    context of your work on this case?

6        A.    Right, during the course of working on this

7    case.

8        Q.    Are there portions of those publications

9    contained in other parts of your file that we haven't

10   gotten to yet?

11       A.    Actually, not of the first one, but there

12   are portions of this second one in the file.

13       Q.    Does your report, which we're going to go

14   over a little later, cite the specific sections of the

15   publications identified in Plaintiff's Exhibit C that

16   you referred to or relied on?

17              MR. MEZZACAPPA:  Just note my

18              objection to the form of the

19              question.

20                 You may answer it.

21       A.    No.  My report cites the second

22   one.

23       Q.    Publication there?

24       A.    Completely.

25       Q.    From what?

1          A.    Just general reference to NFPA 72, 1999

2    edition.

3          Q.    And is there any citations in your report

4    as to the first publication, the National -- Just to

5    make it clear, the *National Fire Alarm Code Handbook*,

6    there's no citation in your report to that

7    publication?

8          A.    That's correct.

9                MR. MEZZACAPPA:    Over objection.

10   BY MR. MASCARO:

11         Q.    Do you recall which sections of that

12   publication you relied on or referred to in the

13   preparation of your report?

14                MR. MEZZACAPPA:    Note my objection as

15                we have the report here.

16                You may answer over objection,

17                to your knowledge.

18         A.    Now I'm confused.  Do I recall which

19   sections I referred to in my report?

20         Q.    No.  My recollection is that you said that

21   in your report you don't refer specifically to the

22   *National Fire Alarm Code Handbook*; is that correct?

23                MR. MEZZACAPPA:    '93?

24                MR. MASCARO:    Right.

25         A.    I made no explicit reference to that.

73

1        Q.    And I believe you said you did at least

2   refer to that publication in the context of your work

3   on this case; is that correct?

4        A.    The second one.  I referred to the

5   handbook, yes.

6        Q.    Do you mention it in your report?

7        A.    No.

8        Q.    Do you know what sections of the handbook

9   you referred to?

10       A.    In general terms.

11       Q.    Is there any way of --

12       A.    Yes, the chapters on residential fire

13  alarms and the appendix or the appendices.

14       Q.    Do you remember specifically what you took

15  from this publication, the *National Fire Alarm Code*

16  *Handbook*, the '93 edition, what specifically you took

17  from that publication?

18                    MR. MEZZACAPPA:  Objection to the

19             form.

20                    You may answer.

21       A.    Yes.  I remember generally how I used --

22  how I referred to the publication.

23       Q.    And how was that?

24       A.    I used it because of the way it's written.

25  It's a -- The second publication, as well as other

74

1    versions, the 1996 edition or the 1993 edition of NFPA

2    72 are code; that is, the NFPA or the National Fire

3    Alarm Code.  And a lot of times it's just statements

4    made without really explanation as to what's meant by

5    the statement or how to -- guidance as to how to

6    interpret the statement.

7            The handbook amplifies on those statements.

8    They will reprint various sections of the code, and

9    then there will be a paragraph or a couple of

10   paragraphs saying -- explaining what the intent of the

11   code is, explaining the reasons for it being written

12   in a particular way, and so it's just as a matter of

13   clarifying what's otherwise kind of an obscure

14   document.

15       Q.     Who or what produces the *National Fire*

16   *Alarm Code Handbook*?

17       A.     Well, it's a committee effort.

18       Q.     From which organization?

19       A.     The NFPA.

20       Q.     And the second page of this stapled,

21   two-page document, which is entitled "National Fire

22   Alarm Code," is that the same as the NFPA 72?  Is that

23   just another name for NFPA 72?

24            MR. MEZZACAPPA:  Objection to form.

25       A.     It's NFPA 72.

75

1      Q.    I just want to make sure that I've got

2   section and names clear, when I'm referring to

3   something I'm not meaning something else.

4      A.    (Indicating.)

5      Q.    I believe there are, you said, copies in

6   other parts of your file from the NFPA 72; is that

7   correct?

8             MR. MEZZACAPPA:  Objection to form.

9             You may answer.

10      A.    From -- I believe the statement I made is

11   there are copies from this particular edition, the

12   1999 edition of NFPA 72.

13      Q.    Did you use other editions other than the

14   1999 edition of NFPA 72 in the preparation of your

15   report?

16             MR. MEZZACAPPA:  Objection to form.

17      A.    Yes.

18             MR. MEZZACAPPA:  What I wanted to say,

19             other than what he's already

20             testified, because it was asked

21             and answered.  I'm not going to

22             stop him from answering.  I just

23             want the objection to be there.

24             You may answer.

25

76

1    BY MR. MASCARO:

2        Q.    I don't recall what you testified to.  What

3    other editions of NFPA 72 did you refer to?

4        A.    I referred to the sections of NFPA 72, 1996

5    edition, that were -- as well as other documents that

6    were provided by the Plaintiff's expert.

7            (Whereupon, the four-page correspondence

8    from Mr. Mezzacappa's office was marked as Plaintiff's

9    Exhibit D for Identification.)

10           (Discussion off the record.)

