111

1          You may answer.

2          A.    The bottom one-third of the page, those

3    notes, were made during that conversation.

4          Q.    Beginning with the date 2/14/2000?

5          A.    Maybe the line above.  I'm not sure.  But

6    everything above that was made previously.

7          Q.    Okay.  I understand.  I think you read a

8    line that said, "Preliminary report based on

9    information available."  Did I read that correctly?

10         A.    Yeah.

11         Q.    What report are you referring to there?

12         A.    What was going to be required of me as far

13   as my report at that point.

14         Q.    Thank you.  You can go on to the second

15   page.

16         A.    The second page, number 1, circled says,

17   "Complaint, May 5th, 2003.  Date of loss July 23rd,

18   2001.  Subrogation.  Command Force agreed to provide

19   security system including:  Smoke detectors, central

20   station monitoring.  Fire origin bedroom lower level.

21   Allege that fire should have been detected earlier.

22   Failed to place smoke detector in every bedroom."

23              Item 2, "Fire marshal's Report.  Alarm

24   11:06:19.  Fire department contact 11:08:13.  Called

25   by central station.  Fire department arrival 11:15.

112

1    Nonhydrant area."

2          Number 3, "Klem report #1 by Joseph Folger

3    and Tom Klem.  Undated, unsigned.  Building contained

4    a fire detection alarm system (with smoke detectors

5    positioned about the house according to national

6    standards at the time of their installation."  And

7    that statement beginning with "with" through

8    "installation" is in parentheses.

9          Q.    And what does that signify that it's in

10   parentheses, that it came from another document or

11   it's your thoughts?

12                    MR. MEZZACAPPA:  Objection to form.

13               You may answer over objection.

14         A.    I don't know.  I'm just stating what I'm

15   reading.

16         Q.    I understand that.  I'm just wondering if

17   you can remember.  That's all.

18         A.    No.  I don't know what the significance of

19   the parentheses are.

20         Q.    The material that's written in parentheses,

21   do you know where that information came from?

22         A.    Yes.

23         Q.    Where did it come from?

24         A.    The initial Klem report.

25         Q.    You can go on.

113

1          A.    Everything in this line comes from the

2    documents that are referenced.

3          Q.    Sure.

4          A.    And the next line says, "Operable and

5    monitored."

6                Next page, number 4, "Expert disclosure,

7    November 17, 2003.  NFPA 72 requires smoke detector

8    just outside bedroom."  I'm having a hard time reading

9    the next line.  It's pretty faint.

10         Q.    That's why I had you read it.

11         A.    I might be able to find my copy.

12         Q.    I don't have any objection to that.

13         A.    Maybe I can't.

14               MR. MEZZACAPPA:  Is your copy any

15               cleaner?

16               (Discussion off the record.)

17               MR. MEZZACAPPA:  Just let the

18               record reflect he's looking at his

19               original now because we couldn't

20               make out some of the words on the

21               copy.  He'll continue to read that

22               page.

23         A.    Right.  The next line says, "Opinions and

24    basis contained in reports."

25               Number 5, "T.J. Klem supplemental report.

ALLAN REPORTING SERVICE

114

1    Used 1999 code.  Computer fire models.  When was alarm

2    system installed?"

3              Item number 6, "Command Force subscriber

4    activity report."

5              Item number 7, "Certificate of Occupancy,

6    Town of Wilton, May 18, 2000.  New two-car garage, 24

7    by 28.  Heinz.  Great room 18 foot by 30 foot.

8    Converted existing garage into two bedrooms.  Covered

9    porch 13 foot by 4 foot.  Converted screened porch to

10   music room.  Converted two bedrooms into one master

11   bedroom."

12             Number 8, "Building permits June 2, 1967,

13   Zimmer CO December 26, 1967.  Built enclosed swimming

14   pool 9/15/80.  CO November 5, 1980.  Extend roof and

15   screen in existing open porch, deck house."

16             Number 9, "Diagram of footprint 7/31/01."

17             Number 10, "Insurance inspection (total

18   renovation.)  7/3/99.  Built 1990.  Addition 1999.

19   Recommended 'a centrally-monitored alarm system'."

20        Q.    The information that you just read for what

21   was number 10, where did that information come from?

22                  MR. MEZZACAPPA:  Objection to form.

23             You may answer.

24        A.    Another document that's in the file.

25        Q.    And that would be part of your file?

115

1        A.    Yes.

2              Number 11, it says, photography -- or

3        "Photographs.  Four sets, 22 color copies of

4        photographs.  T.J. Klem & Associates 01-7-25.  21

5        Schleifer Associates 01-7-31.  Defendant U-GG 1-7-04."

6              It should also say 01-8-8.

7                    MR. MEZZACAPPA:  01-8-8 is the way you

8                    write the year.  It's 01-8-8.

9                    It's the European way of dating.

10                   It's August 8, 2001, right?

11                   THE DEPONENT:  Right.  That's my

12                   understanding.

13       A.    It says, "34 Collectively as Defendant's

14       HH.  Some with 2001-7-25."  And then in the margin it

15       says, "8 color copies, 5 by 8 of new construction

16       Defendant's 00."

17             Next page.  "Klem report #2.  Adequacy of

18       fire detection/alarm.  1.) Early detection of a fire.

