1    report, to your recollection, to that effect?

2        A.    I don't recall.

3        Q.    Turning to the next page of the exhibit

4    that we're looking at, there's some handwriting on

5    this page.  Could you read that into the record for

6    me.

7        A.    Yes.  First in parentheses it says

8    "(degrees K)."  The first statement to the right says,

9    "Temperature history in the room at 5-second

10   intervals."

11       Q.    Go back where it says "(degrees K.)"  "K"

12   being Kelvin?

13       A.    Kelvin, that's correct.  The next statement

14   says, "This is not the standard output but a selected

15   portion." The next statement, "What does this tell

16   about the case?"

17       Q.    The phrase that you read, "This is not the

18   standard output but a selected portion," what does

19   that mean?

20       A.    What it means is if -- I mean, this series

21   of documents, there's 10 pages -- 10 pages of two

22   columns of numbers.  And what I'm saying is this -- if

23   this is -- This is not representative of what would

24   come out of a run of the CFAST program.  All it is is

25   at 5-second intervals the temperature of the gases in

ALLAN REPORTING SERVICE

1    the room throughout the course of a particular fire.

2           The standard output would have many other

3    parameters, and it looks like somebody had to make a

4    selection as to just print out upper layer temperature

5    versus time.  That's all.

6        Q.    The next page, which appears to have

7    writing is the page you have in front of you with the

8    heading "Thomas's correlation for flashover," it

9    appears to be some handwriting near the top of the

10   page underneath the heading?

11       A.    Right.

12       Q.    Can you just read for me beginning with

13   your first handwriting on the page.

14       A.    The first sentence says "Walls."

15       Q.    And the end?

16       A.    Says, "Floors/ceiling."

17       Q.    Why did you write that there?

18       A.    I'm just identifying what the numbers

19   represent, and he's filling in the numbers to complete

20   the calculations for the formula above.  The left-hand

21   portion on it is the wall area exposed to the room,

22   and the right-hand portion is the floor and the

23   ceiling area minus the space that the closet occupies.

24       Q.    And underneath where you wrote "closet,"

25   what did you write there?

ALLAN REPORTING SERVICE

153

1          A.    Actually, it means minus closet.

2          Q.    And then below that it says plus --

3          A.    Well, the term "AO" is the area of the

4    opening to the room, and it looks -- And what I've got

5    written here is "plus window opening."  So this

6    calculation was done for just the door open,

7    ostensibly to the outside, and doesn't include the

8    area of the window that was open.

9          Q.    If the window was open in the room where

10   the fire started for this property in Wilton on July

11   23rd, 2001, would that, in your opinion, have been

12   likely to cause flashover to occur sooner as opposed

13   to having the window closed?

14                    MR. MEZZACAPPA:  Objection to form.

15                    You may answer.

16         A.    It would give you more ventilation.  I

17   mean, you have to go back to the equation that's right

18   here.  The -- I mean, this is just one correlation for

19   a flashover.  Now, if you're talking about in terms of

20   what the impact would be if you're going to calculate

21   flashover from this equation or if you're going to --

22   if it's really what's really going to happen in the

23   physical world, in the real world -- I guess what I'm

24   trying to figure out is what is your question?  Are we

25   concentrating on this equation or are you asking me

154

1   what I think really happened?

2       Q.    I'm not concentrating on the equation.  I'm

3   concentrating on what you think happened, and

4   specifically if the window in the room of fire origin

5   was open, how did that impact the occurrence of

6   flashover?

7               MR. MEZZACAPPA:  Objection to form.

8               You may answer.

9       A.    It's my opinion that you're going to have

10  more air available so the fire is going to grow to

11  flashover quicker if you've got more ventilation.

12      Q.    There's some other writing toward the

13  center of this page.  Could you just read that into

14  the record for me.

15      A.    You're talking about this (Indicating)?

16      Q.    Right here (Indicating).

17      A.    Yes.  The left-hand side it says, "Computer

18  program will predict flashover based on temperature."

19      Q.    And what does the right-hand -- the next

20  portion say?

21      A.    It refers to this circled portion of the

22  calculations that were done above where it says "Q =

23  1237.5-KW," and what it says is fire size in the room

24  for flashover based on geometry and openings and

25  semi-empirical.

155

1      Q.      What does that mean?

2      A.      That means that that's what the basis of

3  Thomas's correlation is.  It's not predicted from

4  theory, but it's predicted from observations of time

5  to flashover and a number of single-room fires where

6  the data is plotted.  The least squares regression

7  analysis was done of the data so that then you can

8  correlate the time to flashover to these parameters or

9  the heat release to flashover to these parameters such

10  as the total exposed area, the area of vents, and the

11  height of the vent, which is the square root term in

12  the equation above.

13      Q.      Are there any other pages in what has been

14  marked as Plaintiff's Exhibit AA that contain your

15  handwriting?

16      A.      There's some.

17      Q.      Why don't you try to show me what the next

18  one is, and then I'll try to follow you from there.

