191

1          calls for speculation.  That's a

2          hypothetical question that he's

3          not here to answer.

4               MR. MASCARO:  I can ask

5          him -- He just gave me a

6          hypothetical statement, if he had

7          a single-station.  I'm changing

8          the type of detector.

9               MR. MEZZACAPPA:  I object

10          because of all the testimony he's

11          given and all the other witnesses.

12          I'm going to allow him to answer.

13          I think it's unfair because it

14          assumes something not in evidence,

15          and it assumes something not

16          requested by the homeowner.  You

17          may answer over objection.

18               MR. MASCARO:  Well, I

19          understand your objection.  I just

20          want to make sure.  I don't agree

21          with all the things in the

22          objection as far as what the

23          homeowner requested.

24     BY MR. MASCARO:

25          Q.    Can you answer that question, please.

ALLAN REPORTING SERVICE

192

1    A.    Given the hypothetical situation that there

2    was a detector in the bedroom where the fire

3    originated and that detector was tied in to the

4    central monitoring station, then, obviously, the time

5    line would be shorter for this detector to activate

6    than a detector that's outside the room.  So the

7    signal to the central station would have gone earlier

8    to the fire development.

9    Q.    And do you have an opinion as to how much

10   earlier?

11                  MR. MEZZACAPPA:  Note my objection.

12   A.    I hadn't -- I haven't studied that

13   completely because I was waiting for Mr. Klem's

14   studies on that, which he hasn't yet produced.

15   Supposedly he had done all that with his fire modeling

16   scenarios, but it could be determined within reason.

17   You can't pin it down to an exact number, but, in

18   general, you can determine how much earlier and what

19   stage the fire would have been for a detector inside

20   the room of origin as opposed to outside the room of

21   origin and located in a similar location as the

22   detector was in this house.

23   Q.    And when you were answering my last

24   question, I believe you said -- and if I'm wrong,

25   please correct me -- that if there was a centrally-

193

1    monitored detector in the room of origin, it would

2    have picked up the fire sooner than the detector

3    located in the hallway outside the room of origin.

4         A.    Elsewhere in the house.

5              MR. MEZZACAPPA:  Objection to the form

6              of the question.

7              You answered it.

8    BY MR. MASCARO:

9         Q.    Do you have an opinion as to which

10   detector -- which centrally-monitored detector picked

11   up the fire at the residence, the one downstairs or

12   the one on the upper level?

13             MR. MEZZACAPPA:  It's been asked and

14             answered.

15             You can answer it again.

16        A.    You've already asked me that, and I haven't

17   done that -- I have no way -- There's no factual

18   evidence to tell me which detector was activated

19   first.  I don't have sufficient indication to develop

20   an opinion, to a reasonable degree of scientific

21   certainty, which detector would have activated it.  I

22   think it's logical that the first detector would have

23   been the one downstairs.

24        Q.    And that was a photo electric detector, is

25   that correct, all of the ones installed by Command

194

1    Force?

2        A.    That's my understanding, yes.

3        Q.    And how do photo electric detectors work

4    again?

5        A.    They work on a light-scattering or

6    obscuration principle.  Basically the smoke has to

7    enter the detector, and it obscures or reflects a

8    light beam, which is then detected by a sensor, and

9    completes an electronic circuit and sends a signal.

10        Q.    I'm just trying to think of how to make

11    this question clear.  It's late in the day, so I'm

12    going to do the best I can with it.

13                MR. MEZZACAPPA:  Objection.

14                MR. MASCARO:  Withdrawn.

15    BY MR. MASCARO:

16        Q.    There has been testimony in this case that

17    Mr. Heinz requested Command Force to install a

18    centrally-monitored system because of his insurance

19    company or per -- because his insurance company

20    requested him to do so.  Is that your understanding in

21    your review of the evidence and documents in this

22    case?

