UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GLENS FALLS INSURANCE COMPANY : | | CIVIL ACTION NO. 303 CV 1015 (DJS) |
| a/s/o HAROLD and LAUREN HEINZ | | |
| Plaintiff | | |
| | : | |
| against | : | |
| | : | |
| COMMAND FORCE SECURITY | : | SEPTEMBER 21, 2004 |
| SYSTEMS, INC. | | |
| Defendant | | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

### INTRODUCTION

This is a negligence (subrogation) action arising from a fire which occurred on July 23, 2001 at 34 Wildwood Drive, Wilton, Connecticut - the home of Harold and Lauren Heinz ("premises").  Prior to the fire the defendant, Command Force Security Systems, Inc. ("Command Force") had installed a centrally monitored fire detection system at the premises.  Centrally monitored means that in the event of a fire the fire detection system would notify a central monitoring station, which would then notify the local fire department.  In other words, even if no one were home at the time of a fire, the centrally monitored system would notify the fire department.  That the fire detection system was centrally monitored is a significant fact for this case because the centrally monitored system should have – but did not – provided adequate protection to the premises in the event of a fire when no one was home.  Indeed, the defendant was informed prior to the installation of the fire detection system that it was the homeowner's insurance company, the plaintiff in this case, for Harold and Lauren Heinz which requested the centrally monitored system.

The defendant has moved for summary judgment and that motion must be denied because there are numerous genuine issues of material fact regarding the adequacy of the fire detection system, the factors that the defendant considered and should have considered in designing this system, the location of the smoke detectors and the time taken to notify the fire department of the fire.   The defendant's entire argument is essentially an attack on the credibility of the plaintiff's liability expert.  This is clearly not a sufficient basis for summary judgment because credibility determinations are the province of the finder-of-fact, not the court on a summary judgment motion.

### STATEMENT OF FACTS

Harold and Lauren Heinz owned the premises and the plaintiff insured the premises.  Despite the presence of a centrally monitored fire detection system designed and installed by the defendant, the premises was so severely damaged by a fire on July 23, 2001 that it was torn down and a new home was built for Harold and Lauren Heinz. The plaintiff paid to or on behalf Harold and Lauren Heinz the amount $980,315.94. (Plaintiff's Damage Analysis attached as Exhibit 10).

### **Fire Investigation Report**

The Fire Investigation Report ("Fire Report") prepared by the Wilton Fire Marshal's Office provided that the fire occurred at the premises on July 23, 2001.  (Fire Report, attached as Exhibit 1).  The report further provided there was heavy fire damage to the room of origin – a bedroom on the lower level used by the son of Harold and Lauren Heinz - and moderate to heavy fire, heat and smoke damage to other areas of the house.  The fire department concluded that the fire began in a lower level bedroom and the burn patterns on the walls of the room and charring of the wood ceiling indicated that

the fire started at the bed.  The mattress and covering for the bed spring had been completely consumed.  (Fire Report, attached as Exhibit 1).

A Press Rrelease issued by the Wilton Fire Department stated that at 11:09 on July 23, 2001, the Wilton Police dispatcher received a report of a fire alarm at the premises and notified the Wilton Fire and Rescue Department.  Upon arrival, the fire fighters reported a working fire with heavy smoke throughout the structure and flames through a portion of the roof.  (Press Release, attached as Exhibit 2).  Thus, when the first fire engine arrived there was already a working fire with heavy smoke through throughout the structure and flames through a portion of the roof.  This occurred despite the fact that the fire occurred on a shift with six fire fighters which allowed for immediate response of Wilton's tanker truck from fire headquarters.  (Press Release, attached as Exhibit 2).  The Press Release further provided that "this was especially critical since the fire occurred in a "non-hydrant area."  (Press Release, attached as Exhibit 2).

A chief of the fire department who was at the scene of the fire ordered a secondary source of water be established by utilizing a "dry hydrant" at Kent Pond on Linden Tree Road.  (A dry hydrant is a pipe that runs from the street underground to a lake, pond, etc. that allows an engine to draft water from a static body of water.  (Press Release, attached as Exhibit 2).