11   BY MR. MASCARO:

12       Q.    Mr. Allen, I'm going to show you what has

13   been marked as Plaintiff's Exhibit D for

14   Identification.  It is four pages.  Can you just take

15   a look at that and then identify that, if possible,

16   for me.

17       A.    It appears to be the last correspondence

18   that I got from Mr. Mezzacappa's office.

19       Q.    Is there any attachments to that

20   correspondence?

21       A.    Yes, with the Notice of Deposition

22   attached.

23       Q.    And I believe also attached to it, the last

24   page of it, is a Request for Production of documents

25   relative to your deposition today; is that correct?

ALLAN REPORTING SERVICE

77

1          A.    That's correct.

2                    MR. MEZZACAPPA:  Which, for the

3                record, is Schedule A of the

4                ReNotice.

5    BY MR. MASCARO:

6          Q.    And in response to that Request for

7    Production, you already testified, I believe, that you

8    forwarded your response to that directly to Attorney

9    Mezzacappa?

10         A.    That's correct.

11                   MR. MASCARO:  Would you mark that.

12               (Whereupon, the letter dated April 1, 2004,

13   was marked as Plaintiff's Exhibit E for

14   Identification.)

15   BY MR. MASCARO:

16         Q.    Mr. Allen, I'm going to show you what has

17   been marked Plaintiff's Exhibit E.  It's a letter

18   dated April 1, 2004.

19         A.    Okay.

20         Q.    I believe in the letter there's a reference

21   made to some attached photographs; is that correct?

22         A.    That's correct.

23         Q.    Now, the photographs weren't appended to

24   that letter, even though there's photographs in other

25   parts of your file?

78

1      A.    Yes.

2      Q.    I was wondering if you could identify, by

3   looking through your file, which photographs came with

4   that letter.

5      A.    I can probably identify it by looking

6   through my file, and then you can relate to what you

7   have there.

8      Q.    Sure.

9      A.    I think it's these, this stack of

10  photographs (Indicating).

11     Q.    I think you're right.

12          MR. MEZZACAPPA:  Can we go off the

13          record for a second?

14          MR. MASCARO:  Yes.

15     (Discussion off the record.)

16          MR. MASCARO:  Back on the

17          record.

18  BY MR. MASCARO:

19     Q.    Mr. Allen, whatever photographs were

20  produced with this letter that has been marked as

21  Plaintiff's Exhibit E would be contained in your file;

22  is that correct?

23     A.    That's correct.

24     Q.    And copies of those photographs would then

25  have been produced to me when you had your file sent

79

1    to me; is that correct?

2         A.    That's correct.

3               MR. MEZZACAPPA:  They're right here.

4         Several bunches down they start.

5               MR. MASCARO:  Would you mark

6         that.

7               (Whereupon, the letter dated March 23,

8    2004, was marked as Plaintiff's Exhibit F for

9    Identification.)

10   BY MR. MASCARO:

11        Q.    Mr. Allen, I'm going to show you what has

12   been marked Plaintiff's Exhibit F for Identification.

13   Could you identify that exhibit for me, please.

14        A.    It's a letter with an attached two-page

15   exhibit that was produced during Mr. Klem's deposition

16   that was sent to me from Mr. Mezzacappa.

17        Q.    Did you review the attachment that

18   accompanied this letter that has been marked as

19   Plaintiff's Exhibit F?

20        A.    Yes, I looked at it.

21        Q.    Do you recall, in reviewing the attachment

22   that went with the letter that has been marked as

23   Plaintiff's Exhibit F, whether that attachment

24   impacted the opinions you had formed in this case at

25   all?

80

1          MR. MEZZACAPPA:  Objection to form.

2          You may answer.

3     A.     Yes, I recall.

4     Q.     Did it impact your opinions at all?

5     A.     Not at all.

6          MR. MASCARO:  Would you mark that.

7          (Whereupon, the letter dated May 7, 2004,

8     was marked as Plaintiff's Exhibit G for

9     Identification.)

10    BY MR. MASCARO:

11    Q.     Mr. Allen, I'm going to show you what has

12    been marked as Plaintiff's Exhibit G.  Could you

13    identify that for me, please.

14    A.     It's a letter, without the attachment,

15    provided to me after Mr. Klem's deposition from

16    Mr. Mezzacappa.

17    Q.     I know there's no attachment to this

18    particular copy of the letter, but when you received

19    the letter, was the attachment included with it?

20    A.     Yes.

21    Q.     And would that attachment be somewhere in

22    your file?

23    A.     Yes.

24    Q.     Mr. Mezzacappa states in his letter,

25    "During his deposition, he handed us the enclosure,

81

1    which is from the Connecticut Building and Fire Code,

2    as well as a statute from the 1996 version of the

3    NFPA.  Please note he is claiming that the central

4    monitoring company has 90 seconds to retransmit the

5    alarm to the fire department."  That's where I'll stop

6    reading from the letter.

7              After reading the letter and the attachment

8    that was sent with it, did you do any -- look at any

9    material or do any research in response to it?

10                  MR. MEZZACAPPA:  Over objection, you

11                  may answer.