19       2.) Notification to monitoring company.  3.) Timely

20       notification of the fire department.  4.) System's

21       ability to achieve life safety of occupants and to

22       limit fire damage to the home."  Over in the margin

23       I've got a written comment, "Monday morning

24       quarterback."

25       Q.    Who are you referring to there?

ALLAN REPORTING SERVICE

1        A.    Mr. Klem.

2        Q.    Why did you write that?

3        A.    Well, the next comments refer to that.

4    Basically it was my general observation upon initially

5    reading the report that he was coming in, as the next

6    comments say, with the benefit of hindsight designing

7    the fire detection and alarm system optimized for the

8    circumstances of this particular fire.  That's what

9    generated the comments "Monday morning quarterback."

10        And the reason is that the report, even

11    though it was very confusing to try and figure out

12    exactly what he was saying, was trying to portray

13    himself as a fire detection system designer, and

14    that's not the way one would design a fire detection

15    system for a building.  You don't go in and look at

16    the last fire that occurred in that building then see

17    what changes you would make in the fire detection

18    system.  What you do is you go into a building, you

19    look at what the hazards are, you look at what the

20    codes are, and then you design a fire detection system

21    to protect the building and the building occupants as

22    best possible.

23        It just -- All I'm trying to do is point

24    out the difference in the approach that Mr. Klem was

25    taking in writing his analysis and what a legitimate

117

1    engineer and fire detection system designer would do.

2         Q.    Just to interject for one moment, have you

3    ever designed a fire detection system for a residence?

4         A.    No, I have not -- Other than my own.

5         Q.    For your own home?

6         A.    Right.

7         Q.    Have you ever designed a fire detection

8    system for any kind of commercial structure?

9         A.    No, I have not.

10        Q.    You can keep going.

11        A.    The next line says, "The code sections

12   cited do not explicitly specify the criteria which

13   Mr. Klem says it violates (in some cases different)."

14   Next line says -- "uses 'weasel words' versus citing

15   noncompliance (i.e., inadequate)."

16        Q.    Do you, in your report, specify where --

17   Withdraw that.

18              You read a section where it said the code

19   sections -- is that word -- What's that next word?

20   "The code sections cited do not explicitly specify the

21   criteria which Mr. Klem says it violates."  And then

22   in parentheses you have "(in some cases different)."

23   Do you specify in your report which sections of

24   Mr. Klem's report where that occurs, where you're

25   referring to what we just read?

ALLAN REPORTING SERVICE

118

1          MR. MEZZACAPPA:  Objection to form.

2              You may answer it.

3     A.     No.  I did not go through his report and

4     reference every section in there.

5     Q.     In the next line you read I think you had a

6     phrase in quotes "weasel words"; is that right?

7     A.     Yes.

8     Q.     What do you mean by that?

9     A.     Just the wording.  It struck me as very

10    strange when I read the report because it sounded so

11    different from reports that I've always read in the

12    past.

13         When a fire protection engineer writes a

14    report evaluating an alarm system or even a building

15    construction, the words that are used are that this is

16    noncompliant, does not meet code, and then specific

17    code sections are cited.

18         In reading this report, it was like chasing

19    a moving target.  It was hard to figure out exactly

20    what he was saying and where he used, you know, soft

21    words, qualifiers, which some people would say, like,

22    weasel words, like saying the system was inadequate

23    but it didn't say it was noncompliant.  These are

24    notes that I'm making to myself.

25    Q.     I understand that.  That's why I'm asking

119

1    you about them.

2        A.    The next line, "A single-station smoke

3    detector installed in the basement bedroom would have

4    met Mr. Klem's suggested increased level of protection

5    to the occupants but would have made no difference in

6    the course of this fire."

7        Q.    When you say "single-station smoke

8    detector" in that portion of your notes that you just

9    read, what do you mean by "single-station"?

10        A.    I mean a smoke detector --

11            MR. MEZZACAPPA:  Note my objection.

12        A.    Any smoke detector, you could take a

13    battery-operated smoke detector, stick it on the

14    ceiling, and that would meet any letter of

15    requirements or any implied requirements in any

16    version of NFPA 72.

17        Q.    But by "single-station," it does not

18    include centrally-monitored smoke detectors, correct?

19            MR. MEZZACAPPA:  Objection; asked and

20            answered earlier today.

21            You may answer it again.

22        A.    That's correct.  A single-station, means a

23    smoke detector that operates on its own, does not have

24    to be tied in to other detectors or to a

25    centrally-monitored system.

120

1      Q.      Okay.  Thank you.

2      A.      The next line says, "Report inadequate:

3  Lack of diagrams, dimensions, details of computer

4  analysis, lack of coherent specification of code

5  requirements."

6          The next page says, "Opinion.  The existing

7  monitored fire alarm system provided sufficient

8  notification to the fire department to limit the

9  direct fire damage to two rooms of the house.  Smoke,

10  heat, and water damage was present during growth

11  spread and suppression in any fire and its cleanup

12  necessary after a fire.  An additional smoke detector

13  in the room of origin would not have changed the

14  course of the fire or the extent of damages to satisfy

15  Mr. Klem's additional requirement above and beyond

16  NFPA 72 in the state of Connecticut.  If there was a

17  clear violation, it would be a one-page report."