19          There's a chart there titled "History of

20  the State Building Code in Connecticut."  Is there any

21  handwriting of yours on this page?

22      A.      Yes.  Just the date that's circled.

23      Q.      And why did you circle that?

24      A.      Trying to figure out when these things were

25  generated, and it's the date 2003.

156

1       Q.    What's the next page that contains any of

2   your writing on it?

3       A.    It's number --

4             MR. MEZZACAPPA:  At the top it's

5             number 36.

6             MR. MASCARO:  I've got it.

7  BY MR. MASCARO:

8       Q.    And where does your handwriting appear on

9   this one?

10      A.    I've got a couple of things circled and an

11  asterisk.

12      Q.    And starting -- It looks like you

13  circled --

14      A.    72-'96.

15      Q.    Correct.  Why did you circle that?

16      A.    Because that's -- The NFPA 72 is a national

17  fire alarm code, and dash '96 is the version of the

18  national fire alarm code that they're referring to.

19      Q.    And the asterisk underneath that, why did

20  you put that there?

21      A.    Because it -- It says that it's a note

22  referring to the one above that says that NFPA 71, 89

23  and 72E 1990 and 74 89 are replaced by NFPA 72 93.

24      Q.    And what's the next page that has any of

25  your writing on it?

157

1        A.      The next page.

2        Q.      And what did you write on this page?

3        A.      Just some underlinings.

4        Q.      And why did you do that?

5        A.      Just to reference what's said in this

6   section 920.3.2.1.

7        Q.      And was this section that's on this

8   particular page that we're looking at where you've got

9   the bracket and the underlining --

10       A.      No.  I didn't put the brackets.

11       Q.      Just the underlining.  I'm sorry.

12               This is part of the document entitled

13  "History of the State Building Code in Connecticut."

14  Is that still part of that document?

15       A.      No.  That document is just the one page.

16  That's just one page that was printed off the

17  internet, and this is this and the two previous

18  pages -- Well, no.  I'm sorry.  The two previous pages

19  are one document, and then this page is as my

20  interpretation is as specified at the top of the page

21  by somebody else's handwriting.

22       Q.      At the time that the defendant in this

23  case, Command Force Security, installed the fire

24  detection system in the property in Wilton, prior to

25  the subject fire -- I know they may have installed

158

1    some things after the fire.  I'm not questioning about

2    that.  Prior to the fire of July 23rd, 2001 -- Strike

3    that.

4              Let me ask you this way:  Based on all the

5    material you reviewed, do you have any knowledge as to

6    when Command Force Security, the defendant in this

7    case, installed the fire detection system at the

8    subject property in Wilton?

9                        MR. MEZZACAPPA:  Objection to form.

10                       You may answer.

11        A.    The only information I have is in my

12   report, and I was given to believe that it was in, I

13   believe, February.

14        Q.    Of what year?

15        A.    Of 2001.

16                       MR. MEZZACAPPA:  2001 or 2000?

17   BY MR. MASCARO:

18        Q.    Or 2000?

19        A.    No, 2000.

20        Q.    Assuming that the installation occurred in

21   February of 2000, what version or edition of the NFPA

22   72 was applicable at that time, February 2000?

23        A.    It's my understanding that the NFPA -- the

24   version of NFPA version 72 would have been -- the '96

25   version would have the applicable one for this

159

1    installation and, I believe, even through the date of

2    the fire and the reconstruction.

3         Q.    At the time this system was installed, if

4    it was February of 2000, were there any other codes or

5    laws or standards that were required to be met by

6    Command Force Security when they installed the system?

7                   MR. MEZZACAPPA:   Objection to the form

8              of the question.

9              You may answer over objection.

10        A.    I'm not aware of all the codes or standards

11   that would have applied to Command Force in their

12   operations.

13        Q.    Or with the State of Connecticut -- Did the

14   State of Connecticut have a building code at that

15   period of time, February 2000?

16        A.    Yes.

17        Q.    And are there provisions or were there

18   provisions in the State building code during that

19   period of time that would be applicable to the

20   installation of a fire detection system?

21                   MR. MEZZACAPPA:   You may answer, over

22             objection.

23        A.    Yes, there were.

24        Q.    And in your opinion, did Command Force

25   Security satisfy the requirements of the State

160

1    building code when it installed the system at the

2    property in Wilton?

3        A.    Now, it's not clear to me that the State

4    building code was applicable to the actions that

5    Command -- that's the applicable code that would

6    reference to the action of Command Force.  I'm not

7    clear on that.

8        Q.    What, in your opinion, was applicable to

9    what Command Force did, assuming it installed the

10   system in February 2000?  What are the applicable

11   codes and laws and standards?

12                MR. MEZZACAPPA:  You're specifically

13                asking about the installation of

14                the smoke detection system?

15                MR. MASCARO:  Exactly.  I

16                don't care about the burglary

17                system.