23        A.    No; not that they requested him to do so.

24    It's my understanding, mainly based on the DataLath

25    report, that they indicated that it would be preferred

1    that -- I don't recall the exact wording, but there

2    were two components to this report.  One, he didn't

3    have a burglar system, and, two, he had a local fire

4    alarm system.

5            And the report said that because of the

6    value of the home, they should have a burglar system

7    that was centrally monitored; and in the fire

8    detection portion of the report, there was just a

9    statement that said it would be preferred to have a

10   centrally-monitored system -- Well, I believe what

11   they said is an off-premises, monitored system.  And

12   there was the implication that it would save him money

13   on his rates.

14       Q.    The room of fire origin where this fire

15   started, do you know, from your review of the evidence

16   in this case, what type of room it is?  In other

17   words, was it a boiler room, where the swimming pool

18   was, a bedroom?

19       A.    It was a bedroom.

20               MR. MASCARO:  Can you mark that as an

21            exhibit, please.

22            (Whereupon, the photograph was marked as

23   Plaintiff's Exhibit DD for Identification.)

24   BY MR. MASCARO:

25       Q.    Mr. Allen, I'm going to show you an

ALLAN REPORTING SERVICE

196

1    original photograph that has been marked Plaintiff's

2    Exhibit DD.  It's a photograph, I believe, that was

3    taken or one of the photographs taken by, if not

4    Mr. Klem, the investigators from T.J. Klem &

5    Associates that went out to the scene shortly after

6    the fire.

7              Do you recall if you've ever seen that

8    photo before?

9         A.    It looks familiar, yes.

10        Q.    And I know you didn't take it, and I'm not

11   asking you to authenticate it, but for purposes of my

12   question only, assuming this is a photograph of the

13   lower level of the Heinz residence, or hallway in the

14   lower level of the Heinz residence, there is a -- what

15   I'll call a horizontal beam that I'm pointing at.

16   That might not be the technically correct term, but

17   that's what I'll use.  Do you see what I'm pointing to

18   at the top of the photograph?

19              MR. MEZZACAPPA:  On the ceiling of the

20              photograph?

21              MR. MASCARO:  Yes, exactly.

22        A.    Yes, correct.

23        Q.    First of all, let me ask you this:  Do you

24   know whether, from looking at the photograph, whether

25   the entranceway to the room of fire origin is depicted

ALLAN REPORTING SERVICE

1   in that photograph?

2         A.    I believe it is, yes.

3         Q.    And can you tell whether that beam is

4   located so as to be from the angle where you're

5   looking at it the beam is before the entrance to

6   either of the two doorways?

7                     MR. MEZZACAPPA:   Objection to form.

8                     If you understand the question,

9                     you may answer it.

10        A.    Well, I do understand, from looking at this

11  photograph as well as the plans of the basement, that

12  this beam appears to be beyond the second doorway of

13  the two doorways that are on the right-hand side of

14  the hallway.

15                    MR. MEZZACAPPA:   As you're looking

16                    into the photograph.  Let the

17                    record reflect he's pointing to

18                    the right side.  Also let the

19                    record reflect that horizontal

20                    beam is the one closest to the

21                    yellow temporary lighting in the

22                    photograph, because there's one

23                    deeper into the picture.

24                    MR. MASCARO:  Yes.

25        A.    Correct.

1    Q.    Assuming, hypothetically, for the purposes

2    of my question, that a fire began in one of the two

3    rooms for which the doorways are depicted in the

4    photograph --

5    A.    Okay.

6    Q.    -- and --

7             MR. MEZZACAPPA:  There are five doors

8             in this photograph.

9             MR. MASCARO:  Is there?

10            MR. MEZZACAPPA:  Two on the right, one

11            directly ahead, and two on the

12            left.

13            MR. MASCARO:  I'm talking

14            about the ones on the right.

15            MR. MEZZACAPPA:  Okay, the

16            two on the right.  There may be

17            more.  That's what I see.