Press reports regarding the fire also emphasized the factors identified in the press release.  Specifically, an article from a newspaper entitled *The Hour* noted that water to combat the fire was half a mile away.  To get water to the scene, hoses had to be placed from Kent Pond, approximately half a mile away.  The driveway to the premises was 3/10 of a mile long.  A fire department spokesman is quoted in the article as noting that

"every 1,200 feet the fire department needed another tanker to pump water", stated the fire department's spokesman. (Article from *The Hour,* attached as Exhibit 3)  An article from the Wilton Villager on July 26, 2001, noted that the firefighters had to contend with 90 degree heat, a fire in a non-hydrant area and communication problems as different radio frequencies used by assisting departments.  (Article from Wilton Villager, Attached as Exhibit 4).  An article from a newspaper entitled, *The Bulletin*, on July 26, 2001, noted that the fire was located far from any hydrants.  (Article from *The Bulletin*, Attached as Exhibit 5).

Thus, the Fire Report and the Press Release establish that at the time the first fire department personnel arrived, the fire had already progressed to the point of heavy smoke throughout the premises and flames through the roof.  Additionally, the premises was located in a "non-hydrant" area which increased the amount of time it took to get water on the fire.

### The Subscriber Activity Report

The Subscriber Activity Report is a document generated by the central monitoring station and purports to list the time that the central monitoring stations was notified of the fire and when it notified Mr. Heinz and then the fire department of the fire.  (Matza Deposition, pg. 73, attached as Exhibit M to defendant's memorandum,) (Subscriber Report, attached as Exhibit 6 to this memorandum).  According to the Subscriber Activity Report, the fire was detected on 11:06 a.m. and 19 seconds.  At 11:06 and 26 seconds the central monitoring station left a message for Mr. Heinz.  At 11:07 and 8 seconds another message was left at the premises.  The Wilton Fire Department was first contacted at 11:08 and 13 seconds, almost two minutes after the fire was first detected.  Press Rrelease

issued by the Wilton Fire Department stated that at 11:09 on July 23, 2001, the Wilton Police dispatcher received a report of a fire, approximately 47 seconds later than listed in the Subscriber Activity Report.

**Testimony of Harold Heinz:**

Harold Heinz testified at his deposition that the premises was built in 1967 or 1968. He further testified that he and his wife purchased the premises in either 1996 or 1997 and after they purchased the premises they had extensive remodeling work done to the premises. (Depo. of Harold Heinz, p. 15-16; attached as Exhibit K to the defendant's memorandum). One of the issues raised by the defendant is when the remodeling work was done. Mr. Heinz was uncertain as to when the remodeling work was completed and his testimony reflected this uncertainty. He testified that they had the house remodeled and that work started in late 1999 and finished sometime in late 2000. (Depo. of Harold Heinz, p. 15-16, Exhibit K). He testified that "we added the bedroom, the family room and the garage and the second story garage, that was done between the end of 1999 or the beginning of 2000 until – you have the records for the occupancy of May 2002." (Depo. of Harold Heinz, p 102-03, Exhibit K). Mr. Heinz contacted the defendant Command Force about a fire detection and security system because his homeowner's insurance carrier – the plaintiff in this case – required it because of the amount of insurance it issued to the plaintiff. This fact relates to the issue of when the remodeling work was done. More specifically, as to when he was asked to have a fire detection and security system installed, Mr. Heinz testified that "It had to have happened in 1999, 2000, when we remodeled the house and increased the insurance protection on the house." (Depo. of Harold Heinz, p. 18, Exhibit K).

The issue of when the remodeling work was done is not dispositive of the issues raised by this case.    Nonetheless, when the remodeling work was completed can be answered with some certainty.    Mr. Heinz was uncertain as to the exact dates the remodeling was commenced and completed, though he did testify that he increased his insurance coverage because of the remodeling work and the increase in coverage promted the plaintiff to request the installation of a centrally monitored fire detection system. There is additional evidence on this issue.    More specifically, a Certificate of Occupancy was issued by the Town of Wilton on May 18, 2000.    This Certificate states that a permit was issued on August 19, 1999, and that the "new 2 car garage 24 'x 28' and great room 18' x 30', converted existing garage into 2 bedrooms and covered porch 13' x 4', converted screen porch to music room, and converted 2 bedrooms into 1 master bedroom." (Certificate attached as Exhibit 7).    Pursuant to Connecticut General Statutes Section 29-265, the issuance of the Certificate of Occupancy means that the buildings or structures identified in the Certificate can be occupied or used.    Connecticut General Statutes Section 29-265 provides, in relevant part, that "  .  .  no building or structure erected or altered an any municipality after October 1, 1970, shall be occupied or used in whole or in part, until a certificate of occupancy has been issued."    Thus, the remodeling work identified in the Certificate of Occupancy was completed by May 18, 2000.