12        A.    Well, I read the attachment, and I also --

13    I did -- Since it dealt with the '96 code, I also

14    referenced the same sections or the sections involving

15    the same issues in the '99 code and the '93 code and

16    just verified what the code, in fact, said.

17        Q.    I think you said you looked at the '93 code

18    and the '99 one as well; is that correct?

19        A.    That's correct.

20        Q.    Starting with the '93 code, does the '93

21    code contain the same provision that has been talked

22    about in the letter that's marked as Plaintiff's

23    Exhibit G?

24                  MR. MEZZACAPPA:  Over objection, as

25                  the codes speak for themselves,

ALLAN REPORTING SERVICE

82

1              and unless you're going to show

2              him those, I will object; but I'll

3              allow him to answer, based on his

4              previous response.

5      A.    As I recall, the '93 code and the '96 code

6  were not the same, and nor was the '99 code the same

7  in the way they referred to that issue.

8      Q.    The issue being the amount of time a

9  central monitoring company has to retransmit the alarm

10  to the fire department?

11      A.    That's correct.

12      Q.    Was the period of time allowed different in

13  each version of the code we're talking about?

14              MR. MEZZACAPPA:  Over objection, you

15              may answer it.

16      A.    I believe the period of time was the same.

17  It's just it was a convoluted way to get to it.  In

18  the '96 code, it was explicitly stated within the

19  code.  In the other codes, it wasn't.  It was referred

20  in the appendix.

21              (Whereupon, the letter dated January 28,

22  2004, was marked as Plaintiff's Exhibit H for

23  Identification.)

24  BY MR. MASCARO:

25      Q.    Mr. Allen, I'm going to show you what has

83

1    been marked Plaintiff's Exhibit H for Identification.

2    If you would take a look at that, and when you're

3    done, identify it for me.

4         A.    Well, it's a January 28, 2004, cover letter

5    from Mr. Mezzacappa with the disclosure of myself as

6    an expert witness in this case, with an attached copy

7    of my report dated January 27th and attached

8    curriculum vitae -- my curriculum vitae from CED,

9    along with the other -- the fee schedule and testimony

10   record.

11        Q.    Was this the first disclosure of you as an

12   expert witness that you saw relative to this case?

13                    MR. MEZZACAPPA:   Objection to form.

14              You may answer.

15        A.    I believe so, yes.

16        Q.    You weren't sent any earlier drafts to

17   comment and amend or revise?

18        A.    No, I was not.

19        Q.    I believe part of this exhibit, including

20   the disclosure, which -- or attached to the disclosure

21   is the report that you prepared in this case; is that

22   correct?  This is the report you prepared in this

23   case?

24        A.    Yes, it is.

25        Q.    Were there any earlier drafts or versions

84

1    of your report other than the one that was attached to

2    your disclosure as an expert witness?

3         A.    I don't believe so, no.

4         Q.    Did either Attorney Mezzacappa or anybody

5    in his office make any revisions or deletions or

6    changes to your report?

7               MR. MEZZACAPPA:  Over objection, you

8               may answer.

9         A.    No.

10              MR. MASCARO:  Mark this as one

11              exhibit.

12              (Whereupon, the package of photocopies of

13   photographs was marked as Plaintiff's Exhibit I for

14   Identification.)

15   BY MR. MASCARO:

16        Q.    Mr. Allen, I'm going to show you what has

17   been marked as Exhibit I for Identification.  Can you

18   just take a brief look at that.

19        A.    Okay.

20        Q.    That's copies of a series of photographs;

21   is that correct?

22        A.    Yes, it is.

23        Q.    And were these some of the photographs that

24   were sent to you by Attorney Mezzacappa or his office?

25        A.    Yes, they are.

ALLAN REPORTING SERVICE

85

1      Q.    Do you know, as you sit here, looking at

2   what has been marked as Plaintiff's Exhibit I, who

3   took those photographs?

4      A.    Well, I don't know by looking at the

5   photographs.  I might be able to tell by looking at my

6   report.

7      Q.    We're going to go through your report.  I

8   just wanted to know as you sit here right now.

9      A.    No.

10      Q.    We'll go through the photographs in some

11   detail later on.  I just want to keep going for the

12   time being.

13              MR. MASCARO:  You can mark all three

14                 of these sets -- actually four

15                 sets.

16              (Whereupon, four packages of photocopies of

17   photographs were marked as Plaintiff's Exhibits J-M

18   for Identification.)

19   BY MR. MASCARO:

20      Q.    Mr. Allen, I'm going to show you four

21   separate exhibits, J, K, L, and M.  If you'd just take

22   a brief look at that and give me a general

23   identification of them.

24      A.    Well, they're photographs.

25      Q.    And that's as specific as I need you to get

86

1    at this point.  Are those all photographs that were

2    provided to you by Attorney Mezzacappa or his office?

3        A.    That's correct.

4        Q.    Just to be more specific, those are copies

5    of photographs, and you have color copies in your

6    original file?

7        A.    Yes, I did.

8        Q.    And to the extent that you relied on any of

9    the photographs that have been marked so far as

10   exhibits today, is that referenced in your report?