18          And the last page, it says, "Life safety

19  code NFPA 101, Handbook 1994, 7-6.2.9 single station

20  smoke detector required, local enunciation."  And then

21  21-3.3.1" underlined.

22      Q.      And what was the reason for writing the

23  material you wrote on the last page?

24      A.      It was -- These two sections of the life

25  safety code handbook were included in the

121

1    documentation from Mr. Klem, and I was just writing

2    what I got from those sections or what sections they

3    were on a separate sheet of paper to refer to them.

4        Q.    How many conversations did you have with

5    Mr. Matza of Command Force Security?

6        A.    How many --

7        Q.    Conversations.  I know there's a reference

8    on the first page of Exhibit U that you had a

9    conversation with Matt Matza, and my question is was

10   there more than one conversation with Mr. Matza or

11   just the one conversation?

12       A.    There was only one conversation that I had

13   with Mr. Mezzacappa where Mr. Matza was involved.

14       Q.    Was that over the phone or in person?

15       A.    It was over the phone.

16       Q.    And did you have any other conversations

17   with Mr. Matza where Mr. Mezzacappa was not involved?

18       A.    No, I did not.

19       Q.    In the notes we just went through on I

20   believe it's the third page of the notes under number

21   10 or next to number 10, you write "insurance

22   inspection" and in parentheses "total renovation," I

23   think.

24       A.    Mm-hmm.

25       Q.    Is there a document that you're referring

122

1      to when you say "insurance inspection"?

2          A.    Yes.

3          Q.    Are you able to locate that document as

4      part of your file?

5          A.    Yes.  I think I can.

6                Yes.  I think this is it.

7          Q.    I'm not sure that I have that, but I may.

8          A.    You have to.

9                    MR. MEZZACAPPA:  It was marked 1/7,

10               2004.  Probably Jake Mollenkopf's

11               deposition, whatever date we did

12               that.

13         A.    I know it's in there.  I can probably even

14     find it.

15         Q.    We'll go through your file then, and if we

16     don't come across it --

17         A.    Because I copied these in order.

18                    MR. MEZZACAPPA:  Leave it in your

19               book, then, and we'll find it.

20     BY MR. MASCARO:

21         Q.    If it's in here, we'll get to it.

22                (Whereupon, the document entitled "Fire

23     Protection Analysis Single-Family Dwelling, 34

24     Wildwood Drive, Wilton, Connecticut" was marked as

25     Plaintiff's Exhibit V for Identification.)

123

1    BY MR. MASCARO:

2        Q.    Mr. Allen, I'm going to show you what has

3    been marked Plaintiff's Exhibit V.  Now, this appears

4    just to be another copy that's previously been marked

5    as an exhibit; is that correct?

6        A.    That's correct.

7        Q.    Can you just very briefly identify what

8    that document is.

9        A.    This is another copy of the first Klem

10    Associates report.

11        Q.    If I may see it for just a second.

12                MR. MEZZACAPPA:  Off the record.

13            (Discussion off the record.)

14    BY MR. MASCARO:

15        Q.    Mr. Allen, we've already had some

16    discussions regarding what was in Mr. Klem's first

17    report, so I'm not going to go through this again in

18    detail with you.  I'm going to show you what's page 1

19    of what has been marked as Plaintiff's Exhibit V, and

20    that doesn't include -- There's a cover page, which is

21    not numbered, and then the second page is numbered

22    page 1.  There's a notation made on the right-hand

23    margin.  It looks like "When?"  Is that your writing?

24        A.    Yes, it is.

25        Q.    What is that referring to?

124

1      A.      It's right next to that -- the phrase "once

2  flashover occurred" is circled, and that's what it's

3  referring to.

4      Q.      The flashover, in other words?

5      A.      Yes, when.  I'm asking when did flashover

6  occur.  When are they saying flashover occurred.

7      Q.      And did you ever make a determination or

8  reach an opinion, your own opinion, as to when

9  flashover occurred on the fire?

10     A.      No.  I didn't -- I did not make a separate

11  opinion.  I just made observations about what they

12  said about flashover.

13          (Whereupon, the document entitled "Fire

14  Investigative Analysis 34 Wildwood Drive, Wilton, CT"

15  was marked as Plaintiff's Exhibit W for

16  Identification.)

17  BY MR. MASCARO:

18     Q.      Mr. Allen, I'm going to show you what has

19  been marked Plaintiff's Exhibit W.  It's another copy

20  of -- it appears to be another copy of the second

21  report prepared by T.J. Klem & Associates.  I'll just

22  have you look at that.  Is that correct?

23     A.      Yes.  It's what it appears to be.

24     Q.      And again, I've asked you some questions

25  about the second report before.  All I want to ask you

125

1  about is some of the writing that's on some of the

2  pages here.  There's some handwriting on the first

3  page near the center of the page.  Is that your

4  handwriting?

5      A.    Which specific --

6              MR. MEZZACAPPA:  You're not talking

7              about the margins?  You're talking

8              about the body, in the center?

9              MR. MASCARO:  Exactly.  I'm

10             not asking about the margins yet.

11     A.    Yes.  All of the handwriting here, here,

12  here, and here is, and this (Indicating).