18                MR. MEZZACAPPA:  Okay.

19       A.    Well, they should be -- they would be

20   governed by the -- I mean, any action taken on the

21   smoke -- the fire detection system is governed by the

22   applicable and adopted version of the NFPA 72, which

23   is the National Fire Alarm Code.  That would be -- And

24   also to the extent that any electrical wiring was

25   done, then the applicable and relevant version of NFPA

161

1    70.

2        Q.    Any other sections of the NFPA that would

3    have been applicable in February 2000 other than 72

4    and 70, if there was electrical wiring done?

5        A.    That would have been applicable to the

6    actions of Command Force?

7        Q.    Yes.  Yes.

8        A.    No.

9              MR. MEZZACAPPA:  Just note my

10             objection to this line of

11             questioning based on the

12             allegations in this case, but to

13             the extent you're asking him with

14             regard to the installation of the

15             smoke detection system, I'll allow

16             him to answer.  I think he did.

17       A.    Yes.  I'm not aware of other codes.

18       Q.    I see that the Wilton fire marshal's report

19   is part of your file.  Did you review that report

20   before you prepared your report in this case?

21       A.    Yes, I did.

22             (Whereupon, the Millennium Information

23   Services, Inc., Automated Property System Maps

24   document was marked as Plaintiff's Exhibit BB for

25   Identification.)

162

1    BY MR. MASCARO:

2         Q.    Mr. Allen, I'm going to show you what has

3    been marked Plaintiff's Exhibit BB.  It's a nine-page

4    document.  Could you briefly identify Plaintiff's

5    Exhibit BB.

6                        MR. MEZZACAPPA:  Note my objection.

7                        The document speaks for itself and

8                        has been identified by someone

9                        else in this case, but over

10                       objection, you may identify it.

11        A.    Well, I can just identify it by the fact

12   that it's a document that was provided to me either in

13   the initial or subsequent information that I received

14   from counsel in this case.  And I identified it in my

15   report, I believe, as the DataLath report.  Yes, item

16   number 8 on page 3, the DataLath inspection services

17   by Edward F. Duffy.

18        Q.    I've gone through what has been provided to

19   me as -- in response to my Request for Production of

20   documents for this deposition today.  I've marked

21   some.  I have not marked all the documents in your

22   file.  Are there documents in your file which were not

23   produced to me but are responsive to my Request for

24   Production?

25                       MR. MEZZACAPPA:  Note my objection.

ALLAN REPORTING SERVICE

163

1          You may answer.

2          A.    I don't believe so.  The only other

3     information that was provided to me was provided

4     electronically.

5          Q.    And what was the nature of that

6     information, meaning, what do you mean

7     "electronically"?  E-mails, I take it?

8          A.    Not all.  With Mr. Klem's initial

9     production he produced a CD, and then the -- he also

10    identified a set of photographs that could be accessed

11    on the internet, which I downloaded, and then both of

12    the transcripts of Mr. Klem's depositions were

13    provided by e-mail.

14         Q.    And did you read both transcripts of

15    Mr. Klem's deposition?

16         A.    Yes, I did.

17         Q.    Mr. Allen, I'm going to go through your

18    report now.  It may have been part of other exhibits

19    we've marked from your file, but I'm just going to

20    mark the report independently so it's more easily

21    identified in the record.

22              (Whereupon, Mr. Allen's five-page 1/27/04

23    report was marked as Plaintiff's Exhibit CC for

24    Identification.)

25

164

1    BY MR. MASCARO:

2        Q.    I assume you have a copy of your report in

3    front of you, Mr. Allen.

4        A.    Yes, I do.

5        Q.    Before I start asking about the report, did

6    you ever go visit the property that is the subject of

7    this case, the property in Wilton?

8        A.    No, I did not.

9        Q.    You never took any photographs, then, of

10   the property yourself?

11               MR. MEZZACAPPA:  Objection to form

12               based on prior testimony in this

13               case.

14       A.    No, I did not.

15       Q.    Turning to your report, which I've got it

16   marked as Plaintiff's Exhibit CC, in the first full

17   paragraph, actually before that -- The report is dated

18   January 27, 2004.  Was that the date that it was

19   prepared?

20       A.    Not in entirety.

21       Q.    Was it done before that as well?

22       A.    Yes.  I believe some of it was produced

23   before that.

24       Q.    And on what date was the report conveyed to

25   Mr. Mezzacappa?

165

1       A.      On January 27th.

2       Q.      In the first paragraph of your report, you

3    reference that "This is a preliminary report based on

4    the information available to me," basically at the

5    present time.  And then you say in the last sentence,

6    "I will amend my opinions in the event that any of

7    this additional information has a bearing on them."

8    Has any of the information that you were provided

9    after January 27, 2004, changed or modified any of

10   your opinions in this case?

11                   MR. MEZZACAPPA:  Note my objection to

12               the form of the question.

13                   You may answer it.

14       A.      No, it hasn't changed any of the

15   opinions, specifically the conclusions stated in this

16   report.

17       Q.      So none of those conclusions have been

18   changed by any of the information you got after

19   January 27, 2004?

20       A.      They haven't been altered by that.

21                   MR. MEZZACAPPA:  Just note my

22               objection to the last question.