18            MR. MASCARO:  I believe --

19            and I may be incorrect -- that the

20            room of fire origin is believed to

21            be one of those rooms on the

22            right.  And, again, all these are

23            hypothetical, assuming certain

24            things that may or may not be

25            right.

199

BY MR. MASCARO:

Q.    But if a fire were to start in one of the
two rooms on the right side of this photograph, and
assuming smoke was coming out of one of those rooms
where the fire started, would the smoke first build up
in the area behind the beam before it migrated further
down the hallway?

                MR. MEZZACAPPA:  Note my objection to
                the hypothetical nature.  The
                question assumes facts not in
                evidence nor not known.

            Over my strenuous objection to
                this line of questioning -- and I
                would object to it in front of a
                jury as well -- you may answer the
                question, if you understand it.

A.    In any of these rooms, or any room
anyplace, maybe not this one, but --

                MR. MEZZACAPPA:  Maybe not this one,
                looking at the room you're in, not
                the photograph.  Go ahead.  The
                pronouns will kill us.  Go ahead.

A.    When a fire develops within a room, the
majority of the products of combustion are going to
rise to the ceiling level and fill the room from the

200

1    top down, akin to what has been described as an

2    inverted bathtub, the same way water fills a bathtub.

3    If we turn that upside down, that's the same way smoke

4    fills a room, except for the fact that it's not quite

5    as dense and uniform as water and smoke.  You know,

6    some smoke may exit the room before it gets to the

7    ceiling, but, in general, the bulk of the smoke and

8    fire products are going to fill the room from the

9    ceiling down.

10          When it reaches the level of an

11   obstruction, such as an open door soffit in the room,

12   then the smoke will spill around the soffit and fill

13   the next space that's there.  If that's a flat

14   ceiling, it will spread across the ceiling until it

15   runs into an additional obstruction, be it a wall or

16   beam or whatever, and fill that area until it reaches

17   the next level of which it can spill over that

18   obstruction.

19          Q.    Great.  That answered an inartfully-worded

20   question.  I thank you.  We're almost done here.  Do

21   you know whether Command Force, before they installed

22   the system at the subject residence, considered the

23   location of the closest fire hydrant?

24                MR. MEZZACAPPA:  Objection.  This

25                question is more appropriately for

ALLAN REPORTING SERVICE

201

1          the Command Force witness who's

2          already been produced.

3               You may answer over objection.

4     A.    No, I don't know.

5     Q.    Should they have considered that?

6               MR. MEZZACAPPA:  Note my objection.

7     A.    I don't -- I'm not aware of what --

8     anything, any regulation, code, standard, or operating

9     procedure that governs their actions that would have

10    required them to consider that as far as -- Yeah, I

11    don't know.

12    Q.    I wasn't asking whether there was any law

13    or code that required them to do that.  My question

14    was, in your opinion, should they have?

15              MR. MEZZACAPPA:  Just note my

16              objection.

17    A.    In my opinion --

18              MR. MEZZACAPPA:  Objection.  It's

19              irrelevant.

20    BY MR. MASCARO:

21    Q.    Do you know whether Command Force, before

22    installing this system at this property, considered

23    the location of the closest fire department?

24              MR. MEZZACAPPA:  Same objection.  The

25              witness from Command Force has

202

1          already been produced.  It calls

2          for state of mind from a witness.

3          What you're asking is to get in

4          Command Force's head.  I note,

5          again, my strenuous objection.  I

6          will not direct him not to answer.

7          I will object, and you may answer.

8     A.   Could you repeat that.

9     Q.   I forgot too.

10          Do you know whether Command Force, before

11    they installed the system at the Heinz residence,

12    whether they -- whether it took into consideration the

13    location of the closest fire department?

14               MR. MEZZACAPPA:  Same objection.

15    A.   I don't know.

16    Q.   Should it have done so?

17               MR. MEZZACAPPA:  Same objection as

18          before.