As to the construction and design of the premises, Mr. Heinz testified that it was "a post and beam house . . . the house has huge rafters in it, like 10, 12 inches in depth . . . the house had beams like one running inside every 10 feet or so." (Depo. of Harold Heinz, p. 95, Exhibit K).    There wrere beams or rafters throughout the premises, including the hallways.    The design of the premises is significant because the plaintiff's

expert – and the defendant's expert (as will be discussed later in this memorandum) - testified that the design of the premises impacted how quickly the fire detection system detected the fire.

Lauren Heinz signed a contract with the defendant dated February 14, 2000, and the installation was done by the defendant sometime shortly thereafter. The fire detection system installed by the defendant was a centrally monitored system. (Depo. of Harold Heinz, p. 28, Exhibit K).

### Testimony of Defendant, Matthew Matza

Matthew Matza, President of the defendant, testified at his deposition that Command Force was contacted either by Mr. or Mrs. Heinz regarding the installation of a fire detection and security system at the premises. (Matza Deposition, pg. 22; attached as Exhibit M to the defendant's memorandum). Mr. Matza met with Harold Heinz at the premises and discussed what his "requirements" were for the system. Mr. Matza testified that Mr. Heinz informed him that he was having a system installed only because of the insurance company which insured the premises. (Matza Deposition, pg. 26, Exhibit M) Mr. Heinz told Mr. Matza that he was trying to satisfy his insurance company's request. (Matza Deposition, pg. 30, Exhibit M) The defendant notes often in its papers that Harold and Lauren Heinz requested that the defendant to install a fire detection system because of the requirements of its homeowner's insurance company (the plaintiff) as if this fact supports the defendant's argument. It does not. Indeed, this fact supports the plaintiff. The defendant knew that Harold and Lauren Heinz requested a centrally monitored fire detection system because of their homeowner's insurance – in other words, to provide greater protection to the premises in the event of the fire. Knowing this

(and even if it did not know this) the defendant should have considered all factors which impacted the ability of the centrally monitored system to detect a fire.  As is discussed below, the defendant failed to consider many relevant factors.

As to how the system was designed, Mr. Matza claimed that we "walked through the house and designed it together."  (Matza Deposition, pg. 26, Exhibit M)  Mr. Matza testified that he designed a fairly simple burglar alarm and fire alarm system for Mr. Heinz.  (Matza Deposition, pg. 28, Exhibit M)  Mr. Matza testified that Mr. Heinz wasn't looking for the most modern or advanced system.  Mr. Matza did not feel that the "parameters" set out by Mr. Heinz were inadequate and if he did think it was inadequate he would have said so.  (Matza Deposition, pg. 30, Exhibit M)

Mr. Matza testified that Command Force installed two centrally monitored smoke detectors on the upper level of the premises and one centrally monitored smoke detector placed on the lower level of the home.  The smoke detector in the lower level was placed in a hallway at the foot of the steps..  (Matza Deposition, pp. 33-34, Exhibit M)  The smoke detectors installed by the defendant were wireless devices, meaning that they transmitted a signal to a receiver at the main control panel.  As to how the centrally monitored system was to work in the event of a fire, Mr. Matza testified that when the smoke detectors detected smoke the central station would get a fire alarm signal and would call the fire department.  (Matza Deposition, pg. 41, Exhibit M)  The central station would first call the premises and then, if there was no answer, would call the fire department.  (Matza Deposition, pp. 41-42, Exhibit M)

Mr. Matza described the premises as an "A-frame ranch, almost like an Aspen-type of house."  (Matza Deposition, pg. 44, Exhibit M)  Mr. Matza testified that the

design of a house impacts the design of the fire detection system. (Matza Deposition, pg. 83)  Mr. Matza testified that a beam, such as the beams located in the premises, could effect how quickly the fire detection system detects smoke.  (Matza Deposition, pg. 84, Exhibit M)  Specifically, a beam could slow the smoke from getting to a smoke detector. (Matza Deposition, pg. 84, Exhibit M)  Despite this knowledge and the design of the premises, Mr. Matza had no specific discussion with Mr. Heinz regarding the beams in the premises.