11       A.    Yes, it is -- On the ones that I received

12   prior to producing the report.  Some of the

13   photographs I received after that.

14       Q.    Okay.

15            (Whereupon, the letter dated January 14,

16   2004, was marked as Plaintiff's Exhibit N for

17   Identification.)

18   BY MR. MASCARO:

19       Q.    Mr. Allen, I'm going to show you what has

20   been marked as Exhibit N.  Could you identify that for

21   me, please.

22       A.    It's a letter from Mr. Mezzacappa after my

23   initial contact with him in this case.

24       Q.    Do you know what was included with this

25   letter, if anything?

87

1      A.    In general.  The photographs that were

2 previously marked as exhibits at another deposition,

3 and that's the only thing that I specifically remember

4 that was included in this and not in the original

5 documentation that I had received.

6      Q.    So you were provided some information and

7 documentation before you even received this letter and

8 its attachments?

9      A.    Yes, I was.

10      Q.    There's a reference in the letter about

11 getting you some additional documentation.  Do you

12 know whether you were provided any additional material

13 after you received this letter dated January 14th and

14 now marked as Plaintiff's Exhibit N and before you

15 prepared your report, which is dated January 27, 2004?

16      A.    I don't believe I was provided any other

17 tangible copies of documentation.

18      Q.    Were you provided any information that --

19 in other words, not tangible copies of any documents

20 or photos or anything of that nature, but were you

21 given information from some source that you used in

22 the preparation of your report?

23      A.    Yes.

24      Q.    And do you recall what that information

25 was?

88

1    A.    No.

2                MR. MEZZACAPPA:  To the extent that it

3              was given by counsel on the

4              telephone, I would object to that,

5              but over that objection, I will

6              allow him to answer it.

7    A.    I don't recall specifically what

8    information, but I do recall that it was by

9    telephone -- a conversation with Mr. Mezzacappa.

10   Q.    Do you remember the date of that

11   conversation with Mr. Mezzacappa that you just

12   referenced?

13   A.    No.  I don't remember if it was one

14   specific date or if it were multiple dates.

15   Q.    In the billing records that have been

16   previously marked Plaintiff's Exhibit B for

17   Identification today, the only entries for work

18   performed after January 14th and up to January 27th,

19   when the report is dated, are an entry on 1/16/04 for

20   review case file and then preparing the report on

21   1/27.  Did you not bill for those conversations or

22   conversation with Attorney Mezzacappa?

23                MR. MEZZACAPPA:  Note my objection, as

24              it mischaracterizes prior

25              testimony.

89

1              You may answer.

2         A.    I didn't explicitly reference the

3    conversation, though I would have -- and my

4    recollection is that I had a conversation in the

5    course of reviewing the case file.

6         Q.    So you have the billing entry in there for

7    reviewing case file and you sort of wrap that in

8    there?

9         A.    Right.  I didn't list all the activities

10   that were involved in that.

11        Q.    Okay.

12             (Whereupon, the Fire Protection Analysis

13   Single-family Dwelling, 34 Wildwood Drive, Wilton,

14   Connecticut document was marked as Plaintiff's Exhibit

15   O for Identification.)

16   BY MR. MASCARO:

17        Q.    Mr. Allen, I'm going to show you what has

18   been marked Plaintiff's Exhibit O.  This document has

19   been exhibits in other depositions.  It is a report

20   prepared by T.J. Klem & Associates.  Everyone here

21   recognizes it.  My question as far as Exhibit O goes,

22   are there any notations, scribbling, underlines, notes

23   that you made on Exhibit O in the context of your

24   reviewing it?

25        A.    Yeah, I see a couple.

ALLAN REPORTING SERVICE

90

1      Q.    Why don't we just go through them.  Which

2    would be the first one on Exhibit O?  I think you had

3    some there on what page?

4      A.    Yes, on page 7.

5      Q.    There's some writing in the margin.  Is

6    that your handwriting?

7      A.    Yeah.  The writing on the left-hand margin

8    looks like my handwriting.

9      Q.    Can you read that into the record for me.

10     A.    It says, "Size of fire at detection?"

11     Q.    And there's some lines on both the left and

12   right margin.  Did you write those lines?

13     A.    I think so.

14     Q.    And there's an underlining within the -- I

15   think it's the first full paragraph on page 7, and

16   next to the notations you just read into the record,

17   did you make those underlinings?

18     A.    I believe I did.

19           MR. MEZZACAPPA:  Just note, Joe, for

20           the record, I don't think the two-

21           page, typewritten article that's

22           attached to this -- three pages

23           that's stapled to it, that's the

24           way it got copied.  But that

25           shouldn't be part of the exhibit

ALLAN REPORTING SERVICE

91

1        because we already went through

2        the exhibit with your expert, and

3        I don't want to mislead anyone.

4        This was not part of his report,

5        according to him, and we had him

6        here for two days.

7            MR. MASCARO:  I'll

8        separate -- I don't recall it

9        being a part of his testimony.

10            MR. MEZZACAPPA:  Just for the

11        record, it's -- Exhibit O is an

12        eight-page report by T.J. Klem, no

13        enclosures to it.  Is that fair?