13     Q.    Is yours?

14     A.    Appear to be mine.

15     Q.    So everything except the handwriting on the

16  right-hand margin, which appears to be cut off, that

17  is not yours?

18             MR. MEZZACAPPA:  That's mine, by

19             counsel.  That was on Post-It

20             notes, and it partially got

21             photocopied.  That's why they have

22             to learn to remove Post-It notes

23             before they photocopy.

24             MR. MASCARO:  You can give me

25             the entire note.

ALLAN REPORTING SERVICE

126

```
1              MR. MEZZACAPPA:  I don't

2         remember what it says.

3              MR. MASCARO:  You know I'm

4         joking.

5    BY MR. MASCARO:

6         Q.    Starting with the first full paragraph that

7    begins with the word "such," there's some writing, a

8    word is underlined, and then there's some writing

9    over -- Does that word say "misstates"?

10        A.    Yes.

11        Q.    And you've underlined "intended"?

12        A.    "Is intended."

13        Q.    "Is intended."  Is that what you wrote that

14   "misstates" refers to?

15             MR. MEZZACAPPA:  Just note my

16        objection in that, for the record,

17        that whole sentence is circled and

18        "misstates" seems to be above that

19        sentence.  So I just want the

20        record to reflect that.

21             MR. MASCARO:  That's fair.  I

22        can't quite make it out on my

23        copy.

24        A.    It's more visible here.

25        Q.    What did you mean when you wrote
```

127

1    "misstates" there?

2         A.    Well, actually, the circle, the

3    underlining, the comment above, and the marginal

4    comment on the left-hand margin are all together, and

5    what I meant was that that's not what the code says.

6    NFPA 72 states that the goal is to get the occupants

7    out, not to detect the fire before its growth and

8    spread; and the code doesn't say anything about the

9    firefighters' capability to achieve early suppression.

10        Q.    I can't read what you wrote in the left-

11   hand margin.  Can you read that into the record for

12   me.

13        A.    There's a hole through part of it, too, but

14   it says, "NFPA 72 states goal to get occupants out."

15        Q.    And there's some handwriting at the bottom

16   of that third full paragraph.  What does that say?

17        A.    "Which edition of National Fire Alarm Code

18   applicable to the installation?"

19        Q.    Turning to the second page, there's some

20   handwriting in the left-hand margin.  Is that your

21   handwriting?

22        A.    Yes.

23        Q.    And can you read that into the record for

24   me.

25        A.    It says, "Do all scenarios originate from

128

1    the same room," and then the line goes over the room

2    of origin, which is underlined.

3         Q.    What does that -- "Do all" -- What is that

4    next word?

5         A.    "Scenarios."

6         Q.    And under the section labeled "Discussion"

7    on page 2, the numbered page 2, there's, it looks

8    like, a question mark with an arrow; is that correct?

9         A.    Right.

10        Q.    And why did you put that there?

11        A.    That's referring to the underlined

12   statement that the relevant fire protection

13   engineering literature is consistent.  What does that

14   mean?  That's what the question mark means.

15        Q.    Turning to the third page, there's -- On

16   the copy I'm looking at there's some writing in the

17   upper right-hand margin, it looks like on your

18   original, that's on a Post-It note.  What does that

19   say?

20        A.    It says, "Unclear without diagram."

21        Q.    And then a little below that there's some

22   additional writing in the right-hand margin.  What

23   does that say?

24        A.    There's an arrow connecting line A, which

25   says, "Detector outside the basement family room

129

1      required by NFPA 72 installed," and then line B where

2      it says, "Detector outside the bedrooms required by

3      NFPA 72 but not installed," and the comment next to

4      the arrow connecting those two; and the question mark

5      under it says, "How are these different?"

6          Q.    The word "these" there refers to --

7          A.    Those two statements.

8          Q.    Underneath the question mark there's a

9      portion of the paragraph labeled paragraph C that's

10     underlined, and then there's a -- I don't know if it's

11     a scribble, a cross-out. Can you just identify what

12     that marking is for me, if it has any significance.

13         A.    Yeah.  I'm not sure.  It's a squiggle.  It

14     looks like an arrow.

15         Q.    Turning the page -- with the numbered page

16     4 on Exhibit W, about halfway down the page there's

17     some underlining and a question mark.  First of all,

18     is that your writing?

19         A.    Yes.

20         Q.    Why did you put a question mark there?

21         A.    Well, the parenthetical comment that's

22     underlined says, "Reflecting the change in national

23     code," and "as it is enforced in Connecticut."  The

24     question mark is I'm saying what does this mean?  What

25     does that statement mean?  I'm expressing a lack of

130

1    understanding of exactly what he's trying to convey by

2    that statement.

3        Q.    Did anything you received and reviewed

4    after you wrote the note or that question mark that

5    we've just been talking about, any of the material

6    that you were provided after you made that question

7    mark, did it answer that question for you?

8                MR. MEZZACAPPA:  Note my objection.

9                You may answer.

10        A.    Not completely.  It did shed some light.

11    Some of the materials that were provided later on shed

12    some light into what he was thinking about when he

13    made that statement, but they didn't clarify it

14    completely.

15        Q.    Do you recall what material shed some light

16    on this particular statement?

17        A.    Yes.  Specifically the Connecticut codes

18    and the references to which versions of the NFPA 72

19    were adopted and when.