23                   It mischaracterizes his testimony.

24                   You're asking him conclusions.

25                   Before you asked him opinions.

ALLAN REPORTING SERVICE

166

1          That's my objection.

2               MR. MASCARO:  Understood.

3          I'll rephrase it.

4  BY MR. MASCARO:

5     Q.    I had asked you whether any information you

6  obtained after January 27, 2004, changed your opinions

7  in this case, and I believe you said it did not; is

8  that correct?

9     A.    It didn't change them to the extent that I

10  felt necessary to alter the conclusions or the -- or

11  any of the content of the written report.  It changed

12  the opinions in some ways in that it reinforced some

13  of the opinions.

14     Q.    Did any of the information you were

15  provided after January 27, 2004, change any of the

16  conclusions listed on page 5 of your report?

17     A.    No, it did not.

18     Q.    As we're going through your report, if

19  there is something in the report that has been changed

20  by any information you obtained after you prepared the

21  report, if you could just please let me know.

22               MR. MEZZACAPPA:  Just note my

23          objection.  I'm not going to agree

24          that this witness either needs to

25          amend the report or that he has to

167

1   think of every single thing that

2   he's read, seen, been shown, that

3   might in some way change it and be

4   precluded at trial if he doesn't

5   amend the report.  I'm unaware of

6   a requirement for him to amend the

7   report now that he's testified

8   that the documents that he's been

9   given have reinforced his

10   opinions.  I'm unaware of any

11   local or federal rule or federal

12   civil procedure requiring him to

13   amend his report because you have

14   a deposition of him and you're

15   hearing his opinions today and

16   have every opportunity to ask him.

17       So I'm just qualifying that for

18   the record.  This is not meant to

19   be a speaking objection in any

20   way, but I don't want you to make

21   a motion at the time of trial

22   saying that he's limited to his

23   opinions in this report only

24   because you have his deposition

25   and you can ask him whatever you

168

```
1              want, and I've allowed you to ask

2              him whatever you want.

3                   MR. MASCARO:  I understand,

4              and that wasn't the intent.

5                   MR. MEZZACAPPA:  I want to

6              make sure there's not going to be

7              a motion later to --

8                   MR. MASCARO:  I'll try to

9              cover it.

10   BY MR. MASCARO:

11        Q.    As we go through your report, under the

12   background section of your report on page 1, the first

13   sentence is, "The subject residence was originally a

14   ranch style house with additions on various levels at

15   various times."  Do you know when the subject

16   residence was built?

17                   MR. MEZZACAPPA:  Objection to form.

18              You may answer.

19        A.    Yes.  As I recall, 1967.

20        Q.    And when you used the phrase "ranch style

21   house," what does that mean?

22        A.    Well, actually, you just hit on one thing

23   that I've learned since the issuing of this report

24   that I might want to change in my report.

25        Q.    Okay.  What is that?
```

ALLAN REPORTING SERVICE

169

1      A.    I would change the term "ranch style

2   house."  It's my understanding that this construction

3   was classified as a deck house.

4      Q.    Do you recall where you learned or you saw

5   that this structure was classified as a deck house?

6      A.    It was either from Mr. Heinz's deposition

7   or a conversation with Mr. Mezzacappa, but one of

8   those.

9      Q.    What do you mean by "deck house"?

10              MR. MEZZACAPPA:  Objection to form.

11              You may answer.

12      A.    I'm not exactly sure, other than it was a

13   unique type of construction, and it was just a way of

14   describing the construction techniques, that there was

15   some sort of a post-and-beam construction as opposed

16   to a classic either single-story ranch-style house or

17   a two-story colonial or something like that, just to

18   differentiate between those.

19      Q.    How many levels or floors did this

20   residence have?  All the questions I'm asking you are

21   about before the fires of July 23, 2001.  There was

22   another house built afterwards, and that's not what

23   I'm asking about.  What was your understanding of how

24   many floors this house had or levels, whatever word

25   you want to use, say, on July 23rd, 2001?

ALLAN REPORTING SERVICE

170

1      A.      Basically it was on two levels.

2      Q.      There has been a lot of -- I didn't mean to

3   cut you off.

4      A.      There was -- it wasn't clearly -- a clearly

5   defined two levels, like a two-story house.  There was

6   half a level up in some areas and half a level down in

7   others.

8      Q.      And who gave you that information?

9      A.      That's just from the descriptions in the

10  documentation and looking at the photographs and, to

11  some extent, the drawings.

12     Q.      There has been a lot of testimony, which

13  you may or may not have seen, about work that had gone

14  on at the premises before the fire, some renovation

15  work.  Do you recall seeing that anywhere?

16              MR. MEZZACAPPA:  Objection to form.

17     A.      Yes.  I recall there being lots of

18  discussion about it.

19     Q.      In the information that you have reviewed,

20  were you able to determine when this renovation work

21  was done?

22              MR. MEZZACAPPA:  Objection.  You may

23              answer.