19    A.   In my opinion, it was not relevant to the

20    work that they were asked to do and that they could

21    accomplish the terms of the work that they were asked

22    to do without taking that into consideration.

23    Q.   What things should have been taken into

24    consideration in installing the fire detection system?

25               MR. MEZZACAPPA:  Note my objection.

ALLAN REPORTING SERVICE

203

1          He's not here as a witness as to

2          the question you just asked him.

3          I think it's far afield to the

4          deposition, but you may answer.

5     A.    Well, I really feel that I'm getting way

6  out of my expertise and certainly the area which I can

7  voice an opinion as to the actions that Command Force

8  should take in doing their jobs.  They should be aware

9  of whatever governing codes and regulations there are,

10  but beyond that, I could not state, with any degree of

11  accuracy, what -- how they should -- all the things

12  that they should take into consideration.

13     Q.    One of the conclusions listed in your

14  report is number 2, "The monitoring company promptly

15  notified the fire department of the fire alarm at the

16  premises in accordance with the requirements of NFPA

17  72."

18          Before I mark my next exhibit, do you know

19  how much time elapsed from the time the fire was

20  detected to the time the monitoring company notified

21  the fire department of the fire alarm?  And it may

22  be -- If you need to refer to your report, you can.

23  It may be identified somewhere in your report.

24     A.    To when the fire was detected?  Nobody

25  knows that.

204

1           MR. MASCARO:  Can you just mark that

2           as the next exhibit.

3           (Whereupon, the one-page Command Force

4    subscriber activity report was marked as Plaintiff's

5    Exhibit EE for Identification.)

6    BY MR. MASCARO:

7           Q.    Mr. Allen, I'm going to show you what has

8    been marked as Exhibit EE.  This is a document that

9    was part of some other exhibit in your file, and I

10   don't want to spend time trying to dig through it and

11   find it.  So I've just marked it again independently,

12   and it's been marked, as you see, in other

13   depositions.  If you could just identify that for me.

14          A.    Yes.  It's the Command Force subscriber

15   activity report.

16          Q.    And does that report indicate when the fire

17   was detected by the system installed by Command Force?

18          A.    No.

19          Q.    There is a time listed here for the date of

20   the fire of 11:06 and 19 seconds.  Do you see that

21   there?

22          A.    Correct.

23          Q.    Do you know what that represents?

24          A.    Yeah.  That's the time that the monitoring

25   company received the signal of the fire.

205

1    Q.    And do you know how much time passed from

2    the time the monitoring company received the signal of

3    the fire to the time that it notified the fire

4    department?

5    A.    Well, according to this report, it was a

6    little under two minutes, a minute 54 seconds.

7             MR. MEZZACAPPA:  Let me just object to

8             this line of questioning as there

9             has been prior testimony about the

10            monitoring company being an

11            outside agency.  You may -- I

12            allowed him to answer.  I'm just

13            objecting to this line of

14            questioning.

15            MR. MASCARO:  He's got it as

16            one of the conclusions in his

17            report.

18            MR. MEZZACAPPA:  I

19            understand.  I'm going to allow

20            him to answer.  I'm just noting

21            for the record that it's an

22            outside company that has been

23            produced.

24    BY MR. MASCARO:

25    Q.    Do you still maintain the same conclusion

ALLAN REPORTING SERVICE

206

1    as you sit here today, that the monitoring company

2    promptly notified the fire department of the fire

3    alarm?

4               MR. MEZZACAPPA:  Over objection, you

5               may answer.

6      A.    Yes, I do maintain the conclusion that the

7    alarm company promptly notified the fire department of

8    the alarm.

9            The second part of that sentence where it

10    says, "In accordance with the requirements of NFPA

11    72," I might temper a little bit, because they didn't

12    notify them within 90 seconds.  But they notified them

13    within, what, 114 seconds?

14               MR. MASCARO:  Let's take a break.

15           (Whereupon, a recess was taken.)