What is revealing is the factors that Mr. Matza did not consider when designing the fire detection system at the premises.  He did not consider at all the type of fire department the Town of Wilton had.  (Matza Deposition, pg. 53, Exhibit M)  He did not even know whether the Wilton Fire Department was volunteer or professional.  (Matza Deposition, pgs. 53-54, Exhibit M)  Significantly, he did not take into consideration where the closest source of water was to the premises in the event of a fire.  (Matza Deposition, pg. 54, Exhibit M).  As noted in the Fire Report, this was an important factor in how quickly the fire department got water onto the fire.

ARGUMENT

I.    Summary Judgment Standard:

Summary judgment is appropriate only when the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." American Cas. Co. of Reading, PA v. Nordic Leasing, Inc. 42 F.3d 725, 728 (2nd Cir.

1994.)  To defeat a motion to summary judgment, a plaintiff must "come forward with enough evidence to support a jury verdict in his favor, and the motion will not be defeated merely . . . on the basis of conjecture or surmise."  Trans Sport, Inc. v. Starter Sportswear. Inc. 964 F.2d 186, 188 (2nd Cir).  A party opposing a motion for summary judgment "may not rest on the pleadings but must further set forth specific facts in the affidavits, depositions, answers to interrogatories, or admissions showing a genuine issue exists for trial."  Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2nd Cir. 1996.)  "In order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor," and "the non-moving party may not rely on conclusory allegations or unsubstantiated speculation."  Byrnie v. Town of Cromwell, 243 F. 3d 93, 101 (2nd Cir. 2001.)

As the U.S. Supreme Court has noted, in ruling on a motion for summary judgment, a court must respect the province of the jury.  A court, therefore, may not try issues of fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 202, 106 S. Ct. 2505 (1986).  It is well established that credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.  Anderson, 477 U.S. at 255.  Thus, a trial court's task is carefully limited to discerning whether there are any genuine issues of material facts to be tried, not to decide them.  a court's duty, in short, is confined to issued finding – not issue resolution.  Gallo v. Prudential Residential Services, 22 F. 3d 1219, 1224 (2nd Cir. 1994).

The defendant does not cite any case law – other than cases reciting the standard of review - in support of its motion for summary judgment.  It does not because it cannot.  Indeed, the only cases in which summary judgment has been granted for a defendant

alarm system designer – installer are cases predicated on either exculpatory clauses or waiver of subrogation clauses in the applicable contract.  <u>Metropolitan Property and Casualty Insurance Co. v. Budd Morgan Central Station Alarm Co., Inc.</u>, 95 F. Supp. 2d 118; 2000 U.S. Dist. LEXIS 7682 (Summary judgment granted based on exculpatory clause in contract);  <u>Champion Home Builders Co. v. ADT Security Services, Inc. et al</u>, 179 F. Supp. 2d 16; 2001 U.S. Dist LEXIS 21375  (Summary judgment granted based on exculpatory clause in contract)  <u>Albany Insurance Co. v. United Alarm Services et al</u>, 194 F. Supp. 2d 87; 2002 U.S. Dist LEXIS 6072.  (Summary judgment granted based on waiver of subrogation clause).

**II.    THERE ARE GENUINE ISSUES OF MATERIAL FACT AND THE MOTION FOR SUMMARY JUDGMENT MUST BE DENIED.**

**A.    There Is Substantial Evidence, Including The Testimony Of The Defendant And Defendant's Expert, That The Defendant Was Negligent And Summary Judgment Therefore, Cannot Be Granted.**

As noted above, Mathew Matza, President of Command Force, testified that the design of a premises impacts the design of a fire detection system.  Furthermore, Mr. Matza testified that the design of the subject premises at 34 Wildwood Drive in Wilton, Connecticut – the "post-and-beam" or "Aspen" design could impact how quickly the fire detection system installed by Command Force detected a fire.  Yet, he had no discussions with Mr. Heinz regarding the impact of the beams on how quickly the fire detection system would detect a fire.  Mr. Matza attempts to excuse this failure by asserting that he and Mr. Heinz designed the system together.  (Deposition of Mathew Matza, Exhibit M to defendant's memorandum; Defendant's responses to interrogatories, attached as Exhibit 8 to this memorandum).  This assertion is nonsense.  No evidence has been produced that Mr. Heinz had any expertise in the design of fire detection systems.

Regardless of whether Mr. Heinz said that he wanted only to satisfy the request of his homeowner's insurance carrier, this does not release the defendant from fulfilling its duty to provide an adequate fire detection system. Indeed, that Mr. Matza was informed that the homeowner's insurance provider requested a centrally monitored system put him on notice that the system he designed and installed needed to provide adequate protection not only for the occupants, but for the property as well.