14    A.    It's one copy of that.

15    Q.    This is what we've marked as Exhibit O here

16    today.

17            MR. MEZZACAPPA:  It's been previously

18        marked with the author of it.

19    BY MR. MASCARO:

20    Q.    Whether there were attachments or

21    references to what Mr. Klem has testified about, all I

22    wanted to ask you about --

23    A.    My point is, there are other copies of that

24    report in my file.

25    Q.    Okay.  As to this particular copy, what is

92

1   the significance of the underlining that we just

2   talked about a minute ago?

3                   MR. MEZZACAPPA:   Objection to form.

4               You may answer.

5               You're referring to the words

6           "requested to comment"?

7       A.    Requested to comment are the words that are

8   underlined, and what's significant is those words were

9   used.

10      Q.    There's no other particular reason why you

11  underlined it?

12                  MR. MEZZACAPPA:   Note my objection.

13              You may answer.

14      A.    Not that I recall.

15              (Whereupon, the NIST news release was

16  marked as Plaintiff's Exhibit P for Identification.)

17      A.    I do recall.

18      Q.    Do you want to go back to exhibit --

19      A.    The last answer I gave you --

20                  MR. MEZZACAPPA:   Based on Exhibit O?

21      A.    Yes, based on Exhibit O, why did I

22  underline those words?

23      Q.    Yes.

24      A.    I underlined them because of what they say.

25  This report, in its entirety, without looking at just

ALLAN REPORTING SERVICE

93

1   that page, is the initial report that's prepared by

2   T.J. Klem & Associates in this case.  It's titled

3   "Fire Protection Analysis of a Single-Family

4   Dwelling," and it was prepared by Joseph Folger and

5   Thomas Klem of T.J. Klem & Associates.

6          And the reason that I underlined this

7   particular comment -- these three words in here on

8   page 7, is that at the time they were given the

9   assignment and produced this report, they were

10  requested to comment on the fire alarm sequencing

11  considering the magnitude of the fire upon arrival of

12  the fire department and the conditions in that bedroom

13  with the door open and considering the location of the

14  smoke detector.  And in that part of the paragraph

15  that's outlined here or that's highlighted here, they

16  say that they would have expected -- "We would have

17  expected that the alarm would have been transmitted to

18  the fire company while the fire was in the

19  controllable phase."  And then they make the statement

20  that, "The time to notify the fire department seems

21  reasonable considering the time of the registration of

22  the alarm by the dispatchers" and all that.

23          So at this point in time, when this report

24  was produced, it is the opinion of T.J. Klem &

25  Associates that there was no problem with the

ALLAN REPORTING SERVICE

94

1    reporting of the alarm that was received by the

2    monitoring company, based on their investigation, and

3    that they were requested to comment on that as part of

4    their initial assignment; and they commented on it,

5    and that was their opinion.  And yet a supplemental

6    report was produced criticizing the amount of time.

7    That's the significance of these marks here.

8        Q.    That's why you underlined it and made those

9    marks?

10       A.    That's why I underlined it in this copy of

11   the report, though I have other copies of the report

12   where -- that I would have referred to that might

13   refresh my memory.

14       Q.    These other copies of the report that you

15   have or are contained in your file, are there also

16   notations made on other copies of that report that has

17   been marked as Exhibit O?

18       A.    There may be.

19       Q.    But that would be part of your file?

20       A.    Yes.  Everything -- all copies of the

21   reports and everything that I've received in this case

22   was included in my file.

23       Q.    Mr. Allen, I'm going to show you what has

24   been marked as Exhibit P, a three-page document.  That

25   was originally attached to the copy of the report that

95

1    has been marked as Plaintiff's Exhibit O today, and by

2    my recollection, I don't recall seeing that particular

3    document attached to any other copies of Mr. -- or

4    T.J. Klem's report that has been marked as Plaintiff's

5    Exhibit O today.

6            First of all, can you just identify that

7    document for us, what's been marked as P.

8        A.    It appears to be a three-page printout from

9    a web page, which is a press release -- a news release

10   at the NIST web site.

11       Q.    What does NIST stand for?

12       A.    National Institute of Standards &

13   Technology.

14       Q.    And did you print out that article?

15       A.    No, I didn't.

16       Q.    Do you know where that article came from?

17       A.    I believe it was produced by Mr. Klem at

18   one of his depositions, and it's my understanding that

19   he or somebody in his office printed it out.

20       Q.    Do you know whether you had the document

21   that has been marked as Exhibit P prior to the

22   preparation of your report dated January 27, 2004?

23       A.    Yes, I know that.

24       Q.    And did you have it prior to the

25   preparation of your report?

96

1          A.     I couldn't have.

2          Q.     Because it was identified in Mr. Klem's

3     deposition or --

4          A.     No.

5          Q.     Well, why, I guess, is the easiest way to

6     ask it?

7          A.     Because it was printed on February 27th,

8     2004.

9          Q.     Had you ever seen that article prior to the

10    preparation of your report?

11         A.     I don't think I could have because it's

12    also dated for release on February 26, 2004.