20        Q.    Underneath the question mark that we've

21    just been talking about, there's a word and, I don't

22    know, some dots or a symbol there.  Can you just tell

23    me what that means.

24        A.    Yeah.  The three dots means therefore

25    complies.

131

1       Q.    And back in the body of the report,

2    there's -- the word "only" seems to be underlined

3    several times or darkly.  Why did you underline "only"

4    there?

5       A.    Exactly why I did it, I'm not sure, other

6    than to emphasize that he's saying that increased --

7    improved -- "unless a distinct hazard to life exists,

8    such improved levels of protection are required in new

9    construction areas only," just highlighting that

10   statement.

11      Q.    Turning to the next page, which is numbered

12   5 on this exhibit, there is some handwriting toward

13   the bottom of the page on both the left and right

14   margins.  Is that your handwriting on both margins?

15      A.    Yes, it is.

16      Q.    Starting with the left margin, can you read

17   what is written there.

18      A.    The top statement says "only if monitored,"

19   and the second statement under that says "code does

20   not require monitored."

21      Q.    And that refers to what specifically?

22      A.    Well, the paragraph right to the right.

23      Q.    Where it starts "a smoke detector"?

24      A.    Yes.

25      Q.    What does it say in the right-hand margin?

132

1          A.      "Single-station versus monitored."

2          Q.      And why did you write that there?

3          A.      It relates to the points that are made in

4     that paragraph.

5          Q.      There's an attachment to this report,

6     Plaintiff's Exhibit W.  I'll show you that page.  This

7     appears to be one page only that has some handwriting

8     on it.  If you can find that page.

9          A.      Right here.

10          Q.      The handwriting is written next to a

11     heading which says, "Chapter 8, fire warning equipment

12     for dwelling units."

13          A.      Mm-hmm.

14          Q.      Can you read for me what's written in the

15     margin.  Actually, let me ask you this question first.

16     Is that your handwriting?

17          A.      Yes, it is.

18          Q.      Can you read what's written in the

19     left-hand margin.

20          A.      It says, "Not necessarily off premises

21     monitoring."

22          Q.      And why did you write that there?

23          A.      Well, it references the Section 8-1 where

24     it's talking about the primary function of equipment,

25     and that paragraph is highlighted; and that's what it

133

1    relates to.

2        Q.    Is there any other writing that is yours on

3    this particular page that we're looking at, writing or

4    markings or notations?

5        A.    Yes.

6        Q.    Which one?

7        A.    Well, there's down towards the -- about a

8    third of the way from the bottom of the page, there's

9    an asterisk next to this Section 8-1.2, and the

10    paragraph right next to that is -- has some

11    underlining that's mine.

12        Q.    Do you recall why you underlined that

13    section?

14        A.    Just to emphasize it.

15        Q.    What does that section provide?  Not that I

16    want you to read it verbatim.

17                MR. MEZZACAPPA:  Just note my

18                objection to not reading it

19                verbatim.  I think if he reads it

20                not verbatim, it's not fair

21                really.

22    BY MR. MASCARO:

23        Q.    All right.  You can read it verbatim.

24                MR. MEZZACAPPA:  8-1.2.2?

25                MR. MASCARO:  Right, the underlined

134

1          section.

2          A.    This is under performance criteria for fire

3     warning equipment for dwelling units.

4          Q.    I can read that clear enough.  You don't

5     have to read that for me.

6                    MR. MASCARO:  Would you mark that for

7                me.

8                    (Whereupon, the Thomas Klem resume was

9     marked as Plaintiff's Exhibit X for Identification.)

10    BY MR. MASCARO:

11         Q.    Mr. Allen, I'm going to show you what has

12    been marked as Plaintiff's Exhibit X from your file.

13    Can you just identify that for me briefly, please.

14         A.    Well, it appears to be Mr. Klem's resume

15    and a list of publications and other information that

16    was provided with his report.

17         Q.    And you have the original or another copy

18    of this in front of you, correct?

19         A.    Yes, I do.

20         Q.    There's some handwriting on the top of

21    this.  It looks like it says, "Implied PE?"  Did I

22    read that correctly?

23         A.    Yes.

24         Q.    Is that your handwriting?

25         A.    Yes.

ALLAN REPORTING SERVICE

135

1      Q.    Why did you write that there?

2      A.    Well, he lists himself with the title of

3  fire protection engineer, and I just am aware in a lot

4  of states that before a person can use the title of

5  engineer, they have to have some sort of certification

6  from the state such as a professional engineer's

7  license, and that's what I'm wondering, is that the

8  case in Massachusetts.

9      Q.    Turning to the second page of what has been

10  marked Exhibit X, if you could turn to the second

11  page, there's some handwriting on the bottom of the

12  page.  Is that your handwriting?

13      A.    Yes.  All of the handwriting on this page

14  is mine.

15      Q.    Next to the heading where it says

16  "Significant fire investigation, see separate

17  listing," there's something written.  Can you read

18  that.