24     A.      When it was done?  When it was completed?

25     Q.      Let me make it more narrow.  That's a good

ALLAN REPORTING SERVICE

171

1    point.  And I'm speaking specifically now as to when

2    the Heinzes owned the residence.  There may have been

3    work that happened in 1967 or after it was built.  But

4    after the Heinzes became the owners of the property,

5    there's some testimony there was some renovations and,

6    I think, additions to the property.  In the

7    information that you've reviewed and analyzed, did you

8    learn when this renovation work began?

9                    MR. MEZZACAPPA:  Note my objection.

10                   You may answer over objection.

11        A.    No.  I never found a clear-cut description

12   as to exactly when the work began, either from

13   Mr. Heinz's testimony or any of the documentation.

14        Q.    And did you reach any determination as to

15   when the work was completed?

16                   MR. MEZZACAPPA:  Note my objection to

17                   this line of testimony from this

18                   witness as we've had the

19                   deposition of Mr. Heinz, who lived

20                   in the house, but over my

21                   strenuous objection, you may

22                   answer it.

23        A.    The only indication that I had as to when

24   it was completed is when the certificate of occupancy

25   was issued.

ALLAN REPORTING SERVICE

172

1      Q.    And do you have any recollection as to when

2    the certificate of occupancy was issued?

3                        MR. MEZZACAPPA:  Just note my

4                continuing objection in that this

5                witness is not a building

6                inspector.  He's here as an expert

7                engineer.  Mr. Heinz -- I'm going

8                to let him answer, but Mr. Heinz

9                was unable to answer these

10               questions for us and did, in fact,

11               give definitive answers in his

12               deposition that postdated the

13               certificate of occupancy issuance,

14               and he lived there during that

15               year.

16                  Over that objection, you may

17               answer the question.

18                  MR. MASCARO:  I don't know

19               that I would agree that Mr. Heinz

20               gave a definitive answer on that

21               point.

22                  MR. MEZZACAPPA:  I recall it.

23               I'll let the witness -- He can

24               leave the room so I don't skew his

25               testimony, and I can state on the

173

1           record what Mr. Heinz said because

2           I remember it.  I took his

3           deposition.

4                MR. MASCARO:  There's no need

5           to.  I read his deposition, and my

6           recollection is that there was, at

7           times, uncertainty about certain

8           dates.  That's all.  I'm clear.

9                MR. MEZZACAPPA:  But there

10          was also testimony that

11          postdated -- I've said enough.

12               You can answer the question.

13     BY MR. MASCARO:

14          Q.    I think the question was do you recall when

15     the certificate of occupancy was issued?

16          A.    What it says -- We can look at the

17     document.  It's in the package.

18          Q.    You don't remember as I'm asking right now?

19          A.    I don't remember off the top of my head.

20          Q.    In your conversation with Mr. Matza of

21     Command Force Security, did you ever discuss with him

22     whether the renovations to the residence were

23     completed before Command Force installed the fire

24     detection system?

25               MR. MEZZACAPPA:  Note my objection.

174

1          There's no foundation for that.

2          You may answer the question.

3     A.    You know, I don't recall specifically

4     asking that question.

5     Q.    In your conversation with Mr. Matza, did

6     you ask him to describe the residence for you?

7     A.    Either I asked him or he voluntarily

8     described -- he described to a certain extent the

9     residence and the installation.

10    Q.    And did Mr. Matza make any statements

11    regarding the renovations to the property?

12               MR. MEZZACAPPA:   Objection to form; no

13               foundation laid.

14               Over objection, you may answer

15               the question.

16    A.    I don't recall any conversation about

17    renovations to the property during any discussion with

18    Mr. Matza.

19    Q.    Going back to your report, the background

20    section of it, the paragraph under the heading

21    "background," it says, "The room of fire origin was

22    reportedly two steps down from the kitchen level or

23    main level of the house."  Where did you get that

24    information?

25    A.    That was a comment that was made by

175

1   Mr. Matza.  That's one of the comments that I took

2   away from that conversation, and it was in an attempt

3   to describe the nonstandard construction or layout of

4   the building, since I didn't have any plans at that

5   time.

6        Q.    Any of the information you received after

7   your conversation with Mr. Matza, did any of that

8   information corroborate that statement we just

9   discussed?

10       A.    No.  Actually, it was more than two steps

11  down.  There was more of a staircase leading from the

12  kitchen level down to the basement level.  In some of

13  the photographs -- I've seen some photographs of that

14  staircase area.  That's why.

15       Q.    Turning to the second page of your report,

16  beginning with the sentence or the sentence that

17  states, "The system was designed with the homeowner in

18  response to an insurance inspection report which

19  recommended that the existing local fire alarms be

20  upgraded to a centrally-monitored system," where did

21  that information come from?

22       A.    Both from the conversation with Mr. Matza

23  and the -- one of the documents that we were just

24  looking at, the DataLath report.

25       Q.    The phrase, "The system was designed with

ALLAN REPORTING SERVICE

176

1    the homeowner," up to that point of the sentence, what

2    does that mean, it was designed with the homeowner?