16    BY MR. MASCARO:

17      Q.    Just to follow up on your last answer, the

18    NFPA 72 provides that the notification should be made

19    within 90 seconds?

20               MR. MEZZACAPPA:  Note my objection.

21      A.    The '96 version of NFPA 72 explicitly in

22    one section in there -- I don't recall what section --

23    explicitly references 90 seconds for the alarm company

24    to retransmit the signal to the fire department.

25               MR. MASCARO:  I don't have any more

207

1                    questions for you.  Thank you.

2                          MR. MEZZACAPPA:  I just have

3                    a few, Mr. Allen.

4    CROSS-EXAMINATION BY MR. MEZZACAPPA:

5         Q.    Take a look at Exhibit O, which was the

6    first report from T.J. Klem.

7         A.    I have that report.  It may not be the

8    same.  It will have the same content.

9                          MR. MEZZACAPPA:  I'll show it to you.

10                         MR. MASCARO:  He's got the

11                   one marked as an exhibit.

12                         MR. MEZZACAPPA:  Okay.

13                   Thanks.

14   BY MR. MEZZACAPPA:

15        Q.    Did Mr. Klem and Mr. Folger come to a

16   conclusion about the time within which the alarm was

17   reported to the fire department in this report?

18        A.    Yes, they did.

19        Q.    And at what page did they come to that

20   conclusion?

21        A.    Page 7.

22        Q.    And please read to us, for the record, the

23   conclusion that Plaintiff's expert came to regarding

24   the timing of the notification to the central -- by

25   the central station alarm to the fire department.

208

1          MR. MASCARO:  I'm going to object to

2          the form.  The report speaks for

3          itself, but you can go ahead and

4          answer it.

5     A.    The statement is that the time to notify

6     the fire department seems reasonable, considering the

7     time of registration of the alarm by the dispatchers

8     on both ends of the reporting process.

9     Q.    Taking a look at Exhibit DD, the

10    photograph --

11    A.    Yes.

12    Q.    -- did Mr. Klem's -- looking at that in

13    conjunction with this question, did either one of

14    Mr. Klem's reports mention the fact that the window in

15    the room of fire origin was open?

16    A.    No.

17    Q.    Had there been a breeze that day or air

18    flowing through the room, could that, in your opinion,

19    with a reasonable degree of scientific certainty, have

20    affected the way in which the smoke from the fire left

21    the room and entered into the hallway?

22    A.    To a minor extent.

23    Q.    Do we know, absent having a videotape of

24    the way the fire progressed, whether the smoke left

25    the room and absolutely filled the lintels or the

209

1    spaces in between the post-and-beam construction or

2    could it be that the smoke traversed in some other

3    manner out of the room of fire origin and down the

4    hallway?

5        A.    I could not state with any degree of

6    certainty that the smoke traversed in any way other

7    than as I described previously.

8        Q.    And there might be other factors that

9    would -- In other words -- Withdrawn.

10            Had you had a videotape of this fire, you

11   might be able to see the progression of it, but that

12   has not been made available to you; is that correct?

13       A.    That's correct.

14       Q.    And Mr. Klem, the Plaintiff's expert, from

15   a review of his deposition testimony, was he present

16   during this fire, to your knowledge?

17       A.    No.

18       Q.    Was any human being present during the

19   progression of this fire?

20       A.    No.

21       Q.    Did you find from your entire review of all

22   the contents that you've been given as well the

23   depositions that you've read, that Command Force

24   violated any rules, regulations, or statutes,

25   including NFPA 72, in their installation of the smoke

ALLAN REPORTING SERVICE

210

1    detection system of this home?

2        A.    No, I did not.

3        Q.    And you had the opportunity to review the

4    two reports that Mr. Klem's company prepared.  The

5    first one is Exhibit O, and the second one -- I don't

6    remember the exhibit number at this time.

7            Did the second report of Mr. Klem in any

8    way state that the first report was to be ignored or

9    that it was being withdrawn?