The testimony of the defendant's expert also demonstrates that there are genuine issues of material fact.

**Testimony of Defendant's Expert:**

The defendant's expert testified, in response to the question of had the defendant installed a centrally monitored smoke detector in the bedroom where the fire originated, would it have made a difference in the course of the fire:

> Given the hypothetical situation that there was a detector in the bedroom where the fire originated and that detector was tied in to the central monitoring station, then, **obviously**, (emphasis added) the time line would be shorter for this detector to activate than a detector that's outside the room. So the signal to the central station would have gone earlier to the fire department. (Deposition of defendant's expert, p. 192; attached as Exhibit N to defendant's memorandum).

Regarding the design of the Heinz house – specifically, the impact of the beams on the amount of time it would take the smoke detectors to detect the fire – the defendant's expert testified that:

> When a fire develops within a room, the majority of the products of combustion are going to rise to the ceiling level and fill the room from the top down, akin to what has been described as an inverted bathtub, the same way water fills a bathtub. If we turn that upside down, that's the same way smoke fills a room, except for the fact that it's not quite as dense and uniform as water and smoke. You know, some smoke may exit the room before it gets to the ceiling, but in

general, the bulk of the smoke and fire products are going to fill the room from the ceiling down.

When it reaches the level of an obstruction, such as an open door soffit in the room, then the smoke will spill around the soffit and fill the next space that's there.  If there's a flat ceiling, it will spread across the ceiling until it runs into an additional obstruction , be it a wall or beam or whatever, and fill that area until it reaches the next level of which it can spill over that obstruction.  (Deposition of defendant's expert, p. 200; attached as Exhibit N to defendant's memorandum).

In other words, the smoke from the fire which started at the Heinz house on July 23, 2001 had to collect and travel around beam in the room of origin and in the hallway where the closest centrally monitored detector was located.  The sole centrally monitored detector on the lower level was located at the base of a stairway in a hallway.

Attached to this memorandum as Exhibit 9 numerous photographs which show not only the extensive damage to the premises, but the "post-and-beam" design of the house.  (Photographs attached as Exhibit 9).

**B.    The Defendant Is Incorrect When It Asserts That This Action Is Predicated Solely On The Allegation That The Defendant Violated Specific Rules, Regulations, Codes or Statutes.**

The defendant argues in the memorandum supporting its motion for summary judgment that "the crux of plaintiff's complaint is that the defendant . . . failed to adhere to the rules, regulations, directives, standards, codes and/or laws established by local, state and/or national agencies and/or by professionals within the fire prevention industry."  (Defendant's memorandum, p. 8).  While this is certainly a part of the plaintiff's allegations against the defendant, the plaintiff has alleged more.

The relevant allegations in the plaintiff's complaint are as follows:

On or about February 4, 2000 the defendant, Command Force, entered into a contract with Harold and Lauren

Heinz wherein Command Force agreed to provide a security system, including smoke detectors and central station monitoring, at the premises.

On or about July 23, 2001, a fire broke out in the premises. The fire originated in a bedroom in the lower level of the premises. The premises and the contents therein were severely damaged by the fire. A substantial portion of the damage to the premises and to the contents of the premises was caused by the negligence and carelessness of the defendant, Command Force. Had the defendant, Command Force, not been negligent in one or more of the ways set forth below, then the fire in the premises would have been detected earlier than it was, the fire department would have been notified and responded sooner, the fire would have been confined to a smaller area and the damage to the premises and its contents would have been reduced.

The loss and damage to the premises and its contents were caused by the negligence and omissions of the defendant, Command Force, in one or more of the following ways, in that it:

a.      FAILED to advise the plaintiff's insureds, prior to July 23, 2001, of the proper design and/or installation of a fire detection/alarm system necessary to provide early detection and notification of any fire within the premises, although it could have and should have done so;

b.      FAILED to design a fire detection/alarm system sufficient to provide the necessary early detection and notification of any fire within the premises;

c.      FAILED to install a fire detection/alarm system sufficient to provide the necessary early detection and notification of any fire within the premises;

d.      FAILED to maintain a fire detection/alarm system sufficient to provide the necessary early detection and notification of any fire within the premises;

e.      FAILED to recognize deficiencies in the location/arrangement of the fire detection/alarm system that it had installed within the premises;

f.      FAILED to rectify deficiencies in the location/arrangement of the fire detection/alarm system that it had installed within the premises;

g.    FAILED to contact the fire department immediately upon notification of a fire alarm coming from the premises, although it could have and should have done so;

h.    FAILED to adhere to the rules, regulations, directives, standards, codes and/or laws established by local, state and/or national agencies and/or by professionals within the fire prevention industry.