13         Q.     I wasn't sure of that because the print

14    date might not have been the release date.

15               This article that we've marked as Exhibit

16    P, did that cause you to change any of your opinions

17    as set forth in your report dated January 27, 2004?

18                    MR. MEZZACAPPA:  Just note my

19                    objection, and you may answer the

20                    question.

21         A.     No, it didn't change any of my

22    opinions.

23               (Whereupon, the document entitled "Fire

24    Investigative Analysis, 34 Wildwood Drive, Wilton,

25    Connecticut was marked as Plaintiff's Exhibit Q for

97

1    Identification.)

2    BY MR. MASCARO:

3         Q.    Mr. Allen, I'm going to show you what has

4    been marked as Exhibit Q, which has been previously

5    identified in other depositions.  Can you just briefly

6    identify what Exhibit Q is.

7         A.    It's a copy of the second report that was

8    produced by T.J. Klem & Associates in this matter.

9         Q.    And in the particular copy that you have in

10   front of you, are there any notations or markings at

11   all that you made on that particular copy or its

12   attachments?

13        A.    I believe there are.

14        Q.    Can you start with the first ones that you

15   see and identify the page where those notations are.

16        A.    Okay.  On page 1, I think the underlinings

17   on this page were made by me.

18        Q.    For what reason did you underline whatever

19   you happened to underline?

20        A.    In reading or rereading the report, I was

21   trying to highlight certain words or phrases that gave

22   me more information about what Mr. Klem had done in

23   the preparation of this report, such as materials he

24   had reviewed or tasks that he had accomplished.

25        Q.    Is there anything -- any other markings or

98

1    notations other than what you have on page 1?

2        A.    This report -- On this report I don't see

3    any others that I think are mine.

4        Q.    Might there be notations on other copies of

5    that report in other portions of your file?

6        A.    Yes, there definitely are.

7        Q.    Okay.  We'll get to that later then.

8            MR. MASCARO:  Can I just go off the

9            record for one second.

10            (Discussion off the record.)

11            (Whereupon, the disclosure of Mr. Klem as

12    an expert witness was marked as Plaintiff's Exhibit R

13    for Identification.)

14    BY MR. MASCARO:

15        Q.    Mr. Allen, I'm going to show you what has

16    been marked as Plaintiff's Exhibit R, which I

17    recognize as a document that I've prepared.  It's a

18    disclosure of expert witness as I prepared in this

19    case.  The particular copy of Exhibit R that you have

20    in front of you right now, are there any underlinings,

21    markings, et cetera that you made on that copy?

22        A.    Yes, there are.

23        Q.    Starting from the beginning, could you

24    first identify where you've made any such notations or

25    markings, and then we'll discuss them.

ALLAN REPORTING SERVICE

99

1        A.      On the first page I've got the date,

2    November 17th, 2003, circled.

3        Q.      Any particular reason for that?

4        A.      Yes; just to establish some kind of time

5    line as to when all this information was provided.

6        Q.      Go on.

7        A.      Page 2, I've got the words underlined, "At

8    a minimum, a smoke detector should have been installed

9    just outside the bedroom area in the lower level."

10       Q.      And why do you have that underlined?

11       A.      In general, just to try and find out what

12   the specific allegation was at that time.

13       Q.      Okay.  Please go on.

14       A.      Now, what appears to be another --

15   there's -- The first disclosure is six pages, and then

16   there's a seven-page disclosure that follows that with

17   the same date, and it's -- page 1 of the second

18   disclosure seems to say the same thing, but I've got

19   a -- the word "reports" underlined.

20       Q.      Any other pages where you've underlined

21   anything?

22       A.      And that's all I saw.

23       Q.      And for the record, what we've marked as

24   Plaintiff's Exhibit R consists of actually two copies

25   of the disclosure of expert witness of Thomas Klem

100

1    dated November 17, 2003.  The second copy contains an

2    additional page, the signature and certification page,

3    that was not included with the first copy.

4                    MR. MASCARO:  Off the record for one

5              second.

6              (Discussion off the record.)

7              (Whereupon, the document entitled

8    "Performance of Home Smoke Alarms Analysis of the

9    Response of Several Available Technologies in

10   Residential Fire Settings" was marked as Plaintiff's

11   Exhibit S for Identification.)

12   BY MR. MASCARO:

13        Q.    Mr. Allen, I'm going to show you what has

14   been marked as Plaintiff's Exhibit S, a document with

15   numerous pages.  Would you identify that for me,

16   please.

17        A.    Yes.  It's an NIST publication, NIST tech

18   note 1455 dated December 2003, and it's part of the

19   documentation that was dumped on us by Mr. Klem at his

20   first deposition.

21        Q.    This document is not something that you

22   referred to or relied on in the preparation of your

23   report?

24        A.    No, it is not.

25                    MR. MASCARO:  Off the record for one

ALLAN REPORTING SERVICE

101

1    second.

2            (Discussion off the record.)

3                MR. MASCARO:  Would you mark

4            that.