19      A.    It says, "Representing NFPA role?"

20      Q.    And what did you mean when you wrote that?

21      A.    Well, I'm aware that from previously in

22  Mr. Klem's resume from 1982 to 1984, he was employed

23  by the NFPA.  Here he's talking about fire

24  investigations that are significant that he's been

25  involved with, and I believe there's a list on a

ALLAN REPORTING SERVICE

136

1    further page that -- of these fire investigations, and

2    he's -- you know, these are significant fire

3    investigations that he was involved with representing

4    the NFPA, and I've been involved in similar -- some of

5    these investigations as well, not representing the

6    NFPA; and I've been involved in other cases where the

7    NFPA sent a representative who was involved in fire

8    investigation, and I'm aware of what their involvement

9    and role usually is in a case like this.

10         And so I'm making the distinction that this

11   is different from being involved either as a member of

12   the public sector who is charged with responsibility

13   for conducting an investigation or working as for one

14   of the parties in the incident, either the plaintiffs

15   or the defendant.

16         The NFPA usually carries on an

17   informational role.  They don't have any official

18   involvement in the investigation because they're not

19   an official government body, and usually what the

20   so-called investigator from the NFPA is doing is

21   generating a magazine article to be published and

22   reported to the NFPA membership summarizing basically

23   what went on and what the significant fire protection

24   issues that were involved in a particular failure or

25   accident were.

137

1        Q.      And on the bottom of the page it appears to

2    be written, "No technical publications"?

3        A.      Yes.

4        Q.      And why did you write that?

5        A.      Because reviewing the list of publications,

6    they're all magazine articles that were not subject to

7    peer review that are not -- where there's no

8    engineering analysis or any -- It's not like a thesis

9    or a research project or a peer-reviewed publication

10   in a technical journal.  These are general information

11   journals to NFPA memberships, firefighters, fire

12   chiefs, and people like that.

13       Q.      On the next page where it lists published

14   articles, you wrote the words "peer review" with a

15   question mark?

16       A.      Yes.

17       Q.      Is that for the same reason you just spoke

18   about regarding the published articles?

19       A.      Yes.

20       Q.      Did you ever write any articles for

21   technical publication?

22       A.      Yes.

23       Q.      How many?

24       A.      The list of publications that I gave you

25   before.  They are all peer reviewed.

138

1      Q.    Were those listed on your -- I don't recall
2    if those were listed on your CV anywhere.
3      A.    They're listed on my CV, the one that you
4    don't have a copy of.
5      Q.    The one that we will be requesting a copy
6    of?
7      A.    Right.
8      Q.    Do you know, in general, how many articles
9    you've written for technical publications?
10     A.    I think I said eight or nine.
11     Q.    Turning to the page where Mr. Klem's
12   testimony cases is listed, this page here
13   (Indicating) --
14     A.    Mm-hmm.
15     Q.    -- there's some writing on sort of toward
16   the right-hand corner.  Can you read that for me.
17     A.    Yes.  It says, "Deposition in Dupont
18   Plaza?"
19     Q.    Why did you write that?
20     A.    Well, I recall that since Mr. Klem was on
21   the scene as a representative of the NFPA at the
22   Dupont Plaza Hotel fire before any of the private
23   sector investigators were there, that he was deposed
24   in that case.
25     Q.    Do you know how many years ago that might

139

1    have been?

2        A.    Yeah.  It would have been in the late '80s,

3    '88 or '89.

4        Q.    Did you ever have any dealings directly

5    with Mr. Klem?

6        A.    No.

7            (Whereupon, the one-page handwritten

8    document was marked as Plaintiff's Exhibit Y for

9    Identification.)

10   BY MR. MASCARO:

11       Q.    Mr. Allen, I'm going to show you what has

12   been marked Plaintiff's Exhibit Y.  Could you identify

13   that for me.

14       A.    Yes.  It's a page of notes that I made to

15   myself prior to calling Mr. Mezzacappa in order to

16   request additional information based on the lack of

17   detail that was provided in the initial disclosure and

18   in the -- with Mr. Klem's report, a lot of what we've

19   already referred to.

20       Q.    Do you have a copy of this note or you have

21   the original of this note?

22       A.    Yes, I do.

23       Q.    Can you read this into the record starting

24   at the top.

25       A.    The first word up at the top says "gun

ALLAN REPORTING SERVICE

140

1    decking?"

2        Q.    What does that mean?

3        A.    Well, that's a very unsavory practice that

4    I've experienced in the past back when I was in the

5    military, and I've seen it in a lot of cases where

6    I've been involved.

7            The definition of the term comes from the

8    fact that in the military they have periodic

9    inspections of ships or squadrons, and one of the

10   things that's always inspected when the inspectors

11   come in is your paperwork for your day-to-day

12   operations and, you know, training, and things like

13   that.

14           And with a lot of squadrons they get so

15   involved in the day-to-day activities that they don't

16   keep up with the paperwork, and usually when they're

17   given about a one-week notice of an inspection, the

18   files are created within that week so that when the

19   inspectors arrive there's paperwork in the files.  So

20   it wasn't created during the course of the last year

21   but in the course of the last week.

22           And many of the things that I saw in this

23   case and I've seen in other cases where there are

24   items referenced in a report that were done or were

25   referred to in generating the report and in

141

1    substantiating the opinions, when you ask for them,

2    they're not able to produce them, and they produce

3    other documents that raise more questions about --

4    Case in point would be the -- It was requested that we

5    have all the information about the fire monitoring

6    that was done, and then in the submission, instead of

7    getting information that was available and referred to

8    back to pre-October or the previous spring, I got a

9    report that's a multipage report from NIST on smoke

10   detectors that was published in December, immediately

11   after the report was published.  I got a download off

12   of a NIST web page.  A lot of files were being

13   recreated after the fact, and so being a very

14   suspicious individual, it raised questions.