3         A.     That this was not -- What I'm addressing

4    here is that there are references in Mr. Klem's second

5    report where he refers to Command Force as the fire

6    detection system designers in criticizing the work

7    that they did.  That it was my understanding from the

8    discussion and particularly with the discussion from

9    Mr. Matza as well as what was in the DataLath report,

10   as well as the -- after this, the deposition of

11   Mr. Heinz, that there was -- this was not a situation

12   where Command Force was called in to design -- you had

13   a building and they were called in to design an alarm

14   system.  It was a situation where the homeowner had an

15   existing alarm system, which was made up of single-

16   station smoke detectors and other sensors, and that

17   based on the recommendation from the inspector, the

18   inspection report and DataLath, then his input was to

19   convert it to a monitored system within the home.

20        Q.     Is that what you meant when you said the

21   system was designed with the homeowner, specifically

22   that he wanted a monitored system?

23        A.     In response to an insurance inspection

24   report.

25                    MR. MEZZACAPPA:  Objection to the form

ALLAN REPORTING SERVICE

177

1          of the question.

2     BY MR. MASCARO:

3          Q.    Did you mean by that phrase "the system was

4     designed with the homeowner," that Mr. Heinz decided

5     where the smoke detectors would be placed?

6               MR. MEZZACAPPA:  Objection to form.

7               Mischaracterizes prior testimony.

8               You may answer.

9          A.    No, not that he decided but that there were

10    existing smoke detectors, and Mr. Heinz exercised some

11    input into how extensive the modification was to be.

12    He wanted the existing protection, but he wanted it

13    monitored off premises.

14         Q.    You mentioned a couple times that there

15    were already -- that there were detectors in the

16    residence prior to Command Force installing what it --

17    whatever it eventually installed; is that correct?

18              MR. MEZZACAPPA:  Objection to form.

19              You may answer.

20         A.    That's my understanding.

21         Q.    Do you have any information as to how many

22    smoke detectors there were in the residence prior to

23    the installation by Command Force?

24         A.    I don't know exactly.  I've seen various

25    references to different numbers that somehow -- Prior

178

1    to the Command Force?

2         Q.    Correct.

3         A.    That's even mirky because there were some

4    that were put in after.

5         Q.    Let me ask it to you this way.  Again,

6    we're just talking about fire detection not the

7    particular detection equipment.  How many smoke

8    detectors did Command Force install in the residence

9    prior to the fire?  Again, anything after the fire I'm

10   not concerned about right now.

11        A.    It's my understanding they installed three

12   detectors.

13        Q.    And starting with what I'll refer to as the

14   upper level -- If that's not a phrase that you think

15   is accurate, let me know, but how many detectors did

16   they install in the upper level of the residence?

17        A.    Two detectors in the upper level.

18        Q.    And do you know in which rooms those

19   detectors were installed?

20                   MR. MEZZACAPPA:  Objection to form.

21                   You may answer.

22        A.    I'm not sure of exactly which rooms.

23   Again, I had no plans.  I still have no plans of the

24   building.  The description to me was they were

25   between the kitchen area and the bedrooms on either

ALLAN REPORTING SERVICE

179

1    side.

2        Q.    And do you know what kind of detectors were

3    installed in the upper level, and by "what kind," I

4    mean you've previously testified there's two types.    I

5    think photo --

6        A.    Photo electric and ionization.

7        Q.    Do you know which kind were installed in

8    the upper level?

9        A.    They were photo electric.

10        Q.    And how many detectors were installed in

11    the what I'll call the lower level?

12        A.    As part of the Command --

13        Q.    By Command Force, yes.

14        A.    One detector.

15        Q.    And do you know what kind of detector that

16    was, the one on the lower level?

17        A.    Yes.    That was photo electric as well.

18        Q.    And all three of the detectors installed by

19    Command Force, were they connected to a central

20    monitoring system?

21        A.    Yes.    It's my understanding they were.

22        Q.    How would the detectors installed by

23    Command Force communicate to whatever kind of station

24    they had in the house -- Let me ask you this way:    Was

25    it a hard-wired system?

ALLAN REPORTING SERVICE

180

1          MR. MEZZACAPPA:  Objection to form.

2          Hold on one second.  Objection to

3          form, as these questions already

4          have been asked of Mr. Matza, who

5          had firsthand knowledge.  Now

6          you're asking this person about

7          the installation.  I will allow

8          him to answer, over objection,

9          with the qualification you already

10         got the information from the right

11         witness for this.  This is not an

12         expert question.  This is a

13         factual question.  He's here as an

14         expert.

15            You may answer.

16    A.    I never asked Mr. Matza, so I don't have

17 the input from him.  I did -- I do believe there was

18 testimony at Mr. Heinz's deposition that it was some

19 sort of wireless system.

20    Q.    Do you know which smoke detector that had

21 been installed by Command Force picked up this fire,

22 if that's the right phrase?

23          MR. MEZZACAPPA:  Over objection to

24          form, you may answer.