10       A.    No, it did not.

11       Q.    In fact, Mr. Klem's report -- Mr. Klem's

12   second report ignores the conclusions that his company

13   found in the first report; is that correct?

14                    MR. MASCARO:  Object to the

15            form.

16            You can go ahead and answer it.

17       A.    I believe so.  And I even commented to that

18   in my report.  I said that Mr. Klem's second report in

19   some ways contradicts the first report.

20       Q.    And you didn't have available to you when

21   you wrote your report the information that the

22   attorneys from Morrison, Mahoney & Miller were the

23   ones that requisitioned the second supplemental

24   report; is that correct?

25       A.    That's correct.

ALLAN REPORTING SERVICE

211

1      Q.    I just need a few more minutes.

2            Is it possible, Doctor, that during the

3   progression of this fire some of the single-station

4   battery-operated smoke detectors were audible and

5   ringing throughout the house during the progression of

6   this fire?

7                  MR. MASCARO:  Object to the form.

8                  You can go ahead and answer it.

9      A.    Yes, it's possible.

10     Q.    And is it possible that some of them might

11  have actually been triggered or been ringing audibly

12  before the ones that were installed by Command Force

13  originally picked up this fire?

14     A.    That's possible, yes.

15     Q.    Is it your opinion, with a reasonable

16  degree of engineering certainty, that on the date of

17  this fire, the system installed by Command Force plus

18  the protections that existed before Command Force

19  installed their system, adequately protected the house

20  under the NFPA 72 and the building code of the State

21  of Connecticut?

22     A.    Yes, it is.

23     Q.    Did you learn from some of the deposition

24  testimony in this case and from some of the documents

25  that an unknown, unidentified builder did renovations

ALLAN REPORTING SERVICE

212

1    to and added smoke detectors to the house after

2    Mr. Matza's company had installed the three centrally-

3    monitored smoke detectors?

4         A.    Yes, I did.

5         Q.    So that on the date of the fire, the smoke

6    detectors placed by Mr. Matza's company were 1-of-3

7    sets of smoke detectors, if you will?  By that I'll

8    define it as the existing smoke detectors before

9    Mr. Matza was there, the ones that Matt Matza's

10   company installed, and the ones the unknown builder

11   installed after Mr. Matza's company?  They were all

12   present on the date of the fire, according to the

13   review of the file that you've been made available; is

14   that correct?

15        A.    That's correct.

16             MR. MASCARO:  Objection to the form.

17             You can answer it.

18   BY MR. MEZZACAPPA:

19        Q.    And as you sit here today, do you know

20   which of the numerous smoke detectors in that house

21   was the first of all of them to actually signal or

22   ring or send an alarm out of all of the ones

23   installed?

24        A.    No, I do not.

25             MR. MEZZACAPPA:  I have nothing

ALLAN REPORTING SERVICE

213

1     further. Thank you.

2 REDIRECT EXAMINATION BY MR. MASCARO:

3   Q. Just a couple quick follow-up.

4    To your knowledge, were there any single-

5 station smoke detectors in the lower level at the time

6 of the fire?

7   A. I don't know specifically, but I believe

8 there were two other single-station detectors -- I'm

9 sorry. In the basement?

10   Q. Yes.

11   A. Yes

12    MR. MASCARO: No further questions.

13    (Whereupon, the deposition was

14     concluded at 6:05 p.m.)

15  (Exhibits retained by Attorney Mascaro.)

16

17

18

19

20

21

22

23

24

25

ALLAN REPORTING SERVICE

214

1

2                                    _____

3                                    JOHN EDWARD ALLEN

4

5

6

7       STATE OF CONNECTICUT    :

8                               :  ss

9       COUNTY OF _____   :

10

11

12                  On the ____ day of _____, 2004,

13      before me, the undersigned Notary Public, personally

14      appeared JOHN EDWARD ALLEN to me known to be the

15      person who has subscribed to and executed the

16      foregoing deposition after having read and corrected

17      it in every particular desired, and acknowledged that

18      he executed the same as his free act and deed.