i.    FAILED to place a smoke/fire detector in all of the bedrooms of the premises;

j.    FAILED to adequately consider and evaluate the design of the premises when installing and locating the smoke detectors at the premises;

k.    FAILED to install a smoke detector just outside of the bedroom area in the lower level of the residence.

l.    FAILED to train, instruct or supervise its employees on the appropriate arrangement and location of smoke detectors.

(Plaintiff's Complaint; attached as exhibit A to the defendant's memorandum).    Only subparagraph (h) alleges that the defendant violated rules, regulations, directives, standards, codes and/or laws established by local, state and/or national agencies and/or by professionals within the fire prevention industry.  This is a negligence action in which the issue is the same as in all negligence actions; did the defendant violate its duty to the plaintiff (in this case the plaintiff's insureds).

**C.    The Second Report Prepared By Plaintiff's Expert Is Reliable And The Opinions Contained Therein Are Admissible.**

**PLAINTIFF'S EXPERT, THOMAS KLEM**

The defendant argues in its Motion for Summary Judgment and in its Motion to Preclude Expert Testimony that the second report prepared by Thomas Klem of T. J. Klem and Associates is inadmissible.  The defendant essentially attacks the credibility of the plaintiff's expert, Thomas Klem.  This attack is clearly insufficient for the granting of

summary judgment for two reasons: (1) Credibility assessments are the province of the jury and not the court on a Motion for Summary Judgment; and (2) The defendant cites and relies on only a small portion of Mr. Klem's deposition testimony and reports in support of its Motion for Summary Judgment. Additionally, the defendant argues briefly that the second report prepared by Mr. Klem is inadmissible pursuant to Daubert v. Merrill Dow Pharms., 509 U.S. 579, 113 S. Ct. 2786 (1993) and State v. Porter, 698 A.2d 238 (1997). This is an inappropriate argument for summary judgment because whether an expert's proffered opinions are admissible pursuant to Daubert v. Merrill Dow Pharms., 509 U.S. 579, 113 S. Ct. 2786 (1993) and State v. Porter, 698 A.2d 238 (1997)can only be decided after an evidentiary hearing.

The opinions of Mr. Klem are contained in his reports (Exhibits G and H to defendant's memorandum) and his disclosure as an expert (Exhibit F to defendant's memorandum). In the second report prepared by T.J. Klem and Associates, it is specifically noted that T.J. Klem and Associates was asked to supplement its fire investigative analysis regarding the fire at the Heinz house. This report specifically states, "this additional analysis assesses the adequacy of the structure's installed fire detection/alarm system (which included alarm monitoring) in providing early detection of a fire, notification to the monitoring company, timely notification of the fire department and the system's ability to achieve life safety of the occupants and to limit fire damage to the home." Mr. Klem further states in his report that "considering the potential threat to life safety within the home, sound fire protection engineering judgment dictates that this home should have installed an equivalent level of fire protection throughout all sleeping areas of the home. The lower level bedrooms did not contain smoke detectors, but they

should have. Further, due to the ceiling being within the area of fire origin, two detectors would have provided the best design of the fire alarm system for this area (if properly placed one detector might have been acceptable)." (Exhibits H to defendant's memorandum).

Thus, the second report prepared by Mr. Klem, plaintiff's expert, does not contradict the first report, as is argued by the defendant in its motions. Rather, the second report was a more complete and thorough analysis directed specifically at the adequacy of the fire detection system installed by the defendant. The first report was a cause and origin investigation and the references to the fire detection system in the first report were not the final word or a detailed analysis of that system. Thus, the defendant's argument that summary judgment should be granted or Mr. Klem's testimony precluded because the second report contradicts the first report is without merit.