5            (Whereupon, the CED/Accident Analysis,

6    Inc., case assignment sheet was marked as Plaintiff's

7    Exhibit T for Identification.)

8    BY MR. MASCARO:

9        Q.    Mr. Allen, I'm going to show you what has

10   been marked as Plaintiff's Exhibit letter T.  Could

11   you identify that for me.

12       A.    It's a CED case assignment sheet.

13       Q.    Was that sent to you when the assignment of

14   this case was sent over to you?

15       A.    Yes.  This would have been the first thing

16   that I received in this case.

17       Q.    And the bottom portion of the document

18   underneath the heading of "Case Notes and

19   Transactions," would you know or do you know who

20   filled out that lower portion of this form?

21       A.    I believe this was Jeff Richard.

22       Q.    And Mr. Richard is affiliated with CED?

23       A.    Yes, he is.

24                MR. MEZZACAPPA:  Just let me put an

25            objection on the record that any

ALLAN REPORTING SERVICE

102

1        reference to the defendant having

2        insurance -- whether this document

3        can be viewed as that or not, I'm

4        not stating an opinion.  Earlier

5        in the testimony there was

6        reference to insurance, and other

7        than the plaintiff, which is

8        obviously an insurance company

9        suing in subrogation, I would

10       object to any document that

11       contains reference to the

12       defendant having insurance for

13       obvious reasons.  And this will be

14       a jury trial, and that would be

15       inappropriate.  And I would ask

16       for a mistrial if any testimony or

17       document, either inadvertently or

18       intentionally, was used in front

19       of the jury or mentioned in front

20       of the jury that indicates or

21       suggests the defendant has

22       insurance here.

23            And, Joe, I'm not saying it's

24       intentional.  I think we have to

25       be very careful about that in this

103

1           case.  So I just meant to say it

2           earlier.  I'm sorry.

3                MR. MASCARO:  That's fine.

4           My only response, obviously, this

5           is not the trial, so if --

6                MR. MEZZACAPPA:  Anything can

7           be said.  To the extent that the

8           word "insurance" comes up coupled

9           with the defendant, we're going to

10          have to redact that or do

11          something about it at trial.

12               MR. MASCARO:  I understand,

13          and your position is well noted.

14          Again, anything that happens

15          during this deposition or any

16          other deposition doesn't mean that

17          we're looking to try to get that

18          inadmissible information into the

19          trial, if we get that far, but I

20          understand your objection.

21     BY MR. MASCARO:

22          Q.    Mr. Allen, I note that the copy of the file

23     that was -- the copy of your file that was provided to

24     me contains a copy of the transcript of the deposition

25     of Mr. Harold Heinz; is that correct?

104

1      A.      Yes, it does.

2      Q.      Did you review the deposition of Mr. Heinz

3    prior to the preparation of your report?

4      A.      No, I didn't.

5      Q.      It would have happened January 29, 2004, so

6    you would not have been able to do that.  Did you

7    review the deposition transcript of Mr. Heinz?

8      A.      Yes, I did.

9      Q.      And you reviewed it after you prepared your

10   report?

11     A.      Yes, I did.

12     Q.      Did it in any way change any of the

13   statements or opinions you made in your report?

14              MR. MEZZACAPPA:  Note my objection to

15          that.

16          You may answer, over objection.

17     A.      Now, you've got two -- You're talking about

18   two things in there, statements and opinions.  I

19   didn't make any -- I did not issue another report with

20   any changes in statement.  My opinions were not

21   materially changed by Mr. Heinz's deposition.  They

22   were clarified to a certain extent.

23     Q.      And when we go through your report, we'll

24   discuss that.  I'm not going to mark Mr. Heinz's

25   deposition as an exhibit.

105

1           MR. MASCARO:  Would you mark that.

2           (Whereupon, the handwritten notations, six

3    pages, were marked as Plaintiff's Exhibit U for

4    Identification.)

5    BY MR. MASCARO:

6           Q.    Mr. Allen, before getting to the next

7    exhibit, just one follow-up question to my last

8    question.  I don't see the transcript of any other

9    deposition taken in this case in the copy of your file

10   provided to me.  Have you had an opportunity to review

11   any other deposition transcripts other than the

12   deposition of Mr. Heinz?

13          A.    Yes, I have.

14          Q.    Which other deposition transcripts have you

15   reviewed?

16          A.    I've reviewed both depositions of Mr. Klem.

17          Q.    Anything else?

18          A.    Those are the only --

19          Q.    I'm sorry to cut you off.

20          A.    -- transcripts.

21          Q.    So the only other deposition transcript

22   that you reviewed other than the transcript of

23   Mr. Heinz's deposition were the transcripts from the

24   two days of deposition of Mr. Klem?

25          A.    That's correct.

106

1          Q.    Did you review the deposition transcript of

2     Matthew Matza of Command Force Security?

3          A.    No, I did not.

4          Q.    Did you review the deposition transcript of

5     Jake Mollenkopf of Encompass Insurance?

6          A.    No, I did not.

7          Q.    I'm going to show you what has been marked

8     as Plaintiff's Exhibit U.  There's several copies of

9     what appears to be handwritten notes.  The first

10    question I have for you, is that your handwriting on

11    each of the pages that has been marked as Exhibit U?