15        Q.    Meaning you were suspicious that that is

16   what happened in this particular case?

17        A.    I thought it was a possibility.

18        Q.    And specifically we're referring to

19   Mr. Klem or the reports prepared by his company?

20        A.    Or the company, yes.

21        Q.    You gave me a specific example about

22   computer modeling as an example of that?

23        A.    Mm-hmm.

24        Q.    Are there any other examples in this

25   particular case that you can give me as examples of

142

1    gun decking?

2        A.    Well, some of this kind of explains my

3    reasoning down there.

4        Q.    Why don't we just go through it and read

5    it, and I can ask you questions on it.

6        A.    Sure.  Item number 1 says, "2 of many

7    studies available from NIST and NFPA on residential

8    smoke detectors + CD."

9                MR. MEZZACAPPA:  Computer disk.

10       A.    And it says, "Note dates 1455 December

11   2003.  1449 February 2003.  + NIST news release

12   printed 2/27/2004."  A comment, "I agree that smoke

13   detectors provide time for occupants to escape from

14   most fires.  The studies are not relevant to this

15   case."

16               I need to -- I think what I said before as

17   to what this document is, I want to clarify that a

18   little bit.  This is apparently written after I

19   received the file materials that were produced either

20   at or immediately prior to Mr. Klem's first

21   deposition.

22       Q.    When you say, "2 of many studies available

23   from NIST and NFPA," does that mean that 2 of many

24   studies were produced?  Is that what that means?

25       A.    Yes.  All that was produced were two

ALLAN REPORTING SERVICE

143

1    documents that had to do with smoke detectors, and

2    they were very recent documents; and, I mean, I have

3    in my office studies going back for years, and NIST is

4    very proliferate and so is NFPA.  A lot of

5    documentation is produced on smoke detectors, and

6    these two documents were totally irrelevant; and they

7    didn't include information that was specifically

8    related to this case and in some cases were produced

9    after the report was generated in this case.

10            So I just didn't understand the relevance

11   of them other than being, you know, a bulk of paper

12   that was thrown in the file and dumped on us.

13        Q.    Under number 2 or next to number 2, can you

14   read what you wrote there.

15        A.    On number 2, "Photographs & reports -

16   already provided.  Defendant's disclosure 1/30/2004."

17        Q.    And why did you write that?

18        A.    I'm just noting -- These numbered items, as

19   I'm going right down here, are identifying various

20   components of the paper that was produced.

21        Q.    And moving on to number 3?

22        A.    Number 3 says, "Handwritten notes and

23   diagrams.  Source of diagrams?  Beam/detector

24   location."

25        Q.    That reference to "beam/detector location,"

144

1    what does that refer to?

2         A.    It refers to the diagrams and the notes.

3         Q.    Does it refer to any particular location

4    within the property that was the subject of the fire?

5                   MR. MEZZACAPPA:   Objection to form.

6         A.    No.

7                   MR. MEZZACAPPA:   You may answer.

8         A.    No.   Item number 3 is another part of the

9    file that was produced.   I'm looking at it and making

10   some notes as to what can be obtained from that part

11   of the file.

12        Q.    Okay.

13        A.    And, you know, the first line is describing

14   what it is.   The source of diagrams is a question I

15   wrote for myself about that.   There was no reference

16   to it in there, and then what the diagrams do give are

17   the location of beams and detectors.

18        Q.    Number 4?

19        A.    Number 4, it says, "Codes.   History of

20   State building code, 9/2/2003.   '96 BOCA, which in

21   turn references 93 NFPA 72.   Second report referred

22   '99 NFPA 72 and '96 and NFPA 101 handbook.   1999

23   supplement 920.3.2.1."

24        Q.    Number 5?

25        A.    Number 5 says -- Well, it's an acronym,

ALLAN REPORTING SERVICE

145

1    CFAST, and the first line says, "Single room model

2    fence to outside."

3         Next line says, "How does it relate to

4    smoke detectors?  Various scenarios.  Detection times.

5    Fire department response time - Nothing about fire

6    department in file."

7         (Whereupon, the two-page typewritten

8    document was marked as Plaintiff's Exhibit Z for

9    Identification.)

10   BY MR. MASCARO:

11        Q.    Mr. Allen, I'm showing you a document

12   that's been marked as Plaintiff's Exhibit Z.  It's a

13   two-page document.  On the bottom they're numbered 259

14   and then 260.

15        Can you tell me what this two-page document

16   is.

17        A.    I think it's the NIST publication 1449 that

18   you referred to in the previous document.

19        Q.    Mr. Allen, we've been looking at what has

20   been marked as Plaintiff's Exhibit Z.  This document,

21   Plaintiff's Exhibit Z, is this something that was

22   produced to you as part of Mr. Klem's file?

23             MR. MEZZACAPPA:  Objection to form.

24             You may answer.

25        A.    Yes.

ALLAN REPORTING SERVICE

146

1      Q.    It's not something that you relied on

2   independently in the preparation of your report?