25    A.    I've seen no indication of that.

ALLAN REPORTING SERVICE

181

1      Q.    Do you have an opinion as to which detector

2  picked up the fire?

3                MR. MEZZACAPPA:   Over objection, you

4                may answer.

5      A.    No.  The only thing I know from the

6  information that's provided to me is that one of the

7  detectors did pick up the fire and notified the

8  monitoring site.

9      Q.    And you don't have any opinion as to which

10  detector it was?

11      A.    No, I don't.

12      Q.    On page 2 of your report, the first full

13  paragraph, the last sentence of the first full

14  paragraph, "there was heat and smoke damage to other

15  areas of the residence," do you know which areas of

16  the residence sustained heat and smoke damage as

17  opposed to direct fire damage?

18      A.    Yes.  The areas other than those affected

19  by the direct fire damage.  I mean, the sentence

20  before that I said the direct fire damage was in the

21  two rooms and then the rest of the residence was

22  basically impacted, to some degree, by heat and smoke.

23      Q.    That's what I wasn't clear on.  So the rest

24  of the residence, I think you said, was impacted, to

25  some degree, I think you said, by heat and smoke?

ALLAN REPORTING SERVICE

182

1      A.    Yes.

2      Q.    Going to the next full paragraph regarding

3    the first sentence regarding what certain

4    investigators have determined about the cause of the

5    fire --

6                    MR. MEZZACAPPA:  Just let me -- I'm

7                    sorry.  Could you leave the room

8                    for one minute.  I have to put an

9                    objection on the record, and I

10                   don't want you to hear what I have

11                   to say.  I don't want to affect

12                   future questions or future

13                   testimony.

14             (Whereupon, the witness exits

15               the proceedings.)

16                    MR. MEZZACAPPA:  I would have

17                   to object to that question at

18                   trial.  This witness says he's the

19                   only one in the case that has

20                   never had the opportunity to go to

21                   the house in the state that it was

22                   before the fire or even after the

23                   fire.  So to ask him what other

24                   rooms in the premises were damaged

25                   by heat and smoke, I don't want

183

1        him to become a fact witness or an

2        expert witness on your other

3        damages.  We've had a lot of

4        testimony about that kind of

5        stuff.

6            I just think now, listening to

7        the question and answer, it's

8        unfair for him.  He's an expert.

9        That's a factual question.  It can

10       be answered by the fire department

11       or Mr. Heinz or maybe Mr. Matza,

12       people that were there.  He didn't

13       have that opportunity, so that's

14       my objection to that.

15           MR. MASCARO:  I understand

16       the objection and --

17           MR. MEZZACAPPA:  I don't

18       think, again, it's not

19       intentional.  When you listen to

20       the question after the fact, your

21       brain says, wait a minute; he's

22       here an as expert and didn't see

23       it.

24           MR. MASCARO:  I understand

25       that.  I'm going through his

184

1            reports, and he's got statements

2            in his report; and I'm asking him

3            about it.  I know what his role

4            is.

5                    MR. MEZZACAPPA:  He had that

6            fire department report with him.

7                    MR. MASCARO:  I understand.

8                    MR. MEZZACAPPA:  I didn't

9            think of it -- what you asked, I

10           thought of it after he answered,

11           so I'm sorry that I did it out of

12           turn.

13                    MR. MASCARO:  That's all

14           right.

15                    MR. MEZZACAPPA:  I don't want

16           to -- You can come back in.

17           (Whereupon, the witness

18            re-entered the proceedings.)

19  BY MR. MASCARO:

20      Q.   Going down to the investigation portion of

21  your report, you list all of the material that you

22  reviewed and analyzed in preparation of your report.

23      A.   Mm-hmm.

24      Q.   Was there any other information you relied

25  upon in the preparation of your report that's not

185

1    listed in numbers 1 through 10-D of the investigation

2    portion of your report?

3          A.    Yes; just that statement following 10-D.

4          Q.    The statement which says, "Additionally, I

5    had a telephone conversation with Mr. Matthew Matza of

6    Command Force Security Systems.  He provided details

7    of the layout of the house and the alarm system

8    installation."  Other than that, is there any other

9    information you used in the preparation of your report

10    that's not listed in your report?

11               MR. MEZZACAPPA:  Objection to the form

12               of the question.

13               You may answer.

14          A.    You know, well, as I mentioned before, I

15    looked at the *National Fire Alarm Code Handbook* as

16    well that I referred to at the beginning of the

17    deposition.  I had looked at it, although I didn't

18    explicitly take anything out of that to reference for

19    my report.

20          Q.    In that paragraph underneath the items that

21    you listed where you say that Mr. Matza provided

22    details of the layout of the house, what did Mr. Matza

23    tell you about the layout of the house?

24          A.    Oh, I don't remember specifically, but I

25    can tell you that the only information I had at that

186

1    time was the initial documentation that I had received

2    on this case, which if I remember correctly, were the

3    two Klem reports and all of the attachments and some

4    photographs; and then other documentation was provided

5    to me after that.