19

20

21                                    _____

22                                    Notary Public

23                                    My commission expires

24

25

ALLAN REPORTING SERVICE

215

1  STATE OF CONNECTICUT :
                        : ss
2  COUNTY OF NEW HAVEN  :

3          I, Christine M. Orts, a Notary Public, do

4  hereby certify:

5          That JOHN EDWARD ALLEN was by me duly sworn

6  in the within-entitled cause;

7          that said deposition was reported by me, a

8  Registered Professional Reporter, was thereafter

9  transcribed under my direction and is a true and

10  complete transcription of all testimony given by said

11  witness.

12          I further certify that I am not a relative,

13  counsel or attorney of any party, or interested,

14  financially or otherwise, in this action.

15          IN WITNESS WHEREOF, I have hereunto set my

16  hand and seal at Seymour, Connecticut this _12th_ day

17  of ___July___, 2004.

18

19

20  _____Christine M. Orts_____

21  Notary Public, LSR NO. 00166

22  My commission expires June 30, 2008

23

24

25

ALLAN REPORTING SERVICE

216

1

**I N D E X**

2                                                              <u>Page</u>

JOHN EDWARD ALLEN

3

Direct Examination by Mr. Mascaro                    4

4

Cross-Examination by Mr. Mezzacappa              207

5

Redirect by Mr. Mascaro                          213

6

7

8

<u>DEFENDANT'S EXHIBITS</u>

9

| <u>No.</u> | <u>Description</u> | <u>ID</u> |
|------|-------------|------|
| A | Four-page curriculum vitae | 21 |
| B | Seven-page packet of CED bills | 63 |
| C | *National Fire Alarm Code Handbook* | 70 |
| D | Four-page correspondence from Mr. Mezzacappa's office | 76 |
| E | Letter dated April 1, 2004 | 77 |
| F | Letter dated March 23, 2004 | 79 |
| G | Letter dated May 7, 2004 | 80 |
| H | Letter dated January 28, 2004 | 82 |
| I | Package of photocopies of photographs | 84 |
| J-M | Four packages of photocopies of photographs | 85 |
| N | Letter dated January 14, 2004 | 86 |
| O | Fire Protection Analysis Single-Family Dwelling, 34 Wildwood Drive, Wilton, Connecticut document | 89 |
| P | NIST news release | 92 |

ALLAN REPORTING SERVICE

217

| | | | |
|---|---|---|---|
| 1 | Q | Document entitled "Fire Investigative Analysis, 34 Wildwood Drive, Wilton, Connecticut" | 96 |
| 3 | R | Disclosure of Mr. Klem as an expert witness | 98 |
| 5 | S | Document entitled "Performance of Home Smoke Alarms Analysis of the Response of Several Available Technologies in Residential Fire Settings" | 100 |
| 8 | T | CED/Accident Analysis, Inc., case assignment sheet | 101 |
| | U | Handwritten notations, six pages | 105 |
| 10 | V | Document entitled "Fire Protection Analysis Single-Family Dwelling, 34 Wildwood Drive, Wilton, Connecticut" | 122 |
| 13 | W | Document entitled "Fire Investigative Analysis 34 Wildwood Drive, Wilton, CT" | 124 |
| 15 | X | Thomas Klem resume | 134 |
| 16 | Y | One-page handwritten document | 139 |
| 17 | Z | Two-page typewritten document | 145 |
| 18 | AA | Packet of documents | 146 |
| 19 | BB | Millennium Information Services, Inc., Automated Property System Maps document | 161 |
| 21 | CC | Mr. Allen's five-page 1/27/04 report | 163 |
| 22 | DD | Photograph | 195 |
| 23 | EE | One-page Command Force subscriber activity report | 204 |