The record establishes that Mr. Klem has excellent credentials. Mr. Klem testified that he was employed with the NFPA as a Chief Fire Investigator for 12 years and that his duties included investigating major fire occurrences for the NFPA and developing investigative reports regarding those fires. (Depo. of Thomas Klem, 3/16/04, p. 8; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment). Mr. Klem has testified at trial at least 6 times and has been deposed approximately 45 times. (Depo. of Thomas Klem, 3/16/04, p. 9-10; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment). He has also testified before Congressional committees twice; once regarding a major fire in a high rise buildings, and the other occasion regarding mobile home fire safety standards being considered by Congress. (Depo. of Thomas Klem, 3/16/04, p. 11;

attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).   Mr. Klem developed an investigative protocol for electrical investigations when he was with the United States Fire Administration and this protocol was adopted by the NFPA.  (Depo. of Thomas Klem, 3/16/04, p. 27; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).

Mr. Klem was retained by the plaintiff one or two days after the fire.  (Depo. of Thomas Klem, 3/16/04, p. 32; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).   He was originally retained to conduct a cause and origin investigation of the fire at the premises.  (Depo. of Thomas Klem, 3/16/04, p. 34; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).   The initial report regarding the fire at the premises was authored by an employee of Mr. Klem,  and reviewed, edited, approved and issued by Mr. Klem.  (Depo. of Thomas Klem, 3/16/04, p. 62 and 67-69, attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).  Mr. Klem was at the premises in October of 2001, took photographs, and did a complete walk-through of the premises.  (Depo. of Thomas Klem, 3/16/04, pp. 80; 88, attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).

Mr. Klem authored the second report.  (Depo. of Thomas Klem, 3/16/04, p. 62; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).  The second report was done after the plaintiff requested (through its attorney) a more in-depth evaluation of the fire and the fire detection system installed at the premises.  (Depo. of Thomas Klem, 3/16/04, p. 64-5; attached as Exhibit I to the

defendant's Memorandum of Law in Support of Motion for Summary Judgment). More specifically, an adjuster, Jake Mollenkopf, affiliated with the plaintiff was perplexed at the severity of the loss at the premises despite the existence of a centrally monitored fire detection system. (Depo. of Thomas Klem, 3/16/04, p. 72; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment). Neither the adjuster not anyone else ever said or suggested to Mr. Klem that the plaintiff wanted to pursue a third party action. (Depo. of Thomas Klem, 3/16/04, p. 77; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment). On the second day of his deposition Mr. Klem again addressed the issue of why he prepared a second report:

> . . . based on my additional review of the fire incident and the additional review that subsequently happened of applicable code standards, regulations of the State of Connecticut and engineering practices to opine as to whether or not the smoke detection system that was installed within the premises was installed properly, adequately, and whether or not – if it was not installed properly, had it been installed as guided by appropriate standards, whether or not it made a difference in the outcome of the fire. (Depo. of Thomas Klem, 5/6/04, p. 165; attached as Exhibit J to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).

Mr. Klem testified that the purpose of smoke detector, pursuant to the NFPA, Life Safety Code, and Fire Alarm Code is for life safety and property protection. (Depo. of Thomas Klem, 3/16/04, p. 90-1; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment). In response to the question of whether the NFPA makes any reference to property protection, Mr. Klem testified as follows:

> I believe I cited in my second report that there are various sections of the code that refer to that. And certainly from a

fire protection engineering standpoint, a user of the code understands that initially life safety objectives are achieved, but there's certain property implications that are either cited or interpreted by engineering judgment. And depending on the complexity of the fire detection system arrangement, certainly property protection is strongly implied. (Depo. of Thomas Klem, 3/16/04, p. 91; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).

In response to a question about the impact the renovations at the premises had on his opinions in the second report, Mr. Klem testified that "Well the conclusions that I make in the report, the analysis takes two prongs: One within the renovations and one independent of the renovations. And from an analysis standpoint, both are relevant topics for discussion, but the conclusions are the same." (Depo. of Thomas Klem, 3/16/04, p. 105; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).

When asked about the statement – "the building contained a fire detection alarm system (with smoke detectors positioned about the home according to national standards at the time of their installation) that was operable at the time of the incident . . " - in the first report, Mr. Klem testified he agreed with that statement based on the level of assessment and research done at the time the report was written and submitted. (Depo. of Thomas Klem, 3/16/04, p. 117; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).

Mr. Klem was asked about the Connecticut State Building Code and its requirements. The Code provides that when alterations or additions requiring a permit occur (such as the work done on the Heinz premises) or when one or more sleeping rooms are added or created an existing dwelling, the entire building shall be provided with smoke detectors as required in new buildings (smoke detector in every bedroom).

(Depo. of Thomas Klem, 3/16/04, p. 127; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).