12         A.    Yes, it is.

13         Q.    And generally speaking, before we go into

14    them in detail, what is Exhibit U?

15         A.    They are notes that I made while reviewing

16    the initial file materials that were sent to me in

17    this case plus some notes that I took during a phone

18    conversation with Mr. Mezzacappa and Matza.

19         Q.    Your writing seems to be pretty good, but

20    what I want you to do, just in case I can't decipher

21    everything in your handwriting, is I want you to go

22    through these, starting at the top; just go through

23    them and tell me what's contained in your notes.

24         A.    Just read it?

25         Q.    Yes.

107

1      A.    On the top, the top right-hand corner, it

2    says, "Glen Falls Insurance versus Command Force

3    Security."  The first line, "Building, 28 feet by 70

4    feet.  ELL, 18 by 24.  Originally one-story ranch.

5    D.O.L. 7/23/01.  Alarm REC 11:06:19 a.m."

6      Q.    I'm going to stop you for one second.  You

7    read a portion near the top of the note where it says,

8    "Building, 28 by 70"; is that correct?  Did I hear you

9    correctly?

10            MR. MEZZACAPPA:  28 feet by 70 feet is

11            what he said.

12   BY MR. MASCARO:

13     Q.    What does that represent?  What do those

14   figures pertain to?

15     A.    They pertain to the residence in this case.

16     Q.    Is that a total size, a size of one of the

17   floors, or a portion of the premises?  Do you know?

18            MR. MEZZACAPPA:  Objection to form.

19            You may answer.

20     A.    I believe it's what I got from the Klem

21   initial report and statements that were made in there

22   as far as a description as to the dimensions of the

23   building.

24     Q.    I'm sorry to cut you off.  You can keep

25   going.

ALLAN REPORTING SERVICE

108

1    A.    I believe obviously the third line down

2  here, "FD contact 11:08:13 a.m.  FD arrival 11:15.

3  Under control 12:45.  Photographs?  Diagrams?  (Floor

4  Plan.)"

5    Q.    And by putting a question mark where you

6  did, does that mean you didn't have any at that time?

7    A.    I didn't have any at this time, and also

8  are they available.  These are notes that I would have

9  taken prior to contacting Ms. Doty or at that point

10  Ms. Doty and later Mr. Mezzacappa.

11        "Inspect residence.  Fire models?"

12    Q.    What does that mean, "Fire models?"

13    A.    There was reference in Mr. Klem's second

14  report that he had used fire modeling in his analysis

15  and -- but there were no details as to what was done

16  as far as fire modeling, and that was a note to me to

17  generate questions for Mr. Mezzacappa to get some

18  information as to what was done as far as the fire

19  modeling in this case.

20    Q.    Go on.

21    A.    The next statement, "False alarms versus

22  number of smoke detectors (addressed by NFPA 72)."

23    Q.    That line that you just read to me, does it

24  say false alarms?  Is that what you said?

25        MR. MEZZACAPPA:  Yes, false alarms

109

1          versus number of smoke detectors."

2     BY MR. MASCARO:

3          Q.     What does that mean?

4          A.     I was expressing the observation that the

5     more smoke detectors that are present, the more

6     probability there is of false alarms, and that

7     specific point is addressed in NFPA 72.

8          Q.     Okay.   Thank you.

9          A.     And then the next line says, "Code and

10    Practice," and then the next line says, "Monitored

11    system versus individual detectors."   The next line

12    says, "Exterior and interior wood construction?"

13         Q.     Does the question mark signify that you

14    weren't sure whether it was wood construction on the

15    exterior and interior?

16                MR. MEZZACAPPA:   Objection to form.

17                You may answer.

18         A.     No.   Not that I'm unsure as to whether it

19    was wood or not, but that was all that was stated in

20    the documentation that I had, and the question mark

21    was what more details can I learn about it.

22                The next section here is kind of written

23    all over the page as opposed to sequentially like what

24    I read before.

25         Q.     Okay.

110

1      A.      And it has the date of "2/14/2000

2    Installation.  Designed with homeowner.  Three smoke

3    detectors, photo electric (system) hard-wired.

4      Q.      Let me just interrupt you.  What does photo

5    electric mean?

6      A.      There are two basic types of smoke

7    detectors that operate on two different principles.

8    One is a photo electric.  Another one is an ionization

9    detector.

10            An ionization detector has a radioactive

11    element into it and is good in sensing open flame and

12    products of combustion.

13            A photo electric smoke detector operates on

14    a light-scattering and obscuration sensing principle

15    and is used and it's better at detecting smoldering

16    fires and smoky fires.

17            "Ranch house.  Two rooms.  Fire damage.

18    Preliminary report based on information available.

19    Smoke detector two steps up, about 5 feet."  And then

20    over to the side is written, "Phone con with Matt

21    Matza and attorney."  And that's the first page.

22      Q.      And the reference to the phone call was

23    with -- Is that significant where you got the

24    information that's on the first page of Exhibit U?

25            MR. MEZZACAPPA:  Objection to form.