3              MR. MEZZACAPPA:   Objection to form.

4              You may answer.

5      A.    That's correct.

6      Q.    And when we took a break, you just

7   identified where you believe this document,

8   Plaintiff's Exhibit Z, came from.   Could you just tell

9   me again.

10      A.    Yeah.   I believe it came from this NIST

11   document, 1449.

12              MR. MASCARO:   Off the record for a

13              second.

14              (Discussion off the record.)

15              (Whereupon, the packet of documents was

16   marked as Plaintiff's Exhibit AA for Identification.)

17   BY MR. MASCARO:

18      Q.    Mr. Allen, I'm going to show you what has

19   been marked as Plaintiff's Exhibit AA.   The top sheet

20   of that is a copy of a letter I wrote to Attorney

21   Mezzacappa referencing a copy of material provided by

22   Mr. Klem, and Plaintiff's Exhibit AA is a large

23   package of documents.   What has been marked as Exhibit

24   AA, is that the letter I sent to Attorney Mezzacappa

25   and a copy of the material I sent him?

147

1            MR. MEZZACAPPA:   Objection to form.

2            You may answer.

3       A.    It is a copy of the letter that you sent to

4   Mr. Mezzacappa and some of the materials that were

5   included in the file.

6       Q.    And do you know whether any of these

7   materials contained any handwritten notations from

8   you?

9       A.    I suspect they do.  Yes, they do.

10      Q.    I'm trying to find the first page where

11  that happens.  (Indicating.)

12      A.    One before that, the third page.

13      Q.    This here (Indicating)?  Turning to the

14  fourth page of this package of documents that have

15  been marked as Exhibit AA, there appears to be some

16  handwriting on this page.  Is all that handwriting

17  your handwriting?

18      A.    Yes, it is.

19      Q.    There's some writing on the left-hand

20  margin.  Can you read that into the record for me.

21      A.    Yes.  On the left-hand margin about a third

22  of the way down from the top of the page next to the

23  circled 2500 it says "40 + minutes."

24      Q.    And what does that refer to?

25      A.    That's what -- The piece of paper that

148

1    we're looking at, which includes the pages that you're

2    referring to plus the next two pages is a printout

3    from a computer program called CFAST, and the 2500 is

4    the simulation time over which the program was run;

5    and I'm just noting that the 2500 seconds corresponds

6    to a time period greater than 40 minutes.

7        Q.    And do you remember why you wrote that

8    there?

9        A.    Yeah.    I'm trying to figure out what this

10   is, what relevance it has to this case.    It was my

11   understanding that we were being provided the computer

12   fire modeling applications that Mr. Klem referred to

13   in his second report, and that's why I'm marking this

14   up because I'm trying to understand exactly what it

15   is.

16       Q.    A little bit below that there's some

17   handwriting.    Can you read that into the record for

18   me.

19       A.    Yes.    Right next to "ambient conditions" is

20   the word "defaults."

21       Q.    And why did you write that there?

22       A.    Because all the values that are used in

23   there are the default values that are built into the

24   program.    There has been no modification of the

25   program to reflect actual conditions of the day.

149

1        Q.    Turning to the next page, about halfway

2    down the page there's some handwriting next to the

3    heading "Main Fire," M-a-i-n, and there's an arrow

4    that says "Bad fire"?

5        A.    It says "bed fire?"

6        Q.    I'm sorry.  Why did you write that there?

7        A.    I'm just trying to identify what's being

8    modelled by the fire down below because there are

9    various fires -- inputs here that -- there's a

10    wardrobe and a television, and I'm questioning is the

11    main fire -- is he using the data that's built into

12    the program for a bed fire.

13        Q.    On the next page there's some handwriting.

14    Can you just read that into the record for me.

15        A.    Next to the wardrobe fire as object number

16    one, I've got a statement, "What are the initiation

17    conditions."

18        Q.    Why did you write that there?

19        A.    Well, the way the program works, is the

20    various data is input for the size of the fire at

21    various times, and when -- And the main fire is what's

22    input into the program when you start running it, and

23    then later in the program as other objects or other

24    fire models are added in to the fire -- you know, the

25    whole room doesn't burst into fire all at once.

150

1          This particular case we're talking about a

2    fire which was presumably initiated on the bed.  So

3    the first fire that starts is the bed.  The wardrobe

4    isn't on fire at time zero.  There has to be some

5    condition in the fire growth on the bed and the spread

6    of the fire, fire products within the room, and the

7    temperatures and the flames spread such that the

8    wardrobe becomes involved in the fire, and that would

9    be the starting point for the input of the wardrobe

10   fire model.  And that's why I'm asking where are the

11   initiation conditions for the other objects that are

12   input into the fire or is he lumping them all

13   together.  That's it.

14        Q.     In any of the material you reviewed

15   regarding the fire at this property in Norwalk,

16   Connecticut, was there any reference to any of the

17   materials that were believed to be on the bed at the

18   time of the fire?

19        A.     Yes.

20        Q.     Do you recall what those references were?

21        A.     I believe in the initial Klem report there

22   was a statement of a certain number -- and I don't

23   recall how many -- of bags of clothes and maybe boxes

24   that were on the bed.

25        Q.     Is there any mention in the fire marshal's