6         So Mr. Matza's description was the only

7    real firsthand account of how the house was laid out

8    and what transpired as far as the alarm installation

9    that I had available to me.

10        Q.    What did Mr. Matza inform you about the

11   alarm system installation?

12        A.    Just what we've already covered.

13        Q.    What we've talked about?

14        A.    Yes.

15        Q.    Nothing else other than that?

16        A.    No.

17        Q.    At the time that Command Force installed

18   the fire detection system in the residence, again,

19   prior to the fire, we think February of 2000, was

20   there any requirement in either the NFPA or any

21   applicable law or code that they install a centrally-

22   monitored system?

23        A.    No.   The NFPA 72, which is the governing

24   code for fire detection installations, specifically

25   says that single-station fire alarm -- smoke detectors

187

1    are all that are required in a private residence.

2         Q.    There's no requirement of a central

3    monitor?

4         A.    No.

5              MR. MEZZACAPPA:   Asked and answered is

6              my objection to the last question.

7    BY MR. MASCARO:

8         Q.    But the system that was installed by

9    Command Force at this property was a centrally-

10   monitored system, correct?

11        A.    At the homeowner's request, yes.

12        Q.    What is the benefit of a centrally-

13   monitored system as opposed to a system that's not

14   centrally monitored?

15        A.    That notification of a fire will be sent to

16   the fire department when the home is unoccupied is the

17   main benefit.

18        Q.    A centrally-monitored system will pick up a

19   fire even if no one's at home, correct?

20        A.    Correct.

21        Q.    So a centrally-monitored system provides a

22   degree of property protection that a single-station

23   system does not, correct?

24              MR. MEZZACAPPA:   Note my objection;

25              mischaracterization of prior

188

1        testimony.  You may answer it.

2        A.    Well, I mean, it depends on what the

3   residence is.  There may be -- You know, one of the

4   cases that we've talked about was a particularly large

5   mansion where the fire could be in a portion of the

6   home other than where the occupants were, and a

7   centrally-monitored system sends -- all alarm

8   companies first call the residence to notify them, and

9   also the reason that they first call the residence is

10  not just to see that there is, in fact, a fire but

11  also to notify any people who may be in the residence

12  to get out of the residence.

13        So I mean -- NFPA 72 is a result of the

14  protection of life safety.  So in all issues, life

15  safety is first.  If there are any property protection

16  benefits accrued from any existing system, that's

17  icing on the cake.  That's in addition to the design

18  intent of an alarm system, which is the protection of

19  life.

20        Q.    Did Mr. Matza tell you that Mr. Heinz had

21  requested a centrally-monitored system at the request

22  of his insurance company?

23              MR. MEZZACAPPA:  Objection; hearsay.

24              You may answer over the

25              objection.

ALLAN REPORTING SERVICE

189

1      A.    I don't recall if that's where I got the

2  information from or if I read it initially in the

3  DataLath report or whatever.  I think I heard it from

4  both sources.

5      Q.    I just want to turn to page 4 of your

6  report, the last paragraph, starting with the word

7  "Additionally."

8      A.    Mm-hmm.

9      Q.    The second sentence you said, "A

10  single-station smoke detector in the basement bedroom

11  would have met Mr. Klem's suggested increased level of

12  protection to the occupants, but would not have made

13  no difference to the course of this fire."  I'm just a

14  little unclear as to what that means.  Can you clarify

15  that for me.

16      A.    You just pointed out a typo.

17            MR. MEZZACAPPA:  Off the record --

18      A.    No.  You inserted a word.  You just

19  confused me because you said would "not" have made no

20  difference and then when I read it, it said "would

21  have made no difference."

22      Q.    That was unintentional.  Either way, can

23  you tell me just what you mean by that sentence.

24      A.    Yeah.  I think I reiterate that, again, in

25  conclusion number 4 on the conclusions that, you know,

1    an additional smoke detector in the room of origin

2    wouldn't have changed the course of this fire or the

3    extent of the damages.

4              If you read NFPA 72 and you apply to it

5    Mr. Klem's suggestion that this place would have been

6    much better protected if there was a smoke detector in

7    every bedroom, and NFPA 72 says if you put a smoke

8    detector in there all it has to be is a single-station

9    battery-operated smoke detector with local enunciation

10   to warn the occupants of that room of the presence of

11   smoke and fire and to get out of the room and there

12   had been a fire, a smoke detector right over the fire

13   in the bed when it was initiated and the detector went

14   off, it sounded the alarm, it wouldn't have gone

15   outside the building.  It wouldn't have gone to the

16   central station.  It wouldn't have been transmitted to

17   the fire department.  So it wouldn't have changed

18   anything in the time of events until the signal was

19   received at Command Force.  Now, all it could have

20   done is warn the cat that there was a fire.

21        Q.    What if Command Force had installed a

22   centrally-monitored detector in the room of origin?

23   Would that have made a difference to the course of the

24   fire?

25              MR. MEZZACAPPA:  Note my objection;