Mr. Klem testified that he used various computer fire models but none of these models were used in his final conclusions. (Depo. of Thomas Klem, 3/16/04, p. 128; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment).

The smoke detector closest to the room of fire origin was eleven feet from the doorway to the room and another 12 feet to the location of fire origin. (Depo. of Thomas Klem, 5/6/04, p. 200; attached as Exhibit I to the defendant's Memorandum of Law in Support of Motion for Summary Judgment). The required response time under the NFPA Section 72 for a central monitoring station to contact a fire department is 90 seconds. (Depo. of Thomas Klem, 5/6/04, p. 218; attached as Exhibit J to the defendant's Memorandum of Law in Support of Motion for Summary Judgment). The central monitoring station, chosen by the defendant, clearly violated this provision of the NFPA because it took more than 90 seconds to contact the fire department. Thus, plaintiff has established that the defendant violated the NFPA.

**The Testimony of Thomas Klem Satisfies The Standard Set Forth In <u>Daubert v. Merrill Dow Pharms.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993)**

The defendant argues that Mr. Klem's testimony is inadmissible pursuant to <u>Daubert v. Merrill Dow Pharms.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993). Under this standard, the trial court is required to act as "gatekeeper" and scrutinize professional expert testimony. As gatekeeper, "the judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." See e.g. <u>Allison v. Meghan</u>

Medical Corp, 184 F.3d 1300, 1311-12 (11th Cir. 1999).   A trial judge is to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue."  Daubert, 509 U.S. at 592-93, 113 S. Ct. at 2796; Porter, 241 Conn at 64, 698 A.2d at 744.

Defendant's argument that Mr. Klem's testimony must be precluded pursuant to Daubert v. Merrill Dow Pharms., 509 U.S. 579, 113 S. Ct. 2786 (1993) must fail.  First, this argument requires an evidentiary hearing and cannot be decided on a motion for summary judgment.  Second, that Mr. Klem has excellent credentials and experience in fire analysis is indisputable.  Third, the analysis and examination conducted by Mr. Klem and his employees satisfy the standards set forth in *Daubert*.  Indeed, the defendant's own expert agrees with Mr. Klem's most significant opinions; that the design of the premises impacted how quickly the fire detection system detected the fire, and a centrally monitored detector in the room of fire origin would have detected the fire sooner.

**CONCLUSION**

Summary judgment must be denied because there are genuine issues of material fact to be decided by the finder-of-fact, not the Court on a summary judgment motion. This is a negligence action and summary judgment is inappropriate in such actions because of the nature of the questions to be decided in a negligence action; for example, the credibility of all of the witnesses.  The defendant knew that the centrally monitored fire detection system it installed was requested by the homeowner's insurance carrier – in other words, to protect the property, not just the occupants.  There were numerous factors – the location of the closest water supply, type of fire department, and design of the

premises, which the defendant failed to consider in designing the system. The arguments made by the defendant as to the admissibility of the testimony of Mr. Klem are arguments addressing the weight to be given the testimony and the credibility of Mr. Klem. Thus, the arguments are not a basis for summary judgment; rather they are arguments to be made to a jury.

The defendant repeatedly asserts that there was no requirement by statute or any other standard that a "centrally monitored" detector be installed in the room of fire origin. While this is correct, it is an incomplete argument. The only type of detectors installed by the defendant were centrally monitored. Thus, it is logical to conclude that had the defendant decided to install a detector in the room of fire origin, it would have been centrally monitored. The defendant should have installed such a detector in the room of fire origin, a bedroom. given the design of the house and the locations of the closest water source available to fight a fire.

Based on the foregoing, the defendant's motion for summary judgment must be denied.

THE PLAINTIFF,
GLENS FALLS INSURANCE COMPANY
a/s/o HAROLD and LAUREN HEINZ


By ___/s/ Joseph E. Mascaro_____
Joseph E. Mascaro, Esq. – CT 12736
Morrison Mahoney LLP
One Constitution Plaza, 10th Floor
Hartford, CT 06103
(860) 616-4441
(860) 541-4878
jmascaro@morrisonmahoney.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was mailed to the following parties of record postage prepaid this 21st   day of September, 2004, as follows:

Attorney Michael Mezzacappa
Kaufman, Borgeest & Ryan, LLP
200 Summit Lake Drive
Valhalla, NY 10595

/s/ Joseph E. Mascaro
Joseph E. Mascaro